[ORAL ARGUMENT NOT YET SCHEDULED]
**Nos. 20-5350, 20-5351 (consolidated)**

———————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————

POMONA VALLEY HOSPITAL MEDICAL CENTER,

Plaintiff-Appellee/Cross-Appellant,

v.

XAVIER BECERRA, Secretary, United States
Department of Health and Human Services,

Defendant-Appellant/Cross-Appellee.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

**BRIEF FOR APPELLANT/CROSS-APPELLEE XAVIER BECERRA**
———————————————

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

MARK B. STERN
STEPHANIE R. MARCUS
  (202) 514-1633
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530-0001*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Counsel for the Department of Justice certify the following:

A. <u>Parties and Amici</u>.

Pomona Valley Hospital Medical Center was the plaintiff before the district court and appears as appellee/cross-appellant before this Court.

Alex M. Azar II, in his official capacity as Secretary of the U.S. Department of Health and Human Services (Secretary), was the defendant before the district court. Xavier Becerra, the current Secretary of HHS, has been automatically substituted pursuant to Fed. R. App. P. 43(c)(2) as appellant/cross-appellee in Case Nos. 20-5350 and 20-5351 before this Court.

No intervenors or amici appeared in the district court proceedings.

B. <u>Ruling Under Review</u>.

The ruling under review is the September 30, 2020 final order and memorandum opinion of the district court (Jackson, J.), in *Pomona Valley Hosp. Med. Ctr. v. Azar*, D.D.C. No. 18-2763, 2020 WL 5816486 (D.D.C. Sept. 30, 2020).

C. <u>Related Cases</u>.

This case has not previously been before this Court. Counsel are not aware of any currently pending related cases in this Court or in any other court in the District of Columbia.

Respectfully submitted,

MARK B. STERN
(202) 514-5089
 s/Stephanie R. Marcus
STEPHANIE R. MARCUS
(202) 514-1633
   Attorneys, Appellate Staff
   Civil Division
   U.S. Department of Justice
   950 Pennsylvania Ave., NW
   Washington, DC  20530

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND
RELATED CASES

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ....................................................................... iii

GLOSSARY

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION ......................................................................1

STATEMENT OF THE ISSUE .....................................................................1

STATUTES AND REGULATIONS INVOLVED ......................................2

STATEMENT OF THE CASE......................................................................2

    A.    Statutory and Regulatory Framework ...........................................2

        1.  The Medicare Statute DSH Provision.............................2

        2.  2010 Final Rule ...............................................................7

            a.  Regulatory Background and *Baystate* Decision .......................7

            b.  2010 Rulemaking ......................................................9

    B.    The Present Litigation .......................................................11

SUMMARY OF ARGUMENT .................................................................17

STANDARD OF REVIEW .......................................................................21

ARGUMENT:

THE BOARD'S DECISION UPHOLDING THE SECRETARY'S
CALCULATION OF THE CHALLENGED MEDICARE
FRACTIONS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE ............21

    A.    The District Court Erred By Failing To Consider or
         Afford Deference to the 2010 Final Rule When It
         Reviewed The Board's Decision .........................................................22

    B.    The District Court Further Erred By Shifting the
         Burden of Production to the Secretary .................................................33

CONCLUSION .....................................................................................................40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                         **Page(s)**

*Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*,
  987 F.2d 821 (D.C. Cir. 1993) ........................................................16, 17

*Baystate Med. Ctr. v. Leavitt*,
  545 F. Supp. 2d 20 (D.D.C.), *amended in part*,
  587 F. Supp. 2d 37 (D.D.C. 2008) ................................. 4, 8, 9, 16, 19, 30, 31, 34

*Capital Cities Cable, Inc. v. Crisp*,
  467 U.S. 691 (1984) ................................................................. 24

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .............................................................. 25, 29

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
  458 U.S. 141 (1982) .................................................................24

*Gilvin v. Fire*,
  259 F.3d 749 (D.C. Cir. 2001) ................................................... 21

*Grossmont Hosp. Corp. v. Burwell*,
  797 F.3d 1079 (D.C. Cir. 2015) ................................................. 21

*Methodist Hosp. v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1994) ............................................ 24, 25, 30

*Mt. Diablo Hosp. v. Shalala*,
  3 F.3d 1226 (9th Cir. 1993) .................................................... 30

*Tenet HealthSystems HealthCorp. v. Thompson*,
  254 F.3d 238 (D.C. Cir. 2001) ............................................... 33, 34


**Statutes:**

Administrative Procedure Act:
  5 U.S.C. 706(2)(A) ................................................................. 21
  5 U.S.C. 706(2)(E) ................................................................. 21

Social Security Act:
  42 U.S.C. 426(a) ..................................................................... 2
  42 U.S.C. 426(b) ..................................................................... 2

42 U.S.C. 1395 *et seq.*............................................................................ 2
42 U.S.C. 1395kk-1 ................................................................................ 5
42 U.S.C. 1395oo(a) ............................................................................... 5
42 U.S.C. 1395oo(f) ............................................................................... 5
42 U.S.C. 1395oo(f)(1) ...................................................................... 1, 21
42 U.S.C. 1395ww(d)(5)(F)(v) ............................................................... 3
42 U.S.C. 1395ww(d)(5)(F)(vi) ............................................................. 3
42 U.S.C. 1395ww(d)(5)(F)(vi)(I) ................................................. 4, 7, 23

Pub. L. No. 108-173, § 951, 117 Stat. 2066, 2427 (2003)
  (codified at 42 U.S.C. 1395ww Note)..................................................6, 35

28 U.S.C. 1291 ....................................................................................... 1

28 U.S.C. 1331 ....................................................................................... 1

28 U.S.C. 1361 ....................................................................................... 1

42 U.S.C. 1381 *et seq.* ......................................................................... 4

**Regulations:**

42 C.F.R. 405.1801(b)(1) ....................................................................... 5

42 C.F.R. 405.1803 ................................................................................ 5

42 C.F.R. 405.1871(a)(3) ............................................................. 5, 19, 33

42 C.F.R. 405.1875 ................................................................................ 5

42 C.F.R. 413.24(f) ................................................................................ 5

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ...................................................................... 1

Fed. R. App. P. 4(a)(3) ............................................................................ 1

**Other Authorities:**

*CMS:*
   *CMS Ruling No. CMS-1498-R*, https://go.usa.gov/xsnnz
    (Apr. 28, 2010) ..................................................................................9

   *DSH Adjustment and 2005-2006 File Updated March 2012*
    *(ZIP)*, https://go.usa.gov/xtKkv.................................................29, 30

51 Fed. Reg. 31,454 (Sept. 3, 1986) ................................................... 7, 8

70 Fed. Reg. 47,278 (Aug. 12, 2005) ........................................... 6, 7, 35

75 Fed. Reg. 23,852 (May 4, 2010) ....................................................... 9

75 Fed. Reg. 50,042 (Aug. 16, 2010) .................................... 4, 8, 9, 10, 11, 23, 24,
                              25, 29, 30, 31, 32, 36

GLOSSARY

| | |
|---|---|
| "Board" | Provider Reimbursement Review Board |
| "CMS" | Centers for Medicare & Medicaid Services |
| "DSH" | Disproportionate share hospital |
| "Medi-Cal" | California Department of Health Care Services' Medicaid program |
| "MedPAR" | Medicare Provider Analysis and Review |
| "Secretary" | Secretary of Health and Human Services |
| "SSI" | Supplemental security income |

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

Plaintiff's complaint invoked the district court's jurisdiction under 42 U.S.C. 1395oo(f)(1); 28 U.S.C. 1331; and 28 U.S.C. 1361.  R1 ¶4, JA-.[1]  On September 30, 2020, the district court issued a final order granting plaintiff's motion for summary judgment in part and denying it in part, and denying defendant's cross-motion for summary judgment.  R19, JA-.  Defendant filed a timely notice of appeal on November 24, 2020.  R21; Fed. R. App. P. 4(a)(1)(B).  Plaintiff filed a timely notice of cross-appeal on November 28, 2020.  R23; Fed. R. App. P. 4(a)(3).  This Court has jurisdiction over the appeal and cross-appeal under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUE

This appeal involves the Secretary of Health and Human Services' (Secretary) calculation of plaintiff's Medicare disproportionate share hospital (DSH) adjustments for fiscal years 2006-2008.  The question presented is:

 Whether the district court erred by failing to defer to the applicable agency notice-and-comment regulation, by shifting the burden of production to the

---

[1]  "R" refers to the Record on Appeal.  When a document is designated for the Joint Appendix, an additional cite will appear as follows:  "JA-."

Secretary, and by ultimately concluding that the Provider Reimbursement Review Board's decision upholding the Secretary's calculation of plaintiff's Medicare fractions for purposes of its fiscal year 2006-2008 DSH adjustments was not supported by substantial evidence.

## STATUTES AND REGULATIONS INVOLVED

Relevant statutory and regulatory provisions are attached in the addendum to this brief.

## STATEMENT OF THE CASE

### A.  Statutory and Regulatory Framework

#### 1.  The Medicare Statute DSH Provision

**a.**  The Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. 1395 *et seq.* (Medicare Act), provides health insurance coverage to individuals who are at least 65 years old and are entitled to monthly Social Security benefits, and to disabled individuals who meet specified eligibility requirements.  42 U.S.C. 426(a), (b).  Such individuals are automatically entitled to benefits under Medicare Part A, which authorizes payments for covered inpatient hospital, home health, and hospice treatment and related services.  42 U.S.C. 426(a).

Generally, under the Medicare hospital inpatient prospective payment system, Medicare pays hospitals for inpatient services furnished to Medicare beneficiaries on the basis of prospectively determined rates. This case involves the calculation of Medicare Part A payments to hospitals that serve significantly disproportionate numbers of low-income patients. Such hospitals may receive an additional payment, known as a "disproportionate share hospital" or "DSH" adjustment. Whether a hospital qualifies for the Medicare DSH adjustment and the amounts of any adjustment depend on the hospital's "disproportionate patient percentage." 42 U.S.C. 1395ww(d)(5)(F)(v). To determine the portion of a hospital's patients that are low-income for purposes of the DSH provision, the Secretary adds together two fractions, which are proxies for two separate and distinct populations – *i.e.*, low-income Medicare patients and low-income non-Medicare patients. See 42 U.S.C 1395ww(d)(5)(F)(vi).

At issue here is the calculation of the "Medicare fraction," which seeks to determine the percentage of hospital patient days attributable to individuals entitled to Medicare who were also low-income. The statute directs the agency to use, as a proxy for low-income patients, Medicare beneficiaries who were also "entitled to

3

supplemental security income [(SSI)]." 42 U.S.C. 1395ww(d)(5)(F)(vi)(I).[2] The SSI program—which is administered by a separate agency, the Social Security Administration—provides cash payments to financially needy people who are 65 or older, blind, or disabled, and who meet various income limitations and other requirements. See 42 U.S.C. 1381 *et seq*.

The Centers for Medicare & Medicaid Services (CMS) calculates the Medicare fraction for all DSH hospitals nationwide. Because the SSI program is administered by the Social Security Administration, calculation of the Medicare fraction numerator requires use of Social Security Administration data, as well as Medicare inpatient data compiled by CMS. See *Baystate Med. Ctr. v. Leavitt* (*Baystate*), 545 F. Supp. 2d 20, 23 (D.D.C.), *amended in part*, 587 F. Supp. 2d 37 (D.D.C. 2008); 75 Fed. Reg. 50,042, 50,276 (Aug. 16, 2010) (2010 Final Rule).

**b.** Hospitals submit cost reports at the end of each fiscal year to Medicare Administrative Contractors, which are generally private insurance companies that

---

[2] The DSH calculation also entails calculation of a "Medicaid fraction," which seeks to measure the number of patient days attributable to low-income *non*-Medicare patients. That calculation is not at issue here.

4

perform certain functions on behalf of CMS. See 42 C.F.R. 405.1801(b)(1), 413.24(f); 42 U.S.C. 1395kk-1. After receiving CMS's determination of the Medicare fraction, the contractor determines the total payment to the hospital (including any hospital-specific adjustments). It then issues a Notice of Program Reimbursement, informing the provider how much it will be paid for the fiscal year at issue. 42 C.F.R. 405.1803.

A hospital may appeal the notice of program reimbursement to the Provider Reimbursement Review Board (Board). 42 U.S.C. 1395oo(a). In a Board hearing, the hospital has both the burden of production and the burden of proof, and agency regulations require the hospital to "carr[y] its burden of production of evidence and burden of proof by establishing, by a preponderance of the evidence, that the provider is entitled to relief on the merits of the matter at issue." 42 C.F.R. 405.1871(a)(3). The Board's decision is final, unless reversed, affirmed, or modified by the Administrator of CMS pursuant to a delegation of authority by the Secretary. See 42 U.S.C. 1395oo(f); 42 C.F.R. 405.1875. The final agency decision is subject to judicial review in federal court. See 42 U.S.C. 1395oo(f).

**c.** In the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Modernization Act"), Congress provided for hospitals' access

5

to data that CMS uses to compute the Medicare fraction.  Section 951 of the statute requires the Secretary to "arrange to furnish * * * hospitals * * * the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage * * * for that hospital for the current cost reporting year."  Pub. L. No. 108-173, § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. 1395ww Note).

To implement this provision, the Secretary established a process to ensure that hospitals have access to data pertaining to the calculation of the DSH adjustment, and to the Medicare fraction in particular.  See 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005).  Pursuant to those procedures, the Secretary provides hospitals with information from the Medicare Provider Analysis and Review (MedPAR) Limited Data Set, which contains the "matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis" for the relevant period. See *id*.  Although the MedPAR data set is protected under the Privacy Act and the Health Insurance Portability and Accountability Act of 1996 (HIPAA), disclosures made through this process are permissible under an applicable routine use.  See *id.* at 47,439.  The data set provided to hospitals under

6

this process is the same data set CMS uses to calculate Medicare fractions for the fiscal year. *Id.*

## 2. 2010 Final Rule

### a. Regulatory Background and *Baystate* Decision

The Medicare DSH provision does not prescribe how the Secretary should determine whether a patient day is attributable to an individual "entitled to [SSI]," nor does it mandate use of any particular data source. See 42 U.S.C. 1395ww(d)(5)(F)(vi)(I). In 1986, the Secretary engaged in notice-and-comment rulemaking to implement the DSH provision, and determined that due to the voluminous data needed and the difficulty hospitals would have obtaining the requisite information, the agency would calculate the Medicare fraction itself. See 51 Fed. Reg. 31,454, 31,459 (Sept. 3, 1986).

To calculate the numerator of the Medicare fraction, i.e., the number of Medicare patients who were also entitled to SSI benefits while in the hospital, the Secretary developed a process of matching individual Medicare billing records to individual SSI records obtained from the Social Security Administration. In 1986, this process involved about 11 million Medicare billing records per year, as well as the agency's month-by-month records of SSI entitlement for over 5 million

7

individuals.  See 51 Fed. Reg. at 31,459.  The data underlying the match process was drawn from (1) a MedPAR file, which contains information for all Medicare beneficiaries using hospital inpatient services, and (2) an SSI eligibility file that the Social Security Administration sends to CMS.  *Baystate*, 545 F. Supp. 2d at 24; see 75 Fed. Reg. at 50,276.

Two decades later, a particular provider, Baystate Medical Center, challenged this matching process, and filed suit in district court seeking review of CMS's determination of its Medicare fractions for fiscal years 1993-1996. *Baystate*, 545 F. Supp. 2d at 24-25.  Specifically, plaintiff Baystate contended that SSI data used to calculate the Medicare fraction was incomplete or inaccurate and that flaws in the data-matching process improperly deflated the agency's count of patient days attributable to Medicare beneficiaries "entitled to [SSI]."  *Id*.  The district court held that the "best available data" standard applied to its review of the challenged Medicare fractions.  *Id*. at 40-41. Under that standard, "the accuracy of any particular index, payment or, in this case, the SSI fraction, cannot be weighed in a vacuum, but instead must be evaluated by reference to the data that was available to the agency at the relevant time."  *Id*.  The court thus agreed with the government that the Secretary's DSH calculations need only be based on "the best

8

available data," even if using that data entails some estimates or produces some

inaccuracies.  See *id.* at 40-42.  Based on the record, however, the court determined

that in certain respects, the Secretary did not use the "best available data" to match

Medicare patient day information with SSI data.  *Id*. at 42-49.

### b.  2010 Rulemaking

Following the *Baystate* decision, the Secretary engaged in notice-and-

comment rulemaking to address *inter alia*, its methodology for determining which

patient days were attributable to individuals "entitled to [SSI]" for purposes of the

Medicare fraction.[3]  See 75 Fed. Reg. at 50,275-50,285.  In the proposed rule, the

Secretary described its then-current matching process as well as the agency's

proposed revisions to that process in significant detail so that interested parties

would have the opportunity to comment.  See 75 Fed. Reg. 23,852, 24,002-24,006

(May 4, 2010).

---

[3] Although this rulemaking post-dates plaintiff's cost years (2006-2008) at issue in
this case, CMS Ruling No. 1498-R, which is binding on all agency components
that adjudicate matters under CMS jurisdiction, provides that the methodology set
forth in the rulemaking applies to pending administrative appeals and open cost
reports as of April 2010.  See *CMS Ruling No. CMS-1498-R*,
https://go.usa.gov/xsnnz (Apr. 28, 2010); 75 Fed. Reg. at 50,285.

In the 2010 Final Rule, the Secretary described the revised data matching process in detail and responded to comments received. See 75 Fed. Reg. at 50,277-50,285. The Secretary summarized the respects in which the *Baystate* court had found that the previous matching process failed to use the best available data and explained how the agency had revised the matching process in order to do so in the future. *Id*. at 50,276-50,278. For example, the SSI file that CMS receives from the Social Security Administration would now include all SSI payment records, including those for "stale" as well as active cases, and for automated and manual payments. *Id*. at 50,277. The Secretary noted that the revised process would also use the Medicare Enrollment Database, which contains social security numbers of Medicare enrollees that could be used in the matching process to help ensure that all Medicare/SSI patient days are included in the calculation. *Id*.

In the Final Rule, the Secretary further explained that "we have requested, and are using in the data matching process, those [Social Security Administration] codes that reflect 'entitlement to' receive SSI benefits," and identified those codes as C01, M01, and M02. 75 Fed. Reg. at 50,280-50,281. The Secretary observed that one commenter suggested that there are various other SSI codes "that represent individuals who were eligible for SSI, but not eligible for SSI payments,

10

that should be included as SSI-entitled for purposes of the data matching process."
*Id.* In response, the Secretary explained that the DSH provision limits the
Medicare fraction numerator to persons entitled to receive payment of SSI benefits.
*Id*. at 50,281. The Secretary also noted that the Social Security Administration
"has provided information regarding all of the SSI status codes mentioned by the
commenter to assist in the determination of whether any of these codes represent
individuals who were entitled to SSI benefits for the purposes of calculating the
[Medicare] fraction for Medicare DSH." *Id*. After a detailed review of this
information, the agency concluded that "[a]s we have described above, none of the
SSI status codes that the commenter mentioned would be used to describe an
individual who was entitled to receive SSI benefits during the month that one of
those status codes was used." *Id*. Rather, "including SSI codes of C01, M01, and
M02 accurately captures all SSI-entitled individuals during the month(s) that they
are entitled to receive SSI benefits." *Id.*

### B.  The Present Litigation

**1.**  Plaintiff Pomona Valley Hospital Medical Center (Pomona) challenged
the Secretary's calculation of its Medicare fractions for fiscal years 2006-2008.
Pomona appealed to the Board, and contended that the Medicare fractions

11

produced in the revised matching process for the fiscal years in question were understated, and resulted in an understated DSH adjustment.  See Board Decision, R18 at 7-11, JA-.  Pomona "challeng[ed] CMS' count of Pomona's qualifying Part A and SSI days, based on an inaccurate translation of data between agencies, human error, coding errors or other potential problems that may have led to CMS not using the best available data to calculate Pomona's SS1 fraction for each of these years."  *Id*. at 10, JA-.

Pomona alleged that by using information obtained from the California Department of Health Care Services' Medicaid program ("Medi-Cal"), it had determined that CMS had undercounted the number of patient days attributable to SSI-entitled Medicare beneficiaries.  See R18 at 11, JA-.  In essence, Pomona argued that certain Medi-Cal codes corresponded to SSI-entitled status, but that some patients assigned these codes were not counted under the CMS regulation. See *id*.  Pomona also stated that it had unsuccessfully attempted to obtain further information from the Social Security Administration, and that CMS had declined its request to test a sample set of patient data for accuracy.  *Id*.

Following a hearing, the Board held that Pomona failed to "submit sufficient quantifiable data in the record to prove" that the Medicare fractions calculated by

12

CMS were inaccurate.  See R18 at 11-14, JA-.  In particular, the Board found that Pomona did not show that the Medi-Cal codes upon which it relied would directly correlate to the SSA codes that indicate entitlement to payment of SSI benefits.  *Id*. The Board identified various flaws in Pomona's approach.  For example, individuals who receive only California state supplementation payments and certain individuals who are in nursing homes fall within the scope of the Medi-Cal codes upon which Pomona relied, but are not encompassed within Social Security Administration codes C01, M01, and M02, which, as the Secretary determined in the 2010 Final Rule, are the sole codes that reflect SSI entitlement within the meaning of the DSH provision.  *Id*. at 12-13, JA-.  In addition, the Board noted that Pomona had not accounted for the discrepancy between the effective dates of eligibility for Medi-Cal benefits (first day of month of application) and entitlement to SSI (first of *month following application*).  *Id*. at 13, JA-.

The Board emphasized that it had requested further information about the overlap or lack thereof between Medi-Cal codes (known as "aide codes") 10, 20, and 60 upon which Pomona relied, and the Social Security Administration codes that CMS uses in calculating the Medicare fraction pursuant to the 2010 Final Rule.  R18 at 13, JA-.  Although this information was available to Pomona, it

13

failed to provide it.  See *id*.  As the Board observed, Pomona "could have analyzed its data to quantify the number of patient days contained in 'aide codes' 10, 20, and 60, for patients with SSI codes E01 and E02"—*i.e.*, codes that indicated non-entitlement to SSI.  *Id*.  The Board further found that Pomona "could have determined if there were any other potential reasons for the discrepancies between the [Medi-Cal] 'aide codes' * * * and the SSI codes."  *Id*.  For example, the Board suggested that Pomona "could have reviewed the definitions of both the SSI codes and 'aide codes' and built a crosswalk or diagram to identify if there were other situations in which an individual would be assigned or remain on an 'aide code,' but the SSI code would not be C01, M01, or M02."  *Id*. at 13-14.

Indeed, the Board noted that at the hearing, it had specifically requested that Pomona provide such a crosswalk, which was "necessary to determine if [Pomona's] use of 'aide codes' 10, 20, and 60"—the Medi-Cal state codes upon which Pomona relied for its calculations—"accurately identified only those individuals with an SSI code of C01, M01, or M02"—which are the Social Security Administration codes used by CMS and set forth in the 2010 Final Rule as indicating SSI entitlement.  R18 at 14, JA-.  The Board concluded that Pomona "could have developed this crosswalk without the use of [HIPAA] protected

14

information, by obtaining the definitions of the various codes, and if necessary confirming the information with the appropriate authorities." *Id*. Because of the numerous flaws in Pomona's evidentiary showing, the Board determined that Pomona had not established that CMS erred in calculating its Medicare DSH fractions for the fiscal years at issue. *Id*.

 **2.**  Pomona filed suit in district court challenging the Board's decision. Dist. Ct. slip opinion (Op.), R20 at 15, JA-. The parties filed cross-motions for summary judgment, and the court granted plaintiff's motion in part and denied the Secretary's motion. *Id*. at 15-24, JA-.

The district court held that the Board's decision was not supported by substantial evidence. Op. 18-23, JA-. At the outset, the court rejected the Secretary's reliance on the 2010 Final Rule. *Id*. at 17, JA-. The court determined that because Pomona challenged the Board's decision, not the Final Rule, judicial review was limited to whether the Board's decision was supported by substantial evidence in the administrative record before the agency. See *id*.

The court concluded that the Board "did not make a serious effort to address" whether CMS had properly calculated plaintiff's Medicare fractions, and "fail[ed] to explain why the various potential flaws with plaintiff's calculation

15

undermined plaintiff's conclusion so thoroughly that there was no reason to peek behind CMS's methodology at all, even though it was CMS's matching that was under review, not plaintiff's." Op. 21, JA-. Although the court acknowledged that Pomona's Medi-Cal codes "do not definitively indicate that a patient is SSI-eligible for purposes of determining the SSI fraction," it criticized the Board for "ma[king] its decision not based on evidence presented by the agency but on its conclusion that plaintiff's evidence was insufficient 'to *prove* that the SSI percentages calculated by CMS . . . were flawed.'" *Id.*

The district court thus did not dispute the Board's conclusion that Pomona had failed to establish an error in CMS's calculation, but held that the "'burden of bringing forward evidence generally shifts when the defendant has greater access to information on a particular issue.'" Op. 22, JA- (quoting *Baystate*, 545 F. Supp. 2d at 51, quoting *Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 831 (D.C. Cir. 1993)). The court determined that CMS had data that "would have answered plaintiff's allegations," and that it would be difficult, if not impossible, for plaintiff to prove such allegations without it. *Id.* The court stated that CMS "declined to provide plaintiff with any of the underlying SSI data or to conduct or facilitate a test of sample data," and "declined to present any of that

16

data to the Board on appeal." *Id*. The court concluded that because the agency did not make an affirmative evidentiary showing, the Board's decision was not supported by substantial evidence. *Id*.

The court rejected Pomona's argument that it should impose an adverse inference against CMS, however, and denied Pomona's request that it "issue a writ of mandamus, and order the Secretary to recalculate its SSI fraction using the correct SSI data, provide plaintiff the data and the programs CMS used to accomplish the recalculation, and pay the additional amounts due to it." Op. 23, JA-. The court explained that the "ultimate burden of persuasion remains with plaintiff." *Id*. (citing *Atlanta Coll.*, 987 F.2d at 831). The court thus held that remand "is the appropriate remedy at this stage of the proceedings." Op. 23, JA-.

## SUMMARY OF ARGUMENT

The district court erred by determining that the Board's decision upholding CMS's calculation of Pomona's Medicare fractions for the cost years at issue was not supported by substantial evidence. In doing so, the court failed to apprehend the workings of the applicable regulatory scheme in significant respects. The Secretary's 2010 notice-and-comment rulemaking established the revised data-matching process that the agency would use in calculating hospitals' DSH

17

Medicare fractions.  A hospital that challenges CMS's calculation can attempt to demonstrate that the agency erred in applying this matching process and thereby understated its DSH Medicare fraction.  However, the burden of demonstrating error falls on the hospital, and, under applicable precedent, it would need to establish that CMS did not use "the best available data" to calculate the challenged fractions.  As the Board properly recognized, Pomona failed to do so here.

**1.**  The Secretary calculated Pomona's Medicare fraction and resulting DSH adjustments by following the procedure set forth in the agency's final 2010 notice-and-comment regulation—consulting data sources and applying matching methods that the regulation specified.  There is no dispute that the 2010 Final Rule's framework applies here and there is no challenge to the validity of the rule.  The 2010 Final Rule therefore should have been the court's starting point in assessing the Board's ruling that Pomona failed to meet its burden of demonstrating error in CMS's calculation of the challenged Medicare fractions.  Because that rule sets forth the methodology and data that CMS will use in determining the Medicare fraction numerator, including whether an individual is "entitled to [SSI]" for a particular patient day, the Board—in contrast to the district court—correctly

18

focused on whether Pomona had produced sufficient evidence to cast doubt on CMS's application of that process in this particular case.

**2.** Even apart from its failure to consider the 2010 Final Rule, the district court misapplied the deferential substantial evidence standard of review. The court improperly shifted the burden of production to the Secretary and failed to give sufficient weight to the Board's finding that Pomona had not "submit[ted] sufficient quantifiable data" to show that CMS's calculations were erroneous. See R18 at 14, JA-. Agency regulations governing Board hearings make clear that the hospital that files the appeal bears both the burden of production and the burden of proof before the Board. 42 C.F.R. 405.1871(a)(3).

The district court determined, however, that the burden of production flipped because the agency alone had the underlying Social Security Administration data that Pomona sought to make its case. The court thus concluded that CMS could not "reject [Pomona's] allegations as insufficiently proven" without providing "countervailing evidence or a reason, not based on the insufficiency of [Pomona's] showing." Op. 22 (emphasis omitted) (quoting *Baystate*, 545 F. Supp. at 51).

The court fundamentally erred in finding that the Board's decision turned solely on the inadequacy of Pomona's affirmative proof. As the Board recognized,

19

the baseline in its analysis was the 2010 Final Rule, which explains the Secretary's decision regarding what constitutes the "best available data" for determining whether an individual is entitled to SSI for purposes of the DSH provision and the rationale for the agency's revised matching process.  See R18 at 9-11, JA-.  The Board's discussion of the Secretary's reasons for adopting the revised data matching process in 2010 Final Rule as legal and factual background for its decision—including the agency's recognition of the "administrative burdens and complexity" of that process, and the need to confine its calculations to patient days of individuals entitled to receive SSI benefits on specific days—makes clear that its rejection of Pomona's challenge did not rest solely on the insufficiency of Pomona's submission.  See *id*.  The Final Rule itself thus provides a reason, wholly apart from the insufficiency of Pomona's evidence, for the agency's decision upholding the challenged calculations.

    In any event, the Secretary *did* provide Pomona with the MedPAR data file through the agency's established process under Section 951 of the Medicare Modernization Act, and thus satisfied all relevant statutory and regulatory requirements with respect to production of data.  The district court also overlooked the Board's identification of the numerous flaws in Pomona's evidence and ways

20

in which Pomona could have strengthened its case without obtaining additional information from the government.  The district court thus failed to afford appropriate weight to either the 2010 Final Rule or the Board's decision.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment under a *de novo* standard.  *Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001).  The Medicare statute expressly incorporates Administrative Procedure Act standards of judicial review (see 42 U.S.C. 1395oo(f)(1)), under which this Court will not set aside the Secretary's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence" in the administrative record.  5 U.S.C. 706(2)(A), (E); see *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1082 (D.C. Cir. 2015).

## ARGUMENT

### THE BOARD'S DECISION UPHOLDING THE SECRETARY'S CALCULATION OF THE CHALLENGED MEDICARE FRACTIONS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

The Board properly held that Pomona failed to make the requisite showing that the Secretary's calculation of Pomona's Medicare fractions for the relevant cost years was inaccurate or that the agency had not used the best available data.

21

The district court's holding that the Board's decision was not supported by substantial evidence is based on two mistaken conclusions.  First, the court erred in determining that the 2010 Final Rule—which sets forth the Secretary's methodology for determining whether an individual is "entitled to [SSI]" for purposes of calculating the Medicare fraction and explains how that methodology uses the best available data—was not relevant to its inquiry.  Second, even apart from its failure to consider the 2010 Final Rule, much less afford it appropriate deference, the district court erred in applying the substantial evidence standard by shifting the burden of production to the Secretary.

**A.  The District Court Erred By Failing To Consider or Afford Deference to the 2010 Final Rule When it Reviewed the Board's Decision.**

**1.**  Pomona challenges CMS's calculation of its DSH Medicare fractions for fiscal years 2006-2008, claiming that CMS undercounted the number of patient days attributable to SSI-entitled Medicare beneficiaries in the numerator of the hospital's DSH Medicare fractions in the cost years at issue.  R18 at 11, 17, JA-.

The Medicare fraction of the DSH provision is a proxy for the percentage of a hospital's patient days attributable to individuals entitled to Medicare who were also low-income.  The Medicare Act thus provides that the numerator of the

22

Medicare fraction consists of patient days attributable to individuals who are

"entitled to benefits under [Medicare] part A" and also "entitled to [SSI]," while

the denominator is all patient days attributable to Medicare beneficiaries. 42

U.S.C. 1395ww(d)(5)(F)(vi)(I). The Act does not prescribe any particular

methodology for determining whether an individual Medicare beneficiary is

"entitled to [SSI]" for purposes of the Medicare fraction numerator. Nor does it

dictate what data should be used for this calculation, who should do the

calculation, or at which particular point in time. Rather, the Act is silent on these

issues, leaving them to be resolved by the Secretary. As discussed above, the

Secretary comprehensively addressed these and related matters in promulgating the

2010 Final Rule.

CMS calculated the challenged Medicare fractions in this case pursuant to

the revised data-matching process adopted through notice-and-comment

rulemaking and set forth in detail in the 2010 Final Rule. See R18 at 11, JA-; 75

Fed. Reg. at 50,276-50,285. Under the Rule, the numerator of the Medicare

fraction is limited to Medicare beneficiaries who are entitled to receive SSI

benefits, as reflected by Social Security Administration codes C01, M01, and M02.

75 Fed. Reg. at 50,280-50,281. The matching process involves a detailed

23

comparison of Medicare billing records and SSI-entitlement data in the SSI file provided by the Social Security Administration. *Id*. at 50,276-50,285. The SSI file contains the codes denoting each individual's month-by-month entitlement to SSI benefits, and, as the Secretary explained, serves as the agency's "system of record" regarding SSI entitlement for purposes of calculating the Medicare fraction. See *id*. at 50,277 (SSI file "serves as the system or record for whether or not SSA made a payment of SSI benefits to an individual").

Where, as here, "Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 699 (1984) (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153-54 (1982)); see *Methodist Hosp. v. Shalala*, 38 F.3d 1225, 1230 (D.C. Cir. 1994) ("The statute does not specify how the Secretary should construct the [wage] index, nor how often she must revise it, although these methodological issues both bear significantly on the accuracy of the Secretary's adjustments. Rather, Congress through its silence delegated these decisions to the Secretary."). Moreover, this Court has "take[n] special note of the tremendous

24

complexity of the Medicare statute," which "adds to the deference which is due to the Secretary's decision" in administering it.  *Methodist Hosp.*, 38 F.3d at 1229.

Here, the details of calculating the DSH adjustment—such as which databases to use, what search procedures to employ, and which safeguards to use to guard against errors or omissions—fall in a "gap left[ ] * * * by Congress" for the agency "to fill."  *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (internal quotation marks omitted).  At a minimum, the legal, policy, and practical justifications for the Secretary's process for determining which Medicare beneficiaries are also entitled to SSI for purposes of the DSH calculation are embodied in the 2010 Final Rule.  75 Fed. Reg. at 50,276-50,285.  Those justifications and deference owed to the agency are at least the starting point in reviewing an agency decision applying that regulation.  *Chevron*, 467 U.S. at 842-43.

**2.**  In its appeal to the Board, Pomona did not challenge either the substantive or procedural validity of the 2010 Final Rule.  Nor did it allege that CMS did not follow the methodology set forth in the Rule.  Rather, the hospital alleged that CMS's application of that methodology resulted in an undercount of patient days in the Medicare fraction numerator, which reflects the number of a

25

hospital's patient days attributable to Medicare beneficiaries who are also entitled to SSI. Pomona speculated that the alleged undercount resulted from "an inaccurate translation of data between agencies, human error, coding errors or other potential problems that may have led to CMS not using the best available data to calculate Pomona's SS1 fraction" for each of the cost years at issue. R18 at 10-11, JA-. But Pomona never specified or developed a theory as to which of these potential errors was the cause of the alleged undercount. Instead, the hospital based its allegations on information it had obtained from the California State Medicaid program (known as "Medi-Cal"), which it contended cast doubt on CMS's calculations. *Id*. at 11, JA -.

The Board rejected Pomona's argument, holding that the hospital had failed to "submit sufficient quantifiable data in the record to prove" that CMS's calculation of the Medicare fractions at issue was inaccurate. R18 at 11-14, JA-. In particular, the Board found that Pomona did not show that Medi-Cal aide codes 10 (aged), 20 (blind), and 60 (disabled), upon which it relied would directly correlate to Social Security Administration codes C01, M01, and M02 that indicate entitlement to payment of SSI benefits as set forth in the 2010 Final Rule. *Id*. The Board identified several ways in which Pomona could have demonstrated such a

26

direct correlation with the information available to it, but found that the hospital had failed to do so. *Id*.

In addition to finding Pomona's affirmative showing insufficient to meet its burden of production, the Board identified flaws in the hospital's data and methodology, including discrepancies between Pomona's Medi-Cal codes and the Social Security Administration codes that CMS uses to calculate hospitals' Medicare fractions that undermine Pomona's claims.  R18 at 12-13, JA-. Specifically, the Board noted that individuals who receive only California state supplementation payments and certain individuals who are in nursing homes fall within the scope of the Medi-Cal codes upon which Pomona relied, but are not encompassed within Social Security Administration codes C01, M01, and M02, which CMS uses to calculate Medicare fractions under the 2010 Final Rule. *Id*. As the Board explained, there is also a discrepancy between the effective dates of eligibility for Medi-Cal benefits (first day of month of application) and entitlement to SSI (first of *month following application*). *Id*. at 13, JA-.  The Board further emphasized that it had requested additional information about the overlap or lack thereof between Pomona's Medi-Cal codes and the Social Security Administration codes, but that Pomona failed to provide it. *Id*. at 13-14.

27

**3.** The district court concluded, however, that the Board's decision was not supported by substantial evidence.  In doing so, the court did not hold that the 2010 Final Rule was contrary to the Medicare Act or that the data-matching process adopted in the rulemaking was arbitrary and capricious or otherwise flawed. Instead, the court essentially divorced the case before the Board from the agency rule that governed its inquiry.  Indeed, when it stated that CMS "did not even bother to produce evidence at the hearing to justify its SSI fraction," the district court misunderstood the fundamental role of the 2010 Final Rule.  See Op. 21, JA-. That justification is set forth in the Final Rule, which the district court failed even to consider.  As the Board recognized, the agency's revised data-matching process as adopted and explained in the Final Rule provides the basis for its calculation of the Medicare fraction.  See R18 at 9-14, JA-; see also R18 at 1613-1615, JA- (contractor position paper before Board relying on 2010 Final Rule).  The district court erred in holding otherwise.

That Pomona directed its challenge to the Board's decision and not the 2010 Final Rule (see Op. 17, JA -), does not alter the fundamental role of that Rule, which governed the Board's analysis.  The 2010 Final Rule therefore should have been the court's starting point in assessing the Board's ruling that Pomona failed to

28

prove that CMS's calculations were inaccurate or that it did not use the best available data.  See *Chevron*, 467 U.S. at 842-43.

The district court misunderstood the relation of the 2010 Final Rule to the particular determination at issue when it declared that the Board "fail[ed] to explain why the various potential flaws with plaintiff's calculation undermined plaintiff's conclusion so thoroughly that there was no reason to peek behind CMS's methodology at all, even though it was CMS's matching that was under review, not plaintiff's."  Op. 21, JA-.  Contrary to the district court's holding, there is no need to "peek behind CMS's methodology" when the agency has outlined that methodology in great detail in a notice-and-comment rulemaking, and the hospital has not shown any error in that methodology as applied to its case.  See 75 Fed. Reg. at 50,276-50,285.

Moreover, the agency needs to have a uniform methodology for the complex and burdensome task of calculating hospitals' Medicare fractions nationwide due in part to the sheer volume of patient days involved and data required.[4]  The 2010

---

[4]  See CMS, *DSH Adjustment and 2005-2006 File Updated March 2012 (ZIP)*, https://go.usa.gov/xtKkv (found under "Downloads").  For example, in 2006 standing alone—just one of the three cost years at issue—CMS calculated Medicare fractions for over 3,700 hospitals, which related to over 6.2 million

29

rulemaking provided hospitals, including Pomona, with the opportunity to suggest other sources of data, and the agency thoroughly explained its ultimate decision to rely on the three Social Security Administration codes that indicate that an individual is "entitled to [SSI]" within the meaning of the Medicare DSH provision.  See *id*. at 50,280-50,281.  Because a notice-and-comment regulation governs the proper methodology and data used in a challenged agency calculation, the Board correctly focused on whether Pomona had produced sufficient evidence to cast doubt on the agency's application of that process in this case.

**4.**  The rulemaking itself is not dispositive of Pomona's challenge, but it was Pomona's burden to establish that the agency did not use the "best available data" in its calculations or committed errors in its calculations.  In the Medicare context, courts have recognized that where, as here, the statute does not prescribe a particular methodology or source of data, CMS's determinations should be upheld so long as the agency uses "the most reliable data available."  See *Methodist Hosp.*, 38 F.3d at 1230; see also *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1233 (9th Cir. 1993); *Baystate*, 545 F. Supp. 2d at 40-41 (concluding that relevant question was

---

patient days in the numerator, and over 69 million patient days in the denominator. See *id*.

whether agency had "reasonably concluded that the SSI fractions for the years at issue were based on the best available data" at time DSH payment determined).

The "best available data" standard "leaves room for error, so long as more reliable data did not exist at the time of the agency decision." *Baystate*, 545 F. Supp. 2d at 49. Thus, even a showing by Pomona that the data used by CMS was not entirely accurate (which, as the Board explained, Pomona failed to make) would have been insufficient to prevail before the Board if the hospital could not show that CMS did not use the best available data at the time it performed the calculations. See *id*.

This conclusion applies with particular force in light of the 2010 Final Rule, in which the Secretary addressed the holding in *Baystate* that its previous methodology had not met the best available data standard in certain respects, and provided a detailed explanation of why the agency determined that the data sources used in its revised matching process do meet that standard. See 75 Fed. Reg. at 50,275-50,281. Notably, in the 2010 rulemaking, no provider objected to the Secretary's determination that the SSI data file received from the Social Security Administration would serve as the "system of record" regarding SSI entitlement, or

suggested that a different database (such as a state Medicaid data file) would provide better data. See *id*. at 50,277-50,281.

In sum, the 2010 Final Rule, which sets forth the Secretary's determination of what constitutes the "best available data" and explains the reasoning behind the agency's revised matching process using such data, was entitled to deference and should have been the starting point for the district court's review of the Board's decision. When the Board's decision is considered in the context of the 2010 Final Rule and the detailed rulemaking process described therein, the error in the court's substantial-evidence ruling becomes apparent. It should have been sufficient for the Board to rely on the regulation and identify the flaws in Pomona's analysis, without requiring the agency to produce case-specific evidence. Only if the Board's identification of the flaws in Pomona's submission was itself arbitrary or capricious should the Board's decision have been set aside, yet, as discussed below, the district court instead erroneously switched the burden of production to the agency.

32

**B.  The District Court Further Erred By Shifting the Burden of Production to the Secretary.**

Even apart from its failure to consider the FY 2010 Final Rule, the district court misapplied the deferential substantial evidence standard of review.  The court improperly shifted the burden of production to the Secretary and failed to give sufficient weight to the Board's finding that Pomona had not "submit[ted] sufficient quantifiable data" to show that CMS's calculations were erroneous.  See R18 at 15, JA-; *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 243-44 (D.C. Cir. 2001) (upholding Board decision that hospital failed to "meet its burden of submitting reliable evidence").

As noted, agency regulations governing Board hearings make clear that the hospital that files the appeal bears the burden of production as well as the burden of proof before the Board.  42 C.F.R. 405.1871(a)(3) (Board "decision must include findings of fact and conclusions of law regarding," *inter alia*, "whether the provider carried its burden of production of evidence and burden of proof by establishing, by a preponderance of the evidence, that the provider is entitled to relief on the merits of the matter at issue.").  This Court has also recognized that when a hospital challenges a Medicare payment determination in an appeal to the

33

Board, it bears the burden of producing sufficient and accurate data to establish its claims.  See *Tenet HealthSystems*, 254 F.3d at 242-46 (agreeing with Board's determination that provider had not produced adequate reliable data in support of its claim and thus upholding Board's decision under substantial evidence standard).

As the Board acknowledged (R18 at 12, JA-), hospitals potentially face difficulties in challenging the Secretary's calculation of the Medicare fraction because the data regarding why particular patients are *not* assigned one of the SSI codes resides with the Social Security Administration, and includes information protected by the Privacy Act and HIPAA.  But contrary to the district court's holding (Op. 22, JA-), such difficulties do not warrant shifting the burden of production to the Secretary when a hospital challenges calculation of its Medicare fractions before the Board.  And the court erred by relying on the principle that "[w]here an agency is in sole possession of the records necessary to prove a party's claim, the agency may not reject the aggrieved party's allegations as insufficiently proven unless the agency comes forward with 'countervailing evidence or a reason, *not based on the insufficiency of the [movant's] showing*, that explains why the * * * allegations have not been accepted.'"  Op. 22, JA- (quoting *Baystate*, 545 F. Supp. 2d at 51).  That principle is inapplicable here for several reasons.

34

First, contrary to the district court's suggestion, the Secretary did "come forward with [a] 'countervailing * * * reason'" unrelated to the insufficiency of Pomona's showing for sustaining the challenged Medicare fraction calculations—the 2010 Final Rule.  The rulemaking provides the agency's rationale for its data-matching process, and thus, is itself a reason for sustaining CMS's calculation of the fractions absent any showing by Pomona that the calculation was flawed. Because the 2010 Final Rule reasonably prescribes a methodology, hospitals do not have the right to demand additional information on a case-by-case basis to challenge its application.  Thus, as the Board correctly recognized, the critical issue in this case was the reliability of Pomona's own methodology and data—or lack thereof.  R18 at 12-14, JA-.

Second, this is not a case where the agency has sole possession of the relevant data.  Rather, the Secretary provided Pomona with the MedPAR data file through the agency's established process under Section 951 of the Medicare Modernization Act of 2003 (codified at 42 U.S.C. 1395ww Note); see 70 Fed. Reg. at 47,438.  The Secretary thereby satisfied all relevant statutory and regulatory requirements with respect to production of data, and Pomona used that data in its calculations.  Pomona has provided no reason to conclude that Congress has not

35

already adequately address this issue in the Medicare Modernization Act, nor has Pomona challenged the adequacy of the process created by the Secretary to implement that statute.  Given that Congress has specifically addressed this issue, and the Secretary has already furnished the relevant data pursuant to the applicable statutory and regulatory standards (see R18 at 11, JA-), the district court should have rejected Pomona's arguments for burden-shifting.

The district court's reasoning in this regard also overlooked the judgments of the Secretary in the 2010 Final Rule regarding the tradeoffs involved in determining Medicare payment rates based on nonpublic data.  As noted, the Secretary recognized potential problems when data includes information subject to the Privacy Act and HIPAA, but concluded that these concerns were outweighed by the advantages of using such data, and stated that the agency would produce summary statistical data relating to the matching process and would also produce "certain detailed SSI fraction data," if "the hospital has a valid data use agreement with CMS and submits a request for such data."  See 75 Fed. Reg. at 50,277-50,279.

Balancing these considerations is a judgment Congress left to the agency. Pomona's inability to double-check every aspect of the underlying data should not

be viewed in isolation, but as one byproduct of a methodology that accepts limits on transparency in exchange for a more complete and accurate picture of the computation Congress set forth in the statute.  See 75 Fed. Reg. at 50,277-50,279. Hospitals' lack of unfettered access to data bearing on the Medicare fraction calculation also is itself largely a function of Congress's decision to base that calculation on sensitive, patient-specific information, such as entitlement to SSI benefits.  And as set forth above, Congress has already addressed hospitals' transparency concerns by requiring disclosure of data in the Medicare Modernization Act, reflecting an implicit judgment that disclosing more is not required, and Pomona has not challenged the agency's compliance with that statute here.

Moreover, although the Board acknowledged potential practical difficulties for hospitals in challenging the accuracy of CMS's calculation of Medicare fractions, it thoroughly explained why Pomona had failed to satisfy its burden of production even in light of these difficulties.  R18 at 12-14, JA-.  Where, as here, an agency has undertaken a notice-and-comment rulemaking to ensure the use of the best available data and provide administrative finality in order to enable the agency to compute thousands of Medicare fractions encompassing millions of

37

patient days every fiscal year (see *supra* n.4), and has already produced statutorily-required data to the hospital, it was entirely appropriate for the Board *not* to shift the burden of production.  In addition, the Board did not simply rely on the 2010 Final Rule.  Rather, it carefully analyzed the evidence presented by Pomona, identified numerous flaws in that evidence, and suggested ways in which Pomona could have strengthened its case without obtaining additional information from CMS or the Social Security Administration.  R18 at 12-14, JA-.

Indeed, Pomona is in a better position than CMS to obtain information bearing on the reliability of its own methodology.  For example, as noted, the Board found that Pomona had not accounted for the discrepancy between the effective dates of eligibility for Medi-Cal benefits (first day of month of application) and entitlement to SSI (first of *month following application*).  R18 at 13, JA-.  As the Board explained, Pomona "could have estimated the potential impact that the different effective dates had on the additional days it is requesting by reviewing its records and the State's records, to determine if any of the additional days are associated with individuals whose application for Medi-Cal/[State Supplemental Amount] was submitted in [the] same month the patient

days of service occurred," but "[w]ithout this information the Board does not know the potential impact the different effective dates has on Pomona's data." *Id*.

In addition, the Board had asked Pomona to produce a "crosswalk" comparing the scope of the Medi-Cal codes upon which it relied to the scope of the Social Security Administration codes that indicate entitlement to SSI.  R18 at 13-14, JA-.  The Board had concluded that a crosswalk was "necessary to determine if [Pomona's] use of 'aide codes' 10, 20, and 60, accurately identified only those individuals with an SSI code" set forth in the 2010 Final Rule.  *Id*., JA-. The Board found that Pomona "could have developed this crosswalk without the use of [HIPAA] protected information, by obtaining the definitions of the various codes, and if necessary confirming the information with the appropriate authorities." *Id*. at 14, JA-.  In short, although the record indicates that Pomona could have ascertained what the Medi-Cal aide codes mean and how they compare to SSI codes, Pomona failed to do so.

The district court therefore erred by holding that the Board's decision is not supported by substantial evidence, and this Court should reverse the district court's grant of partial summary judgment to Pomona.

39

## CONCLUSION

For the foregoing reasons, the district court's grant of partial summary

judgment in favor of plaintiff should be reversed.

<div style="margin-left:40%">

Respectfully submitted,

BRIAN M. BOYNTON
 *Acting Assistant Attorney General*

MARK B. STERN
    (202) 514-5089
STEPHANIE R. MARCUS
    (202) 514-1633
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7539*
    *Department of Justice*
    *950 Pennsylvania Ave., N.W.*
    *Washington, D.C.  20530*

</div>

JANUARY 2022

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. 32(a)(6). The word processing program (Microsoft Word 2016) used to prepare the brief reports that the brief is 7,929 words long. The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 with Times New Roman, 14 point font.

 /s/ Stephanie R. Marcus
Stephanie R. Marcus

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of January, 2022, I electronically filed the foregoing Brief for Appellant/Cross-Appellee with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.

I further certify that on this 24th day of January, 2022, I served the foregoing Brief for Appellant/Cross-Appellee by electronic service via the CM/ECF system on counsel of record for appellee/cross-appellant.


 /s/ Stephanie R. Marcus
Stephanie R. Marcus

**ADDENDUM**

# TABLE OF CONTENTS

**Statute:**

42 U.S.C § 1395ww(d)(5)(F)(v) ...........................................................Add. 1

42 U.S.C § 1395ww(d)(5)(F)(vi) .........................................................Add. 1

**Regulatory Materials:**

42 C.F.R. § 405.1871(a) ......................................................................Add. 3

70 Fed. Reg. 47,278, 47,439-47,440 (Aug. 12, 2005) .......................Add. 4

75 Fed. Reg. 50,042, 50,275-50,285 (Aug. 16, 2010) .......................Add. 7

**Statute:**

**42 U.S.C § 1395ww.    Payments to hospitals for inpatient hospital services (excerpts)**

\*\*\*

**[42 U.S.C § 1395ww(d)(5)(F)(v), (vi)]**

**(d) Inpatient hospital service payments on basis of prospective rates; Medicare Geographic Classification Review Board**

 **(v)** In this subparagraph, a hospital "serves a significantly disproportionate number of low income patients" for a cost reporting period if the hospital has a disproportionate patient percentage (as defined in clause (vi)) for that period which equals, or exceeds--

  **(I)** 15 percent, if the hospital is located in an urban area and has 100 or more beds,

  **(II)** 30 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in a rural area and has more than 100 beds, or is located in a rural area and is classified as a sole community hospital under subparagraph (D),

  **(III)** 40 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in an urban area and has less than 100 beds, or

  **(IV)** 45 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in a rural area and is not described in subclause (II).

A hospital located in a rural area and with 500 or more beds also "serves a significantly disproportionate number of low income patients" for a cost reporting period if the hospital has a disproportionate patient percentage (as defined in clause (vi)) for that period which equals or exceeds a percentage specified by the Secretary.

 **(vi)** In this subparagraph, the term "disproportionate patient percentage" means, with respect to a cost reporting period of a hospital, the sum of--

  **(I)** the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter,

and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter, and

**(II)** the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI.

**Regulation:**

**42 C.F.R. § 405.1871.  Board hearing decision (excerpt)**

**\*\*\***

**[42 C.F.R. § 405.1871(a)]**

(a)(1) If the Board finds jurisdiction over a specific matter at issue and conducts a hearing on the matter (as described in § 405.1840(a) and § 405.1845(e) of this subpart), the Board must issue a hearing decision deciding the merits of the specific matter at issue.

    (2) A Board hearing decision must be in writing and based on the admissible evidence from the Board hearing and other admissible evidence and written argument or comments as may be included in the record and accepted by the Board (as described in § 405.1845(g) and § 405.1865 of this subpart).

    (3) The decision must include findings of fact and conclusions of law regarding the Board's jurisdiction over each specific matter at issue (see § 405.1840(c)(1)), and whether the provider carried its burden of production of evidence and burden of proof by establishing, by a preponderance of the evidence, that the provider is entitled to relief on the merits of the matter at issue.

    (4) The decision must include appropriate citations to the record evidence and to the applicable law, regulations, CMS Rulings, and other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS. Where the Board's decision reverses or modifies a contractor determination on an issue for which the policy expressed in an interpretive rule (other than a regulation or a CMS Ruling), general statement of policy or rule of agency organization, procedure or practice established by CMS would be dispositive of that issue (if followed by the Board), the Board decision must explain how it gave great weight to such interpretive rule or other such instruction but did not uphold the contractor's determination on the issue.

    (5) A copy of the decision must be sent promptly to each party to the appeal.

**Add. 3**

USCA Case #20-5350    Document #1983095    Filed: 01/24/2023    Page 57 of 71

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 405, 412, 413, 415, 419, 422, and 485**

**[CMS–1500–F]**

**RIN 0938–AN57**

## Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates

**AGENCY:** Centers for Medicare and Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

**SUMMARY:** We are revising the Medicare hospital inpatient prospective payment systems (IPPS) for operating and capital-related costs to implement changes arising from our continuing experience with these systems. In addition, in the Addendum to this final rule, we describe the changes to the amounts and factors used to determine the rates for Medicare hospital inpatient services for operating costs and capital-related costs. We also are setting forth rate-of-increase limits as well as policy changes for hospitals and hospital units excluded from the IPPS that are paid in full or in part on a reasonable cost basis subject to these limits. These changes are applicable to discharges occurring on or after October 1, 2005, with one exception: The changes relating to submittal of hospital wage data by a campus or campuses of a multicampus hospital system (that is, the changes to § 412.230(d)(2) of the regulations) are effective on August 12, 2005.

Among the policy changes that we are making are changes relating to: The classification of cases to the diagnosis-related groups (DRGs); the long-term care (LTC)–DRGs and relative weights; the wage data, including the occupational mix data, used to compute the wage index; rebasing and revision of the hospital market basket; applications for new technologies and medical services add-on payments; policies governing postacute care transfers, payments to hospitals for the direct and indirect costs of graduate medical education, submission of hospital quality data, payment adjustment for low-volume hospitals, changes in the requirements for provider-based facilities; and changes in the requirements for critical access hospitals (CAHs).

**DATES:** *Effective Dates:* The provisions of this final rule, except the provisions

of § 412.230(d)(2), are effective on October 1, 2005. The provisions of § 412.230(d)(2) are effective on August 12, 2005. This rule is a major rule as defined in 5 U.S.C. 804(2). Pursuant to 5 U.S.C. 801(a)(1)(A), we are submitting a report to Congress on this rule on August 1, 2005.

**FOR FURTHER INFORMATION CONTACT:**

Marc Hartstein, (410) 786–4548, Operating Prospective Payment, Diagnosis-Related Groups (DRGs), Wage Index, New Medical Services and Technology Add-On Payments, Hospital Geographic Reclassifications, Postacute Care Transfers, and Disproportionate Share Hospital Issues.

Tzvi Hefter, (410) 786–4487, Capital Prospective Payment, Excluded Hospitals, Graduate Medical Education, Critical Access Hospitals, and Long-Term Care (LTC)–DRGs, and Provider-Based Facilities Issues.

Steve Heffler, (410) 786–1211, Hospital Market Basket Revision and Rebasing.

Siddhartha Mazumdar, (410) 786–6673, Rural Hospital Community Demonstration Project Issues.

Mary Collins, (410) 786–3189, Critical Access Hospitals (CAHs) Issues.

Debbra Harris, (410) 786–1855, Quality Data for Annual Payment Update Issues.

Martha Kuespert, (410) 786–4605, Specialty Hospitals Definition Issues.

**SUPPLEMENTARY INFORMATION:**

### Electronic Access

This *Federal Register* document is also available from the *Federal Register* online database through *GPO Access*, a service of the U.S. Government Printing Office. Free public access is available on a Wide Area Information Server (WAIS) through the Internet and via asynchronous dial-in. Internet users can access the database by using the World Wide Web; the Superintendent of Documents home page address is *http://www.access.gpo.gov/nara_docs/*, by using local WAIS client software, or by telnet to *swais.access.gpo.gov*, then login as guest (no password required). Dial-in users should use communications software and modem to call (202) 512–1661; type swais, then login as guest (no password required).

### Acronyms

AAOS  American Association of Orthopedic Surgeons
ACGME  Accreditation Council on Graduate Medical Education
AHIMA  American Health Information Management Association
AHA  American Hospital Association
AICD  Automatic implantable cardioverter defibrillator

AMI  Acute myocardial infarction
AOA  American Osteopathic Association
ASC  Ambulatory Surgical Center
ASP  Average sales price
AWP  Average wholesale price
BBA  Balanced Budget Act of 1997, Pub. L. 105–33
BES  Business Expenses Survey
BIPA  Medicare, Medicaid, and SCHIP [State Children's Health Insurance Program] Benefits Improvement and Protection Act of 2000, Pub. L. 106–554
BLS  Bureau of Labor Statistics
CAH  Critical access hospital
CBSAs  Core-Based Statistical Areas
CC  Complication or comorbidity
CIPI  Capital Input Price Index
CMS  Centers for Medicare & Medicaid Services
CMSA  Consolidated Metropolitan Statistical Area
COBRA  Consolidated Omnibus Reconciliation Act of 1985, Pub. L. 99–272
CoP  Condition of Participation
CPI  Consumer Price Index
CRNA  Certified registered nurse anesthetist
CRT  Cardiac Resynchronization Therapy
DRG  Diagnosis-related group
DSH  Disproportionate share hospital
ECI  Employment Cost Index
FDA  Food and Drug Administration
FIPS  Federal Information Processing Standards
FQHC  Federally qualified health center
FTE  Full-time equivalent
FY  Federal fiscal year
GAAP  Generally accepted accounting principles
GAF  Geographic adjustment factor
HIC  Health Insurance Card
HIS  Health Information System
GME  Graduate medical education
HCRIS  Hospital Cost Report Information System
HIPC  Health Information Policy Council
HIPAA  Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191
HHA  Home health agency
HHS  Department of Health and Human Services
HPSA  Health Professions Shortage Area
HQA  Hospital Quality Alliance
ICD–9–CM  International Classification of Diseases, Ninth Revision, Clinical Modification
ICD–10–PCS  International Classification of Diseases, Tenth Edition, Procedure Coding System
ICU  Intensive Care Unit
IHS  Indian Health Service
IME  Indirect medical education
IPPS  Acute care hospital inpatient prospective payment system
IPF  Inpatient psychiatric facility
IRF  Inpatient rehabilitation facility
IRP  Initial residency period
JCAHO  Joint Commission on Accreditation of Healthcare Organizations
LAMCs  Large area metropolitan counties
LTC–DRG  Long-term care diagnosis-related group
LTCH  Long-term care hospital
MCE  Medicare Code Editor
MCO  Managed care organization
MDC  Major diagnostic category

**Add. 4**

entitlement information for the fiscal year to determine the number of Medicare/SSI days for each hospital during each fiscal year. These data are maintained in the MedPAR Limited Data Set (LDS) as described in more detail below and discussed in a notice published on August 18, 2000 in the **Federal Register** (65 FR 50548). The number of patient days furnished by the hospital to Medicare beneficiaries entitled to SSI is divided by the hospital's total number of Medicare days (the denominator of the Medicare fraction). CMS determines this number from Medicare claims data; hospitals also have this information in their records. The Medicare fraction for each hospital is posted on the CMS Web site (*http://www.cms.hhs.gov*) under the SSI/Medicare Part A Disproportionate Share Percentage File. Under current regulations at § 412.106(b)(3), a hospital may request to have its Medicare fraction recomputed based on the hospital's cost reporting period if that year differs from the Federal fiscal year. This request may be made only once per cost reporting period, and the hospital must accept the resulting DSH percentage for that year, whether or not it is a more favorable number than the DSH percentage based on the Federal fiscal year.

In accordance with section 951 of Pub. L. 108–173, as we proposed in the FY 2006 IPPS proposed rule, we are changing the process that we use to make Medicare data used in the DSH calculation available to hospitals. Currently, as stated above, CMS calculates the Medicare fraction for each section 1886(d) hospital using data from the MedPAR LDS (as established in a notice published in the August 18, 2000 **Federal Register** (65 FR 50548)). The MedPAR LDS contains a summary of all services furnished to a Medicare beneficiary, from the time of admission through discharge, for a stay in an inpatient hospital or skilled nursing facility, or both; SSI eligibility information; and enrollment data on Medicare beneficiaries. The MedPAR LDS is protected by the Privacy Act of 1974 (5 U.S.C. 552a) and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104–191). The Privacy Act allows us to disclose information without an individual's consent if the information is to be used for a purpose that is compatible with the purpose(s) for which the information was collected. Any such compatible use of data is known as a "routine use." In order to obtain this privacy-protected data, the hospital must qualify under the routine

use that was described in the August 18, 2000 **Federal Register**. Currently, a hospital qualifies under the routine use if it has an appeal properly pending before the Provider Reimbursement Review Board (PRRB) or before an intermediary on the issue of whether it is entitled to DSH payments, or the amount of such payments. Once determined eligible to receive the data under the routine use, the hospital is then required to sign a data use agreement with CMS to ensure that the data are appropriately used and protected, and pay the requisite fee.

Beginning with cost reporting periods that include December 8, 2004 (within one year of the date of enactment of Pub. L. 108–173), we will arrange to furnish, consistent with the Privacy Act, MedPAR LDS data for a hospital's patients eligible for both SSI and Medicare at the hospital's request, regardless of whether there is a properly pending appeal relating to DSH payments. We will make the information available for either the Federal fiscal year or, if the hospital's fiscal year differs from the Federal fiscal year, for the months included in the 2 Federal fiscal years that encompass the hospital's cost reporting period. Under this provision, the hospital will be able to use these data to calculate and verify its Medicare fraction, and to decide whether it prefers to have the fraction determined on the basis of its fiscal year rather than a Federal fiscal year. The data set made available to hospitals will be the same data set CMS uses to calculate the Medicare fractions for the Federal fiscal year.

Because we interpret section 951 to require the Secretary to arrange to furnish these data, we do not believe that it will continue to be appropriate to charge hospitals to access the data. These changes will require CMS to modify the current routine use for the MedPAR LDS to reflect changes in the data provided and the circumstances under which they are made available to hospitals. In a future **Federal Register** document, we will publish the details of any necessary modifications to the current routine use to implement section 951 of Pub. L. 108–173.

*Comment:* Several commenters supported our proposal to release information from the MedPAR LDS to hospitals so that they can verify their Medicare DSH calculation. The commenters also supported our proposal to allow hospitals to choose whether they prefer to have their calculations performed using data from the Federal fiscal year or the hospital's cost reporting period. In addition, most commenters agreed with our proposal to

eliminate the need for a pending appeal in order to receive the data and to eliminate the corresponding fee.

Several commenters requested that CMS expedite the publication of the updated routine use for the MedPAR system of records, which will reflect the changes necessary to implement section 951 of Pub. L. 108–173. One commenter urged CMS to eliminate the fee associated with data requests for all years and not just years that span December 8, 2004. In addition, the commenter recommended the elimination of the appeals requirement for all years, including those that occur before the cost reporting period that includes December 8, 2004.

One commenter recommended that CMS clarify how hospitals will receive the SSI/Medicare data for both the Federal fiscal year and the hospital's cost reporting period. The commenter also asked whether CMS expected or would require hospitals to elect the same time period from year to year. Another commenter requested that CMS provide specific guidance to hospitals and fiscal intermediaries on how to use this information to support the Medicare DSH calculation. One commenter requested that CMS clarify whether the data provided to the hospitals will be patient-specific and whether the data will include the date of discharge.

*Response:* We appreciate the commenters' support for our proposed policies and kept their views in mind in developing the final regulations set forth below. We understand hospitals' need for more information on the updated routine use and data use agreement and are working to release these documents as soon as possible. As we stated in the FY 2006 IPPS proposed rule, the new routine use and data use agreement will require neither a fee nor a properly pending appeal before the fiscal intermediary or the PRRB for us to furnish information from the MedPAR LDS to hospitals. Hospitals must submit a written request to CMS through the fiscal intermediary to receive this information. With respect to applying this policy retroactively, section 903 of Pub. L. 108–173 prohibits us from issuing retroactive rulemaking unless it is necessary to comply with statutory requirements, or failure to apply the change retroactively would be contrary to public interest. We do not believe this policy meets either of the conditions for making the policy retroactive to cost reporting periods prior to those that span December 8, 2004.

We expect that hospitals will use these data to calculate and verify DSH Medicare fraction, and to decide

whether they prefer to have the fraction determined on the basis of their cost reporting period rather than a Federal fiscal year. The information from the MedPAR LDS released to hospitals will contain the matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis for the 2 Federal fiscal years that comprise a hospital's cost reporting period. At this time, we are not requiring hospitals to select either the Federal fiscal year or their cost reporting period and use that selection for each subsequent year. A hospital may opt to use the data from either time period each year. Regardless, a hospital will continue to be required under the regulations at § 412.106(b)(3) to submit a written request to CMS, through its fiscal intermediary, if it prefers to use its cost reporting period data instead of the Federal fiscal year data in determining the DSH Medicare fraction. The resulting fraction will become the hospital's official DSH Medicare fraction for that period and will be binding for that cost reporting period.

*Comment:* One commenter cautioned that, while access to the data could reduce the number of appeals to the PRRB on the DSH calculation, CMS must respond in a timely manner to hospital requests for the SSI/Medicare data for this policy to be effective.

*Response:* We understand that it is imperative that we release information from the MedPAR LDS to hospitals in a timely manner to ensure that they can calculate their Medicare DSH fraction. When we publish the updated routine use, we will indicate the timeframes within which we expect to make these data available to hospitals. Currently, we publish the prior Federal fiscal year's DSH Medicare fractions (also called "SSI ratios") for all providers in August of each year.

*Comment:* Several commenters suggested that we release the data file of SSI eligibility information provided to CMS by SSA. The commenters indicated that hospitals need access to the SSI eligibility file in order to compute their own Medicare DSH adjustment. One commenter suggested that CMS modify the routine use to allow SSI eligibility information to be provided directly to hospitals.

*Response:* In accordance with the published routine use for the SSI system of records maintained by the SSA, CMS signs a data use agreement with SSA to receive the SSI data file for the sole purpose of administering the Medicare and Medicaid programs. While we understand the commenters' concern, CMS is strictly prohibited from disclosing SSI eligibility information. In

addition, SSA is prohibited from disclosing this information by Federal law and regulations. While we cannot release the SSI eligibility information provided by SSA, we are permitted to disclose the results of the data match of SSI eligibility information with the Medicare inpatient hospital billing data as a routine use for the MedPAR LDS system of records. The routine use allows us to release the information to hospitals that sign a data use agreement that limits the uses and protects the privacy of the SSI/MedPAR LDS match information.

*Comment:* One commenter stated that SSA has expressed a willingness to provide CMS with updated SSI eligibility information that may include retroactive grants or denials of eligibility, which would then be used by CMS to revise calculations of hospitals' DSH Medicare fractions.

*Response:* We understand that many hospitals are concerned that later data matches may produce a different Medicare fraction. However, we believe that there needs to be administrative finality to the calculation of a hospital's Medicare fraction. CMS has previously stated that its goal is to obtain reasonably accurate but not perfect calculations (51 FR 16777). Additionally, our data have shown that 98 to 99 percent of SSI eligibility determinations are made and remain unchanged 6 months after the end of the Federal fiscal year. There will be a minimum of 6 months between the end of the hospital's cost reporting period and the April 1 date that we receive SSI eligibility information. The time lag between the close of a hospital's cost reporting period and the April 1 date that we obtain the eligibility information could actually be much longer for many hospitals. For a hospital with an October 1 to September 30 cost reporting period, we will use SSI eligibility information from 6 months after its year ends. However, we will be using SSI eligibility 17 months after a hospital's year ends with a November 1 to October 31 cost reporting period. Given the time between the end of hospital cost reporting periods and when we are furnished with SSI eligibility information for that period, we believe it is highly unlikely that a subsequent data run will produce data that is significantly different than one completed 6 months after the end of the Federal fiscal year.

Therefore, we will use the SSI eligibility information provided to CMS by SSA 6 months after the end of the Federal fiscal year (or April 1) to calculate the DSH Medicare fraction. We will match these data to the MedPAR

system once and conduct no further matches after that time. For cost reporting periods that span 2 Federal fiscal years, a hospital will receive the data for the 2 Federal fiscal years once the data from the second year have been matched against the SSI data available to CMS 6 months after the end of that year. Although it is possible that these data will be available up to 17 months after the cost reporting period has ended, hospitals will continue to be permitted to use the data to determine whether they prefer to base their calculation on data from the Federal fiscal year or their cost reporting period. The calculation from the requested time period will be used in the final settlement for the cost reporting period. This policy will be reflected in the updated routine use and in the data use agreement, which hospitals will sign with CMS to obtain the privacy protected MedPAR LDS data match. As previously mentioned, we will publish the updated notice of routine use for the MedPAR system of records in a future **Federal Register** document.

*Comment:* One commenter requested that CMS allow hospitals to choose the data field CMS would use to conduct the SSI eligibility/MedPAR LDS data match. The commenter suggested that hospitals be allowed to request that the data match be made by social security number, health insurance claim account number (HICAN), name, gender, date of birth, or Title II identifier, or a combination of these factors.

*Response:* We do not use social security numbers to conduct the SSI/MedPAR data match because social security numbers are used on a "wage earner" basis that is not necessarily specific to an individual Medicare beneficiary (or hospital patient). The HICANs are unique to each beneficiary. Because of this, we do not have social security numbers for every Medicare beneficiary in the MedPAR data.

In addition, we do not agree that individual hospitals should be given the choice to run the SSI/MedPAR data match by alternative criteria. Such variation between providers would result in an inconsistent matching methodology, and inconsistent DSH Medicare fraction calculations, among providers.

*Comment:* One commenter suggested that, in place of using the MedPAR system, CMS use the Provider Statistical and Reimbursement (PS&R) data file to determine the denominator of the Medicare fraction.

*Response:* We believe it is appropriate to continue to use the MedPAR for Medicare DSH calculations. Principally, as documented in the **Federal Register**,

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**42 CFR Parts 412, 413, 415, 424, 440, 441, 482, 485, and 489**

**[CMS–1498–Fand CMS–1498–IFC; CMS–1406–F]**

**RIN 0938–AP80; RIN 0938–AP33**

**Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System Changes and FY2011 Rates; Provider Agreements and Supplier Approvals; and Hospital Conditions of Participation for Rehabilitation and Respiratory Care Services; Medicaid Program: Accreditation for Providers of Inpatient Psychiatric Services**

**AGENCY:** Centers for Medicare and Medicaid Services (CMS), HHS.

**ACTION:** Final rules and interim final rule with comment period.

**SUMMARY:** We are revising the Medicare hospital inpatient prospective payment systems (IPPS) for operating and capital-related costs of acute care hospitals to implement changes arising from our continuing experience with these systems and to implement certain provisions of the Affordable Care Act and other legislation. In addition, we describe the changes to the amounts and factors used to determine the rates for Medicare acute care hospital inpatient services for operating costs and capital-related costs. We also are setting forth the update to the rate-of-increase limits for certain hospitals excluded from the IPPS that are paid on a reasonable cost basis subject to these limits.

We are updating the payment policy and the annual payment rates for the Medicare prospective payment system (PPS) for inpatient hospital services provided by long-term care hospitals (LTCHs) and setting forth the changes to the payment rates, factors, and other payment rate policies under the LTCH PPS. In addition, we are finalizing the provisions of the August 27, 2009 interim final rule that implemented statutory provisions relating to payments to LTCHs and LTCH satellite facilities and increases in beds in existing LTCHs and LTCH satellite facilities under the LTCH PPS.

We are making changes affecting the: Medicare conditions of participation for hospitals relating to the types of practitioners who may provide

rehabilitation services and respiratory care services; and determination of the effective date of provider agreements and supplier approvals under Medicare.

We are also setting forth provisions that offer psychiatric hospitals and hospitals with inpatient psychiatric programs increased flexibility in obtaining accreditation to participate in the Medicaid program. Psychiatric hospitals and hospitals with inpatient psychiatric programs will have the choice of undergoing a State survey or of obtaining accreditation from a national accrediting organization whose hospital accreditation program has been approved by CMS.

We are also issuing an interim final rule with comment period to implement a provision of the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010 relating to Medicare payments for outpatient services provided prior to a Medicare beneficiary's inpatient admission.

**DATES:** *Effective Date:* These rules are effective on October 1, 2010, except for amendments to § 412.2(c)(5) introductory text, (c)(5)(iii), and (c)(5)(iv); § 412.405; § 412.521(b)(1); § 412.540; § 412.604(f); § 413.40(c)(2) introductory text, (c)(2)(iii), and (c)(2)(iv), that are effective on June 25, 2010 and apply to services furnished on or after June 25, 2010. In accordance with sections 1871(e)(1)(A)(i) and (ii) of the Social Security Act, the Secretary has determined that retroactive application of these regulatory amendments is necessary to comply with the statute and that failure to apply the changes retroactively would be contrary to public interest:

*Comment Period:* To be assured consideration, comments on the interim final rule with comment period (CMS–1498–IFC) that appears as section IV.M., of the preamble of this document and includes amendments to § 412.2(c)(5) introductory text, (c)(5)(iii), and (c)(5)(iv); § 412.405; § 412.521(b)(1); § 412.540; § 412.604(f); § 413.40(c)(2) introductory text, (c)(2)(iii), and (c)(2)(iv) must be received at one of the addresses provided below, no later than 5 p.m. EST on September 28, 2010. Comments on other sections of this document will not be considered.

**ADDRESSES:** When commenting on issues presented in the interim final rule with comment period, please refer to file code CMS–1498–IFC. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation at *http://www.regulations.gov.* Follow the instructions for "Comment or Submission" and enter the file code CMS–1498–IFC to submit comments on this interim final rule.

2. *By regular mail.* You may mail written comments (one original and two copies) to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1498–IFC, P.O. Box 8011, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments (one original and two copies) to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1406–IFC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments (one original and two copies) before the close of the comment period to either of the following addresses:

a. Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201

(Because access to the interior of the HHH Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, please call telephone number (410) 786–7195 in advance to schedule your arrival with one of our staff members.

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Tzvi Hefter, (410) 786–4487, and Ing-Jye Cheng, (410) 786–4548, Operating Prospective Payment, MS–DRGs, Hospital Acquired Conditions (HAC),

meet the Medicare discharge criterion based on the latest available MedPAR data. However, the hospital must verify in writing to its fiscal intermediary or MAC that it continues to be more than 15 miles from any other IPPS hospital. (As noted above, we expect Medicare claims data from FY 2010 to be available to determine the low-volume payment adjustment for FY 2012.) A hospital that was not a low-volume hospital in FY 2011, and believes it meets the discharge and mileage criterion for FY 2012, should make its request in writing, with documentation that it meets the mileage criterion, to its fiscal intermediary or MAC by September 1, 2011, in order for the applicable low-volume percentage add-on to be applied beginning with discharges on or after October 1, 2011.

*Comment:* A few commenters requested clarification regarding the application of the low-volume payment adjustment at section 1886(d)(12) of the Act to SCHs and MDHs, given that these types of hospitals are also subsection (d) hospitals. These commenters also requested that CMS explicitly state that the applicable low-volume percentage add-on is applied to an SCH's or a MDH's payments at the Federal rate or the hospital-specific rate.

*Response:* Section 1886(d)(12)(C)(i) defines a low-volume hospital, in part, as a "subsection (d) hospital." SCHs and MDHs are "subsection (d) hospitals" although they can be paid under a hospital-specific rate instead of under the Federal standardized amount under the IPPS. As subsection (d) hospitals, SCHs and MDHs are eligible to receive the low-volume adjustment if the hospital meets the discharge and mileage criteria. Section 1886(d)(12)(A) states that the applicable low-volume percentage add-on payment will be "[i]n addition to any payments calculated [under section 1886]". For SCHs and MDHs, payment under section 1886 is determined using either the Federal rate or the hospital-specific rate, whichever results in a greater payment.

After consideration of the public comments we received, we are adopting the continuous linear sliding scale equation set forth by commenters to determine the low-volume payment adjustment for FYs 2011 and 2012 for eligible low-volume hospitals with Medicare discharges of *more than 200* and *less than 1,600* (that is, from 201 to 1,599 Medicare discharges), and we have modified § 412.101(c)(2) of the regulations in this final rule accordingly. We are revising § 412.101 to reflect the final changes as discussed above. In addition, we note that we are making structural changes to the final

regulation text at § 412.101 as compared to the proposed regulation text at § 412.101(for example, we are combining proposed paragraph (b)(2)(iii) into paragraph (b)(2)(i) to more concisely reflect the final policy that we are establishing in this final rule).

## E. Indirect Medical Education (IME) Adjustment (§ 412.105)

### 1. Background

Section 1886(d)(5)(B) of the Act provides for an additional payment amount under the IPPS for hospitals that have residents in an approved graduate medical education (GME) program in order to reflect the higher indirect patient care costs of teaching hospitals relative to nonteaching hospitals. The regulations regarding the calculation of this additional payment, known as the indirect medical education (IME) adjustment, are located at § 412.105.

Public Law 105–33 (BBA 1987) established a limit on the number of allopathic and osteopathic residents that a hospital may include in its full-time equivalent (FTE) resident count for direct GME and IME payment purposes. Under section 1886(h)(4)(F) of the Act, for cost reporting periods beginning on or after October 1, 1997, a hospital's unweighted FTE count of residents for purposes of direct GME may not exceed the hospital's unweighted FTE count for its most recent cost reporting period ending on or before December 31, 1996. Under section 1886(d)(5)(B)(v) of the Act, a similar limit on the FTE resident count for IME purposes is effective for discharges occurring on or after October 1, 1997.

### 2. IME Adjustment Factor for FY 2011

The IME adjustment to the MS–DRG payment is based in part on the applicable IME adjustment factor. The IME adjustment factor is calculated by using a hospital's ratio of residents to beds, which is represented as $r$, and a formula multiplier, which is represented as $c$, in the following equation: $c \times [(1 + r)^{.405} - 1]$. The formula is traditionally described in terms of a certain percentage increase in payment for every 10-percent increase in the resident-to-bed ratio.

Section 502(a) of Public Law 108–173 modified the formula multiplier *(c)* to be used in the calculation of the IME adjustment. Prior to the enactment of Public Law 108–173, the formula multiplier was fixed at 1.35 for discharges occurring on or after FY 2003 and thereafter. In the FY 2005 IPPS final rule, we announced the schedule of formula multipliers to be used in the

calculation of the IME adjustment and incorporated the schedule in our regulations at § 412.105(d)(3)(viii) through (d)(3)(xii). Section 502(a) modified the formula multiplier beginning midway through FY 2004 and provided for a new schedule of formula multipliers for FYs 2005 and thereafter as follows:

• For discharges occurring on or after April 1, 2004, and before October 1, 2004, the formula multiplier is 1.47.
• For discharges occurring during FY 2005, the formula multiplier is 1.42.
• For discharges occurring during FY 2006, the formula multiplier is 1.37.
• For discharges occurring during FY 2007, the formula multiplier is 1.32.
• For discharges occurring during FY 2008 and fiscal years thereafter, the formula multiplier is 1.35.

Accordingly, for discharges occurring during FY 2011, the formula multiplier is 1.35. We estimate that application of this formula multiplier for the FY 2011 IME adjustment will result in an increase in IPPS payment of 5.5 percent for every approximately 10-percent increase in the hospital's resident-to-bed ratio.

### 3. IME-Related Changes in Other Sections of this Final Rule

We refer readers to section IV.H.2. and IV.H.3. of the preamble of this final rule for a discussion of changes to the policies for identifying "approved medical residency programs" and the electronic submission of Medicare GME affiliation agreements.

## F. Payment Adjustment for Medicare Disproportionate Share Hospitals (DSHs): Supplemental Security Income (SSI) Fraction (§ 412.106)

### 1. Background

Section 1886(d)(5)(F) of the Act provides for additional Medicare payments to subsection (d) hospitals that serve a significantly disproportionate number of low-income patients. The Act specifies two methods by which a hospital may qualify for the Medicare disproportionate share hospital (DSH) adjustment. Under the first method, hospitals that are located in an urban area and have 100 or more beds may receive a Medicare DSH payment adjustment if the hospital can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are derived from State and local government payments for care furnished to needy patients with low incomes. This method is commonly referred to as the "Pickle method."

The second method for qualifying for the DSH payment adjustment, which is

the most common, is based on a complex statutory formula under which the DSH payment adjustment is based on the hospital's geographic designation, the number of beds in the hospital, and the level of the hospital's disproportionate patient percentage (DPP). A hospital's DPP is the sum of two fractions: the "Supplemental Security Income (SSI) fraction" and the "Medicaid fraction." The SSI fraction (also known as the "SSI ratio" or the "Medicare fraction") is computed by dividing the number of the hospital's inpatient days that are furnished to patients who were entitled to both Medicare Part A (including patients who are enrolled in a Medicare Advantage (Part C) plan) and SSI benefits by the hospital's total number of patient days furnished to patients entitled to benefits under Medicare Part A (including patients who are enrolled in a Medicare Advantage (Part C) plan). The Medicaid fraction is computed by dividing the hospital's number of inpatient days furnished to patients who, for such days, were eligible for Medicaid, but were not entitled to benefits under Medicare Part A, by the hospital's total number of inpatient days in the same period.

Because the DSH payment adjustment is part of the IPPS, the DSH statutory references (under section 1886(d)(5)(F) of the Act) to "days" apply only to hospital acute care inpatient days. Regulations located at 42 CFR 412.106 govern the Medicare DSH payment adjustment and specify how the DPP is calculated as well as how beds and patient days are counted in determining the DSH payment adjustment. Under § 412.106(a)(1)(i), the number of beds for the Medicare DSH payment adjustment is determined in accordance with bed counting rules for the IME adjustment under § 412.105(b).

## 2. CMS' Current Data Matching Process for the SSI Fraction

As we discussed in the FY 2011 IPPS/LTCH PPS proposed rule (75 FR 24002), from the inception of the Medicare DSH adjustment in 1986, CMS (formerly HCFA) has calculated the SSI fraction for each acute care hospital paid under the IPPS. This fraction, in combination with the Medicaid fraction, is used to determine whether the provider qualifies for a DSH payment adjustment and the amount of any such payment (51 FR 16772, 16777, May 6, 1986 interim final rule). In determining the number of inpatient days for individuals entitled to both Medicare Part A and SSI, as required for calculation of the numerator of the SSI fraction, CMS matches the Medicare records and SSI

eligibility records for each hospital's patients during the Federal fiscal year, unless the provider requests calculation of the SSI fraction on a cost reporting period basis (in which case the provider would receive its SSI fraction based on its own cost reporting period). The data underlying the match process are drawn from: (a) The Medicare Provider Analysis and Review (MedPAR) data file; and (b) SSI eligibility data provided by the Social Security Administration (SSA). CMS has matched Medicare and SSI eligibility records using Title II numbers (included in the SSI records) and Health Insurance Claims Account Numbers (HICANs) (contained in the MedPAR file). Below we provide a more detailed description of both a Title II number and a HICAN.

*Title II Number:* If a person qualifies for retirement or disability benefits under Title II of the Act (42 U.S.C. 401 *et seq.*), SSA assigns a "Title II number" to the individual. If the Title II beneficiary's own earnings history (or the individual's disability) were the basis for such benefits, the person's Social Security number (SSN) would constitute the "root" of the individual's Title II number. However, if the person's Title II benefits were based on the earnings history of another individual (for example, a spouse), that other person's SSN would provide the root for the beneficiary's Title II number. In addition to a root SSN, each Title II number ends with a Beneficiary Identification Code (BIC) that identifies the basis for an individual's entitlement to benefits. For example, a person who becomes eligible for benefits under his or her own account would be described by his or her SSN followed by the BIC "A" whereas a wife who becomes eligible for benefits under her husband's account would be described by his SSN followed by the BIC "B." Children who become eligible under a parent's account would be described by the parent's SSN followed by the BIC "C1," "C2," etc.

*HICAN:* When a person becomes entitled to Medicare benefits, he or she is assigned a HICAN for purposes of processing claims submitted on his or her behalf for Medicare services. A beneficiary's HICAN (which may not necessarily contain his or her SSN) is included on the Medicare inpatient hospital claim.

Each HICAN for a beneficiary should be identical, at the same point in time, to that individual's Title II number. This is because HICANs and Title II numbers are both assigned on the basis of the same data source, the SSA-maintained Master Beneficiary Record, and by using the same rules (that is, the rules for

determining which person's SSN will serve as the root for an individual's HICAN and Title II number and for determining the BIC for both types of numbers).

We note that a person's Title II number and HICAN can change over time. For example, if the individual's entitlement to Title II and Medicare benefits was originally based on the earnings history of a first spouse, but the beneficiary later qualified for such benefits on the basis of a second spouse's earnings history, the beneficiary's HICAN and Title II number would change accordingly. Specifically, the first spouse's SSN would be the root of the beneficiary's original HICAN and Title II number; later, the second spouse's SSN would become the root of the beneficiary's second HICAN and Title II number.

The SSI eligibility data that CMS receives from SSA contain monthly indicators to denote which month(s) each person was eligible for SSI benefits during a specific time period. The current matching process uses only one Title II number (which is included in the SSI file) and one HICAN (found in the MedPAR file) for each beneficiary. In the current matching process, CMS has used the HICAN because it is the patient identifier that is provided by hospitals on the Medicare claim. Because SSNs are not included on Medicare inpatient claims, CMS has not historically used SSNs in the match process.

For a given fiscal year, CMS determines the numerator of the hospital's SSI fraction (that is, the number of the hospital's inpatient days for all of its patients who were simultaneously entitled to Medicare Part A benefits and SSI benefits) by calculating the sum of the number of the hospital's inpatient days that are associated with all of the identical Title II numbers and HICANs for the hospital's claims that are found through the data matching process. In turn, CMS determines the denominator of the hospital's SSI fraction by calculating the sum of the number of the hospital's inpatient days for patients entitled to benefits under Medicare Part A (regardless of SSI eligibility) that are included in the hospital's inpatient claims for the period.

## 3. *Baystate Medical Center* v. *Leavitt* Court Decision

In *Baystate Medical Center* v. *Leavitt,* 545 F. Supp. 2d 20, *as amended,* 587 F. Supp. 2d 37, 44 (D.D.C. 2008), the district court concluded that, in certain respects, CMS' current matching process (as described above) did not use the

"best available data" to match Medicare patient day information with SSI eligibility data when calculating the plaintiff's SSI fractions for FYs 1993 through 1996. Specifically, the court found that:

• Stale SSI Records and Forced Pay SSI Records. For the earliest years in question in *Baystate,* the SSI eligibility data did not include "stale" records— that is, records for individuals whose SSI records were no longer active from SSA's perspective. (We note that it is our understanding that, as of the year 2000, SSA no longer differentiates between inactive and active records and therefore, no longer uses the "stale record" indicator in its databases.) The court also found that the SSI data file only included SSI eligibility information for SSI payments that were automated (as opposed to manual), thereby excluding those people who, for whatever reason, received manual or "forced pay" payments. *Baystate,* 545 F. Supp. 2d at 44–46.

• Match Based on Only One Title II Number and One HICAN. The court found fault with CMS' use of only a single Title II number and one HICAN in the match process. As a beneficiary may receive SSI and Medicare Part A benefits under more than one Title II number and HICAN over a period of time, CMS would not have matched a beneficiary's records if there had been a change in the person's Title II number and HICAN between the time of an inpatient stay and when the match process was completed. *Baystate,* 545 F. Supp. 2d at 46–49.

• Retroactive SSI Eligibility Determinations and Lifting of Payment Suspensions. The court found that the match process did not appropriately account for retroactive eligibility determinations of SSI eligibility and the lifting of payment suspensions because the match process used SSI eligibility data that did not include more recent retroactive determinations of SSI eligibility and the lifting of SSI payment suspensions. By not using more recent SSI eligibility information that was available to CMS at the time of the hospital's cost report settlement, the court concluded that CMS did not use the "best available data" to calculate the provider's SSI fraction. *Baystate,* 545 F. Supp. 2d at 42–44.

CMS continues to believe that its current data matching process and the resultant SSI fraction and DSH payments were lawful. Nonetheless, the agency did not appeal the *Baystate* decision. Accordingly, CMS implemented the court's decision by recalculating the plaintiff's SSI fractions for 1993 through 1996. In recalculating

the SSI fractions at issue in the *Baystate* case, we worked closely with SSA to ensure that stale and forced pay SSI records were included in the SSI eligibility data. Also, we used a revised data matching process (described in more detail below) that comports with the court's decision. As the revised data matching process was completed using SSI eligibility data compiled between 13 and 16 years beyond the fiscal years at issue in the *Baystate* case, we believe any issues associated with retroactive determinations of SSI eligibility and the lifting of payment suspensions had been long since resolved. Furthermore, because we believe that the revised match process used to implement the Baystate decision addressed all of the concerns found by the court, in the FY 2011 IPPS/LTCH PPS proposed rule we proposed to use the same revised data matching process for calculating hospitals' SSI fractions for FY 2011 and subsequent fiscal years.

### 4. CMS' Process for Matching Medicare and SSI Eligibility Data

a. Inclusion of Stale Records and Forced Pay Records in the SSI Eligibility Data Files

In recalculating the SSI fractions at issue in the *Baystate* case, stale records and forced pay records were included in the SSI eligibility data files that CMS used in the revised data match for the four fiscal years at issue. All SSI payment records, whether the payments were automated or manual or were for an individual whose record was active or stale, are now included in the data files provided by SSA and will continue to be included in the future.

b. Use of SSNs in the Revised Match Process

As indicated above, the current matching process only uses one Title II number and one HICAN in the data match process. As we discussed in the FY 2011 IPPS/LTCH PPS proposed rule, by contrast, our revised match process would make use of the Medicare Enrollment Database (EDB), which is CMS' system of records for all individuals who have ever been enrolled in Medicare. The EDB includes SSNs as well as all of an individual's HICANs. In our proposed revised match process, the individual's SSN, contained in the SSI eligibility data file, would be compared to the SSNs in the Medicare EDB, and each matched SSN would then be "cross-walked" within the EDB to find any and all HICANs associated with the individual's SSN. The resulting HICANs would then be matched against

those HICANs contained in the MedPAR claims data files.

As stated in the proposed rule, before explaining our proposed revised match process in more detail, we believe it is appropriate to provide some background regarding SSNs and the three databases that would be used in our proposed match process. An individual should have only one SSN, which should be unique to that individual. The SSN may be assigned by SSA when the individual begins gainful employment (if not earlier). However, if an applicant for SSI benefits does not already have a SSN, SSA then assigns a SSN to the person. Thus, in the SSI eligibility data that SSA provides to CMS, each individual identified in those data should have a unique SSN.

The first database that we proposed to use in our revised match process was the SSI eligibility data file, which contains a unique SSN for every SSI record and could include as many as 10 different historical Title II numbers for the records related to one individual. We proposed to use 10 as the maximum number of Title II numbers for a beneficiary because that is likewise the maximum number of HICANs that can be attributed to any one individual in our EDB. However, we noted that, as a practical matter, the greatest number of historical HICANs associated with any beneficiary appears to be 7. The SSI eligibility file serves as the system of record for whether or not SSA made a payment of SSI benefits to an individual who applied for SSI benefits.

The second relevant database, the Medicare EDB, contains a SSN for virtually every record in the EDB. Furthermore, the EDB has the capacity to hold up to 10 historical HICANs for a specific Medicare enrollee. (It is important to note that, of the more than 100 million records in the EDB, less than 0.07 percent (that is, fewer than 7 of every 10,000 records) relate to individuals for whom the EDB does not include a SSN for the person. The EDB might not include a SSN for an individual if, for example, the person lives in another country but is entitled to Medicare benefits through his or her spouse.)

The third relevant database that we proposed to use in our revised match process was the MedPAR file. Hospitals submit claims to Medicare for inpatient services provided to Medicare beneficiaries. These claims are eventually accumulated in the MedPAR database. We noted that the MedPAR database does not contain SSNs. The MedPAR database contains one HICAN number for each and every record of services provided to a Medicare

**Add. 10**

beneficiary who was admitted to a Medicare-certified hospital or skilled nursing facility. This database allows us to calculate the number of Medicare inpatient hospital days, which we use in determining each hospital's DSH SSI fraction.

Utilizing the steps set forth below, in the proposed rule, we proposed to use these three databases in a revised match process for FY 2011 and subsequent fiscal years:

Step 1—Use SSNs to find any and all relevant HICANs. We proposed to use the SSI eligibility file provided by SSA to compare the individual SSNs in that file to the SSNs contained in the Medicare EDB. Each matched SSN would then be "cross-walked" (within the EDB) to find any and all HICANs associated with the individual's SSN. The resulting HICANs would then be matched against those HICANs contained in the MedPAR claims data files. This process should identify all relevant SSI records in which a SSN is associated with an individual who is simultaneously enrolled in Medicare Part A and in the SSI program.

Step 2—Utilize any and all Title II numbers. In order to provide further assurance that all of the Title II numbers and HICANs for SSI-eligible individuals have been identified, next we proposed to compare the complete list of Title II numbers from the SSI data file (up to 10 Title II numbers for any one individual) to the list of HICANs generated through Step 1 above. If the SSI data file includes any Title II numbers that were not already identified in Step 1, the Title II number would be included in our revised match process and compared to any and all HICANs in MedPAR. We noted that by including this second step (that is, adding all Title II numbers not previously identified by Step 1), we were addressing the very small universe of individuals for whom the EDB does not include a SSN. If an individual is entitled to SSI benefits and Medicare benefits, the new format of the SSI eligibility file will contain up to 10 Title II numbers and, if they have not already been captured, each of those numbers will be included in our revised match process. Even if an individual does not have a SSN in the EDB, this second step should ensure that our revised match process will include that individual.

Step 3—Ensure consistency between the HICANs in the EDB, Title II numbers, and the HICANs in the MedPAR file. The EDB stores the beneficiary's HICAN at the most specific level of detail. For example, if the beneficiary's Medicare eligibility was originally based on the earnings history

of a spouse who subsequently dies, the beneficiary would have two HICANs. Both HICANs, which would have the same root, but different BICs, would be stored in the EDB. However, the inpatient claim in the MedPAR file will only have the individual's HICAN at a more general level of detail; in the preceding example, the BIC would identify the beneficiary only as a spouse without specifying whether the spouse (that is, the "primary" beneficiary) was alive or deceased. This third step should ensure consistency between the HICANs from Step 1 and the Title II numbers from Step 2 by "equating" (or converting) the BIC identifiers to the identifiers that are on the inpatient claim that is included in the MedPAR file. In addition, we proposed that, for any SSI-eligible beneficiary who is receiving Medicare benefits based on his or her own account but whose records have not been matched already, we would attempt to match the beneficiary's HICAN in the MedPAR file. Specifically, we proposed to simply add an "A" to all the SSNs in the SSI eligibility data file so that, if that individual was not captured by Steps 1 and 2 above (for whatever unlikely reason) but MedPAR indicated that the person had received Medicare services, the individual would be included in the data match process by this third step.

Step 4—Calculate the SSI fraction. We did not propose any changes with respect to the final step in determining the SSI fraction. To calculate the numerator of the SSI fraction, CMS would continue to sum a hospital's Medicare inpatient days in the acute care part of the hospital (excluding IPPS-exempt units such as rehabilitation and psychiatric units) where the Medicare beneficiary was simultaneously entitled to SSI benefits. To calculate the denominator, CMS would continue to sum a hospital's total Medicare inpatient days in the acute care part of the hospital.

*Comment:* Many commenters supported the proposed data matching process and applauded CMS for working to refine the data matching process and for sharing details of the process in the proposed rule. Some commenters stated that it was difficult to determine the accuracy of the proposed data matching process without more details about the matching process, including more information on steps, testing, and validation processes or, alternatively, providing the underlying data files to the hospitals. Some commenters asked that CMS ensure that all HICANs included in the MedPAR file match to a HICAN in the EDB. The commenters requested that

CMS exclude any HICANs from the MedPAR file that did not match to the EDB so that the SSI fractions would not be understated. Commenters also asked that CMS ensure that the proposed data matching process is consistent with Federal Information Processing Standards (FIPS). One commenter asked that CMS include SSI indicators in the EDB and give access to authorized parties so that hospitals can calculate their own SSI fractions and litigation over the SSI fractions would be reduced.

*Response:* We appreciate the commenters' support of our proposed data matching process. We believe that the proposed data matching process will produce more accurate SSI fractions. We also believe that we have shared all relevant details about the proposed revised data matching process in order to allow the public a meaningful opportunity to submit comments. Specifically, we have described the specific data files we intend to use, provided information and background about those data files along with a detailed, step-by-step description of how we intend to use those files for purposes of the data matching process, and provided specific information, including examples, of the specific timeframes in which we intend to conduct the various aspects of the data matching processes. However, per the commenters' request, we are sharing additional details in this final rule about the testing and validation procedures we intend to use. Specifically, as part of our internal data validation processes, we will track certain summary statistics in an effort to minimize any errors or omissions of data that might lead to inaccurate SSI fractions. The summary statistics we produce when calculating each fiscal year's SSI fractions for FY 2011 and beyond will include the number of SSI records received from SSA and will include at least all of the following information about SSI records that "matched" to Medicare inpatient hospital claims using the revised data matching process: (1) The number of SSI records matched using the new data matching process; (2) the number of records indicating that the individual is deceased; and (3) the number of records where at least one SSI monthly indicator reflects that the individual was in forced pay or forced due status. Additionally, we will produce summary statistics relating to SSI records that did not match to a Medicare inpatient claim, and will include at least all of the following information: (1) The number of unmatched SSI records with no Title II numbers; (2) the number of unmatched SSI records with one or

more Title II numbers; and (3) the number of records in the EDB with a HICAN, but no SSN. As these data will be used as part of our internal data validation process, we do not intend to provide them to the public.

In response to the comment requesting that we ensure that every HICAN on the MedPAR file match a HICAN in the EDB, we agree that every HICAN in the MedPAR file should match a HICAN in the EDB. We believe that this is necessarily the case because a Medicare claim must be submitted with a valid HICAN in order to populate the MedPAR database. As we stated in the proposed rule, the EDB is CMS' system of records for all individuals who have ever been enrolled in Medicare and includes SSNs as well as all of an individual's (current and historical) HICANs. The MedPAR file includes the HICAN under which the Medicare beneficiary received medical benefits for a particular inpatient stay. Therefore, there should not be a HICAN in the MedPAR file that does not match to a HICAN in the EDB. Because there is no apparent reason for there to be a case where a HICAN in the MedPAR file did not match to a HICAN in the EDB, we did not propose to match HICANs in the MedPAR file to those in the EDB. We also note that "Step 3" of our proposed process should ensure consistency between the HICANs in the EDB and those in the MedPAR file by "equating" (or converting) the BIC identifiers in the EDB to the identifiers that are on the inpatient claim that is included in the MedPAR file. We also proposed that, for any SSI-eligible beneficiary who is receiving Medicare benefits based on his or her own account but whose records have not been matched in steps 1 or 2 of the proposed data matching process, we would attempt to match directly to the beneficiary's HICAN in the MedPAR file. Specifically, we proposed to add an "A" to all the SSNs in the SSI eligibility data file so that, if that individual was not captured by Steps 1 and 2 above, but the MedPAR file indicated that the person had received Medicare services, the individual would be included in the data match process by this third step. We believe that this step further helps us to capture any SSI-entitled individual who is receiving Medicare benefits based on his or her own account. However, after consideration of this public comment, in an attempt to provide even more assurances that our data matching process will yield accurate SSI fractions and capture all Medicare beneficiaries who were entitled to SSI at the time of their

inpatient hospital stay, we will add this step to our validation procedures when conducting the data matching process. That is, we will test the MedPAR data to determine whether each HICAN in the MedPAR file matches to a HICAN in the EDB. In the unlikely event that we find a HICAN in the MedPAR file that we are not able to locate in the EDB, we will investigate the record to determine whether the HICAN is valid (in which case we would include it in our data matching process). However, if we find that the HICAN is not valid, we are adopting a policy to exclude that record from the data matching process, and we also will exclude that invalid record from the calculation of both the numerator and the denominator of the SSI fraction.

With respect to the comment about FIPS, we note that the data matching process is consistent with the FIPS, to the extent the data used in the data matching process are covered under FIPS.

In response to the comment that we populate the EDB with the monthly SSI indicators and grant access to certain members of the public so that hospitals could calculate their own SSI fractions, we note that the EDB contains several elements of protected personally identifiable information and is the sole system of records for Medicare eligibility. As such, we may only provide access to the EDB to persons authorized under the Privacy Act or the HIPAA Privacy Rule. However, we agree that there are advantages to allowing hospitals to compute their own SSI fraction and provide supporting documentation for the amount of DSH claimed, consistent with the process under the regulations for computing the Medicaid fraction. We are open to suggestions from the public regarding how CMS and SSA could provide the data necessary for hospitals to compute their own SSI fractions without compromising protected personally identifiable information and other protected information. We also welcome suggestions describing how CMS or its contractors should verify the accuracy of the hospitals' computations without significantly increasing administrative burden.

*Comment:* A few commenters requested that CMS release each hospital's detailed SSI fraction data or give hospitals access to patient-level detail data, including SSI eligibility information, so each hospital could determine the accuracy of its SSI fractions. One commenter asked that CMS publish both the Federal fiscal year SSI fractions and each hospital's cost reporting period SSI fractions.

Some commenters asked that CMS provide assurances that there are no other data errors or omissions in the SSI file or the data matching process and asked that CMS work collaboratively with SSA to ensure the accuracy of the SSI file and to obtain SSNs for records in the EDB that are missing an SSN.

*Response:* Under the proposed data matching process for FY 2011 and beyond, CMS will continue to share certain detailed SSI fraction data used to calculate the hospital's SSI fraction as long as the hospital has a valid data use agreement with CMS and submits a request for such data. More detail on obtaining these data may be found on our Web site at: *http://www.cms.gov/PrivProtectedData/ 07_DSHRateData.asp* and the data use agreement application may be found on our Web site at: *http://cmsnet.cms.hhs. gov/hpages/oisnew/sysndata/access_to_ data/cms-DUA.pdf.* As we stated in the proposed rule, we publish these data for every hospital based on the Federal fiscal year but, under the regulations at § 412.106(b)(3), a hospital with a cost reporting period that differs from the Federal fiscal year may request a revised SSI fraction that is based on its own cost reporting period rather than the Federal fiscal year. In such a case, we would revise the hospital's SSI fraction using SSI and Medicare data derived from the data match process for the two Federal fiscal years that spanned the hospital's cost reporting period. We believe that the statute governing the SSI fraction (section 1886(d)(5)(F)(vi)(I) of the Act) requires that one SSI fraction be calculated and used for purposes of determining a hospital's disproportionate patient percentage. We believe that allowing individual hospitals to request their own cost reporting period SSI fractions is sufficient and goes above and beyond what the statute requires. The current policy of calculating all hospitals' SSI fractions based on the Federal fiscal year does not require that we maintain a list of each individual hospital's cost reporting period, nor does it require that we perform multiple iterations of the data matching process. It would be administratively unwieldy to not only track every hospital's cost reporting period, but to calculate SSI fractions based on the many different cost reporting periods that hospitals across the country may have.

With respect to the comment requesting that CMS work with SSA to ensure accuracy of the SSI file, we note that CMS has worked collaboratively with SSA throughout the development of the data matching process that was described in the FY 2011 proposed rule.

**Add. 12**

We are committed to continue working with SSA to ensure that the file we receive from SSA for the purposes of the SSI fraction data matching process is complete and comprehensive and includes all individuals who are entitled to SSI. To our knowledge, there are no omissions or data errors on the SSI file that we receive from SSA. If we become aware of any such omissions or errors, we will work with SSA to correct them as quickly as possible. With respect to obtaining an SSN for each record in the EBD that does not have an SSN, we remind the commenters that "of the more than 100 million records in the EDB, less than 0.07 percent (that is, fewer than 7 of every 10,000 records) relate to individuals for whom the EDB does not include a SSN for the person." There are valid reasons that a person in the EDB may not have an SSN. For example, as we noted in the proposed rule, a person could live in a country other than the United States, but be entitled to Medicare benefits through his or her spouse. Another example of a record in the EDB that may validly lack an SSN is if the person filed for a spouse's or widow/er's benefit prior to the 1980's because SSA did not require that the person filing for benefits have an SSN at that time. There may be other valid reasons that a record in the EDB does not have an SSN, and as we previously stated, less than 0.07 percent of records in the EDB lack an SSN. We do not believe that it is possible to add an SSN for every record if the person became entitled to Title II or Medicare benefits without ever applying or receiving an SSN. However, we note that the EDB is populated by SSA on a frequent basis; to the extent that a record is added to the EDB, the SSN that SSA has on file for that person should be included in the EDB as well. Moreover, even if there were instances in which a record in the EDB was missing an SSN, the lack of an SSN for certain records in the EDB should have no effect on the data matching process because, in order to be entitled to SSI benefits, an individual must have an SSN. That is, a person who does not have an SSN, by definition, cannot be entitled to SSI. (We refer readers to the proposed rule language at 75 FR 24003 that states: "However, if an applicant for SSI benefits does not already have a SSN, SSA then assigns a SSN to the person.") Thus, in the SSI eligibility data that SSA provides to CMS, each individual identified in those data should have a unique SSN. Additionally, as we stated under Step 2 of the proposed data matching process, if an individual is entitled to SSI

benefits and Medicare benefits, the new format of the SSI eligibility file will contain up to 10 Title II numbers and, if they have not already been captured, each of those numbers will be included in our revised match process. Even if an individual does not have a SSN in the EDB, this second step should ensure that our revised match process will include that individual.

In response to the comment that CMS share the SSI file data with hospitals, the SSI program is under the authority of SSA and CMS is not authorized to share SSA data. Additionally, CMS is only permitted to use the SSI data for the sole purpose of conducting the data match process and calculating the SSI fractions. To the extent that a third party wishes to obtain direct access to the SSI file, it must contact SSA directly and meet SSA's requirements to become an authorized user.

*Comment:* One commenter stated that CMS uses total (that is, "paid and unpaid") Medicare days in the denominator of the SSI fraction, but uses paid SSI days in the numerator of the SSI fraction. The commenter requested that CMS interpret the word "entitled" to mean "paid" for both SSI-entitled days used for the numerator and Medicare-entitled days used in the denominator, or alternatively, that CMS include both paid and unpaid days for both SSI entitlement and Medicare entitlement such that there is consistency between the numerator and the denominator of the SSI fraction. The commenter stated that there were several SSI codes that represent individuals who were eligible for SSI, but not eligible for SSI payments, that should be included as SSI-entitled for purposes of the data matching process. Specifically, the commenter stated that at least the following codes should be considered to be SSI-entitlement:

• E01 and E02
• N06, N10, N11, N18, N35, N39, N42, N43, N46, N50, and N54
• P01
• S04, S05, S06, S07, S08, S09, S10, S20, S21, S90, and S91
• T01, T20, T22, and T31

*Response:* In response to the comment that we are incorrectly applying a different standard in interpreting the word "entitled" with respect to SSI entitlement versus Medicare entitlement, we disagree. The authorizing DSH statute at section 1886(d)(5)(F)(vi)(I) of the Act limits the numerator to individuals entitled to Medicare benefits who are also "*entitled* to supplemental security income benefits (excluding any State

supplementation)" (emphasis added).[19] Consistent with this requirement, we have requested, and are using in the data matching process, those SSA codes that reflect "entitlement to" receive SSI benefits. Section 1602 of the Act provides that "[e]very aged, blind, or disabled individual who is determined under Part A to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this title, be *paid* benefits by the Commissioner of the Social Security" (emphasis added). However, eligibility for SSI benefits does not automatically mean that an individual will receive SSI benefits for a particular month. For example, section 1611(c)(7) of the Act provides that an application for SSI benefits becomes effective on the later of either the month following the filing of an application for SSI benefits or the month following eligibility for SSI benefits.

On the other hand, section 226 of the Act provides that an individual is automatically "entitled" to Medicare Part A when the person reaches age 65 and is entitled to Social Security benefits under section 202 of the Act (42 U.S.C. 402) or becomes disabled and has been entitled to disability benefits under section 223 of the Act (42 U.S.C. 423) for 24 calendar months. Section 226A of the Act provides that qualifying individuals with end-stage renal disease shall be entitled to Medicare Part A. In addition, section 1818(a)(4) of the Act provides that, "unless otherwise provided, any reference to an individual entitled to benefits under [Part A] includes an individual entitled to benefits under [Part A] pursuant to enrollment under [section 1818] or section 1818A." We believe that Congress used the phrase "entitled to benefits under part A" in section 1886(d)(5)(F)(vi) of the Act to refer individuals who meet the criteria for entitlement under these sections.

Moreover, unlike the SSI program (in which entitlement to receive SSI benefits is based on income and resources and, therefore, can vary from time to time), once a person becomes entitled to Medicare Part A, the individual does not lose such entitlement simply because there was no Medicare Part A coverage of a

---

[19] As a side note, we have used the phrase "SSI-eligible" interchangeably with the term "SSI-entitled" in the FY 2011 proposed rule as well as prior proposed and final rules, but the statute requires that we include individuals who were entitled to SSI benefits in the SSI fractions. Although we have used these terms interchangeably, we intended no different meaning, and our policy has always been to include only Medicare beneficiaries who are entitled to receive SSI benefits in the numerator of the SSI fraction.

**Add. 13**

specific inpatient stay. Entitlement to Medicare Part A reflects an *individual's* entitlement to Medicare Part A benefits, not the hospital's entitlement or right to receive payment for services provided to such individual. Such Medicare entitlement does not cease to exist simply because Medicare payment for an individual inpatient hospital claim is not made. Again, we are bound by section 1886(d)(5)(F)(vi)(I) of the Act, which defines the SSI fraction numerator as the number of SSI-entitled inpatient days for persons who were "entitled to benefits under [P]art A," and the denominator as the total number of inpatient days for individuals who are "entitled" to Medicare Part A benefits.

In response to the comment about specific SSI status codes, SSA has provided information regarding all of the SSI status codes mentioned by the commenter to assist in the determination of whether any of these codes represent individuals who were entitled to SSI benefits for the purposes of calculating the SSI fraction for Medicare DSH. With respect to the codes that begin with the letter "T," SSA informed us that all of the codes represent individuals whose SSI entitlement was terminated. Code "T01" represents records that were terminated because of the death of the individual, but we confirmed that this code would not be used until the first full month after the death of the individual. That is, for example, if a Medicare individual was entitled to SSI during the month of October, was admitted to the hospital on October 1 and died in the hospital on October 15, the individual would show up as entitled to SSI for the entire month of October on the SSI file (code T01 would not be used on the SSI file until November) and 15 Medicare/SSI inpatient hospital days for that individual would be counted in the numerator and the denominator of the SSI fraction for that hospital.

Codes beginning with the letter "S" reflect records that are in a "suspended" status and, according to SSA, do not represent individuals who are entitled to SSI benefits.

SSA maintains that code "P01" is obsolete and has not been used since the mid-1980s. Therefore, it would not be used on any SSI files reflecting SSI entitlement for FY 2011 and beyond.

Codes that begin with the letter "N" represent records on "nonpayment" and are not used for individuals who are entitled to SSI benefits.

Code "E01" represents an individual who is a resident of a medical treatment facility and is subject to a $30 payment limit, but has countable income of $30 or more. Such an individual is not

entitled to receive SSI payment. Alternatively, an individual who is a resident of a medical treatment facility and is subject to a $30 payment limit, but does not have countable income of at least $30, would be reflected on the SSI file as a "C01" (which denotes SSI entitlement) for any month in which the requirements described in this sentence are met. Code "E02" is used to identify a person who is not entitled to SSI payments in the month in which that code is used pursuant to section 1611(c)(7) of the Act, which provides that an application for SSI benefits shall be effective on the later of (1) the first day of the month following the date the application is filed, or (2) the first day of the month following the date the individual becomes eligible for SSI based on that application. Such an individual is not entitled to SSI benefits during the month that his or her application is filed or is determined to be eligible for SSI, but, for the following month, would be coded as a "C01" because he or she would then be entitled to SSI benefits.

Therefore, both codes E01 and E02 represent individuals who are not entitled to SSI benefits and are reflected accordingly on the SSI file. If the individual's entitlement to SSI benefits is initiated the ensuing month, that individual would then be coded as a "C01" on the SSI file and would be included as SSI-entitled for purposes of the data matching process.

As we have described above, none of the SSI status codes that the commenter mentioned would be used to describe an individual who was entitled to receive SSI benefits during the month that one of those status codes was used. SSI entitlement can change from time to time, and we believe that including SSI codes of C01, M01, and M02 accurately captures all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits.

After consideration of the public comments we received, we are adopting the proposed data matching process for FY 2011 and beyond as final. The only modification we are making to the proposed data matching process is adopting a policy to exclude a record from the data matching process if we find a HICAN in the MedPAR file that we are not able to locate in the EDB, which is an extremely unlikely situation as noted in the prior discussion in this final rule. We are adopting this additional step in our validation process in response to public comments to provide even more assurances that our data matching process will yield accurate SSI fractions and capture all Medicare beneficiaries who were

entitled to SSI at the time of their inpatient hospital stay.

c. Timing of the Match

One of the district court's findings in the *Baystate* decision was that CMS did not use a more recent SSI entitlement file to calculate the provider's SSI fractions. As a result, it might be possible that if a beneficiary treated at the hospital was later determined retroactively to be SSI entitled, or if a suspension of the individual's SSI payments was later lifted, that inpatient stay might not be included in the numerator of the SSI fraction. We believe that, in our recalculation of the *Baystate* hospital's SSI fractions and DSH payments, retroactive SSI entitlement determinations and the lifting of SSI payment suspensions were not an issue due to the long period of time that elapsed between the provider's 1993 through 1996 fiscal years and our use of updated SSI entitlement data during our completion of the revised match process in 2009. However, we stated our belief that further consideration of the timing of both the SSI entitlement information that SSA provides to CMS and our proposed revised match process for FY 2011 and subsequent fiscal years was warranted.

At present, SSA provides an annual file to CMS with SSI entitlement information that is current through March 31, or 6 months after the end of the prior Federal fiscal year on September 30 (70 FR 47278, 47440, August 12, 2005). Based on this date, for a hospital with an October 1 to September 30 cost reporting period, the SSI entitlement information we currently use contains 6 to 18 months worth of retroactive SSI entitlement determinations and payment suspension closures—6 months from September (that is, the end of the cost reporting period), and 18 months from October (that is, the beginning of the cost reporting period). The time lag between the close of a hospital's cost reporting period and the date that CMS receives SSI entitlement information could actually be longer or shorter for some hospitals, depending on the hospital's specific cost reporting period. The SSI fractions are generally based on the Federal fiscal year; however, under the regulations at § 412.106(b)(3), a hospital with a cost reporting period that differs from the Federal fiscal year may request a revised SSI fraction that is based on its own cost reporting period rather than the Federal fiscal year. In such a case, we would revise the hospital's SSI fraction using SSI and Medicare data derived from the data match process for the two Federal fiscal years that

**Add. 14**

spanned the hospital's cost reporting period.

As we stated in the FY 2006 IPPS final rule, we believe that administrative finality with respect to the calculation of a hospital's SSI fraction is important (70 FR 47440). We continue to believe that it is important to find an appropriate balance between administrative finality (that is, the final settlement of a hospital's cost report) and the inclusion of retroactive SSI eligibility determinations and the lifting of SSI payment suspensions by using the best and latest available SSI eligibility data at the time of cost report settlement. Further, we believe it is important to account for the time period in which hospitals are allowed to submit timely Medicare claims in order to ensure that the point in time that we perform the match process includes as many timely submitted inpatient hospital claims as are administratively practicable.

In accordance with the regulations at 42 CFR 424.44 and the Medicare Claims Processing Manual (Pub. 100–04), Chapter 1, Section 70, a hospital must generally file a claim by December 31 of the following year (for services furnished during the first 9 months of a calendar year) and by December 31 of the second following year (for services provided during the last 3 months of the calendar year). Section 6404 of the Affordable Care Act recently changed these deadlines to no more than "1 calendar year after the date of service" effective for services provided on or after January 1, 2010. Therefore, Medicare claims for hospital services furnished in FY 2011 would have to be submitted no later than September 30, 2012.

Generally speaking, providers have a financial incentive to submit fee-for-service claims as close as possible to the date of the patient's discharge, and providers have no incentive to wait until the claims submission deadline. Thus, while conducting a data match with MedPAR files that were updated 6 months after the end of the Federal fiscal year may not capture all of a provider's Medicare inpatient claims, we believe that, in large part, the provider's fee-for-service claims are very likely to be included in that MedPAR file. The same may not be true for the "information only" or "no pay" claims that hospitals are required to submit to their fee-for-service contractor for Medicare Advantage (MA) beneficiaries. Because claims for MA beneficiaries are paid by MA plans and not the fee-for-service contractor, hospitals may not have the same incentive to file these claims as close as possible to the date

of the patient's discharge.[20] However, in accordance with Transmittal 1396 (issued December 14, 2007) and Transmittal 1695 (issued March 6, 2009), which changed the instructions in the Medicare Claims Processing Manual (Pub. 100–04), all IPPS hospitals that do not qualify for IME payments, direct GME payments, or nursing and allied health (N&AH) payments are specifically directed to submit informational-only claims for all MA inpatients to ensure that all data for MA beneficiaries are included in the SSI fraction. Accordingly, we indicated that we also were considering changes to the timing of the data match process to ensure that all of a hospital's MA claims are included in the revised matching process, given the current timing requirements for when hospitals must submit these claims after the time of the patient's discharge.

In addition, in matching eligibility records for Medicare beneficiaries and SSI recipients to calculate the SSI fractions for FY 2011 and future fiscal years, we proposed to use more recent SSI eligibility information from SSA and a more updated version of the MedPAR file that is likely to contain more claims data. We currently use SSI eligibility data and MedPAR claims data that are updated 6 months after the close of the Federal fiscal year. We proposed to use, for FY 2011 and subsequent years, SSI eligibility data files compiled by SSA and MedPAR claims information that are updated 15 months after the close of each Federal fiscal year. This proposal would more closely align the timing of the match process with the timing of our requirements (described above) for the timely submission of claims. For example, under our proposal, to calculate the FY 2011 SSI fractions, we would use the December 2012 update of the FY 2011 MedPAR file (containing claims information for patient discharges between October 1, 2010 and September 30, 2011), and a December 2012 SSI eligibility file (containing FY 2011 SSI eligibility data updated

through December 2012, with a lag time relative to the Federal fiscal year of between 15 and 27 months). We expect that the FY 2011 SSI fractions would be published around March 2013 and would be used to settle cost reports for cost reporting periods that began in FY 2011. In addition, we would continue our practice of using each hospital's latest available SSI fraction in determining IPPS interim payments from the time that the SSI fractions are published until the SSI fractions for the next fiscal year are published.

Under current law as amended by section 6404 of the Affordable Care Act, Medicare inpatient claims for FY 2011 can be submitted no later than 1 calendar year from the date of service or by September 30, 2012, for claims with a September 30, 2011 date of service. Therefore, we believe that using the version of MedPAR that is updated 15 months after the end of the fiscal year would contain more accurate and complete inpatient claims information, as we would be using claims data from 3 months after the filing deadline for claims with a date of service occurring on the last day of the second preceding fiscal year. Furthermore, a later update of the SSI eligibility file would contain more accurate eligibility information and would account for all retroactive changes in SSI eligibility and the lifting of SSI payment suspensions through that date.

We proposed that the FY 2011 SSI fractions would be used to determine the hospitals' Medicare DSH payments for cost reporting periods beginning in FY 2011 (that is, October 1, 2010 through September 30, 2011). The proposed timing of the data match for the SSI fractions, effective for FY 2011, would result in FY 2011 SSI fractions being published around March 2013 and would generally coincide with the final settlement of cost reports for cost reporting periods beginning in FY 2011.

We believe that, by calculating SSI fractions on the basis of SSI eligibility data and MedPAR claims data that are updated 15 months after the end of the Federal fiscal year, we would be using the best data available to us, given the deadlines for the submission and final settlement of Medicare cost reports. Cost reports must be submitted to the Medicare fiscal intermediary or MAC no later than 5 months after the end of the provider's cost reporting period; the fiscal intermediary or MAC must make a determination of cost report acceptability within 30 days of receipt of the provider's cost report (42 CFR 413.24(f)(2)(i) and 413.24(f)(5)(iii)). In accordance with the Medicare Financial Manual (Pub. 100–06), Chapter 8,

---

[20] Teaching hospitals have an incentive to submit these claims as close as possible to the date of the patient's discharge because these claims are used, in part, to compute those hospitals' indirect graduate medical education payments. The claims are also used for a teaching hospital's direct medical education payments. Non-teaching DSH hospitals do not have the same direct incentives to submit these claims as close as possible to the date of the patient's discharge, but to the extent that the MA beneficiary is also SSI eligible, it would be to the hospital's advantage to ensure these claims are included in the match process. However, nonteaching DSH hospitals are required to submit MA claims for all MA beneficiaries, regardless of whether the beneficiaries were eligible for SSI benefits.

**Add. 15**

Section 90, the fiscal intermediary or MAC is expected to settle each cost report that is not scheduled for audit within 12 months of the contractor's acceptance of the cost report. We believe that our proposed timing of the data match would achieve an appropriate balance between accounting for additional retroactive SSI eligibility determinations and the lifting of SSI payment suspensions using all timely submitted Part A inpatient claims, and facilitating administrative finality through the timely final settlement of Medicare cost reports.

**BILLING CODE 4120–01–P**

### Example of Timeline to Calculate FY 2011 SSI Fractions under Current Policy

| Cost Reports That Use the FY 2011 SSI Ratios | Deadline for Timely Filing of Claims | MedPAR File Used | SSI Entitlement File | Cost Reports Normally Accepted | Cost Report Final Settlement | SSI Fraction Available |
|---|---|---|---|---|---|---|
| Cost reports beginning October 1, 2010 through September 30, 2011 | September 2012 | March 2012 update of FY 2011 MedPAR | March 2012 update of FY 2011 SSI eligibility | Generally between March 2012 and February 2013 | Generally between March 2013 and February 2014 | Summer 2012 |

### Example of Timeline to Calculate FY 2011 SSI Fractions under Final Rule

| Cost Reports That Use the FY 2011 SSI Ratios | Deadline for Timely Filing of Claims | MedPAR File Used | SSI Entitlement File | Cost Reports Normally Accepted | Cost Report Final Settlement | SSI Fraction Available |
|---|---|---|---|---|---|---|
| Cost reports beginning October 1, 2010 through September 30, 2011 | September 2012 | December 2012 update of FY 2011 MedPAR | December 2012 update of FY 2011 SSI eligibility | Generally between March 2012 and February 2013 | Generally between March 2013 and February 2014 | Spring 2013 |

Add. 16

BILLING CODE 4120–01–C

*Comment:* Many commenters supported the proposed timing of the data matching process. Some commenters asked that CMS explain how cost report settlement would coincide with the proposed timing. Specifically, commenters asked whether contractors would issue Notices of Program Reimbursement prior to the availability of the SSI fractions. One commenter asked that CMS calculate an additional SSI fraction at the time of cost report audit for cost reports that are audited after the initial SSI fractions are published. One commenter noted that under the proposed timeline for calculating the SSI fractions, some hospitals would have already submitted their cost reports and had desk reviews and audits before the release of the SSI fractions. In particular, some commenters were concerned that hospitals with fiscal years beginning between October 1 and December 1 would have their cost reports settled before the release of the SSI fractions. One commenter cited Medicare Financial Management Manual Publication 100–06, Chapter 8, Section 90 that requires final settlement of cost reports within 12 months of acceptance. Commenters are concerned that the 12-month cost report settlement deadline may occur before the publication of the SSI fractions for certain cost reporting periods. Commenters questioned whether CMS will instruct Medicare contractors to hold the Notice of Program Reimbursement until the SSI fractions are released or will the contractors settle cost reports using the prior year's SSI fraction. In addition, commenters questioned whether contractors would automatically re-open cost reports to use the current year's SSI fractions if they were settled using the prior year's SSI fraction before the publication of the current year's SSI fractions.

*Response:* We appreciate the support for our proposal to change the timing of our match and calculation of the SSI fractions from 6 months after the end of the Federal fiscal year to 15 months after the end of the Federal fiscal year. We believe that our proposal to conduct the SSI eligibility match and calculate the SSI fractions 15 months after the end of the Federal fiscal year will ensure that the SSI fractions are calculated with the best data available to us at that time. We note that the 15-month timeframe proposed is an approximation and subject to the data validation protocols as described previously in this final rule. We believe that the match will be conducted no sooner than 15 months after the end of

the Federal fiscal year and the match process, including all appropriate validation steps as finalized, will be performed as efficiently as possible and in accordance with the production cycles of the required data files.

Hospitals submit their cost reports based on their cost reporting period, which varies by hospital. Thus, it would be administratively unwieldy to conduct the SSI match in "real-time" and calculate an individual hospital's SSI fraction whenever that hospital's cost report needed to be settled. By calculating the SSI fractions 15 months after the end of the Federal fiscal year, we believe that we are striking an appropriate balance between the best data available to us at the time and the agency's operational needs, using the best available data that does not unduly hinder the cost report settlement process. As we discussed in the proposed rule, hospital cost reports are submitted to the Medicare contractor no later than 5 months after the end of the provider's cost reporting period. The Medicare contractor must accept the cost report within 30 days of receipt (in accordance with 42 CFR 413.24(f)(2)(i) and 413.24(f)(5)(iii)), and is expected to settle the cost reports that are not audited within 12 months of acceptance of the cost report (in accordance with Medicare Financial Management Manual Publication 100–06, Chapter 8, Section 90). Generally, hospital cost reports are not final settled without the SSI fraction that corresponds to the fiscal year in which the cost report began. Commenters raised concerns that hospitals with fiscal years beginning October 1, 2010 or December 1, 2010 (thus, ending September 30, 2011 or November 30, 2011) would be settled before the release of the SSI fractions. Those cost reports would be submitted by the end of February 2012 or April 2012; they would be accepted by March 2012 or May 2012 and would need to be final settled no later than March 2013 or May 2013. We believe that under our proposal to calculate the SSI match 15 months after the end of the Federal fiscal year, cost reports will be settled with the appropriate SSI fraction within the timeframe of cost report settlement and that cost reports will be final settled with the SSI fraction of the given year. In the case where a cost report is required to be settled before the SSI fractions are published, CMS may instruct that the contractors settle the cost report with the latest SSI fraction available and may reopen the cost report to issue a revised notice of program reimbursement once the appropriate SSI fraction is available, or we may instruct

the contractors to wait to settle the cost report until the appropriate SSI fractions are published. We will continue to evaluate what would be the best approach in such a scenario.

*Comment:* One commenter stated that the chart in the proposed rule that displayed the timeline for the revised match process indicated that, for FY 2011, the timely filing of claims ends in December 2012 when it should be September 2012. The commenter asked that CMS correct the deadline for the timely filing of claims for FY 2011 to read September 2012.

*Response:* We agree with the commenter. Under section 6404 of the Affordable Care Act, the deadline for timely filing of claims has been revised to be one year after the end of the Federal fiscal year, effective January 1, 2010. Therefore, hospitals will have until September 2012 to file their FY 2011 claims. The chart has been revised in this final rule to reflect this change. Although the deadline for the timely filing of claims is 12 months after the end of the Federal fiscal year, we are finalizing our proposal to conduct the data matching process and calculate SSI fractions approximately 15 months after the end of the Federal fiscal year to ensure we have captured all of the inpatient claims and to capture as many retroactive SSI entitlement determinations as possible.

After consideration of the public comments that we received, we are adopting a policy to conduct the data matching process approximately 15 months after the end of the Federal fiscal year.

### 5. CMS Ruling 1498–R

On April 28, 2010, the CMS Administrator issued a CMS Ruling, CMS–1498–R (Ruling), that addresses three Medicare DSH issues, including CMS' process for matching Medicare and SSI eligibility data and calculating hospitals' SSI fractions. With respect to the data matching process issue, the Ruling requires the Medicare administrative appeals tribunal (that is, the Administrator of CMS, the PRRB, the fiscal intermediary hearing officer, or the CMS reviewing official) to remand each qualifying appeal to the appropriate Medicare contractor. The Ruling also explains how, on remand, CMS and the contractor will recalculate the provider's DSH payment adjustment and make any payment deemed owing. The Ruling further provides that CMS and the Medicare contractors will apply the provisions of the Ruling on the data matching process issue (and two other DSH issues, as applicable), in calculating the DSH payment

**Add. 17**

adjustment for each hospital cost reporting period where the contractor has not yet final settled the provider's Medicare cost report through the issuance of an initial notice of program reimbursement (NPR) (42 CFR 405.1801(a) and 405.1803).

More specifically, the Ruling provides that, for qualifying appeals of the data matching issue and for cost reports not yet final settled by an initial NPR, CMS will apply any new data matching process that is adopted in the forthcoming FY 2011 IPPS final rule for each appeal that is subject to the Ruling. The data matching process provisions of the Ruling would apply to properly pending appeals and open cost reports for cost reporting periods beginning prior to October 1, 2010 (that is, those preceding the effective date of the FY 2011 IPPS final rule).

The Ruling further states that, if a new data matching process is not adopted in the forthcoming FY 2011 IPPS final rule, CMS would apply to claims subject to the Ruling the same data matching process as the agency used to implement the *Baystate* decision by recalculating that provider's SSI fractions. As indicated above, we have adopted the proposed data matching process for FY 2011 and beyond as final. The only modification we are making to the proposed matching process is adopting a policy to exclude a record from the data matching process if we find a HICAN in the MedPAR file that we are not able to locate in the EDB, which is an extremely unlikely situation as noted in the prior discussion in this final rule. We are adopting this additional step in our validation process to respond to public comment and provide even more assurances that our data matching process will yield accurate SSI fractions and capture all Medicare beneficiaries who were entitled to SSI at the time of their inpatient hospital stay. The same data matching process will be used to calculate SSI fractions for cost reporting periods covered under the Ruling.

*Comment:* Several commenters addressed a variety of issues related to the Ruling.

*Response:* We note that Administrator Rulings are not subject to public comment and that we did not seek public comment on CMS Ruling 1498–R. Accordingly, we are not summarizing or providing responses to comments related to the Ruling in this final rule.

6. Clarification of Language on Inclusion of Medicare Advantage Days in the SSI Fraction of the Medicare DSH Calculation

In the FY 2005 IPPS final rule (69 FR 49099), we discussed in the preamble the codification of our policy of including the days associated with Medicare + Choice (now Medicare Advantage (MA)) beneficiaries under Medicare Part C in the SSI fraction of the DSH calculation. In that rule, we indicated that we were revising the regulation text at § 412.106(b)(2)(i) to incorporate this policy. However, we inadvertently did not make a change in the regulation text to conform to the preamble language. We also inadvertently did not propose to change § 412.106(b)(2)(iii) in the FY 2005 final rule, although we intended to do so. Accordingly, in the FY 2007 IPPS final rule (72 FR 47384), we made a technical correction to amend the regulations at § 412.106(b)(2)(i) and § 412.106(b)(2)(iii) to make them consistent with the preamble language of the FY 2005 IPPS final rule and to conform to the policy implemented in that rule. Section 412.106(b)(2)(i) of the regulations discusses the numerator of the SSI fraction of the Medicare disproportionate patient percentage (DPP) calculation, while § 412.106(b)(2)(iii) of the regulations discusses the denominator of the SSI fraction of the Medicare DPP.

In the proposed rule, we indicated that we were aware that there might be some confusion about our policy to include MA days in the SSI fraction, specifically regarding whether we have implied that MA beneficiaries are not actually "entitled to receive benefits under Part A" by using the word "or" in § 412.106(b)(2)(i)(B) and § 412.106 (b)(2)(iii)(B) with respect to MA days. We note that, in the FY 2005 final rule, we stated that we believed that Medicare + Choice (now MA) beneficiaries are patients who are entitled to benefits under Medicare Part A. With respect to the change to the regulatory text that we intended to make in the FY 2005 IPPS final rule, we stated "* * * we are adopting a policy to *include* patient days for M+C beneficiaries in the Medicare fraction" (69 FR 49099) (emphasis added). In order to further clarify our policy that patients days associated with MA beneficiaries are to be included in the SSI fraction because they are still entitled to benefits under Medicare Part A, in the FY 2011 IPPS/LTCH PPS proposed rule (75 FR 24006 and 24007), we proposed to replace the word "or" with the word "including" in

§ 412.106(b)(2)(i)(B) and § 412.106(b)(2)(iii)(B).

*Comment:* We did not receive any public comments on this specific proposal. However, several commenters urged CMS to reconsider its policy to include Medicare Advantage days and days for which a beneficiary exhausted his or her Medicare inpatient hospital benefits in the SSI fraction. The commenters stated that such days did not represent days that individuals were "entitled to benefits under Medicare [P]art A" (because the patient days were not paid for under Medicare Part A) and as such, should not be included in either the numerator or denominator of the SSI fraction. The commenters stated that, to the extent that dually eligible (that is, simultaneously enrolled in Medicare and Medicaid) Medicare Advantage patients or exhausted benefits patients had an inpatient hospital stay, those days should be included in the Medicaid fraction. Additionally, a commenter stated that CMS did not have sufficient processes in place to assure that the agency is properly counting all of the days in the SSI fraction and "is not double counting any of them in both the numerator of the Medicaid fraction and the denominator of the SSI fraction." The commenter asked that CMS address why it "* * * thinks it need not properly capture all of these days in the denominator of the SSI fraction or the precise steps that CMS has or will take to assure that the agency is capturing all of these days in that denominator."

*Response:* We did not propose any changes to the categories of Medicare days that we include in the SSI fractions. Specifically, the proposed rule states that "We did not propose any changes with respect to the final step in determining the SSI fraction. As we stated in the proposed rule, to calculate the numerator of the SSI fraction, CMS will continue to sum a hospital's Medicare inpatient days in the acute care part of the hospital (excluding IPPS-exempt units such as rehabilitation and psychiatric units) where the Medicare beneficiary was simultaneously entitled to SSI benefits. To calculate the denominator, CMS will continue to sum a hospital's total Medicare inpatient days in the acute care part of the hospital."

Accordingly, we are not responding to these comments in detail. However, we disagree that Medicare Advantage days and exhausted benefit days should be excluded from the SSI fraction. We believe that the days of all patients who are entitled to SSI and Medicare Part A should be included in the Medicare fraction. We adopted a policy to include