[ORAL ARGUMENT NOT YET SCHEDULED]
**Nos. 20-5350, 20-5351 (consolidated)**

———————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————

POMONA VALLEY HOSPITAL MEDICAL CENTER,
Plaintiff-Appellee/Cross-Appellant,

v.

XAVIER BECERRA, Secretary, United States
Department of Health and Human Services,
Defendant-Appellant/Cross-Appellee.

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————

**JOINT APPENDIX**

———————————————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARK B. STERN
STEPHANIE R. MARCUS
(202) 514-1633
*Attorneys, Appellate Staff*
*Civil Division, Room 7539*
*Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530-0001*

## TABLE OF CONTENTS

District Court Docket Sheet ................................................................... JA 1

Complaint (Nov. 27, 2018), Dkt. No. 1 ................................................. JA 4

District Court JA (Dec. 10, 2019), Dkt. No. 18 (excerpts)................................ JA 30

  PRRB Decision (Nov. 21, 2018) (AR 1-15)................................................. JA 33

  Provider's Post-Hearing Br. (excerpts) (AR 38, 54, 77) ........................... JA 48

    App. A, Decl. of Stan Rosenstein (AR 102-108) ..................................... JA 51

    App. B, Decl. of Candice Le-Tran (AR 109-114) ..................................... JA 58

    Ex. P-40, 2006 Summ. Impact Chart (AR 118-119) ................................. JA 64

    Ex. P-41, 2007 Summ. Impact Chart (AR 120-121) ................................. JA 66

    Ex. P-42, 2008 Summ. Impact Chart (AR 122-123) ................................. JA 68

    Ex. P-43, 2006 Individual Appeal Req. Docs. (excerpts)
    (AR 124, 133-135)................................................................... JA 70

    Ex. P-44, 2007 Individual Appeal Req. Docs. (excerpts)
    (AR 142, 151-154)................................................................... JA 74

    Ex. P-45, 2008 Individual Appeal Req. Docs. (excerpts)
    (AR 161, 170-171) .................................................................. JA 79

    Ex. P-46, Cal. SSI/SSP Caseload from CDSS Sept. 8, 2017
    (AR 178-179) ....................................................................... JA 82

    Ex. P-47, SSI Eligibility (AR 180-182)................................................ JA 84

    Ex. P-48, Summ. of SSI Eligibility (AR 183-184)................................... JA 87

    Ex. P-49, Email String from Stan Rosenstein to Sharyl Shanen-Raya,
    DHCS (AR 185-188) ................................................................ JA 89

Ex. P-51, Cal. SSI/SSP Caseload from CDSS, July 2005-June 2009
(AR 191-193) ........................................................................................ JA 93

Ex. P-52, HHS Public Access, Publication: "Lengths of Stay for Older
Adults Residing in Nursing Homes at the End of Life" (AR 194-204) ... JA 96

Ex. P-53, Email String from Candice Le-Tran to Amy Rosenkranz,
DHCS (AR 205-210) ........................................................................... JA 107

Ex. P-54, Listing of California General Acute Hospitals as of 2010
(AR 211-216) ...................................................................................... JA 113

Ex. P-55, Email from Amy Rosenkranz, DHCS to Candice Le-Tran,
(AR 217-218) ...................................................................................... JA 119

PRRB Hearing Tr. (excerpts) (AR 339, 349-443) ..................................... JA 121

Provider's Supplemental Exhibits:

Ex. P-20, PVHMC SSI Data Process Flow Chart (AR 1036-1037) ........ JA 217

Ex. P-24, Letter from C. Le-Tran to T. Hefter; letter from S.
Rosenstein to M. Hartstein (AR 1057-1059, 1061-1063) ........................ JA 219

Ex. P-25, Letter from Sen. Dianne Feinstein to C. Walters,
SSA; letter from P. Raymond, SSA, to Sen. Dianne Feinstein
(AR 1359-1363) ................................................................................... JA 225

Ex. P-26, Letter from Sen. Dianne Feinstein to C. Colvin, SSA;
letter from Sen. Dianne Feinstein to S. Verma, CMS, and
N. Berryhill, SSA (AR 1364-1368) ...................................................... JA 230

Ex. P-27, PVHMC Summ. of SSI Days by Aid Code (excerpts),
(AR 1369-1372, 1387-1389, 1404-1406) ............................................. JA 235

Ex. P-30, E-Mail Corresp. w/A. Sadra, Aide to Sen. Dianne Feinstein
(excerpts) (AR 1429, 1434-1443) ......................................................... JA 245

Ex. P-32, Letter from C. Blackford, CMS, to Sen. Dianne Feinstein
(AR 1451-1453) ......................................................................... JA 256

Ex. P-34, Expert Report by Stan Rosenstein (AR 1459-1467) ............... JA 259
Ex. P-37, Statewide SSI/SSP and SSP Only Data Tables
(AR 1490-1494) ......................................................................... JA 268

Medicare Admin. Contractor Final Position Paper (excerpts)
(AR 1602, 1613-1615) ............................................................... JA 273

Provider's Final Position Paper, Ex. P-7, DSH Data Use Agreement
for Cost Reporting Periods that Include Dec. 8, 2004 and Thereafter
(AR 1908-1913) ......................................................................... JA 277

District Court Order (Sept. 30, 2020), Dkt. No. 19 ........................................ JA 283

District Court Mem. Op. (Sept. 30, 2020), Dkt. No. 20 .................................. JA 284

CERTIFICATE OF SERVICE

APPEAL,CLOSED,TYPE–C

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:18–cv–02763–ABJ

| | |
|---|---|
| POMONA VALLEY HOSPITAL MEDICAL CENTER v. AZAR | Date Filed: 11/27/2018 |
| Assigned to: Judge Amy Berman Jackson | Date Terminated: 09/30/2020 |
| Case in other court:  USCA, 20–05350 | Jury Demand: None |
| USCA, 20–05351 | Nature of Suit: 151 Contract: Recovery Medicare |
| Cause: 42:1395 HHS: Adverse Reimbursement Review | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **POMONA VALLEY HOSPITAL MEDICAL CENTER** | represented by | **Robert L. Roth** |
| | | HOOPER LUNDY & BOOKMAN, PC |
| | | 401 9th Street, NW |
| | | Suite 550 |
| | | Washington, DC 20004 |
| | | (202) 580–7701 |
| | | Fax: (202) 580–7719 |
| | | Email: rroth@health–law.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **ALEX M. AZAR, II** | represented by | **Peter M. Bryce** |
| *Secretary, U.S. Department of Health and Human Services* | | U.S. DEPARTMENT OF JUSTICE |
| | | Civil Division, Federal Programs Branch |
| | | 1100 L Street NW |
| | | Washington, DC 20005 |
| | | (202) 616–8335 |
| | | Fax: (202) 616–8470 |
| | | Email: peter.bryce@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2018 | 1 | COMPLAINT against ALEX M. AZAR, II ( Filing fee $ 400 receipt number 0090–5809623) filed by POMONA VALLEY HOSPITAL MEDICAL CENTER. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Alex M. Azar, II, Secretary, U.S. Department of Health and Human Services, # 3 Summons Matthew G. Whitaker, Acting Attorney General of the United States, # 4 Summons Jessie K. Liu, United States Attorney for the District of Columbia, # 5 Summons Robert P. Charrow, General Counsel, U.S. Department of Health and Human Services)(Roth, Robert) (Entered: 11/27/2018) |
| 11/27/2018 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by POMONA VALLEY HOSPITAL MEDICAL CENTER (Roth, Robert) (Entered: 11/27/2018) |
| 11/28/2018 | | Case Assigned to Judge Amy Berman Jackson. (zrdj) (Entered: 11/28/2018) |
| 11/28/2018 | 3 | SUMMONS (4) Issued Electronically as to ALEX M. AZAR, II, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zrdj) (Entered: 11/28/2018) |
| 12/17/2018 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALEX M. AZAR, II served on 12/12/2018, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of |

| | | |
|---|---|---|
| | | Service Upon United States Attorney General 12/13/2018., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 12/13/2018. ( Answer due for ALL FEDERAL DEFENDANTS by 2/11/2019.) (Attachments: # 1 Exhibit A – Return Receipts for Certified Mail)(Roth, Robert) (Entered: 12/17/2018) |
| 12/21/2018 | 5 | NOTICE of Appearance by Peter M. Bryce on behalf of ALEX M. AZAR, II (Bryce, Peter) (Entered: 12/21/2018) |
| 02/04/2019 | 6 | Unopposed MOTION for Extension of Time to File Answer *or Otherwise Respond to the Complaint* by ALEX M. AZAR, II (Attachments: # 1 Text of Proposed Order)(Bryce, Peter) (Entered: 02/04/2019) |
| 02/05/2019 | | MINUTE ORDER granting 6 defendant's unopposed motion for extension of time to answer or otherwise respond to the complaint. It is ORDERED that defendant's response to the complaint is due by March 13, 2019. Signed by Judge Amy Berman Jackson on 2/5/19. (DMK) (Entered: 02/05/2019) |
| 03/13/2019 | 7 | ANSWER to Complaint by ALEX M. AZAR, II.(Bryce, Peter) (Entered: 03/13/2019) |
| 03/15/2019 | | MINUTE ORDER directing the parties to meet, confer, and file a Joint Report pursuant to Local Rule 16.3 by March 29, 2019. The Court will issue a scheduling order after reviewing the parties' Joint Report. The parties' proposed briefing schedule should not anticipate the filing of simultaneous briefs. Rather it should be consecutive briefing (motion for summary judgment followed by the opposition and cross–motion, then the reply and cross–opposition, and the cross–reply, if needed). Dates contained in the report should be expressed as specific dates (month/day/year) rather than as time frames (e.g., "60 days after the entry of the scheduling order"). Signed by Judge Amy Berman Jackson on 3/15/19. (DMK) (Entered: 03/15/2019) |
| 03/17/2019 | | Set/Reset Deadline: The parties Joint Report pursuant to Local Rule 16.3 is due by 3/29/2019. (jth) (Entered: 03/17/2019) |
| 03/27/2019 | 8 | MEET AND CONFER STATEMENT. (Bryce, Peter) (Entered: 03/27/2019) |
| 04/02/2019 | 9 | SCHEDULING ORDER. Defendant must serve a copy of the administrative record and file a certified list of the contents of the administrative record by April 12, 2019. Plaintiff's motion for summary judgment is due by May 29, 2019. Defendant's opposition to plaintiff's motion, combined with its cross–motion for summary judgment, which shall be supported by a single memorandum of points and authorities, is due by July 29, 2019. Plaintiff's reply in support of its motion and cross–opposition to defendant's cross–motion, which shall also be supported by a single memorandum of points and authorities, is due by September 27, 2019. Defendant's cross–reply is due by November 26, 2019. The parties shall file a joint appendix by December 10, 2019. The Court notes that since the agreed schedule is such a significant expansion of the schedule provided by the rules or even the more generous schedule the Court usually establishes, there will have to be exigent circumstances to warrant an extension. See Order for details. Signed by Judge Amy Berman Jackson on 4/2/19. (DMK) (Entered: 04/02/2019) |
| 04/12/2019 | 10 | NOTICE *of Filing of Certified Lists of Contents of Administrative Record* by ALEX M. AZAR, II (Bryce, Peter) (Entered: 04/12/2019) |
| 05/05/2019 | | Set/Reset Deadlines: Plaintiff's Motion for Summary Judgment is due by 5/29/2019. Defendant's Opposition to Plaintiff's Motion, and Cross–Motion for Summary Judgment, which shall be supported by a single memorandum of points and authorities, is due by 7/29/2019. Plaintiff's Reply in support of its Motion and Opposition to Defendant's Cross–Motion, supported by a single memorandum of points and authorities, is due by 9/27/2019. Defendant's Cross–Reply is due by 11/26/2019. The Joint Appendix shall be filed by 12/10/2019. (jth) (Entered: 05/05/2019) |
| 05/29/2019 | 11 | MOTION for Summary Judgment by POMONA VALLEY HOSPITAL MEDICAL CENTER (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Roth, Robert) (Entered: 05/29/2019) |
| 07/24/2019 | 12 | Unopposed MOTION for Extension of Time to *file Opposition to Plaintiff's Motion for Summary Judgment and Cross–Motion for Summary Judgment* by ALEX M. AZAR, |

| | | II (Attachments: # 1 Text of Proposed Order)(Bryce, Peter) (Entered: 07/24/2019) |
|---|---|---|
| 07/25/2019 | | MINUTE ORDER granting 12 Defendant's Unopposed Motion for Extension of Time. It is ORDERED that defendant's opposition to plaintiff's motion for summary judgment and cross–motion for summary judgment is due by August 9, 2019. Signed by Judge Amy Berman Jackson on 7/25/19. (DMK) (Entered: 07/25/2019) |
| 07/25/2019 | | Set/Reset Deadlines: Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Cross–Motion for Summary Judgment is due by 8/9/2019. (jth) (Entered: 07/25/2019) |
| 08/09/2019 | 13 | Cross MOTION for Summary Judgment by ALEX M. AZAR, II (Attachments: # 1 Text of Proposed Order)(Bryce, Peter) (Entered: 08/09/2019) |
| 08/09/2019 | 14 | Memorandum in opposition to re 11 MOTION for Summary Judgment filed by ALEX M. AZAR, II. (Attachments: # 1 Text of Proposed Order)(Bryce, Peter) (Entered: 08/09/2019) |
| 09/27/2019 | 15 | Memorandum in opposition to re 13 Cross MOTION for Summary Judgment filed by POMONA VALLEY HOSPITAL MEDICAL CENTER. (Roth, Robert) (Entered: 09/27/2019) |
| 09/27/2019 | 16 | REPLY re 14 Memorandum in Opposition filed by POMONA VALLEY HOSPITAL MEDICAL CENTER. (Roth, Robert) (Entered: 09/27/2019) |
| 11/26/2019 | 17 | REPLY to opposition to motion re 13 Cross MOTION for Summary Judgment filed by ALEX M. AZAR, II. (Bryce, Peter) (Entered: 11/26/2019) |
| 12/10/2019 | 18 | JOINT APPENDIX by POMONA VALLEY HOSPITAL MEDICAL CENTER. (Roth, Robert) (Entered: 12/10/2019) |
| 09/30/2020 | 19 | ORDER granting in part and denying in part 11 Plaintiff's Motion for Summary Judgment and denying 13 Defendant's Cross–Motion for Summary Judgment. Signed by Judge Amy Berman Jackson on 9/30/20. (DMK) (Entered: 09/30/2020) |
| 09/30/2020 | 20 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 9/30/20. (DMK) (Entered: 09/30/2020) |
| 11/24/2020 | 21 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 20 Memorandum & Opinion, 19 Order on Motion for Summary Judgment, by ALEX M. AZAR, II. Fee Status: No Fee Paid. Parties have been notified. (Bryce, Peter) (Entered: 11/24/2020) |
| 11/24/2020 | 22 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 21 Notice of Appeal to DC Circuit Court. (zjf) (Entered: 11/24/2020) |
| 11/28/2020 | 23 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 20 Memorandum & Opinion, 19 Order on Motion for Summary Judgment, by POMONA VALLEY HOSPITAL MEDICAL CENTER. Filing fee $ 505, receipt number ADCDC–7890397. Fee Status: Fee Paid. Parties have been notified. (Roth, Robert) (Entered: 11/28/2020) |
| 11/30/2020 | 24 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 23 Notice of Appeal to DC Circuit Court. (zrdj) (Entered: 11/30/2020) |
| 11/30/2020 | | USCA Case Number 20–5350 for 21 Notice of Appeal to DC Circuit Court filed by ALEX M. AZAR, II. (zrdj) (Entered: 11/30/2020) |
| 11/30/2020 | | USCA Case Number 20–5351 for 23 Notice of Appeal to DC Circuit Court, filed by POMONA VALLEY HOSPITAL MEDICAL CENTER. (zrdj) (Entered: 11/30/2020) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

POMONA VALLEY HOSPITAL MEDICAL
CENTER,
1798 North Garey Avenue
Pomona, CA 91767,

                         Plaintiff,

        v.

ALEX M. AZAR II, Secretary,
United States Department of Health and
Human Services,
200 Independence Avenue, S.W.
Washington, D.C.  20201,

                      Defendant.

Case No. _____

     Plaintiff Pomona Valley Hospital Medical Center ("the Hospital"), by and through its undersigned attorneys, brings this action against defendant Alex M. Azar, II, in his official capacity as the Secretary ("the Secretary") of the Department of Health and Human Services ("HHS"), and states as follows:

### <u>INTRODUCTION</u>

     1.     This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq*. (the "Medicare Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§551 *et seq*.  The Hospital seeks judicial review of the final decision (the "Final Decision") issued by the Provider Reimbursement Review Board ("Board" or "PRRB") rejecting the Hospital's challenge to the Supplemental Security Income ("SSI") percentages calculated by the Centers for Medicare & Medicaid Services ("CMS") that were used to determine the Hospital's Medicare disproportionate share hospital ("DSH") payments for the Hospital's Fiscal Years ("FYs") 2006,

2007, and 2008. The Hospital challenged those SSI percentages as understated based on official records from the California "Medi-Cal" program (California's Medicaid program) showing that CMS undercounted the number of days during which the Hospital's inpatients were entitled to Medicare Part A and SSI benefits. Significantly, CMS could have, but refused to, provide the data that would conclusively show whether the SSI percentages at issue were, in fact, accurate.

2. The PRRB's Final Decision, which is the Secretary's Final Decision for purposes of judicial review, must be set aside because it is arbitrary and capricious, not based on substantial evidence, and otherwise unlawful. For example, the PRRB failed to address the uncontroverted testimony from the Hospital's expert showing that the SSI percentages were incorrectly low and unreasonably not based on the best available data. The evidence in the record shows that there are unexplained discrepancies in the data that CMS used to calculate the SSI percentages at issue, and that CMS unreasonably failed to consider other sources of data and, therefore, relief is warranted.

3. The Hospital seeks an order (a) reversing or setting aside the Final Decision, (b) requiring CMS to provide the Hospital with access to the information necessary to confirm that the SSI percentages at issue were incorrectly understated, and (c) directing the Secretary to recalculate the Hospital's DSH payments for the FYs at issue using SSI percentages based on correct data.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 42 U.S.C. §1395oo(f) (appeal of final Medicare program agency decision) and 28 U.S.C. §§1331 (federal question) and 1361 (mandamus).

5. Venue lies in this judicial district under 42 U.S.C. §1395oo(f) and 28 U.S.C. §1391.

## PARTIES

6.      At all times relevant to this action, the Hospital (Medicare Provider No. 05-0231) was a Medicare-participating, not-for-profit general acute-care hospital located in Pomona, California that furnished inpatient and outpatient hospital services to patients entitled to benefits under the Medicare program and others.

7.      Defendant Alex M. Azar, II, is the Secretary of HHS, the federal department which contains CMS.  The Secretary, the federal official responsible for administration of the Medicare Program, has delegated the responsibility to administer that program to CMS.  Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA").  In this Complaint, the Hospital generally refers to the agency as CMS.

## PROCEDURAL BACKGROUND

8.      This action arises from three consolidated PRRB appeals challenging the Hospital's Medicare DSH payments for FYs 2006, 2007, and 2008.  The PRRB held a combined hearing on these three appeals on August 17, 2017 (the "Hearing").  Following the Hearing, and extensive post-hearing briefing, the PRRB issued its Final Decision on October 1, 2018.  On November 21, 2018, the CMS Administrator gave notice that she had declined to review the PRRB's decision, making it the Secretary's Final Decision for purposes of judicial review under 42 U.S.C. §1395oo.  This action is timely-filed under 42 U.S.C. §1395oo(f).

## GENERAL BACKGROUND OF THE MEDICARE PROGRAM

9.      The Medicare Act establishes a system of health insurance for the aged, disabled, and individuals with end-stage renal disease.  42 U.S.C. §1395c.  The Medicare program is federally funded and administered by the Secretary through the CMS and its contractors.  42 U.S.C. §1395kk; 42 Fed. Reg. 13,262 (Mar. 9, 1977).

10.     CMS implements the Medicare program, in part, through the issuance of official Rulings.  *See* 42 C.F.R. §401.108.  In addition to the substantive rules published by the Secretary in the Code of Federal Regulations and the Rulings, CMS publishes numerous other interpretative rules implementing the Medicare program, which are compiled in one or more CMS Manuals.  The Secretary also issues other subregulatory documents to implement the Medicare program, which generally do not have the force and effect of law.  The Medicare Act, at 42 U.S.C. §1395hh(a), prohibits the application of any rule or policy that establishes or changes a substantive legal standard governing the payment for service unless it is promulgated by the Secretary using notice-and-comment rulemaking.

11.     The Medicare program is divided into five parts: A, B, C, D, and E.  Part A of the Medicare program, which is the Part primarily at issue in this action, provides for coverage and payment for, among others, inpatient hospital services on a fee-for-service basis.  42 U.S.C. §§1395c *et seq*.  Individuals are automatically entitled to Part A coverage when they reach age 65 if they are entitled to Social Security benefits, or at a younger age if they become disabled and have been entitled to disability benefits for 24 calendar months.  42 U.S.C. §426.  In addition, the Medicare Program provides that certain qualifying individuals with end stage renal disease are entitled to Part A coverage.  *See* 42 U.S.C. §426-1.  Part A services are furnished to Medicare beneficiaries by "providers" of services, including the Hospital, that have entered into written provider agreements with the Secretary, under 42 U.S.C. §1395cc, to furnish hospital services to Medicare beneficiaries.

12.     CMS pays providers participating in Part A of the Medicare program for covered services rendered to Medicare beneficiaries through Medicare Administrative Contractors ("MACs"), which are agents of the Secretary.  Each Medicare-participating hospital is assigned

to a MAC.  42 U.S.C. §1395h.  The amount of the Medicare Part A payment to a hospital for services furnished to Medicare beneficiaries is determined by its MAC based on instructions from CMS.

13.     Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted the hospital inpatient prospective payment system ("IPPS") to reimburse hospitals, including the Hospital, for inpatient hospital operating costs.  Under IPPS, Medicare payments for hospital inpatient operating costs are not based directly on the costs actually incurred by the hospitals.  Rather, they are based on predetermined, nationally applicable rates based on the diagnosis of the patient determined at the time of discharge from the inpatient stay, subject to certain payment adjustments.  One of these adjustments is the Medicare "disproportionate share hospital" or "DSH" payment.  *See* 42 U.S.C. §1395ww(d)(5)(F).

## MEDICARE DSH PAYMENT

14.     Hospitals that treat a disproportionately large number of low-income patients are entitled by statute to a DSH payment adjustment, in addition to standard Medicare payments.  42 U.S.C. §1395ww(d)(5)(F).  Congress enacted the DSH adjustment in recognition of the relatively higher costs associated with providing services to low-income patients.  These higher costs have been found to result from the generally poorer health of low-income patients.  The DSH adjustment provides additional Medicare reimbursement to hospitals for the increased cost of providing services to their low-income patients.

15.     There are two methods of determining qualification for a DSH adjustment: the more common "proxy method" (42 U.S.C. §1395ww(d)(5)(F)(i)(I)) and the less common "Pickle method" (42 U.S.C. §1395ww(d)(5)(F)(i)(II)).  The Hospital's DSH calculations were made using the proxy method, under which entitlement to a DSH adjustment, as well as the amount of

the DSH payment, is based on the hospital's "disproportionate patient percentage" ("DPP").  42 U.S.C. §1395ww(d)(5)(F)(v) and (vi).

16.     The DPP is the sum of two fractions, which are designed to capture the number of low-income patients a hospital serves on an inpatient basis by counting the number of days that certain low-income patients receive inpatient services in a given fiscal year.  Thus, the two fractions serve as a "proxy" to determine low-income patients, rather than having CMS count the actual number of such patients.

17.     The focus of this action is the first fraction in the DPP equation, referred to as the "Medicare/SSI fraction," which accounts for inpatients who are entitled to both Medicare Part A benefits and benefits under SSI, a federal low-income supplemental payment focused primarily on supplementing the income of low-income individuals who are either aged, blind, or disabled. The Medicare/SSI fraction is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter.

42 U.S.C. §1395ww(d)(5)(F)(vi)(I).  The Medicare/SSI fraction, therefore, is the percentage of a hospital's Medicare Part A-entitled inpatients who were also entitled to SSI benefits at the time that they were receiving inpatient services at the hospital.  The terms "Medicare" and "SSI," and "ratio," "fraction," "proxy" and "percentage" are all used interchangeably throughout various sources to describe the fraction set forth in 42 U.S.C. §1395ww(d)(5)(F)(vi)(I).  For consistency, the term "Medicare/SSI fraction" is used herein.

18.      There is no discussion, direction, or limitation, in either the statute or regulation, as to the particular time when the data used to calculate the Medicare/SSI fraction should be measured or when that calculation must be finalized.  *See* 42 U.S.C. §1395ww(d)(5)(F)(vi)(I); *see also* 42 C.F.R. §412.106 [2008].  There is similarly no limitation in the statute or regulation regarding review of the accuracy of the calculation of the Medicare/SSI fraction at a later date**.**

19.      CMS determines the numerator of the Medicare/SSI fraction for all IPPS hospitals by matching data from the Medicare Provider Analysis and Review ("MedPAR") file, which is Medicare's database of hospital inpatients, with a file created for CMS by the Social Security Administration ("SSA"), the agency that administers the SSI program, to identify SSI-recipients. CMS generally does not share with providers the underlying SSA data that CMS uses to "match" inpatients for Medicare DSH purposes and specifically refused the Hospital's request for such data for purposes of determining the accuracy of the SSI percentages at issue.

20.      Section 3-20.3 of the Medicare Claims Processing Manual ("MCPM") requires MACs to make DSH payment determinations using the Medicare/SSI fraction supplied to them by CMS.  Accordingly, IPPS hospitals, such as the Hospital, are not permitted to create their own Medicare/SSI fractions for use by CMS or their MAC.  In accordance with this duty, the Hospital's MAC made the DSH payment determinations at issue in this action using the Medicare/SSI fractions that CMS furnished to them.

### PREVIOUS SCRUTINY OF CMS'S CALCULATION OF THE MEDICARE/SSI FRACTION

21.      There has previously been scrutiny of, and litigation regarding, CMS's calculation of the Medicare/SSI fraction.  In *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008) ("*Baystate*"), this Court determined that, given the evidence in the record, it was arbitrary and capricious for the CMS Administrator to find that

**JA 10**

CMS had used the "best available data" in determining the Medicare/SSI fractions at issue in that action.  To correct the agency's errors, the Court remanded the matter to the Secretary for the purposes of having CMS recalculate the Medicare/SSI fractions at issue based on the "best available data" as determined by the Court.  The *Baystate* Court was unmoved by the Secretary's arguments that Medicare/SSI fraction recalculations would conflict with the agency's interest in "administrative finality."

22.     In response to *Baystate*, CMS issued CMS Ruling 1498-R ("the Ruling") on April 28, 2010.  The Ruling required CMS to review and recalculate the Medicare/SSI fraction of Baystate Medical Center and the other *Baystate* plaintiffs.  CMS also required, as part of the Ruling, that the claims for all hospitals pending at the PRRB as of the date of the Ruling—April 28, 2010—would thereafter be remanded to the hospitals' MACs for reprocessing pursuant to CMS's "improved" methodology for calculating Medicare/SSI fractions.

23.     Further, for all claims in cost reporting periods that had not been settled as of April 2010, which includes the FYs at issue here, the Ruling required the MAC to recalculate the Medicare/SSI fraction using the "suitably revised data matching process" ordered by this Court in *Baystate* or, in the alternative, using the methodology implemented under CMS's final rule published on August 16, 2010 ("FFY 2011 IPPS Final Rule"), effective October 1, 2010, depending on the year at issue and whether that Final Rule applied.

24.     More specifically, in the FFY 2011 IPPS Final Rule, CMS implemented a revised data matching process, explaining that only the following three SSA codes transmitted to CMS would be counted as confirming a patient's entitlement to SSI: C01, M01, and M02.  *See* 75 Fed. Reg. 50,041, 50,281 (Aug. 16, 2010).  CMS would not take into account any other SSA codes in its determination of whether a particular patient was entitled to SSI.  The FFY 2011 IPPS Final

Rule did not, however, explain how CMS determined that these particular SSA codes alone "match up" to a patient's SSI entitlement or how these codes were derived.  In addition to limiting the SSA codes upon which CMS would rely, in the Final Rule's preamble, CMS also attempted to limit the use of specific data to that available as of fifteen months after the end of the Federal fiscal year and to require that the data be measured only once, and never revisited. *See* 75 Fed. Reg. at 50,282.  Such a limitation resulted in calculations that, almost by definition, are arbitrary and incorrect because not all of the relevant SSI entitled determinations are made and/or identified until after this time period.

25.     As a result of the Ruling, CMS calculated new Medicare/SSI fractions for the Hospital for the FYs at issue, which the MAC used to make the DSH payment determinations that the Hospital challenged because CMS's recalculations still significantly understate the Hospital's Medicare/SSI patient days, due to inaccurate and/or incomplete data, which the MAC and CMS have failed to explain and which reflect an incomplete and arbitrary process.

**THE MEDICARE APPEALS PROCESS**

26.     Under the Medicare program, each hospital's MAC is required to audit the hospital's annually submitted Medicare cost report and issue a Notice of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's fiscal year.

27.     If a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in the NPR, and the hospital satisfies the amount in controversy requirements, the hospital has a right to obtain a hearing before the PRRB by filing an appeal within 180 days of receiving its NPR (or any revised NPR).  42 U.S.C. §1395oo.

28. The decision of the PRRB constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the PRRB's decision. 42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§405.1875 and 405.1877. The Secretary has delegated his authority under the statute to review PRRB decisions to the CMS Administrator.

29. A hospital may obtain judicial review of the PRRB's decision by filing suit within 60 days of receipt of notice of any final decision in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia. 42 U.S.C. §1395oo(f). In any such action, the Secretary is the proper defendant. *See* 42 C.F.R. §421.5(b). Under 42 U.S.C. §1395oo(f)(2), interest is to be awarded in favor of a hospital that prevails in an action brought under 42 U.S.C. §1395oo(f).

30. Judicial relief is also available under the equitable remedy of mandamus where a hospital has a clear right to the relief sought and the Secretary has a non-discretionary duty to honor that right. *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807 (D.C. Cir. 2001).

## APPLICABILITY OF THE APA TO MEDICARE APPEALS

31. Under 42 U.S.C. §1395oo(f)(1), an action brought for judicial review "shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the APA. Under the APA, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). "Generally, an agency's decision is arbitrary and capricious 'if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Johnson v. U.S. Dep't of Educ.*, 580 F. Supp. 2d 154,

157 (D.D.C. 2008) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("Motor Vehicle")*, 463 U.S. 29, 43 (1983)) (internal citations omitted).   Furthermore, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §706(2)(C).

32.      Additionally, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…without observance of procedure required by law."  5 U.S.C. §706(2)(D).  The APA dictates rulemaking procedural requirements, specifically the requirement that the agency provides notice of proposed rulemaking, that the agency affords interested parties an opportunity to comment on the proposed rulemaking, and that the agency considers the relevant matters presented.  5 U.S.C. §553.

## FACTUAL BACKGROUND

### THE HOSPITAL'S ANALYSIS OF CMS'S MEDICARE/SSI FRACTIONS FOR THE FYS AT ISSUE

33.      For each FY at issue here, the Hospital filed its cost report using its best estimate of what its Medicare/SSI fraction should be based on prior experience.  At final audit, the MAC adjusted the Hospital's Medicare/SSI fraction, reducing it in each FY to the percentage determined and published by CMS, following its matching of SSA and CMS data.  CMS's Medicare/SSI fractions calculated for the Hospital for FYs 2006, 2007, and 2008, respectively, were 14.74%, 14.73%, and 14.40%.

34.      As explained in detail below, the Hospital was unable to access the underlying SSA data that CMS used in calculating the Medicare/SSI fractions at issue, either from SSA directly or through CMS.  Thus, to review the accuracy of CMS's published Medicare/SSI fractions for FYs 2006, 2007, and 2008, the Hospital used a number of other verified data

sources.  In particular, the Hospital analyzed data drawn from a database maintained by the State of California, which is directly compiled using SSA data, and compared it to data that CMS used to determine the Hospital's SSI percentages at issue.  The applicability and accuracy of Hospital's data collection and calculation methodology was confirmed by testimony given by the former Director of California's Medi-Cal program, whom the PRRB accepted as an expert, and extensive evidence submitted on the record.  A brief summary of that data collection and methodology is included here.

35.     The Hospital gathered "aid" or "aide" codes for all of its patients who were Medi-Cal beneficiaries under the California Department of Health Care Services ("DHCS"), the State Medicaid agency for California.  Specifically, the Hospital compiled a list of all patients that DHCS assigned aid codes "10", "20," and "60," since these three aid codes specifically and uniquely identify individuals who are confirmed to the State Medi-Cal program by SSA as actively receiving SSI and/or state supplementation payments ("SSP") benefits.  As confirmed by expert testimony, the assignment of these three aid codes is based completely on information that DHCS receives from SSA, which is updated weekly or monthly.

36.     The Hospital went to extraordinary lengths to confirm the aid codes assigned for particular days for each and every patient, utilizing data from the State Medi-Cal Paid Claims Summaries, the Hospital's internal patient data, including its internal financial patient database, the DSS database, a database prepared and maintained by a private contractor to DHCS, "HDX"; and the Automated Enrollment Verification System ("AEVS") operated by DHCS.

37.     During this first phase of the process, if the Hospital could not confirm that a particular patient had SSI and/or SSP benefits during the patient's inpatient stay, the Hospital would not include the inpatient days from that patient in its total count of days in the

Medicare/SSI fraction numerator.  Similarly, if a patient were assigned a "10", "20," or "60" aid code for a portion of his or her inpatient stay, only those days during the period actually covered were included in the Hospital's calculation of the Medicare/SSI fraction numerator.

38.    The Hospital recognized that the total number of patients (and days) associated with aid codes 10, 20, or 60, may include some patients that were receiving only SSP benefits, and thus would not be eligible to be counted in the Medicare/SSI fraction.  However, DHCS records do not distinguish between a patient who receives SSI and SSP benefits, and one that receives only SSP benefits, and, as previously mentioned, the Hospital was unable to access SSA data to confirm the exact number of patients receiving only SSP benefits.  To eliminate patients receiving only SSP benefits from the calculation, the Hospital reduced its "raw" total of patients (and days) by approximately 16.5%, which is the Statewide average from 2005 through 2009 of SSI/SSP patients having only SSP benefits.  These calculations were confirmed through expert testimony.  Further, the Hospital presented testimony at the Hearing that the Statewide average was likely <u>higher than</u> the actual percentage of SSP only beneficiaries in Southern California, where the Hospital is located.

39.    Second, the Hospital obtained, through data use agreements, CMS's data, from the MedPAR file, that supported Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008.

40.    Third, with the above two datasets—the Hospital's verified list of patients assigned aid codes 10, 20, or 60, and CMS's MedPAR file—the Hospital compared patient-by-patient, and day-by-day, the days that CMS included in the numerator of the Medicare/SSI fraction for each of the FYs at issue, and the Hospital's results, and grouped the days as either "matched" (CMS's data and Hospital's data is in agreement), "unmatched" (Hospital's data

**JA 16**

includes verified 10, 20, or 60 aid code for all days, but CMS does not include the patient and days on its list of Part A/SSI beneficiaries), or "partial match" (a portion of the inpatient admission was "matched" but not all days of the admission).  The results of the comparison are:

| Year | CMS "SSI" Days | Hospital "SSI" Days | CMS "SSI" Patients | Hospital "SSI" Patients |
|------|----------------|---------------------|--------------------|-------------------------|
| 2006 | 4,886 | 5,841 | 748 | 1,129 |
| 2007 | 4,153 | 5,553 | 757 | 1,197 |
| 2008 | 4,238 | 5,500 | 729 | 1,148 |

41.    As evident from this chart, CMS's Medicare/SSI fraction for the Hospital is lower than the Hospital's calculated SSI fraction by 19.55% in 2006, by 25% in 2007, and by 22.95% in 2008.  In addition, CMS's count of patients receiving SSI benefits during the month(s) of admission is lower than the Hospital's count of SSI receiving patients during these years by 20.56% in 2006, by 24.09% in 2007, and by 23.79% in 2008.  The differences between CMS's data and the Hospital's data result in estimated negative reimbursement impacts of $770,837 in FY 2006, $1,291,520 in FY 2007, and $1,232,627 in FY 2008.  These differences were confirmed by expert testimony, and are <u>unexplained</u> by any theory espoused (or evidence submitted) by the MAC or CMS during the PRRB appeal process.

42.    The Hospital presented an overwhelming amount of evidence and testimony before the PRRB, including but not limited to, expert testimony at the Hearing, and then provided additional information and evidence in response to numerous PRRB questions on specific factual issues related to the methodology and data sources detailed above.  The MAC introduced no contrary evidence, brought no witnesses to offer contrary evidence at the Hearing, and based its argument on CMS's right to calculate providers' Medicare/SSI fractions essentially in any way CMS deems appropriate, despite the APA requirements to the contrary.  The Hospital met its burden of production of evidence and proof and established before the PRRB that it is

entitled to relief.   Indeed, the Hospital's expert testimony, which went completely unrefuted

during the Hearing, was not addressed by the PRRB <u>at all</u> in the Final Decision.

### THE PRRB'S FINAL DECISION IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

43.     In its Final Decision, the PRRB determined that the Medicare/SSI fractions used

by the MAC were proper.   This determination was based on a number of findings that are

unsupported by any evidence, let alone substantial evidence, including but not limited to the

following:

a.      The Hospital assumed all individuals with 10, 20, or 60 aid codes mapped to SSI codes of C01, M01, or M02;[1]

b.      The Hospital did not provide a "crosswalk" between aid codes 10, 20 and 60, and the SSI codes C01, M01, or M02;

c.      The Hospital did not explain or identify the potential reasons for differences between the Medi-Cal aid codes and SSI codes;

d.      The Hospital could have, but did not, provide an estimate of the impact of two potential explanations for the variances between the state Medi-Cal aid codes and SSI codes; and, finally,

e.      The Hospital did not submit sufficient quantifiable data in the record to prove that the Medicare/SSI fractions calculated by CMS, and used in Hospital's 2006, 2007, and 2008 cost reports, were flawed.

44.     The Final Decision also failed to address the extensive, uncontroverted evidence

and testimony, including expert testimony by the former Director of the Medi-Cal program and

Director of the Eligibility Branch of Medi-Cal, presented by the Hospital at the Hearing and in

post-hearing briefing and accompanying declarations.   The expert testimony offered by the

---

[1]  To the extent that the Hospital's initial totals, calculated prior to the Hearing, of individuals with aid codes of 10, 20, or 60, potentially included individuals receiving SSP benefits only, the PRRB recognized that the Hospital corrected its totals by adjusting for SSP-only days.  The Final Decision does not challenge the Hospital's revised number of SSI patients/days on that basis. Similarly, the PRRB accepted the Hospital's use of the CMS MedPAR total of entitled (covered) days as the denominator of its request for recalculation of the SSI Fraction for FYs 2006, 2007, and 2008 as it is not questioned in the Final Decision.

Hospital covered numerous, highly relevant topics, and, in particular, confirmed Hospital's methodology for calculating its SSI patients/days through analysis of Medi-Cal records, which included accounting for SSP-only days; confirmed the insignificant effect of nursing home residents and month of eligibility on Hospital's final count of SSI patients/days; and, finally, confirmed that the difference between CMS's and Hospital's Medicare/SSI fractions is significant and unexplained by any CMS or MAC theory. Although the PRRB accepted one of the Hospital's witnesses as an expert, the PRRB failed even to comment in the Final Decision on the expert report, testimony, or additional declaration responding to specific Board inquiries.

### THE PRRB'S UNSUPPORTED FINDINGS REGARDING THE RELATIONSHIP BETWEEN AID CODES AND SSI CODES

45. The PRRB's fundamental misunderstanding of the data issues raised by the Hospital on appeal, and the PRRB's ignoring of unrefuted expert testimony, resulted in the PRRB's unsupported (and clearly inaccurate) findings (1) that the "Provider's methodology assumes that all individuals with an 'aid code' of 10, 20, or 60 will map to an SSI code of C01, M01, or M02," and (2) that a "crosswalk [between the "Medi-Cal" aid codes and CMS SSI codes] is necessary to determine if the Provider's use of 'aid codes' 10, 20, and 60, accurately identified only those individuals with an SSI code of C01, M01, and M02."

46. Without the underlying SSA data that support the SSI codes, a comparison of the two datasets is not possible.

47. The futility of the comparison between Medi-Cal aid codes and CMS SSI codes, as well as the Hearing testimony and the Hospital's post-hearing brief and accompanying declarations, make it clear that merely matching the aid codes to the specific SSI/CMS codes C0I, M0I and M02 is not the focus of the Hospital's appeal. Instead, the focus of the Hospital's appeal is whether CMS's count of qualifying SSI and Part A days is correct—or, put another

way, whether CMS's matching process is flawed such that C01, M01, and M02 <u>do not capture all qualifying SSI and Part A days</u> for the Hospital's inpatients during FYs 2006, 2007, and 2008.

48. As discussed above, this Court previously ordered CMS to modify its methodology for matching CMS Medicare data and the SSI benefits information provided by SSA. While CMS modified its methodology, virtually nothing is known about the underlying matching process. And, the MAC presented <u>no evidence</u> supporting CMS's methodology before, at, or following the Hearing. On the other hand, the Hospital has shown, through extensive evidence and testimony, that aid codes 10, 20, and 60, can be assigned by State DHCS <u>only in cases where a potential Medi-Cal beneficiary is aged, blind or disabled and is entitled to SSI and/or SSP benefits</u>. The Hospital also provided extensive evidence, as well as expert testimony, demonstrating how SSI and SSP entitlement data is transmitted directly from SSA to DHCS and how such data is translated into aid codes by the DHCS. It appears that the PRRB's only issue with the Hospital's evidence in this regard is that it does not link the aid codes to the SSI codes of C01, M01, and M02. For the reasons stated above, this is insufficient to support the PRRB's conclusion that the Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008 were proper.

## **THE PRRB'S UNSUPPORTED FINDINGS REGARDING POTENTIAL EXPLANATIONS FOR VARIANCES BETWEEN THE DATA**

49. The PRRB also found that the Hospital did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS, and used in Hospital's FYs 2006, 2007, and 2008 cost reports, were flawed. The PRRB appeared to base this finding on Hospital's alleged inability (1) to explain or identify the potential reasons for differences between Medi-Cal's aid codes and CMS's SSI codes; (2) to demonstrate the significance

resulting from differences in coding nursing home residents, and (3) to demonstrate the significance resulting from differences in effective dates for Medi-Cal eligibility versus SSI payments.

50.    The record demonstrates that the Hospital met its burden of producing substantial evidence that the discrepancies in CMS's data had an impact on the Hospital's Medicare/SSI fraction, and ultimately the Hospital's DSH payment.  However, CMS and SSA are in sole possession of the records necessary to conclusively prove (or disprove) the Hospital's claim and the exact adverse impact.  In that situation, the PRRB may not reject the Hospital's allegations as "insufficiently proven unless [CMS] comes forward with 'countervailing evidence or a reason, not based on the insufficiency of [Hospital's] showing, that explains why the … allegations have not been accepted." *Baystate*, 545 F. Supp. 2d at 93-94.  This is because "the burden of bringing forward evidence generally shifts when the defendant has greater access to information on a particular issue." *Id.* at 94.  The Final Decision does not base its findings on any countervailing evidence, nor could it because the MAC did not present any such evidence.

51.    At the Hearing, the PRRB questioned whether nursing home (residential long-term care facilities) residents could account for some or all of the difference between the Hospital's calculated Medicare/SSI fraction and CMS's calculated Medicare/SSI fraction.  When individuals enter nursing homes, the benefits received in the form of payments to the nursing home from the State or other third party payor are counted as "income" for purposes of SSI (and SSP) benefits.  Thus, if a longtime resident of a nursing facility is admitted to a hospital as a patient, that patient may no longer qualify for SSI benefits, and should not be included when determining SSI eligible days for the numerator of the Medicare/SSI fraction.

52.     The PRRB stated, incorrectly, that the Hospital only provided "some statewide statistics to backup [its] assertion" that the difference does not represent a significant number of days.  The Hospital provided testimony at the Hearing, including unrefuted <u>expert</u> testimony, as well as extensive documentation and analysis in its post-hearing brief and accompanying declarations, that demonstrated the number of patients who both (1) are admitted to hospitals in California from nursing homes, and (2) have had their SSI payments reduced to zero in the month of hospitalization, is quite small, and would have had minimal, if any, impact on the Hospital's SSI percentage during the relevant FYs.  Notwithstanding that substantial evidence, the PRRB indicated that the Hospital needed to provide an estimate of the impact of the difference on the additional SSI days being requested.  However, this is not what is required— the undisputed evidence of errors in CMS's data shifts the burden to the MAC to "produce countervailing evidence or a reason, not based on the insufficiency of [Hospital's] evidence, that explains why [Hospital's] allegations [should not be] accepted." *Baystate*, 545 F. Supp. 2d at 93-94.  This burden cannot be avoided merely by asserting generalized scenarios that could affect the impact of CMS's errors and omissions and that "could only be eliminated with information unavailable to [the Hospital]." *Atlanta College of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830-31 (D.C. Cir. 1993).  The MAC introduced no contrary evidence and brought no witnesses to offer contrary evidence at the Hearing.

53.     Regarding the second potential explanation of the variances between the Medicare/SSI fractions, the PRRB also questioned at the Hearing whether differences in timing of patients' qualification for Medi-Cal benefits as compared to when such patient started to receive actual SSI payments may have skewed the number of "unmatched" patients and/or days.  The Hospital provided testimony and evidence, including expert testimony, that this is a rare

situation that occurs only if the patient is admitted at the Hospital in that same month for the first time applied for both Medi-Cal and SSI benefits, and was somehow granted Medi-Cal eligibility on the basis of a very quick decision by the SSA to make the individual eligibly for SSI benefits, for the first time, that same month.  The MAC did not meet its burden to produce countervailing evidence or proof to explain why the Hospital's overall allegations should not be accepted.  *See Atlanta College of Med. & Dental Careers*, 987 F.2d at 830-31.

54.    A court must be satisfied that the agency "has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle*, 463 U.S. at 43.  Here, the Final Decision does not articulate a rational connection between the overwhelming and <u>uncontroverted</u> evidence, including expert testimony, submitted by the Hospital and the PRRB's ultimate findings and decision.  For this reason, the Final Decision should be reversed.

## CMS'S RESISTANCE TO EFFORTS TO OBTAIN RELEVANT EVIDENCE IN THE GOVERNMENT'S SOLE POSSESSION BEARING ON FINANCIAL IMPACT OF ERRORS IN CMS'S CALCULATIONS

55.    Prior to, and during the appeal process, the Hospital sought to obtain information directly from the SSA, as well as from CMS, to confirm the accuracy of the SSI/Medicare fractions at issue.  The Hospital was unsuccessful on both fronts due to CMS's resistance. Initially, the SSA advised the Hospital that no data could be shared directly between SSA and a provider.  The Hospital then requested that CMS, instead, review a sample of fifty "unmatched" patients and days and compare that sample against official SSA records to which CMS had access.  The Hospital indicated that it would accept the results of any such CMS review of the sample claim; thus, if the review showed overwhelmingly that the "unmatched" patients were not included in official SSA records, the Hospital would have dropped its consolidated appeal.

56.     To facilitate the review, the Hospital engaged a former longtime CMS official to approach CMS.  After several months of back and forth between that individual and CMS, CMS ultimately refused to conduct the review for workload concerns, and stated that the PRRB was the proper forum for the Hospital to present its data issues.  The Hospital also sought assistance from its Congressional delegation.  Senator Dianne Feinstein's office, in particular, engaged with SSA and CMS and brokered an arrangement whereby SSA would review the Hospital's sample data if the data sample was supplied to SSA directly from CMS.  Ultimately, the review never took place because, even though SSA expressed its willingness to review the sample data, CMS refused to cooperate and transmit the Hospital's data sample to the SSA, necessitating the current action.

57.     The Final Decision "recognize[d] [the Hospital's] difficulty in proving that CMS significantly understated [the Hospital's] SSI fractions for the three fiscal years under appeal, and in demonstrating that [the Hospital's] calculations of the SSI fractions are more accurate," without the SSA data.  However, the Final Decision failed to apply the correct shifting burden, described above, given CMS's control of the data.  *See Baystate*, 545 F. Supp. 2d at 93-94.  CMS's refusal to cooperate with an alternative match approach the Hospital proposed, which and was acceptable to SSA, unlawfully and improperly denied the Hospital access to the SSI records needed to prove impact of the errors and omissions in CMS's calculation of the Hospital's Medicare/SSI fractions for the fiscal years at issue.  The Final Decision unlawfully ignored the impact of CMS's denials.

## CAUSES OF ACTION

### COUNT I

### Judicial Review Under the APA and the Medicare Act
### (The PRRB's Final Decision Affirming CMS's Improper Calculation of the Hospital's Medicare/SSI Fractions is Contrary to Law.)

58.     The Hospital hereby incorporates by reference paragraphs 1 through 57 herein.

59.     The PRRB's Final Decision finding that Medicare/SSI fractions used to calculate the Hospital's Medicare DSH payments for FYs 2006, 2007, and 2008 were "proper" is unlawful and must be reversed because it is procedurally and substantively contrary to the APA, the Medicare Act, and other authorities, including but not limited to various Medicare regulations, and is otherwise unlawful.

60.     The PRRB's Final Decision is contrary to plain meaning and legislative intent of DSH statute and regulations, which require the Secretary to compute using accurate data the number of Medicare patient days attributable to hospital inpatients who were entitled to benefits under both Medicare Part A and SSI during their inpatient stay.  For example, the Final Decision did not examine the relevant data presented by the Hospital that revealed discrepancies in CMS's data, nor did it offer any rational connection between the evidence in the record and the conclusion that the data used was accurate.

### COUNT II

### Judicial Review Under the APA and the Medicare Act
### (The PRRB's Final Decision Affirming CMS's Improper Calculation of the Hospital's Medicare/SSI Fractions is Arbitrary and Capricious.)

61.     The Hospital hereby incorporates by reference paragraphs 1 through 60 herein.

62.     Under 42 U.S.C. §1395oo(f), the PRRB's Final Decision finding that Medicare/SSI fractions used to calculate the Hospital's Medicare DSH payments for FYs 2006, 2007, and 2008 were "proper" is final agency action that is subject to judicial review under the

applicable provisions of the APA.  Under the APA, the reviewing court shall set aside the final

agency decision if, *inter alia*, it is contrary to law, arbitrary and capricious, an abuse of

discretion, or unsupported by substantial evidence in the record.  5 U.S.C. §706.

63.      The PRRB's Final Decision is procedurally and substantively arbitrary,

capricious, and otherwise unlawful under the APA because it is inconsistent with (a) the

Medicare Act and other authorities including but not limited to, various Medicare regulations,

and (b) the previous decision of this Court in *Baystate* and the Secretary's actions in light of that

decision.  For example, the Final Decision improperly failed to examine the relevant data

presented by the Hospital that revealed discrepancies in CMS's data, nor offer any rational

connection between the evidence in the record and the conclusion that the data used was

accurate.  Moreover, the PRRB's Final Decision results in the Hospital's FYs 2006, 2007, and

2008 Medicare payments being based on incorrect factual data, in violation of *St. Francis*

*Medical Center v. Azar*, 894 F. 3d 290 (D.C. Cir. 2018).

64.      The PRRB's Final Decision is thus contrary to law, arbitrary and capricious, an

abuse of discretion, or unsupported by substantial evidence in the record pursuant to 5 U.S.C.

§706, and other laws, and must be reversed or set aside.

## COUNT III

### Judicial Review Under the APA and the Medicare Act
### (The Hospital's DSH payments are unlawful and should be set aside because the Final Decision is arbitrary and capricious and unsupported by the evidence in the record.)

65.      The Hospital hereby incorporates by reference paragraphs 1 through 64 herein.

66.      Under 42 U.S.C. §1395oo(f), the PRRB's Final Decision finding that

Medicare/SSI fractions used to calculate the Hospital's Medicare DSH payments for FYs 2006,

2007, and 2008 were "proper" is final agency action that is subject to judicial review under the

applicable provisions of the APA.  Under the APA, the reviewing court shall set aside the final

agency decision if, *inter alia*, it is contrary to law, arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence in the record.  5 U.S.C. §706.

67.     The PRRB's Final Decision in this action must be aside because it is arbitrary, capricious, and unsupported by substantial evidence in the record.  The uncontroverted facts in the record before the PRRB show there are unexplained discrepancies in CMS's data.  The discrepancies are sufficient to show that CMS's data was inaccurate, not based on the best available data, and that relief is warranted.  In addition, the Final Decision neither addressed nor explained the failure to address extensive testimony, including expert testimony, that was not contradicted by the MAC and/or CMS.  Given this failure to address evidence and expert testimony, the Final Decision "entirely failed to consider an important aspect of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle*, 463 U.S. at 43.

68.     The Final Decision is thus contrary to law, arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence in the record pursuant to 5 U.S.C. §706, and other laws, and must be reversed or set aside.

## COUNT IV
## Mandamus

69.     The Hospital hereby incorporates by reference paragraphs 1 through 68 herein.

70.     The Secretary has the non-discretionary duty to reimburse the Hospital fully at the amounts to which it is entitled under the law.  The Hospital is entitled to a writ of mandamus under 28 U.S.C. §1361, directing the Secretary to recalculate the Hospital's DSH payments for the FYs at issue after validating the underlying data used by CMS to calculate the Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008.

## COUNT V

## All Writs Act

71.     The Hospital hereby incorporates by reference paragraphs 1 through 70 herein.

72.     The Secretary has violated the Medicare Act and APA by improperly calculating the Hospital's DSH payments at issue.  Under the All Writs Act, 28 U.S.C. §1651, and other authority, the Hospital is entitled to issuance of an order requiring the Secretary to recalculate Hospital's DSH payments for the FYs at issue after validating the underlying data that CMS used to calculate the Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008.

### REQUEST FOR RELIEF

WHEREFORE, the Hospital requests:

1.     An order reversing or setting aside the Final Decision and remanding this action to the Secretary with instructions to (a) obtain correct and complete patient SSI data from SSA for the periods at issue, (b) recalculate the Hospital's Medicare/SSI fractions for the FYs at issue based on a patient by patient match to the SSA's SSI data, (c) provide the Hospital with the patient-level data, and the data specifications, systems requirements, and programs used to compute the revised fractions for the FYs at issue so that the Hospital can validate the results, and (d) pay the Hospital the additional DSH amounts due as a result of the recalculations of the Medicare/SSI fractions for the FYs at issue, with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

2.     Issuance of a writ of mandamus requiring the Secretary to (a) obtain correct and complete patient SSI data from SSA for the periods at issue, (b) recalculate the Hospital's Medicare/SSI fractions for the FYs at issue based on a patient by patient match to the SSA's SSI data, (c) provide the Hospital with the patient-level data, and the data specifications, systems

requirements, and programs used to compute the revised fractions for the FYs at issue so that the

Hospital can validate the results; and (d) pay the Hospital the additional DSH amounts due as a

result of the recalculations of the Medicare/SSI fractions for the FYs at issue, with interest

calculated in accordance with 42 U.S.C. §1395oo(f)(2);

3.      An order that the Court shall retain jurisdiction over this action for purposes of

enforcement until notice, upon motion of the Hospital, of the Secretary's compliance with this

Court's orders, and the PRRB's compliance with all of the remand instructions of the Secretary;

4.      Legal fees and costs of suit incurred by the Hospital; including reasonable

attorneys' fees; and

5.      Such other and relief as the Court deems just and proper.

Dated:  November 27, 2018                         Respectfully submitted,

                                                  /s/ Robert L. Roth
                                                  Robert L. Roth (DC Bar No. 441803)
Laurence D. Getzoff                               Kelly A. Carroll (DC Bar No. 1018485)
Alicia W. Macklin                                 HOOPER LUNDY & BOOKMAN, P.C.
HOOPER LUNDY & BOOKMAN, P.C.                       401 9th Street, NW, Suite 550
1875 Century Park East, Suite 1600                Washington, D.C.  20004
Los Angeles, CA  90067-2517                       Tel.: (202) 580-7700
Tel:  (310) 551-8111                              Fax: (202) 580-7719
Fax:  (310) 551-8181                              E-mail:  rroth@health-law.com
E-mail:  lgetzoff@health-law.com                  E-mail:  kcarroll@health-law.com
E-mail:  amacklin@health-law.com


*Counsel for Plaintiff Pomona Valley Hospital Medical Center*

**JA 29**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

POMONA VALLEY HOSPITAL MEDICAL
CENTER

                              Plaintiff,

      v.

ALEX M. AZAR II, Secretary,
United States Department of Health and Human
Services,

                           Defendant.

Civil Action No.: 18-cv-2763 (ABJ)

### JOINT APPENDIX

Pursuant to Local Rule 7(n), the designations to the administrative record filed in this matter

as listed on the following table of contents have been mutually agreed to by all of the parties to this

action and are being submitted by Plaintiffs on behalf of all the parties.

Dated:  December 10, 2019

                             Respectfully submitted,

Laurence D. Getzoff
Alicia W. Macklin
HOOPER LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA  90067-2517
Tel:  (310) 551-8111
Fax:  (310) 551-8181
E-mail:  lgetzoff@health-law.com
E-mail:  amacklin@health-law.com

/s/ Robert L. Roth
Robert L. Roth (DC Bar No. 441803)
HOOPER LUNDY & BOOKMAN, P.C.
401 9th Street, NW, Suite 550
Washington, D.C.  20004
Tel.: (202) 580-7700
Fax: (202) 580-7719
E-mail:  rroth@health-law.com

*Counsel for Plaintiff Pomona Valley Hospital Medical Center*

5899582.6

## JA 30

## TABLE OF CONTENTS

| Document Title/Description | Administrative Record Pages Included in Appendix |
|---|---|
| **PRRB Administrative Record** | |
| PRRB Decision No. 2018-D50 (Oct. 1, 2018) | 1-26 |
| Provider's Post-Hearing Brief | 38-101 |
| Declaration of Stan Rosenstein, Expert Witness to the PRRB Hearing Dated August 17, 2017 | 102-108 |
| Declaration of Candice Le-Tran, Witness to the PRRB Hearing Dated August 17, 2017 | 109-114 |
| 2006 Summary Impact Chart, Ex. P-40 | 118-119 |
| 2007 Summary Impact Chart, Ex. P-41 | 120-121 |
| 2008 Summary Impact Chart, Ex. P-42 | 122-123 |
| 2006 Individual Appeal Request Documents, Ex. P-43 | 124-141 |
| 2007 Individual Appeal Request Documents, Ex. P-44 | 142-160 |
| 2008 Individual Appeal Request Documents, Ex. P-45 | 161-177 |
| California SSI/SSP Caseload from CDSS dated September 8, 2017, Ex. P-46 | 178-179 |
| SSI Eligibility, Ex. P-47 | 180-182 |
| Summary of SSI Eligibility Chart, Ex. P-48 | 183-184 |
| Email String from Provider's Expert Witness, Stan Rosenstein to Sharyl Shanen-Ray, DHCS dated August 25, 2017, Ex. P-49 | 185-188 |
| SSP Program Recipient Summary Report dated August 22, 2017 (California Department of Social Services), Ex. P-50 | 189-190 |
| California SSI/SSP Caseload from CDSS dated July 2005 through June 2009, Ex. P-51 | 191-193 |
| HHS Public Access, Publication: "*Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life*" published at J Am Geriatr Soc. 2010 Sep: 58(9): 1701-1706; PMCID: PMC2945440, Ex. P-52 | 194-204 |
| Email String from Provider's Witness, Candice Le-Tran to Amy Rosenkranz, DHCS dated September 7, 2017, Ex. P-53 | 205-210 |
| Listing of California GENERAL ACUTE Hospitals as of 2010, Ex. P-54 | 211-216 |
| Email from Amy Rosenkranz, DHCS, to Provider's Witness, Candice Le-Tran dated September 12, 2017, Ex. P-55 | 217-218 |
| August 17, 2017 PRRB Hearing Transcript (complete) | 339-476 |
| PVHMC SSI Data Process Flow Chart, Ex. P-20 | 1036-1037 |
| FYEs 2006, 2007 and 2008 SSI Verification Process and Supporting Data Prepared by PVHMC for Tzvi Hefter, Ex. P-24 | 1057-1059, 1061-1063 |
| Letter from U.S. Senator Dianne Feinstein to Christina Walters, SSA (May 20, 2016); Reply Letter from Patricia Raymond, SSA to U.S. Senator Dianne Feinstein (Oct. 26, 2016), Ex. P-25 | 1359-1363 |
| Letter from U.S. Senator Dianne Feinstein to Carolyn Colvin, SSA (Oct. 26, | 1364-1368 |

| | |
|---|---|
| 2016); Letter from U.S. Senator Dianne Feinstein to Seema Verma, CMS and Nancy Berryhill, SSA (May 19, 2017), Ex. P-26 | |
| PVHMC Summary of SSI Days by Aid Code, Ex. P-27 | 1369-1372, 1387-1389, 1404-1406 |
| E-Mail Correspondence with Amanda Sadra, Aide to U.S. Senator Dianne Feinstein, Ex. P-30 | 1429-1446 |
| Letter from N. Berryhill, SSA, to U.S. Senator Dianne Feinstein (May 30, 2017), Ex. P-31 | 1447-1449 |
| Letter from Carol Blackford, CMS to U.S. Senator Dianne Feinstein (June 23, 2017), Ex. P-32 | 1451-1454 |
| Expert Report by Stan Rosenstein, Ex. P-34 | 1459-1469 |
| Statewide SSI/SSP and SSP Only Data Tables prepared by Aron Smith, California DSS, Ex. P-37 | 1490-1494 |
| MAC's Final Position Paper | 1600-1617 |
| Provider's Final Position Paper | 1822-1838 |
| DSH Data Use Agreement for Cost Reporting Periods that Include December 8, 2004 and Thereafter | 1908-1915 |
| **Rulemaking Record** | |
| Public Comments | 002292, 002578, 002301 |

ĐEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

**NOV 2 1 2018**

**VIA EMAIL AND
FIRST CLASS MAIL**

Laurence D. Getzoff, Esquire
Hooper, Lundy & Bookman
Watt Plaza, Suite 1600
1875 Century Park East
Los Angeles, CA 90067-2799

Re: Pomona Valley Hospital Medical Center, PRRB Decision No. 2018-D50

Dear Mr. Getzoff:

This is to advise that the Administrator of the Centers for Medicare & Medicaid Services (CMS)
has declined to review the decision entered by the Provider Reimbursement Review Board in the
captioned case.

If the Provider wishes to obtain judicial review of the matter, civil action must be initiated within
60 days of the date the Board's decision was received in accordance with 42 CFR 405.1877.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Wilson Leong, CPA, Esquire, Intermediary's Representative

**JA 33**

00001

1

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



Re:   *Pomona Valley Hospital Medical Center*, PRRB Dec. No. 2018-D50 (09/21/18) (FYE: Various)

I recommend that the Administrator, Centers for Medicare and Medicaid Services, decline

to review the decision entered by the Provider Reimbursement Review Board in this case.

Jacqueline R. Vaughn
Attorney Advisor

APPROVED:

Date:   NOV 2 0 2018

Demetrios L Kouzoukas
Principal Deputy Administrator
Centers for Medicare & Medicaid Services

00002

**Gassmann, Arlene O. (CMS/OSORA)**

| | |
|---|---|
| **From:** | noreply@salesforce.com on behalf of CMS PRRB_OHCDMS |
| **Sent:** | Monday, October 1, 2018 4:35 PM |
| **To:** | lgetzoff@health-law.com; jeprrbappeals@noridian.com; board@fssappeals.com; CMS PRRB_OHCDMS· |
| **Subject:** | PRRB Case No. 13-0430, Pomona Valley Hospital Medical Center (05-0231) FYE 12/31/2006, PRRB Notification Letter |
| **Attachments:** | Oct 1 2018-D50.pdf.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please find the attached information regarding PRRB case number 13-0430.

Regards,
**Provider Reimbursement Review Board**

1

**JA 35**

00003



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Provider Reimbursement Review Board
1508 Woodlawn Drive, Suite 100
Baltimore, MD 21207
410-786-2671

October 1, 2018

Laurence D. Getzoff, Esq.
Hooper, Lundy & Bookman, P.C.
Watt Plaza, Suite 1600
1875 Century Park East
Los Angeles, CA  90067-2799

Wilson C. Leong, Esq.
Federal Specialized Services
PRRB Appeals
1701 S. Racine Avenue
Chicago, IL  60608-4058

RE:  PRRB Decision 2018-D50
     Pomona Valley Hospital Medical Center
     PRRB Case Numbers:  13-0430; 13-0628; 13-0680

Dear Laurence D. Getzoff and Wilson Leong:

The Provider Reimbursement Review Board issued PRRB decision 2018-D50 via the Office of Hearings Case and Document Management System (OHCDMS) on September 21, 2018. It has come to our attention that although the decision was uploaded in the system and available for view, not all parties received notification of the decision issuance.  Therefore the Board is reissuing the decision with a date of October 1, 2018.  Please reference 42 U.S.C. § 1395oo(f) and 42 C.F.R. §§ 405.1875 and 405.1877 regarding Administrator review and judicial review of this decision.

If you have any questions, please call (410) 786-2671.

Sincerely

Lisa Ogilvie-Barr
Director, DHD

*Enclosure*

cc:  Lorraine Frewert, Noridian Healthcare Solutions

**JA 36**

00004



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Provider Reimbursement Review Board
1508 Woodlawn Drive, Suite 100
Baltimore, MD 21207
410-786-2671

September 21, 2018

Laurence D. Getzoff, Esq.                    Wilson C. Leong, Esq.
Hooper, Lundy & Bookman, P.C.                Federal Specialized Services
Watt Plaza, Suite 1600                       PRRB Appeals
1875 Century Park East                       1701 S. Racine Avenue
Los Angeles, CA  90067-2799                  Chicago, IL  60608-4058

RE: PRRB Decision 2018-D50
    Pomona Valley Hospital Medical Center
    PRRB Case Numbers:  13-0430; 13-0628; 13-0680

Dear Laurence D. Getzoff and Wilson Leong:

A copy of the Provider Reimbursement Review Board's decision for the above-referenced appeal is
enclosed.  Please reference 42 U.S.C. § 1395oo(f) and 42 C.F.R. §§ 405.1875 and 405.1877 regarding
Administrator review and judicial review of this decision.

If you have any questions, please call (410) 786-2671.

Sincerely,


Lisa Ogilvie-Barr
Director, DHD

Enclosure


cc:  Lorraine Frewert, Noridian Healthcare Solutions

**JA 37**

00005

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2018-D50

**PROVIDER-**
Pomona Valley Hospital Medical Center

**HEARING DATE –**
August 17, 2017

**Provider No.: 05-0231**

**Cost Reporting Period Ended --**
12/31/2006, 12/31/2007, 12/31/2008

**vs.**

**MEDICARE CONTRACTOR –**
Noridian Healthcare Solutions

**CASE NOs. –** 13-0430 13-0628 13-0680

## INDEX

| | Page No. |
|---|---|
| Issue Statement | 2 |
| Decision | 2 |
| Introduction | 2 |
| Statement of the Facts | 2 |
| Discussion, Findings of Facts, and Conclusions of Law | 5 |
| Decision and Order | 9 |

00006

Page 2                                                  Case Nos.: 13-0430, 13-0628 & 13-0680

## ISSUE STATEMENT:

Whether the Medicare Administrative Contractor properly calculated Pomona Valley Hospital
Medical Center's disproportionate share hospital reimbursement with respect to the Provider's
Supplemental Security Income percentage.[1]

## DECISION

After considering Medicare law and regulations, arguments presented, and the evidence
admitted, the Provider Reimbursement Review Board ("Board") finds that the Supplemental
Security Income ("SSI") percentages used by the Medicare Contractor for Pomona Valley
Hospital Medical Center's ("Pomona" or "Provider") disproportionate share hospital ("DSH")
adjustment for its 12/31/2006, 12/31/2007 and 12/31/2008 cost reports were proper.

## INTRODUCTION

Pomona is a Medicare-certified acute care hospital located in Pomona, California.  Noridian
Healthcare Solutions is Pomona's Medicare Contractor.  For each of the fiscal years ("FY's")
involved, 12/31/2006, 12/31/2007, and 12/31/2008, Pomona qualified for a DSH payment and
the Medicare Contractor updated the SSI percentage to the percentage published by CMS for the
respective year.

Pomona timely appealed the Medicare Contractor's adjustments to the Board, and met the
jurisdictional requirements of 42 C.F.R. §§ 405.1835-405.1840.  The Board held a live hearing
on August 17, 2017.  Laurence D. Getzoff, Esq., of Hooper, Lundy & Bookman, P.C.,
represented the Provider.  Jerrod Olszewski, Esq., of Federal Specialized Services, represented
the Medicare Contractor.

## STATEMENT OF THE FACTS

Under Medicare's inpatient prospective payment system ("IPPS") the Medicare program pays
providers of inpatient hospital services based on predetermined, standardized amounts subject to
certain payment adjustments.[2]  One of these adjustments, the Medicare DSH adjustment,
provides additional payments to certain qualifying hospitals that treat a disproportionate share of
low income patients.[3]  The Medicare DSH adjustment is calculated using two fractions known as
the Medicare fraction (also referred to as the SSI percentage or SSI fraction) and the Medicaid
fraction.  The Medicare fraction is calculated by using: (a) in the numerator, the "number of such
hospital's patient days...which were made up of patients who (for such days) were entitled to
benefits under part A of the subchapter and were entitled to supplementary security income
benefits...under subchapter XVI of this chapter..."[4]; and (b) in the denominator, the number of
days of care that are furnished to patients who were entitled to Medicare Part A.

---

[1] Transcript ("Tr") at 6-7.
[2] 42 C.F.R. Part 412.
[3] 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).
[4] 42 U.S.C. 1395d(5)(F)(vi)(I); See also  42 C.F.R. § 412.106(b)(2)(i)(B) (copy included at Provider Exhibit P-39).

Page 3                                              Case Nos.: 13-0430, 13-0628 and 13-0680

The SSI program is a federal cash assistance program for low-income individuals who are aged, blind, or disabled,[5] administered by the Social Security Administration ("SSA"). The SSI statute, generally, does not use the term "entitled" to SSI benefits. Rather, the SSI statute typically refers to whether an individual is "eligible for benefits."[6] In order to be eligible for SSI benefits, a person must be: (1) 65 years of age or older, blind or disabled; (2) a lawful resident of the United States; (3) have limited income and resources; (4) not be fleeing to avoid prosecution for a crime or violating a condition of parole; and (5) file an application for benefits.[7]

The Medicare program is an insurance program where an individual is automatically entitled to Medicare Part A when the person reaches age 65 and is entitled to Social Security benefits, or becomes disabled and had been entitled to disability benefits for 24 calendar months.[8] In addition, the Medicare program provides that certain qualifying individuals with end stage renal disease are entitled to Medicare Part A.[9]

Unlike entitlement for Medicare Part A benefits, an individual who is currently eligible for SSI benefits may later become *ineligible* for SSI benefits. In this regard, SSA conducts periodic redeterminations to ensure continued eligibility[10] and may terminate,[11] suspend,[12] or stop payments to individuals who are temporarily or permanently ineligible for payment of SSI benefits.[13] In particular, SSI eligibility may be lost if a person no longer meets the basic requirements. For example, an individual may lose SSI eligibility if the individual is no longer disabled or the individual meets one of the following reasons set forth in Sections §§ 416.207-416.216:

  1. The individual fails to give the SSA permission to contact financial institutions;[14]
  2. The individual fails to apply for other benefits to which the individual may be entitled;[15]
  3. The individual fails to participate in drug or alcohol addiction treatment;[16]
  4. The individual is absent from the United States for more than 30 days;[17] or
  5. The individual becomes a resident of a public institutions or prison.[18]

Under certain circumstances, the SSA may not pay benefits for administrative reasons, including removal of a representative payee, an unknown address for the beneficiary, or because of income from a previous month.[19]

---

[5] 42 U.S.C. § 1382.
[6] 42 U.S.C. §§ 1381a, 1382(a) (emphasis added).
[7] *See* 20 C.F.R. § 416.202.
[8] *See* 42 U.S.C. § 426.
[9] 42 U.S.C. § 426-1.
[10] 20 C.F.R. § 416.204.
[11] *Id.* at §§ 416.1331-1335.
[12] *Id.* at §§ 416.1320-1330.
[13] *Id.* at § 416.1320.
[14] *Id.* at § 416.207.
[15] 20 C.F.R. § 416.210.
[16] *Id.* at § 416.214.
[17] *Id.* at § 416.215.
[18] *Id.* at § 416.211.
[19] SSA Program Operations Manual ("POMS") § SI 02301.201 (describing certain SSI post-eligibility events).

**JA 40**

00008

Page 4                                          Case Nos.: 13-0430, 13-0628 and 13-0680

After the Medicare DSH legislation was enacted in 1984, the Health Care Financing Administration ("HCFA"), the predecessor to CMS, announced that the Secretary of Health and Human Services, rather than the hospitals, would be solely responsible for computation of the Medicare fraction because the data necessary to compute the Medicare fraction is voluminous and much of the required data needed to be obtained from another agency, the SSA.[20]  HCFA noted that, as of 1986, the data sources for the computation of the Medicare fraction included approximately 11 million billing records contained in the Medicare inpatient discharge file and over 5 million records in the SSI file compiled by SSA.[21]  To compute the Medicare fraction, HCFA had to match individual Medicare billing records to individual SSI records.[22]  Considering the administrative burdens and complexity of the data matching process, HCFA concluded that the Secretary would be responsible for the data matching process, which she would conduct retrospectively for every eligible Medicare hospital on a "federal fiscal year" basis—that is, based on discharges occurring in the federal fiscal year.[23]  HCFA/CMS notifies the Medicare contractors of the SSI fractions after they are calculated.  CMS currently makes this notification by posting the resulting fractions on its website.  The Medicare contractors then use the posted SSI fraction to calculate the Medicare DSH percentage used to determine the hospital's Medicare DSH adjustment.[24]

The Medicare DSH adjustment has been the subject of much litigation and *Baystate v. Leavitt*, 545 F. Supp. 2d 20 *as amended* 587 F. Supp. 2d 37, 44 (D.D.C. 2008) ("*Baystate*"), is of particular relevance to this appeal.  In *Baystate*, the court held that the Secretary's process to identify and gather the data necessary to calculate each hospital's SSI fraction was deficient.  On April 28, 2010, CMS published Ruling 1498-R to respond to the court's order in *Baystate*.  This Ruling stated that CMS implemented the court order by recalculating the plaintiff's SSI fractions and Medicare DSH adjustments, using a revised data matching process that used "updated and refined SSI eligibility data and Medicare records, and by matching individuals' records with reference to Social Security numbers ("SSNs") as well as HICANs [Health Insurance Claim Account Numbers] and Title II numbers."[25]  The Ruling also stated that "in the FY 2011 proposed rule, CMS is proposing to adopt the same revised data matching process" for use with all hospitals and that "[i]n the forthcoming FY 2011 final rule, CMS expects to respond to public comments on the proposed new data matching process, make any changes to such matching process that seem appropriate, and adopt finally a new data matching process."[26]  CMS also stated that it would "use that new data matching process in calculating SSI fractions and DSH payments for specific claims that are found to qualify for relief under this Ruling."[27]

Consistent with Ruling 1498-R, CMS published the new data matching process in the FY 2011 proposed rule published on May 4, 2010,[28] and finalized that data matching process in the final

---

[20] 51 Fed. Reg. 31454, 31459 (Sep. 3, 1986).
[21] *Id.*
[22] *Id.*
[23] *Id.* at 31459–31460; 42 C.F.R. § 412.106(b).
[24] 42 C.F.R. § 412.106(b)(5); 42 C.F.R. § 405.1803.
[25] CMS-1498-R at 5 (copy included at Provider Exhibit P-6).
[26] *Id.*
[27] *Id.* at 5-6.
[28] 75 Fed. Reg. 23852, 24002-24007 (May 4, 2010).

**JA 41**

Page 5                                    Case Nos.: 13-0430, 13-0628 and 13-0680

rule published on August 16, 2010 ("FY 2011 Final Rule").[29]  Significantly, in the preamble to the FY 2011 Final Rule, CMS acknowledged a public comment requesting "that CMS include both paid and unpaid days for both SSI entitlement and Medicare entitlement such that there would be consistency between the numerator and denominator of the SSI fraction."[30]  This same public comment provided examples of "several SSI codes that represent individuals who were eligible for SSI but not eligible for SSI payments" asserting that these codes should be included as SSI-entitled for purposes of the data match process.[31]  CMS responded in detail to this comment and explained that CMS interprets SSI entitlement to correspond with any month for which an individual *receives* payment of SSI benefits.[32]  CMS also stated that the three SSI codes denoted as C01, M01, or M02 "accurately captures all SSI-entitled individuals, during the month(s) they are entitled to receive SSI benefits."[33]

While the new data matching process established in the FY 2011 Final Rule was effective October 1, 2010, Ruling 1498-R directed that the Medicare Contractors apply "the same, unitary relief" consisting of SSI fractions that the Secretary had calculated using the new "suitably revised" data matching process to: (1) any Medicare cost report that had not been settled; and (2) all properly pending Medicare DSH appeals of the SSI fraction data matching process issue.[34]  The Ruling noted that hospitals dissatisfied with the initial or revised NPR issued using the new SSI ratios in the Medicare DSH adjustment calculation could seek administrative and judicial review provided they met the jurisdictional and procedural requirements of 42 U.S.C. § 1395oo, the Medicare regulations, and other agency rules and guidelines.[35]

As a result of CMS Ruling 1498-R and these regulations, CMS calculated new SSI percentages for Pomona for all of the fiscal years at issue in these appeals.[36]  However Pomona contends that the new methodology CMS uses to generate the new SSI fractions, although slightly improved, still significantly understates its Medicare/SSI patient days, due to inaccurate and/or incomplete data[37] and therefore Pomona appealed the count of Pomona's qualifying Part A and SSI days.

## DISCUSSION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

At the outset, Pomona notes that unlike other SSI percentage cases that have come before the Board, this case is not about "eligible" days versus "entitled" days.  Rather, Pomona is challenging CMS' count of Pomona's qualifying Part A and SSI days, based on an inaccurate translation of data between agencies, human error, coding errors or other potential problems that may have led to CMS not using the best available data to calculate Pomona's SSI fraction for each of these years.[38]

---

[29] 75 Fed. Reg. 50041, 50280-50281 (Aug. 16, 2010) (copy included at Medicare Contractor Exhibit I-8).
[30] *Id.* at 50280.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 50281.
[34] CMS-1498-R at 6-7.
[35] *Id.* at 28, 31.
[36] Tr. at 120-122.
[37] Provider's Final Position Paper (2006) at 3-4.
[38] Provider's Post-Hearing Brief at 3.

Page 6                                                   Case Nos.: 13-0430, 13-0628 and 13-0680

To prove its case Pomona sought to match CMS' Medicare Provider Analysis and Review
("MedPAR") data files and other CMS supplied data with the Provider's own patient
records denoting SSI eligibility, and with the State of California's records showing specific
benefit "aide codes" assigned to specific patients.[39]  Pomona explains the "aide codes" are
assigned by SSA and then tabulated and published by the State of California Department of
Health Care Services.  The Provider believes that "aide codes" 10 (aged), 20 (blind), and 60
(disabled), unambiguously reflect and correspond to a patient's SSI status since the State's
Medicaid program obtains patients' SSI status in real time directly from SSA.[40]  The
Provider believes these records are especially reliable because California provides a State
Supplement amount ("SSP") that is in addition to the benefits these patients receive from
SSA.  The beneficiaries receive one check from SSA that includes both the SSI benefit and
the State's SSP benefit.[41]

Using its data along with the State of California's records for "aide codes" 10, 20, and 60,
the Provider identified the following SSI/Medicare days and asserts that its calculation of
the SSI fractions using this data is more accurate then CMS' calculations:[42]

- For 2006 Pomona identified 6965 SSI/Medicare days compared to the 4886 days
  identified by CMS.[43]
- For 2007 Pomona identified 6665 SSI/Medicare days compared to the 4153 days
  identified by CMS.[44]
- For 2008 Pomona identified 6572 SSI/Medicare days compared to the 4235 days
  identified by CMS.[45]

Pomona points out that it made numerous efforts to obtain the source SSA data to test a
sample set of patient records and learn whether or not SSA's data would confirm or
disagree with Pomona's own underlying data.  Pomona agreed to abide by the result of such
test.  Despite enlisting former government officials and members of Congress to convince
CMS to investigate what Pomona believed were discrepancies in the calculations, CMS
blocked Pomona's process of testing the data, and directed the Provider to the Board for
relief.[46]

The Medicare Contractor believes its SSI adjustments are correct and points out that CMS
revised its process of matching Medicare and SSI eligibility data, and the Provider received
SSI fractions based on that revised process for each of the three fiscal years at issue.[47]
Additionally the Medicare Contractor disputes that Pomona's data is more accurate than
CMS' because the Provider did not explain how the SSI status codes of C01, M01, and

---

[39] Provider's Final Position Paper (2006) at 5.
[40] *Id.* at 5-6.  Provider Exhibit P-10.
[41] *Id.* at 6-7.
[42] *Id.* at 8.
[43] *Id.*
[44] Provider's Final Position Paper (2007) at 8.
[45] Provider's Final Position Paper (2008) at 9
[46] Provider's Post-Hearing Brief at 3-4.
[47] Medicare Contractor's Post-Hearing Brief at 5.

M02 used by CMS to calculate the SSI fraction interplay with the California's "aide codes" of 10, 20 and 60. The Medicare Contractor argues that the Provider has been unable to explain how its methodology is better for determining SSI entitlement.[48]

The Board is aware that Pomona sought to obtain SSI information directly from SSA through various means and that SSA advised the Provider that no SSA data could be shared directly with the Provider.[49]  In addition the Board understands that Pomona created a sample and asked CMS to rematch the unmatched patient days against official SSA records but CMS declined to do so based on workload concerns.[50]  Without this information the Board recognizes Pomona's difficulty in proving that CMS significantly understated Pomona's SSI fractions for the three fiscal years under appeal, and in demonstrating that Pomona's calculations of its SSI fractions are more accurate.

After reviewing Pomona's methodology and data, the Board finds that the Provider's methodology assumes that all individuals with an "aide code" of 10, 20, or 60, will map to an SSI code of C01, M01, or M02.  However, in its post hearing brief Pomona recognized that "aide codes" 10, 20, and 60, include individuals who receive a SSP payment but no SSI payment and therefore these individuals would not have an SSI code of C01, M01, or M02.  The Provider estimates that its original calculation of SSI days included 1,141 SSP only days for 12/31/2006; 1,112 SSP only days for 12/31/2007; and 1,095 SSP only days for 12/31/2008,[51] and agrees that these days are not SSI eligible for purposes of the Medicare DSH calculation.  Pomona eliminated these SSP only days, reducing the number of additional SSI days it is requesting to 955 days for 12/31/2006; 1,400 days for 12/31/2007; and 1,262 days for 12/31/2008.[52]

During the hearing the Board pointed to other reasons of why variances may exist between the "aide codes" used by Pomona and the SSI codes.  One of the reasons is the difference in coding nursing home residents.  At the hearing Pomona's witness explained that a Medi-Cal eligible person who went into a nursing home would still remain Medi-Cal eligible and remain on an aide code of 10, 20, or 60, and would be counted as SSI eligible by Pomona.[53]  However, in the August 16, 2010, Federal Register, CMS explains that SSI Code E01 "represents an individual who is a resident of a medical treatment facility and is subject to a $30 payment limit, but has countable income of $30 or more.  Such an individual is not entitled to receive SSI payment."[54]  CMS does not include individuals with Code E01 when determining SSI eligible days.  Pomona does not believe this difference represents a significant number of days,[55] and submitted some statewide statistics to backup this assertion.[56]  However the Provider could have quantified from its own records the number of additional days being requested that were for patients that came to Pomona from a nursing home.  Without Pomona providing an estimate of the impact of this

---

[48] *Id.* at 9.
[49] Provider's Post-Hearing Brief at 16.
[50] *Id.* at 16-18.
[51] Provider Exhibits P-40, P-41, and P-42.
[52] *Id.*
[53] Tr. at 339-340.
[54] 75 Fed. Reg. 50042, 50281 (Aug. 16, 2010).
[55] Provider's Post-Hearing Brief at 35.
[56] *Id.* at 36-38.

Page 8                                      Case Nos.: 13-0430, 13-0628 and 13-0680

difference on the additional SSI days being requested, the Board does not and cannot know the
significance of this coding difference.

Pomona's witness also testified that "Medi-Cal eligibility is month-specific… they would get
eligibility the first day of the month of the application"[57] and the person would also be identified
as a code 10, 20, or 60, if the person qualified for SSI/SSP.[58]  This is different than the effective
date for an SSI payment as the FY 2011 Final Rule states "Code E02 is used to identify a person
who is not entitled to SSI payment in a month … pursuant to section 1611(c)(7) of the Act,
which provides that an application for SSI benefits shall be effective on the later of the 1) first
day of the month *following the date the application is filed*, or 2) the first day of the month
following the date the individual becomes eligible for SSI based on that application.  Such an
individual is not entitled to SSI benefits during the month his or her application is filed or
determined to be eligible for SSI, but, for, the following month."[59]  As CMS does not include
days for individuals with code E02 when determining SSI eligible days, the different effective
dates represents another difference between CMS' data and Pomona's data.  The Board
recognizes that Pomona believes this difference would have a minimal effect on the number of
SSI eligible days,[60] and explained post hearing that the Provider is not assisting patients to file
for SSI benefits and uses other basis to qualify patients for Medi-Cal benefits on a first time
basis.[61]  However, Pomona could have estimated the potential impact that the different effective
dates had on the additional days it is requesting by reviewing its records and the State's records,
to determine if any of the additional days are associated with individuals whose application for
Medi-Cal/SSP was submitted in same month the patient days of service occurred.  Without this
information the Board does not know the potential impact the different effective dates has on
Pomona's data.

Further the Board points out that, while the Provider performed a detail comparison of its
internal data, the Medi-Cal system data, the MedPAR SSI patient file, and multiple other data
sources,[62] it did not explain or identify the potential reasons for differences between the data
from these sources.  While the Board understand that the Medi-Cal aide code information used
by Pomona is based on real time data from SSA,[63] there is no information in the record to
identify what SSI codes other than C01, M01, and M02, are translated into the "aide codes" of
10, 20, and 60.[64]  As explained above the Board believes the Provider could have analyzed its
data to quantify the number of patient days contained in "aide codes" 10, 20, and 60, for patients
with SSI codes E01 and E02.  In addition the Provider could have determined if there were any
other potential reasons for the discrepancies between the "aide codes" of 10, 20, and 60, and the
SSI codes of C01, M01, and M02.  Specifically the Provider could have reviewed the definitions
of both the SSI codes and "aide codes" and built a crosswalk or diagram to identify if there were
other situations in which an individual would be assigned or remain on an "aide code" of 10, 20,

---

[57] Tr. at 342.
[58] Tr. at 342.
[59] 75 Fed. Reg. at 50281.
[60] Provider's Post-Hearing Brief and Declarations, Exhibit A at 2.
[61] Provider's Post-Hearing Brief at 40.
[62] Provider Exhibit P-27 contains the comparison of "aide code" days to SSI days for each year and P-20 contains
the diagram of the logic and data sources used. The logic for Provider Exhibit P-20 is explained in Tr. at 54 - 80.
[63] Provider's Post-Hearing Brief at 24.
[64] Tr. at 334-338.

Page 9                                         Case Nos.: 13-0430, 13-0628 and 13-0680

or 60, but the SSI code would not be C01, M01, or M02 (e.g. SSI codes beginning with the letter "S" reflect records in a "suspended" status,[65] and the Provider did not address if individuals with "S" codes get assigned or retain a code of 10, 20, or 60).  Rather Pomona's witness testified that he "didn't go through the data on the dictionary from---for the SSA." and did not know if there was a one-to-one correlation with "aide codes" 10, 20, and 60, and the SSI codes of C01, M01, and M02.[66]

At the hearing the Board specifically requested a diagram of how information from SSA is translated into "aide codes" 10, 20, and 60,[67] in order to gain insight into how these aide codes relate to C01, M01, and M02.  The Provider submitted Exhibits P-47 and P-55 with its post-hearing brief containing indicator value codes used by the State in assigning the "aide codes." It is unclear what the indicator value codes mean and how they relate to the SSI codes of C01, M01, and M02. The Medi-Cal Eligibility Division advised the Provider to contact SSA for the meaning of the indicator value codes.[68]  This question remains unanswered as Pomona did not submit any additional information.  The Board acknowledges that building a crosswalk might have been a difficult task, but finds a crosswalk is necessary to determine if the Provider's use of "aide codes" 10, 20, and 60, accurately identified only those individuals with an SSI code of C01, M01, or M02.  The Board notes the Provider could have developed this crosswalk without the use of Health Insurance Portability and Accountability Act ("HIPAA") protected information, by obtaining the definitions of the various codes, and if necessary confirming the information with the appropriate authorities.

The Board finds that the Provider did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS, and used in Pomona's FYE 12/31/2006, 12/31/2007, and 12/31/2008 cost reports, were flawed.  The Board affirms the SSI percentages used by the Medicare Contractor.

## DECISION AND ORDER

After considering Medicare law and regulations, arguments presented, and the evidence admitted, the Board finds that the SSI percentages used by the Medicare Contractor for Pomona's DSH adjustment for its 12/31/2006, 12/31/2007, and 12/31/2008 cost reports were proper.

## BOARD MEMBERS PARTICIPATING:

Charlotte F. Benson, CPA
Gregory H. Zeigler, CPA, CPC-A
Robert A. Evarts, Esq.

---

[65] 75 Fed. Reg. at 50281
[66] Tr. at 334-338.
[67] Tr. at 400-411.
[68] Provider Exhibit P-55.

Page 10                                    Case Nos.: 13-0430, 13-0628 and 13-0680

**FOR THE BOARD:**

*Charlotte Benson*

Board Member

**DATE:**

SEP 2 1 2018

BEFORE THE

PROVIDER REIMBURSEMENT REVIEW BOARD

In the Matter of: )
)
**POMONA VALLEY HOSPITAL** )          CASE NOS.:   13-0430
**MEDICAL CENTER** )                                  13-0628
)                                  13-0680
Fiscal Years Ended: )
  December 31, 2006 )
  December 31, 2007 )
  December 31, 2008 )                             **RECEIVED**
)
Provider No.:  05-0231 )                        OCT **1 3** 2017
_____ )
                                        PROVIDER REIMBURSEMENT
                                              REVIEW BOARD

**PROVIDER'S POST-HEARING BRIEF**
**(AND DECLARATIONS)**

*Attorneys for Provider:*
POMONA VALLEY HOSPITAL
MEDICAL CENTER

LAURENCE D. GETZOFF
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA  90067
Tel.:  (310) 551-8111
Fax:  (310) 551-8181

Testimony of Stan Rosenstein, Transcript, p. 320, l. 15 to p. 321, l. 17; see also, more complete

discussion in Section III, above, Section V.E.1, below, and Exhibits P-47 and P-48, and

Declaration of Stan Rosenstein, paragraph 3.

The credibility of such data, especially the DHCS aid codes assigned based on SSA data

that transfers directly to the State, also is enhanced by the fact that the State relies on such data,

and assigns aid codes that form the basis of the State's obligation to make payments to Medi-Cal

beneficiaries, as well as to SSP recipients.  As Stan Rosenstein testified:

> "Well, the people, you know, people who are enrolled by the Social
> Security Administration in both programs they come over electronically to the
> state, the state will then pay for their health care, become – the state becomes
> responsible and and pays the state's share of 50 percent, draws down federal
> funds from CMS paying the federal matching rates in California, which is 50
> percent.  So the state is accountable for making sure its payments are correct
> both to the state and its taxpayers, as well as the Federal Government, CMS
> and the federal taxpayers."  [Transcript, p. 303, l. 22 to p. 304, l. 13]

In addition, Pomona has reduced its raw total of patients' days covered by aid codes 10,

20 and 60 by a credible, and possibly even overstated, percentage of SSP only recipients in

California, approximately 16.5% each year.  Further, Pomona accounted for admissions wherein

patients were covered by aid codes 10, 20 and 60 for only a portion of their admission, rather

than including all of the days of such an admission.  Pomona also chose not to include in its SSI

fraction numerator any days that did not have aid codes 10, 20 and 60, unless such days were

specifically identified as SSI days by CMS in CMS's own calculation.

As discussed in more detail in the next section, Pomona also created a sample of 50

patients spanning the three fiscal years at issue to assure that aid codes were being accounted for

accurately.  Pomona then had the first part of the sample verified by the State of California

DHCS, and the results of such verification showed that Pomona's assignment of State aid codes

was 100% accurate.  (See Exhibit P-24, p. 222, see also Transcript, at p. 99, l. 23 to p. 100, l. 8.)

-12-

**JA 49**

00054

between Pomona's calculated SSI fraction and CMS's calculated SSI fraction for Pomona. Following the hearing, Pomona and its consultants carefully analyzed this issue and conclude that nursing home residents cannot explain the discrepancy between the calculations.

The issue was raised because when individuals go into nursing homes, the benefits received in the form of payments to the nursing home from the State or other third party payor are counted as "income" for purposes of SSI (and SSP) benefits. Accordingly, if a longtime resident of a nursing facility is admitted to a hospital as a patient, that patient – who may have previously qualified for SSI benefits – may no longer qualify for SSI payments at the time of hospitalization. The issue was raised, in addition, because Mr. Rosenstein confirmed at the hearing, and as has since been re-confirmed after the hearing as well, that patients who lose their SSI payments completely due to receipt of nursing home benefits, may still be "coded" by DHCS for some period as 10, 20 or 60 for Medi-Cal eligibility. (See Transcript at p. 340, ll. 13-22, and Declaration of Stan Rosenstein).

However, upon close inspection and analysis, it is clear that the number of hospital patients who both (1) are admitted to hospitals in California from nursing homes, and (2) have had their SSI payments reduced to zero in the month of hospitalization, is quite small, and would have had minimal, if any, impact on the Provider's SSI percentage during any of the three years on appeal.

First, Candice Le-Tran conferred with Amy Rosenkranz of the Program Integrity Unit of the State DHCS. Ms. Rosenkranz confirmed that an SSI/SSP recipient who goes into long term care (including a nursing facility) would remain in aid codes 10, 20 and 60 for the first three months of the long term care placement. (See Email string between Candice Le-Tran and Amy Rosenkranz, Exhibit P-53; see also, Declaration of Candice Le-Tran, Appendix B, paragraph 8.)

-35-

**JA 50**

00077

A

**BEFORE THE**

**PROVIDER REIMBURSEMENT REVIEW BOARD**

| | |
|---|---|
| In the Matter(s) of: | Case No's.:  13-0430 |
| | 13-0628 |
| **POMONA VALLEY HOSPITAL MEDICAL CENTER** | 13-0680 |
| **Fiscal Years Ended:** | |
| December 31, 2006 | |
| December 31, 2007 | |
| December 31, 2008 | |
| | |
| Provider No.:  05-0231 | |

**DECLARATION OF STAN ROSENSTEIN, EXPERT WITNESS TO THE PRRB HEARING DATED AUGUST 17, 2017**

1236274.4

**JA 52**

00103

## DECLARATION OF STAN ROSENSTEIN

I, STAN ROSENSTEIN, declare as follows:

1.      I am a former Director of the California Medicaid Program known as "Medi-Cal" and I make this declaration in support of my testimony submitted to the Provider Reimbursement Review Board Hearing conducted on August 17, 2017, to respond to questions posed by various Board Members.  The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.      Candice Le-Tran was asked by a Board Member (pp. 195-196 of Transcript) whether SSP payment benefits start simultaneously with SSI benefits (as of the month following demonstration of qualification), as opposed to Medi-Cal benefits which can start during the month of application.  My understanding based on my experience directing the Medi-Cal program and subprograms, and after re-checking with sources currently within the program, is that SSP payment benefits and SSI payment benefits have the same start dates.  The same processes are used to set up payments for both.  A Board member questioned whether SSP benefits could be paid earlier, however, I have never heard of that or understood that to be the case.

3.      Board Members requested me (see pp. 321, 377-386, 388-389, and 407-412 of Transcript) to clarify how data from the SSA physically is transmitted and ultimately assigned in the form of "aid codes" to Medi-Cal patient at the Department of Health Care Services in California, and how such information then reaches or is accessed by a provider.  To clarify this matter, I prepared two documents:  1) a verbal "flow sheet" demonstrating in some detail how data from the SSA flows to the State of California, and then how such data is matched within the Department of Health Care Services to DHCS "aid codes" to be used for qualifying beneficiaries for Medi-Cal benefits (this is attached as Exhibit P-47), and 2) a pictorial representation of the same process (albeit with slightly less detail) (this is attached as Exhibit P-48).

4.      Board Members questioned  (see pp. 341-354 of Transcript) whether the difference in timing of patients' qualification for Medi-Cal benefits versus SSI benefits would have a meaningful impact on the number of a hospital's SSI beneficiary patients.  It is my

**JA 53**

00104

opinion based on my many years of experience working in the Medi-Cal eligibility area that any

effect of such a difference would be minimal.  From my vantage point as a former Director of

Medi-Cal, we know that most of the enrollment on SSI is fairly stable in California, and that if a

hospital is not using SSI as the means for obtaining Medi-Cal enrollment for coverage of an

hospitalization, then it is quite uncommon for a patient to be seeking Medi-Cal enrollment for the

first time at the same time as seeking SSI payment benefits for the first time.  This is also

confirmed by another and current employee of the Department of Health Care Services, Sharyl

Shanen-Raya (see email string with Sharyl Shanen-Raya, new Exhibit P-49, pgs. 1-2).  My

understanding in this case (to be confirmed by Ms. Le-Tran) is that Pomona does not assist

individual patients in seeking SSI (or SSP) payments, but rather uses other methods to help such

patients qualify for Medi-Cal benefits if needed.  As SSI coverage is relativity stable, and since

the hospital does not assist patients in enrolling in SSI as a means of obtaining Medi-Cal

coverage for hospital care, there likely would be few hospital stays that would occur in the

person's first month of eligibility, the potential period where the person would be SSI eligible

but not receive a SSI payment.

     5.     Board Members requested additional information from me regarding the

derivation of the "14%" estimate of "SSP only" beneficiaries Statewide in California during the

2006 through 2008 period (see pp. 396-401 of Transcript).  To "drill down" somewhat on the

data reported at the hearing in Exhibit P-37, I reviewed California Department of Social Services

"source documentation" regarding current year's expenditures and caseloads relating to SSI and

SSP beneficiaries in California.  The "source documentation" is attached as Exhibit P-50).

Further, I conferred with contacts within the State Department of Health Care Services and the

Department of Social Services.  Based on my review of the source documentation, I can now

conclude that the original document submitted as Exhibit P-37 was potentially ambiguous in one

respect, and therefore led to an incorrect estimate.  The left column in P-37 labeled "Total SSI

Caseload" actually included all SSI/SSP recipients, the aggregate total of all such recipients of

SSI and/or SSP benefits, and thus it included those who were SSP only during a particular

month.  Accordingly, the 14% estimate submitted at the hearing is not technically accurate.  I

1236274.4                         2

have prepared a "modified" version of the State document [P-37] as new Exhibit P-51. The modified version (P-51) now "corrects" the heading on the left column and recalculates the Statewide average for each month. The aggregate percentage of SSP only patients for the same studied 2005-2009 period was 16.46 % (not 14%).

6.     Board Members questioned whether patients who are admitted to the hospital from nursing homes could have skewed Pomona's count of SSI beneficiary Part A patients in that California aid codes 10, 20 and 60 may reflect continued Medi-Cal benefits, but not necessarily continued receiving SSI payments (see pp. 338-340, and 415-416 of Transcript). For various reasons (as explained herein, and in paragraphs 7 through 9, below), it is extremely unlikely that a large number of nursing home resident patients could have significantly inflated Pomona's count of SSI beneficiary patients above the number of patients actually still receiving SSI benefits. First, I confirmed with an eligibility expert at the Department of Health Care Services, Sharyl Shanen-Raya, that patients with SSI benefits retain their full SSI benefits for the first three months of residence in a nursing facility. (See email string with Sharyl Shanen-Raya, new Exhibit P-49, page 3.) This fact was also independently confirmed with another employee of the California Department of Health Services, Amy Rosenkranz, as stated in the Declaration of Candice Le-Tran.) Second, from my experience working with the Medi-Cal population, an average of fifty percent (50%) of the people in nursing facilities remain there for less than three (3) months. (Exhibit P-49, page 2). This statistic is supported further by an article entitled "Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life" as published in the Journal of American Geriatric Society, September 2010, 58 (9):1701-1706 (online version attached as Exhibit P-52). As such, any *potential* impact from nursing home patients should be reduced initially by fifty percent (50%) as 50 percent of all Medi-Cal nursing home days occur during the period where SSI benefits have not been reduced.

7.     The total number of Medi-Cal beneficiary nursing home patients in California during the relevant period from 2005 through 2010 or so ranged between 60,000 and 65,000 individuals. (See email string with Sharyl Shanen-Raya, Exhibit P-49, page 2.) During the relevant period, there were approximately 360 general acute care hospitals operating in

00106

California. (See Exhibit P-54.) Dividing the roughly 63,000 patients by 360 hospitals suggests that, on average, each hospital would potentially service only about 175 Medi-Cal patients from nursing homes each year. But, not all nursing home patients would require hospital care in the first place each year. In fact, many do not. But assuming that up to fifty percent would require hospital services[1], that would mean that an average hospital would see only about 88 Medi-Cal patients potentially with SSI benefits admitted each year from nursing homes.

8.       The number of nursing facility patients coming to the hospital would have to be further reduced for the following reasons:

a.       The number of SSI linked Medi-Cal patients in a nursing facility coming to Pomona must be reduced by another fifty percent, as stated in paragraph 6, to take into account the fact that only half of the nursing patients likely would remain in a nursing facility for up to three months, and thus, these patients would continue to receive SSI payments in those three months.

b.       Individuals receiving SSI benefits in nursing facilities only would receive a zero payment amount when their income exceeds the remaining SSI maintenance need grant amount for people in a nursing facility. It is unknown, what percentage of people on SSI in a nursing facility meet this circumstance, but for those people who still receive a reduced SSI grant amount, they would still be counted as SSI recipients for purposes of the SSI percentage.

c.       The already and substantially reduced number of potential nursing home patients who had SSI benefits but then are reduced to a zero payment amount prior to or during hospitalization must then be further and significantly reduced by the number of Medi-Cal nursing facility patients who obtain their eligibility from non-SSI related Medi-Cal programs. According to data from the Department of Health Care Services budget, in State fiscal year 2005-2006, there were 63,100 average monthly eligibles in nursing facilities with

---

[1] 53.3 percent of residents at the end-of-life had at least one hospitalization. "Hospitalizations Among Nursing Home Residents in the Last Year of Life: Nursing Home Characteristics and Variation in Potentially Avoidable Hospitalizations", Journal of American Geriatric Society, November 5, 2013, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3827689/table/T2/

1236274.4                                          4

00107

Medi-Cal coverage granted by the counties.  Likewise, in 2006-2007, there were about 62,300

monthly eligibles in nursing facilities with Medi-Cal coverage (Statewide) granted by the

counties on the basis of other non-SSI programs (See Exhibit P-56),[2] and 62,400 non-SSI related

nursing facility patients in 2007-2008 (See Exhibit P-57).[3]  SSI benefits would not have been the

basis by which at least most of these individuals qualified for their Medi-Cal benefits.  The State

data shows that the majority of individuals on Medi-Cal in nursing facilities were not on SSI or

SSI aid codes at the time, but gained their Medi-Cal eligibility through other programs.

        9.     Given the above factors, one has to conclude that the number of nursing facility

patients hospitalized at a hospital such as Pomona, who were assigned aid codes 10, 20 or 60, but

who were no longer receiving SSI payments, would only be a very small fraction of the potential

88 nursing home patients per year that might go to Pomona for care.  This small number of

people could explain only a mere fraction of the 18% to 26% difference between CMS's count of

SSI beneficiaries and the hospital's count of SSI beneficiaries.

        I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

        Executed September 14, 2017, at Davis, California.

_____
STAN ROSENSTEIN

---

[2]  May 2006 Medi-Cal Estimate, Department of Health Care Services,
http://www.dhcs.ca.gov/dataandstats/reports/mcestimates/Documents/2006_may_estimate/04_csld/est06M_csld_1.pdf

[3]  May 2007 Medi-Cal Estimate, Department of Health Care Services,
http://www.dhcs.ca.gov/dataandstats/reports/mcestimates/Documents/2007_May_Estimate/04_Caseload/Pages_0A_May_2007_Caseload.pdf

1236274.4               5

B

00109

BEFORE THE

PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| In the Matter(s) of: | Case No's.:  13-0430 |
| | 13-0628 |
| **POMONA VALLEY HOSPITAL MEDICAL CENTER** | 13-0680 |
| **Fiscal Years Ended:** | |
| December 31, 2006 | |
| December 31, 2007 | |
| December 31, 2008 | |
| Provider No.:  05-0231 | |

DECLARATION OF CANDICE LE-TRAN, WITNESS
TO THE PRRB HEARING DATED AUGUST 17, 2017

1236325.2

**JA 59**

00110

## DECLARATION OF CANDICE LE-TRAN

I, CANDICE LE-TRAN, declare as follows:

1.      I am the Director of Reimbursement and Analytics at Pomona Valley Hospital Medical Center and am submitting this Declaration in response to questions from Members of the Provider Reimbursement Review Board, in support of my testimony submitted to the Provider Reimbursement Review Board Hearing conducted on August 17, 2017. The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.      I was asked by a Board Member (pp. 124-138 of the Transcript) to clarify whether or not Pomona Valley Hospital Medical Center used consistent data ranges to calculate the hospital's "SSI percentage" for each of fiscal years 2006, 2007 and 2008. I have reviewed my work for each of these three years and conclude that I did use consistent data ranges so as to make an "apples to apples" comparison as noted in paragraphs 3 and 4, below.

3.      The CMS MedPAR SSI file includes listings of both Medicare Covered Day and Medicare Total Days. In preparing the SSI analysis I have used to support Pomona's SSI percentage for each year, 2006, 2007 and 2008, PVHMC used the MedPAR file to identify the Medicare population and used the CMS covered days calculation as reflected in Pomona's SSI percentage denominator. Exhibits submitted herewith to update the hospital's calculations, P-40 (for 2006), P-41 (for 2007) and P-42 (for 2008) were prepared by me, and I used the CMS MedPAR value in each so that "paid" or "covered" days would appear in the denominator, which is consistent with my understanding of how the SSI percentage is required to be calculated by statute and regulation. My Department at Pomona also analyzed for additional SSI days using the same Medicare population in the MedPAR SSI file, and therefore our calculation of Medicare covered (or "paid") days would be the same as the MedPAR file's "covered Medicare days."

**JA 60**

00111

4.     In each year, the numerator of Pomona's calculated SSI percentage for each of the three years also included only days that would have been included in the "paid" or "covered" days summary shown in the CMS MedPAR SSI file.. All of the "unmatched" days claimed by Pomona are "paid" or "covered" days and do not correspond to days deemed to be unpaid days and thus included by CMS in its calculation of "total Part A days". Please see Exhibits P-40, P-41, and P-42, which reflect the revised calculations taking into account items discovered post-hearing (small increase in number of SSP-only days, and corresponding small reduction in reimbursement claimed by Pomona at the hearing, which was based on a reduction for only 14% SSP-only days).

5.     I was asked by a Board Member (pp. 197-203 of the Transcript) whether Pomona has appealed CMS's calculation of the denominator of Pomona's SSI percentage in each of the fiscal years 2006, 2007 and 2008. CMS's calculation each year used "total" Part A days in the denominator of each year's percentage, instead of "paid" or "covered" days, as the Provider contends is required by law. Pomona has consistently used "paid" or "covered" days in the denominator of its SSI percentage calculations for each of the years 2006, 2007 and 2008, from the start of its appeal of each of the three fiscal years, thereby placing the use of the MedPAR file's listing "paid" days at issue, in lieu of the slightly higher number of "total" days used by CMS in the final published calculation of the Provider's SSI percentage in each of fiscal years 2006, 2007 and 2008. It is evident from Pomona's original hearing request and position papers for each of the three years that Pomona has consistently contended that "covered" days should be calculated from the SSI (paid or covered days) denominator as reported in the Medicare P, S & R. Pomona is re-submitting its original appeal documentation, including the original reimbursement calculation for each year, to demonstrate that it has consistently used "covered" not "total" days in its denominator. The new exhibits are P-43 (2006), P-44 (2007) and P-45 (2008).

6.     Board Members requested Pomona to provide additional clarity regarding the derivation of the "14%" SSP-only population in California and how that number was derived (pp. 396-401 of Transcript). As noted in the Declaration submitted by Stan Rosenstein, the

California Department of Social Services mis-labeled one of its subheadings on the report that was submitted prior to the hearing as Exhibit P-37. As such, the report was misinterpreted. A corrected version of the report has been submitted by Mr. Rosenstein (as Exhibit P-51), which increased the percentage of SSP only beneficiaries in California to just over 16%. Accordingly, Pomona is now reducing its claimed SSI percentage to reflect a slightly higher number of SSP only beneficiary patients. The revised calculations are included in Exhibits P-40 (2006), P-41 (2007) and P-42 (2008). In addition, Pomona is submitting new Exhibit P-46 which demonstrates more specifically and isolates by each individual year, the basis (Statewide average of SSP-only recipients) for adopting 16.34% (for 2006), 16.69% (for 2007), and 16.61% (for 2008) as the "reduction" in SSI percentage to reflect the percentage of the Provider's patients who were "SSP only."

7.       In response to Board Members' questions regarding the potential difference in timing of qualification for Medi-Cal benefits and SSI benefits (pp. 341-354 of Transcript), Pomona Valley Hospital Medical Center does not (and did not in 2006, 2007 and 2008) assist our patients in applying for SSI benefits, nor does the hospital have a process or procedure in place to help patients use newly applied for SSI benefits to qualify patients for Medi-Cal benefits.

8.       In response to Board Members' questions regarding whether patients being admitted to our hospital from nursing homes could have skewed Pomona's count of SSI beneficiary Part A patients (in that California aid codes 10, 20 and 60 may reflect continued Medi-Cal benefits, but not necessarily continued receipt of SSI payments) (see pp. 338-340, and pp. 415-416 of Transcript), I conferred with Amy Rosenkranz of the Program Integrity Unit of the California Department of Health Care Services. Ms. Rosenkranz confirmed that an SSI/SSP recipient who goes into long term care (including a nursing facility) would stay in aid codes 10, 20, and 60 for the first three months of the long term care placement. Thereafter, the counties will be required to evaluate which benefits the individuals qualify for. (Please see email string between Candice Le-Tran and Amy Rosenkranz, Exhibit P-53.)

1236325.2

3

**JA 62**

00113

9.      In response to Board Members' requests to clarify how data from the SSA physically is transmitted and ultimately assigned to Medi-Cal beneficiary patients in the form of "aid codes" in California (Transcript, pp. 321, 377-386, 388-389 and 407-412), I asked my contact at the Department of Health Care Services, Amy Rosenkranz of the Program Integrity Division, to furnish me with a "crosswalk" showing how codes from the SSA are translated into aid codes used by the State Medi-Cal program.  Although a formal table or "crosswalk" is not available, Ms. Rosenkranz did provide the translation instruction by email.  This is submitted as Exhibit P-55.  This information also was used as a basis for Stan Rosenstein's process flow charts in Exhibits P-47 and P-48.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed September 14, 2017, at Pomona, California.


CANDICE LE-TRAN

1236325.2                          4

P-40

00118

|   | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | | | |
| 2 | FYE: 2006 | | | | | | | |
| 3 | | | | | | | | |
| 4 | | SUMMARY IMPACT FOR PRRB POST-HEARING with reduction for estimated SSP Only Days | | | | | | |
| 5 | | | | | | | | |
| 6 | Note for Medicare Days Denominator: | | | | | | | |
| 7 | The CMS Medpar SSI file has Medicare Covered Days and Medicare Total Days (used in published SSI%) as reflected below. In preparing the SSI data | | | | | | | |
| 8 | analysis, PVHMC used the Medpar SSI file to identify the Medicare population and used the CMS covered days as reflected in the PVHMC Medicare | | | | | | | |
| 9 | denominator below. We analyzed for additional SSI days using the same Medicare population in the Medpar SSI file, and therefore our covered | | | | | | | |
| 10 | Medicare days would be the same as the Medpar's covered Medicare days. Note that in our original hearing request and position papers, we consistently used covered days in the SSI Denominator as reported in the Medicare PS&R. | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | | | |
| 15 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published Data | SSI Days Diff | % Diff |
| 16 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,803 | 4,886 | 4,886 | | |
| 17 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 179 | | | | |
| 18 | Less: Estimate of State SSP only days  & Note B below | | 16.34% | (1,141) | | | | |
| 19 | Total Federal Medicare SSI days | | | 5,841 | 4,886 | 4,886 | 955 | 20% |
| 20 | Total Medicare  Days Part A & C per CMS MedPar data (2) | | | 32,371 | 32,371 | 33,149 | | |
| 21 | SSI Percentage per PVHMC | | | 18.04% | 15.09% | 14.740% | | |
| 22 | Published SSI % per CMS | | | 14.740% | 14.740% | 14.740% | | |
| 23 | SSI Percent Difference | | | 3.30% | 0.35% | 0.00% | | |
| 24 | DSH Formula's Multiplier | | | 82.50% | 82.50% | 82.50% | | |
| 25 | SSI Incremental Difference | | | 2.73% | 0.29% | 0.00% | | |
| 26 | PVHMC 2006 Federal specific Payment per Audited PS&R dated 11/29/2010 | | | 28,271,965 | 28,271,965 | 28,271,965 | | |
| 27 | Increase in SSI Reimbursement | | | $     770,837 | $    82,626 | $          - | | |
| 28 | | | | | | | | |
| 29 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | | | |
| 30 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C | | | | | | | |
| 31 | in SSI factor is already in a separate appeal issue | | | | | | | |
| 32 | | | | | | | | |
| 33 | Note B: Per CDSS data for 2006-2008 SSI/SSP Case load | | | | | | | |

9/11/2017 2:39 PM        N:\SSI Data\2006\FFY 2006 PVHMC SSI_Patient List with PHI_Revised 1.29.16  WP:S_Summary for Post Hearing

00119    0630

JA 65

P-

00120

PVHMC

FYE: 2007 (SSI = FFY 2007)

## SUMMARY IMPACT FOR PRRB POST-HEARING with reduction for estimated SSP Only Days

Note for Medicare Days Denominator:

The CMS Medpar SSI file has Medicare Covered Days and Medicare Total Days (used in published SSI%) as reflected below. In preparing the SSI data analysis, PVHMC used the Medpar SSI file to identify the Medicare population and used the CMS covered days as reflected in the PVHMC Medicare denominator below. We analyzed for additional SSI days using the same Medicare population in the Medpar SSI file, and therefore our covered Medicare days would be the same as the Medpar's covered Medicare days. Note that in our original hearing request and position papers, we consistently used covered days in the SSI Denominator as reported in the Medicare PS&R.

Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One

| | C | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published (3/19/2012) Data - FFY 2007 | SSI Days Diff between PVHMC and CMS | SSI % Diff between PVHMC and CMS |
|---|---|---|---|---|---|---|
| SSI and Medicare Days per PVHMC Listing - Part A (1) | | 6,320 | 4,153 | 4,153 | | |
| SSI and Medicare Days per PVHMC Listing - Part C (1) | | 345 | | | | |
| Less: Estimate of State SSP only days & Note B below | 16.69% | (1,112) | | | | |
| **Total Federal Medicare SSI days** | | **5,553** | **4,153** | **4153** | **1,400** | **25%** |
| Total Medicare Days Part A & C per CMS MedPar data (2) | | 27,538 | 27,538 | 28,188 | | |
| SSI Percentage per PVHMC | | 20.16% | 15.08% | 14.733% | | |
| Published SSI % per CMS | | 14.733% | 14.733% | 14.733% | | |
| SSI Percent Difference | | 5.43% | 0.35% | 0.00% | | |
| DSH Formula's Multiplier | | 82.50% | 82.50% | 82.50% | | |
| SSI Incremental Difference | | 4.48% | 0.29% | 0.00% | | |
| PVHMC Federal specific Payment per Audited PS&R dated 7/28/11 for FYE 2007 | | 28,828,953 | 28,828,953 | 28,828,953 | | |
| **Increase in SSI Reimbursement** | | $ 1,291,520 | $ 82,763 | $ - | | |
| | | 1262269 | | | | |

(1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details

(2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C in SSI factor is already in a separate appeal issue

Note B: Per CDSS data for 2006-2008 SSI/SSP Case load

P-42

00122

PVHMC

FYE: 2008 (SSI = FFY 2008)

### SUMMARY IMPACT FOR PRRB POST-HEARING with reduction for estimated SSP Only Day

Note for Medicare Days Denominator:

The CMS Medpar SSI file has Medicare Covered Days and Medicare Total Days (used in published SSI%) as reflected below. In pr
analysis, PVHMC used the Medpar SSI file to identify the Medicare population and used the CMS covered days as reflected in the
denominator below. We analyzed for additional SSI days using the same Medicare population in the Medpar SSI file, and therefo
days would be the same as the Medpar's covered Medicare days. Note that in our original hearing request and position papers, 
covered days in the SSI Denominator as reported in the Medicare PS&R.

| Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare | CMS Published (3/19/2012)Data - FFY 2008 |
|---|---|---|---|---|---|
| SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,167 | 4,238 | 4,235 |
| SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 428 | | |
| Less: Estimate of State SSP only days & Note B below | | 16.61% | (1,095) | | |
| **Total Federal Medicare SSI days** | | | **5,500** | **4,238** | **4,235** |
| Total Medicare Days Part A & C per CMS MedPar data (2) | | | 28,768 | 28,768 | 29,404 |
| SSI Percentage per PVHMC | | | 19.12% | 14.73% | 14.403% |
| Published SSI % per CMS | | | 14.403% | 14.403% | 14.403% |
| SSI Percent Difference | | | 4.71% | 0.33% | 0.00% |
| DSH Formula's Multiplier | | | 82.50% | 82.50% | 82.50% |
| SSI Incremental Difference | | | 3.89% | 0.27% | 0.00% |
| PVHMC Federal specific Payment per Audited PS&R dated 2/23/12 (FYE 2008) | | | 31,693,675 | 31,693,675 | 31,693,675 |
| Increase in SSI Reimbursement | | | $   1,232,627 | $    85,932 | $          - |

(1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details

(2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C in
SSI factor is already in a separate appeal issue

Note B: Per CDSS data for 2006-2008 SSI/SSP Case load

P-43

00124

Audit Adjustment Report
Date Prepared: 8/8/2012
Data File:     C:\mcrif32\DATA\Settle\050231 12312006\WA050231.mca
Fiscal Year:   01/01/2006   To   12/31/2006
Provider Name: POMONA VALLEY HOSPITAL MED CTR
Provider No:   050231

CMS-2552-96
Page 12

Health Financial Systems
MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

WPR: B15A-1.19
To adjust the DSH SSI % to the latest publication from CMS dated 3/16/2012.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

E, Part A, Title XVIII, Hospital, Line 4.00 Percentage of SSI recipient patient days to Medicare Part A patient days. (see instructions)
| 1.00 | 23.21 | -8.47 | 14.74 | Replace |

WPR: B15A-1.19
To adjust the DSH Patient Percentage to the MAC's computation based on revised Medicaid Days, SSI Percentage date 3/16/2012 and DRG Payments.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions)
| 1.00 | 52.12 | -7.38 | 44.74 | Replace |

WPR: B15-2.13
To adjust OP Hospital data to our reconciliation with the 11/29/2010 PS&R.
Outpatient - OPPS Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

E, Part B, Title XVIII, Hospital, Line 1.02 PPS payments received including outliers.
| 1.00 | 9,020,056 | 155,396 | 9,175,452 | Replace |

E, Part B, Title XVIII, Hospital, Line 18.00 Deductibles and coinsurance (see instructions)
| 1.00 | 66,545 | -55,024 | 11,521 | Replace |

E, Part B, Title XVIII, Hospital, Line 18.01 Deductibles and coinsurance relating to line 17.01 (see instructions)
| 1.00 | 2,610,612 | 41,452 | 2,652,064 | Replace |

E, Part B, Title XVIII, Hospital, Line 24.00 Primary payer payments
| 1.00 | 5,222 | 85 | 5,307 | Replace |

E, Part B, Title XVIII, Hospital, Line 30.99 OTHER ADJUSTMENTS (SPECIFY)
| 1.00 | 0 | -207 | -207 | Replace |

WPR: B14-1
To adjust OP Bad Debts to the provider's submitted bad debt logs considering the patients 2% SOC.
42 CFR Section 413.80
CMS 15-1 Section 300

E, Part B, Title XVIII, Hospital, Line 27.00 Bad debts (see instructions)
| 1.00 | 853,849 | -39,475 | 814,374 | Replace |

E, Part B, Title XVIII, Hospital, Line 27.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions)
| 1.00 | 853,849 | -39,824 | 814,025 | Replace |

0641

00133

Audit Adjustment Report
Date Prepared: 8/8/2012
Data File:     C:\mcrif32\DATA\Settle\050231 12312006\WA050231.mca
Fiscal Year:   01/01/2006  To  12/31/2006
Provider Name: POMONA VALLEY HOSPITAL MED CTR
Provider No:   050231

CMS-2552-96
Page 11

Health Financial Systems
MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

WPR: B13-6
To adjust the Prior Year Intern & Resident to Bed Ratio to the MAC's computation based on the Prior Year Finalized Cost Report.
PRM-II, Section 3630.1

E, Part A, Title XVIII, Hospital, Line 3.19 Prior year resident to bed ratio (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 0.047342 | -0.000719 | 0.046623 | Replace |

WPR: B15-1
To properly eliminate the as filed IP Protested Amount.
Inpatient Part A Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

E, Part A, Title XVIII, Hospital, Line 30.00 Protested amounts (nonallowable cost report items) in accordance with CMS Pub. 15-II, section 11

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 596,732 | -596,732 | 0 | Replace |

WPR: B14-1
To adjust IP Bad Debts to the provider's submitted bad debt logs considering the patients 2% SOC.
42 CFR Section 413.80
CMS 15-1 Section 300

E, Part A, Title XVIII, Hospital, Line 21.00 Reimbursable bad debts (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 1,106,683 | 20,762 | 1,127,445 | Replace |

E, Part A, Title XVIII, Hospital, Line 21.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 1,106,683 | 19,850 | 1,126,533 | Replace |

WPR: B15-4.8
To adjust ESRD days and discharges to the providers revised listings based on the results of our audit.
42CFR 412.104

E, Part A, Title XVIII, Hospital, Line 5.00 Total Medicare discharges on Worksheet S-3, Part I excluding discharges for DRGs 302, 316, 317 M

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 3,270 | 28 | 3,298 | Replace |

E, Part A, Title XVIII, Hospital, Line 5.01 Total ESRD Medicare discharges excluding DRGs 302, 316, 317, MS-DRGs 683 and 684 (see instruc

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 363 | -2 | 361 | Replace |

E, Part A, Title XVIII, Hospital, Line 5.03 Total Medicare ESRD inpatient days excluding DRGs 302, 316, 317, MS-DRGs 683 and 684 (see inst

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 3,063 | 42 | 3,105 | Replace |

0642

00134

Audit Adjustment Report                                                                    CMS-2552-96
Date Prepared: 8/8/2012                                                                     Page 16
Data File:    C:\mcrif32\DATA\Settle\050231 12312006\WA050231.mca
Fiscal Year:    01/01/2006   To   12/31/2006
Provider Name: POMONA VALLEY HOSPITAL MED CTR                                      Health Financial Systems
Provider No:    050231                                                                       MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

WPR: B13-1
To properly include the locality-adjusted national average per resident amount.
42 CFR 413.77
PM A-01-38
PRM-II, Section 3633.4

E-3, Part VI, Title XVIII, Hospital, Line 8.00 Enter the locality adjustment national average per resident amount (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 DIRECT GME & IME PAYMENTS FOR REDISTRI | 0.00 | 96,606.04 | 96,606.04 | Replace |

WPR: B15-2.13
To adjust Capital DRG and Outliers to our reconciliation with the 11/29/2010 PS&R.
Inpatient Part A Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

L, Part I, Title XVIII, Hospital, Line 2.00 Capital DRG other than outlier

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 2,537,783 | 28,977 | 2,566,760 | Replace |

L, Part I, Title XVIII, Hospital, Line 3.01 Capital DRG outlier payments for services rendered on or after to October 1, 1997

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 103,345 | 659 | 104,004 | Replace |

WPR: B15A-1.19
To adjust the Capital DSH SSI % to the latest publication from CMS dated 3/16/2012.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

L, Part I, Title XVIII, Hospital, Line 5.00 Percentage of SSI recipient patient days to Medicare Part A patient days (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 23.21 | -8.47 | 14.74 | Replace |

0643

00135

P-44

Audit Adjustment Report                                                                    CMS-2552-96
Date Prepared: 8/9/2012                                                                    Page 11
Data File:    C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:  01/01/2007  To  12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR                                              Health Financial Systems
Provider No:   050231                                                                      MCRIF32

|  | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 17    Ref: 27

WPR:  B14.1
To adjust Bad debts to the provider's revised listing submitted during the desk review.
42 CFR 413.80
CMS Pub 15-1 Sec. 300

| E, Part A, Title XVIII, Hospital, Line 21.00 Reimbursable bad debts (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 1,290,899 | -97,620 | 1,193,279 | Replace |

| E, Part A, Title XVIII, Hospital, Line 21.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 1,156,931 | -18,646 | 1,138,285 | Replace |

### Adjustment No. 18    Ref: 29

WPR:  B15.6
To removed the Part A protested amount.
42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

| E, Part A, Title XVIII, Hospital, Line 30.00 Protested amounts (nonallowable cost report items) in accordance with CMS Pub. 15-II, section 11 | | | | |
|---|---|---|---|---|
| 1.00 | 540,081 | -540,081 | 0 | Replace |

### Adjustment No. 19    Ref: 32

WPR:  B13.5
To adjust the allowable CY and Penultimate Year FTE count to the MAC's record's for the proper computation of the IME rolling average.
42 CFR 413.79
42 CFR 412.105

| E, Part A, Title XVIII, Hospital, Line 3.08 FTE count for allopathic and osteopathic programs in the current year from your records | | | | |
|---|---|---|---|---|
| 1.00 | 18.06 | -0.03 | 18.03 | Replace |

| E, Part A, Title XVIII, Hospital, Line 3.16 Total allowable FTE count for the penultimate year if that year ended on or after September 30, 199 | | | | |
|---|---|---|---|---|
| 1.00 | 17.78 | 0.03 | 17.81 | Replace |

### Adjustment No. 20    Ref: 34

WPR:  B15.5.16
To adjust the DSH Patient Percentage to the MAC's computation based on revised Medicaid Days, revised SSI Percentage dated 3/16/2012 and DRG Payments.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

| E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 54.10 | -6.99 | 47.11 | Replace |

0658

**JA 75**

00151

Audit Adjustment Report                                                                         CMS-2552-96
Date Prepared: 8/9/2012                                                                               Page 12
Data File:     C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:   01/01/2007  To  12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR                                      Health Financial Systems
Provider No:   050231                                                                              MCRIF32

|  | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

**Adjustment No. 21   Ref: 35**

WPR:  B15.16
To adjust the SSI percentage to the revised CMS publication dated 3/16/2012.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

| E, Part A, Title XVIII, Hospital, Line 4.00 Percentage of SSI recipient patient days to Medicare Part A patient days. (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 22.82 | -8.09 | 14.73 | Replace |

**Adjustment No. 22   Ref: 14**

WPR:  B15.2.2
*To adjust OP Hospital PPS data to our reconciliation to the 7/28/11 PS&R.*
Outpatient - OPPS Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

| E, Part B, Title XVIII, Hospital, Line 1.02 PPS payments received including outliers. | | | | |
|---|---|---|---|---|
| 1.00 | 10,360,467 | 165,001 | 10,525,468 | Replace |

| E, Part B, Title XVIII, Hospital, Line 18.00 Deductibles and coinsurance (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 9,936 | 55 | 9,991 | Replace |

| E, Part B, Title XVIII, Hospital, Line 18.01 Deductibles and coinsurance relating to line 17.01 (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 2,917,811 | 46,054 | 2,963,865 | Replace |

| E, Part B, Title XVIII, Hospital, Line 24.00 Primary payer payments | | | | |
|---|---|---|---|---|
| 1.00 | 5,571 | 0 | 5,571 | Replace |

| E, Part B, Title XVIII, Hospital, Line 30.99 OTHER ADJUSTMENTS (SPECIFY) | | | | |
|---|---|---|---|---|
| 1.00 | -165 | 0 | -165 | Replace |

**Adjustment No. 23   Ref: 27**

WPR:  B14.1
*To adjust Bad debts to the provider's revised listing submitted during the desk review.*
42 CFR 413.80
CMS Pub 15-1 Sec. 300

| E, Part B, Title XVIII, Hospital, Line 27.00 Bad debts (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 1,287,382 | -90,495 | 1,196,887 | Replace |

| E, Part B, Title XVIII, Hospital, Line 27.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 | 774,157 | 309,992 | 1,084,149 | Replace |

0659

**JA 76**                                  00152

Audit Adjustment Report                      CMS-2552-96
Date Prepared: 8/9/2012                      Page 15
Data File:    C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:    01/01/2007  To  12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR          Health Financial Systems
Provider No:     050231                              MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 29   Ref: 22

WPR: B15.3.2
To adjust Part A SNF PPS data to our reconciliation to the 7/28/11 PS&R.
SNF Inpatient Part A Ref:-42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

| E-3, Part III, Title XVIII, Skilled Nursing Facility, Line 24.00 Other than outlier payments | | | | |
|---|---|---|---|---|
| 2.00 | 2,117,036 | 20,602 | 2,137,638 | Replace |

| E-3, Part III, Title XVIII, Skilled Nursing Facility, Line 36.00 Coinsurance | | | | |
|---|---|---|---|---|
| 2.00 | 113,708 | 3,100 | 116,808 | Replace |

### Adjustment No. 30   Ref: 27

WPR: B14.1
To adjust Bad debts to the provider's revised listing submitted during the desk review.
42 CFR 413.80
CMS Pub 15-1 Sec. 300

| E-3, Part III, Title XVIII, Skilled Nursing Facility, Line 38.00 Reimbursable bad debts (see instructions) | | | | |
|---|---|---|---|---|
| 2.00 | 8,774 | -4,304 | 4,470 | Replace |

### Adjustment No. 31   Ref: 11

WPR: B15.1.4
To adjust IP Hospital managed care days to our reconciliation to the 7/28/11 PS&R.
Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

| E-3, Part IV, Title XVIII, Hospital, Line 6.02 Program managed care days occuring on or after January 1 of this cost reporting period (see inst | | | | |
|---|---|---|---|---|
| 1.00 DIRECT GME & ESRD OUTPATIENT DIRECT ME | 9,146 | 24 | 9,170 | Replace |

### Adjustment No. 32   Ref: 30

WPR: B13.1
To adjust the Primary Care PRA to the Mac's record's.
42 CFR 413.77
PM A-01-38
PRM-II, Section 3633.4

| E-3, Part IV, Title XVIII, Hospital, Line 3.23 See instructions depending on the cost reporting periods beginning prior to 10/01/2001 or on or | | | | |
|---|---|---|---|---|
| 1.00 DIRECT GME & ESRD OUTPATIENT DIRECT ME | 102,107.54 | -169.03 | 101,938.51 | Replace |

### Adjustment No. 33   Ref: 31

WPR: B13.1
To properly include the locality-adjusted national average per resident amount.
42 CFR 413.77
PM A-01-38
PRM-II, Section 3633.4

| E-3, Part VI, Title XVIII, Hospital, Line 8.00 Enter the locality adjustment national average per resident amount (see instructions) | | | | |
|---|---|---|---|---|
| 1.00 DIRECT GME & IME PAYMENTS FOR REDISTRI | 0.00 | 99,040.51 | 99,040.51 | Replace |

Audit Adjustment Report                                                    CMS-2552-96
Date Prepared: 8/9/2012                                                    Page 16
Data File:      C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:    01/01/2007  To  12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR                              Health Financial Systems
Provider No:    050231                                                     MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

**Adjustment No: 34    Ref: 6**

WPR: B15.1.4
To adjust Hospital Capital PPS data to our reconciliation to the 7/28/11 PS&R.
Inpatient Part A Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

L, Part I, Title XVIII, Hospital, Line 2.00 Capital DRG other than outlier
| 1.00 CAPITAL PAYMENT | 2,510,038 | 42,870 | 2,552,908 | Replace |

L, Part I, Title XVIII, Hospital, Line 3.01 Capital DRG outlier payments for services rendered on or after to October 1, 1997
| 1.00 CAPITAL PAYMENT | 67,220 | 995 | 68,215 | Replace |

**Adjustment No: 35    Ref: 35**

WPR: B15.16
To adjust the SSI percentage to the revised CMS publication dated 3/16/2012.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

L, Part I, Title XVIII, Hospital, Line 5.00 Percentage of SSI recipient patient days to Medicare Part A patient days (see instructions)
| 1.00 CAPITAL PAYMENT | 22.82 | -8.09 | 14.73 | Replace |

0661

**JA 78**

00154

P-45

00161

Audit Adjustment Report                                                      CMS-2552-96
Date Prepared: 8/16/2012                                                     Page 11
Data File:     C:\HFS 2012 (AS)\050231.1208\F.050231.1208.mca
Fiscal Year:   01/01/2008   To   12/31/2008
Provider Name: POMONA VALLEY HOSPITAL MED CTR                                Health Financial Systems
Provider No:   050231                                                       MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 16   Ref: 25

WPR: B.30.1
E, Part A, Title XVIII, Disproportionate Share Hospital
Ref: 42CFR 412.106
CMS PUB. 15-1 Sec. 2807.2
To adjust the Allowable DSH percentage and SSI%, based on our CY audit findings.

E, Part A, Title XVIII, Hospital, Line 4.00 Percentage of SSI recipient patient days to Medicare Part A patient days. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 22.82 | -8.42 | 14.40 | Replace |

E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 52.78 | -6.65 | 46.13 | Replace |

See Also Ref.# 30

### Adjustment No. 17   Ref: 26

WPR: B.53.1
Protested Amount - Title XVIII
Ref: 42CFR 413.24
CMS PUB. 15-2 Sec. 3630.1
To eliminate protested amounts identified on the amended OCR, in accordance to our CMS guidelies.

E, Part A, Title XVIII, Hospital, Line 30.00 Protested amounts (nonallowable cost report items) in accordance with CMS Pub. 15-II, section 11

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 3,786,857 | -3,786,857 | 0 | Replace |

### Adjustment No. 18   Ref: 27

WPR: B.12.2
E, Part A, Title XVIII, IME Rolling Average
Ref: 42CFR 413.79
CMS PUB. 15-1 Sec. 3630.1
To adjust the CY IME FTE count to be used for the Rolling Average calculation.

E, Part A, Title XVIII, Hospital, Line 3.08 FTE count for allopathic and osteopathic programs in the current year from your records

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 18.23 | -0.07 | 18.16 | Replace |

### Adjustment No. 19   Ref: 30

WPR: B.30.2
E, Part A, Title XVIII, Disproportionate Share Hospital Percentage
Ref: 42CFR 412.106
CMS PUB. 15-1 Sec. 2807.2
To adjust the Allowable DSH percentage, based on provider submitted listing.

E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 46.13 | -0.27 | 45.86 | Add |

See Also Ref.# 25

0676

Audit Adjustment Report                                                                 CMS-2552-96
Date Prepared: 8/16/2012                                                                  Page 15
Data File:     C:\HFS 2012 (AS)\050231.1208\F.050231.1208.mca
Fiscal Year:   01/01/2008  To  12/31/2008
Provider Name: POMONA VALLEY HOSPITAL MED CTR                              Health Financial Systems
Provider No:   050231                                                                    MCRIF32

|  | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 30   Ref: 24

WPR: 8.9.1
E-3, Part IV, Per-Resident-Amount
Ref: 42 CFR 413.77
CMS PUB.-15-2 Sec. 3633.4
To adjust the updated per-resident amount (PRA) for the primary care residents, and include the Locality-adjusted national average per resident amount on the RCR.

E-3, Part VI, Title XVIII, Hospital, Line 8.00 Enter the locality adjustment national average per resident amount (see instructions)

| 1.00 DIRECT GME & IME PAYMENTS FOR REDISTRI | 0.00 | 104,299.56 | 104,299.56 | Replace |

### Adjustment No. 31   Ref: 8

WPR: B.51.1A
L, Part I, Inpatient Part A
Ref: 42 CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4
To reconcile updated PS&R data dated 02/23/2012. to CY amended OCR data.

L, Part I, Title XVIII, Hospital, Line 2.00 Capital DRG other than outlier

| 1.00 CAPITAL PAYMENT | 2,688,052 | -16,380 | 2,671,672 | Replace |

L, Part I, Title XVIII, Hospital, Line 3.01 Capital DRG outlier payments for services rendered on or after to October 1, 1997

| 1.00 CAPITAL PAYMENT | 93,961 | 4,783 | 98,744 | Replace |

### Adjustment No. 32   Ref: 25

WPR: B.30.1
E, Part A, Title XVIII, Disproportionate Share Hospital
Ref: 42CFR 412.106
CMS PUB. 15-1 Sec. 2807.2
To adjust the Allowable DSH percentage and SSI%, based on our CY audit findings.

L, Part I, Title XVIII, Hospital, Line 5.00 Percentage of SSI recipient patient days to Medicare Part A patient days (see instructions)

| 1.00 CAPITAL PAYMENT | 22.82 | -8.42 | 14.40 | Replace |

0677

**JA 81**

00171

P-46

00178

## California SSI/SSP Caseload from CDSS

| Month | Total SSI and SSP Caseload | Total SSP Only Caseload | Percent SSP only |
|---|---|---|---|
| Federal Fiscal Year 2006: Oct 1, 2005 to Sept 30, 2006 | | | |
| Oct-05 | 1,203,912 | 199,399 | 16.56% |
| Nov-05 | 1,209,061 | 200,163 | 16.56% |
| Dec-05 | 1,203,954 | 200,535 | 16.66% |
| Jan-06 | 1,180,468 | 187,387 | 15.87% |
| Feb-06 | 1,182,214 | 187,571 | 15.87% |
| Mar-06 | 1,196,088 | 190,377 | 15.92% |
| Apr-06 | 1,207,087 | 198,651 | 16.46% |
| May-06 | 1,209,340 | 199,120 | 16.47% |
| Jun-06 | 1,209,410 | 199,936 | 16.53% |
| Jul-06 | 1,163,141 | 190,204 | 16.35% |
| Aug-06 | 1,173,146 | 192,004 | 16.37% |
| Sep-06 | 1,175,737 | 193,470 | 16.46% |
| FFY 2006 Total | 14,313,558 | 2,338,817 | 16.34% |
| | | | |
| Federal Fiscal Year 2007: Oct 1, 2006 to Sept 30, 2007 | | | |
| Oct-06 | 1,222,746 | 203,814 | 16.67% |
| Nov-06 | 1,223,216 | 204,693 | 16.73% |
| Dec-06 | 1,221,100 | 205,347 | 16.82% |
| Jan-07 | 1,224,647 | 202,549 | 16.54% |
| Feb-07 | 1,225,847 | 202,881 | 16.55% |
| Mar-07 | 1,226,262 | 203,062 | 16.56% |
| Apr-07 | 1,230,427 | 203,978 | 16.58% |
| May-07 | 1,230,532 | 204,176 | 16.59% |
| Jun-07 | 1,232,539 | 204,942 | 16.63% |
| Jul-07 | 1,214,181 | 204,939 | 16.88% |
| Aug-07 | 1,216,117 | 205,349 | 16.89% |
| Sep-07 | 1,220,536 | 206,286 | 16.90% |
| FFY 2007 Total | 14,688,150 | 2,452,016 | 16.69% |
| | | | |
| | | | |
| Federal Fiscal Year 2008: Oct 1, 2007 to Sept 30, 2008 | | | |
| Oct-07 | 1,244,689 | 207,203 | 16.65% |
| Nov-07 | 1,244,211 | 207,894 | 16.71% |
| Dec-07 | 1,225,029 | 203,512 | 16.61% |
| Jan-08 | 1,226,334 | 202,092 | 16.48% |
| Feb-08 | 1,244,310 | 206,091 | 16.56% |
| Mar-08 | 1,245,627 | 206,777 | 16.60% |
| Apr-08 | 1,248,737 | 206,969 | 16.57% |
| May-08 | 1,247,780 | 206,956 | 16.59% |
| Jun-08 | 1,253,629 | 208,221 | 16.61% |
| Jul-08 | 1,254,039 | 208,359 | 16.62% |
| Aug-08 | 1,257,422 | 209,052 | 16.63% |
| Sep-08 | 1,262,530 | 210,177 | 16.65% |
| FFY 2008 Total | 14,954,337 | 2,483,303 | 16.61% |
| | | | |

9/8/2017

0684

P-47

00180

## SSI Eligibility

SSA determines SSI/SSP eligibility
- Sets effective date of eligibility
- Sets grant amount
- Establishes eligibility for SSI/SSP or SSP only

### *SSA Sends Data to State*

Weekly SSA sends eligibility information to State of California
- Information on State Data Exchange (SDX)
- Information in SSA format
- File goes to state Department of Health Care Services (DHCS)

## State Processes Data

DHCS processes SDX information
- Sets eligibility effective date based on SSI/SSP effective date
  - Full month eligibility
  - Eligibility is monthly
- Sets Medi-Cal aid code based on SSA data
- Uses two SSA SDX data fields
  - First use SDX field "Multi Category Indicator" field 1529.
    - Values '2', '3', '6', '7', 'F', 'G', '0', 'P', 'S', 'T', 'Y' or 'Z' are set as blind, aid code 20.
    - Values '4', 'D', 'M', 'Q' or 'W' are set as disabled, aid code 60.
    - Value '1', '5', 'E', 'N', 'R' or 'X' are set as aged, aid code 10.
  - Secondary use SDX field "Recipient Type", Field 6465.
    - AI     Aged Individual= Aid Code 10, aged
    - AS     Aged Spouse= Aid Code 10, aged
    - BI     Blind Individual= Aid Code 20, blind
    - BS     Blind Spouse= Aid Code 20, blind
    - BC     Blind Child= Aid Code 20, blind
    - DC     Disabled Child= Aid Code 60, disabled
    - DI     *Disabled Individual= Aid Code 60, disabled*
    - DS     Disabled Spouse= Aid Code 60, disabled
- Post Medi-Cal eligibility and information on Medi-Cal Eligibility Data System (MEDS)
- Issue Medi-Cal Benefits Identification Card (BIC) to all new eligibles
  - BIC only provides basic demographic information, no specific eligibility information for each month

## State Operates Automated Eligibility Verification System (AEVS)

- Since eligibility in Medi-Cal is monthly and the BIC does not provide information that the patient is eligible this month, the state created this system.
- Similar to a credit card verification system used in retail
- Providers access system by computer, swipe card reader or other methods to obtain information on eligibility for the service being provided including aid code

1

0685

**JA 85**                                                              00181

- AVES does not store eligibility information, rather it accesses MEDS for that information

**Provider/Hospital Provides Services**

- Patient presents BIC to provider
- Provider needs to know if patient is eligible for the month of service and for what scope of benefits-full scope or limited benefits
- Provider must access AEVS to obtain this information

**Medi-Cal Eligibility Verification**

- Provider accesses AEVS for eligibility information
- AEVS verifies providers eligibility for information
- AEVS accesses MEDS for the most current eligibility information
- MEDS returns the information to AEVS
- AVES sends the MEDS eligibility information to the provider
  - There is no processing or interpretation of the data, it is passed on to the provider as it exists on MEDS
- This includes information on the patient's eligibility status for the month, any restrictions in eligibility, and the patient's aid code

***Provider Now has Patient's Eligibility Information***

2

0686

**JA 86**                                                                         00182

P-48

00183

Summary of SSI Eligibility Process between SSA and California Department of Health Care Services (DHCS)
Source: Summary SSI Flow-process write-up from Stan Rosenstein
Amy Rosenkranz, Medi-Cal Eligibility Division of DHCS (email 9/07/17 and 9/12/17)



Burgundy: SSA process          Blue: California DHCS process          Yellow: Providers

SSA determines SSI/SSP eligibility
* Sets effective date of eligibility
* Sets grant amount
* Establishes eligibility for SSI/SSP or SSP only

SSA sends weekly SSI/SSP eligibility data to CA DHCS
* Information on State Data Exchange (SDX)
* Information in SSA format

DHCS operates Automated Eligibility Verification system (AEVS)
* AEVS accesses date from MEDS
* Provide eligibility data including aid code by computer, swipe card reader or other methods
* Similar to a credit card verification system used in retail
* Available to providers

DHCS Posts Medi-Cal eligibility information on Medi-Cal Eligibility Data System (MEDS)
* Central depository of all Medi-Cal eligibility data
* Eligibility is by month
* Aid code by month
* Full scope or limited benefits by month

DHCS processes SSA SDX information
* Uses SSI/SSP eligibility effective date for each month
* Sets Medi-Cal SSI/SSP aid code 10, 20, 60 based on SSA data
* DHCS uses two SSA SDX data fields for SSI/SSP

Primary SSA SDX Field "Multi Category Indicator":
* Value "1", "5", "E", "N", "R" or "X" = Aged, aid code 10
* Values "2", "6", "G", "7", "P", "G", "O", "P", "S", "T", "V" or "Z" = Blind, aid code 20
* Values "4", "D", "M", "Q" or "W" = Disabled, aid code 60.

Secondary SSA SDX field "Recipient Type"
AI    Aged Individual= Aid Code 10, aged
AS    Aged Spouse= Aid Code 10, aged
BI    Blind Individual= Aid Code 20, blind
BS    Blind Spouse= Aid Code 20, blind
BC    Blind Child= Aid Code 20, blind
DC    Disabled Child= Aid Code 60, disabled
DI    Disabled Individual= Aid Code 60, disabled

Providers access AEVS for eligibility information
* On-line verification, or
* Through State-approved vendors such as HDX

09/13/2017   Prepared by: C. Le-Tran

P:\My Documents\Reimb\Appeals\06_08 SSI Appeals\SSI to DHCS process summary_flow chart_final

00184

0690

**JA 88**

P-49

00185

**Stan Rosenstein <stan.rosenstein@gmail.com>**                Aug 25 (13 days ago)

to Sharyl, bcc: srosenstein

Hope you don't mind me asking for a little more information.
I remember years ago you had information that I would love to get now if you still have it.
1.  You had a report that showed the current number of Medi-Cal enrollees in nursing facilities.  If I remember correctly it was consistently about 60,000.  Do you still have this data and can you send it to me?
2.  You also did a review of the number of people on Medi-Cal and how they derived their eligibility.  We were trying to see if they came in ineligible for Medi-Cal, sheltered their assets and got eligible.  If I recall correctly you found that the majority of people came into the nursing facility already being on Medi-Cal because they were on SSI.   Do you still have this study and can you also send that to me?
Much appreciated.  Thanks Stan

**Shanen-Raya, Sharyl (HCP-MED)@DHCS Sharyl.Shanen-Raya@dhcs.ca.gov via cadhcs.onmicrosoft.com**                Aug 25 (13 days ago)

to me

I do have it somewhere and I will find it for you!  If I can't today, I will try for early next week.  Have a good weekend either way!  Sharyl

**From:** Stan Rosenstein [mailto:stan.rosenstein@gmail.com]
**Sent:** Friday, August 25, 2017 3:00 PM
**To:** Shanen-Raya, Sharyl (HCP-MED)@DHCS <Sharyl.Shanen-Raya@dhcs.ca.gov>
**Subject:** Nursing Home patients

**Stan Rosenstein <stan.rosenstein@gmail.com>**                Aug 25 (13 days ago)

to Sharyl.Shanen-.

Thank you.  Stan

**Shanen-Raya, Sharyl (HCP-MED)@DHCS Sharyl.Shanen-Raya@dhcs.ca.gov via cadhcs.onmicrosoft.com**                Aug 29 (9 days ago)

to me

Hi Stan!
This is a write up about the reseach that we did.  I will keep looking for more.  Sharyl

A review of the numbers indicates that only 1.2 percent (783 in 2/2009) of those receiving LTC on Medi-Cal (63,452 in 2/2009) were new to Medi-Cal each month and were not moving from programs such as SSI, AFDC, Medi-Cal in the community, or DDS immediately prior to entry into LTC.  Therefore, the vast majority of individuals in LTC would not have had excess resources prior to entry.  Assuming only 8

0688

**JA 90**

00186

percent had spouses, the spousal impoverishment resource provisions would apply to a very small number (63 individuals in 2/2009).  (Please note: using 2009 numbers allows time for appeals to be settled and claims to be submitted.)  A very small number, less than 1 percent of the cases reviewed a number of years ago of individuals owned houses while in LTC.  This is because of the natural course of events that occur as individuals age and find they can't care for homes any longer, move to apartments, then to board and care facilities and then to LTC.  The few who move from home to LTC facilities, find that they can't afford to keep their homes on the meager $35 personal needs allowance they are permitted to retain.  Even those individuals who are certified by their doctors as reasonably expected to return home in 6 months find that they cannot keep their homes on the small upkeep and repair allowance of $209 per month.

At any given point in time, the number of people in LTC changes up and down by a few thousand a year.  According to information gathered from the financial statements of LTC facilities in California by the Office of Statewide Health Planning and Development, back in 1983, at any given point in time there were approximately 66,000 people in LTC on Medi-Cal.  The latest information for the month of 2/2009 that staff received was that that figure had dropped by approximately 3,000 to 63,452 in 2/2009, while the number of beds has increased from 101,000 in 1983 to approximately 120,000. The LTC population is one of the most stable populations on Medi-Cal and changes in resource limits do not affect the numbers.  Prior to implementation of the Medicaid spousal impoverishment provisions on 1/1/90 community property rules applied, meaning the spouse in the home retained all of his/her separate and ½ of the community property.  Under the spousal impoverishment provisions all of a couple's combined community and separate property is compared against the Community Spouse Resource Allowance, plus $2,000 for the institutionalized spouse.  That amount started at $64,580 in 1990 and is currently $111,560.  Even though the amount a couple is allowed to retain has increased that much, the number of people in LTC at any given point in time has remained stable.  It appears that medical necessity for skilled nursing care services and the increased number of more desirable Continuing Care Residential Communities are effective gate keepers for delaying entry into LTC on Medi-Cal.

**From:** Stan Rosenstein [mailto:stan.rosenstein@gmail.com]
**Sent:** Friday, August 25, 2017 3:10 PM
**To:** Shanen-Raya, Sharyl (HCP-MED)@DHCS <Sharyl.Shanen-Raya@dhcs.ca.gov>
**Subject:** Re: Nursing Home patients

**Stan Rosenstein <stan.rosenstein@gmail.com>**                    Aug 29 (9 days ago)

to Sharyl.Shanen-.

Thank you. This is great information.
Do you know what percentage of people going to a nursing home are on SSI specifically.
Much appreciated.
Stan

Sent from my IPhone

**Shanen-Raya, Sharyl (HCP-MED)@DHCS Sharyl.Shanen-Raya@dhcs.ca.gov via cadhcs.onmicrosoft.com**                    Aug 29 (9 days ago)

to me

0689

**JA 91**                                                                    00187

No, I don't.  That gets a little trickier since SSI individuals are only in aid codes 10, 20 or 60.  We would have to do a run to look at living arrangement codes or claims paid data and some Medi-Cal Manage Care plans are at risk for LTC now, so some may be hidden.  There is also the possibility of attacking it by looking at the amount of SSI received (up to only $50 per month for those who have no other income); however SSI keeps folks at their regular community payment level for the 1st 3 months of LTC as "temporarily absent" from the home, before they reduce their payment level or discontinue them from SSI.  Any suggestions?

**From:** Stan Rosenstein [mailto:stan.rosenstein@gmail.com]
**Sent:** Tuesday, August 29, 2017 1:43 PM

**Stan Rosenstein** **<stan.rosenstein@gmail.com>**                    Aug 29 (9 days ago)

to Sharyl.Shanen-.

No suggestions but one more question.
When someone on Medi-Cal on SSI goes into a NF long term do they stay in aid code 10, 20 or 60?
Thanks Stan

Sent from my iPhone

**Shanen-Raya, Sharyl (HCP-MED)@DHCS** **Sharyl.Shanen-**          Aug 29 (9 days
**Raya@dhcs.ca.gov** **via** **cadhcs.onmicrosoft.com**                    ago)

to me

Yes, they do stay in aid codes 10, 20, and 60.  It may be pretty tricky to study this issue.  I would have to think about the most reliable way to catch everybody you want; whether you want to include those who are temporarily absent or exclude them, whether to use living arrangement information or claims data or payment levels.  Do you still want to pursue it?  Perhaps SSI would have better data on this issue.  Remember at one  point you called a phone number of a systems guru at SSI and you were able to get exactly what you wanted?  The phone number was on some document or table that I sent to you.  I can't remember what that was about.

0690

P-51

00191

California SSI/SSP Caseload

| Month | Total SSI and SSP Caseload | Total SSP Only Caseload | Percent SSP only |
|---|---|---|---|
| Jul-05 | 1,196,567 | 196,567 | 0.164275799 |
| Aug-05 | 1,201,958 | 197,436 | 0.164261979 |
| Sep-05 | 1,203,998 | 197,896 | 0.164365722 |
| Oct-05 | 1,203,912 | 199,399 | 0.165625893 |
| Nov-05 | 1,209,061 | 200,163 | 0.165552441 |
| Dec-05 | 1,203,954 | 200,535 | 0.166563673 |
| Jan-06 | 1,180,468 | 187,387 | 0.158739585 |
| Feb-06 | 1,182,214 | 187,571 | 0.158660784 |
| Mar-06 | 1,196,088 | 190,377 | 0.159166382 |
| Apr-06 | 1,207,087 | 198,651 | 0.164570574 |
| May-06 | 1,209,340 | 199,120 | 0.164651794 |
| Jun-06 | 1,209,410 | 199,936 | 0.165316973 |
|  |  |  |  |
| Jul-06 | 1,163,141 | 190,204 | 0.163526176 |
| Aug-06 | 1,173,146 | 192,004 | 0.163665903 |
| Sep-06 | 1,175,737 | 193,470 | 0.164552106 |
| Oct-06 | 1,222,746 | 203,814 | 0.166685477 |
| Nov-06 | 1,223,216 | 204,693 | 0.167340028 |
| Dec-06 | 1,221,100 | 205,347 | 0.168165588 |
| Jan-07 | 1,224,647 | 202,549 | 0.165393783 |
| Feb-07 | 1,225,847 | 202,881 | 0.16550271 |
| Mar-07 | 1,226,262 | 203,062 | 0.165594302 |
| Apr-07 | 1,230,427 | 203,978 | 0.165778222 |
| May-07 | 1,230,532 | 204,176 | 0.165924982 |
| Jun-07 | 1,232,539 | 204,942 | 0.16627628 |
|  |  |  |  |
| Jul-07 | 1,214,181 | 204,939 | 0.16878785 |
| Aug-07 | 1,216,117 | 205,349 | 0.168856286 |
| Sep-07 | 1,220,536 | 206,286 | 0.169012631 |
| Oct-07 | 1,244,689 | 207,203 | 0.166469696 |
| Nov-07 | 1,244,211 | 207,894 | 0.167089023 |
| Dec-07 | 1,225,029 | 203,512 | 0.166128312 |
| Jan-08 | 1,226,334 | 202,092 | 0.164793604 |
| Feb-08 | 1,244,310 | 206,091 | 0.165626733 |
| Mar-08 | 1,245,627 | 206,777 | 0.166002343 |
| Apr-08 | 1,248,737 | 206,969 | 0.165742666 |
| May-08 | 1,247,780 | 206,956 | 0.165859366 |
| Jun-08 | 1,253,629 | 208,221 | 0.166094594 |
|  |  |  |  |
| Jul-08 | 1,254,039 | 208,359 | 0.166150335 |
| Aug-08 | 1,257,422 | 209,052 | 0.166254448 |
| Sep-08 | 1,262,530 | 210,177 | 0.166472876 |

0692

**JA 94**

00192

| Month | Total SSI and SSP Caseload | Total SSP Only Caseload | Percent SSP only |
|---|---|---|---|
| Oct-08 | 1,262,985 | 210,174 | 0.166410527 |
| Nov-08 | 1,267,145 | 212,100 | 0.167384159 |
| Dec-08 | 1,266,221 | 211,238 | 0.166825538 |
| Jan-09 | 1,263,666 | 205,594 | 0.162696472 |
| Feb-09 | 1,268,020 | 205,956 | 0.162423306 |
| Mar-09 | 1,268,371 | 205,983 | 0.162399645 |
| Apr-09 | 1,270,831 | 206,306 | 0.162339446 |
| May-09 | 1,253,793 | 188,190 | 0.150096547 |
| Jun-09 | 1,257,200 | 188,219 | 0.149712854 |
| | 58,936,800 | 9,699,795 | 0.164579601 |

0693

**JA 95**

00193

P-52

00194



**HHS Public Access**
Author manuscript
Peer-reviewed and accepted for publication

| About author manuscripts | Submit a manuscript |

J Am Geriatr Soc. Author manuscript; available in PMC 2011 Sep 1.

Published in final edited form as:

J Am Geriatr Soc. 2010 Sep; 58(9): 1701–1706.

Published online 2010 Aug 24. doi: 10.1111/j.1532-5415.2010.03005.x

PMCID: PMC2945440
NIHMSID: NIHMS216108

# Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life

Anne Kelly, MSW,[1] Jessamyn Conell-Price, BA,[2] Kenneth Covinsky, MD, MPH,[1,2] Irena Stijacic Cenzer, MA,[1,2] Anna Chang, MD,[1,2] W. John Boscardin, PhD,[1,2] and Alexander K. Smith, MD, MS, MPH[1,2]

[1] Veterans Affairs Medical Center, San Francisco, CA
[2] Division of Geriatrics, Department of Medicine, University of California, San Francisco, San Francisco, CA
Address correspondence requests to: Alexander K. Smith, MD, MS, MPH, Division of Geriatrics, UCSF, 4150 Clement St (181G), San Francisco, CA 94121, Voice: 415-221-4810 x 4684, Fax: 415-750-6641, aksmith@ucsf.edu

Copyright notice and Disclaimer

The publisher's final edited version of this article is available at J Am Geriatr Soc
See other articles in PMC that cite the published article.

## Abstract

Go to:

### OBJECTIVES

To describe lengths of stay among nursing home decedents.

### DESIGN

Retrospective cohort study.

### SETTING

The Health and Retirement Study (HRS), a nationally representative survey of U.S. adults aged 50 and older.

### PARTICIPANTS

1,817 nursing home residents who died between 1992 and 2006.

### MEASUREMENTS

Our primary outcome was length of stay, defined as the number of months between the nursing home admission and the date of death. Covariates included demographic, social, and clinical factors drawn from the HRS interview conducted closest to the date of nursing home admission.

## RESULTS

The mean age of decedents was 83.3 (SD 9.0) and the majority were female (59.12%), and White (81.5%). Median and mean length of stay prior to death were 5 months (IQR 1-20) and 13.7 months (SD 18.4), respectively. Fifty-three percent died within 6 months of placement. Large differences in median length of stay were observed by gender (men, 3 months vs. women, 8 months) and net worth (highest quartile, 3 months vs. lowest quartile, 9 months) (all p<.001). These differences persisted after adjustment for age, sex, marital status, net worth, geographic region, and diagnosed chronic conditions (cancer, hypertension, diabetes, lung disease, heart disease, and stroke).

## CONCLUSION

Nursing home lengths of stay are brief for the majority of decedents. Lengths of stay varied markedly by factors related to social support.

**Keywords:** Nursing Home, End of Life, Length of Stay, Palliative Care, Advance Care Planning

## INTRODUCTION                                                                                     Go to:

Death has become institutionalized over the last 100 years.[1] Today, 25% of all deaths in the nation occur in nursing homes and the proportion of all deaths that occur in these settings continues to rise.[2] By the year 2020, an estimated 40% of Americans will die in a nursing home.[3]

While the proportion of overall deaths located in nursing homes has been well described, lengths of stay in nursing homes at the end of life have received little attention. The duration of time residents spend in a nursing home prior to death has important clinical and policy implications. If nursing home lengths of stay tend to be long, then systems and policy directives may improve overall care by prioritizing maintenance and improvement of functional status. If lengths of stay are generally brief at the end of life, then policy ensuring nursing home residents' access to quality palliative and end-of-life care must be systematized.

We used the Health and Retirement Study (HRS), a nationally representative cohort of older adults, to describe lengths of stay among older adult decedents who resided in nursing homes at the end of life.

## MATERIALS AND METHODS                                                                            Go to:

### Study Population

We examined a consecutive sample of HRS subjects who died between 1992 and 2006. HRS subjects are a representative sample of Americans over the age of 50 who were living in the community at the *time of their initial interview. The HRS is conducted by the Institute for Social Research at the* University of Michigan and is sponsored by the National Institute on Aging. The HRS is designed to study transitions in health and wealth among older adults. More information about HRS sampling, data collection procedures and measures can be found on the HRS website (www.hrsonline.isr.umich.edu/).

Subjects were interviewed every two years between 1992 and 2006. Following their death, exit interviews were conducted with family caregivers. Decedents' primary residence at the end of life was

obtained from exit interviews with family caregivers. A nursing home was defined as a facility that provides the following services: dispensing of medication, 24-hour nursing assistance and supervision, personal assistance, and room & meals. A separate question asked about the location of death (nursing home, hospital, home, hospice, or elsewhere), and interviewers were instructed to clarify that residence in a nursing home at the end of life may be distinct from the location of death. Time between the exit interview with the family caregiver and the death of the subject ranged from zero months (i.e., the interview took place during the same month that the subject died) to 59 months. The mean time was one year and 93.4% of family caregivers were interviewed within two years of the subject's death.

Two thousand three hundred and one subjects primarily resided in a nursing home at the end of life. We excluded subjects with missing information regarding their exact year of placement in nursing home (n=68), age at time of placement in nursing home (n=27), not having completed a core interview within two years of their placement in nursing home (n=203), not having the exact date of death (n=71), having reported nursing home placement after the date of death (n=54) and having an irreconcilable nursing home admission date (i.e. subjects reported as being interviewed in the community after the nursing home admission date) (n=67). Our final sample was comprised of 1,817 decedents. We performed sensitivity analysis to determine how the excluded subjects differ from the subjects in the final sample with regards to demographic characteristics and length of stay in nursing home before death.

### Primary Outcome: Length of Stay

In exit interviews, decedents' caregivers were asked to identify the month and year decedents relocated to the nursing home. The HRS gathers month and year of decedents' death through proxy interviews and National Death Index records. We used the date of admission to the nursing home and the date of death to calculate length of stay in months. Lengths of stay were considered brief if they were less than 6 months, the prognostic requirement for the Medicare hospice benefit.

### Potential Predictors

In the absence of previous studies identifying variables related to lengths of stay in nursing homes at the end of life, we looked at existing literature to identify factors associated with nursing home admission for older adults.[2-8] Of those, we selected variables that were available for examination in HRS in order to identify variables that may influence nursing home lengths of stay. Demographic variables include the age at which decedents moved to a nursing home (categorized as <84 and 85 or older in bivariate analysis), sex, and race/ethnicity (categorized as Non-Hispanic White, Non-Hispanic Black, Hispanic, and Non-Hispanic Other.) Data on social and clinical factors are drawn from the last HRS interview before decedents entered a nursing home. The social factors are respondents' marital status (categorized as Married/Partnered, Not Married/Partnered) and participants' household net worth (in quartiles). Respondents were asked if they had any of the following diagnosed chronic conditions at the time of nursing home admission: hypertension, diabetes, heart disease, stroke, cancer (except skin cancer), or chronic lung disease (except asthma). Geographical region in which decedents died are drawn from exit interviews with caregivers (categorized as Northeast, Midwest, Southeast, and West).

### Analyses

0696

JA 99

00197

Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life                                   9/1/17, 3:33 PM

We described lengths of stay in nursing homes at the end of life using a plot of the data and descriptive statistics. Length of stay data had a skewed distribution and, therefore, median length of stay represents the best clinical summary. We performed bivariate analysis using non-parametric methods (Wilcoxon Rank test and Kruskal Wallis test, as appropriate). Multivariate linear regression analysis was used to examine the adjusted associations of demographic, social and clinical factors in relation to lengths of stay in a nursing home at the end of life. Age at time of admission to nursing home, chronic conditions and any other factors significant at a p<.05 level in bivariate analysis were included in the multivariable model. Since the sample size is large, the results of the multiple linear regression are valid even though the normality assumption was not met.[9] Additionally, we computed bootstrap estimates of the regression coefficients and their distributions. All statistical analyses were performed using Stata/MP 10.1 and SAS 9.1.3. The institutional review board at the University of California, San Francisco considered this study exempt.

## RESULTS                                                                                    Go to:

### Study population

Over the years 1992 to 2006, 8,433 HRS participants died, and 27.3% of these decedents resided in a nursing home at the time of death. While subjects resided in a nursing home at the end of life, their physical location of death was distinct for many. Of the 1,817 subjects in our study sample who resided in a nursing home at the end of life, next-of-kin stated that the physical location of death was the nursing home for 70.4% of subjects, the hospital for 22.6%, in-inpatient hospice facilities for 3.5%, home for 0.4%, and 3.1% died elsewhere. The majority of decedents were Non-Hispanic White (81.5%), female (59.1%), and had a mean age of 83.3 (SD 9.0) years at the time of admission to a nursing home (Table 1).

   Table 1
Characteristics of study sample (N=1,817)

Analysis of the 484 subjects excluded from our analysis due to missing data revealed that those subjects were similar to the subjects included in the sample in age at the time of placement in nursing home, household net worth and length of stay in nursing home before death. They were, however, more likely to be female (64.3% vs. 59.1%, p=0.040) and Hispanic (5.6% vs. 2.9%, p=0.004).

### Length of stay in nursing homes at the end of life

Decedents' lengths of stay in nursing homes at the end of life are illustrated in the Figure. The mean length of stay among decedents was 13.7 months; however, this was explained by a relatively small number of subjects with long lengths of stay. The median length of stay was only 5 months (IQR 1-20). The majority of residents had short lengths of stay, 65% percent of decedents had lengths of stay of less than one year, and over 53% died within 6 months of admission.

Bivariate analysis identified statistically significant associations between lengths of stay and gender, marital status, household net worth, region of death, all chronic conditions but hypertension, and the

JA 100                                                                                         00198

number of chronic conditions (Table 2). Men spent fewer months (median of 3 months) in a long-term care setting prior to death than women (median of 8 months) (p<.0001). Those who were married at the time of placement had median lengths of stay 4 months shorter than those who were unmarried (p<.0001). Decedents in the highest quartile of net worth (household net worth > $150,000) had median lengths of stay 6 months shorter than the median stays of the lowest quartile (household net worth < $3,000) (p <.0001). There was regional variation in average length of stay; decedents in the West had median nursing home lengths of stays that were 2 months shorter than decedents in the Midwest and 3 months shorter than decedents in the South or Northeast (p=0.015). Having a chronic illness was associated with statistically significant differences in lengths of stay. Lengths of stay were shortest for patients suffering from cancer or lung disease (median of 3 months). There were no statistically significant associations between lengths of stay and decedents' race or ethnicity.



Table 2
Factors associated with length of stay among residents who resided in a nursing home near death: bivariate analysis

Multivariate linear regression analysis revealed that male gender, high household net worth, and diagnoses of cancer, hypertension, diabetes, lung disease, or heart disease were associated with shorter lengths of stay after adjusting for all other potential predictors (Table 3). Residents with a history of stroke had longer lengths of stay than those without a history of stroke. Bootstrap estimates and corresponding p-values were very similar and therefore are not reported here.



Table 3
Independent factors associated with length of stay among residents who resided in a nursing home near death: multivariate linear regression analysis

## DISCUSSION                                                                                Go to:

In this sample of 1,817 older adults who were living in nursing homes at the end of life, we found that lengths of stay for the majority of decedents were brief: less than six months. We also found that decedents' lengths of stay differed according to a number of demographic, social, and clinical factors and some of these differences were dramatic. Demographic and social indicators often related to having increased access to paid and informal caregiver support include being male, married, and having a higher net worth.[10] These indicators revealed significantly shorter nursing home lengths of stay at the end of life. Additionally, those who were diagnosed with a chronic illness often associated with rapid functional decline, such as cancer, had shorter median lengths of stay at the end of life than those diagnosed with an illness generally associated with more progressive functional decline, such as stroke or heart disease.

Brief lengths of stay at the end of life coupled with the variability that exists among subgroups highlights the importance of addressing advance care planning needs with residents and families, as there may be shorter periods of time to address important end-of-life tasks with some residents than with others. There is growing support for the notion that advance care planning conversations,

including hospice and palliative care options, ought to occur shortly after admission and be readdressed periodically with nursing home residents and their families.[11, 12] Currently, many nursing home residents do not have any documentation of advance directives. In 2004 only 44% of nursing home residents had any advance directive recorded at admission and only 63% of residents had any advance directive orders after 12 months in the nursing home.[13] Yet, lengths of stay (and life) were within the window of hospice eligibility for most patients among this sample of decedents at the time of nursing home admission.

While the rates of hospice use in our sample are unknown, hospice care appears to be underutilized in long-term care settings.[11, 12, 14] Currently, estimates of the proportion of nursing home decedents in the United States who received hospice or palliative care range from less than 10% to 30%.[15, 16] Research suggests that hospice care improves the quality of life at the end-of-life in long term care settings. A 2002 study by Miller and colleagues found that 51% of dying nursing home residents who were enrolled in hospice (n=2,644) received analgesics for daily pain, compared to 33% of non-hospice residents (n=7,929)[17]. Family satisfaction with symptom care has been shown to be superior for long-term care residents enrolled in hospice compared to non-hospice residents.[18] Evidence suggests that non-hospice palliative care teams and palliative care education for nursing home staff improves patient care[19]. Unlike hospice care, which is bound by criteria related to prognosis and goals of care, non-hospice palliative care may be offered in conjunction with curative treatments for chronically or terminally ill residents despite their expected prognosis, code status, or treatment plan. Unfortunately, while many nursing homes have some affiliation with a hospice, few nursing home providers have received any training in palliative care.[11, 14, 20]

These findings may have important implications for nursing home care, as it now often focuses on rehabilitation.[11, 12] A 1991 survey of North Carolina nursing homes reported 8 percent of patients were in daily specialized rehabilitation.[21] By 2006, however, rehabilitation accounted for 86 percent of all Medicare reimbursement days in skilled nursing facilities nationwide[22]. Many of these changes are due to financial policy rather than clinical factors.[23] Rehabilitation is an important goal for many, but some patients may benefit more from a palliative approach[24-26].

Though over half of decedents resided in a long-term care setting for less than six months before death, the range in lengths of stay within this study population was large (ranging from less than one month to more than 10 years). Eligibility for the Medicare hospice benefit is prognosis based: patients must have a physician estimated prognosis of less than six months to live. While we do not have data in our study on the expected prognosis of subjects at the time of admission, in general, prognosis for nursing home residents can be difficult to determine.[27-29] The Medicare hospice benefit may more appropriately and effectively serve older adults at the end of life if eligibility criteria were redefined by symptom and psychosocial needs, rather than prognosis.

Unlike our study, previous studies have been limited to describing nursing home residents whose physical location of death was the nursing home, excluding those who resided in a nursing home near the end of life but were transferred to the hospital in the hours or days prior to death.[2, 30-32] For these patients, however, the optimal time and place to address palliative needs is likely the nursing home setting where they spend the last weeks or months of life, not the hospital where they spend the final

0699

JA 102

00200

moments prior to death[33].

Limitations of this study are noted. The HRS enrolls community dwelling older adults and tracks them over time as they age and enter nursing homes. Additionally, the few residents of nursing homes admitted at a younger age would not be captured in this study, biasing our findings toward shorter lengths of stay. We relied on after death interviews with next-of-kin to determine the admission date to the nursing home. In addition to the issue of recall bias, lengths of stays for nursing home residents who were transferred to the hospital due to acute illness and then later readmitted may not be accurately presented in this study. However, subjects' next-of-kin are unlikely to have counted readmission to the nursing home after hospitalization as a new start date. In this way our data may be superior to administrative data that count only the length of stay for the final admission prior to death. We do not know the reason for admission to the nursing home, and some patients may have been admitted specifically for end-of-life care. We excluded patients admitted to residential hospice facilities, although some residential hospice facilities may have been located within nursing homes. Given the complexities of the study design, we were unable to track time trends in nursing home use in the HRS. The prognoses for patients in our study were not known at the time of admission. Retrospective studies of end-of-life care have been criticized as identifying patients who are dying can be challenging for clinicians;[34] thus, studies of the dying differ from studies of decedents.[35] However, studies of decedents may offer utility in identifying patterns that add incrementally to our understanding of how to care for patients at the end of life.[36]

Future prospective studies in this area are needed to further examine trends in nursing home lengths of stay at the end of life over time, and identify additional clinical and social indicators that may be significantly associated, such as functional status, expected prognosis at admission, and the number of hospital readmissions that take place prior to death. Authors of this study are in the process of linking HRS data to Medicare claim data to identify those patients who utilize hospice benefits or acute care services at the end of life. Given that median lengths of stay in a nursing home were less than a year, studies are also needed to examine the possible fiscal implications nursing home lengths of may have for individuals interested in purchasing long term care insurance.

In conclusion, brief nursing home lengths of stay among older adult decedents highlight the importance for health care providers to discuss and address advance care planning needs with patients and families, including palliative and hospice care options, soon after admission to the nursing home.

---



<u>Figure 1</u>
Lengths of stay among subjects who resided in a nursing home at death

## Acknowledgments                                                                 Go to:

**Funding Sources**: Dr. Smith is supported by a Research Supplement to Promote Diversity in Health Related Research from the National Institute on Aging (R01AG028481), the University of California San Francisco Clinical and Translational Science Institute (UL1 RR024131), and the National

**JA 103**

00201

Palliative Care Research Center.

**Sponsor's Role**: The National Institute of Health and the National Palliative Care Research Center had no role in the design, methods, subject recruitment, data collections, analysis, or preparation of the paper.

## Footnotes                                                                                   Go to:

**Author Contributions**: All authors were involved in the study concept and design, Drs. Smith and Covinsky were responsible for the acquisition of data, and all authors were involved in the analysis and interpretation of data and preparation of the manuscript.

**Conflict of Interest**: The editor in chief has reviewed the conflict of interest checklist provided by the authors and has determined that the authors have no financial or any other kind of personal conflicts with this paper.

## References                                                                                  Go to:

1. Katz BP, Zdeb MS, Therriault GD. Where people die. Public Health Rep. 1979;94:522–527. [PMC free article] [PubMed]

2. Gruneir A, Mor V, Weitzen S, et al. Where people die: A multilevel approach to understanding influences on site of death in America. Med Care Res Rev. 2007;64:351–378. [PubMed]

3. Weitzen S, Teno JM, Fennell M, et al. Factors associated with site of death: A national study of where people die. Med Care. 2003;41:323–335. [PubMed]

4. Bharucha AJ, Pandav R, Shen C, et al. Predictors of nursing facility admission: A 12-year epidemiological study in the United States. J Am Geriatr Soc. 2004;52:434–439. [PubMed]

5. Yaffe K, Fox P, Newcomer R, et al. Patient and caregiver characteristics and nursing home placement in patients with dementia. JAM. 2002;287:2090–2097. [PubMed]

6. Brock DB, Foley DJ, Salive ME. Hospital and nursing home use in the last three months of life. J Aging Healt. 1996;8:307–319. [PubMed]

7. Andel R, Hyer K, Slack A. Risk factors for nursing home placement in older adults with and without dementia. J Aging Healt. 2007;19:213–228. [PubMed]

8. Mitchell SL, Teno JM, Miller SC, et al. A national study of the location of death for older persons with dementia. J Am Geriatr Soc. 2005;53:299–305. [PubMed]

9. Lumley T, Diehr P, Emerson S, et al. The importance of the normality assumption in large public health data sets. Annu Rev Public Health. 2002;23:151–169. [PubMed]

10. Katz SJ, Kabeto M, Langa KM. Gender disparities in the receipt of home care for elderly people with disability in the United States. JAMA. 2000;284:3022–3027. [PubMed]

11. Meier DE, Lim B, Carlson MD. Raising the standard: palliative care in nursing homes. Health Aff (Millwood) 29:136–140. [PubMed]

12. Hirschman K, Kapo J, Straton JB, et al. Hospice in Long-Term Care. Ann Long-Term Care. 2005;13:25–29.

**JA 104**

00202

13. McAuley WJ, Buchanan RJ, Travis SS, et al. Recent trends in advance directives at nursing home admission and one year after admission. Gerontologist. 2006;46:377–381. [PubMed]

14. Zerzan J, Stearns S, Hanson L. Access to palliative care and hospice in nursing homes. JAMA. 2000;284:2489–2494. [PubMed]

15. Bercovitz A, Decker FH, Jones A, et al. End-of-life care in nursing homes: 2004 National Nursing Home Survey. Natl Health Stat Report. 2008:1–23. [PubMed]

16. Miller SC, Han B. End-of-life care in U.S. nursing homes: Nursing homes with special programs and trained staff for hospice or palliative/end-of-life care. J Palliat Med. 2008;11:866–877. [PubMed]

17. Miller SC, Mor V, Wu N, et al. Does receipt of hospice care in nursing homes improve the management of pain at the end of life? J Am Geriatr Soc. 2002;50:507–515. [PubMed]

18. Baer WM, Hanson LC. Families' perception of the added value of hospice in the nursing home. J Am Geriatr Soc. 2000;48:879–882. [PubMed]

19. Hanson LC, Reynolds KS, Henderson M, et al. A quality improvement intervention to increase palliative care in nursing homes. J Palliat Med. 2005;8:576–584. [PubMed]

20. Chang A, Walter L. Recognizing dementia is a terminal illness in nursing home residents. Arch Intern Med. In Press. [PubMed]

21. Kochersberger G, Hielema F, Westlund R. Rehabilitation in the nursing home: How much, why, and with what results. Public Health Rep. 1994;109:372–376. [PMC free article] [PubMed]

22. MEDPAC. A Data Book: Healthcare spending and the Medicare program. Commission MPA, ed 2008 June;

23. Buntin MB. Access to postacute rehabilitation. Arch Phys Med Rehabil. 2007;88:1488–1493. [PubMed]

24. Boyd CM, Landefeld CS, Counsell SR, et al. Recovery of activities of daily living in older adults after hospitalization for acute medical illness. J Am Geriatr Soc. 2008;56:2171–2179. [PMC free article] [PubMed]

25. Kurella Tamura M, Covinsky KE, Chertow GM, et al. Functional Status of Elderly Adults before and after Initiation of Dialysis. N Engl J Med. 2009;361:1539–1547. [PMC free article] [PubMed]

26. Arnold RM, Zeidel ML. Dialysis in frail elders--a role for palliative care. N Engl J Med. 2009;361:1597–1598. [PubMed]

27. Murray SA, Kendall M, Boyd K, et al. Illness trajectories and palliative care. BMJ. 2005;330:1007–1011. [PMC free article] [PubMed]

28. Flacker JM, Kiely DK. Mortality-related factors and 1-year survival in nursing home residents. J Am Geriatr Soc. 2003;51:213–221. [PubMed]

29. Mitchell SL, Teno JM, Kiely DK, et al. The clinical course of advanced dementia. N Engl J Med. 2009;361:1529–1538. [PMC free article] [PubMed]

JA 105

00203

30. Hanson LC, Eckert JK, Dobbs D, et al. Symptom experience of dying long-term care residents. J Am Geriatr Soc. 2008;56:91–98. [PubMed]

31. Teno JM, Clarridge BR, Casey V, et al. Family perspectives on end-of-life care at the last place of care. JAMA. 2004;291:88–93. [PubMed]

32. Miller SC, Gozalo P, Mor V. Hospice enrollment and hospitalization of dying nursing home patients. Am J Med. 2001;111:38–44. [PubMed]

33. Miller SC, Teno JM, Mor V. Hospice and palliative care in nursing homes. Clin Geriatr Med. 2004;20:717–734. vii. [PubMed]

34. Christakis NA, Lamont EB. Extent and determinants of error in doctors' prognoses in terminally ill patients: Prospective cohort study. BMJ. 2000;320:469–472. [PMC free article] [PubMed]

35. Bach PB, Schrag D, Begg CB. Resurrecting treatment histories of dead patients: A study design that should be laid to rest. JAMA. 2004;292:2765–2770. [PubMed]

36. Earle CC, Ayanian JZ. Looking back from death: The value of retrospective studies of end-of-life care. J Clin Oncol. 2006;24:838–840. [PubMed]

JA 106

00204

P-5

00205

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Thursday, September 07, 2017 4:58 PM
**To:** Laurence D. Getzoff
**Subject:** FW: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Candice Le-Tran
Office: 909-865-9844

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Thursday, September 07, 2017 1:09 PM
**To:** Candice LeTran
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

I'm told the beneficiary is eligible in Month 1.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

<u>Confidentiality Notice:</u>
*This e-mail and any attachments may contain information which is confidential, sensitive, privileged, proprietary or otherwise protected by law.
The information is solely intended for the named recipients, other authorized individuals, or a person responsible for delivering it to the
authorized recipients. If you are not an authorized recipient of this message, you are not permitted to read, print, retain, copy or disseminate this
message or any part of it. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete it from your
e-mail inbox, including your deleted items folder.*

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Thursday, September 07, 2017 1:03 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS <Amy.Rosenkranz@dhcs.ca.gov>
**Cc:** 'lgetzoff@health-law.com' <lgetzoff@health-law.com>
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Hi Amy,
Thank you for your explanations below, and for continuing to look into the SSA-DHCS aid code
cross walk. On answer (A) below, would you please clarify for me what is considered as "first
month"? In my question, I indicated that the Board said someone may qualify for SSI (month 1),
but is not eligible until the following month (month 2). So, in your "first month" below, is that the
actual month that the member is eligible for payment (month 2)? Thank you.

Candice Le-Tran
Office: 909-865-9844

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Thursday, September 07, 2017 9:53 AM

0704

**JA 108**

00206

**To:** Candice LeTran
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Hi Candice –

I have a response to your two questions.

A) The SSI recipient would get the aid code 10, 20, or 60 for the first month. It would post to our system once we received the file from SSA and will show as eligible in the first month.
B) The SSI/SSP recipient going into long term care would stay in aid codes 10, 20, or 60 for three months and then revert to aid codes 1E, 2E, or 6E. That will trigger the counties to evaluate the case and decide what program the person qualifies for. If the beneficiary has an income of less than $50 per month, that person can stay in 10, 20, or 60. Most beneficiaries have more income than that, and many of them will qualify for our medically needy long term care aid codes, which are 13, 23, or 63. There are also cases where the person will qualify for a MAGI aid code, such as M1, except for those in aid code 10 because MAGI only covers up to age 64. Basically, if a beneficiary goes into long term care, the county eligibility worker will review the person's case and determine which program best meets their needs on an individual basis.

I am still waiting on an answer regarding the aid code crosswalk.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
This e-mail and any attachments may contain information which is confidential, sensitive, privileged, proprietary or otherwise protected by law. The information is solely intended for the named recipients, other authorized individuals, or a person responsible for delivering it to the authorized recipients. If you are not an authorized recipient of this message, you are not permitted to read, print, retain, copy or disseminate this message or any part of it. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete it from your e-mail inbox, including your deleted items folder.

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Thursday, August 24, 2017 3:36 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS <Amy.Rosenkranz@dhcs.ca.gov>
**Subject:** Re: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Thank you Amy for your prompt reply. The PRRB Board was the one requesting the information so everyone can better understand the mapping from the Federal SSA system to the State DHCS system.

Also, the Board also posed 2 system sample questions which we don't know the answers:
A) SSI recipient qualifies in month 1 for both SSI and Medi-Cal but do not get the actual SSI cash grant until the subsequent month (month 2). Month 2 is the actual eligible SSI month. In this case, would aid codes 10/20/60 be assign in month 2 (the correct assignment) and not month

1? If so, what code would the recipient get in month 1 for the Medi-Cal only since recipient was not yet eligible for SSI?

B) Recipient qualified for both Medi-Cal and SSI but was sent to a nursing home permanently. Recipient will lose SSI benefits since they now reside at the nursing home. Recipient was a code 10 but after the nursing home admit month, what aid code would recipient get?

Thank you.

Candice Le-Tran
Director of Regulatory Reimbursement & Analytics
Pomona Valley Hospital Medical Center
909-865-9844

On Aug 24, 2017, at 2:42 PM, Rosenkranz, Amy (HCP-MED)@DHCS
<Amy.Rosenkranz@dhcs.ca.gov> wrote:

Hi Candice –

I spoke with one of the managers here, and she has reached out to someone in our IT department to see if there's anything we can give you.

The way this works is that SSA determines eligibility, and then they include the new client information in a periodic file of updates.  No one at the state visually sees the file contents – it consists entirely of computer code.  The file is then uploaded to our computer system, our computer system reads the file, determines the aid code here based on programming (aged is 10, blind is 20, and disabled is 60), and it is posted.  Our computer system is programmed to select the appropriate aid code based on specific SSA computer code in the file.

The only location that we are aware of where the conversion of SSA codes to our aid codes is found is embedded in our computer code, and we don't think we can give that to you.  However, she is checking to see if there's anything we can do for you.  I will let you know when we have an answer.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
The information contained in this e-mail document is confidential and is intended only to be viewed by the recipient(s) listed above.  If you are not the intended recipient(s), you are hereby notified that any distribution or copying of this document is strictly prohibited.  If you have received this document in error, please contact the sender listed above, and destroy the document(s).

0706

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Tuesday, August 22, 2017 5:11 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS <Amy.Rosenkranz@dhcs.ca.gov>
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients
**Importance:** High

Hi Amy,
Thank you for the update below on the DSH system. I am writing to enlist your help again on the DHCS SSI/SSP aid codes (10, 20, 60…). We just got back from Baltimore for our PRRB Hearing last week and the PRRB Board is requesting additional information. You informed me around 2015/2016 that the SSI/SSP aid codes are handled by the SSA office. At the Board hearing, we were informed that SSA uses codes Cxx, Mxx, etc. to classify their SSI/SSP patients. Since DHCS is using more of a numeric classifications (10,20,60), there must be a crosswalk that translates the SSA codes into the DHCS aid codes.

This crosswalk will be very valuable to our continued quest of getting to the bottom of the SSI days discrepancy from the SSA, and we need to submit it back to the Board. Would you please look into this and direct me to the right person at DHCS, perhaps the department that handles the data translation received from SSA before it is loaded into DHCS MEDS??

Thank you for your assistance on our appeal with CMS.

Candice Le-Tran
Office: 909-865-9844

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Tuesday, August 22, 2017 2:27 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS
**Subject:** DSH System Issues

Hello –

The DSH system is currently not operational. I do not know how long it will take to bring the system back up, but I will let everyone know when it is back online.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
The information contained in this e-mail document is confidential and is intended only to be viewed by the recipient(s) listed above. If you are not the intended recipient(s), you are hereby notified that any distribution or copying of this document is strictly prohibited. If you have received this document in error, please contact the sender listed above, and destroy the document(s).

0707

00209

PVHMC Email Confidentiality Notice

PVHMC Email Confidentiality Notice

PVHMC Email Confidentiality Notice

0708

00210

P-54

00211

## Listing of 2010 California GENERAL ACUTE Hospitals

Source: Annual Financial Disclosure Reports filed with the Office of Statewide Health Planning and
Development for FY periods ending in calendar year 2010, as reported by OSHPD June 6, 2013

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 1 | 106301098 | 50226 | AHMC ANAHEIM REGIONAL MEDICAL CENTER | General Acute | - |
| 2 | 106010846 | 50320 | ALAMEDA COUNTY MEDICAL CENTER | General Acute | - |
| 3 | 106010735 | 50211 | ALAMEDA HOSPITAL | General Acute | - |
| 4 | 106190017 | 50281 | ALHAMBRA HOSPITAL | General Acute | - |
| 5 | 106010739 | 50305 | ALTA BATES SUMMIT MED CTR-ALTA BATES CAMPUS | General Acute | - |
| 6 | 106010937 | 50043 | ALTA BATES SUMMIT MED CTR-SUMMIT CAMPUS-HAWTHORNE | General Acute | - |
| 7 | 106370652 | 50757 | ALVARADO HOSPITAL | General Acute | - |
| 8 | 106301097 | 50768 | ANAHEIM GENERAL HOSPITAL | General Acute | - |
| 9 | 106190034 | 50056 | ANTELOPE VALLEY HOSPITAL | General Acute | - |
| 10 | 106364231 | 50245 | ARROWHEAD REGIONAL MEDICAL CENTER | General Acute | - |
| 11 | 106400466 | 50016 | ARROYO GRANDE COMMUNITY HOSPITAL | General Acute | - |
| 12 | 106150722 | 50036 | BAKERSFIELD MEMORIAL HOSPITAL | General Acute | - |
| 13 | 106184008 | 51320 | BANNER LASSEN MEDICAL CENTER | General Acute | Small/Rural |
| 14 | 106361105 | 50298 | BARSTOW COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 15 | 106090793 | 50352 | BARTON MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 16 | 106361110 | 50618 | BEAR VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 17 | 106190066 | 50531 | BELLFLOWER MEDICAL CENTER | General Acute | - |
| 18 | 106190081 | 50350 | BEVERLY HOSPITAL | General Acute | - |
| 19 | 106040802 | 51311 | BIGGS-GRIDLEY MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 20 | 106190110 | 50752 | BROTMAN MEDICAL CENTER | General Acute | - |
| 21 | 106190125 | 50149 | CALIFORNIA HOSPITAL MEDICAL CENTER | General Acute | - |
| 22 | 106380929 | 50047 | CALIFORNIA PACIFIC MEDICAL CENTER | General Acute | - |
| 23 | 106380964 | 50055 | CALIFORNIA PACIFIC MEDICAL CTN-ST. LUKE'S CAMPUS | General Acute | - |
| 24 | 106190045 | 51307 | CATALINA ISLAND MEDICAL CENTER | General Acute | Small/Rural |
| 25 | 106190555 | 50625 | CEDARS-SINAI MEDICAL CENTER | General Acute | - |
| 26 | 106190148 | 50739 | CENTINELA HOSPITAL MEDICAL CENTER | General Acute | - |
| 27 | 106160787 | 50196 | CENTRAL VALLEY GENERAL HOSPITAL | General Acute | - |
| 28 | 106301140 | 50745 | CHAPMAN MEDICAL CENTER | General Acute | - |
| 29 | 106010776 | 53301 | CHILDRENS HOSPITAL & RESEARCH CENTER AT OAKLAND | General Acute | - |
| 30 | 106304113 | 53306 | CHILDREN'S HOSPITAL AT MISSION | General Acute | - |
| 31 | 106204019 | 53300 | CHILDREN'S HOSPITAL CENTRAL CALIFORNIA | General Acute | - |
| 32 | 106190170 | 53302 | CHILDREN'S HOSPITAL OF LOS ANGELES | General Acute | - |
| 33 | 106300032 | 53304 | CHILDREN'S HOSPITAL OF ORANGE COUNTY | General Acute | - |
| 34 | 106434051 | #N/A | CHILDRENS RECOVERY CENTER OF NORTHERN CALIFORNIA | General Acute | - |
| 35 | 106382715 | 50407 | CHINESE HOSPITAL | General Acute | - |
| 36 | 106361144 | 50586 | CHINO VALLEY MEDICAL CENTER | General Acute | - |
| 37 | 106190636 | 50382 | CITRUS VALLEY MEDICAL CENTER - QV CAMPUS | General Acute | - |
| 38 | 106190176 | 50146 | CITY OF HOPE HELFORD CLINICAL RESEARCH HOSPITAL | General Acute | - |
| 39 | 106100005 | 50492 | CLOVIS COMMUNITY MEDICAL CENTER | General Acute | - |
| 40 | 106100697 | 50397 | COALINGA REGIONAL MEDICAL CENTER | General Acute | Small/Rural |
| 41 | 106190766 | 50219 | COAST PLAZA DOCTORS HOSPITAL | General Acute | - |
| 42 | 106301258 | 50747 | COASTAL COMMUNITIES HOSPITAL | General Acute | - |
| 43 | 106301155 | 50543 | COLLEGE HOSPITAL COSTA MESA | General Acute | - |
| 44 | 106361468 | 51323 | COLORADO RIVER MEDICAL CENTER | General Acute | Small/Rural |
| 45 | 106060870 | 50434 | COLUSA REGIONAL MEDICAL CENTER | General Acute | Small/Rural |
| 46 | 106190197 | 50091 | COMMUNITY & MISSION HOSPITALS OF HUNTINGTON PARK | General Acute | - |
| 47 | 106190475 | 50727 | COMMUNITY HOSPITAL OF LONG BEACH | General Acute | - |
| 48 | 106430743 | 50188 | COMMUNITY HOSPITAL OF LOS GATOS | General Acute | 1 |
| 49 | 106361323 | 50089 | COMMUNITY HOSPITAL OF SAN BERNARDINO | General Acute | - |
| 50 | 106270744 | 50145 | COMMUNITY HOSPITAL OF THE MONTEREY PENINSULA | General Acute | - |
| 51 | 106560473 | 50394 | COMMUNITY MEMORIAL HOSPITAL - SAN BUENAVENTURA | General Acute | - |
| 52 | 106100717 | 50060 | COMMUNITY REGIONAL MEDICAL CENTER | General Acute | - |
| 53 | 106070924 | 50276 | CONTRA COSTA REGIONAL MEDICAL CENTER | General Acute | - |
| 54 | 106160702 | 50349 | CORCORAN DISTRICT HOSPITAL | General Acute | Small/Rural |
| 55 | 106331152 | 50329 | CORONA REGIONAL MEDICAL CENTER - MAIN | General Acute | - |
| 56 | 106390846 | 50122 | DAMERON HOSPITAL | General Acute | - |
| 57 | 106150706 | 50608 | DELANO REGIONAL MEDICAL CENTER | General Acute | - |
| 58 | 106331164 | 50243 | DESERT REGIONAL MEDICAL CENTER | General Acute | - |
| 59 | 106364144 | 50709 | DESERT VALLEY HOSPITAL | General Acute | - |
| 60 | 106392287 | 50118 | DOCTORS HOSPITAL OF MANTECA | General Acute | - |
| 61 | 106190857 | 50096 | DOCTORS HOSPITAL OF WEST COVINA | General Acute | - |
| 62 | 106500852 | 50464 | DOCTORS MEDICAL CENTER | General Acute | - |
| 63 | 106070904 | 50079 | DOCTORS MEDICAL CENTER - SAN PABLO | General Acute | - |
| 64 | 106440755 | 50242 | DOMINICAN SANTA CRUZ HOSPITAL - SOQUEL | General Acute | - |
| 65 | 106190243 | 50393 | DOWNEY REGIONAL MEDICAL CENTER | General Acute | - |
| 66 | 106196168 | 53309 | EARL & LORRAINE MILLER CHILDRENS HOSPITAL | General Acute | - |
| 67 | 106190256 | 50641 | EAST LOS ANGELES DOCTOR'S HOSPITAL | General Acute | - |
| 68 | 106190328 | 50205 | EAST VALLEY HOSPITAL MEDICAL CENTER | General Acute | - |
| 69 | 106320859 | 51300 | EASTERN PLUMAS HEALTH CARE | General Acute | Small/Rural |
| 70 | 106010805 | 50488 | EDEN MEDICAL CENTER | General Acute | - |
| 71 | 106331168 | 50573 | EISENHOWER MEDICAL CENTER | General Acute | - |
| 72 | 106430763 | 50308 | EL CAMINO HOSPITAL | General Acute | - |
| 73 | 106130699 | 50045 | EL CENTRO REGIONAL MEDICAL CENTER | General Acute | - |

0709

JA 114

00212

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 74 | 106500867 | 50179 | EMANUEL MEDICAL CENTER | General Acute | - |
| 75 | 106190280 | 50158 | ENCINO HOSPITAL MEDICAL CENTER | General Acute | - |
| 76 | 106040962 | 50039 | ENLOE MEDICAL CENTER - ESPLANADE CAMPUS | General Acute | - |
| 77 | 106474007 | 51316 | FAIRCHILD MEDICAL CENTER | General Acute | Small/Rural |
| 78 | 106370705 | 50435 | FALLBROOK HOSPITAL DISTRICT | General Acute | Small/Rural |
| 79 | 106040875 | 50225 | FEATHER RIVER HOSPITAL | General Acute | - |
| 80 | 106190298 | 50597 | FOOTHILL PRESBYTERIAN HOSPITAL | General Acute | - |
| 81 | 106301175 | 50570 | FOUNTAIN VALLEY REGIONAL HOSPITAL& MEDICAL CENTER- EUCLID | General Acute | - |
| 82 | 106230949 | 51310 | FRANK R HOWARD MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 83 | 106400480 | 50232 | FRENCH HOSPITAL MEDICAL CENTER | General Acute | - |
| 84 | 106105029 | 50732 | FRESNO HEART & SURGICAL HOSPITAL | General Acute | - |
| 85 | 106301283 | 50230 | GARDEN GROVE HOSPITAL & MEDICAL CENTER | General Acute | - |
| 86 | 106190315 | 50737 | GARFIELD MEDICAL CENTER | General Acute | - |
| 87 | 106270777 | 50189 | GEORGE L. MEE MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 88 | 106190323 | 50239 | GLENDALE ADVENTIST MEDICAL CENTER | General Acute | - |
| 89 | 106190522 | 50058 | GLENDALE MEMORIAL HOSPITAL AND HEALTH CENTER | General Acute | - |
| 90 | 106110889 | 51306 | GLENN MEDICAL CENTER | General Acute | Small/Rural |
| 91 | 106420483 | 50357 | GOLETA VALLEY COTTAGE HOSPITAL | General Acute | - |
| 92 | 106150775 | 50257 | GOOD SAMARITAN HOSPITAL | General Acute | - |
| 93 | 106190392 | 50471 | GOOD SAMARITAN HOSPITAL- LA | General Acute | - |
| 94 | 106430779 | 50380 | GOOD SAMARITAN HOSPITAL- SAN JOSE | General Acute | - |
| 95 | 106190352 | 50738 | GREATER EL MONTE COMMUNITY HOSPITAL | General Acute | - |
| 96 | 106160725 | 50121 | HANFORD COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 97 | 106350784 | 50296 | HAZEL HAWKINS MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 98 | 106490964 | 51321 | HEALDSBURG DISTRICT HOSPITAL | General Acute | Small/Rural |
| 99 | 106304159 | 53308 | HEALTHBRIDGE CHILDREN'S HOSPITAL-ORANGE | General Acute | - |
| 100 | 106331194 | 50390 | HEMET VALLEY MEDICAL CENTER | General Acute | - |
| 101 | 106190949 | 50624 | HENRY MAYO NEWHALL MEMORIAL HOSPITAL | General Acute | - |
| 102 | 106362041 | 50279 | HI-DESERT MEDICAL CENTER | General Acute | - |
| 103 | 106301205 | 50224 | HOAG MEMORIAL HOSPITAL PRESBYTERIAN | General Acute | - |
| 104 | 106190380 | 50135 | HOLLYWOOD COMMUNITY HOSPITAL OF HOLLYWOOD | General Acute | - |
| 105 | 106190382 | 50063 | HOLLYWOOD PRESBYTERIAN MEDICAL CENTER | General Acute | - |
| 106 | 106301209 | 50526 | HUNTINGTON BEACH HOSPITAL | General Acute | - |
| 107 | 106190400 | 50438 | HUNTINGTON MEMORIAL HOSPITAL | General Acute | - |
| 108 | 106121031 | 51309 | JEROLD PHELPS COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 109 | 106220733 | 51304 | JOHN C FREMONT HEALTHCARE DISTRICT | General Acute | Small/Rural |
| 110 | 106331216 | 50534 | JOHN F. KENNEDY MEMORIAL HOSPITAL | General Acute | - |
| 111 | 106071018 | 50496 | JOHN MUIR MEDICAL CENTER-CONCORD CAMPUS | General Acute | - |
| 112 | 108070988 | 50180 | JOHN MUIR MEDICAL CENTER-WALNUT CREEK CAMPUS | General Acute | - |
| 113 | 106190430 | 50139 | KAISER FDN HOSP - BELLFLOWER | General Acute | - |
| 114 | 106301132 | 50609 | KAISER FOUNDATION HOSPITAL - ANAHEIM | General Acute | - |
| 115 | 106074097 | 50760 | KAISER FOUNDATION HOSPITAL - ANTIOCH | General Acute | - |
| 116 | 106196035 | 50723 | KAISER FOUNDATION HOSPITAL - BALDWIN PARK | General Acute | - |
| 117 | 106196403 | #N/A | KAISER FOUNDATION HOSPITAL - DOWNEY | General Acute | - |
| 118 | 106361223 | 50140 | KAISER FOUNDATION HOSPITAL - FONTANA | General Acute | - |
| 119 | 106104062 | 50710 | KAISER FOUNDATION HOSPITAL - FRESNO | General Acute | - |
| 120 | 106380857 | 50076 | KAISER FOUNDATION HOSPITAL - GEARY (S.F.) | General Acute | - |
| 121 | 106190431 | 50411 | KAISER FOUNDATION HOSPITAL - HARBOR CITY | General Acute | - |
| 122 | 106010858 | 50512 | KAISER FOUNDATION HOSPITAL - HAYWARD | General Acute | - |
| 123 | 106394009 | 50748 | KAISER FOUNDATION HOSPITAL - MANTECA | General Acute | - |
| 124 | 106334048 | 50694 | KAISER FOUNDATION HOSPITAL - MORENO VALLEY | General Acute | - |
| 125 | 106010856 | 50075 | KAISER FOUNDATION HOSPITAL - OAKLAND CAMPUS | General Acute | - |
| 126 | 106190432 | 50137 | KAISER FOUNDATION HOSPITAL - PANORAMA CITY | General Acute | - |
| 127 | 106410804 | 50541 | KAISER FOUNDATION HOSPITAL - REDWOOD CITY | General Acute | - |
| 128 | 106340025 | 50686 | KAISER FOUNDATION HOSPITAL - RIVERSIDE | General Acute | - |
| 129 | 106340913 | 50425 | KAISER FOUNDATION HOSPITAL - SACRAMENTO/ROSEVILLE | General Acute | - |
| 130 | 106370730 | 50515 | KAISER FOUNDATION HOSPITAL - SAN DIEGO | General Acute | - |
| 131 | 106431506 | 50604 | KAISER FOUNDATION HOSPITAL - SAN JOSE | General Acute | - |
| 132 | 106210992 | 50510 | KAISER FOUNDATION HOSPITAL - SAN RAFAEL | General Acute | - |
| 133 | 106434153 | 50071 | KAISER FOUNDATION HOSPITAL - SANTA CLARA | General Acute | - |
| 134 | 106494019 | 50690 | KAISER FOUNDATION HOSPITAL - SANTA ROSA | General Acute | - |
| 135 | 106342344 | 50674 | KAISER FOUNDATION HOSPITAL - SOUTH SACRAMENTO | General Acute | - |
| 136 | 106410806 | 50070 | KAISER FOUNDATION HOSPITAL - SOUTH SAN FRANCISCO | General Acute | - |
| 137 | 106190429 | 50138 | KAISER FOUNDATION HOSPITAL - SUNSET | General Acute | - |
| 138 | 106484044 | 50767 | KAISER FOUNDATION HOSPITAL - VACAVILLE | General Acute | - |
| 139 | 106070990 | 50072 | KAISER FOUNDATION HOSPITAL - WALNUT CREEK | General Acute | - |
| 140 | 106190434 | 50561 | KAISER FOUNDATION HOSPITAL - WEST LA | General Acute | - |
| 141 | 106191450 | 50677 | KAISER FOUNDATION HOSPITAL - WOODLAND HILLS | General Acute | - |
| 142 | 106480989 | 50073 | KAISER FOUNDATION HOSPITAL AND REHABILITATION CENTER - VALLEJ | General Acute | - |
| 143 | 106015000 | #N/A | KAISER FOUNDATION NORTHERN REGION | General Acute | - |
| 144 | 106191300 | #N/A | KAISER FOUNDATION SOUTHERN REGION | General Acute | - |
| 145 | 106540734 | 50057 | KAWEAH DELTA MEDICAL CENTER | General Acute | - |
| 146 | 106150736 | 50315 | KERN MEDICAL CENTER | General Acute | - |
| 147 | 106150737 | 51314 | KERN VALLEY HEALTHCARE DISTRICT | General Acute | Small/Rural |
| 148 | 106301127 | 52039 | KINDRED HOSPITAL - BREA | General Acute | - |
| 149 | 106190449 | 52038 | KINDRED HOSPITAL - LA MIRADA | General Acute | - |
| 150 | 106190305 | 52032 | KINDRED HOSPITAL - LOS ANGELES | General Acute | - |

0710

**JA 115**

00213

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 151 | 106361274 | 52037 | KINDRED HOSPITAL - ONTARIO | General Acute | - |
| 152 | 106344035 | 52033 | KINDRED HOSPITAL – SACRAMENTO | General Acute | - |
| 153 | 106370721 | 52036 | KINDRED HOSPITAL - SAN DIEGO | General Acute | - |
| 154 | 106010887 | 52034 | KINDRED HOSPITAL - SAN FRANCISCO BAY AREA | General Acute | - |
| 155 | 106301380 | 52035 | KINDRED HOSPITAL - WESTMINSTER | General Acute | - |
| 156 | 106100745 | 50682 | KINGSBURG MEDICAL HOSPITAL | General Acute | Small/Rural |
| 157 | 106194981 | #N/A | LA CASA PSYCHIATRIC HEALTH FACILITY | General Acute | - |
| 158 | 106301234 | 50580 | LA PALMA INTERCOMMUNITY HOSPITAL | General Acute | - |
| 159 | 106191227 | 50376 | LAC/HARBOR-UCLA MEDICAL CENTER | General Acute | - |
| 160 | 106191231 | 50040 | LAC/OLIVE VIEW-UCLA MEDICAL CENTER | General Acute | - |
| 161 | 106191306 | 50717 | LAC/RANCHO LOS AMIGOS NATIONAL REHABILITATION CTR | General Acute | - |
| 162 | 106191228 | 50373 | LAC/USC MEDICAL CENTER | General Acute | - |
| 163 | 106380865 | 50668 | LAGUNA HONDA HOSP & REHAB CENTER | General Acute | - |
| 164 | 106190240 | 50581 | LAKEWOOD REGIONAL MEDICAL CENTER | General Acute | - |
| 165 | 106190455 | 50204 | LANCASTER COMMUNITY HOSPITAL | General Acute | - |
| 166 | 106390923 | 50336 | LODI MEMORIAL HOSPITAL | General Acute | - |
| 167 | 106361246 | 50327 | LOMA LINDA UNIVERSITY MEDICAL CENTER | General Acute | - |
| 168 | 106420491 | 50110 | LOMPOC VALLEY MEDICAL CENTER | General Acute | Small/Rural |
| 169 | 106190525 | 50485 | LONG BEACH MEMORIAL MEDICAL CENTER | General Acute | - |
| 170 | 106301248 | 50551 | LOS ALAMITOS MEDICAL CENTER | General Acute | - |
| 171 | 106190198 | 50663 | LOS ANGELES COMMUNITY HOSPITAL | General Acute | - |
| 172 | 106190854 | 50644 | LOS ANGELES METROPOLITAN MEDICAL CENTER | General Acute | - |
| 173 | 106560492 | 50549 | LOS ROBLES HOSPITAL & MEDICAL CENTER | General Acute | - |
| 174 | 106434040 | 53305 | LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD | General Acute | - |
| 175 | 106121002 | 50028 | MAD RIVER COMMUNITY HOSPITAL | General Acute | - |
| 176 | 106201281 | 50568 | MADERA COMMUNITY HOSPITAL | General Acute | - |
| 177 | 106260011 | 51303 | MAMMOTH HOSPITAL | General Acute | Small/Rural |
| 178 | 106420493 | 50107 | MARIAN MEDICAL CENTER | General Acute | - |
| 179 | 106211006 | 50360 | MARIN GENERAL HOSPITAL | General Acute | - |
| 180 | 106190500 | 50740 | MARINA DEL REY HOSPITAL | General Acute | - |
| 181 | 106050932 | 50366 | MARK TWAIN ST. JOSEPH'S HOSPITAL | General Acute | Small/Rural |
| 182 | 106090933 | 50254 | MARSHALL MEDICAL CENTER | General Acute | Small/Rural |
| 183 | 106450936 | 51305 | MAYERS MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 184 | 106240924 | 50528 | MEMORIAL HOSPITAL LOS BANOS | General Acute | Small/Rural |
| 185 | 106500939 | 50557 | MEMORIAL HOSPITAL MODESTO | General Acute | - |
| 186 | 106190521 | 50468 | MEMORIAL HOSPITAL OF GARDENA | General Acute | - |
| 187 | 106231013 | 50569 | MENDOCINO COAST DISTRICT HOSPTIAL | General Acute | - |
| 188 | 106334018 | 50684 | MENIFEE VALLEY MEDICAL CENTER | General Acute | - |
| 189 | 106414018 | 50754 | MENLO PARK SURGICAL HOSPITAL | General Acute | - |
| 190 | 106340947 | 50017 | MERCY GENERAL HOSPITAL | General Acute | - |
| 191 | 106150761 | 50295 | MERCY HOSPITAL - BAKERSFIELD | General Acute | - |
| 192 | 106344029 | 50414 | MERCY HOSPITAL - FOLSOM | General Acute | - |
| 193 | 106470871 | 51319 | MERCY HOSPITAL OF MT. SHASTA | General Acute | Small/Rural |
| 194 | 106450949 | 50280 | MERCY MEDICAL CENTER | General Acute | - |
| 195 | 106240942 | 50444 | MERCY MEDICAL CENTER MERCED - COMMUNITY CAMPUS | General Acute | - |
| 196 | 106340950 | 50516 | MERCY SAN JUAN HOSPITAL | General Acute | - |
| 197 | 106340951 | 50590 | METHODIST HOSPITAL OF SACRAMENTO | General Acute | - |
| 198 | 106190529 | 50238 | METHODIST HOSPITAL OF SOUTHERN CALIFORNIA | General Acute | - |
| 199 | 106190681 | 50751 | MIRACLE MILE MEDICAL CENTER | General Acute | - |
| 200 | 106190524 | 50704 | MISSION COMMUNITY HOSPITAL - PANORAMA CAMPUS | General Acute | - |
| 201 | 106301262 | 50567 | MISSION HOSPITAL REGIONAL MEDICAL CENTER | General Acute | - |
| 202 | 106250956 | 50430 | MODOC MEDICAL CENTER | General Acute | Small/Rural |
| 203 | 106190541 | 52054 | MONROVIA MEMORIAL HOSPITAL | General Acute | - |
| 204 | 106361166 | 50758 | MONTCLAIR HOSPITAL MEDICAL CENTER | General Acute | - |
| 205 | 106190547 | 50736 | MONTEREY PARK HOSPITAL | General Acute | - |
| 206 | 106190552 | #N/A | MOTION PICTURE & TELEVISION HOSPITAL | General Acute | - |
| 207 | 106361266 | 51312 | MOUNTAINS COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 208 | 106274043 | 50248 | NATIVIDAD MEDICAL CENTER | General Acute | - |
| 209 | 106301357 | 52053 | NEWPORT SPECIALTY HOSPITAL | General Acute | - |
| 210 | 106481357 | 50367 | NORTH BAY MEDICAL CENTER | General Acute | - |
| 211 | 106141273 | 51324 | NORTHERN INYO HOSPITAL | General Acute | Small/Rural |
| 212 | 106190568 | 50116 | NORTHRIDGE HOSPITAL MEDICAL CENTER | General Acute | - |
| 213 | 106214034 | 50131 | NOVATO COMMUNITY HOSPITAL | General Acute | - |
| 214 | 106500967 | 50067 | OAK VALLEY DISTRICT HOSPITAL | General Acute | Small/Rural |
| 215 | 106430837 | 50153 | O'CONNOR HOSPITAL | General Acute | - |
| 216 | 106560501 | 50046 | OJAI VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 217 | 106190534 | 50742 | OLYMPIA MEDICAL CENTER | General Acute | - |
| 218 | 106300225 | 50678 | ORANGE COAST MEMORIAL MEDICAL CENTER | General Acute | - |
| 219 | 106040937 | 50030 | OROVILLE HOSPITAL | General Acute | - |
| 220 | 106190307 | 50018 | PACIFIC ALLIANCE MEDICAL CENTER | General Acute | - |
| 221 | 106190587 | 50277 | PACIFIC HOSPITAL OF LONG BEACH | General Acute | - |
| 222 | 106190696 | 50378 | PACIFICA HOSPITAL OF THE VALLEY | General Acute | - |
| 223 | 106491338 | 50385 | PALM DRIVE HOSPITAL | General Acute | Small/Rural |
| 224 | 106331288 | 50423 | PALO VERDE HOSPITAL | General Acute | Small/Rural |
| 225 | 106370755 | 50115 | PALOMAR MEDICAL CENTER | General Acute | - |
| 226 | 106370759 | 50024 | PARADISE VALLEY HOSPITAL | General Acute | - |
| 227 | 106331293 | 50102 | PARKVIEW COMMUNITY HOSPITAL | General Acute | - |

0711

JA 116

00214

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 228 | 106410852 | 50007 | PENINSULA MEDICAL CENTER | General Acute | - |
| 229 | 106491001 | 50136 | PETALUMA VALLEY HOSPITAL | General Acute | - |
| 230 | 106130760 | 50342 | PIONEERS MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 231 | 106301297 | 50589 | PLACENTIA-LINDA COMMUNITY HOSPITAL | General Acute | - |
| 232 | 106320986 | 51326 | PLUMAS DISTRICT HOSPITAL | General Acute | Small/Rural |
| 233 | 106370977 | 50636 | POMERADO HOSPITAL | General Acute | - |
| 234 | 106190630 | 50231 | POMONA VALLEY HOSPITAL MEDICAL CENTER | General Acute | - |
| 235 | 106190631 | 50169 | PRESBYTERIAN INTERCOMMUNITY HOSPITAL | General Acute | - |
| 236 | 106190599 | 52046 | PROMISE HOSPITAL OF EAST LOS ANGELES | General Acute | - |
| 237 | 106190385 | 50278 | PROVIDENCE HOLY CROSS MEDICAL CENTER | General Acute | - |
| 238 | 106190680 | 50078 | PROVIDENCE LITTLE CO OF MARY-SAN PEDRO | General Acute | - |
| 239 | 106190470 | 50353 | PROVIDENCE LITTLE CO OF MARY-TORRANCE | General Acute | - |
| 240 | 106190758 | 50235 | PROVIDENCE SAINT JOSEPH MEDICAL CENTER | General Acute | - |
| 241 | 106190517 | 50761 | PROVIDENCE TARZANA MEDICAL CENTER | General Acute | - |
| 242 | 106281047 | 50009 | QUEEN OF THE VALLEY HOSPITAL | General Acute | - |
| 243 | 106370673 | 53303 | RADY CHILDREN'S HOSPITAL - SAN DIEGO | General Acute | - |
| 244 | 106364188 | 52049 | RANCHO SPECIALTY HOSPITAL | General Acute | - |
| 245 | 106361308 | 50272 | REDLANDS COMMUNITY HOSPITAL | General Acute | - |
| 246 | 106121051 | 51318 | REDWOOD MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 247 | 106430705 | 50125 | REGIONAL MEDICAL CENTER OF SAN JOSE | General Acute | - |
| 248 | 106580996 | 50133 | RIDEOUT MEMORIAL HOSPITAL | General Acute | - |
| 249 | 106150782 | 50448 | RIDGECREST REGIONAL HOSPITAL | General Acute | Small/Rural |
| 250 | 106331312 | 50022 | RIVERSIDE COMMUNITY HOSPITAL | General Acute | - |
| 251 | 106334487 | 50292 | RIVERSIDE COUNTY REGIONAL MEDICAL CENTER | General Acute | - |
| 252 | 106190796 | 50262 | RONALD REAGAN UCLA MEDICAL CENTER | General Acute | - |
| 253 | 106301317 | 50603 | SADDLEBACK MEMORIAL MEDICAL CENTER | General Acute | - |
| 254 | 106270875 | 50334 | SALINAS VALLEY MEMORIAL HOSPITAL | General Acute | - |
| 255 | 106361318 | 50099 | SAN ANTONIO COMMUNITY HOSPITAL | General Acute | - |
| 256 | 106190673 | 50588 | SAN DIMAS COMMUNITY HOSPITAL | General Acute | - |
| 257 | 106380939 | 50228 | SAN FRANCISCO GENERAL HOSPITAL MEDICAL CENTER | General Acute | - |
| 258 | 106190200 | 50132 | SAN GABRIEL VALLEY MEDICAL CENTER | General Acute | - |
| 259 | 106331326 | 50054 | SAN GORGONIO MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 260 | 106150788 | 50455 | SAN JOAQUIN COMMUNITY HOSPITAL | General Acute | - |
| 261 | 106391010 | 50167 | SAN JOAQUIN GENERAL HOSPITAL | General Acute | - |
| 262 | 106410782 | 50113 | SAN MATEO MEDICAL CENTER | General Acute | - |
| 263 | 106074017 | 50689 | SAN RAMON REGIONAL MEDICAL CENTER | General Acute | - |
| 264 | 106420514 | 50396 | SANTA BARBARA COTTAGE HOSPITAL | General Acute | - |
| 265 | 106430883 | 50038 | SANTA CLARA VALLEY MEDICAL CENTER | General Acute | - |
| 266 | 106190687 | 50112 | SANTA MONICA-UCLA MEDICAL CENTER & ORTHOPAEDIC HOSPITAL | General Acute | - |
| 267 | 106491064 | 50174 | SANTA ROSA MEMORIAL HOSPITAL | General Acute | - |
| 268 | 106420522 | 50478 | SANTA YNEZ VALLEY COTTAGE HOSPITAL | General Acute | Small/Rural |
| 269 | 106371256 | 50424 | SCRIPPS GREEN HOSPITAL | General Acute | - |
| 270 | 106371394 | 50503 | SCRIPPS MEMORIAL HOSPITAL - ENCINITAS | General Acute | - |
| 271 | 106370744 | 50077 | SCRIPPS MERCY HOSPITAL | General Acute | - |
| 272 | 106321016 | 50333 | SENECA HEALTHCARE DISTRICT | General Acute | Small/Rural |
| 273 | 106410891 | 50197 | SEQUOIA HOSPITAL | General Acute | - |
| 274 | 106410817 | 50289 | SETON MEDICAL CENTER | General Acute | - |
| 275 | 106370875 | 50222 | SHARP CHULA VISTA MEDICAL CENTER | General Acute | - |
| 276 | 106370689 | 50234 | SHARP CORONADO HOSPITAL & HEALTHCARE CENTER | General Acute | - |
| 277 | 106370714 | 50026 | SHARP GROSSMONT HOSPITAL | General Acute | - |
| 278 | 106370695 | 50722 | SHARP MARY BIRCH HOSPITAL FOR WOMEN | General Acute | - |
| 279 | 106370694 | 50100 | SHARP MEMORIAL HOSPITAL | General Acute | - |
| 280 | 106450940 | 50764 | SHASTA REGIONAL MEDICAL CENTER | General Acute | - |
| 281 | 106190708 | 50755 | SHERMAN OAKS HOSPITAL & HEALTH CENTER | General Acute | - |
| 282 | 106190712 | #N/A | SHRINERS HOSPITAL FOR CHILDREN- LOS ANGELES | General Acute | - |
| 283 | 106344114 | #N/A | SHRINERS HOSPITALS FOR CHILDREN NORTHERN CALIFORNIA | General Acute | - |
| 284 | 106100797 | 50192 | SIERRA KINGS DISTRICT HOSPITAL | General Acute | Small/Rural |
| 285 | 106291023 | 50150 | SIERRA NEVADA MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 286 | 106540798 | 50261 | SIERRA VIEW DISTRICT HOSPITAL | General Acute | - |
| 287 | 106400524 | 50506 | SIERRA VISTA REGIONAL MEDICAL CENTER | General Acute | - |
| 288 | 106190661 | 50763 | SILVER LAKE MEDICAL CENTER | General Acute | - |
| 289 | 106560525 | 50236 | SIMI VALLEY HOSPITAL & HEALTH CARE SERVICES - SYCAMORE | General Acute | - |
| 290 | 106491076 | 50090 | SONOMA VALLEY HOSPITAL | General Acute | Small/Rural |
| 291 | 106540011 | 50335 | SONORA REGIONAL MEDICAL CENTER-GREENLEY | General Acute | Small/Rural |
| 292 | 106301337 | 50193 | SOUTH COAST MEDICAL CENTER | General Acute | - |
| 293 | 106141338 | 51302 | SOUTHERN INYO HOSPITAL | General Acute | Small/Rural |
| 294 | 106334068 | 50701 | SOUTHWEST HEALTHCARE SYSTEM - MURRIETA | General Acute | - |
| 295 | 106100899 | 50093 | ST. AGNES MEDICAL CENTER | General Acute | - |
| 296 | 106361339 | 50129 | ST. BERNARDINE MEDICAL CENTER | General Acute | - |
| 297 | 106521041 | 50042 | ST. ELIZABETH COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 298 | 106190754 | 50104 | ST. FRANCIS MEDICAL CENTER | General Acute | - |
| 299 | 106380960 | 50152 | ST. FRANCIS MEMORIAL HOSPITAL | General Acute | - |
| 300 | 106281078 | 50013 | ST. HELENA HOSPITAL | General Acute | - |
| 301 | 106171049 | 51317 | ST. HELENA HOSPITAL - CLEARLAKE | General Acute | Small/Rural |
| 302 | 106190756 | 50290 | ST. JOHN'S HEALTH CENTER | General Acute | - |
| 303 | 106560508 | 50616 | ST. JOHN'S PLEASANT VALLEY HOSPITAL | General Acute | - |
| 304 | 106560529 | 50082 | ST. JOHN'S REGIONAL MEDICAL CENTER | General Acute | - |

0712

JA 117

00215

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 305 | 106121080 | 50006 | ST. JOSEPH HOSPITAL - EUREKA | General Acute | - |
| 306 | 106301340 | 50069 | ST. JOSEPH HOSPITAL - ORANGE | General Acute | - |
| 307 | 106391042 | 50084 | ST. JOSEPH'S MEDICAL CENTER OF STOCKTON | General Acute | - |
| 308 | 106301342 | 50168 | ST. JUDE MEDICAL CENTER | General Acute | - |
| 309 | 106434138 | 50688 | ST. LOUISE REGIONAL HOSPITAL | General Acute | - |
| 310 | 106361343 | 50300 | ST. MARY MEDICAL CENTER - APPLE VALLEY | General Acute | Small/Rural |
| 311 | 106190053 | 50191 | ST. MARY MEDICAL CENTER - LOS ANGELES | General Acute | - |
| 312 | 106380965 | 50457 | ST. MARY'S MEDICAL CENTER-SAN FRANCISCO | General Acute | - |
| 313 | 106010967 | 50002 | ST. ROSE HOSPITAL | General Acute | - |
| 314 | 106190762 | 50502 | ST. VINCENT MEDICAL CENTER | General Acute | - |
| 315 | 106430905 | 50441 | STANFORD UNIVERSITY HOSPITAL | General Acute | - |
| 316 | 106250955 | 51308 | SURPRISE VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 317 | 106034002 | 50014 | SUTTER AMADOR HOSPITAL | General Acute | Small/Rural |
| 318 | 106310791 | 50498 | SUTTER AUBURN FAITH HOSPITAL | General Acute | - |
| 319 | 106084001 | 50417 | SUTTER COAST HOSPITAL | General Acute | Small/Rural |
| 320 | 106574010 | 50537 | SUTTER DAVIS HOSPITAL | General Acute | - |
| 321 | 106070934 | 50523 | SUTTER DELTA MEDICAL CENTER | General Acute | - |
| 322 | 106171395 | 51329 | SUTTER LAKESIDE HOSPITAL | General Acute | Small/Rural |
| 323 | 106444012 | 50714 | SUTTER MATERNITY & SURGERY CENTER OF SANTA CRUZ | General Acute | - |
| 324 | 106341051 | 50108 | SUTTER MEDICAL CENTER - SACRAMENTO | General Acute | - |
| 325 | 106490919 | 50291 | SUTTER MEDICAL CENTER OF SANTA ROSA | General Acute | - |
| 326 | 106311000 | 50309 | SUTTER ROSEVILLE MEDICAL CENTER | General Acute | - |
| 327 | 106481094 | 50101 | SUTTER SOLANO MEDICAL CENTER | General Acute | - |
| 328 | 106391056 | 50313 | SUTTER TRACY COMMUNITY HOSPITAL | General Acute | - |
| 329 | 106291053 | 50494 | TAHOE FOREST HOSPITAL | General Acute | Small/Rural |
| 330 | 106150808 | 51301 | TEHACHAPI HOSPITAL | General Acute | Small/Rural |
| 331 | 106190784 | 50111 | TEMPLE COMMUNITY HOSPITAL | General Acute | - |
| 332 | 106190422 | 50351 | TORRANCE MEMORIAL MEDICAL CENTER | General Acute | - |
| 333 | 106370780 | 50128 | TRI-CITY MEDICAL CENTER | General Acute | - |
| 334 | 106190159 | 50575 | TRI-CITY REGIONAL MEDICAL CENTER | General Acute | - |
| 335 | 106531059 | 51315 | TRINITY HOSPITAL | General Acute | Small/Rural |
| 336 | 106540816 | 50359 | TULARE DISTRICT HOSPITAL | General Acute | - |
| 337 | 106551061 | #N/A | TUOLUMNE GENERAL MEDICAL FACILITY | General Acute | Small/Rural |
| 338 | 106400548 | 50633 | TWIN CITIES COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 339 | 106381154 | 50454 | UCSF MEDICAL CENTER | General Acute | - |
| 340 | 106231396 | 50301 | UKIAH VALLEY MEDICAL CENTER - HOSPITAL DRIVE | General Acute | Small/Rural |
| 341 | 106370782 | 50025 | UNIVERSITY OF CALIF - SAN DIEGO MEDICAL CENTER | General Acute | - |
| 342 | 106341006 | 50599 | UNIVERSITY OF CALIFORNIA DAVIS MEDICAL CENTER | General Acute | - |
| 343 | 106301279 | 50348 | UNIVERSITY OF CALIFORNIA IRVINE MEDICAL CENTER | General Acute | - |
| 344 | 106194219 | 50696 | USC UNIVERSITY HOSPITAL | General Acute | - |
| 345 | 106484001 | 50680 | VACA VALLEY HOSPITAL | General Acute | - |
| 346 | 106190812 | 50126 | VALLEY PRESBYTERIAN HOSPITAL | General Acute | - |
| 347 | 106014050 | 50283 | VALLEYCARE MEDICAL CENTER | General Acute | - |
| 348 | 106560481 | 50159 | VENTURA COUNTY MEDICAL CENTER | General Acute | - |
| 349 | 106190818 | 50124 | VERDUGO HILLS HOSPITAL | General Acute | - |
| 350 | 106361370 | 50517 | VICTOR VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 351 | 106190049 | 52045 | VISTA HOSPITAL OF SAN GABRIEL VALLEY | General Acute | - |
| 352 | 106010987 | 50195 | WASHINGTON HOSPITAL - FREMONT | General Acute | - |
| 353 | 106444013 | 50194 | WATSONVILLE COMMUNITY HOSPITAL | General Acute | - |
| 354 | 106301379 | 50426 | WEST ANAHEIM MEDICAL CENTER | General Acute | - |
| 355 | 106190859 | 50481 | WEST HILLS HOSPITAL & MEDICAL CENTER | General Acute | - |
| 356 | 106301188 | 50744 | WESTERN MEDICAL CENTER-ANAHEIM | General Acute | - |
| 357 | 106301566 | 50746 | WESTERN MEDICAL CENTER-SANTA ANA | General Acute | - |
| 358 | 106190878 | 50103 | WHITE MEMORIAL MEDICAL CENTER | General Acute | - |
| 359 | 106190883 | 50735 | WHITTIER HOSPITAL MEDICAL CENTER | General Acute | - |
| 360 | 106571086 | 50127 | WOODLAND MEMORIAL HOSPITAL | General Acute | - |

0713

JA 118

00216

P-55

00217

**Laurence D. Getzoff**

**Subject:**                    FW: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Tuesday, September 12, 2017 9:10 AM
**To:** Candice_LeTran
**Cc:** Laurence D. Getzoff
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Hi Candice –

This isn't an aid code crosswalk exactly, but what we have is the criteria our system uses to determine which of the three SSI/SSP aid codes we assign to a beneficiary based on the files we receive from SSA:

If the **multi-category indicator** value is '1', '5', 'E', 'N', 'R' or 'X', then aid code '10' is used.  (Aged)
If the **multi-category indicator** value is '2', '3', '6', '7', 'F', 'G', 'O', 'P', 'S', 'T', 'Y' or 'Z', then aid code '20' is used.  (Blind)
If the **multi-category indicator** value is '4', 'D', 'M', 'Q' or 'W', then aid code '60' is used. (Disabled)

If you don't know what these indicator values mean, you will need to get that information from SSA as it is their programming code.

I hope this helps.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
This e-mail and any attachments may contain information which is confidential, sensitive, privileged, proprietary or otherwise protected by law. The information is solely intended for the named recipients, other authorized individuals, or a person responsible for delivering it to the authorized recipients.  If you are not an authorized recipient of this message, you are not permitted to read, print, retain, copy or disseminate this message or any part of it. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete it from your e-mail inbox, including your deleted items folder.

0714

**JA 120**

00218

2

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES

RECEIVED

PROVIDER REIMBURSEMENT REVIEW BOARD

AUG 3 0 2017

PROVIDER REIMBURSEMENT
REVIEW BOARD

IN THE MATTER OF:

POMONA VALLEY HOSPITAL MEDICAL CENTER

CASE NO.   13-0430
                      13-0628
                      13-0680

VS.

NORIDIAN HEALTHCARE SOLUTIONS, LLC,
CAHABA SAFEGUARD ADMINISTRATORS, LLC

TRANSCRIPT OF PROCEEDINGS

AUGUST 17, 2017
8:50 A.M.
1508 WOODLAWN DRIVE
SUITE 100
BALTIMORE, MARYLAND

APPEARANCES

MEMBERS OF THE BOARD:
CLAYTON J. NIX, ACTING CHAIRMAN
CHARLOTTE F. BENSON, CPA
JACK AHERN, MBA, CHFP
GREGORY H. ZIEGLER

BOARD ADVISOR:
BECKY SHIREY

FOR THE PROVIDER:
LAURENCE D. GETZOFF, ESQUIRE

FOR THE INTERMEDIARY:
JERROD OLSZEWSKI, ESQUIRE

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

3

CONTENTS

|  | DIRECT | CROSS | BOARD |
|---|---|---|---|
| FOR THE PROVIDER: | | | |
| Candice LeTran | 45 | 117 | 119 |
| Tzvi Hefter | 205 | 243 | 245 |
| Stan Rosenstein | 270 | 285 | 334 |
|  |  |  | 330 |
| FOR THE INTERMEDIARY: | | | |
| [None] | | | |

***

EXHIBITS

|  | MARKED | ADMITTED |
|---|---|---|
| FOR THE PROVIDER: | | |
| 13-0430: | | |
| Final position paper | 8 | 15 |
| with Exhibits P1-P19 | | |
| 13-0628: | | |
| Final position paper | 8 | 15 |
| with Exhibits P1-P19 | | |
| 13-0680: | | |
| Final position paper | 8 | 15 |
| with Exhibits P1-P19 | | |

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

4

| 13-0430, 13-0628, 13-0680: | | |
|---|---|---|
| Consolidated Exhibits | 8 | 15 |
| P20-P39 | | |

|  | MARKED | ADMITTED |
|---|---|---|
| FOR THE INTERMEDIARY: | | |
| 13-0430: | | |
| Final position paper | 15 | 16 |
| with Exhibits I1-I10 | | |
| 13-0628: | | |
| Final position paper | 15 | 16 |
| with Exhibits I1-I9 | | |
| 13-0680: | | |
| Final position paper | 15 | 16 |
| with Exhibits I1-I10 | | |

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 121**

00339

41

1  and CMS, and that it is
2  inappropriate to use data from
3  California's Medi-Cal system
4  because it's a secondary
5  source.  CMS revised its
6  process for matching Medicare
7  and SSI eligibility data, and
8  published it in the August 16,
9  2010, Federal Register.  In
10  the Federal Register, CMS
11  responded to comments
12  regarding the revised process
13  and stated "SSI entitlement
14  can change from time to time,
15  and we believe that including
16  SSI codes of C01, M01, and M02
17  accurately captures all SSI-
18  entitled individuals during
19  the month or months that they
20  are entitled to receive SSI
21  benefits."  CMS also published
22  its comments on the timing of
23  the data match, stating "We
24  believe that administrative
25  finality with respect to the

42

1  calculation of a hospital's
2  SSI fraction is important.  We
3  continue to believe that it is
4  important to find an
5  appropriate balance between
6  administrative finality and
7  the inclusion of retroactive
8  SSI eligibility
9  determinations, and the
10  lifting of SSI payment
11  suspensions by using the best
12  and latest available SSI
13  eligibility data at the time
14  of the cost report
15  settlement."  CMS further
16  commented that they believe by
17  calculating the SSI fractions
18  of the basis of SSI
19  eligibility data and MedPAR
20  claims that are updated 15
21  months after the end of the
22  federal fiscal year, that CMS
23  would be using the best data
24  available to them, given the
25  deadlines for submission in

43

1  final settlement of Medicare
2  cost reports.  Now, it's the
3  MAC's position that CMS'
4  processes facilitates
5  administrative finality and
6  certainty, which is imperative
7  to the entire Medicare
8  reimbursement process, and it
9  ensures predictability in the
10  process by preventing
11  unexpected shifts in the
12  payment rates based on later
13  data.  In conclusion, the
14  plain language of the
15  regulation does not provide
16  for recalculation based on
17  later data.  CMS' data-
18  matching process is much more
19  detailed, accurate, and
20  specific than the Provider's
21  proposed calculation, and
22  further and most important, it
23  is that CMS' data-matching
24  process provides finality and
25  certainty, which allows it to

44

1  administer the entire Medicare
2  reimbursement process.  It
3  would be administratively
4  impossible to recalculate
5  every hospital's DSH SSI
6  percentage based upon later or
7  corrected data.  There must be
8  a point in time where the data
9  is processed and a percentage
10  is obtained.  This cannot be a
11  moving target.  The MAC
12  respectfully requests that the
13  Board affirms its adjustments
14  to the SSI percentage as
15  calculated by CMS.  Thank you.
16  THE CHAIRMAN:
17      Thank you.  Mr. Getzoff, you
18      can call your first witness.
19  MR. GETZOFF:
20      Yes, the Provider calls Ms.
21      Candice LeTran.
22  THE CHAIRMAN:
23      And...
24  MS. LETRAN:
25      Do I sit here?

**JA 122**

45

```
 1   THE CHAIRMAN:
 2        Yes.  And before you seat, I
 3        will swear you in.  If you
 4        could please raise your right
 5        hand.
 6                ***
 7   [Witness sworn]
 8                ***
 9   THE CHAIRMAN:
10        Thank you.  Please be seated.
11        Please proceed, Mr. Getzoff.
12   MR. GETZOFF:
13        Thank you.
14                ***
15        CANDICE LETRAN,
16   having been first duly sworn, was
17   called as a witness herein and was
18   examined and testified as follows:
19                ***
20        DIRECT EXAMINATION
21   BY MR. GETZOFF:
22        Q.  Good morning, Ms. LeTran.
23        A.  Good morning.  Let me raise
24   the chair up.  Good morning.
25        Q.  Okay.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

46

```
 1        A.  Good morning, Board
 2   Members.
 3                ***
 4   MS. BENSON:
 5        Good morning.
 6   THE CHAIRMAN:
 7        Good morning.
 8   MR. ZIEGLER:
 9        Good morning.
10                ***
11   BY MR. GETZOFF:
12        Q.  Before I start with the
13   questions, just to let you know, I
14   put copies of the exhibits up there,
15   since we may be referring to them
16   at...
17        A.  Yes.
18        Q.  ...various times.  What is
19   your current position with Pomona
20   Valley Hospital Medical Center?
21        A.  My current position is
22   director of regulatory reimbursement
23   and analytics.
24        Q.  For how long have you
25   worked at Pomona
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

47

```
 1        A.  I've been with the hospital
 2   for 28 years.
 3        Q.  And in what capacities or
 4   positions?
 5        A.  My primary responsibility
 6   is in providing leadership,
 7   operational and technical advisory to
 8   the hospital operations, and the
 9   focus is in the reimbursement area.
10   And I'm overseeing the reimbursement
11   are for Medicare fee for service,
12   Medicare Advantage, Medicaid, HMO,
13   PPO, and also self-insured medical
14   group health.
15        Q.  Have your responsibilities
16   changed over time?
17        A.  Yes, we never, for 28
18   years, changed them prior to that.  I
19   started out as the manager of
20   financial planning, and at that time
21   my responsibility was in day-to-day
22   operations and preparing the cost
23   report, and working very closely with
24   the admitting office and the billing
25   office, and that is why I'm able to
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

48

```
 1   understand the patient details very
 2   well.  And then I was promoted to the
 3   director, and at that time I became
 4   more involved in the leadership and
 5   the operational and supervising the
 6   cost report preparation.  And now my
 7   role is more in the advisory role for
 8   the hospital.
 9        Q.  Approximately how many cost
10   reports have you prepared while at
11   Pomona?
12        A.  I would say about 60.
13        Q.  Medicare cost reports.
14        A.  About 30 Medicare cost
15   reports and...
16        Q.  Okay.
17        A.  ...and 30 Medi-Cal cost
18   reports.
19        Q.  Okay.
20        A.  Yeah.
21        Q.  Prior to working at Pomona,
22   did you have other experience working
23   on Medicare cost reporting and
24   auditing issues?
25        A.  Yes, I have always had an
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 123**

49

1  interest in the reimbursement area.
2  I started out as a Medicare auditor
3  for -- so I'm familiar with the
4  auditing process.  And then I worked
5  for a healthcare firm for five years,
6  and they specialize in Medicare cost
7  report consulting and preparation,
8  and we also do auditing for private
9  industries, so I'm very familiar in
10 that area.
11        Q.  Are you a certified public
12 accountant?
13        A.  Yes, I am.
14        Q.  And what degrees and
15 certificates do you hold?
16        A.  I have a Bachelor Degree in
17 accounting, and also an MBA in
18 finance.
19        Q.  For approximately how many
20 years has your work involved review
21 and appeal of DSH issues?
22        A.  Twenty-eight years, since I
23 started with Pomona.
24        Q.  Are you familiar with the
25 Medicare regulation at 42 C.F.R.

50

1  412.106, and it's Exhibit P39, which
2  is...
3        A.  That's the DSH -- that's
4  the...
5        Q.  The DSH...
6        A.  ...the DSH regulation.
7        Q.  Yeah.
8        A.  Yes, I'm very familiar with
9  that.
10        Q.  Please briefly describe for
11 the Board that regulation in terms of
12 what a DSH calculation is.
13        A.  Yes.  So a DSH
14 reimbursement is an add-on funding
15 for hospitals that serve a higher
16 proportion of low-income patients.
17 And we look at our DSH reimbursement
18 very carefully because we get about
19 -- back during those years, about $18
20 million a year.
21        Q.  Okay.  What does that
22 Medicare regulation state with
23 respect to how a Provider's DSH
24 percentage is calculated?
25        A.  Well, it's based on a

51

1  formula, and in the formula there are
2  two components, as you are aware,
3  it's the SSI component and the
4  Medicaid fraction component.
5        Q.  When you prepare Pomona's
6  annual cost report, and I'm speaking
7  more generically now, where do you
8  find the information needed to
9  calculate the hospital's SSI
10 percentage?
11        A.  As part of the
12 Intermediary's requirement, I would
13 use the latest available published
14 SSI on the web -- on the internet.
15 So it could -- you know, it is a
16 couple of years behind.  So, for
17 example, when we filed the 2016 cost
18 report just a couple of months ago,
19 the latest available was the SSI
20 ratio from 2014, and we would use
21 that for the cost report filing.
22        Q.  So at the time of filing
23 the hospital's cost report, is that
24 percentage actually based on a number
25 that CMS publishes?

52

1        A.  Yes.
2        Q.  Okay.  Once the hospital
3  files its cost report, is the
4  hospital's claimed SSI percentage
5  then adjusted by the Medicare
6  Contractor?
7        A.  Yes.  It would be adjusted
8  when the Medicare contractor comes
9  out a couple of years down the road
10 to review the cost report.
11        Q.  And how does the adjusted
12 SSI percentage get communicated to
13 you by the Medicare Contractor?
14        A.  Through an adjustment
15 report and we would validate that by
16 confirming it on the website -- on
17 the CMS website.
18        Q.  If you disagree with the
19 contractor's adjustment, do you
20 appeal the specific adjustments to
21 the hospital's SSI percentage in an
22 appeal filed with this Board?
23        A.  Yes, we would appeal based
24 on the NPR, yeah.
25        Q.  And on what do you base

**JA 124**

53

1  your decision whether or not to
2  appeal that adjustment every year?
3        A. We -- by that time we would
4  look at our internal data, we have
5  established a process in trying to
6  validate the SSI, since it's always
7  been a large number for the hospital,
8  so we would look at our internal data
9  and, you know, and see that looks
10 like the ratio is understated by
11 about three to six percent, and we
12 would use that as our appeal.
13       Q. Okay.  Is that the process
14 you followed for each of the years
15 2006, 2007, and 2008?
16       A. Yes.  Yeah.
17       Q. Okay.  Now, focusing more
18 specifically on the 2006 through 2008
19 cost years, let's focus first on
20 2006.
21       A. Okay.
22       Q. Did you follow your own
23 individualized methodology for
24 isolating patients' SSI days and
25 calculating the hospital's SSI
        York Stenographic Services, Inc.
  34 North George St., York, PA 17401 - (717) 854-0077

54

1  percentage in that year?
2        A. Yes, we developed our own
3  logics and database to try to
4  determine the internal SSI number, if
5  you will.
6        Q. Okay.  If I could direct
7  you in the large book to Exhibit P20,
8  which is -- it's...
9        A. Yes.
10       Q. ...colored -- in color, and
11 it's the flowchart.
12       A. Yes, I have it.
13       Q. Okay.  I'd like to take you
14 through that methodology for
15 determining Pomona's SSI percentage
16 in 2006.  Did you use the methodology
17 shown in Exhibit P20 for 2006?
18       A. Yes.  This is a high-level
19 recap of our process.
20       Q. Okay.  Starting at the left
21 top of the page, there are three
22 small circles or ovals.  What
23 information did you start with?
24       A. So these three small
25 circles on the left are basically the
        York Stenographic Services, Inc.
  34 North George St., York, PA 17401 - (717) 854-0077

55

1  raw data sources that we would use to
2  prepare our SSI analysis.
3        Q. And why did you look at
4  each of the three sources?
5        A. Because, as we -- as our
6  Counsel mentioned earlier, the SSI
7  data is not readily available
8  anywhere, so I have to search for
9  various data sources in order to
10 capture this data.  And I need to
11 look at several of them.
12       Q. From where do you obtain
13 the CMS MedPAR SSI patient file?
14       A. That is blue circle, and I
15 get that from CMS.
16       Q. Okay.  And what does the
17 MedPAR SSI file tell you?
18       A. It tells me all the people
19 that was on the published SSI
20 percentage, on the website, and it's
21 patient by patient.  So when we
22 requested the MedPAR file, it would
23 come in a disc or in an e-mail, and
24 it had patient information it, and it
25 would show how many SSI days there
        York Stenographic Services, Inc.
  34 North George St., York, PA 17401 - (717) 854-0077

56

1  were for each patient on that file.
2        Q. Did you also look at the
3  hospital's patient data?
4        A. Yes.  That was our initial
5  starting data in the red box on the
6  left.
7        Q. Okay, and what aspects of
8  the hospital's patient data did you
9  look at?
10       A. We would look at all of the
11 financial and building and
12 demographic data.  So we basically,
13 you know, we know when the patient
14 came in and they registered at the
15 hospital, we know a lot about the
16 patient.  So those are very important
17 in this analysis.
18       Q. And did you look at the DSS
19 database?
20       A. Yes.
21       Q. What is the DSS database?
22       A. That is our internal
23 financial patient database.
24       Q. What would this information
25 show?
        York Stenographic Services, Inc.
  34 North George St., York, PA 17401 - (717) 854-0077

**JA 125**

57

1    A. It would give me all the
2  patient detail, you know, including
3  financial, diagnosis, the doctor that
4  treated the patient, how long the
5  patient stayed, and their
6  demographic.
7    Q. What is the HDX database?
8    A. This is a state-approved
9  verification system to verify
10  insurance coverages for all the
11  payers that participated in this HDX
12  company.
13    Q. Would such a database cover
14  all the patients treated at the
15  hospital?
16    A. It would cover all the
17  patients that came in that we believe
18  that they were insured.  So if they
19  were uninsured we would not be using
20  this HDX database to verify coverage.
21    Q. Okay.  Looking at Exhibit
22  P23, which starts at 184 -- page 184.
23    A. Okay.
24    Q. Is Exhibit P23, pages 184
25  through about 191, it looks like, is

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

58

1  that an example of the type of report
2  one would find in the HDX database?
3    A. Yes, this is our printout
4  record of a particular patient that
5  we ran the HDX on this patient so we
6  can find out if he's covered.  So,
7  for example, in this case the patient
8  had Medicare, and it will tell you
9  when the coverage started, the
10  deductible, the coinsurance, the
11  lifetime days, and it will tell you
12  if the patient had Medi-Cal, and what
13  kind of an age the patient would
14  have.
15          ***
16  MR. GETZOFF:
17    Okay.  Just to clarify for the
18    Board, and for Mr. Olszewski,
19    we are using all redacted
20    records for the hearing, so
21    that's why some of the
22    information is not on the
23    sheet.  But...
24  THE CHAIRMAN:
25    And on that note, would ask if

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

59

1    you could just re-review the
2    records at a certain point for
3    -- make sure that the patient
4    identifiable information has
5    been excluded.  I know that
6    there's, on 187, at least one
7    Medi-Cal ID.
8  MR. GETZOFF:
9    Really?
10  THE CHAIRMAN:
11    Yeah.
12  MR. GETZOFF:
13    Okay, we'll have to -- we'll
14    send in another...
15  THE CHAIRMAN:
16    It...
17  MR. GETZOFF:
18    ...thing at the end.  It's...
19  THE CHAIRMAN:
20    It's a lot of...
21  MS. LETRAN:
22    Yes.
23  THE CHAIRMAN:
24    Yeah.  It's a lot of
25    information that's the...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

60

1  MR. GETZOFF:
2    Okay.
3  THE CHAIRMAN:
4    Go ahead.
5          ***
6  BY MR. GETZOFF:
7    Q. So from where does HDX
8  obtain aid code information?
9    A. As I mentioned, HDX is a
10  state-approved program, and it gets
11  its information from the state of
12  California, from the Department of
13  Healthcare Services.
14    Q. So looking at this exhibit,
15  starting on 184, from where does HDX
16  -- well, back up.  What does this
17  example show in terms of information
18  that would be meaningful to your SSI
19  inquiry?
20    A. So this example shows the
21  -- all the insurance coverages that
22  this patient has, and in this
23  particular example, if we go to page
24  187, you will see that this patient
25  is also qualified for Medi-Cal, and

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 126**

61

```
 1   in the middle of the page the patient
 2   was in County 19, which is from Los
 3   Angeles, and then the primary aid
 4   code for this patient is 60, so we
 5   know that the patient qualified for
 6   Medi-Cal under SSI, SSP, disabled aid
 7   code.
 8       Q.  Okay.  Now, going back to
 9   Exhibit P20, which is the color
10   flowchart, in looking at the middle
11   small circle at the upper left, which
12   would be a green color...
13       A.  Yes.
14       Q.  ...did you also review paid
15   claims?
16       A.  Yes, we also reviewed the
17   Medicaid paid claims data.
18       Q.  Okay, and what did this
19   review consist of?
20       A.  This data would also give
21   us the aid code of the patient that
22   Medi-Cal paid on our behalf.
23       Q.  And what is the PCL file?
24       A.  That's the abbreviation for
25   paid claim summary.  That's the
```

62

```
 1   abbreviation that the state of
 2   California uses.
 3       Q.  Okay.  What is the PS&R
 4   file?
 5       A.  That is the Medicare paid
 6   claim summary.  It stands for
 7   Provider statistic and reporting
 8   file.
 9       Q.  Okay, and what about the
10   PS&R file would be relevant to your
11   SSI inquiry?
12       A.  We use the PS&R file to
13   ensure that the patient is a Medicare
14   patient, because we know under the
15   regulation that we can only count
16   Medicare Part A patient and SSI
17   patient.
18       Q.  Okay.
19       A.  So we use that to validate
20   that we are capturing the correct
21   Medicare patients.
22       Q.  What is the PFC DSH
23   database?
24       A.  This is another database
25   that we have because in the DSH
```

63

```
 1   component we have the Medicaid
 2   fraction, and we get audited for the
 3   Medicaid fraction annually.  So we
 4   also put together a different
 5   database to defend our DSH days, and
 6   in that database we have many, many
 7   valuable information.  So we wanted
 8   to use that database to help assist
 9   with this analysis.
10       Q.  Just so the Board members
11   understand your process, do you
12   capture this information, if
13   available, on all patients who are
14   inpatient at Pomona in a given year,
15   such as 2006?
16       A.  Yes.  We started out with
17   our work on all patients in the
18   hospital.  So every -- for every --
19   you know, for a particular year we
20   have about 30,000 patient records
21   that we look at.
22       Q.  Now, moving to the larger
23   blue circle at the top center of
24   Exhibit P20, once you have compiled
25   your master patient list, what is the
```

64

```
 1   next step?
 2       A.  So this is when the data
 3   scrubbing begins, if you will.  So
 4   now that we have all of the fields
 5   that we need we start to look at the
 6   data and we will bill logics to
 7   ensure that we would meet the
 8   requirement in the regulation.
 9       Q.  Why would some of the
10   patients not have aid codes?
11       A.  Because they were not
12   Medi-Cal, because the aid code is an
13   indicator that Medi-Cal -- assigned
14   to Medi-Cal patient.  And so either
15   they were not Medi-Cal or either the
16   aid code was not input into our
17   system.  So that is not a required
18   field that has to be in our billing
19   system for billing, so there are
20   times when it's not there.
21       Q.  Would you then seek to
22   assign aid codes where an individual
23   had not been assigned one?
24       A.  Right.  So our first step
25   is to get a download of our internal
```

65

1 data, and to see how many aid codes
2 are in our own internal data, and we
3 would see a, you know, a big portion
4 of the aid codes that are missing.
5 And that was done -- we would look at
6 the HDX data to bring more aid codes
7 in, and then we would look at the
8 Medi-Cal paid plan summary to bring
9 any missing aid codes into our master
10 database so we can start the process.
11 Q. The white box to the right
12 of the blue circle on Exhibit P20,
13 does this show various sources of aid
14 codes?
15 A. Yes, right. So this is
16 where we can find aid codes.
17 Q. If Pomona is only able to
18 verify a partial aid code approval,
19 what does this signify?
20 A. The partial aid code
21 approval means for partial month. A
22 patient who has stayed for three,
23 months and they may only qualify for
24 SSI or SSP for the first month, and
25 then they would lose their benefit

66

1 for the second month. So we want to
2 be aware of that and look at the case
3 a little bit closer to determine that
4 we're not over-capturing days.
5 Q. Okay. Do you seek to
6 identify and quantify changes within
7 a given patient's admission?
8 A. I'm sorry, can you...
9 Q. Do you...
10 A. ...please...
11 Q. Changes to aid codes within
12 a given patient's admission.
13 A. We do. So when we do this
14 analysis, we look for all the aid
15 codes that were available for that
16 patient, and the patient may have
17 multiple aid codes for one month.
18 And when the patient is staying for
19 three months, and now we're looking
20 at a minimum of three aid codes for
21 that particular stay, and if a
22 patient has multiple aid codes, it
23 could be five or six, or -- yeah, so
24 it gets very complicated.
25 Q. Okay. Do you try to

67

1 analyze these items by the day?
2 A. We analyze them by the
3 month because the Medi-Cal
4 eligibility is based on the month.
5 And then we will translate that into
6 the number of days that the patient
7 was in the hospital for that month.
8 Q. Okay. After you complete
9 the process of finding all of the aid
10 codes that you can find in a given
11 year, what is the next step?
12 A. So after we found all the
13 aid codes, then we would look at the
14 whole database and then we would look
15 for all the patients that have
16 Medicare Part A and Medi-Cal, and
17 with the SSI aid code, we would
18 identify the SSI aid code.
19 Q. Okay. From all the
20 information collected to this point
21 in the process, were you able to
22 identify all of the days that you
23 believe were SSI days?
24 A. Not all of them, but a
25 majority of them, because in the end

68

1 we still have patients that we know
2 Medicare -- has Medicare, Medi-Cal,
3 but we did not have an aid code, and
4 after our manual research we still
5 couldn't find the aid code, so we
6 just gave up on those accounts.
7 Q. So those are not included
8 in your request for inclusion in the
9 SSI -- numerator of the SSI...
10 A. No.
11 Q. ...DSH percentage?
12 A. No, so if we cannot find an
13 aid code to substantiate that the
14 patient has SSI or SSP then we do not
15 want to put those -- we did not claim
16 those patients.
17 Q. Okay. Reading down the
18 blue circle, again, at the top of
19 Exhibit P20, it says that you linked
20 in CMS MedPAR SSI patients. Why
21 would you do this?
22 A. We -- this is a very
23 important step because the CMS MedPAR
24 file is the file that produced the
25 SSI percentage, and we're appealing

69

that number so we want to make sure
that after we're done with our
initial look, that we would match
each patient that we have to the CMS
file, because if CMS has those
patients then we know we're in good
shape, you know, but if CMS doesn't
have them then we have to go one more
step to find out why is there a
discrepancy.  And want to compare
because, again, we only want to
capture Medicare patients.  So if a
patient has SSI and did not have
Medicare, then we do not want to
claim that patient.
      Q.  Okay.  What is the
difference -- actually, let's move to
the red rectangle just under the
larger blue circle.
      A.  Okay.
      Q.  Moving down that chart,
what did you next do with the listing
of all patients in SSI status?
      A.  Right, so by -- so when
we're done with the blue circle, you

70

-- that the majority of the data
scrubbing is done, so now we want to
do a final look and see what is the
results here.  So we would start to
group all of our patients by the aid
codes, and only a few aid codes
qualify for SSI, so we know that from
the state's description.  So we would
group the SSI aid codes versus the
non-SSI aid codes so that we can only
claim the SSI patients.
      Q.  Okay.  Looking at the white
box to the right of the red triangle,
so it's the second white box down on
the page, what do the items all CMS
SSI accounts and PVHMC SSI 10, 20, 60
mean?
      A.  So in this process in which
we will see indicated in one of the
exhibits.  So in the end we have a
comparison that show all of the days
that CMS gave to us as SSI.  So those
are in the MedPAR file, patient by
patient, showing all the SSI days.
And we're accepting those.  And then

71

we also have another column that
showed the patient that we identified
as SSI, using the state's aid code of
10, 20 and 60.
      Q.  Turning to Exhibit P27, and
I think if we look at page 502...
      A.  Okay.
      Q.  ...is this what you mean by
aid codes?
      A.  Exhibit 502 is the
description of the aid codes, yes.
      Q.  Okay.
      A.  These descriptions came
from the state of California.
      Q.  Okay.  From where does the
state get that information, if you
know?
      A.  The state would get the aid
codes from the Social Security
Administration office.
      Q.  Okay.  If we could turn to
-- and we'll use the 2006 volume,
Exhibit P11, 11B.
      A.  Okay.
      Q.  Okay.  Who is -- this is an

72

e-mail -- or purporting to be an
e-mail from Amy Rosenkranz to you.
      A.  Right.  Yes.
      Q.  Did you receive this
e-mail?
      A.  Yes, I did.
      Q.  Yeah.
      A.  This was part of my
communication with her.
      Q.  Okay.  Who is Amy
Rosenkranz?
      A.  Amy Rosenkranz is my main
contact at the Medi-Cal eligibility
division when I have questions about
Medi-Cal eligibility.
      Q.  Did Ms. Rosenkranz confirm
where the aid codes are obtained?
      A.  Yes.  So in these strings
of e-mail she told me that it came
from the SSA office, because I was
asking her to do some validation for
me and she said she couldn't because
it came from the SSA.
      Q.  Okay.  What is significant
about aid codes 10, 20, and 60?

**JA 129**

00356

73

1  A. As I mentioned, 10, 20, and
2  60 is the aid code for people that
3  receive the cash grant from SSI or
4  SSP. And they are either aged, which
5  is number 10, 20 is blind, and 60 is
6  disabled. So that's the distinction.
7  Q. Okay. How did you obtain
8  the CMS SSI account list for 2006,
9  2007, and 2008?
10  A. Through the -- through CMS
11  MedPAR SSI files.
12  Q. Okay. Going back to
13  Exhibit P20, and looking back at the
14  -- that second-from-the-top white box
15  on the right...
16  ***
17  UNIDENTIFIED SPEAKER:
18  It's tabbed 8.
19 · MS. LETRAN:
20  Yes.
21  ***
22  BY MR. GETZOFF:
23  Q. ...the box includes an item
24  regarding sending accounts to the
25  state for verification. Was this

York Stenographic Services, Inc.
34 North George St., York, PA 17401 · (717) 854-0077

74

1  done for 2006?
2  A. Yes, this was done for
3  2006, '07, and '08, and this was our
4  attempt in validating our data before
5  we proceed to this Board.
6  Q. What information do you try
7  to obtain from the state?
8  A. So when we were done with
9  these analyses, and we knew this for
10  many years, not just these three
11  years, we've always known that's a
12  big discrepancy, so we wanted to find
13  out why, was there some flaw in our
14  math. This is a home-cooked process,
15  so we're saying that maybe we're
16  missing something, so we would like
17  for the SSA to look at 10 accounts
18  for each year to see if we're
19  correct, we're on the right track, or
20  if this information, if whatever
21  we're doing is all wrong, we wanted
22  to find out why.
23  Q. Okay. If we could now turn
24  to, again, the 2006 booklet...
25  A. Okay.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 · (717) 854-0077

75

1  Q. ...Exhibit 11A on page 107,
2  and continues 108 and nothing really
3  on 109, but 107 and 108.
4  A. Yes.
5  Q. What was this
6  communication?
7  A. Okay, give me a minute. So
8  this communication is a string of
9  e-mails between me and Amy Rosenkranz
10  around October 2015, and I wanted to
11  confirm with Amy one more time about
12  this aid code because we know -- I
13  know from the description that 10,
14  20, 60 -- for aged, disabled, and
15  blind for SSI and SSP, and I know
16  that from the regulation we cannot
17  include the state SSP. So I wanted
18  to clarify where the information came
19  from, and I was told from one of the
20  previous contacts that I had that it
21  is -- whatever days that I have aid
22  codes 10, 20, 60, they were all
23  federal SSI. So I was very excited
24  to hear that because I'm saying that
25  based on what I'm doing this is all

York Stenographic Services, Inc.
34 North George St., York, PA 17401 · (717) 854-0077

76

1  now federal SSI, and I did not have
2  to exclude the state SSP. So this is
3  what this communication is doing, and
4  Amy confirmed with me that they were
5  all federal SSI. So we -- again, we
6  were very happy with that news, but
7  in the...
8  Q. Okay. Moving back to the
9  red rectangle in the center of
10  Exhibit P20, which is our flowchart,
11  once you had grouped the SSI and the
12  non-SSI days as determined through
13  the hospital's process, and obtained
14  the CMS listing of SSI days, what is
15  meant by the terms matched and
16  unmatched SSI days?
17  A. So matched, all the
18  individual patient accounts that we
19  were able to compare to the CMS
20  MedPAR file and we were able to match
21  with all the data across. So we are
22  in complete agreement with CMS MedPAR
23  file on that particular account. And
24  the unmatched, those accounts where
25  we matched to the SSI MedPAR file but

York Stenographic Services, Inc.
34 North George St., York, PA 17401 · (717) 854-0077

77

1  we could not find a patient with the
2  same episode to match up to our
3  analysis.
4      Q.  At the bottom of Exhibit
5  P20 there is an orange box.  The
6  language in the orange box talks
7  about removing accounts.  What do you
8  mean by removing accounts?
9      A.  Right.  Yes, as I said in
10 the beginning, when we did this we
11 looked at all patients, all inpatient
12 in the hospital for a particular
13 year.  So, of course, we have non-
14 Medicare patients, we have commercial
15 insurance, you have non -- many,
16 many.  So by the time we're done
17 we wanted to exclude all those
18 accounts that do not meet the
19 requirement, so we would remove
20 patients that did not have the SSI
21 aid code and patients that were not
22 met from our analysis.
23     Q.  Were all of the steps that
24 you just mentioned taken for all
25 patient accounts in 2006, 2007, and

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

78

1  2008?
2      A.  Yes, we do the same steps.
3      Q.  It wasn't just for the
4  sample?
5      A.  No, we -- right.  We do
6  this for the -- all patients in the
7  hospital.
8      Q.  Okay.  Looking at Exhibit
9  P21, starting on page 176...
10     A.  Yes.
11     Q.  ...does this table
12 summarize what you presented from
13 Exhibit P20 in a more technical form?
14     A.  Yes.  So this is a high-
15 level, detailed summary of the
16 process.
17     Q.  Which we will not go
18 through.
19     A.  Right.
20     Q.  Once your SSI
21 identification process is complete,
22 approximately how many sources would
23 you say you check annually to
24 determine a patient's SSI status
25 throughout his or her admission?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

79

1      A.  I would say four sources.
2  So the first source is our internal
3  data from the HDX, which is the
4  state-approved system, and if we
5  cannot find it then we would go to
6  the Medi-Cal website, which is the
7  point of service network.  And then
8  we would do manual research, we would
9  go look up record and go through all
10 the pages to find out if there's an
11 aid code somewhere that we can find,
12 and then we would use the paid claim
13 summary.  Those are our main sources.
14     Q.  Okay.  Looking at Exhibit
15 P22, starting on 179...
16     A.  Yes.
17     Q.  ...where is this
18 information from?
19     A.  This is a printout from the
20 California Department of Healthcare
21 Services for our eligibility
22 verification.
23     Q.  Okay, what is the Medi-Cal
24 recipient eligibility page or site?
25     A.  That's the site where

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

80

1  hospitals can -- or Providers can go
2  in and check for eligibility for
3  Medi-Cal.
4      Q.  Okay, now that we have
5  reviewed your methodology, let's take
6  you through the results of your
7  inquiry for each of the three years
8  at issue today.
9      A.  Yes.
10     Q.  First, for 2006.
11     A.  Okay.
12     Q.  Looking at Exhibit P27,
13 page 501, which is the first page of
14 that exhibit...
15     A.  Okay.
16     Q.  ...what does this table
17 show?
18     A.  This is our summary
19 analysis of our final results, after
20 we went through all of the steps and
21 backing out things that done qualify,
22 accounts that don't qualify, this is
23 the final...
24     Q.  And you spoke earlier about
25 matched and unmatched...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

00358

81

A. Correct.

Q. ...days and patients, do you separate them on this chart?

A. Yes. So if you look on the left-hand side of this exhibit you will see that I have a column labeled CMS matched, CMS partial matched, and then CMS unmatched.

Q. Okay. In addition to the predominant totals in the codes 10, 20, and 60 on this table, several other aid codes are listed. Why are these additional aid codes shown on the table?

A. So you can see the additional aid codes I've listed all fell under the category CMS matched. So when we get the MedPAR SSI file from CMS there was no aid code in that file. And by using all the data in there and matching up to our internal data, we were able to obtain the aid code. And this summary here proves again to me that our analysis

82

is correct because the majority under the CMS matched fell under aid code 10, 20, and 60, and that was our premise in saying that, okay, if people have 10, 20, 60, and they have Medicare Part A, then they would qualify for SSI. However, we also found a handful of patients with aid code 14, 1E, 64, 60, and those that we couldn't find that CMS gave to us as SSI patients.

Q. Okay.

A. So we're keeping those and count them because those are on the SSI listing.

Q. At the bottom of each of the columns there are matched and unmatched totals...

A. Yes.

Q. ...on this chart. What do these totals represent?

A. So the -- if you look at the grand total on line 27, we were looking at, in the end, 1,129 patients that we want to claim as SSI

83

patients. And of that, we were able to match with the CMS file on line 19 of 748 patients. So again, our system is working because we were able to match, and then we have about 380-some patients that we couldn't match by using our own internal analysis.

Q. Ultimately, which totals are being compared to determine what SSI days Pomona -- and, therefore, increased SSI percentage, Pomona claimed in 2006?

A. So that would be the last column, because in the last column we show total PVHMC SSI days, and we are asking for 6,982 SSI days for our DSH reimbursement, and in the CMS MedPAR file we saw 4,886 days.

Q. Was a similar table prepared for each of the years 2007 and 2008 as well?

A. Yes.

Q. Okay, and I just want to direct your attention briefly, we

84

won't go through all the detail, but page 518 of the same exhibit for 2007.

A. Yes, I'm there.

Q. I just want you to confirm if this is the same type of table.

A. This is the same format, yes.

Q. Okay.

A. So in this case we are asking for 6,665 days in the last column, but CMS showed 4,153 days. Again, we're looking at a huge difference.

Q. Okay. And for 2008, page 535.

A. Yes, same format. And we're asking for 6,595 days, and CMS showed 4,231.

Q. For some aid codes, the CMS total count and the hospital's total are the same. What does this mean?

A. Well, they're the same because we were able to match up the patient with the CMS file. So we're

JA 132

85

keeping it in a separate category so we know that these are the accounts that we have both satisfied with the...

Q. Did you obtain the CMS data through a data use agreement with CMS?

A. Yes, we started with the data use agreement and it was signed.

Q. Looking at Exhibit P27, which is a lengthy -- the lengthy exhibit that we've been in...

A. Okay.

Q. ...comprised largely of redacted patient lists...

A. Correct.

Q. ...what are the redacted patient tables in this exhibit? And for the Board's reference, they're -- 2006 is at 504 to 517, 2007 is 521 to 534, and 2008 is 538 to 553.

A. Yes, I have it. So, for example, if we look at 2007, beginning on 522, so these are the detailed patient listings. So if you

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

86

-- when we get audited, if this gets, you know, approved, I can pull up the patient account for each of these lines on here. So these have patient detail that we have and the grand total on the last page of this 2007 year, which is on page 534, the grand total would tie into my summary slide that we looked at earlier. So I was saying that we were asking for 6,665 days, and if you look on page 534 that's the grand total of patient medication.

Q. And do you follow this process for each of the years?

A. Yes.

Q. Okay.

A. Yes, I do.

Q. Okay, looking at page 538, the tab pertaining to year 2008, please briefly explain the data on this page.

A. So this is similar to what I just pointed out. So this is a detailed patient listing of all of

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

87

our SSI days that we are asking for fiscal year 2008, and it would -- you know, for example, on the first it will show the admit date, the date the patient was admitted, patient was discharged, how many days they stayed, how many Medicare days, and how many SSI days that CMS showed, and how many SSI days that we would want to have.

Q. Okay.

A. So those are the typical columns in our final result.

Q. Now, pleases look at page 547. Below the partial match entries there are several admissions that continue on the next page, labeled unmatched. What does this mean in this context?

A. Right, so unmatched, so this would be a patient that we were able to find the aid codes 10, 20, or 60 with Medicare, and we are claiming them as SSI but in the CMS file we could not find the -- record.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

88

Q. And we're not going to go through all the thousands of entries here, but was the same type of table prepared for each of the three years 2006 through 2008?

A. Yes.

Q. Turning to Exhibit P27, page 503, and again, this is for 2006, what is this table?

A. This is our final summary with the reimbursement impacts. So after we showed how many SSI days we would like to have, we ran it through this formula to look at our additional reimbursement impact.

Q. Does your calculation distil the data from the previous summary pages that you testified about, 501, for this year, down to this calculation?

A. Yes, it took the data from 501, because on 501 the last column shows 6,982 days, and you will see that in the page 503 on line 9.

Q. Okay, where do the Pomona

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

00360

89

1  SSI day totals come from?
2      A. From 501 -- from page 501.
3      Q. Where do the CMS SSI data
4  totals come from?
5      A. Came from the MedPAR file.
6      Q. Okay. Looking at line 10
7  of the table on page 503, why are
8  there two different CMS totals for
9  Medicare days?
10      A. Right, so we've seen this
11  consistently with almost all the
12  years. So in the actual CMS website
13  under the published data, we would
14  see 4,886 out of the website for all
15  the hospitals in the nation. You
16  know, so for us it was 4.886. And
17  for the denominator the number of
18  Medicare days were at 33,149, and
19  that was our final SSI for 2006 of
20  14.74 percent. However, when we got
21  the MedPAR file we don't see the same
22  number. So we saw 4,886 for SSI
23  days, which agreed with the published
24  website, but for the denominator we
25  only saw 32,371 days, and those came

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

90

1  from Medicare covered days column.
2  So after tracing through, then I --
3  we noticed that the 33,149 is
4  actually the total length of stay for
5  the patient. So we're not sure what
6  CMS is doing here because, for 2006,
7  you know, we -- and per those
8  regulations that the denominator
9  should be based on entitled Medicare
10  Part A, and in this case it did not
11  show entitled Medicare Part A, it
12  showed total length of stay of
13  33,149. So that actually hurt us
14  even more because now our SSI ratio
15  is lower than what was in the MedPAR
16  file.
17      Q. So...
18      A. So that's another anomaly
19  that we see with data. You know,
20  when you deal with data that's also
21  the issues that are going on.
22      Q. Does the regulation require
23  the use of covered days in the --
24  Part A days in the denominator?
25      A. It's the entitled, so it

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

91

1  would be paid or covered days, so it
2  should be the denominator, so that
3  should be 32,371. So if anything,
4  our SSI ratio using purely CMS data
5  should have been at 15.09 percent,
6  and not even 14.74 percent.
7      Q. Okay. How do you calculate
8  the requested increase in
9  reimbursement?
10      A. So based on our analysis we
11  are asking for 6,982 SSI days, and
12  we're using the denominator of
13  32,371, which is covered days from
14  the MedPAR file, and that gave us 21
15  percent -- 21.57 percent for SSI, and
16  the published SSI was 14.7, so we
17  have a differential of 6.8, and we
18  would run it through the formula in
19  the regulation, which reduce it by 17
20  1/2 percent. And going through the
21  formula, and we're looking at an
22  anticipated reimbursement increase of
23  almost $1.6 million for 2006.
24      Q. Okay. Once again, we have
25  the same type of exhibits for the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

92

1  other two years on page 519 and 536.
2  We won't go through all the numbers
3  on that page, but, Ms. LeTran, if you
4  would just confirm for the Board that
5  pages 519 and 536 are, in fact, those
6  same calculations for 2007 and 2008
7  respectfully?
8      A. Yes, they are the same
9  method -- the same type of
10  calculation.
11      Q. Okay. Putting that exhibit
12  aside for the moment, the Medicare
13  Contractor contended in its final
14  position paper that it believed the
15  hospital's reimbursement impact
16  calculation was "too simplistic", in
17  that it ignores the fact that there
18  may be state supplemental payment, or
19  SSP, beneficiaries who do not also
20  qualify for SSI payments.
21      A. Yes.
22      Q. Are you aware of that
23  contention?
24      A. Yes, I am.
25      Q. What is the proper

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 134**

93

```
1   treatment of patient days that are
2   deemed SSP-only days, and in other
3   words, these days do not involve
4   patients who qualify at that time for
5   SSI benefits as well?
6        A.  So the proper treatment,
7   which I agree, is to remove all the
8   state-only SSI or state-only SSP
9   days.
10       Q.  And why did Pomona not
11  eliminate such days from your initial
12  calculations for 2006, 2007, and
13  2008?
14       A.  So if you can see -- again,
15  I'm on page 503, on line 8 I have a
16  line in there to back-out the state-
17  only SSP days, and I put zero
18  percent.  At the time that we did
19  this, we were getting conflicting
20  information, we did not have any
21  reliable information as to how much
22  was the state-only SSP days.  And
23  then I got that conversation going
24  with Amy Rosenkranz, which I put
25  notes on there that she told me that
```

94

```
1   everything that I thought was all
2   federal SSI.  So our understanding,
3   which was incorrect at that time, was
4   that I didn't need to back-out
5   anything for the state.  But I did
6   leave a line in there.
7        Q.  Subsequent to filing the
8   original exhibits, have you been able
9   to find reliable statistics regarding
10  SSP-only patient populations in
11  California?
12       A.  Yes, we have.
13       Q.  From what source?
14       A.  We got it from the
15  California Department of Social
16  Services through our consultant, the
17  former Medi-Cal director, and he will
18  testify later.
19       Q.  Have you read Mr.
20  Rosenstein's expert report, which is
21  included in the documentation,
22  Exhibit P34?
23       A.  Yes, I have.
24       Q.  All right.  What does that
25  report conclude about the SSP-only
```

95

```
1   percentage in California during the
2   years 2006 through 2008?
3        A.  So Mr. Rosenstein was able
4   to obtain a monthly -- a report that
5   lists the monthly SSI beneficiaries
6   and SSP-only beneficiaries for the
7   years in question, and on average
8   they came out to be about 14 percent,
9   consistently, month by month, when
10  you look at the data.
11       Q.  Okay.  Looking at Exhibit
12  P27, and back to page 503...
13       A.  Okay, I'm there.
14       Q.  ...for 2006, approximately
15  what percentage lower than the
16  hospital's calculation of total SSI
17  days was CMS' count of total SSI days
18  for that year?
19       A.  So in here we are asking
20  for 6,982, and CMS was showing 4,886,
21  so this is about 40 percent different
22  -- lower.
23       Q.  Okay.  Looking at page 519
24  of that same exhibit for 2007, what
25  percentage lower does CMS' total
```

96

```
1   appear as based on your work?
2        A.  So I don't have the actual
3   percentage here, but it's running
4   about 40, 45 percent on my line 9.
5        Q.  And did you reach the --
6   roughly the same conclusion for
7   2008...
8        A.  Yes.
9        Q.  ...and that'll be page 536.
10       A.  Yes, the difference here in
11  terms of days was -- is over 2,200
12  days, but yeah, it's around that 45
13  percent.
14       Q.  Okay.  Based on your
15  analysis of all the data, can a 14
16  percent reduction in the hospital's
17  SSI days due to recognition of SSP-
18  only days explain the 40 to 45
19  percent difference between total SSI
20  days shown by CMS versus the hospital
21  in each of the three years?
22       A.  No, it cannot explain that.
23  The gap is too wide.
24       Q.  Has Pomona attempted to
25  verify its identification of SSI days
```

97

1  against the SSA database?
2      A. Yes, we have put in a
3  tremendous amount of effort to -- in
4  order to verify the data, because we
5  were -- again, we were hoping to
6  avoid all of this hearing and get to
7  a resolution.
8      Q. Did Pomona use CMS' SSI day
9  information as input into its own SSI
10  day identification process?
11      A. I'm sorry?
12      Q. Did you use CMS information
13  as part of the process...
14      A. Yes.
15      Q. ...of...
16      A. Yes, we started out with
17  CMS information.
18      Q. In what ways did Pomona
19  attempt to obtain SSI data directly
20  or through a consultant?
21      A. We started in early January
22  2006 by reaching out to a former
23  center director, Mr. Tzvi Hefter,
24  and, you know, hoping that he can
25  coordinate some effort between CMS

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

98

1  and SSA, so that SSA would be willing
2  to look at our sample of 30 records,
3  you know, to validate the
4  information.
5      Q. Let's get into the sample a
6  bit since I don't think we've really
7  touched on that.
8      A. Okay.
9      Q. Did Pomona create a sample
10  of patient claims to be matched
11  against SSA data?
12      A. Yes, we did. But I want to
13  clarify here that we created a sample
14  based on existing data, we did not
15  handpick any of the data.
16      Q. What did this sample
17  consist of?
18      A. We sorted the SSI days, a
19  count high to low each year, and then
20  we picked the top 10 accounts of each
21  individual year. So it's
22  consistently the top 10 accounts.
23      Q. And did you include any
24  other patient records in this...
25      A. Yes, for...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

99

1      Q. ...sample?
2      A. For 2006 we also did a
3  random sample. So after the top 10
4  accounts, we randomly picked every
5  fifth account, and we picked 20
6  additional every fifth account. And
7  we were hoping that SSA can look at
8  30 accounts for 2006 and then 10
9  accounts each for 2007 and 2008.
10      Q. Did each of the claims in
11  the sample go through the full
12  process of internal verification that
13  you described?
14      A. Right. So each of the
15  claims, including the remaining of
16  the claims, went through the same
17  process. Again, we didn't handpick
18  any of these sample, it's just part
19  of the process.
20      Q. Did you submit the sample
21  of claims to the State Department of
22  Healthcare Services for verification?
23      A. Yes, I also submitted 30
24  accounts to the Department of
25  Healthcare Services to validate the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

100

1  aid codes.
2      Q. And what was the result of
3  such verification effort?
4      A. They did not have
5  resources, and they could only do one
6  year for me, and that was 2006, and
7  the result came back consistent with
8  what I show as the aid codes.
9      Q. How did Pomona first
10  attempt to have the SSA review the
11  hospital's sample of, we'll call it
12  30 to 50 claims?
13      A. Our first attempt was
14  through Mr. Hefter.
15      Q. And approximately when did
16  you contact Mr. Hefter?
17      A. We contacted him in --
18  early in January of 2016.
19      Q. Why did you select him in
20  particular?
21      A. He was a former top CMS
22  official and he was in charge of the
23  division of the acute care, so he was
24  an expert in the IPPS ruling and the
25  DSH, and we felt very comfortable and

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 136**

101

we were hoping that with his
connection with CMS that we can find
-- he can find the right person to
resolve this matter.

Q. What did Mr. Hefter agree
to do on behalf of Pomona?

A. After several lengthy
conversations, so that we can go
through the detail with Mr. Hefter,
he agreed to take on the case and he
agreed to go to CMS and discuss the
issue with CMS.

Q. Did he actually submit your
sample of claims to CMS?

A. Yes, he did.

Q. For approximately how long
did Mr. Hefter attempt to work with
CMS to convince them to send your
sample to the SSA for verification?

A. He met with CMS, I think
early in February, and the process
went on until October of 2016, with
several follow-ups, but, yeah, with
some progress.

Q. Mr. Hefter will be

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

102

testifying himself shortly, but was
his efforts successful?

A. Not, it was not.  But,
yeah, by May we started to get
nervous, and by October, yes, it was
not successful.

Q. Was Pomona willing to abide
by the results of the review of the
sample?

A. Yes, we were.  We were very
curious as to what's going on, as we
were definitely willing to abide with
the result.

Q. Would Pomona had been
willing to resolve this appeal based
upon the sample?

A. Definitely.

Q. Would Pomona still be
willing to abide by the results of a
review of the sample by the SSA?

A. Yes.

Q. Once you saw that Mr.
Hefter's efforts were not resulting
in a quick review by the SSA of
Pomona's sample, did Pomona make

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

103

further efforts?

A. Yes, we did.

Q. Did Pomona contact its
legislative representatives?

A. Yes.  By around May, we --
May of 2016, the process was not
going and Mr. Hefter was getting
nervous, and he said we needed to
reach out to congressional help, and
we did that.  I personally contacted
a government relations firm here in
D.C. to reach out to our senators.
And we reached out to Senator
Feinstein, Senator -- ex-Senator
Boxer, and now District Congresswoman
Norma Torres.  And I was involved in
all those process, every step of the
way.  And I even met with the staff.

Q. Did any of the legislative
offices offer to assist Pomona?

A. Yes, they all offered to
help.

Q. Looking at Exhibit P25,
were you aware of this letter to the
SSA from Senator Feinstein?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

104

A. Yes, I am.

Q. What happened after that
letter was sent?  Was there any
movement?

A. No.  This letter was
written when we first approached
Senator Feinstein's office in May,
and she did it right away in May of
2016, and nothing was happening until
October 2016.

Q. Okay.  Looking at Exhibit
P29, is Representative Torres the
representative from the district that
Pomona is located in?

A. Yes.

Q. Were you made aware of the
letter from Representative Torres?

A. Yes, I am aware of this
letter, and before this letter was
written I met with Representative
Torres' director or deputy director
here in D.C., and we talked about
this and so I have personal
knowledge.

Q. Looking at Exhibit P25, and

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

105

```
 1  page 496, do you recall the Social
 2  Security Administration's response to
 3  Senator Feinstein?
 4       A.  Yes, I recall this letter
 5  clearly.
 6       Q.  Was this letter -- well,
 7  who gave you this letter?
 8       A.  This letter would come from
 9  Senator's Feinstein's staff, Amanda
10  Sagra [ph].  And...
11       Q.  What does the letter say?
12  You don't have to read it, but just
13  summarize.
14       A.  Right.  So this came from
15  the SSA office and it said that --
16  and in the middle paragraph it said
17  that the SSA provided the requested
18  information to CMS.  We're not sure
19  what was provided.  And it says that
20  they found no evidence that they
21  agreed to do anything at SSA, and
22  they refer us back to Emily Lipkin
23  [ph] at the bottom, and Lisa Leon
24  [ph] in the San Francisco office.
25  And Emily Lipkin was the one that
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

106

```
 1  Tzvi Hefter met with in February to
 2  give the packet of the sample, so
 3  that Emily Lipkin can go to SSA.  So
 4  now they're referring us back to her.
 5       Q.  Okay, is there any
 6  indication that Pomona's claim sample
 7  was ever reviewed by the SSA?
 8       A.  No.
 9       Q.  After the SSA's response to
10  Senator Feinstein's May 8, 2016,
11  letter, did you make additional
12  efforts to get your claim sample
13  reviewed by the SSA?
14       A.  Yes.  So after we saw this
15  letter we were very perplexed and
16  confused and upset about how this
17  thing is going in circles and
18  circles, and we met back with Senator
19  Feinstein's staff and discussed the
20  process, and she volunteered to
21  continue to help.
22       Q.  Okay.  Did Senator
23  Feinstein's office provide additional
24  assistance?
25       A.  Yes.  Yes, they did.  So at
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

107

```
 1  that time -- so this is around
 2  October, and at that time we decided
 3  that it's best to reach out to the
 4  CMS office in San Francisco instead
 5  of the D.C. office.  So we -- so
 6  Senator Feinstein's office spoke to
 7  Lisa Leon and somebody else at SSA
 8  and they have agreed to look at the
 9  data.  But they specified that the
10  data has to come through CMS.  Pomona
11  cannot view the data directly.  So we
12  worked with Senator Feinstein's
13  office and we gave the 30 account
14  through their office so that they can
15  pass it on to SSA.
16       Q.  Okay.  Did -- if you'd look
17  at page 497 and 498, it's Exhibit
18  P26.
19       A.  Yes.
20       Q.  Are you familiar with this
21  letter?
22       A.  Yes, this is a follow-up
23  letter from Senator Feinstein to her
24  May letter, that nothing was
25  happening until October.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

108

```
 1       Q.  And from where did you
 2  obtain this document?
 3       A.  This letter was forwarded
 4  to me from Senator Feinstein's
 5  office, from Amanda Sagra.
 6       Q.  Okay, and who is Amanda
 7  Sagra?
 8       A.  She's the staff that's in
 9  charge of this coordination project.
10       Q.  Okay, looking at Exhibit
11  P30, page 558 through -- it goes on
12  for several pages to about 574, and
13  appears to be a string of e-mails.
14  What are these e-mails?
15       A.  These are communications to
16  and from me and from our counsel, and
17  I am included pretty much all of
18  these e-mails here, as a
19  communication of our effort to try to
20  re-coordinate the effort to have the
21  CMS office in San Francisco to work
22  with SSA to look at the 30 records.
23       Q.  Okay.  Did the Social
24  Security Administration ever agree to
25  review Pomona's claim sample?
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 138**

109

1    A. Based on the e-mails that I
2 received from Amanda Sagra, yes, they
3 agreed to initially look at the
4 sample.
5    Q. Did Ms. Sagra, or Sagra,
6 tell you that she also communicated
7 with CMS?
8    A. Yes, she had an e-mail and
9 said she was in constant
10 communication with them, and she said
11 she assured me that it would be
12 looked at, and she was working with
13 the top people at CMS and SSA.  She
14 didn't specify names.
15    Q. Did Ms. Sagra tell you why
16 she needed to involve CMS?
17    A. Because we have to transmit
18 the data through CMS, since SSA
19 cannot receive the data directly from
20 the Provider.
21    Q. Was the, again, 30 to 50
22 claim sample provided to CMS for
23 purposes of sending them to the SSA
24 for review?
25    A. I'm sorry?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

110

1    Q. Was the sample, the 30-
2 record sample, provided to CMS...
3    A. Yes.  Yes...
4    Q. ...for purposes...
5    A. ...they were provided.
6    Q. ...of transmitting it to
7 the Social Security Administration?
8    A. Yes, they were provided in
9 these strings of e-mails in Exhibit
10 P30.
11    Q. Okay.  And what happened
12 following the submission of the
13 claims sample to CMS?
14    A. Right.  So this was late in
15 October and the holidays were coming,
16 you know, so we knew it was going to
17 take a while.  And we waited a month,
18 and I followed up months to find out
19 what's going on, and not much was
20 happening.  And at the same time,
21 Senator Feinstein's staff would tell
22 me that she's working on it, she's in
23 communication with them, SSA has
24 agreed to look at it, and so we were
25 still very hopeful -- we're still

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

111

1 very hopeful by the end of 2016,
2 because the request was not shut
3 down.
4    Q. Okay.  Looking at Exhibit
5 P26, pages 499 and 500.
6    A. P26, okay.
7    Q. Are you familiar with this
8 document?
9    A. Yes.
10    Q. And from where did you
11 obtain this document?
12    A. From Amanda Sagra...
13    Q. Okay.
14    A. ...of Senator Feinstein's
15 staff.
16    Q. And what does this letter
17 state?
18    A. This is -- again, this is
19 the follow-up letter to the one that
20 Senator Feinstein wrote in May 2016.
21 And she put in here that they have
22 made several effort and made many
23 attempts, and they have not heard
24 back from the SSA office.
25    Q. Okay.  Looking at Exhibit

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

112

1 P31, it's 575 and 576, with a
2 transmittal from 577, are you
3 familiar with this -- these two
4 documents?
5    A. Yes.  Yes.
6    Q. What are they?
7    A. Okay, so this is the final
8 letter, and this is dated May 3,
9 2017, final letter from the SSA
10 office to Senator Feinstein saying
11 that they cannot help us with the
12 matching record, because the
13 initial letter from Senator Feinstein
14 was to help us with the 30 records.
15 And they cited the Bush regulation
16 and they are deferring to CMS.
17    Q. And who sent that letter to
18 you?
19    A. This letter, by this time
20 Amanda Sagra had left Senator
21 Feinstein's office, and this came
22 from the new person, which was
23 Kristin Woodruff [ph], on page 577.
24    Q. Okay.  Looking at Exhibit
25 P32, are you familiar with this

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

113

document?

A. Yes.

Q. And from where did you obtain this document?

A. This is the final letter from CMS dated June 23, 2017. Basically, this is in response to Senator Feinstein's request of helping us to review the 30 records. This letter says that there's nothing CMS can do, and the process for us is to go through the PRRB to have this heard.

Q. And...

A. And that was the -- you know, in the beginning we were trying to avoid the PRRB, and we said so -- Senator Feinstein said so in her letter, and in the end, after they promised to help and now they're saying that just go through the PRRB and get it resolved.

Q. Okay. So we're here. The -- did Ms. Woodruff or Mr. Miller make additional efforts to get

114

representatives of both CMS and SSA to meet them in Washington, D.C.?

A. Yes. They were at -- they were very -- they were great. They were excellent in trying to help Pomona. They offered to set up a meeting, and counsel -- my counsel and I were planning on flying over here to D.C. to meet with them, you know, in June to get this resolved. And that was in the works, but it didn't work out.

Q. Finally, just out of curiosity, how long would you say it would take one person to verify the status of 30 patients who name and identification, dates of service, and all other information is provided?

A. Based on my years of professional experience in reviewing records and looking at records online, if we have an indicator, which we do, the HIC number or the social security number, we just go online, look up the number, look

115

through some of the pages, it should take about three to five minutes per account. So I'm going to give it five minutes. And we're asking for 30 accounts, so I'm asking of the SSA office to give us less than three hours to look at the 30 samples to see if we're on the right track or we're on the wrong track so we know what to do. And that was not answered.

***

MR. GETZOFF:

That's all I have for this witness.

THE CHAIRMAN:

Okay. Before we go to cross examination, I will take a 10-minute break. So we're off the record.

***

[Off the record]

[On the record]

***

THE CHAIRMAN:

116

Let's go back on the record. Mr. Getzoff, you've completed your direct examination...

MR. GETZOFF:

Yes.

THE CHAIRMAN:

...of the witness?

MR. GETZOFF:

Yes, I have.

THE CHAIRMAN:

Okay, thank you. Mr. Olszewski, do you have cross examination?

MR. OLSZEWSKI:

I do.

THE CHAIRMAN:

Please proceed. Thank you.

MR. OLSZEWSKI:

Thank you.

***

CROSS EXAMINATION

BY MR. OLSZEWSKI:

Q. Ms. LeTran, if I could direct your attention to Provider's Exhibit 27, page 503.

**JA 140**

117

A. 27. Yes, 503. Yes, I'm there.

Q. Okay. And I -- Mr. Getzoff had asked you some questions about this and I just wanted to clarify one point just so I understand this table. So the -- what is the number of days that Pomona Valley was seeking, the number of SSI days? Is it 6,982?

A. Yes.

Q. And the number of SSI days that CMS had down for Pomona was 4,886?

A. Correct.

Q. And I think the question was asked what percentage difference is that between the number of days Pomona wants, and the number of days that CMS was giving. And I -- did you say 40 percent -- about 40 percent?

A. Yes.

***

MR. OLSZEWSKI:

118

I have no further questions.

THE CHAIRMAN:

Okay. Do you have any redirect based on Mr. Olszewski's questions?

***

REDIRECT EXAMINATION

BY MR. GETZOFF:

Q. In -- just one question. In terms of the number of days that you are seeking -- Pomona is seeking, would some number of SSP-only days then be subtracted from that total?

A. Yes, it would be, now that we know we have 14 percent so I would reduce it by 14 percent, and it's not on this schedule.

***

MR. GETZOFF:

Thank you.

THE CHAIRMAN:

Okay. We'll move to Board questions. Ms. Benson?

MS. BENSON:

Good morning. Thank you for

119

your testimony.

MS. LETRAN:

Good morning, Ms. Benson.

MS. BENSON:

I just want to ask one basic question to make sure I have the right understanding. All the NPRs that, you know, for these three years, they all used -- or they all were settled with the newly published SSI ratio that CMS calculated based on the revised methodology that was in the rule and the ruling?

MS. LETRAN:

The Bay State ruling? The...

MS. BENSON:

Yes, the 1498...

MS. LETRAN:

Dash...

MS. BENSON:

...R...

MS. LETRAN:

1498-R2.

120

MS. BENSON:

Yes.

MS. LETRAN:

Right.

MS. BENSON:

Is that a true statement?

MS. LETRAN:

No, that's not, because the 1498-R2 from the Bay State ruling was republished around April of 2015, and that was only through fiscal year 2005.

MS. BENSON:

Well, not R2, but 1498-R.

MS. LETRAN:

1498-R.

MS. BENSON:

Yes.

THE CHAIRMAN:

In the 2010 rulemaking.

MS. LETRAN:

Right. So that was -- I think that was...

MS. BENSON:

So what I'm trying to get at

**JA 141**

121

```
 1       is the SSI fractions that are
 2       used in these three cost
 3       reports, the agency published
 4       SSI fractions up until, you
 5       know, the Bay State hearing...
 6   MS. LETRAN:
 7       Right.
 8   MS. BENSON:
 9       ...and they were settling cost
10       reports, and at a point in
11       time the agency, because of
12       the Bay State case, stopped
13       settling cost reports...
14   MS. LETRAN:
15       Right.
16   MS. BENSON:
17       ...because of the decision in
18       Bay State.  They developed a
19       new methodology which was
20       proposed -- which was put in
21       the proposed rule for fiscal
22       year...
23   THE CHAIRMAN:
24       It was...
25   MS. BENSON:
```

122

```
 1       ...'11, I thought it was.
 2   THE CHAIRMAN:
 3       For fiscal year 2011,
 4       published in 2010.
 5   MS. BENSON:
 6       Yes.  So for fiscal year '11,
 7       and they also issued a ruling,
 8       1498-R.
 9   MS. LETRAN:
10       Right.
11   MS. BENSON:
12       In that ruling and in the
13       final rule it said that any
14       cost report that had not been
15       settled for any year would use
16       the newly published SSI
17       ratios.  So what I'm trying to
18       find out, based on the
19       methodology that was proposed
20       and then finalized in the
21       final rule, what I'm trying to
22       find out is do these three
23       cost reports have CMS' SSI
24       ratio based on the revised
25       methodology, based on Bay
```

123

```
 1       State?
 2   MS. LETRAN:
 3       Got it.  Yes.  Yes, they do.
 4       And I know that because in one
 5       of these exhibits here, I'm
 6       not sure which page, we have a
 7       data use agreement and an
 8       e-mail from CMS staff giving
 9       us the file, and that e-mail
10       was around 2013.
11   MS. BENSON:
12       Okay.
13   MS. LETRAN:
14       And then I also received
15       another file from another CMS
16       staffer, you know, in 2015,
17       and the data was the same.
18       So, yes, it is after the Bay
19       State 1498-R republished data.
20   MS. BENSON:
21       Okay.  I just wanted to make
22       sure the record was clear that
23       these are the newly published
24       SSI ratios using the new
25       methodology.
```

124

```
 1   MS. LETRAN:
 2       Yes, they are.
 3   MS. BENSON:
 4       If you can turn to P20.  I
 5       think that was the exhibit
 6       that had all that nice
 7       flowcharting in it.
 8   MS. LETRAN:
 9       Yes.
10   MS. BENSON:
11       And specifically, in the left-
12       hand column, kind of the
13       greenish-yellow bubble...
14   MS. LETRAN:
15       Yes.
16   MS. BENSON:
17       ...that talks about, I guess,
18       where the data comes from that
19       you begin to use in your
20       process.  And it comes from
21       several different data
22       sources; paid claims, the PCL
23       file, the PS&R file, the PFC
24       DSH database.  My question is,
25       the actual claims that you are
```

125

```
 1        using; the patient days, the
 2        patients and the days, why
 3        would you use like a state-
 4        paid claim file in addition to
 5        the PS&R file?  Why aren't you
 6        just using the PS&R file to
 7        bring in the claims?
 8   MS. LETRAN:
 9        Sure.  So in the process, our
10        original data is actually from
11        the hospital internal data.
12        So that's in the red box.  I'm
13        going to go into a little bit
14        of detail.
15   MS. BENSON:
16        Okay.
17   MS. LETRAN:
18        So we want to capture all of
19        our basis, foundation for that
20        particular year, so we capture
21        that from the hospital's
22        internal data.  And we're
23        using the state-paid claims
24        data so that we can look for
25        the aid code...
```

126

```
 1   MS. BENSON:
 2        Okay.
 3   MS. LETRAN:
 4        ...because the aid code is the
 5        missing element here.  So
 6        that's why I used the state-
 7        paid claim summary for the aid
 8        code.  And then we use the
 9        PS&R to assure ourselves that
10        we are only claiming Medicare
11        paid claims.  So we're using
12        them for different validation
13        process.
14   MS. BENSON:
15        Okay, so if you have somebody
16        on your file, the -- and I
17        guess your inpatient database
18        file that -- of all your
19        patients, that was not paid by
20        Medicare...
21   MS. LETRAN:
22        Right.
23   MS. BENSON:
24        ...maybe it had a Medicare
25        claim on it because at intake
```

127

```
 1        you believed that patient
 2        should be paid by Medicare
 3        but, in fact, it wasn't for
 4        one of numerous reasons.
 5   MS. LETRAN:
 6        Exactly.
 7   MS. BENSON:
 8        The claim could be denied, the
 9        Medicare number could be
10        wrong, you know, I won't go
11        and name other possible
12        reasons, but would that claim
13        be in your file and be picked
14        up here and matched?
15   MS. LETRAN:
16        No.  That claim would be
17        dropped off at the end.  So
18        that was in the orange box.
19        So after we're going through
20        everything, and if we cannot
21        validate that that patient was
22        a truly paid Medicare claim,
23        then we will not claim that.
24   MS. BENSON:
25        Okay, so they would be dropped
```

128

```
 1        off by the orange box.  Okay,
 2        thank you.  So do you know
 3        what the denominator of your
 4        file was?  For instance, we
 5        just talked about page 503, I
 6        think it was 503 or...
 7   MS. LETRAN:
 8        In P27, right.
 9   MS. BENSON:
10        Yeah, I think it was 503.
11        Yes, 503, where the -- looks
12        like the denominator that
13        Medicare used, you initially
14        said that they used 33,149,
15        but you believe it should be
16        32,371.  And I believe you
17        said the difference between
18        those two numbers was that the
19        larger number included total
20        length of stay, whereas the
21        smaller number included the
22        paid days.
23   MS. LETRAN:
24        The covered, right.  The...
25   MS. BENSON:
```

**JA 143**

129

```
 1        The covered days.
 2   MS. LETRAN:
 3        ...covered days, right.
 4   MS. BENSON:
 5        Okay.  And can you explain to
 6        me, when you say covered as
 7        opposed to paid, what is the
 8        difference?
 9   MS. LETRAN:
10        Well, I'm using the...
11   MS. BENSON:
12        In your mind.
13   MS. LETRAN:
14        All right.  I'm using the
15        exact language in the file.
16        So if you were to pull up the
17        MedPAR file, the file would
18        have a header -- which you
19        don't have it here, the file
20        would have a header that say
21        Medicare-covered days.  So
22        you're right, covered days
23        should be paid days, but
24        that's what the file
25        indicates.  So the 32,371 came
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

130

```
 1        from CMS MedPAR SSI file.  It
 2        wasn't my number.
 3   MS. BENSON:
 4        And it said -- okay, so what
 5        was your number?
 6   MS. LETRAN:
 7        I'm going with that number.
 8        So my number that I'm putting
 9        here is 32,371.
10   MS. BENSON:
11        Right, I understand that,
12        but...
13   MS. LETRAN:
14        Um-hum.
15   MS. BENSON:
16        ...when you -- you have a
17        group of days that you're
18        looking at...
19   MS. LETRAN:
20        Right.
21   MS. BENSON:
22        ...and you're looking at those
23        days to see if they, and I'll
24        say are SSI-eligible based on
25        the aid codes that you have...
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

131

```
 1   MS. LETRAN:
 2        Yes.
 3   MS. BENSON:
 4        ...what was the denominator of
 5        -- what was the total number
 6        of days in that file for 2006?
 7   MS. LETRAN:
 8        Okay.  So I do not have that
 9        information there, but I can
10        look it up.  It would be
11        different because the total
12        days that I have for my
13        internal -- from our internal
14        database would be the total
15        length of stay.  And we would
16        have issues in there, for
17        example, denial and untimely
18        billing and all sort of issues
19        that were not paid.  So in our
20        internal database, we don't
21        track -- we don't breakout an
22        account for the actual paid
23        days, I have to rely on an
24        external source to get the
25        paid days.  So, for example, a
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

132

```
 1        patient came in and stayed 30
 2        days and we bill, and in our
 3        billing process somehow we've
 4        forgotten, we billed
 5        incorrectly and we only billed
 6        for 28 days, so we would only
 7        be paid for 28 days.  So the
 8        28 days is the covered days,
 9        but in my database I would
10        show 30 days because that's
11        the total length of stay.
12   MS. BENSON:
13        Right.
14   MS. LETRAN:
15        And so that's why I'm using
16        the covered days from the CMS
17        file.
18   MS. BENSON:
19        But I guess what I'm thinking
20        of is, that becomes your
21        denominator, but in your
22        numerator were you basing it
23        on something that had more
24        than the 32,371 days?
25   MS. LETRAN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 144**

00371

133

No, it would be less than that
because I'm only looking for
Medicare-covered or paid days
in my population.  So in the
final population I'm looking
for Medicare Part A paid with
SSI benefit.

MS. BENSON:
Right.  Right.  I understand
what you're looking for.  I
guess what I'm a little bit
concerned about is that you
take a database that's very
big...

MS. LETRAN:
Right.

MS. BENSON:
...and then you parse it
down...

MS. LETRAN:
Um-hum.

MS. BENSON:
...doing many different
things...

MS. LETRAN:

134

Exactly.

MS. BENSON:
...and you pull out a number
of days, but then you take
that number of days and you
apply it to an unrelated
denominator, because you're
applying it to a denominator
that's coming out of the
Medicare system, but your
inputs didn't come out of the
Medicare system.  The inputs
came out of numerous different
systems.

MS. LETRAN:
Right.

MS. BENSON:
And so I'm wondering if you're
comparing apples to apples.

MS. LETRAN:
Apples to apples.

MS. BENSON:
That's...

MS. LETRAN:
Right, I...

135

MS. BENSON:
That's my question.

MS. LETRAN:
I understand your question,
and I -- may I look at some of
the...

MS. BENSON:
Sure.

MS. LETRAN:
...schedules in here to...

MS. BENSON:
And I don't want to put you on
the spot...

MS. LETRAN:
I understand.  Yeah.

MS. BENSON:
...so it may be something
that...

MS. LETRAN:
I...

MS. BENSON:
...you may have to get to me
post-hearing on.

MS. LETRAN:
If I could do that, that would

136

be great because I have -- I
do have that information, you
know, in...

MS. BENSON:
Yes.

MS. LETRAN:
...on my computer, but I'm --
I just want to validate -- and
I was hoping that I can answer
that question right here with
the exhibits that are here.

MS. BENSON:
I mean what my concern is, is
that, you know, when I go back
to P20, and I know that you're
removing days and I know that
you're removing them maybe
after a matching process...

MS. LETRAN:
Yes.

MS. BENSON:
...if they weren't paid, but
it's -- you know, if you start
with a very big number, and as
you say, there's denials,

**JA 145**

137

there's maybe days that
weren't timely billed, there's
lots of other reasons, and
some of those days get into
the total that have been
identified as SSI days...

MS. LETRAN:
Um-hum.

MS. BENSON:
...based on your
methodology...

MS. LETRAN:
Yes.

MS. BENSON:
...and then that's compared to
a denominator that comes from
something else, that's a
concern.

MS. LETRAN:
Right, because it's not
apples-to-apples.  But I --
like I say, I'm pretty certain
that it's the correct number.
If I can bring your attention
to page 517 within Exhibit

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

138

P27, see if we can -- I'm
trying to find a good example
to show to you.  Are you -- so
if we look at page 517, at the
last line, the last
subtotal...

MS. BENSON:
Yes.

MS. LETRAN:
...you can see that the days
stay that we show -- that I
show is 1,204, so those are
the total length of stay in
our system.  And the CMS
Medicare days is 1,146.  And
you know what, I don't have
enough information here to --
so let me get back to you with
the post-hearing -- in the
post-hearing Brief on that.

MS. BENSON:
All right.  I would appreciate
it.

MS. LETRAN:
But I -- I'm -- I understand

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

139

your concern that we need to
be consistent with the
denominator.

MS. BENSON:
Yes.  And just because I want
to -- again, I'm thinking of
consistency, in your
calculations, and I'm not sure
if the fiscal year ended this
Provider, it's December 31, so
are you looking at the federal
fiscal year or are you looking
at the -- in your data, or are
you looking at the Provider's
fiscal year, which is the
calendar year?

MS. LETRAN:
Right.  I'm looking at the
federal fiscal year, because
we never asked for a
realignment so we always go
with the federal fiscal year
SSI.  And if you look at any
of these particular year, you
will see that it will start

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

140

out in October and it will end
in September.

MS. BENSON:
Okay.  That was...

MS. LETRAN:
And...

MS. BENSON:
That was one of my questions.

MS. LETRAN:
Yes.

MS. BENSON:
I wanted to make sure that, in
the data analysis that you
were doing, you were looking
at the federal fiscal year...

MS. LETRAN:
Federal fiscal year, right.

MS. BENSON:
...and that's what was on your
cost report.

MS. LETRAN:
Right.  And it -- and it's
labeled on each of the
exhibits.

MS. BENSON:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 146**

141

1    I saw that, and I just wanted
2    to make sure that it wasn't
3    that way, just because that's
4    how the SSI is done.
5  MS. LETRAN:
6       Right.
7  MS. BENSON:
8       Okay.  I guess my other -- my
9    only other question is, and
10   you may not be the right
11   person to ask this to, and if
12   not, just say that you're not
13   the right person, I know you
14   picked up aid codes 10, 20,
15   and 60, and I know in the
16   final rule CMS talked about
17   codes C01, M01, and M02.  Is
18   there a direct correlation
19   between 10, 20, and 60 and
20   C01, M01, and M02?
21 MS. LETRAN:
22      I'm not the person to answer
23   that.
24 MS. BENSON:
25      Okay.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

142

1  MS. LETRAN:
2       I'm not familiar with the SSA
3    coding system at all.
4  MS. BENSON:
5       Okay.
6  MS. LETRAN:
7       No, I'm only familiar with the
8    state system.
9  MS. BENSON:
10      Then I won't ask you.
11 MS. LETRAN:
12      Okay.  Yeah, that should be --
13   but I -- yeah.
14 MS. BENSON:
15      I think that's all the
16   questions that I have.  Thank
17   you.
18 MS. LETRAN:
19      Yeah.  Thank you.
20 THE CHAIRMAN:
21      Mr. Ahern?
22 MR. AHERN:
23      Yes.  Thank you for your
24   testimony.
25 MS. LETRAN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

143

1       Thank you.
2  MR. AHERN:
3       It's painful to hear how much
4    work has been put into this...
5  MS. LETRAN:
6       Thank you.  I appreciate that.
7  MR. AHERN:
8       ...I can only imagine, from
9    the beginning to the end.
10 MS. LETRAN:
11      Right.
12 MR. AHERN:
13      And I'm going to look at this
14   just a little bit bigger
15   picture to get some
16   clarification, and not get
17   into the minutiae of some of
18   these counts.  Essentially, if
19   I am correct, and tell me if
20   I'm wrong, you set out to have
21   a more accurate count because
22   you realized the SSI percent
23   was substantially lower than
24   it should be.  Is that
25   correct?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

144

1  MS. LETRAN:
2       Right.
3  MR. AHERN:
4       What got you on this path, so
5    to speak?  It's -- it is quite
6    a path...
7  MS. LETRAN:
8       Right.
9  MR. AHERN:
10      ...what started you on this
11   path?
12 MS. LETRAN:
13      Thank you.  Thank you for
14   asking that question.  So when
15   I first came to Pomona, the
16   SSI number was a number that
17   attracted me right away
18   because in the cost report, if
19   you will, basically every item
20   in the cost report is
21   traceable down to the detail
22   level.  If you look at
23   payroll, you can trace down to
24   my paycheck, you can see how
25   much I make an hour.  You

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

145

know, if we have invoices, you
can trace it down, and
everything is supportable.
But when it comes to the SSI
back then, nothing was
available. The only thing
that was available was the
numerator and the denominator.
Not even a patient detail.
You know, we always call it,
in the Provider community, as
a black box, you know, and we
just live with it. So it was
very -- it's a mystery to me,
and it was a big number
because, as I mentioned, we
were getting about 16, $17
million of DSH reimbursement,
and the SSI component was
about 3, $4 million back then.
And so that was a big interest
for me. And then also, if you
look at the trend, every year
around July, August, we have
to anticipate it's going to be

146

published and what it is, and
it would go up and down and it
would fluctuate. And we know
that in the Pomona area, the
population is pretty much
consistent so why would our
SSI go up and down? So that
was another interest. And we
got consultants approaching us
telling us that it's not
right, so that when we got
onto that question, we wanted
to validate, and it was years
in the making to validate all
this process.
MR. AHERN:
    So from what I'm hearing, the
    key element that might have
    told you you had to do
    something is that there was no
    fluctuation from your point of
    view, but there's fluctuation
    on the number that's being
    published in terms of the SSI
    percent. So you're seeing a

147

fluctuating percentage that
doesn't track to what you're
experiencing at your hospital.
MS. LETRAN:
    Right, a fluctuating
    percentage, and no detail to
    support such a big
    reimbursable number.
MR. AHERN:
    Can you recall roughly how big
    the fluctuations you were
    seeing that got you on this
    track? Just in rough terms.
MS. LETRAN:
    Yeah. I think in the
    beginning it was, I would say
    9, 10, 12 percent, and then
    one year it would jump to 23
    percent, and then one year
    would go back to 18 percent.
    And when it jump up by 23
    percent, we would have a
    pickup of like $800,000 in our
    books and we were very happy
    with that, you know, and then

148

we were hoping that, okay,
next year maybe it will stay
at 23 percent, and it would
drop down to 18 and we would
have to take a hit of several
hundred thousand dollars on
our books.
MR. AHERN:
    So you said let's give this a
    better look, and you developed
    this process over the years.
    And you're trying to get it
    validated, if possible, and
    use it going forward...
MS. LETRAN:
    Right.
MR. AHERN:
    ...is the essence of...
MS. LETRAN:
    Right. Right. And then I
    want to -- as it is a very
    difficult process because, as
    far as the billing office is
    concerned, they don't need to
    know the aid code to bill

**JA 148**

149

1    Medi-Cal, they just need to
2    know that the patient is
3    eligible, and if the patient
4    is full scope or limited
5    scope, whatever the aid code
6    is really not important.  So
7    that is not an indicator that
8    we tracked in our system, and
9    that was why it makes this
10   whole process so difficult.
11   MR. AHERN:
12       So moving through the process,
13       and I'm not going to revisit
14       that, we've gone into great
15       detail, and I thought very
16       orderly, very nicely done, at
17       one point you said you
18       contacted your
19       Representatives, and I
20       understand that.  In fact, in
21       the past, in your state I've
22       recommended that for people I
23       worked with.  But I didn't go
24       to a government relations
25       firm, and I was wondering why

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

150

1    and how you got to that point
2    before getting to Senator
3    Feinstein.
4    MS. LETRAN:
5        Yeah.
6    MR. AHERN:
7        What is that and what did it
8        cost you?  Or did it cost you
9        anything?
10   MS. LETRAN:
11       Yes, it cost us.  So this was
12       my -- this has been a great
13       experience for me, you know,
14       working with the government
15       legislative branches.  This
16       was my first time.  So when we
17       heard that we needed to reach
18       out to congressional help, I
19       went to my boss and I said we
20       need to do this, and we were
21       very closely involved with an
22       organization in California,
23       it's called Peach.  I'm not
24       sure if you've heard of them.
25       It's a private -- a central

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

151

1    organization that helped us
2    with our Medi-Cal DSH.  And we
3    have government relations
4    consultant on site already for
5    that, so we reached out to
6    them and we asked them to
7    help, and they were very nice.
8    They charged us a nominal fee
9    to do that.  Do you want me --
10   do you want to know how much?
11   MR. AHERN:
12       Five, 10,000?
13   MS. LETRAN:
14       4,000.
15   MR. AHERN:
16       Very nominal.
17   MS. LETRAN:
18       Yeah, 4,000.  And they were
19       very -- yeah.
20   MR. AHERN:
21       Virtually...
22   MS. LETRAN:
23       And it...
24   MR. AHERN:
25       ...nothing in the world of

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

152

1    what is and government
2    consultants, that's nothing.
3    MS. LETRAN:
4        I think it's nominal.
5    MR. AHERN:
6        Virtually nothing.
7    MS. LETRAN:
8        I think it's -- and they did a
9        lot of work.  They drafted the
10       letter, they met with me.  We
11       talked about the issue.  I
12       explained to them about DSH
13       and the reimbursement impact,
14       because they needed to be
15       onboard.  So -- yes.
16   MR. AHERN:
17       And they connected you with
18       Senator Feinstein, et cetera,
19       or contacted their staffers
20       and got the -- provided the
21       factual backdrop that the
22       senator would want before she
23       gets involved.
24   MS. LETRAN:
25       Exactly.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

153

```
 1  MR. AHERN:
 2      Like bring her up-to-speed...
 3  MS. LETRAN:
 4      Right.  Right.
 5  MR. AHERN:
 6      ...and make sure she's solid
 7      in what she's putting her name
 8      to.
 9  MS. LETRAN:
10      Right.
11  MR. AHERN:
12      So that said, I don't have any
13      other question.  I mean I
14      think what we see here is a
15      process that you believe is
16      valid, but you'd like it
17      validated.
18  MS. LETRAN:
19      Right.
20  MR. AHERN:
21      And you're willing to risk it
22      being invalidated.
23  MS. LETRAN:
24      Correct.
25  MR. AHERN:
```

154

```
 1      But you're going in
 2      legislative and bureaucratic
 3      circles, and getting finally
 4      to us.
 5  MS. LETRAN:
 6      Thank you.  Right, yes.
 7  MR. AHERN:
 8      Okay, so that's all I have.
 9  THE CHAIRMAN:
10      Mr. Ziegler?
11  MR. ZIEGLER:
12      Okay.  Yeah, again, thank you
13      for your testimony.  And I do
14      appreciate the work you've
15      done here...
16  MS. LETRAN:
17      Thank you.
18  MR. ZIEGLER:
19      ...because I actually come
20      from the Provider's side...
21  MS. LETRAN:
22      Thank you.
23  MR. ZIEGLER:
24      ...so I know this SSI issue
25      has been an issue everybody
```

155

```
 1      has been trying to figure out
 2      for some time now.  So it's a
 3      big, big issue.  If you could
 4      turn to P20, your diagram
 5      here, the key factor, if I
 6      were to summarize this is, in
 7      order for you to get to the
 8      proper SSI percentage,
 9      basically, the key factor here
10      is the aid codes.  Without the
11      aid codes you'd have no way of
12      getting to that SSI
13      percentage.
14  MS. LETRAN:
15      Correct.
16  MR. ZIEGLER:
17      Correct?  Okay.
18  MS. LETRAN:
19      Yes.
20  MR. ZIEGLER:
21      Now, you referred to, and
22      correct me, I may have
23      misunderstood you, but you did
24      a lot of reference to the
25      MedPAR file...
```

156

```
 1  MS. LETRAN:
 2      Yes.
 3  MR. ZIEGLER:
 4      ...which is different from the
 5      PS&R.  That's your more
 6      detailed file, has more info.
 7      Correct?
 8  MS. LETRAN:
 9      Correct.
10  MR. ZIEGLER:
11      Okay, so you actually get that
12      MedPAR file, you actually --
13      from CMS?  It's not the PS&R
14      detailed file, you're getting
15      another file called MedPAR.
16  MS. LETRAN:
17      Right.  So...
18  MR. ZIEGLER:
19      Okay, go ahead.
20  MS. LETRAN:
21      The MedPAR -- I mean the PS&R
22      I think is coming from the
23      MedPAR file.
24  MR. ZIEGLER:
25      Right.  It...
```

**JA 150**

00377

157

1  MS. LETRAN:
2       Right.
3  MR. ZIEGLER:
4       ...ultimately does, yes.
5  MS. LETRAN:
6       Right.  And then for the PS&R
7       nowadays we can go online and
8       request...
9  MR. ZIEGLER:
10       Correct.
11  MS. LETRAN:
12       ...that information easily,
13       and it comes back real-time.
14       And to get the detail, we just
15       simply request the detail on
16       line and it will come in a
17       diskette.  But with the CMS
18       MedPAR SSI file, we have to
19       wait for the right timing when
20       it's released.  And when it's
21       released we have to reach out
22       to a different division --
23       division of operational...
24  MR. ZIEGLER:
25       Right.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

158

1  MS. LETRAN:
2       ...IT...
3  MR. ZIEGLER:
4       Okay.
5  MS. LETRAN:
6       ...or something.  And then we
7       have to ask for that file.
8  MR. ZIEGLER:
9       Um-hum.
10  MS. LETRAN:
11       And the people there were very
12       responsive.  When we asked,
13       they would give it to us.
14  MR. ZIEGLER:
15       Okay.  So basically, when you
16       referred to MedPAR, you --
17       it's called a DUA.
18  MS. LETRAN:
19       Right.
20  MR. ZIEGLER:
21       Right?  You filled out your
22       DUA and then they sent you the
23       data.  And I've gotten that
24       data too.
25  MS. LETRAN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

159

1       Right.
2  MR. ZIEGLER:
3       Is that what you're referring
4       to is MedPAR, in essence?
5  MS. LETRAN:
6       Well, yes.  Yes, but because
7       the name -- the actual name --
8       the actual official name is
9       also called the CMS MedPAR SSI
10       file.  That's...
11  MR. ZIEGLER:
12       Okay.
13  MS. LETRAN:
14       That's the name of it.  So
15       that when we request, the
16       other side doesn't get
17       confused as to what we're
18       asking for.
19  MR. ZIEGLER:
20       Okay.  Okay.
21  MS. LETRAN:
22       Yeah.
23  MR. ZIEGLER:
24       So on that file, did you say
25       that it had the aid codes or

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

160

1       anything like that?
2  MS. LETRAN:
3       No...
4  MR. ZIEGLER:
5       No.
6  MS. LETRAN:
7       ...it does not have the...
8  MR. ZIEGLER:
9       The -- okay.
10  MS. LETRAN:
11       ...aid code.
12  MR. ZIEGLER:
13       The only way you have the aid
14       code is based upon your own
15       internal records.
16  MS. LETRAN:
17       Exactly.
18  MR. ZIEGLER:
19       Okay.
20  MS. LETRAN:
21       Right.
22  MR. ZIEGLER:
23       All right.
24  MS. LETRAN:
25       So in that -- to add onto

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 151**

161

1     that, in that file, there is a
2     file format somewhere in these
3     exhibits, I don't remember
4     which one.  We can look at the
5     index and it will tell you the
6     fields that were available in
7     the MedPAR file.  Maybe like
8     eight fields in there.
9   MR. ZIEGLER:
10        Yeah.  It wasn't much, if
11        it's...
12  MS. LETRAN:
13        Yeah.
14  MR. ZIEGLER:
15        ...the same file I'm thinking
16        of.
17  MS. LETRAN:
18        Okay.
19  MR. ZIEGLER:
20        Okay.  So you also said the
21        process is -- basically, I
22        assume you have an upfront
23        admissions process to capture
24        that aid code...
25  MS. LETRAN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

162

1        Yes.
2   MR. ZIEGLER:
3        ...correct?
4   MS. LETRAN:
5        Right.
6   MR. ZIEGLER:
7        Okay.  And that's more -- I
8        guess your staff is very aware
9        of the importance of that aid
10        code...
11  MS. LETRAN:
12        They...
13  MR. ZIEGLER:
14        ...so...
15  MS. LETRAN:
16        I'm sorry.
17  MR. ZIEGLER:
18        Go ahead.
19  MS. LETRAN:
20        They are -- the admitting
21        people are aware of my
22        department's needs for it, and
23        how high is my needs in the
24        whole scheme of things is not
25        very high...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

163

1   MR. ZIEGLER:
2        Okay.
3   MS. LETRAN:
4        ...because the admitting
5        people have to worry about
6        admitting patient quickly,
7        getting the financial...
8   MR. ZIEGLER:
9        Right.
10  MS. LETRAN:
11        ...information, you know, so
12        getting the extra aid code for
13        the reimbursement department
14        is not that important, if you
15        will.  And that's just a...
16  MR. ZIEGLER:
17        Right.
18  MS. LETRAN:
19        ...fact of life, you know.
20        So...
21  MR. ZIEGLER:
22        But they must be maintaining
23        it for...
24  MS. LETRAN:
25        They are.  They...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

164

1   MR. ZIEGLER:
2        ...you to be able to -- for
3        you to get -- do this analysis
4        and to come up with a higher
5        SSI percentage, evidently,
6        they're pretty much almost all
7        the time getting that code.
8   MS. LETRAN:
9        Right.  I would say 80 percent
10        of the time, or not all the
11        time.  They do maintain it,
12        and that's why I have to use
13        this HDX database to capture
14        the data because it's
15        maintained in this different
16        database.
17  MR. ZIEGLER:
18        Okay, I see.  Okay.
19  MS. LETRAN:
20        Yes.
21  MR. ZIEGLER:
22        Got you.  I missed that piece.
23        So you're really the HDX,
24        which is the state database,
25        is why you're pulling that in.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

165

```
 1   MS. LETRAN:
 2       Yes.
 3   MR. ZIEGLER:
 4       Okay.  So that's really your
 5       key reference to getting that
 6       aid code.
 7   MS. LETRAN:
 8       Exactly.
 9   MR. ZIEGLER:
10       Okay.
11   MS. LETRAN:
12       Right.
13   MR. ZIEGLER:
14       Now, I know the key to coming
15       up with the SSI percentage,
16       and you can help me out here,
17       is really -- it's the
18       application, and you know
19       this, for instance, when
20       someone applies to admission
21       and you're trying to get them
22       Medicaid certified, and you
23       can tell me if you -- if I'm,
24       you know, overreaching here,
25       but one is your Medicaid
```

166

```
 1       application, which is a page
 2       -- two-page application, the
 3       other application is an SSI
 4       application, or SSDI.
 5   MS. LETRAN:
 6       Okay.
 7   MR. ZIEGLER:
 8       So that's a more extensive
 9       application.  So a lot of
10       times what they'll do is
11       they'll file the Medicaid
12       application -- I don't know --
13       do -- is -- do you have your
14       staff, is it contracted at
15       your facility or is it...
16   MS. LETRAN:
17       I'm not familiar with the
18       application process.
19   MR. ZIEGLER:
20       Okay.  You're not, okay.
21   MS. LETRAN:
22       Right.
23   MR. ZIEGLER:
24       That's fine.
25   MS. LETRAN:
```

167

```
 1       Right.
 2   MR. ZIEGLER:
 3       I guess the key point I'm
 4       getting at is, in order for
 5       someone to get SSI, SSDI, if
 6       it's either done at the
 7       facility, which generally it
 8       isn't, by the way, because --
 9       especially if you're paying
10       for people to get this -- get
11       patients Medicaid certified,
12       they'll always go for that
13       shorter application, but in
14       order for them to get SSI and
15       be identified for SSDI it's
16       basically done somehow by the
17       state.  So the state
18       ultimately has the information
19       because they're the ones who
20       are submitting the information
21       on behalf of, you know, people
22       who qualify within the state.
23   MS. LETRAN:
24       Right.  Right.
25   MR. ZIEGLER:
```

168

```
 1       So basically, what I'm trying
 2       to get at is, so we know the
 3       state ultimately is the one
 4       who is filing these
 5       applications, and I'm not
 6       familiar with exactly how that
 7       occurs or -- you know, I -- it
 8       seems to me it's more -- the
 9       patient would actually have to
10       be aware that that's
11       available, and then they would
12       apply somehow or another
13       through the state.  Are you
14       familiar with the process,
15       or...
16   MS. LETRAN:
17       I'm a bit familiar with that.
18       So I know at our hospital we
19       have a department that is
20       called Medi-Cal eligibility or
21       something to that extent, that
22       we would apply for Medi-Cal...
23   MR. ZIEGLER:
24       Okay.
25   MS. LETRAN:
```

**JA 153**

169

```
 1        ...when a low-income patient,
 2     uninsured patient showed up
 3     and...
 4  MR. ZIEGLER:
 5        Right.
 6  MS. LETRAN:
 7        ...did not have insurance.
 8     And we look at their financial
 9     and we feel like they may
10     quality, we would work with
11     the social service office...
12  MR. ZIEGLER:
13        Yeah.
14  MS. LETRAN:
15        ...and apply for Medi-Cal
16     only, because as far as the
17     hospital is concerned, we want
18     that claim to be paid so we
19     would apply for Medi-Cal...
20  MR. ZIEGLER:
21        Right.
22  MS. LETRAN:
23        ...but not SSI.  And that's
24     why I'm not familiar with the
25     SSI...
```

170

```
 1  MR. ZIEGLER:
 2        Yeah, well, they...
 3  MS. LETRAN:
 4        ...process.
 5  MR. ZIEGLER:
 6        ...so...
 7  MS. LETRAN:
 8        Right.
 9  MR. ZIEGLER:
10        ...you may want to look into
11     that, but...
12  MS. LETRAN:
13        Right.
14  MR. ZIEGLER:
15        ...then they don't...
16  MS. LETRAN:
17        Right.  But then -- but on the
18     SSI, I do, from my contact and
19     talking with the state, I know
20     that -- and you are correct
21     that the process would start
22     with the state...
23  MR. ZIEGLER:
24        Yeah.
25  MS. LETRAN:
```

171

```
 1        ...but then from my
 2     understanding, the Federal
 3     Government will take over to
 4     manage the federal SSI.  And
 5     it may have to do...
 6  MR. ZIEGLER:
 7        Okay.
 8  MS. LETRAN:
 9        ...with Section 1638 agreement
10     where...
11  MR. ZIEGLER:
12        Okay.
13  MS. LETRAN:
14        ...you know, where the federal
15     will take over and manage this
16     whole thing, and the state
17     will be out of the picture
18     after the initial application
19     is filed.
20  MR. ZIEGLER:
21        Okay.  So here's sort of where
22     I'm driving at.  We're relying
23     on the 10 -- I forget, the 20,
24     60 codes.
25  MS. LETRAN:
```

172

```
 1        Sixty.
 2  MR. ZIEGLER:
 3        And the question, I guess,
 4     that anybody's going to want
 5     to understand is, those are
 6     codes that Medi-Cal is
 7     assigning, correct?  Is it
 8     Medi-Cal?
 9  MS. LETRAN:
10        No, Medi-Cal...
11  MR. ZIEGLER:
12        Or Medicaid or California,
13     or...
14  MS. LETRAN:
15        Medicaid -- Medi-Cal, but...
16  MR. ZIEGLER:
17        Medicaid.
18  MS. LETRAN:
19        But they told me that it was
20     -- it's coming from SSA.
21  MR. ZIEGLER:
22        Right, that's what they said.
23     So -- yeah.  So how exactly
24     does that process work?
25     That's what I'm trying to
```

**JA 154**

173

```
 1   understand.  Is SSA -- because
 2   they're providing a
 3   supplemental payment, they're
 4   attaching it to the SSI,
 5   according to what I read in
 6   the paper -- the appeal paper.
 7   So they're attaching that
 8   supplemental payment to the
 9   SSI, and then they're paying
10   an administrative fee, if I'm
11   understanding it, for SSA to
12   then -- to pay the individual
13   patients who qualify for SSI,
14   whatever that program is.  So
15   they're -- so how are they
16   becoming -- how is the state
17   becoming aware of the patients
18   that they have to provide this
19   supplemental payment for?
20   MS. LETRAN:
21       So those were some of the
22   questions that I actually
23   asked the state myself, and
24   again, they could not help me
25   and they -- in one of the
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

174

```
 1   e-mails they actually say that
 2   the SSA office maintain all of
 3   that information and they
 4   don't own.  So, therefore, I'm
 5   -- I don't know.
 6   MR. GETZOFF:
 7       May I?
 8   MR. ZIEGLER:
 9       Yeah, go ahead.
10   MR. GETZOFF:
11       Sorry to interrupt.
12   MR. ZIEGLER:
13       No, that's fine.  That's fine.
14   MR. GETZOFF:
15       We do have the former director
16   of the Medi-Cal program
17   sitting back there, and he
18   will be testifying, and I
19   suspect he will be able to
20   answer those questions...
21   MR. ZIEGLER:
22       Okay, that's fine.
23   MR. GETZOFF:
24       ...pretty easily.
25   MR. ZIEGLER:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

175

```
 1   Okay, that's fine.  That's
 2   fine.  Yeah, because I'm just
 3   looking for the process,
 4   how...
 5   MS. LETRAN:
 6       Right.
 7   MR. ZIEGLER:
 8       ...do they send a file, or
 9   what is the process.
10   MS. LETRAN:
11       Right.  I understand.  That
12   was what I asked them because
13   I say -- I asked the state
14   could you tell me if this
15   patient qualified for cash
16   state grant, can you look into
17   your record and let me know...
18   MR. ZIEGLER:
19       Right.
20   MS. LETRAN:
21       ...that the cash grant came
22   from the state and not the
23   federal, and they told me they
24   couldn't help me at all
25   because...
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

176

```
 1   MR. ZIEGLER:
 2       Okay.
 3   MS. LETRAN:
 4       ...it was maintained by SSA.
 5   MR. ZIEGLER:
 6       Okay.  We talked about the SSP
 7   a little bit, and I think you
 8   said Amy, I forget it,
 9   Rosenkrantz, or whatever...
10   MS. LETRAN:
11       Rosenkranz, yes.
12   MR. ZIEGLER:
13       Okay.  She basically said all
14   your 10, 20, and 60 were --
15   was all SSI, no...
16   MS. LETRAN:
17       All federal, right.
18   MR. ZIEGLER:
19       ...no SSP.  I think you had
20   said also that there was a way
21   to -- that you know now to
22   validate the SSP?
23   MS. LETRAN:
24       Yes.
25   MR. ZIEGLER:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

177

```
 1        Okay.  And...
 2  MS. LETRAN:
 3        And that...
 4  MR. ZIEGLER:
 5        ...what is that -- how is
 6        that?
 7  MS. LETRAN:
 8        That way will be through our
 9        next witness, Mr. Stan
10        Rosenstein, who was the former
11        director at the Medi-Cal
12        department.  He contacted the
13        California Department of
14        Social Services and were able
15        to obtain a listing -- a
16        general state average listing
17        of all the people that have
18        SSI, and then the people that
19        have SSP only.  And based on
20        that listing, I think that's
21        in Exhibit P35 or P36...
22  MR. ZIEGLER:
23        Okay.
24  MS. LETRAN:
25        ...in that listing it shows
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

178

```
 1        that on average it's -- on a
 2        monthly average it's about 14
 3        percent...
 4  MR. ZIEGLER:
 5        Okay.
 6  MS. LETRAN:
 7        ...for the state-only SSP.
 8  MR. ZIEGLER:
 9        Okay.  But you haven't figured
10        out a way yet to do it per
11        patient.  It's...
12  MS. LETRAN:
13        No.  I...
14  MR. ZIEGLER:
15        No, okay.
16  MS. LETRAN:
17        And that was -- right.  Right.
18  MR. ZIEGLER:
19        Okay.  Yeah.
20  MS. LETRAN:
21        Right.  Right.  Yes, that's --
22        that is my dilemma.  I --
23        yeah, I don't have...
24  MR. ZIEGLER:
25        Right, okay.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

179

```
 1  MS. LETRAN:
 2        ...the information to figure
 3        it out down to the patient
 4        level for the state-only.  So
 5        we were hoping to come to a
 6        settlement and say we will
 7        reduce whatever we're asking
 8        by 14 percent, because that's
 9        the state average...
10  MR. ZIEGLER:
11        Got you.
12  MS. LETRAN:
13        ...you know, and we believe
14        that the state average is
15        representative of Pomona and
16        Los Angeles County.
17  MR. ZIEGLER:
18        Now, I don't know if you
19        tracked this, but as a result
20        of the Bay State you had a
21        previous SSI percentage...
22  MS. LETRAN:
23        I do track that.
24  MR. ZIEGLER:
25        Right.  And then you have it
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

180

```
 1        as a result of the revised Bay
 2        State.  How much did that
 3        vary, just out of curiosity?
 4        Very -- as what I saw, very
 5        insignificant.
 6  MS. LETRAN:
 7        Right.  When did you -- what
 8        have you seen?
 9  MR. ZIEGLER:
10        For the hospital I worked at,
11        it -- there wasn't much of a
12        difference once they reran the
13        data.
14  MS. LETRAN:
15        Correct.  And that's what I've
16        seen.  I've tracked it and
17        actually have a chart, I
18        tracked it from 1987 on
19        through...
20  MR. ZIEGLER:
21        Right.
22  MS. LETRAN:
23        ...present, and with the
24        reissuance of the 1498-R2, the
25        numbers changed little.  And
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 156**

181

```
1        in many of the years...
2  MR. ZIEGLER:
3        Very little.
4  MS. LETRAN:
5        ...it went the wrong way.
6  MR. ZIEGLER:
7        Yeah.  Um-hum.
8  MS. LETRAN:
9        So I know that for 1990 I
10       would have to pay CMS back
11       $250,000...
12 MR. ZIEGLER:
13       Right.  Yeah.
14 MS. LETRAN:
15       ...because the number went
16       completely the wrong way.
17 MR. ZIEGLER:
18       Yeah.
19 MS. LETRAN:
20       My denominator increased by
21       several thousand days, which
22       I'm not sure how...
23 MR. ZIEGLER:
24       Right.
25 MS. LETRAN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

182

```
1        ...and then my numerator went
2        down.
3  MR. ZIEGLER:
4        Um-hum.  So...
5  MS. LETRAN:
6        So...
7  MR. ZIEGLER:
8        ...that raises a question...
9  MS. LETRAN:
10       Right.  So that's why I...
11 MR. ZIEGLER:
12       ...right?  Yeah, I was...
13 MS. LETRAN:
14       ...I still...
15 MR. ZIEGLER:
16       ...expecting a big change when
17       I was sitting on...
18 MS. LETRAN:
19       Exactly, because...
20 MR. ZIEGLER:
21       ...the hospital's side.
22 MS. LETRAN:
23       ...in the Bay State it talked
24       about all the admission
25       duplicate record, forgetting
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

183

```
1        to use an ID, and this is the
2        revision, and after the
3        revision...
4  MR. ZIEGLER:
5        Um-hum.
6  MS. LETRAN:
7        ...I -- my numbers went the
8        wrong way.  So...
9  MR. ZIEGLER:
10       Let's see, if we could go to
11       P27 real quick.
12 MS. LETRAN:
13       Yes, I'm there.
14 MR. ZIEGLER:
15       Go to 0503.  And this ties
16       back into Ms. Benson's
17       question.  And this -- when
18       the -- the covered days, you
19       said again, you referenced the
20       MedPAR.
21 MS. LETRAN:
22       The MedPAR SSI file.
23 MR. ZIEGLER:
24       Is it -- SSI.  Did you tie
25       that also to the PS&R, the
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

184

```
1        32...
2  MS. LETRAN:
3        No, I didn't, because the PS&R
4        that we have is on a calendar
5        year, and not that I couldn't
6        order it by the federal fiscal
7        year, but I didn't want to...
8  MR. ZIEGLER:
9        I see.
10 MS. LETRAN:
11       ...I -- yeah, I didn't want to
12       go there...
13 MR. ZIEGLER:
14       Okay.
15 MS. LETRAN:
16       ...I wanted to stay with one
17       source from CMS.
18 MR. ZIEGLER:
19       Okay.
20 MS. LETRAN:
21       You know.  Yes.
22 MR. ZIEGLER:
23       Okay.  All right, let me see,
24       I think I had another
25       question.  Yeah, when you did
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

185

1      your matching and you came up
2      with your other codes, right.
3  MS. LETRAN:
4      The 1E, 6E from CMS.
5  MR. ZIEGLER:
6      Yeah.  Yeah.  Yeah.
7  MS. LETRAN:
8      Yes.  Yes.
9  MR. ZIEGLER:
10     So help me understand, so
11     you're going through your
12     whole process on P20, and it's
13     a very extensive process.
14     I've got to commend you for
15     it.  It's very, very detailed.
16 MS. LETRAN:
17     Thank you.
18 MR. ZIEGLER:
19     A very good process.  You ran
20     through that process and then
21     you did your matching.  Now,
22     where did you get -- I know
23     where you got it from, you got
24     it from the DUA, the -- what
25     you call the MedPAR file

186

1      returned with...
2  MS. LETRAN:
3      Right.
4  MR. ZIEGLER:
5      ...the SSI data.
6  MS. LETRAN:
7      Right.
8  MR. ZIEGLER:
9      Or did they have that 1E stuff
10     on it?
11 MS. LETRAN:
12     No.
13 MR. ZIEGLER:
14     I can't remember.
15 MS. LETRAN:
16     They don't.
17 MR. ZIEGLER:
18     They don't.
19 MS. LETRAN:
20     They don't.  Right.
21 MR. ZIEGLER:
22     Yeah, I don't recall they do.
23     So you got it from the MedPAR
24     file -- what you call the
25     MedPAR?

187

1  MS. LETRAN:
2      No, so I would get the aid
3      code from our own internal
4      database, either through HDX
5      or the Medi-Cal Point of
6      Service...
7  MR. ZIEGLER:
8      Okay, right.
9  MS. LETRAN:
10     ...Network, or the paid claims
11     summary.
12 MR. ZIEGLER:
13     Okay.  And then you're
14     matching -- I got you.  I got
15     you.
16 MS. LETRAN:
17     Right.
18 MR. ZIEGLER:
19     So you're getting that code,
20     and then you're seeing it's a
21     14 in -- whatever that file
22     was from the state, and then
23     you match against the file --
24     the return from -- with your
25     SSI.

188

1  MS. LETRAN:
2      Right.
3  MR. ZIEGLER:
4      Okay.  I got you.
5  MS. LETRAN:
6      Right.
7  MR. ZIEGLER:
8      I know exactly what you're
9      doing.  So any idea why some
10     of those had like 14 on it and
11     not your 10...
12 MS. LETRAN:
13     Yes, I have...
14 MR. ZIEGLER:
15     ...20, 60.
16 MS. LETRAN:
17     I have some ideas.  If you
18     look on page 502...
19 MR. ZIEGLER:
20     Um-hum.
21 MS. LETRAN:
22     ...the descriptions of the
23     miscellaneous aid codes, if
24     you look at 14, 1E, or 6E...
25 MR. ZIEGLER:

**JA 158**

189

Um-hum.

MS. LETRAN:

...they all had a cash grant previously, but for whatever reason they fell off. So they could have perhaps made more income for that month, or maybe they were in the hospital and they could not fill out the paperwork. I don't know how often they have to go back and submit the paperwork...

MR. ZIEGLER:

Yeah.

MS. LETRAN:

...because I know with SSI you have to prove that your income is at a certain level...

MR. ZIEGLER:

Right.

MS. LETRAN:

...and if -- every month -- if you're suddenly -- if you make too much then you would lose

190

out on that benefit. So perhaps they were sick and nobody was taking care of them, and they didn't do the paperwork...

MR. ZIEGLER:

Right.

MS. LETRAN:

...so somehow they fell off, but CMS knew that and CMS still gave those days to me...

MR. ZIEGLER:

Right.

MS. LETRAN:

...as an SSI patient.

MR. ZIEGLER:

But you would think, because your starting point there is the SSI, SSI says these patients qualify...

MS. LETRAN:

Right.

MR. ZIEGLER:

...right? That's your key starting point. And then

191

you're going to your state data and it's giving you different codes...

MS. LETRAN:

Right.

MR. ZIEGLER:

...than what you would expect.

MS. LETRAN:

Right.

MR. ZIEGLER:

So your starting point is your SSI, so you would expect this is -- in theory, you would expect it all to be 10, 20, or 60. You would expect.

MS. LETRAN:

Right. Right.

MR. ZIEGLER:

But for...

MS. LETRAN:

And...

MR. ZIEGLER:

...whatever reason, it wasn't. And -- so...

MS. LETRAN:

192

And -- right. And it's very small. Right? We're looking at 28 days...

MR. ZIEGLER:

Yeah, we're not looking at big numbers here.

MS. LETRAN:

Yeah. We're looking at, I think, less than 100 days.

MR. ZIEGLER:

Okay.

MS. LETRAN:

Yes.

MR. ZIEGLER:

I think that's all my questions. And, you know -- and I understand and you've done great work here. I know this is something...

MS. LETRAN:

Thank you.

MR. ZIEGLER:

...the hospital side has been trying to get at forever, and...

**JA 159**

193

MS. LETRAN:

Thank you.

MR. ZIEGLER:

...been, you know, suspicious of some of the numbers, but -- so I thank you for your testimony.

MS. LETRAN:

Thank you.

THE CHAIRMAN:

I just have two things that I wanted to touch upon, and one of them was sort of a follow-up by Mr. Ziegler that you may not be able to address, and that concerned the SSP. Wanted to see if you knew when SSP-only days might arise, as opposed to it actually being sort of a supplemental payment on top of an SSI payment.

MS. LETRAN:

Okay, I can answer that question.

THE CHAIRMAN:

194

Okay.

MS. LETRAN:

So we know that in California the SSP is an augmentation to the federal SSI.  So, for example, for -- if you qualify for SSI, the normal cash grant would be $600 a month, just as an example.  And for California, because of the cost of living and the higher ceiling, the number is $800. So if I qualify for SSI, I would automatically qualify for SSP and I would get a check for $800 a month.  And if I was retired and I got a pension income of $700, so now I'm only getting a cash grant of $100.  So now I'm an SSP-only patient because my supplemental income or my retired income is higher than the federal level.

THE CHAIRMAN:

195

Okay.  Another example would -- that was -- I'm not sure about was, I know that, for instance, there's a gap period between when you become SSI eligible and when actual payments begin.  So like if you become eligible like the 15th of a month, you actually don't begin receiving payments until the 1st of the following month, I think it is.

MS. LETRAN:

Okay.

THE CHAIRMAN:

And so would there be SSP for those initial 15 days of unpaid SSI, for example?

MS. LETRAN:

I'm not -- I don't know...

THE CHAIRMAN:

Okay.

MS. LETRAN:

...the answer.  So perhaps Mr. Rosenstein can talk about it.

196

THE CHAIRMAN:

Okay.

MS. LETRAN:

Yes.

THE CHAIRMAN:

So I know you're not challenging as part of your appeal that sort of short window where they're eligible but not receiving an SSI payment, but didn't know if part of the confusion about SSP-only was SSP-only occurring during that window...

MS. LETRAN:

That -- I see.  I see.  And could be a possibility, and that was why we were very willing to have SSA look at our record and say, hey, this is...

THE CHAIRMAN:

Sure.

MS. LETRAN:

**JA 160**

197

```
 1          ...wrong because of this, and
 2      this is wrong because of that,
 3      and we would say, okay, the
 4      whole thing is wrong.  So, you
 5      know, so...
 6  THE CHAIRMAN:
 7      Very understandable.
 8  MS. LETRAN:
 9      ...which -- yeah.  Thank you.
10  THE CHAIRMAN:
11      The other question was, I know
12      that in your charts you had --
13      I think it was in P27, you had
14      denoted that there were two
15      different denominator numbers;
16      one from MedPAR and one that
17      was published...
18  MS. LETRAN:
19      Yes.
20  THE CHAIRMAN:
21      ...and that that had a
22      reimbursement impact.  Is that
23      denominator issue -- is it
24      your position that it's part
25      of this appeal?
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

198

```
 1  MS. LETRAN:
 2      We didn't specify it in our
 3      position paper, so I'm not
 4      sure if it can be, but I would
 5      love for it to be part of the
 6      settlement, you know.  So --
 7      and I would like to hear from
 8      CMS are we -- am I wrong,
 9      should the information be
10      based on total length of stay
11      or total covered days...
12  THE CHAIRMAN:
13      Right.
14  MS. LETRAN:
15      ...because both of these
16      columns were provided in the
17      MedPAR SSI file.  It was
18      there.  It was there for me to
19      pick it out.  So I'm -- yeah,
20      I'm not sure how we want to
21      proceed with that, but -- so
22      that does have a reimbursement
23      impact.  This is like a
24      quarter of a percent, so
25      maybe, I don't know, less than
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

199

```
 1      $100,000 per year.
 2  THE CHAIRMAN:
 3      Okay.
 4  MS. LETRAN:
 5      So...
 6  THE CHAIRMAN:
 7      It'd be -- I'd ask Counsel to
 8      confirm whether or not that is
 9      part of this appeal, because
10      that may -- if it is then I
11      guess one of the things the
12      Board would have to, you know,
13      review would be whether or not
14      there's a, you know,
15      potential, you know, we'd want
16      to make sure that we have
17      jurisdiction to hear it in
18      terms of that it was sort of
19      properly part of the appeal.
20  MR. GETZOFF:
21      The claimed percentage
22      includes the paid days, which
23      is -- my understanding has
24      always been that the statute
25      and the regulations go by paid
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

200

```
 1      Part A days in the
 2      denominator.  So we're asking
 3      for the slightly lower
 4      denominator to be consistent
 5      with the regulation and the
 6      statute.  In that sense, I
 7      think the Board has
 8      jurisdiction, unless you're
 9      aware of something...
10  THE CHAIRMAN:
11      Well, it would be whether...
12  MR. GETZOFF:
13      ...else that...
14  THE CHAIRMAN:
15      ...or not it's a properly
16      preserved issue; meaning
17      whether or not, you know, the
18      Provider's appeal included,
19      from general -- generally
20      speaking, in terms of
21      jurisdiction...
22  MR. GETZOFF:
23      It's not a huge issue, I'll
24      put it that way, to be
25      honest...
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 161**

201

1  THE CHAIRMAN:
2     All right.
3  MR. GETZOFF:
4     ...but on the other hand, it
5     is -- I think the Provider has
6     consistently asked for the
7     slightly higher number in
8     their appeal.
9  THE CHAIRMAN:
10    Okay.
11 MR. GETZOFF:
12    I think even as back -- far
13    back as the appeal letter
14    probably used that...
15 MS. LETRAN:
16    Right.
17 MR. GETZOFF:
18    Yeah.  So...
19 MS. LETRAN:
20    And I'm sorry, and I agree
21    with my Counsel, it's not a
22    huge issue, but I wanted to
23    bring it up here just to point
24    out that when you deal with
25    data, there are all sorts of

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

202

1     misunderstanding...
2  THE CHAIRMAN:
3     Sure.
4  MS. LETRAN:
5     ...all sort of -- you pick up
6     the wrong column it messes
7     everything up...
8  THE CHAIRMAN:
9     That's right.
10 MS. LETRAN:
11    ...and this is an example of
12    it, you know.  So...
13 THE CHAIRMAN:
14    Right.  And I know that you
15    all had had a lot of breaking
16    out of issues and some split
17    off into other groups, and so
18    that was another reason why I
19    wanted to be able to confirm
20    that for the record and then
21    have the parties sort of
22    address that on a -- I guess
23    the post-hearing basis then.
24    That's all the questions that
25    I had.  So that being said,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

203

1     would ask Mr. Getzoff if you
2     had any additional questions
3     or redirect based on the
4     Board's questions?
5  MR. GETZOFF:
6     I do not.
7  THE CHAIRMAN:
8     Mr. Olszewski?
9  MR. OLSZEWSKI:
10    I just have one.
11             ***
12       RECROSS EXAMINATION
13 BY MR. OLSZEWSKI:
14    Q.  Ms. LeTran, when Board
15 Member Ziegler was asking you a
16 question I heard you say you received
17 codes 10, 20, and 60 from CMS.  I was
18 wondering if that was a misstatement
19 on your behalf.
20    A.  No, that would be a mistake
21 if I said that.
22    Q.  Okay.
23    A.  Right, because I do not...
24    Q.  Because CMS never gives...
25    A.  ...get aid codes from

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

204

1  CMS...
2     Q.  Okay.
3     A.  ...so I probably say HDX,
4  but I'm not sure, but that would have
5  been a mistake.  Yeah.
6             ***
7  MR. OLSZEWSKI:
8     Thank you.  That was it
9  THE CHAIRMAN:
10    Mr. Getzoff, any additional...
11 MR. GETZOFF:
12    No, sir.
13 THE CHAIRMAN:
14    Okay, great.  Then this
15    concludes your testimony, Ms.
16    LeTran.
17 MS. LETRAN:
18    Thank you, Mr. Nix.
19 THE CHAIRMAN:
20    Thank you.  And, Mr. Getzoff,
21    you can call your -- let's go
22    off the record.
23             ***
24 [Off the record]
25 [On the record]

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 162**

205

1               ***
2    THE CHAIRMAN:
3         Okay, let's go back on the
4         record.  Mr. Hefter, can you
5         please raise your right hand?
6    MR. HEFTER:
7         Sure.
8               ***
9    [Witness sworn]
10               ***
11   THE CHAIRMAN:
12         Thank you.  Mr. Getzoff, you
13         can proceed with your direct.
14   MR. GETZOFF:
15         Thank you.
16               ***
17         TZVI HEFTER,
18   having been first duly sworn, was
19   called as a witness herein and was
20   examined and testified as follows:
21               ***
22         DIRECT EXAMINATION
23   BY MR. GETZOFF:
24         Q.  Mr. Hefter, good morning,
25   and thank you for joining us from

206

1    afar.
2         A.  Good morning.  Good morning
3    to you.
4         Q.  What is your current
5    occupation?
6         A.  I'm currently a consultant.
7    I'm the president of TMA Health
8    Policy Consultants, which provides
9    consulting services to hospitals,
10   lawyers, and people who are
11   interested in the Medicare program.
12         Q.  Okay.  Prior to your work
13   as a consultant, where did you work?
14         A.  Nearly my entire career was
15   at HCFA and CMS, the last 22 years of
16   which, which ended in 2014, I was the
17   director of the Division of Acute
18   Care which is a division in CMS which
19   is responsible for inpatient hospital
20   payment policies, including the
21   subject we're dealing with today;
22   DSH.
23         Q.  Okay.  Did your
24   responsibilities include working with
25   regulatory rules and regulations

207

1    relating to how hospitals' DSH
2    reimbursements were calculated?
3         A.  Well, the way the process
4    works is really, annually -- at least
5    annually, CMS publishes a proposed
6    and then a final rule, and in that
7    proposed and final rule all policies
8    affecting Medicare payments to
9    hospitals for inpatients are
10   proposed, including whether there are
11   statutory changes that need to be
12   implemented, whether there are policy
13   changes that need to be proposed and
14   finalized.  So every year, besides
15   updating the rates, which means
16   recalibrating the DRG rate and such,
17   I was responsible for issuing those
18   proposed and final rules.  And
19   certainly, many of those years there
20   were DSH issues that were related to
21   hospital data polices that were
22   finalized as well.
23               ***
24   THE CHAIRMAN:
25         Mr. Hefter, can you please --

208

1         are you on speaker or are you
2         speaking directly into the
3         telephone?
4    MR. HEFTER:
5         I am on speaker.  Is it better
6         if I spoke on the phone
7         directly?
8    THE CHAIRMAN:
9         Yes.  The transcriptionist is
10         having problems hearing your
11         testimony.
12   MR. HEFTER:
13         Okay, let me try this.  Are
14         you there?
15   MR. HEFTER:
16         Does this work better?  If
17         not, I may have to call back
18         in.  Does this work better?
19   THE CHAIRMAN:
20         No, that's not better.  That's
21         actually a little bit worse.
22   MR. HEFTER:
23         I can hang up and call you
24         back with the regular phone.
25         Okay?

209

```
 1  THE CHAIRMAN:
 2       Okay.  We'll go off the
 3       record.
 4                  ***
 5  [Off the record]
 6  [On the record]
 7                  ***
 8  THE CHAIRMAN:
 9       Okay, we'll go back on the
10       record.  Please proceed, Mr.
11       Getzoff.
12  MR. GETZOFF:
13       Okay, thank you.
14                  ***
15  BY MR. GETZOFF:
16       Q.  Mr. Hefter, I think
17  probably -- it may have to do with
18  movement or your motion, or whatever,
19  sometimes.  But, you know, I guess,
20  just try to be as deliberate as
21  possible with the answers, and we'll
22  do the best we can.  Are you familiar
23  -- if you'd look at the 2006 book --
24  actually, any of them, Exhibit #3,
25  which is the statute at 42 U.S.C.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

210

```
 1  Section 1395ww(d)(5)(f)?
 2       A.  Yeah.
 3       Q.  Does that section address
 4  what a Provider's SSI percentage or
 5  Medicare fraction is?
 6       A.  Yeah, that's the section of
 7  the statute that deals with the DSH
 8  adjustment, and it details everything
 9  -- including the two parts of the
10  formula, meaning the SSI percentage
11  and the Medicaid percentage.
12       Q.  Okay.  And how is the SSI
13  percentage measured and derived
14  pursuant to statute?
15       A.  Well, the SSI Medicare
16  percentage is a ratio of the Medicare
17  patients who receiving SSI over the
18  total number of Medicare patients
19  that are being treated by the
20  hospital.
21       Q.  Okay.
22       A.  That's patient days for
23  both.
24                  ***
25  THE CHAIRMAN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

211

```
 1       Mr. Hefter, if you could just
 2       speak a little bit more
 3       slowly, I think that will help
 4       with the transcriptionist.
 5  MR. HEFTER:
 6       Okay, I will try my best.
 7  THE CHAIRMAN:
 8       Okay.
 9                  ***
10  BY MR. GETZOFF:
11       Q.  Do the Medicare program
12  regulations address how hospitals'
13  SSI percentage or fractions are to be
14  calculated?
15       A.  Certainly, the regulations
16  do implement all the statutory
17  provisions.  In the case of the
18  percentages that we're talking about,
19  the regulations do mimic the -- they
20  definitely -- it's almost a cut-and-
21  paste as to what the percentages are
22  for the Medicaid percent and for the
23  SSI percentage.
24       Q.  Okay.  Aside from the
25  changes to the regulations, are you
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

212

```
 1  familiar with the methodology that
 2  CMS used to actually calculate each
 3  individual hospital's SSI percentage
 4  or fraction?
 5       A.  Yes, at least to the point
 6  that I'm not a computer programmer,
 7  so there is a data function to it,
 8  meaning that CMS has its data; the
 9  MedPAR data, that it compares to data
10  that it gets from the Social Security
11  Administration; the SSI data, and
12  based on running those two sets of
13  data, CMS puts together the data file
14  that shows the Medicare SSI
15  percentages for each hospital.
16       Q.  Was some type of matching,
17  therefore, required to derive each
18  hospital's SSI percentage?
19       A.  Certainly.
20       Q.  And...
21       A.  Certainly.
22       Q.  And who conducted the
23  matching?
24       A.  I believe that match is
25  done by staff at CMS.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 164**

213

Q. During your tenure at CMS, were problems ever brought to the agency's attention regarding the extent to which the matching of a hospital's inpatient Part A days and SSI benefit days was accurate?

A. Yes.  In fact, that's probably something that we hear about a lot.  There are always different issues that hospitals have brought up questioning CMS' percentages, and there are always questions both on the Medicaid side, which is really not the percentage that we're talking about as far as how to count Medicaid days, but even the SSI days which was the subject of litigation, there was questions of whether or not the numbers that CMS was determining really accurately reflected all the days that should have been as far as the number of patients who were really getting SSI or not.  The hospitals felt that maybe the files that CMS was receiving from the

214

Social Security Administration, maybe they were not asking for the information correctly so that they weren't really getting a complete list of all the SSI patients.

Q. Okay.  Are you aware of any reason to why the SSA data regarding the SSI list and the CMS data on Part A days failed to match completely in the past?

A. Yeah, I mean there were -- some of the litigation involved with whether patients who were deceased, whether they were wiped off of the SSA list, and, therefore, when CMS queried the data from SSA, at that point it was no longer on the SSA list, whether or not there was a question of how Medicare was comparing social security numbers for Medicare patients and the SSI social security numbers.  They didn't necessarily match, maybe there was limitation in the number of fields that was originally used for how many

215

social security numbers could be matched, and maybe those weren't showing up.  There could have been a question of retroactive eligibility for SSI.  So there could be a number of reasons, and were, in fact, a number of reasons that the SSA data it was argued was not accurate as far as calculating the SSI percentage.

Q. Okay.  Are you familiar with the Bay State Medical Center v. Leavitt case?

A. Yeah, I guess so.

Q. Were you with CMS at the time this -- that decision was announced?

A. Yeah, definitely.

Q. And what was CMS required to do under that decision?

A. CMS -- although I don't think CMS ever admitted that CMS did anything wrong, but CMS did agree based on that decision to go back and really work with SSA to make that SSA list as accurate as possible, and

216

accounting for all these situations that we just talked about.  Different things were done, in fact, to address each one of these issues, whether it was -- had to do with social security numbers, not enough fields being matched, whether it was that there was more recent data that CMS had that it wasn't using, there were -- all the issues that were raised were addressed by CMS in the post-Bay State era.

Q. Okay.  Are you familiar with the process by which the California Medi-Cal program received information regarding the SSI status of its beneficiaries?

A. Well, what I understand, and I'm not a Medi-Cal expert, but from the information that I was given by the hospital it seems to me that the -- because of the fact, and this is what intrigued me in the first place, that the state had a very invested interest in making sure that

**JA 165**

217

the information it was getting from
SSA was consistent with its
information, because it was paying
money to the Social Security
Administration to supplement those
SSI payments, and I think maybe to
administer them. So the data that
the state was getting, it was getting
from SSA, and it seems to be a
reliable basis for determining
whether or not those patients truly
were getting SSI or not.

Q. Approximately when were you
first contacted by a representative
on behalf of Pomona with respect to
its SSI percentage issue appeals for
these years, 2006 through 2008?

A. I believe I was first
contacted in January of 2016.

Q. Okay. And what were you
initially asked to do?

A. Well, the first question
was could I look at the information
and get a feel whether I felt that
there was something that the hospital

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

218

had a legitimate question of whether
or not its data submitted as
furnished to it by CMS, whether there
were any questions of the data, and I
agreed that I would look at it, and
there was a lot of stuff to look at
but based on what I looked at, it
certainly seems like the numbers were
two off; meaning that sometimes --
even in the Bay State case, if I
remember correctly, when Providers
were complaining about this and that,
and whatever, CMS' argument then was
-- and I don't think anybody really
took issue, was that argument, that
the differences were not huge; in
other words, each one of these
changes could affect by a little bit,
a couple percent maybe, but the
numbers that they were talking about
here as of -- as the data in the
exhibit shows, that we're talking
between 40 and 50 percent of a
difference in the number of days.
And that just struck me as something

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

219

that needs to be resolved. It has --
obviously has a real solid impact on
the hospital, but as a policy kind of
guy, it bothered me that there was
such a big difference, and there
needs to be an answer why are the
numbers so different.

Q. Okay. If you could look at
Exhibit P24.

A. Sure. Okay, it's hard to
do onehanded, but I will try.

Q. Right.

A. Okay, I got it.

Q. Okay. Turning first to
your review of Pomona's methodology,
what documentation did you review to
determine whether and to what extent
you could assist Pomona with efforts
to contact CMS and ultimately Social
Security Administration?

A. So really, the -- P24 I
believe probably consists of most of
the information that I received. It
looks very similar, I didn't go
through each page, but it certainly

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

220

looks very similar, at least in
format, to the type of information I
was looking at which, again, it
boiled down to these three codes; the
10, the 20, and the 60, which -- and
this is data that -- it's not the
hospital generates, it's the
hospital's data that the hospital
gets, which is showing these aid
codes as being for patient -- for all
these patients, and it shows whether
or not they're entitled to SSI. And
it seems to flow, if you look at this
-- the printout, which -- I forget
the name of the company, HDX, or
whatever it -- whatever these
printouts are are, which the hospital
routinely -- and I assume it's every
hospital in California does, they
routinely get for every patient who
comes into the hospital, they get a
printout of exactly what their status
is, are they Medicare patients, how
many days they have left, and all
that kind of information is all on

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

221

1  this printout.  And one of the items
2  on this printout is that aid code.
3  Again, it's not something that the
4  hospital itself generates, it's
5  information that is given to the
6  hospital, and I understand that the
7  source for this information is either
8  the state or in some cases it's CMS
9  itself.  So all this input data that
10  is -- that the hospital gets, and
11  this is what the hospital used to
12  determine whether or not these
13  patients are both Medicare and SSI
14  eligible.
15     Q. Okay.  Did you review a --
16  an explanatory letter from Candice
17  LeTran, page 192, 193?
18     A. Yes.
19     Q. Did you review Medi-Cal aid
20  code information and descriptions of
21  patients who might qualify for the
22  SSI benefits...
23     A. Yes.
24     Q. ...and -- now, if we go to
25  Exhibit P27.

222

1     A. Okay, I have it.
2     Q. Did the data show for each
3  of the cost years 2006 through 2008
4  that Pomona believed that many more
5  of its Medicare Part A patients
6  qualified for SSI benefits than was
7  shown by the CMS data?  You can start
8  at page 501, which is 2006.
9     A. I'm looking at 501, which
10  is 2006.  And there you can see that
11  it shows on line 19 it shows what the
12  CMS match number is, the number of
13  patients, the number days, this is
14  4,821, and then this is a -- there's
15  a partial match, I guess, which shows
16  that maybe CMS is showing for some
17  reason only some of the days, which
18  that there may be explanations for,
19  I'm not sure.  And then there's the
20  unmatched which are totally unmatched
21  for each one of these codes 10, 20,
22  and 60, again, which is over 2,000
23  days.  In this case it's a little bit
24  less than half, I think some of the
25  other years it was closer to half,

223

1  that where these days are SSI-
2  eligible patients which CMS' MedPAR
3  SSI data does not show these folks as
4  being eligible for Medicare and SSI.
5     Q. Okay.  Did you review a
6  similar chart for each of the other
7  two years?
8     A. I did.
9     Q. Okay.  For each of the
10  years, what was the discrepancy
11  between Pomona's count of these Part
12  A patients with SSI benefits as
13  opposed to the number of such
14  patients that were counted by CMS?
15     A. Again, I think they were at
16  least 40 percent, sometimes even
17  higher.
18     Q. Okay, if you want to look
19  at -- well, we looked at 501, maybe
20  if you want to take a look at...
21     A. I'm looking at...
22     Q. ...page 518 is another...
23     A. I'm looking at 518.  518
24  you see it's even higher.  518 it's
25  showing CMS' match total as 4,000,

224

1  and CMS' unmatched total at 2,400,
2  which is over 50 percent increase.
3     Q. Okay.
4     A. So, yes, the problem maybe
5  between '06 and '07 got even worse.
6     Q. What struck you regarding
7  the size of the discrepancy between
8  the number of SSI plus Part A
9  patients identified CMS, versus the
10  number of such days identified by
11  Pomona?
12     A. I just -- it made me think
13  that there's some kind of a systemic
14  problem.  It just -- to me it's huge.
15  It's really huge.  It's not like we
16  happened to come across a certain
17  number of patients who became
18  eligible on the last day of their
19  stay, or something, I don't know.  So
20  it just seemed that it was a huge
21  difference that -- and I have no clue
22  what it is, and that's what intrigues
23  me.  I have no clue what the problem
24  is.  But to me it's just pointing to
25  that there is a real problem.  Maybe

**JA 167**

225

1  it's a programming problem somehow
2  that's dropping -- I mean I'm making
3  this up, maybe everybody who has a
4  certain letter of the last name is an
5  S is dropped.  I don't know, but the
6  point is that this is a huge number
7  of cases that aren't showing up.  And
8  it's not the fringes, it's not like
9  we're talking about the fringes.
10 And, in fact, again, in the Bay State
11 case the -- each letter -- each one
12 is issued separately, really was
13 nothing in magnitude compared to this
14 one.
15      Q.  Okay.  Based on your review
16 of the data obtained and organized by
17 Pomona, which Medi-Cal aid codes did
18 Pomona use to identify patients and
19 claims that would likely be
20 associated with individuals having
21 SSI benefits?
22      A.  So clearly, Pomona took a
23 conservative approach and -- at least
24 as far as I could figure, they only
25 looked at the 10 to 20s and the 60s.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

226

1  Even though it's interesting that
2  when Pomona matched, in other words
3  when they looked at the cases that
4  CMS actually did match, there were
5  14s and 64s, et cetera, that matched
6  as well, but Pomona felt that there
7  they weren't as comfortable that they
8  were both getting SSI and SSP, so
9  they didn't include them -- they
10 might be, but they didn't include
11 them, so taking a conservative
12 approach they only included the 10s,
13 20s, and 60s.
14      Q.  Based on your experience
15 with Medicare generally, and the SSI
16 percentage calculation specifically,
17 would you expect most individuals
18 with aid codes 10, 20, or 60 to also
19 qualify for SSI benefits?
20      A.  So I have to tell you, I --
21 before this case I knew nothing about
22 10s, 20s, and 60s.  Those numbers
23 were a new concept to me.  It's only
24 based on the description of what 10,
25 20, and 60 is that I also came to the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

227

1  conclusion that those are patients
2  who are SSI-eligible, and, therefore,
3  if they show up in the MedPAR file as
4  being as receiving Medicare services
5  during this period, they should be on
6  the list.  But I can't say I knew
7  that a 10, 20, and 60 before this
8  case, that I knew that it meant
9  anything.
10      Q.  Okay.  Going back to
11 Exhibit P24, the first couple of
12 pages, which is the letter from
13 Candice LeTran dated January 21,
14 2016, does that letter explain how
15 aid codes were matched to Pomona's
16 patients?
17      A.  I believe it did.
18      Q.  And referring to that
19 letter once again, and based on any
20 discussions you may have had with Ms.
21 LeTran, did you come to understand
22 the methodology that Pomona used to
23 seek verification by the state of
24 California to assure that the
25 appropriate aid codes had been

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

228

1  assigned?
2      A.  Yes, when I understood the
3  size, the size of the HDX inquiries
4  that we see here in the attachment
5  here, which look like computer
6  printouts, Pomona went back to the
7  state separately and with a list of
8  social security numbers, I guess, for
9  specific patients to ask the state,
10 forget about all this other stuff, go
11 to your records and see whether
12 according to your records these
13 patients are really getting SSI, and
14 for each one of them, each one that
15 they asked for, the state confirmed,
16 in fact, that they were getting SSI.
17 I think Pomona did try to get, not
18 only for 2006, they tried to get for
19 2007 and '08, and maybe more for
20 2006, and at that point the state
21 said that oh my gosh, this is too
22 much work for us so we really can't
23 do this for you anymore.
24      Q.  Based on your experience,
25 did Pomona use a credible methodology

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

229

for identifying blind, aged, and/or disabled patients, and then coding them as potential SSI beneficiaries?

A. Yeah. I mean I think Pomona used whatever they could, meaning they -- the only thing they wanted to use, which they obviously weren't able to use, would be direct input from SSA, but other than that, anything they used was the best they could other than that.

Q. Okay. What types of issues did you typically see create discrepancies between state Medicaid program aid code data and the CMS database based on matching between SSI and CMS patient data? I'm speaking of when you were at CMS.

A. So again, I have to tell you again, when I was at CMS I knew nothing about aid codes. It was a new concept that I learned from this case. And so when I was at CMS we -- all we knew at CMS was what SSA told us, meaning that if they told us,

230

look, this is what we're giving you, we're giving you our list of SSI patients, then you can take this list and crossmatch your MedPAR days and you can do whatever you want with it. It was only when Providers raised certain issues, for example, well, wait a minute, we know this patient, and they gave the social security number, we know that they had SSI and they're not showing up in your list. Well, what was determined was that that patient had died, and since that patient had died and the way SSA was generating a list, any SSI recipient who was deceased no longer was on -- showing on that list. So after Bay State they revised the way they were giving CMS the data to make sure that those type of patients didn't drop. But as far as aid codes and -- I'm sorry, I can't really speak to -- at all as to how CMS thought about -- really I don't think we knew about aid codes now. I didn't, and

231

certainly the policy of people that I was responsible for, we didn't. I can only speak for the data -- again, the computer programming people who were crunching this data and doing the matches. Maybe they did know about aid codes. There, I can't speak for them.

Q. Okay. Are you familiar with what SSP-only patients are?

A. From what I understand they are patients who the state is paying -- instead of -- like we said before, instead of the state supplementing what the Federal Government pays them for SSI, these patients are getting only the supplement. And from what I understood, excuse me, from what I understood, the reason why that could be is because there could be some patients -- excuse me, some recipients who exceeded the federal level of income and, therefore, no longer qualified for the federal SSI payment, but still fell below the

232

state, which is a higher threshold, that the state threshold for getting SSP and, therefore, would receive just the SSP benefit.

Q. Okay. What in your opinion is the likelihood that SSP-only patients explains the entire, you know, 40 or 50 percent difference in CMS' count of SSI plus Part A patients and Pomona's count of such patients?

A. Okay. So that was something I definitely did discuss with the hospital, and I think at one point I was given a data point which was that, at least as far as statewide, the percentage of SSI recipients who were getting SSP only is somewhere between 14 to 15 percent. That being the case, to assume that the -- Pomona just happened, happened year after year, to have the treating patients who are three times, whatever, maybe more, the statewide average of SSP-only, it

233

1   defies logic.  It -- I mean I can't
2   say it's impossible, but certainly
3   it's not something I would expect to
4   find, unless, again, you know, SSA
5   really went through their records and
6   pulled all the records that they're
7   talking about, each one of the ones
8   you told us, they're not getting SSI,
9   they're getting SSP only.  Okay,
10  then, you know, sloopier [sic] things
11  happen.  And data, maybe it's true,
12  if I had to -- from an analysis
13  perspective, from a policy analysis
14  perspective, to say, well, I assume
15  that the problem really is all these
16  probably non-matched patients are
17  SSP-only, it's so unlikely.  It's so,
18  so unlikely.
19          Q.  What conclusions did you
20  reach regarding the accuracy of the
21  CMS count following your review of
22  Pomona's methodology, and the
23  discrepancy between -- I'll just
24  leave it at that.  What conclusions
25  did you reach regarding the accuracy

234

1   of the CMS count following your
2   review of Pomona's methodology?
3          A.  The conclusion I came to
4   was that there's a problem here, or
5   at least a question here, and it's a
6   question that begs for an answer,
7   meaning that the state seems to have
8   done -- I mean, excuse me, the
9   hospital seems to have done its due
10  diligence by speaking to this case,
11  and seems to have a very good basis
12  for assuming -- they're assuming that
13  these patients truly are SSI
14  patients.  Now, ultimately, it needs
15  work.  Somebody needs to be able to
16  go to SSA and get SSA to pull the
17  specific records that we're talking
18  about, these -- for these specific
19  patients, to see what it is that the
20  SSA's records are showing maybe
21  before the fact, after the fact,
22  something, to find out why is it that
23  the state records, which is what
24  Pomona is using, is showing them as
25  being SSI and Medicare's are not.

235

1   Now, I think I even made the point
2   when I spoke to CMS staff, and that
3   was that really from my discussions
4   with Pomona's folks, I was very
5   impressed with them in that they want
6   an answer.  Is the answer proves to
7   be, in fact, that your -- CMS'
8   numbers are correct and here's why
9   they're correct, they'll live with
10  that, that's fine.  But right now,
11  it's a very big question that begs
12  for an answer.
13          Q.  Did you represent Pomona in
14  submitting a data sample to CMS?
15          A.  I did.
16          Q.  What documentation did you
17  submit to CMS?
18          A.  I think all the same
19  documentation that Pomona gave to me.
20  I shared that with CMS staff and
21  showed them the same things that
22  Pomona showed me really as to where
23  they were getting their information
24  from, and a list really of the social
25  security numbers of the, I'll call it

236

1   random sample.  This is definitely a
2   sample, a sample of SSA -- of social
3   security numbers of the patients that
4   it believes are SSI-eligible, which
5   CMS' data did not show, and asked CMS
6   could they pursue with Social
7   Security Administration to get to the
8   bottom of this problem.
9          Q.  Okay.  Were you satisfied
10  that this was a representative sample
11  of the patients Pomona claimed as
12  having SSI benefits, but which CMS
13  has not shown as SSI beneficiaries?
14          A.  I'm not a statistician, and
15  I know when statisticians through any
16  examples they have like these charts
17  of random numbers or whatever, but to
18  me, what they did was they just
19  randomly went, and I think they
20  picked every fifth so, or tenth, I
21  forget which, number on the list and
22  used them.  And to me, that was
23  certainly an unbiased way of just
24  picking random numbers.  Now, whether
25  statistically that would prove in a

**JA 170**

237

1  court as a statistically valid random
2  sample, I don't know about that, but
3  it certainly was a valid basis of
4  going to SSA and seeing if we can get
5  to the bottom of this.
6      Q. Okay.  Are you familiar
7  with a letter, it appears in Exhibit
8  24, it's page 195 through 197, from
9  Stan Rosenstein to Mark Hardstein
10  [ph]?
11      A. I -- yes, I believe I --
12  I've got a copy of it.
13      Q. Okay.  Did Mr. Rosenstein
14  make any representations in that
15  letter which supported the
16  authenticity of the records that
17  Pomona was asking CMS and SSA to
18  review?
19      A. Correct, yes, he did.
20      Q. All right.  Did you
21  ultimately meet with CMS
22  representatives?
23      A. I did, I believe a few
24  times, and the first few times -- I
25  think the first time I went I -- it

238

1  was with a little bit of -- a little
2  bit skeptical, but they did agree
3  that it was something they would look
4  at, or at least look into, and -- but
5  I subsequently met with them a couple
6  of times and each time I came away
7  with a feeling that although they --
8  at least at first, at first they
9  certainly very sympathetic to the
10  hospital saying that, gee whiz, it
11  seems like they are really stuck in a
12  -- you're at a quagmire between SSA
13  and CMS, and certainly a horrible
14  feeling but they could sympathize
15  with that and they would see what
16  they could do.  At the end, the last
17  person I spoke to there at CMS, the
18  impression I got was that we can't --
19  we really can't pursue this the way I
20  would have liked them to do, and it's
21  basically a workload issue, meaning
22  they felt that DSH issues are not a
23  rare issue, meaning hospitals all
24  over the country, there are well over
25  1,000 DSH hospitals -- over 2,000,

239

1  and they always have issues with
2  their numbers, and if CMS would start
3  a -- of saying that, well, if you
4  come in to me, we'll go in to SSA and
5  start looking at -- pulling data,
6  your specific data, they just felt
7  that that would be an issue that they
8  just couldn't deal with from a
9  workload and a manpower perspective.
10  So their answer really was that,
11  look, we can't do that, we're sorry,
12  their proper avenue for appeal is to
13  go through the Board.
14      Q. So CMS recommended that we
15  proceed through the appeal process.
16      A. Correct.  I mean originally
17  when I came to CMS I -- my argument
18  -- my question to them was that when
19  I was at CMS I always felt that if we
20  could resolve administratively to get
21  to the bottom of an issue, it saves
22  everybody, everybody.  I mean the
23  Provider, the agency, everybody, a
24  lot of time and effort, so let's see
25  if we can resolve this issue and that

240

1  you -- and the Provider -- the
2  hospital would not have to go to the
3  Board or to court.  And they seemed
4  sympathetic.  They seemed to
5  understand, yes, that really is in
6  everybody's best interest.  But that
7  definitely changed over time.
8      Q. Okay.  What -- at what
9  level of, you know, manager or
10  director were you dealing with at
11  CMS?
12      A. Well, first I dealt with
13  really the person who replaced me as
14  the director of -- care, and later
15  when that person was, I guess,
16  promoted there was an acting director
17  of the division, I dealt with that
18  person.
19      Q. So...
20      A. And also, of course, the
21  analysts who worked on DSH
22  themselves.  It was always both of
23  them together.
24      Q. So did you feel that you
25  were speaking to officials who had

241

1  the authority to proceed with this if
2  they chose to?
3          A.  Yeah, the reason for that
4  is, in fact, when the Bay State
5  decision was finalized, it really
6  fell into our group and our area to
7  work with SSA to come up with a
8  "better file" from SSA.  It really --
9  at that time it was the -- I think
10  the SPD or I forget, either the
11  deputy group director or the acting
12  group director, whatever, who was the
13  negotiator with SSA.  So that person
14  was no longer with the agency so I
15  couldn't deal with him, but there
16  were other people who could have, I
17  guess, said, well, since that person
18  -- maybe we could follow up and do
19  more of the same, working with SSA.
20  But it proved to be much harder than
21  anybody thought it would be getting
22  SSA to work with them.
23          Q.  Okay.  Did representatives
24  of Pomona discuss with you additional
25  efforts to get CMS to transmit a 30-

242

1  record sample to SSA for review?
2          A.  Yeah, in fact, I think at
3  one point I recommended that they get
4  congressional involvement, whether
5  it's at the Senate level or at the
6  House level, because usually, usually
7  the agency, both SSA, I thought, and
8  CMS, responds much more quickly and
9  effectively when there is
10  congressional interest.  And, in
11  fact, I think they got Senator
12  Feinstein's office involved and maybe
13  another congressperson involved, and
14  even with their involvement it didn't
15  seem to work.
16               ***
17  MR. GETZOFF:
18          I have no further questions.
19  THE CHAIRMAN:
20          Thank you.  Mr. Olszewski, do
21  you have cross examination?
22  MR. OLSZEWSKI:
23          I do, very, very brief.
24  THE CHAIRMAN:
25          Please proceed.

243

1               ***
2          CROSS EXAMINATION
3  BY MR. OLSZEWSKI:
4          Q.  Mr. Hefter, I don't want to
5  misquote you in your testimony, but I
6  believe you might have made a
7  misstatement.  Regarding the aid
8  codes 10, 20, and 60, I believe you
9  testified the Provider gets these
10  codes from the state or maybe CMS.
11  Did...
12          A.  No, no, no, no, no.  HDX.
13          Q.  HDX?
14          A.  Yes.
15          Q.  Thank you.  Did you enter
16  into an agreement with the Provider
17  to review all the documents and
18  testify today?
19          A.  Sure.
20          Q.  Was that agreement a
21  written agreement?
22          A.  I believe it was, yes.
23          Q.  Okay.
24          A.  I mean I -- at the time, I
25  don't know if the original agreement

244

1  talked about testimony, but it
2  definitely -- I definitely had an
3  agreement that we went into where I
4  agreed to review and get involved in
5  this issue.
6          Q.  And in return for your
7  review and getting involved with the
8  issue, was the Provider paying you?
9          A.  Yes.
10          Q.  And that agreement that you
11  had with the Provider, is it -- is
12  there any contingency in there based
13  on the outcome of this case?
14          A.  No.
15          Q.  And do you have any -- did
16  -- strike that.  Did anybody ask you
17  for a copy of that agreement so they
18  could offer it as an exhibit today?
19          A.  Not that I recall.
20               ***
21  MR. OLSZEWSKI:
22          That's all I have.  Thank you.
23  THE CHAIRMAN:
24          Okay.  Any redirect, Mr.
25  Getzoff?

00399

245

1  MR. GETZOFF:
2      No.
3  THE CHAIRMAN:
4      We'll move to Board questions.
5      Ms. Benson?
6  MS. BENSON:
7      Yes.  Thank you for your
8      testimony, Mr. Hefter.  You
9      stated that you were working
10     with, I'll say people at CMS
11     who I believe you said
12     actually initially tried to
13     work with SSA to get
14     information, and that proved
15     difficult, and then they --
16     and I'm trying to figure out
17     -- I mean it sounds like you
18     said they tried to, it became
19     difficult, and then you said
20     earlier that CMS really didn't
21     want to pursue it because it
22     would be too costly because of
23     the number of providers that
24     could come in, you know, this
25     wouldn't be the only Provider

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

246

1      that might have this type of
2      situation.  So like did SSA
3      refuse to give the information
4      or was there like a change in
5      the minds of CMS partway
6      through the process?  I'm just
7      trying to figure out if it was
8      SSA who said, no, we're just
9      not doing this, it's too
10     costly, or if it was CMS that
11     said, well, we started this
12     process but we now don't think
13     it's a good idea anymore.
14  MR. HEFTER:
15     So I believe it's more of the
16     latter, meaning the -- at
17     first it was definitely a
18     problem even finding somebody
19     at SSA, I believe -- this is
20     the impression I got, there
21     was a problem finding somebody
22     at SSA who would be willing to
23     work with CMS to address this
24     issue.  And I think at the
25     staff level that was proving

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

247

1      to be very difficult.  And --
2      but I'm saying over time there
3      were different people
4      involved.  At one point I
5      think maybe SSA said, okay,
6      but, you know, we'd only deal
7      with CMS, and I think there's
8      probably a data use agreement
9      that CMS has with SSA, and if
10     you want -- I'm guessing -- I
11     may be guessing -- maybe more
12     than -- maybe less than a
13     guess, I'm not sure, but they
14     probably would want more money
15     from CMS to do extra runs, so
16     that could have been an issue
17     as well.  But ultimately,
18     ultimately, the last
19     impression I had clearly from
20     different people that were
21     involved at the CMS position
22     level was that we really can't
23     do this, we can't because of
24     the workload and the manpower
25     issue.  We just can't.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

248

1  MS. BENSON:
2      Okay, thank you.  Do you know
3      any other time in the past
4      when CMS has calculated an SSI
5      fraction outside of their
6      ordinary process, going and
7      looking at different data and
8      actually coming up with, I'll
9      say a different SSI fraction
10     outside the methodology they
11     usually use?
12  MR. HEFTER:
13     No.  So here what's really
14     unique, really, really, unique
15     about this situation here, CMS
16     published a rule which
17     basically says, look, this is
18     how we're going to come up
19     with the data which -- and it
20     was very clear as far as, I
21     guess -- how we were going to
22     do this, meaning they -- for
23     example, prior to the court
24     case, there were really two
25     data runs that CMS was getting

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 173**

249

from SSA, and CMS was only
using the first data and not
the second data, where the
second data really was more
accurate.  So CMS said, look,
we're going to propose a
finalized -- a rule, I think
it was in 2010, 2011, which
was going to say this is the
data we're going to use.  And
CMS feels, and still feels,
that we have a proposed a
final rule and it says that
this is what we're going to
use.  Really, right, wrong, or
indifferent, that's the best
data that we have available at
the time, and this is the data
we're going to use.  And,
therefore, they don't feel
that there's any need to
address this issue.  Now, what
CMS is not addressing is that,
okay, but there could be a
data problem here and all

250

we're doing now is
perpetuating it forever by not
looking into it.  And that
part isn't being addressed by
CMS.
MS. BENSON:
    Okay, thank you very much.  I
    don't have any further
    questions.
THE CHAIRMAN:
    Mr. Ahern?
MR. AHERN:
    Yes.  Thank you for your
    testimony.  I've read some of
    the things you've written, so
    now I've heard you through the
    phone, and someday I might
    even get to meet you face-to-
    face.  So...
MR. HEFTER:
    My pleasure.
MR. AHERN:
    ...I certainly appreciate your
    input over the years,
    especially in the GME world.

251

So in terms of this morning,
did you hear Ms. LeTran's
testimony?
MR. HEFTER:
    I heard much of it -- I should
    say parts of it.  I don't know
    how much I missed, so I
    definitely heard parts of it.
MR. AHERN:
    Well, I'm going to represent
    to you, and tell me if you
    heard this, that she said what
    got her into chasing the SSI
    percent were unexplained
    variances of up to 12 percent,
    and I took that as not 12
    percent of the SSI percent,
    but a variance within the SSI
    percent of 12 percent, and
    significant variances.  Did
    you hear that testimony?
MR. HEFTER:
    I think I did.  I heard that
    -- but I didn't really
    memorize the number she used,

252

but I do remember her saying
that what intrigued her was --
made her think that something
weird is she saw significant
changes from year to year in
the DSH percentage.
MR. AHERN:
    Okay.  So that said, we're
    talking about significant
    financial impact and
    significant variance in the
    SSI percent which did not
    track to her payer mix
    experience, which was
    relatively stable from year to
    year.  So with that background
    and accepting that to be more
    or less accurate, you
    mentioned the SSI-only percent
    state average, do you think
    that could account for the
    variance from year to year...
MR. HEFTER:
    So...
MR. AHERN:

00401

253

```
 1          ...given what knowledge you
 2      have of that issue?
 3  MR. HEFTER:
 4          That's why I said before, the
 5      number that I heard from the
 6      state was that statewide the
 7      SSP, the state-only payment,
 8      is about 14 percent of the
 9      total number of the folks that
10      are getting SSI.  So it's
11      possible, I can't say -- I
12      will not say it's impossible
13      that the variance is totally
14      due to that, but it's so
15      unlikely that we're talking
16      about that many tend to fall
17      into Pomona's hospital, it
18      just doesn't make sense.  It
19      really -- that means like we
20      were saying before, again,
21      these are patients whose
22      income falls just between the
23      federal max for getting SSI
24      and the state max for getting
25      SSI.  I think maybe 1,000 or
```

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

254

```
 1      $2,000 difference between the
 2      two.  It's so unlikely that
 3      for some reason Pomona happens
 4      to be located in an area where
 5      they -- where there's three
 6      times the statewide average of
 7      those kinds of patients.  I
 8      won't say it's impossible,
 9      it's -- no, it's not
10      impossible.  Is it likely?
11      Not very likely at all.
12  MR. AHERN:
13          So that said, we've heard the
14      14 percent number, and it's
15      being used in a calculation,
16      and this is a question to you
17      but maybe Counsel can respond
18      if perhaps that's more
19      appropriate, but is there a
20      solid source for that number?
21      You said you've heard and you
22      talked to, and those are all,
23      you know, perfectly legitimate
24      ways to get information, but
25      when you're using it in a
```

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

255

```
 1      calculation it seems you might
 2      want to have a solid source or
 3      a documented source.  Is --
 4      can you give us some sense of
 5      your source for that number?
 6  MR. HEFTER:
 7          So my source for this number
 8      was I think one of your
 9      witnesses today, Mr., is it
10      Rosenstein, who used to work
11      for the state.  I think he was
12      the person in charge of this
13      area.  So if he tells me that
14      statewide it's 14 percent or
15      so, I mean I took that as a
16      pretty good number.
17  MR. AHERN:
18          And, fortunately, we have Mr.
19      Rosenstein here, and we will
20      have the pleasure of hearing
21      his direct testimony, so we
22      will talk to him about that.
23      And I have no more questions.
24  MR. HEFTER:
25          Thank you.
```

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

256

```
 1  THE CHAIRMAN:
 2          Mr. Ziegler?
 3  MR. ZIEGLER:
 4          Okay.  Thank you, Mr. Hefter,
 5      for your testimony.  You
 6      probably don't remember me but
 7      I know -- I've had contact
 8      with you when I had worked at
 9      a hospital before, but that
10      was quite some time ago.
11  MR. HEFTER:
12          I hope I was fair.  I hope I
13      was fair.
14  MR. ZIEGLER:
15          Yeah.  Question for you.  I
16      guess, what is your
17      understanding of SSP?
18  MR. HEFTER:
19          To me, from what I understand,
20      SSP is the state of
21      California, in this case,
22      contributes money to
23      supplement -- in most cases,
24      to supplement the amount of
25      money that the Federal
```

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

**JA 175**

257

```
 1        Government normally pays for
 2     SSI.  In fact, in that case, I
 3     think the recipient gets one
 4     check, one check from Social
 5     Security Administration, which
 6     includes both the federal SSI
 7     amount and the state
 8     supplement amount, and I think
 9     the state, in fact, pays an
10     additional administrative fee
11     for doing that.  And
12     obviously, that's something
13     that the state will want
14     specific information from the
15     Social Security Administration
16     before it pays it money.  It
17     wants to make sure that it's
18     going to folks who are getting
19     SSI.  In addition...
20  MR. ZIEGLER:
21        Okay.
22  MR. HEFTER:
23        In addition, there are also,
24     as we said before, there are
25     some recipients in the state
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

258

```
 1     who are only getting the state
 2     supplement, and for some
 3     reason they're not entitled,
 4     and I'm assuming the reason
 5     why they're not entitled is
 6     because they're over the
 7     federal max -- income max,
 8     they don't get the federal SSI
 9     payment.
10  MR. ZIEGLER:
11        Okay.  Here's where my
12     confusion comes in, and I
13     don't know if you can answer
14     this or not, but the SSP and
15     the SSI in theory should be
16     synonymous because they're
17     attaching this SSP payment to
18     the SSI payment.  And
19     evidently, that's being
20     administered through SSA
21     somehow.  Is that your
22     understanding?
23  MR. HEFTER:
24        When -- certainly, when there
25        -- when they are administered
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

259

```
 1        -- when the patient is getting
 2     both, when the patient is
 3     getting both SSI and SSP,
 4     certainly, I understood that
 5     it's being administered by --
 6     being paid by -- I mean the
 7     check is being cut by SSA.  I
 8     don't know -- I just don't
 9     know whether that's true as
10     far as who cuts the check when
11     it's SSP-only.  I don't know.
12  MR. ZIEGLER:
13        But they're pretty much
14     synonymous, is that how you
15     understand it, SSP and SSI?
16     If they're getting SSI
17     payment, they should be
18     getting an SSP payment.
19  MR. HEFTER:
20        If you're getting SSI, you
21     should be getting SSP,
22     correct.
23  MR. ZIEGLER:
24        Okay.
25  MR. HEFTER:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

260

```
 1        If you're getting SSP, you
 2     might not be getting SSI, but
 3     yes, if you're getting SSI,
 4     you should be getting SSP.
 5  MR. ZIEGLER:
 6        Okay, you said you could be
 7     getting SSP but not SSI.
 8  MR. HEFTER:
 9        Correct.
10  MR. ZIEGLER:
11        Okay, so they're not
12     synonymous.  Okay.  So
13     evidently, whatever the
14     threshold is for SSP, it's a
15     lower threshold...
16  MR. HEFTER:
17        Higher.  Higher.
18  MR. ZIEGLER:
19        ...to qualify?
20  MR. HEFTER:
21        Higher.  Higher.  Higher.  You
22     can make more...
23  MR. ZIEGLER:
24        Higher, okay.
25  MR. HEFTER:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 176**

261

```
 1          ...money.
 2   MR. ZIEGLER:
 3          Okay.
 4   MR. HEFTER:
 5          You can be making more money
 6          and still qualify under the
 7          state's SSP, but still -- but
 8          then at that point you're
 9          making too much for the
10          federal threshold.
11   MR. ZIEGLER:
12          Okay.  And this is another
13          clarification, I think you did
14          respond to this, but the codes
15          -- the 10, 20, and 60 codes,
16          the -- are they coming from
17          the government, or are they
18          coming from SSA, how does
19          Medi-Cal get those codes?
20   MR. HEFTER:
21          So I don't know -- I really
22          don't know.  I don't know
23          whether -- in fact, I suspect
24          the answer is no, but I don't
25          know whether SSA also uses the
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

262

```
 1          same code, meaning 10, 20, 60,
 2          those number, whether they
 3          actually use those numbers, or
 4          they use some other kind of a
 5          code, some other kind of
 6          number, which the state
 7          converts to 10, 20, 60.  I
 8          don't know.
 9   MR. ZIEGLER:
10          Okay.
11   MR. HEFTER:
12          But whatever it is, it -- the
13          10 definitely identifies SSI
14          patients who are over 65, the
15          20 who are, I think blind, and
16          the 60 who are disabled.
17   MR. ZIEGLER:
18          Okay.  And I guess Mr.
19          Rosenstein will probably know
20          that.  So you were with CMS
21          after the Bay State case, so I
22          guess the question -- well,
23          let me ask you this.  During
24          your time at CMS, did you used
25          to get any questions related
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

263

```
 1          to large variances in the SSI
 2          from one year to the next?
 3   MR. HEFTER:
 4          I don't remember.
 5   MR. ZIEGLER:
 6          Okay.
 7   MR. HEFTER:
 8          Let's see, did we get
 9          questions of high variances?
10          We had -- I think it was more
11          tied to issues than to
12          numbers, meaning...
13   MR. ZIEGLER:
14          Okay.
15   MR. HEFTER:
16          ...people would come to us and
17          say we looked at the list of
18          patients who -- from CMS'
19          data, or who are both getting
20          SSI and showing up on our
21          MedPAR file, and we believe
22          you're not including a certain
23          kind of a patient.  And they
24          would come to us and say that
25          we believe, let's say for
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

264

```
 1          example, the reason why you're
 2          not showing this patient is
 3          because they're really
 4          qualifying for Medicare under
 5          their second husband's social
 6          security number, and they're
 7          getting SSI under their own
 8          social security number,
 9          therefore, it's not showing
10          up, or something like that.
11          So it wasn't so much that the
12          numbers we -- I used to deal
13          more with the issues
14          themselves.  And how they came
15          about to identify them,
16          whether or not there were a
17          lot of patients that showed up
18          with, you know, with that
19          problem or not, I don't
20          remember that I was aware of
21          the numbers.
22   MR. ZIEGLER:
23          Okay.  That's all my
24          questions.
25   THE CHAIRMAN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 177**

265

```
 1        Okay.  Thank you again, Mr.
 2    Hefter, for your testimony.
 3    Have had the pleasure of
 4    seeing your name come across a
 5    number of different times in
 6    different Board hearings from
 7    correspondence and rulings, et
 8    cetera, so pleasure to have
 9    you here testifying by
10    telephone.  I just had this
11    quick sort of follow-up
12    question on the 14 percent
13    from the state.  Do you know
14    how that number is calculated
15    or what that's sort of based
16    on?  I think you had indicated
17    it was sort of like a
18    percentage of patients or -- I
19    say patients, a percentage
20    of...
21 MR. HEFTER:
22        Recipients.
23 THE CHAIRMAN:
24        ...recipients, just -- so it's
25    just a simple raw number of
```

266

```
 1        state-only recipients versus
 2    recipients who were receiving
 3    some combination of SSI and
 4    SSP.
 5 MR. HEFTER:
 6        Correct.  That's the
 7    impression that I'm under
 8    that's where the data came
 9    from.
10 THE CHAIRMAN:
11        Okay.  Do you know if that
12    number is actually in the
13    record?
14 MR. HEFTER:
15        I mean I don't think the
16    derivation of it is.
17 THE CHAIRMAN:
18        Okay.
19 MR. HEFTER:
20        There may be a mention of the
21    14 somewhere in the record,
22    but how...
23 MR. GETZOFF:
24        It is.
25 MR. HEFTER:
```

267

```
 1        ...how...
 2 MR. GETZOFF:
 3        Yeah.
 4 MR. HEFTER:
 5        But how the 14 came -- was
 6    determined, I'm not sure
 7    that's in the record.  Might
 8    be.
 9 THE CHAIRMAN:
10        Okay.  I guess that's -- Mr.
11    Rosenstein will...
12 MR. GETZOFF:
13        Yeah, it's P37 is...
14 MR. HEFTER:
15        Correct.
16 THE CHAIRMAN:
17        Okay.
18 MR. GETZOFF:
19        Yeah.
20 THE CHAIRMAN:
21        Great.  That's all the
22    questions I had.  I guess
23    based on the Board's
24    questions, is there any
25    redirect, Mr. Getzoff?
```

268

```
 1 MR. GETZOFF:
 2        No.  No, there's not.
 3 THE CHAIRMAN:
 4        And, Mr. Olszewski, do you
 5    have any additional questions
 6    based on the Board questions?
 7 MR. OLSZEWSKI:
 8        No, other than based on
 9    Counsel representing that P37
10    represents the 14 percent that
11    you were asking about, I don't
12    see that in the record, but
13    no, no questions.
14 THE CHAIRMAN:
15        Okay.  I understand that Mr.
16    Rosenstein will be addressing
17    that.  I guess at this point
18    that concludes your testimony,
19    Mr. Hefter.  And we'll go off
20    the record.
21            ***
22 [Off the record]
23 [On the record]
24            ***
25 THE CHAIRMAN:
```

JA 178

269

1          Let's go on the record.  Mr.
2      Getzoff, you can call your
3      next witness:
4  MR. GETZOFF:
5          Okay.  The Provider calls Stan
6      Rosenstein to the stand.
7  THE CHAIRMAN:
8          And before you are seated,
9      I'll have you raise your right
10      hand.
11              ***
12  [Witness sworn]
13              ***
14  THE CHAIRMAN:
15          Thank you, please be seated.
16      And please proceed with your
17      direct examination, Mr.
18      Getzoff.
19              ***
20          STAN ROSENSTEIN,
21  having been first duly sworn, was
22  called as a witness herein and was
23  examined and testified as follows:
24              ***
25          DIRECT EXAMINATION
        York Stenographic Services, Inc.
    34 North George St., York, PA 17401 - (717) 854-0077

270

1  BY MR. GETZOFF:
2          Q.  Good afternoon, Mr.
3  Rosenstein.  What is your current
4  occupation?
5          A.  Good afternoon.  I am
6  currently a healthcare consultant
7  specializing predominantly in
8  Medicaid issues.
9          Q.  Pursuant to your resume,
10  which is included as Exhibit P33,
11  starting on page 581, you indicate
12  that you have worked at the
13  California Department of Healthcare
14  Services, or its predecessor, since
15  about 1977.
16          A.  That's correct, about 31
17  years.
18          Q.  Is the California
19  Department of Healthcare Services the
20  state agency responsible for
21  administering California's Medi-Cal
22  program?
23          A.  Yes, it's a single state
24  agency responsible for Medicaid in
25  California, called Medi-Cal.
        York Stenographic Services, Inc.
    34 North George St., York, PA 17401 - (717) 854-0077

271

1          Q.  Looking at your CV, it
2  indicates that you were a section
3  chief for various sections from
4  November 1983 to April 1986.  Can you
5  describe your positions and duties
6  during that time?
7          A.  Yes, I was responsible for
8  various components of the design and
9  implementation and operation of
10  what's called the California Medicaid
11  Management Information System.  The
12  Medicaid Management Information
13  System is a federally required system
14  that's got six subsystems and it
15  operates both computer programs as
16  well as the manual processes around
17  predominantly to pay claims, but it
18  does -- among its subsystems is
19  what's called the recipient subsystem
20  who -- which is responsible for
21  maintaining information on everybody
22  enrolled in the Medicaid program,
23  Medi-Cal in California, and providing
24  Providers with that information.  And
25  I was actually the manager in charge
        York Stenographic Services, Inc.
    34 North George St., York, PA 17401 - (717) 854-0077

272

1  of the design of the recipient
2  component of that subsystem.
3          Q.  Your CV then indicates that
4  from April 1986 to July 1993, you
5  were the executive project director
6  for the Medi-Cal procurement project.
7  Can you describe your position and
8  duties during that time?
9          A.  Yeah, there were two
10  predominant responsibilities I had.
11  One was I managed the rebid of the
12  fiscal agent who operates the claims
13  processing system, the Medicaid
14  Management Information System.  Part
15  of that was also the implementation
16  of a large number, 54, enhancements.
17  And the enhancement that's relevant
18  to this case is I was the manager
19  responsible for implementation of
20  what's called the Automated
21  Eligibility Verification System,
22  which is the system that provides
23  information to Providers on who is
24  eligible for Medi-Cal.
25          Q.  Okay.  The CV goes on, from
        York Stenographic Services, Inc.
    34 North George St., York, PA 17401 - (717) 854-0077

**JA 179**

273

February 1993 to October 1996 you were the division chief of the payment systems division. Can you describe your position and duties during that time?

A. Yes, that was the -- I was the manager of the overall division; one of four divisions in the Medicaid program. And I was responsible for all of the systems operations for the Medi-Cal program related to claims processing, eligibility, verification, providing eligibility information, so everything related to Providers getting paid, Providers getting eligibility reported to me. I also had a few other programs that are not really relevant to this case that I was responsible for.

Q. And from October 1996 to June 2007 you held various titles, appearing as acting deputy director, assistant deputy director, and deputy director of medical care services. Can you describe your positions and

274

duties during that time?

A. Yeah. Over a course of 13 years, I was either the deputy Medicaid director or the Medicaid director California, and the Medicaid director is the person responsible for the administration of the entire Medicaid program in California, Medi-Cal. So I was either during that time the Medicaid director or the number two person.

Q. From July '07 to December '08 you were the chief deputy director of healthcare programs. Was this different than your prior Medicaid director duties?

A. Slightly different. The department reorganized. We split from -- into a separate department, so I changed job titles and remained the Medicaid director. I also picked up some responsibility for some other healthcare programs that are not Medicaid, and really unrelated to this case, but predominantly I was

275

still the Medicaid director.

Q. Okay. Did you serve as Medicaid director during the fiscal years at issue in these appeals: 2006 through 2008?

A. Yes, I did.

Q. Did you have supervisory responsibility over the policies of the Medi-Cal eligibility system?

A. Yes, I was a -- the Medi-Cal eligibility division reported to me, and I was responsible for establishing policies on who was eligible for Medi-Cal, who -- you know, what was the criteria for eligibility, creation of new programs, the establishment of what's aid codes which are basically categories of eligibility under the Medi-Cal program.

Q. For how long did you have, we'll call it operational authority over the eligibility system?

A. Thirteen years.

Q. Okay. Can you describe

276

your experience and leadership with Medicaid on the national level?

A. Yes, I had a two-measure involvement in Medicaid. You know, I was Medicaid director, you know, I was heavily involved with, you know, all aspects of the Federal Government. And then the last four years of my tenure I was an officer with what's called the National Association of State Medicaid Directors. I ended up being the vice chair of that Association, and that's the arm of the state Medicaid directors that work with CMS, work with Congress on establishing Medi-Cal -- or Medicaid policy, Medicaid rules, just the overall involvement of the creation of the -- how the Medicaid program worked. I did such things as I headed up the state's effort to work with CMS on system problems they were having on the implementation of the Medicare Part D program, for example. I worked

**JA 180**

00407

277

```
 1   closely at that time with Secretary
 2   Leavitt on that issue, and I was
 3   involved in virtually every major
 4   Medicaid policy issue for, you know,
 5   the last 13 years of my state tenure
 6   at a national level.
 7        Q.  And what is your
 8   educational background?
 9        A.  I have a -- other -- I'm
10   sorry, let me finish one...
11        Q.  Sorry.
12        A.  ...more part of that.  I
13   forgot to mention the second part of
14   my responsibility for when I was the
15   division chief over payment systems
16   division, I was running what was
17   known as the system development TAG,
18   technical advisor group.  And that
19   was a group of people who provided
20   advice to CMS on various issues, and
21   my area was the computer systems, the
22   Medicaid Management Information
23   System.  So I provided them with
24   background recommendations on how the
25   computer systems and -- systems were
```

278

```
 1   on and should work on Medicaid.  As
 2   for my educational background, I have
 3   a Master of Public Administration
 4   from the University of Southern
 5   California, and a Bachelor's from the
 6   University of Iowa.
 7        Q.  Okay.  During your tenure
 8   at Medi-Cal were you involved in the
 9   state process for obtaining SSI and
10   SSP data from the Social Security
11   Administration?
12        A.  Yes, I was.  California
13   has, among a number of states, a
14   contract agreement with the Social
15   Security Administration to provide
16   automatic Medicaid eligibility to
17   anybody on the SSI program.  And part
18   of that is to have the Social
19   Security Administration administer
20   for the state the eligibility and
21   payment for the SSP program, the
22   Supplemental State program.  So I was
23   involved in that process.  The
24   program was established years before
25   I actually started working for state
```

279

```
 1   government, it was probably back in
 2   the '70, before 1977, but I was
 3   involved in that program, worked
 4   closely with both CMS and Social
 5   Security Administration during my
 6   tenure with the state.
 7        Q.  Okay.  What is the
 8   California Medicaid Management
 9   Information Systems, MMIS?
10        A.  It's a set of computer
11   programs and manual processes that
12   constitute the system to manage the
13   program to pay providers, pay claims,
14   manage who becomes eligible for the
15   program, reciprocal of who becomes an
16   enrollee, and it provides information
17   to providers who -- on who is
18   eligible.  It also has four other
19   subsystems, a couple of reporting
20   subsystems, management of who
21   providers are, and management of
22   various reference files like, for
23   example, what drugs that the program
24   covers.  So it's all of the
25   management of the computers and
```

280

```
 1   programs that make the program work,
 2   including eligibility verification,
 3   maintenance of eligibility.
 4        Q.  Okay.  And what is the
 5   Medi-Cal Eligibility Data System,
 6   MEDS?
 7        A.  The Medi-Cal Eligibility
 8   Data System, called MEDS, is the
 9   statewide database that receives all
10   information on eligibility for the
11   Medi-Cal program.  Medi-Cal has a
12   number of entities who determine
13   eligibility for who's eligible for
14   Medi-Cal.  Social Security
15   Administration determines it for
16   people on SSI and SSP.  The carriers
17   in California determine it for most
18   of the people.  And there's some
19   eligibility state determination.  All
20   of those entities determine
21   eligibility and they send the state
22   computerized files, and the state
23   maintains the system -- the
24   information on the MEDS system.
25        Q.  Okay.  What is the Medi-Cal
```

**JA 181**

281

Automated Eligibility Verification
System, AEVS, that you've mentioned?

A. The AEVS is a set of
systems that allow providers, through
a number of ways, to find out who is
eligible for Medi-Cal.  Medi-Cal
issues a lifetime plastic card to its
members; everybody, including people
on SSI.  And that card has got some
really basic demographic information,
but it doesn't tell you who -- is the
person eligible this month and under
what conditions.  The AEVS system is
a system that providers access Medi-
Cal through its fiscal agent to get
information from MEDS that tells them
who is eligible this month, is your
patient eligible, and then what are
the conditions of eligibility.  And a
big part of that is what aid code
does the person have on that given
month.

Q. Okay.  Were these systems;
MMIS, MEDS, AEVS, in operation during
the fiscal years at issue; 2006

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

282

through 2008?

A. Yes, they were.  They were
-- they've been in operation for
decades now, and they were in
operation during that period.
***
MR. GETZOFF:
Okay.  At this point, Mr.
Chairman, I would like to ask
the Board to accept Mr.
Rosenstein, whose expert
report is at P34, to be
accepted as an expert witness
on certain points, which
I'm...
THE CHAIRMAN:
What are those points?
MR. GETZOFF:
The Medi-Cal program, the
Medi-Cal eligibility systems,
the interface with and use of
SSI and SSP data by Medi-Cal
for determining eligibility,
how California obtains SSI and
SSP information from the

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

283

Social Security
Administration, and the Medi-
Cal aid code system.
MR. OLSZEWSKI:
The MAC objects.
THE CHAIRMAN:
To all or any portions?
MR. OLSZEWSKI:
To all, especially offering
this witness as an expert.
I'd like the opportunity to
cross examine before the Board
makes a determination.
THE CHAIRMAN:
Okay.  Mr. Getzoff, do you
have objection to the cross
examination, or...
MR. GETZOFF:
I think it's, you know -- Mr.
Olszewski has had the expert
report for a month and has
never -- I offered to discuss
any issues such as this prior
to the hearing, he made no
effort whatsoever to bring

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

284

this up.  I would have happily
started that process at the
beginning of Mr. Rosenstein's
testimony, but I think it
seemed appropriate to allow
Mr. Rosenstein to continue
with his direct testimony, and
if Mr. Olszewski wishes to
cross examine, he's certainly
welcome to.
THE CHAIRMAN:
Okay.  We'll allow you to
cross examine to determine the
nature of your objections.
MR. OLSZEWSKI:
Thank you.
***
CROSS EXAMINATION
BY MR. OLSZEWSKI:
Q. Mr. Rosenstein, have you
ever testified as an expert before?
A. Yes, I have.  I've been an
expert witness a number of times now.
Q. In what type of forums or
venues?  Court systems, Board

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

**JA 182**

285

1   hearings, where have you been an
2   expert?
3        A. I've been an expert in
4   Board hearings. I've been an expert
5   in court actions, although at this
6   date none of those have actually gone
7   to court, but I served as an expert
8   on a number of court cases but I
9   haven't actually testified in court
10  yet...
11       Q. Okay.
12       A. ...on those, but on Board
13  actions.
14       Q. So you've not actually
15  testified in any court cases as an
16  expert, but you have in Board cases?
17       A. That's correct.
18       Q. Okay. And what type of
19  Boards were those, if there was more
20  than one?
21       A. There were -- it varied.
22  Some of them were employer-employee
23  cases, some of them were disputes
24  between health plans and providers.
25  The cases I did with the Federal

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

286

1   Government, I served as an expert for
2   the U.S. Department of Justice on the
3   entire Medicaid program.
4        Q. So did you actually testify
5   in those Board hearings? What was
6   the name of the Board?
7        A. I'm not sure -- I don't
8   have them in front of me. One was
9   Employment Relations Board a few
10  years back. I don't have the names
11  right in front of me, I didn't bring
12  that. I'm sorry.
13       Q. Do you happen to have any
14  of the case numbers...
15       A. Not...
16       Q. ...with you?
17       A. Not here. I mean I have
18  them back in my office, but...
19            ***
20  MR. GETZOFF:
21       I fail to see the relevance of
22       the case numbers that Mr.
23       Rosenstein has testified in.
24       He's -- as a former director
25       for a long time of the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

287

1        Medicaid program, the issues
2        that we have asked he be
3        accepted as are very narrowly
4        drawn, and they're drawn
5        completely within his
6        expertise is probably greater
7        than anyone else in the
8        country right now on those
9        particular topics.
10  MR. OLSZEWSKI:
11       In response to that, the MAC
12       would not object to this
13       witness as being offered as a
14       witness. The label expert is
15       what the objection is for, and
16       that's where my cross
17       examining -- examination is
18       going. He's never testified
19       in court -- and I've only
20       asked two questions so far.
21       He's testified before one
22       Board that he can name, has no
23       case numbers, has not
24       testified in court yet, but
25       has worked as an expert on

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

288

1        some cases that might lead up
2        to court. So I have a string
3        of questions to go through,
4        but if he wants to be -- I'll
5        accept him as an opinion
6        witness, but not an expert
7        witness -- or, I'm sorry, a
8        lay witness, not an expert
9        witness.
10  THE CHAIRMAN:
11       Okay. In -- and I wanted to
12       sort of pause for a second
13       just to get some history here.
14       Did -- was -- I know that as
15       part of the Board procedures,
16       a witness list is supposed to
17       be submitted in advance to the
18       Board in advance of the
19       hearing, and that includes
20       identification of witnesses
21       that are proposed to be expert
22       witnesses.
23  MR. GETZOFF:
24       Yes.
25  THE CHAIRMAN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 183**

289

1    And I didn't know if that
2    witness list designated...
3  MR. GETZOFF:
4    It did.
5  THE CHAIRMAN:
6    Okay.
7  MR. GETZOFF:
8    And we submitted the expert
9    report 30 days ahead of time,
10   as required.
11 THE CHAIRMAN:
12   Okay.  And the points of -- I
13   guess the four -- I think you
14   had listed four different...
15 MR. GETZOFF:
16   Five.  I guess you could say
17   two are related, but -- do you
18   want me to go through them
19   again?
20 THE CHAIRMAN:
21   Yes, please.
22 MR. GETZOFF:
23   Okay.  The Medi-Cal program,
24   the Medi-Cal eligibility
25   systems, the interface with

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

290

1    and use of SSI and SSP data by
2    Medi-Cal for determining Medi-
3    Cal eligibility, how...
4  THE CHAIRMAN:
5    Could you state that one again
6    please?
7  MR. GETZOFF:
8    The interface with and use of
9    SSI and SSP data from the
10   Social Security Administration
11   by the Medi-Cal program for
12   determining Medi-Cal
13   eligibility.  The fourth one
14   is how California obtains SSI
15   and SSP information from the
16   Social Security
17   Administration.  And the last
18   one is the Medi-Cal aid code
19   system, all areas that he has
20   indicated he worked on for
21   many years, and supervised
22   each one of those.
23 THE CHAIRMAN:
24   Okay.  Mr. Olszewski, as to
25   the first two bullet points,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

291

1    are you objecting as to his
2    being an expert as to the
3    first two bullet points?
4  MR. OLSZEWSKI:
5    Yes.
6  THE CHAIRMAN:
7    And what would be the basis of
8    his expertise in Medi-Cal and
9    Medi-Cal eligibility?
10 MR. OLSZEWSKI:
11   Thus far, he's -- he needs to
12   be shown to be an expert.
13   He's never testified -- well,
14   he's testified in one Board
15   hearing that he's been able to
16   recall right now.  He needs to
17   be an expert in order to be --
18   testify as an expert.
19 MR. GETZOFF:
20   Okay.  If I may react to that,
21   I mean...
22 THE CHAIRMAN:
23   Sure.
24 MR. GETZOFF:
25   ...honestly, I've never heard

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

292

1    of such a silly argument.  You
2    know, he was in government his
3    whole life and he became a
4    consultant somewhat recently.
5    And the fact that he's done
6    depositions but not appeared
7    in court doesn't make him any
8    less than an -- less of an
9    expert.  He's, frankly, more
10   knowledgeable about the Medi-
11   Cal system than any other
12   living human being, I imagine.
13 THE CHAIRMAN:
14   Duly...
15 MR. OLSZEWSKI:
16   For such a...
17 THE CHAIRMAN:
18   ...noted.
19 MR. OLSZEWSKI:
20   For such a silly argument,
21   it's called the Daubert
22   standard, practiced in every
23   federal court around here.
24 THE CHAIRMAN:
25   Okay.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

293

MR. GETZOFF:

Well, this is not a federal court, the last time I checked.

THE CHAIRMAN:

An expert does have to have their first testimony before a court as an expert, so I hear your objection but I -- that in and of itself, particularly with his expertise having served as an administrator of Medi-Cal, doesn't seem like a sufficient basis for an objection relative to the first two points. And is that the -- relative to the first two points, is that your sole objection or concern?

MR. OLSZEWSKI:

Yes, for all four points.

THE CHAIRMAN:

For all four points.

MR. OLSZEWSKI:

Yes.

294

THE CHAIRMAN:

Relative to the other three points, I'd like to take a recess, if that's the full nature of your objections.

MR. OLSZEWSKI:

That is my full nature of the objection.

THE CHAIRMAN:

We'll take a recess, and I'd like to confer with the other Board Members regarding the other three bullet points.

***

[Off the record]

[On the record]

***

THE CHAIRMAN:

And we'll go back on the record. And after a conference, the Board has decided at this time to accept Mr. Rosenstein as an expert relative to Medi-Cal and Medi-Cal eligibility. As to the

295

remaining three points, the Board at this time declines to recognize him as an expert as to those three points, as the Board feels that there hasn't been yet a sufficient foundation laid for his expertise in those areas. Those are rather technical areas, and this is -- so at this point in time, don't feel like there's a sufficient foundation. If, Mr. Getzoff, you wish us to revisit that at a later point during the hearing, you may do so.

MR. GETZOFF:

Okay, thank you.

***

BY MR. GETZOFF:

Q. Welcome back. Mr. Rosenstein, can you briefly explain the SSI program and its basic eligibility requirements? Not -- just briefly.

296

A. Yes. The SSI program is a cash grant program to people who are disabled and unable to work. There are a wide variety of categories of people -- of eligibility criteria, and a wide variety of income levels. So people have to be below to be eligible.

Q. Can you briefly explain the SSP program and its basic eligibility requirements?

A. Yeah. The SSP program is a state program administered by the Social Security Administration that provides a supplemental grant to everybody who is SSI eligible, and because it has a different income level, it does provide a grant to some people who are not SSI income level eligible, but who are still below the income standard for the SSP program.

Q. Okay. Are all individuals who are eligible for SSI also eligible for SSP?

297

1    A. Yes, everybody on SSI gets
2  SSP.
3    Q. And why are there some
4  individuals who qualify for SSP but
5  not SSI?
6    A. SSI has its own income
7  standard based upon the size of its
8  cash grant. SSP has a higher income
9  standard. So anybody who falls below
10 the income standard for SSI, by
11 definition falls below the income
12 standard for SSP and gets both
13 programs. There is a segment of the
14 population whose income falls above
15 the SSI level, but below the SSP
16 level, and they get SSP only.
17    Q. Okay. If you could turn to
18 Exhibit P30, at page 612. Okay? The
19 first two pages of the exhibit
20 appears to be a short e-mail string.
21 Could you describe those
22 communications to and from you?
23    A. Yes. Well, this starts off
24 as an e-mail from me to you, but more
25 importantly is an e-mail I received

298

1  from Harrold Smith [ph] from the
2  California Department of Social
3  Services, and they are the department
4  responsible for running the SSP
5  program. They don't administer it
6  but they have the responsibility for
7  establishment as to the cash grant.
8  And in this case, Mr. Smith provided
9  me with data for the period in
10 question of the SSI caseload and the
11 SSP-specific caseload, and that's
12 attached to the e-mail, it's an
13 attachment of a two-page chart.
14    Q. Okay. Why is the State
15 Department of Social Services the
16 best source of such information?
17    A. Okay, the California
18 Department of Health Services
19 administers Medi-Cal, and the only
20 information they have is people who
21 are in -- on the SSI, SSP program.
22 The Department does not have --
23 healthcare services Medi-Cal program
24 does not know who is SSP only. The
25 California Department of Social

299

1  Services has the state responsibility
2  for the SSP program, and they were
3  the entity who knows who's SSI -- who
4  has SSI, and by definition, anybody
5  who has SSI has SSP, and those people
6  who are SSP only. So they were the
7  only source that I could get this
8  information from from the state, and
9  they were kind enough to provide it.
10    Q. Looking at the chart,
11 starting on page 614 of Exhibit P37,
12 is this the chart that was provided
13 to you by the Department of Social
14 Services?
15    A. Yes.
16    Q. And what do the numbers in
17 the middle column represent?
18    A. Okay, the middle column is
19 the caseload that -- on a monthly
20 basis of people who the state got who
21 were on SSI, SSI-eligible.
22    Q. Okay. And what do the
23 numbers in the right column
24 represent?
25    A. This is the number of

300

1  people who are SSP-only eligible.
2  They have SSP, but as it says, no
3  SSI.
4    Q. Okay. Looking at your
5  expert report, which is included at
6  Exhibit P34, did you analyze the data
7  provided to you from the Department
8  of Social Services?
9    A. Yes, I did. I looked at it
10 and made a determination as to what
11 percentage of the total universe of
12 caseload, and by -- just to be clear
13 on that, it's the total of people who
14 are SSI and SSP only, because that's
15 what the Department would have. So
16 you have those two columns together.
17 I analyzed to determine what
18 percentage of the total population
19 was SSP-only, and while it varied
20 very, very slightly month to month,
21 it was on the average about 14
22 percent. A few fractions one way or
23 another every month, but it was
24 pretty consistently 14 percent
25 throughout, and 40 percent total.

301

1   Q. So the numbers that you
2   list in, you know, the 68 million, 59
3   million, 9 million, those numbers
4   that appear in your report, how did
5   you arrive at those numbers?
6   A. Well, I totaled the total
7   eligibility months, and one is the
8   total of all eligibility months for
9   SSI and SSP, and the other is the
10  total of all eligibility months for
11  just SSP only.
12  Q. Okay.
13  A. And those are the -- you
14  know, if you run a total of these
15  charts, which is what I did, that's
16  what you get.
17  Q. Okay.  And were the
18  percentages that you mentioned, you
19  said about 14 percent, consistent on
20  a month-to-month basis?
21  A. Yes.  Slight fractional
22  variations, but it was consistently
23  just about 14 percent every month.
24  Q. Was there any significant
25  difference from year to year, and

302

1   we're referring to the 2006 to
2   2008...
3   A. No.
4   Q. ...period?
5   A. No, it was consistent month
6   to month, year to year.
7   Q. Okay.  Would you expect the
8   percentage of SSP-only beneficiaries
9   to vary greatly compared to statewide
10  averages in any particular large city
11  or county of the state?
12  A. No, I think it would be
13  very common.  If anywhere, there
14  would be a higher SSP-only population
15  in northern California, and southern
16  California would have a lower
17  percentage, but I would consider it
18  to be pretty consistent.  Northern
19  California has a higher income level
20  on average than southern California,
21  so if anything, northern California
22  is going to be slightly greater
23  percentage of SSP only, but I would
24  expect it to run pretty consistently.
25  Q. And what...

303

1   A. And the data on these
2   programs has been very consistent
3   year to year for a long time.
4   Q. What does that suggest
5   about Pomona's SSP program?
6   A. Well, Pomona is in a poor
7   area of town.  They see a lot of poor
8   people.  So I would expect them to be
9   at the 14 percent average or possibly
10  below it.
11  Q. Do SSI and SSP eligibility
12  relate to Medi-Cal eligibility?
13  A. Yes. by contract,
14  California is one of the states that
15  adopted a contract to grant automatic
16  eligibility to -- Medi-Cal
17  eligibility to anybody on SSI, SSP.
18  Q. Why were the SSI, SSP
19  status of Medi-Cal beneficiaries
20  important to the Department of
21  Healthcare Services?
22  A. Well, the people -- you
23  know, people who are enrolled by the
24  Social Security Administration in
25  both programs they come over

304

1   electronically to the state, the
2   state will then pay for their health
3   care, become -- the state becomes
4   responsible and pays the state's
5   share of 50 percent, draws down
6   federal funds from CMS paying the
7   federal matching rates in California,
8   which is 50 percent.  So the state is
9   accountable for making sure its
10  payments are correct both to the
11  state and its taxpayers, as well as
12  the Federal Government, CMS, and the
13  federal taxpayers.  So there's a
14  tremendous amount of oversight on who
15  Medi-Cal covers, so that it has to be
16  done right.
17  Q. Okay.  What is a 1634
18  agreement?
19  A. A 1634 is the federal law
20  that provides for the contract for
21  states to contract for the Social
22  Security Administration to manage the
23  eligibility for SSI and for the SSP
24  program, and part of that provision
25  grants automatic Medicaid

00414

305

```
 1  eligibility.
 2        Q. How does the Social
 3  Security Administration send
 4  eligibility information to Medi-Cal?
 5        A. Social Security
 6  Administration sends it
 7  electronically in what's called a
 8  state data exchange.  So they will
 9  determine eligibility and they will
10  send an electronic computer file to
11  the state, which the state then
12  processes and posts to the MEDS, the
13  Medi-Cal Eligibility Database.
14        Q. How frequently does the
15  Social Security Administration update
16  such information to the State
17  Department of Healthcare Services?
18        A. It's done on a fairly
19  routine basis.  Once monthly you get
20  the full file, and then you get
21  updates.
22        Q. And what does Medi-Cal do
23  with the SSI, SSP data provided
24  through the SDX?
25        A. It takes the data, runs it,
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

306

```
 1  it adds the aid code based upon the
 2  data that's on the Social Security
 3  Administration file, and it posts it
 4  to the MEDS file, Medi-Cal
 5  Eligibility Database.  The first time
 6  that a person comes in, the person is
 7  also issued a plastic Medi-Cal card.
 8  It's a permanent lifetime card.  So
 9  the person gets it.  And then that
10  person is eligible for Medi-Cal and
11  goes through the traditional Medi-Cal
12  program.
13        Q. In addition to the
14  information provided by the Social
15  Security Administration via the SDX,
16  what other sources were used during
17  the 2006 to 2008 period to provide
18  eligibility information in the MEDS
19  system?
20        A. Well, the state receives
21  eligibility from the Social Security
22  Administration.  That's the only
23  source for SSI, SSP.  It gets
24  eligibility from counties and the
25  state from other eligibility
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

307

```
 1  programs, but for those -- only those
 2  three programs are -- for SSI, SSP,
 3  it's only from the Social Security
 4  Administration, posts it to MEDS,
 5  assigns one of those three aid codes
 6  that have been in place before I
 7  started, they came in place before
 8  1979 when I started.  And then it
 9  provides providers with the
10  information so that they can render
11  services to the individuals.
12        Q. How reliable is the
13  information provided by the MEDS
14  system?
15        A. 100 percent reliable.  It
16  is a program -- it's a system that's
17  been in place since the 1980s.  It
18  has been tested time and time again.
19  It's been reviewed by the State
20  Department of Healthcare Services,
21  State Control Agency, State Oversight
22  Agency, by the Federal Government.
23  It's a federally certified system.
24  It has to be accurate, and it's been
25  proven accurate, because there are
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

308

```
 1  literally billions of dollars
 2  dependent on the accuracy of that
 3  system.
 4        Q. Are you familiar with the
 5  system of aid codes that Medi-Cal
 6  uses?
 7        A. Yes, I am.  California
 8  established what's called aid codes
 9  to tell various entities; the state,
10  Federal Government, providers, what
11  is the source of eligibility.  You
12  know, Medicaid is a -- it's sometimes
13  a mindboggling, complex program.
14  It's just not one program, there are
15  multiple sources of people got
16  eligibility.  You could be SSI, SSP,
17  you could be CalWORKS, or TANF on the
18  federal level.  You can be a breast
19  and cervical cancer, on and on and
20  on.  So there's multiple programs,
21  each of those programs have to be
22  identified.  Each of those programs
23  could have a different scope of
24  benefits, you might have a full
25  scope; you might have a limited
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 188**

309

```
 1   scope.  Each of those might have a
 2   different federal matching rate.  The
 3   aid code is the singular indicator
 4   that drives all of that information.
 5   So when you -- you can look at an aid
 6   code you know where this person --
 7   how this person became eligible,
 8   source of eligibility, what source of
 9   benefits they get, how much money
10   the state can claim from the Federal
11   Government.
12        Q.  Which agency assigns the
13   aid codes to individual patients?
14        A.  Which -- I'm sorry?
15        Q.  Which agency?
16        A.  The Department of
17   Healthcare Services assigns them.
18        Q.  How accurate in general are
19   the aid codes in the MEDS system with
20   respect to identifying a
21   beneficiary's source of eligibility?
22        A.  They're 100 percent
23   accurate.  They've been well-tested.
24   We cannot bring up somebody in
25   eligibility without having the aid
```

310

```
 1   code be correct, so that's -- every
 2   new aid code is tested, as well as we
 3   test whether any program has changes
 4   for new aid code change -- changes
 5   the old aid codes.  And the three aid
 6   codes for SSI, SSP, as I said, have
 7   been in existence and used in the
 8   MEDS system since the 1980s.  They've
 9   been proven the test of time.
10        Q.  Is there federal oversight
11   over the accuracy of these aid codes
12   as used by the Medi-Cal program?
13        A.  Yes, there's federal
14   computer reviews, there are -- I mean
15   this is what drives the federal
16   claim.  So the aid code drives how
17   much money and what matching rate.
18   So every quarter CMS reviews the
19   state's claim to make sure it's
20   proper, and that would include from
21   time to time aid codes, they would
22   want to make sure that if somebody's
23   eligible for 50 percent federal
24   matching rate, the state's not
25   claiming 95 percent match because the
```

311

```
 1   aid code is wrong.
 2        Q.  And which aid codes
 3   identify a Medi-Cal enrollee on SSI
 4   and/or SSP?
 5        A.  They are identified by
 6   three aid codes; 10, 20, and 60.
 7        Q.  Okay.  Could a Provider,
 8   such as Pomona Valley, during the
 9   2006 to 2008 period, verify that a
10   patient is eligible for Medi-Cal
11   benefits?
12        A.  Yes.  They -- again,
13   there's a plastic card that's issue.
14   It doesn't tell you are they eligible
15   this month.  A Provider needs to know
16   are you eligible this month, so they
17   go through what's called the AEVS
18   system to determine what is your
19   eligibility status.  And they have to
20   do it month to month.  There's
21   multiple ways to access that system,
22   most are computerized now, and they
23   access the system based on the
24   information the patient has, and
25   Medi-Cal returns the patient through
```

312

```
 1   the AEVS system eligibility
 2   information; are they eligible, what
 3   scope of benefits that they're
 4   eligible for, are there any
 5   restrictions, and what the aid code
 6   is.  That all is returned to the
 7   Provider.
 8        Q.  How...
 9        A.  And that information is all
10   taken directly off of MEDS with
11   really no interpretation by the AEVS
12   system.
13        Q.  Okay.  How frequently is
14   the AEVS system updated?
15        A.  It's updated real-time.  So
16   any time an eligibility worker adds
17   somebody, it's updated.  So
18   literally, you could be found
19   eligible at noon and walk down to the
20   doctor's office at 12:30 and you'd be
21   on the eligibility verification
22   system.
23        Q.  Can you summarize then how
24   data travels from the Social Security
25   Administration to a Provider, such as
```

**JA 189**

313

1  Pomona, and what information would be
2  available through these Medi-Cal
3  systems?
4       A.  Right.  So somebody who is
5  determined eligible from the Social
6  Security Administration is posted, of
7  course, through the Social Security
8  Administration's files.  The Social
9  Security Administration, through the
10  state data exchange, sends the data
11  to Department of Healthcare Services.
12  The Department of Healthcare Services
13  takes that data, posts it to the MEDS
14  system.  It then sits and resides on
15  the MEDS system.  When a Provider
16  sees a patient and they want to know
17  are they eligible, the Provider
18  accesses through the AEVS system, is
19  my patient eligible.  The AEVS system
20  goes to MEDS, grabs the record,
21  doesn't do any data interpretation or
22  changing, and basically ships that
23  information back to the Provider.  It
24  includes basic demographic
25  information, what the person is

314

1  eligible, what scope of benefits, and
2  again, the aid code.  So that is an
3  aid code that is coming directly off
4  of MEDS, unchanged, and the state is
5  taking the aid code from Social --
6  you know, from Social Security
7  information -- Social Security
8  Administration doesn't have the aid
9  code, has data elements that the
10  state is able to use that social
11  security data element to assign the
12  aid code.
13       Q.  Approximately when were you
14  first contacted by a representative
15  of Pomona with respect to its SSI
16  percentage issue appeals for these
17  three cost years?
18       A.  About a year and a half
19  ago.
20       Q.  And what were you asked to
21  do?
22       A.  I was asked to do a number
23  of things.  To verify that their
24  processes, their ideas to determine
25  what -- who was SSI on Medi-Cal were

315

1  accurate to validate their process,
2  to make sure they had interpreted
3  Medi-Cal right, and then to assist
4  them in trying to resolve the
5  question of why did they have such a
6  high -- or such a -- you know, I
7  guess a high percentage of people who
8  would be showing as SSI -- or, excuse
9  me, high percentage of people showing
10  as SSP only, and try to resolve that
11  and get to the bottom of it from the
12  Medi-Cal data's perspective.
13       Q.  Do you recall what
14  documents you were asked to review?
15       A.  I was asked to review
16  various reports from the hospital,
17  that are exhibits here, on the
18  analysis that they had done, and
19  reviewed what work the hospital did.
20  And then I also reviewed the samples
21  -- the information with the
22  Department of Healthcare Services on
23  their sample.  And then I collected
24  data from the Department -- State
25  Department of Social Services.

316

1       Q.  Did you review Ms. LeTran's
2  and Pomona's methodology for
3  obtaining data?
4       A.  Yes, I did.
5       Q.  In your opinion, were Ms.
6  LeTran's methods for assigning aid
7  codes sound?
8       A.  Yes, it was very simple.
9  She looked on her files, which were
10  actually files that she got from the
11  state Medi-Cal program, for 10, 20,
12  or 60.  It was no more complicated
13  than that.
14       Q.  Do you believe the data she
15  compiled is accurate for purposes of
16  demonstrating SSI and SSP status?
17       A.  Yes.  She's accurately gone
18  through her records and found people
19  who are either a 10, 20, or 30 [sic]
20  aid code, SSI, SSP.
21       Q.  Was there any important
22  data source of which you are aware
23  that Ms. LeTran did not seek to
24  access in her patient data
25  compilation?

**JA 190**

00417

317

```
1   A. No. Again, from an SSI,
2 SSP, Medi-Cal perspective, it's the
3 eligibility verification process I
4 described.
5   Q. Okay. Are you aware
6 whether the state of California
7 verified part of a sample of Pomona's
8 SSI and SSP patient list?
9   A. Yes. The State Department
10 of Health Services' eligibility
11 division was asked to verify a sample
12 for three years. They verified it
13 for one year, and they found 100
14 percent accuracy with the sample...
15   Q. Okay.
16   A. ...that the sample
17 accurately reflected people who were
18 SSI, SSP on Medi-Cal.
19   Q. Did Pomona also seek to
20 submit patient claim samples for 2007
21 and 2008 to the Department of
22 Healthcare Services?
23   A. They did, and the
24 Department of Healthcare Services
25 wasn't able to accommodate due to
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

318

```
1 staffing concerns.
2   Q. In your opinion, does this
3 list from the Medi-Cal program verify
4 that Ms. LeTran's methods of
5 identifying aid codes and SSI/SSP
6 patients were accurate?
7   A. Yes. I mean they were 100
8 percent accurate one year. There
9 really wasn't any reason to do the
10 other two years because, you know,
11 they -- she was doing it right.
12   Q. Okay. If I could ask you
13 to look at Exhibit P24, and starting
14 on page 235, there is a very large
15 group of these items at the top
16 called eligibility response reports.
17 All three years are in here, but
18 we're only going to ask the questions
19 on the first set. How would a
20 Provider such as Pomona obtain these
21 reports?
22   A. Well, these are reports
23 largely generated by their vendor.
24 The first parts of these reports are
25 from Medicare data, and then later on
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

319

```
1 in the data, on pages -- you get to
2 the Medi-Cal data. On page, for
3 example, 541 is the Medi-Cal data.
4 And if I might add, if you look at
5 page 541 you can see...
6   Q. 541 or 241?
7   A. Should be -- I'm sorry,
8 page 237...
9   Q. 237.
10   A. ...would be -- the number
11 541 is on the top of it.
12   Q. Okay.
13   A. My apologies. Yeah. So
14 page 237 of this document you'll see
15 a -- my apologies, I looked at the
16 wrong page number. So on page 237 if
17 you look at the top you'll see Medi-
18 Cal name redacted, county code 36,
19 and you see the 60 primary aid code,
20 that shows you that it's SSI, SSP
21 status, because what -- it's either a
22 10, 30, or 60. And you can go
23 through page after page after page
24 and see that is the primary aid code.
25   Q. Okay. And did you review
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077 ,

320

```
1 this set of eligibility reports?
2   A. I reviewed the set and
3 summaries, and everything I saw was
4 either a 10, 20, or 60 aid code. I
5 mean there are -- just so you know
6 and are not surprised, there could be
7 secondary aid codes in Medi-Cal,
8 because they might be eligible for
9 two different programs, but what's
10 important is the primary aid codes,
11 SSI and SSP. They might be eligible
12 on some other program too. There's
13 -- so you can have multiple sources
14 of eligibility.
15   Q. Okay. Does the information
16 used to create the aid codes
17 ultimately derive from the Social
18 Security Administration?
19   A. 100 percent. It comes off
20 of what Social Security
21 Administration gives the state, and
22 all the -- the 10, 20, and 60, all it
23 does is define whether aged, blind,
24 or disabled.
25   Q. And how is then assigned to
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 191**

321

individuals?

A. Well, it's assigned -- the aid code is assigned based upon the Social Security record, and there's a data element in the Social Security record that says, you know, for this eligible person, they're aged, blind, or disabled. So it's in their data set and the state takes that data, changes the number to one of the -- you know, changes the data to its data set and posts it.

Q. In your opinion, do these records verify that Pomona's methods of identifying SSI and SSP patients were accurate?

A. Yes.

Q. Okay. If I could ask you to turn to Exhibit 27, and start with pages -- there's a series of them, but 504 to 517 is the first set for 2006.

A. Yes, if you look at that on page 504 you can see on the second to right-hand side it says aid code, if

322

you look straight down that column you see 10, 10, 10, 10, 10, 10, 10, 10, 10, 10, that's the SSI, SSP aid code. And you can go page after page and, you know, easily see that these are SSI, SSP individuals.

Q. In your opinion, do these lists appear to be compiled using accurate information?

A. Yes, I mean it's actually very simple information. Aid code off of the eligibility verification and she basically ran the aid codes and -- that are on there, and you can just go page after page and see that they're one of the three aid codes.

Q. And what does it mean for a patient to be matched or unmatched with the CMS data in terms of SSI status?

A. It's -- my understanding is that the matched are the people who Medicare shows SSI, SSP, and CMS system confirmed they were SSI. And the unmatched are those people that

323

the state said was SSI, SSP, and CMS said they were not SSI.

Q. Okay. Now, if I could ask you to turn back to your expert report, which is starting at 584, and specifically, if you could look at page 589.

A. Yeah.

Q. For fiscal year 2006, how many patients were matched and how many patients were unmatched?

A. In 2006, I looked at eligibles. And to be clear, it's eligibles, not days, and I found that of the eligibles 716 were matched, 381 were unmatched, which made it 35 percent unmatched.

Q. When you mentioned the term eligible, does that refer -- what does that refer to?

A. Individual enrollees, eligible months. So a person...

Q. Okay.

A. Because my 14 percent from Social Security -- from the

324

Department of Social Services were people. To get an apple-to-apple comparison I had to look people to people. I couldn't look -- I could not look claims to claims. You know, that's more the people we're talking about 50 percent of claims are days, for me to compare to the 14 percent to give you an accurate apples-to-applies comparison, I had to look at people. So the 35 percent is 35 percent of the people were unmatched, which would equate to 35 percent SSP only, whereas we had statewide 14 percent.

Q. If the CMS data concerning SSI days and percentages were accurate, what would these results mean in terms of Pomona's percentage of SSP-only patients?

A. Well, this would -- for the first year it would mean they would have to have 35 percent of the people who were SSP only, 37 percent and 39 percent the subsequent years who were

325

SSP only, as compared to a statewide
average of 14 percent.

Q. Is there anything that you
are aware of in the circumstances of
Pomona Valley Hospital Medical Center
that would suggest that it would be
likely that 35 to 39 percent of its
patients were SSP only?

A. I cannot think of thing.
The only thing that causes someone to
be SSP-only is they have an income
that's above the SSI level, but below
SSP.  So they have relatively a
higher income -- literal income.
There's nothing in the Pomona
community that would ever leave one
to think that would be a highly --
represent all the people that have
more income in Pomona.  If anything,
I would think they'd have less income
than the statewide averages.  So you
know the dynamics of California,
northern California is far more
wealthy than southern California.
You know, California has a tremendous

326

level of poverty, and poverty is
greater in southern California than
it is in northern California.  So I
can't explain why they would be so
much higher than the statewide
average.

Q. So if the CMS information
were accurate, would Pomona's SSP-
only population have to be
approximately 250 percent of the
statewide average?

A. Yes.  I mean I can't
account for how that would ever
occur.

Q. Given the information and
records you have reviewed, what do
you conclude regarding the accuracy
of CMS' data with respect to Pomona's
SSI percentage for cost years '06,
'07, and '08?

A. There has to be something
wrong with the data.  It just does
not -- it's not in sync with the
experience of -- that the state of
California has with the overall SSI,

327

SSP program.  It's just so much more
off than the average.  And the SSI,
SSP population is a very consistent
population.  You know, much of Medi-
Cal churns, but the SSI, SSP
population doesn't, it's pretty
consistent, and consistent year to
year.

Q. Do you believe that the CMS
data understates the number of SSI-
qualifying patients treated at Pomona
during each of the three years?

A. Yes, it has to.  There's
something wrong with the data.  There
has to be a data error somewhere.
And, you know, I sought to find out
what the problem was, but was not
successful.  That would have been the
better way to resolve this is to find
out, you know, what was the data --
what's the problem with this data.

Q. Were you asked by Pomona to
provide your analysis to CMS?

A. Yes, and I did send CMS a
letter.

328

Q. If you want to take a look
at Exhibit P35, starting at 594.

A. Yeah, on January 21, 2016,
I sent CMS a letter describing who I
was and what I had found, and asking
them to help resolve this by going
through the sample of data and trying
to get to, you know, what was going
on here so we could get to some sort
of resolution.  Regretfully, I never
received a response from CMS on this.
CMS didn't do the sample and, you
know, I -- they were not willing to
help resolve this issue.  Rather
unfortunate.

Q. Had CMS acted on your
letter, do you believe that CMS would
have largely validated Pomona's data?

***

MR. OLSZEWSKI:
    I'm going to object to that as
    speculating as to what CMS
    would or would not have done.
MR. GETZOFF:
    If he knows, I...

**JA 193**

00420

329

THE CHAIRMAN:
    Can you restate your question
    again please?
MR. GETZOFF:
    Had CMS acted on your letter,
    do you believe that CMS would
    have largely validated
    Pomona's data?
THE CHAIRMAN:
    It is -- calls for, I guess,
    speculation.
MR. GETZOFF:
    Okay.
        ***
BY MR. GETZOFF:
    Q. Did CMS ever act on your
letter?
    A. They did not.
    Q. Did CMS ever agree to
request the Social Security
Administration to review the small
sample of claims submitted?
    A. Not that I'm aware of.
        ***
MR. GETZOFF:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

330

    Okay. I have no further
    questions.
THE CHAIRMAN:
    Thank you. Cross examination?
MR. OLSZEWSKI:
    Yes, thank you.
        ***
    CROSS EXAMINATION
BY MR. OLSZEWSKI:
    Q. Mr. Rosenstein, in your
review of the documents to prepare
your report, could you look at page
503 for me please? It is Exhibit 27,
page 503.
    A. Yes.
    Q. Thank you, and if you could
keep your thumb on that page and then
look at your expert report on page
589. So that's Exhibit 34, page 589.
    A. Yes.
    Q. Okay, so on your expert
report, I believe I heard you testify
that down here on the bottom of the
page for fiscal year 2006 there was
35 percent unmatched, and you

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

331

specified, I believe, unmatched
people as opposed to days. Is that
correct?
    A. That's correct.
    Q. In -- now, looking --
keeping your thumb on that, and going
back to page 503, is there anywhere
in this document that you're able to
confirm that your estimate of 35
percent?
    A. On page 503? No. I took
the data from the hospital on patient
count. So if you look at page 501, I
went to the -- if you look you see a
patient count number, I excluded any
patients who were not 10, 20, or 60,
and I did the count based upon that
data field. So that's the source of
my data.
    Q. So did you actually review
the unmatched days that Pomona Valley
is claiming?
    A. I'm not sure what you mean
by review. I went through all of
their records and reviewed their

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

332

records. Did I independently
calculate the days? No, but I went
through and validated that they used
-- selected using the proper aid
codes. And then as I said before, I
-- to give you an apples-to-apples
comparison of the 14 percent, I had
to deal with people, not days. And
that's how I dealt with people.
    Q. Back -- I think you
testified, about a year and a half
ago Pomona Valley contacted you to
have you look at their documents and
make a determination. Was there an
agreement that you entered into with
Pomona Valley?
    A. Yes. I operated under a
company called Health Management
Associates, who I subcontract with.
So Health Management Associates
entered into a consulting contract
with Pomona Valley.
    Q. And in that contract, would
it state how much you were going to
be getting paid for your work?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 194**

00421

333

1    A. How much Health Management
2  Associates would be paid for my work,
3  yes.
4    Q. And then, in turn, you
5  would be getting paid from Health
6  Management Associates?
7    A. That's correct.
8    Q. Do you own any part of
9  Health Management Associates?
10   A. I do not.
11   Q. Did you happen to bring a
12 copy of that written contract with
13 you today?
14   A. I did not.
15   Q. Have you ever read that
16 written contract?
17   A. I did.
18   Q. Based on your memory, do
19 you remember if there is a -- if it's
20 contingent based on -- if there's any
21 pay contingent based on the outcome
22 of this case?
23   A. No contingency.  It's
24 strictly a time and materials, hourly
25 reimbursement, plus -- an hourly rate

334

1  plus reimbursement for expenses.
2    Q. Did anybody ever contact
3  you for the purposes of this -- these
4  proceedings to get a copy of that
5  agreement to offer it into the record
6  as evidence?
7    A. No.
8          ***
9  MR. OLSZEWSKI:
10   That's all I have.  Thank you.
11 THE CHAIRMAN:
12   Any redirect?
13 MR. GETZOFF:
14   No.
15 THE CHAIRMAN:
16   Okay.  We'll move to Board
17   questions.  Ms. Benson?
18 MS. BENSON:
19   Thank you.  Thank you for your
20   testimony.  I have some
21   questions.  I guess my first
22   one is, the aid codes that are
23   being talked about here are
24   10, 20, and 60.  Do you know
25   how they correlate to the SSI

335

1    codes C01, M01, and M02?
2  MR. ROSENSTEIN:
3    I knew you were going to ask
4    that.  Not specifically,
5    because I didn't go through
6    the data on the dictionary
7    from -- for the SSA.  If those
8    are aid -- if those are codes
9    that designate this person as
10   aged, blind, or disabled,
11   which I don't know, then it
12   probably is the correlation,
13   but I don't know the data
14   dictionary for...
15 MS. BENSON:
16   Yeah.  You don't really know
17   if it is or isn't.
18 MR. ROSENSTEIN:
19   Well, I don't know that the
20   data...
21 MS. BENSON:
22   That there's a one-to-one
23   correlation between...
24 MR. ROSENSTEIN:
25   Whether -- yeah, I don't.

336

1  MS. BENSON:
2    ...C01, M01, and M02.
3  MR. ROSENSTEIN:
4    Yeah, I don't...
5  MS. BENSON:
6    Okay.
7  MR. ROSENSTEIN:
8    I don't have -- know the...
9  MS. BENSON:
10   That's fine.
11 MR. ROSENSTEIN:
12   I don't know the data
13   dictionary.  It's...
14 MS. BENSON:
15   I just asked that -- go ahead.
16 THE CHAIRMAN:
17   So the aid code goes to their
18   -- more of the nature of their
19   eligibility, it doesn't go to,
20   for instance, like SSA may
21   suspend or -- SSI payments,
22   and that's sort of -- there's
23   a whole different types of
24   codes that go through that in
25   -- on the SSA side of things.

337

MR. ROSENSTEIN:

Yeah, and those codes pass to the state too. I mean if...

THE CHAIRMAN:

But that doesn't...

MR. ROSENSTEIN:

They -- there not easy aid codes. I mean the people who, for example, who receive Medi-Cal eligibility due to SSI, if they lose their SSI status, Medi-Cal then has to do an independent eligibility determination before they're taken off of Medi-Cal. So all of that other data passes to the state too, and the state knows when the person's SSI eligibility either pended or ended, or they die, and all that information -- but it's not...

MS. BENSON:

What...

MR. ROSENSTEIN:

338

...it's not generated in the aid code.

MS. BENSON:

What happens if it's not -- their eligibility gets changed, but -- it's my understanding C02, M01, M02, and then there's a whole series of other codes that were explained in the Federal Register, and some of those explanations talk about not the person being ineligible or -- based on their income, but they may be in a nursing home, they may be -- they didn't get a check that month for some reason, not necessarily that their income went up or went down, but they didn't get a check that month for a reason, would that change code 10, 20, or 60?

MR. ROSENSTEIN:

It would not. For example, if

339

they went in a nursing home their SSI could drop, was typically what would happen, but they would still remain Medi-Cal eligible on one of those SSI aid codes. It wouldn't change the aid code, it would change, in that case, the grant amount.

MS. BENSON:

Yeah. I'm just asking because that could be one of the reasons for the differences. If you read the Federal Register, that was one of the explanations of the codes that CMS doesn't pick up is when a person is in a nursing home, if they get, and I'm not going to quote the Federal Register, but sometimes they get a nominal payment, sometimes they get no payment. When they get no payment, they don't pick up, you know, that

340

patient because -- and Medicare explains it in the Federal Register, they say they did not get any SSI benefits that month. So I'm just looking for if that 10, 20, or 60 didn't change, and if the person was in a nursing home, that could be some of the reason for the difference. Would you agree with that?

MR. ROSENSTEIN:

Yeah, I -- you know, nursing home -- someone who went into a nursing home, and there are not a whole lot of them; 65,000 on Medi-Cal statewide, yeah, they would still have a 10, 20, or 60, and they would have a reduced grant amount, but they would still show a 10, 20, 60.

MS. BENSON:

Okay. So that's just a potential reason for a

341

difference. So let me ask
another question. I assume
some people come to the
hospital and they don't have
Medi-Cal the day they walk in,
they don't have SSI, they
don't have anything, they get
qualified when they're in the
hospital. So let's, as an
example, say they went in the
hospital on, you know, August
10...

MR. ROSENSTEIN:

Um-hum.

MS. BENSON:

...and they got -- filed all
their paperwork, they got
qualified August 10 when, you
know, the date they filed
their paper, would you get a
code for that person that said
they were a 10, a 20, or a 60
beginning either August 1 or
August 10?

MR. ROSENSTEIN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

342

Well, Medi-Cal eligibility
month-specific. So if -- they
would get eligibility the
first day of the month of the
application.

MS. BENSON:

Okay, so in that case, so
August 1 would be their
eligibility date...

MR. ROSENSTEIN:

That's correct.

MS. BENSON:

...and the code would be
either a 10, a 20, or a 60.

MR. ROSENSTEIN:

If it was an SSI, SSP, that's
correct.

MS. BENSON:

Okay. So I just want to point
out another difference in the
Federal -- the Federal
Register talks about that they
make payment not the first
month that you qualify for
SSI, but the first of the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

343

following month. So in the
example that I just gave, the
SSI payment would not be in
the month of August, it would
be for the month of September.
And according to what I read
in the Federal Register, and
probably some other cases that
we've maybe heard, the days
before the month -- the first
month of payment are not
counted in the SSI fraction
calculation. So that would be
another difference. I just
want to point that out that
if, you know, if the state is
receiving a code 10, 20, or 60
for the first of the month in
which they actually filed the
application, the SSI rules say
your benefits are paid the
first of the following month.
And CMS said in its rule it
looks at the first time you
were paid a benefit. So those

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

344

days in the month prior to you
actually receiving your first
SSI payment wouldn't be
calculated in the DSH
calculation. So that would be
potentially another group of
days...

MR. ROSENSTEIN:

Well, Medi-Cal is using the
start date that Social
Security Administration gives
us.

MS. BENSON:

Right, but I -- I guess what
I'm saying is I'm not --
there's potentially a
difference between the start
date of...

THE CHAIRMAN:

Eligibility.

MS. BENSON:

...when -- of eligibility and
the first benefit check that's
issued to the beneficiary for
SSI. And the final rule

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 197**

345

1    explains that, at least for
2    the DSH calculation, the CMS
3    said that they were using the
4    month that -- the month that
5    you get a benefit check is,
6    you know, the days -- how many
7    days in that month where the
8    patient was in an inpatient
9    stay they counted.  If, for
10    some reason, you didn't get a
11    benefit check because maybe
12    you hadn't reached the first
13    of the month after you
14    applied, those days would not
15    be counted.  That was how it
16    was explained in the Federal
17    Register.  So it may be --
18    that could be a reason for
19    some of these days.  So I'm
20    just trying to point out that,
21    you know, if -- I was curious
22    if the 10, 20, or 60 was
23    assigned from the date -- the
24    first of the month of when the
25    application was filed, and if

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

346

1    it is...
2  MR. ROSENSTEIN:
3    It would be the...
4  MS. BENSON:
5    ...then...
6  MR. ROSENSTEIN:
7    ...first of the -- the start
8    date that Social Security
9    Administration...
10  MS. BENSON:
11    Right.
12  MR. ROSENSTEIN:
13    ...gives Medi-Cal...
14  MS. BENSON:
15    Right.
16  MR. ROSENSTEIN:
17    ...it's all driven by Social
18    Security.
19  MS. BENSON:
20    So that's just, I'll say maybe
21    a difference in definition,
22    you know, the state uses one
23    for paying the Medi-Cal claim,
24    which is probably the exact
25    right one to use...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

347

1  MR. ROSENSTEIN:
2    Um-hum.
3  MS. BENSON:
4    ...but CMS uses a different
5    one maybe for counting the
6    number of days that are
7    eligible for SSI payment,
8    because if you're not eligible
9    until the month of September,
10    because it's the first of the
11    following month after you
12    apply, there's some -- there's
13    obviously a discrepancy there,
14    and one for Medicaid is
15    counted the prior month and
16    the other is counted
17    subsequent, and that could be
18    a significant number of days.
19  THE CHAIRMAN:
20    And I guess to sort of sum up
21    that, it sounds like what Ms.
22    Benson is suggesting is that
23    the first day of Medi-Cal
24    coverage equals the first day
25    of state supplemental

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

348

1    payments, but may not equal
2    the first day of Social
3    Security Income payments.  It
4    may equal the first day of
5    Social Security Income
6    eligibility.
7  MR. ROSENSTEIN:
8    I had understood that SSI and
9    SSP payments start at the same
10    time.  Perhaps I'm wrong, but
11    I...
12  MR. ZIEGLER:
13    Can I ask a...
14  MR. ROSENSTEIN:
15    ...thought they had the same
16    start date.
17  MS. BENSON:
18    But the payment maybe -- and I
19    don't know when the SSP is
20    paid, it may be actually the
21    same month...
22  MR. ROSENSTEIN:
23    Yeah.
24  MS. BENSON:
25    ...that the SSI is paid, but

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 198**

349

```
 1        the Medi-Cal payment may be
 2        earlier, the actual, you know,
 3        paying for the medical
 4        services in the hospital, and
 5        if that's the date that the
 6        code is assigned, the first
 7        month of the month that the
 8        person applied, that is
 9        different than the definition
10        of when your SSI payment
11        begins.
12   MR. ROSENSTEIN:
13        Could...
14   MS. BENSON:
15        And I think that could be part
16        of the discrepancy.
17   THE CHAIRMAN:
18        So maybe that the first day of
19        Medi-Cal coverage always
20        equals the first day of SSP
21        and SSI eligibility, and the
22        date of the first SSI payment
23        or SSP payment may be later or
24        may be the same.
25   MR. ZIEGLER:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

350

```
 1        What may add some clarity to
 2        this, and I -- you know, is
 3        when you receive the file from
 4        SSA there is a translation
 5        occurs, right, to your 10,
 6        your 20, your 60.  We're not
 7        sure what's on that SSA file.
 8        But if -- because it's
 9        translating -- you asked about
10        C01, M01, M02, so the question
11        is what were the codes on the
12        SSA file when it came over,
13        because those codes are being
14        translated in the Medi-Cal
15        system, correct?
16   MR. ROSENSTEIN:
17        Well, I don't know if I'd call
18        it -- transferred, more than
19        translating.
20   MR. ZIEGLER:
21        Transferred?
22   MR. ROSENSTEIN:
23        Well, there's an -- there's
24        multiple indicators on the
25        Social Security file.  It's a
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

351

```
 1        pretty massive -- you know, a
 2        lot of files.  One of them
 3        says -- tells us if they're
 4        aged, blind, or disabled, so
 5        the difference between 10, 20,
 6        and 60 -- I mean the
 7        eligibility 10, 20, and 60 are
 8        the same, so it just
 9        categorizes the person.
10        There's other file dates such
11        as the effective date of
12        eligibility, which is what
13        you're speaking to, and Social
14        Security Administration will
15        give the state here is when
16        the person's eligibility is
17        effective, and the state, you
18        know, the state has agreed to
19        follow everything the Social
20        Security Administration...
21   MR. ZIEGLER:
22        So that can't...
23   MR. ROSENSTEIN:
24        ...supplies because they're --
25        they determine eligibility.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

352

```
 1   MS. BENSON:
 2        But there is a difference
 3        between the effective date of
 4        eligibility and the date the
 5        first SSI benefit payment is
 6        made.  By definition, if you
 7        read the SSI rules, it says,
 8        you know, the first of the
 9        following month.  So it's just
10        the potential for where some
11        of these differences are.
12   MR. ROSENSTEIN:
13        Yeah.  I don't know if that
14        would explain in my analysis
15        about a 20 percent difference.
16   MS. BENSON:
17        Yeah.  I certainly don't know.
18   MR. ROSENSTEIN:
19        Yeah.
20   MS. BENSON:
21        I'm just...
22   MR. ROSENSTEIN:
23        Yeah.  Yeah.
24   MS. BENSON:
25        I'm trying to like look at the
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

353

1  process...
2  MR. ROSENSTEIN:
3      Yeah.
4  MS. BENSON:
5      ...and listen to, you know...
6  MR. ROSENSTEIN:
7      Yeah, ideally...
8  MS. BENSON:
9      ...the various testimony
10     and...
11 MR. ROSENSTEIN:
12     Ideally, where I expected this
13     to have ended up was CMS would
14     have reviewed the data, and
15     they would have come back to
16     us, and maybe with some
17     answers like that we would
18     have gotten to the bottom of
19     this, is what we expected.  I
20     -- you know, I never
21     personally expected to be
22     here, I expected that CMS...
23 MS. BENSON:
24     Yeah.
25 MR. ROSENSTEIN:

354

1      ...would have responded to the
2      letter and...
3  MS. BENSON:
4      But that's a whole...
5  MR. ROSENSTEIN:
6      ...we would have gotten to the
7      bottom of this, but...
8  MS. BENSON:
9      ...other story.  I was just
10     trying to go through this and
11     listening to what you said
12     when you said you got the code
13     right away, and looking at
14     actually the information in
15     the record, I could see that,
16     you know, the day -- the date
17     of service might have been,
18     you know, August 24, the date
19     of eligibility was August 1,
20     and it looked like just what
21     you said, that Medicaid
22     eligibility was the first of
23     the month that they applied...
24 MR. ROSENSTEIN:
25     Um-hum.

355

1  MS. BENSON:
2      ...and that's what seems like
3      it's true, and that's what
4      made me think, well, if that's
5      true, the SSI payment is not
6      the first of the month that
7      you apply.  And so that just,
8      you know, is definitely a
9      discrepancy that I wanted to
10     point out.  Do you know if
11     there's any backlog in -- like
12     sounds like the state of
13     California does the initial
14     review of the SSI, SSDI
15     applications.
16 MR. ROSENSTEIN:
17     No, it -- we do not.
18 MS. BENSON:
19     You don't do that.
20 MR. ROSENSTEIN:
21     Someone said that, but that is
22     not accurate.  If you want SSI
23     you have to apply at Social
24     Security Administration.  The
       state of California has no

356

1      involvement under its
2      contract.  People who are
3      aged, blind, disabled can
4      apply at the county social
5      services department and they
6      will get only Medi-Cal, but
7      they will not enter the stream
8      for SSI, SSP.  They have to go
9      to Social Security directly.
10 MS. BENSON:
11     Okay.  Thank you.  Thanks for
12     clearing that up because,
13     actually, I thought you had to
14     go to Social Security, but...
15 MR. ROSENSTEIN:
16     Yeah.
17 MS. BENSON:
18     I had one other question.  You
19     get a lot of information from
20     the Social Security
21     Administration, but it sounds
22     like you don't get the, and
23     I'll call it their payment
24     codes, like the C01, the M01,
25     the M02 codes, because I

**JA 200**

357

```
1       imagine if you got them, you
2       would -- we all wouldn't be
3       here today.  Is that a true
4       statement?
5   MR. ROSENSTEIN:
6       Well, I'm not -- there are
7       lots of other information the
8       state gets that could trigger
9       a number of actions that are
10      not related to the aid code.
11      So, for example, if they get a
12      code they went to a nursing
13      home, the state gets that
14      information and knows that the
15      cash grant is going to drop.
16      If they got a hold status,
17      that affects the Medi-Cal
18      eligibility.  If they get a
19      status that the person died,
20      you know, the person is
21      removed.  If they get a status
22      that says the person has
23      eligibility that's terminated,
24      there's a reason code.  So
25      there's a whole lot of
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

358

```
1       different data that comes
2       over.
3   MS. BENSON:
4       I'm just wondering if...
5   MR. ROSENSTEIN:
6       But it's not -- doesn't affect
7       the aid code.
8   MS. BENSON:
9       If you take a look at -- and
10      it's in I9, and it's page
11      5280, this is the CMS final
12      rule for -- well, I think this
13      is actually the proposed rule
14      there.  I -- the final rule is
15      the same.  I think we could
16      probably look at either one.
17  MR. GETZOFF:
18      Excuse me, he doesn't have
19      that up there.  So...
20  MS. BENSON:
21      You don't -- sure, if you want
22      to give it to him.  In the
23      second column on page 5280
24      there's a list of codes that
25      were submitted in comments to
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

359

```
1       the proposed rule, and I guess
2       the submitter was stating that
3       they would like these other
4       codes used, and it's E01, E02,
5       N06, N10, N11, and it keeps on
6       going.  And I'm just assuming
7       that you don't get all those
8       -- these specific codes in
9       your -- in the file that you
10      get.
11  MR. ROSENSTEIN:
12      We may or may not.  I don't --
13      it wasn't part of the analysis
14      here.
15  MS. BENSON:
16      Okay.  So you don't really
17      know if you get those codes.
18  MR. ROSENSTEIN:
19      Yeah.  We...
20  MS. BENSON:
21      I would just suggest that if
22      you did, you know, then you
23      would have the information
24      with C01, CO -- you know, M01
25      and M02, which, you know,
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

360

```
1       would be what I think you were
2       trying to get from the agency.
3       So...
4   THE CHAIRMAN:
5       Are there similar code --
6       payment codes that the state
7       uses that might shed light on
8       the state-only payment
9       situations?
10  MR. ROSENSTEIN:
11      There isn't, and the challenge
12      here is the Department of
13      Healthcare Services gets all
14      sorts of data from the Social
15      Security Administration that
16      are not even posted to the aid
17      systems that we talked about.
18      By federal law, the State
19      Department of Healthcare
20      Services is charged with the
21      administration of the Medicaid
22      program, and must maintain
23      confidentiality and only use
24      the data they receive from the
25      Social Security Administration
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 201**

361

```
 1       for the administration of the
 2       Medicaid program.  This is not
 3       about the administration of
 4       the Medicaid program.  So had
 5       we even asked the Department
 6       of Healthcare Services to help
 7       us analyze their data from
 8       Social Security Administration
 9       for a Medicare appeal, they
10       would have rightly told us
11       it's not even allowed by the
12       Social Security
13       Administration.  They can't
14       use that data for Medicare,
15       they can only use it for
16       Medicaid.  So even if we had
17       asked for this, they couldn't
18       legally do this work for us.
19  MS. BENSON:
20       Okay.  So I just wanted...
21  MR. ROSENSTEIN:
22       Only the CMS and Social
23       Security Administration can do
24       this analysis, I'm afraid.
25  MS. BENSON:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

362

```
 1       So I just wanted to point out
 2       specifically where I was
 3       talking before about if you
 4       turn to the next page, the
 5       5281, it's where it explains
 6       code E2 is used to identify a
 7       person who is not eligible --
 8       who is not entitled to SSI
 9       payment in the month in which
10       that code is used, pursuant to
11       Section 1611(c)(7) of the Act,
12       which provides that an
13       application for SSI benefits
14       shall be effective on the
15       latter of the first day of the
16       month following the date the
17       application is filed, or, two,
18       the first day of the month
19       following the date the
20       individual becomes eligible
21       for SSI based on that
22       application.  So that's where
23       I was getting the information
24       that I was talking about
25       before, so I just wanted to
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

363

```
 1       point that out.
 2  MR. ROSENSTEIN:
 3       Yeah.  And again, the state
 4       would rely upon the data that
 5       the Social Security
 6       Administration sent them in
 7       terms of the effective date of
 8       enrollment.
 9  MS. BENSON:
10       Enrollment, right, but not --
11       it's not necessarily the --
12       when they're going to get the
13       benefit paid.  And I think
14       that's, you know, probably
15       where some of these
16       differences come in.  That's
17       all the questions I have.
18  THE CHAIRMAN:
19       Mr. Ahern?
20  MR. AHERN:
21       Yes.  First, thank you for
22       your testimony.  Late
23       afternoon.  Hopefully, you're
24       still awake and interested, so
25       that...
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

364

```
 1  MR. ROSENSTEIN:
 2       Good.
 3  MR. AHERN:
 4       ...that by itself should be
 5       grounds for some kind of an
 6       approval.  So I'm interested
 7       in your level of expertise,
 8       not because I question it, but
 9       because I want to understand
10       it and get it on the record.
11  MR. ROSENSTEIN:
12       Um-hum.
13  MR. AHERN:
14       Okay.  You've been at the top
15       of the Medi-Cal system...
16  MR. ROSENSTEIN:
17       And at the bottom.
18  MR. ROSENSTEIN:
19       Yeah, and you talk about
20       various systems and what's on
21       the Social Security file that
22       you receive in terms of
23       indicators.  And the genre of
24       my questions are just to
25       understand your personal
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

365

experience and your
professional life, because I
know myself, I've worked with
things on the field-by-field
basis matching financial
systems, which is quite
different than understanding
on a diagrammatic...

MR. ROSENSTEIN:

Um-hum.

MR. AHERN:

...or a decision-making level
where we're looking at what
information is available, we
ask somebody else who is an IT
person.  So if we were to look
at the MEDS program, okay, can
you give us some in-depth
understanding of your personal
experience with the technical
-- because we get it, you --
you've made the -- you
understand the system and what
it does, and how it
interacts...

366

MR. ROSENSTEIN:

Um-hum.

MR. AHERN:

...but on the technical level,
the type of things that you
did or you had to get your
hands involved with in terms
of the data and how it's
transferred and how it's used.

MR. ROSENSTEIN:

Okay.

MR. AHERN:

With an emphasis on how it's
transferred and the -- we're
getting this -- how it's used
has more or less been covered,
you know.

MR. ROSENSTEIN:

Right.  Well, first of all, I
want to be clear I'm not a
computer programmer.

MR. AHERN:

Okay.

MR. ROSENSTEIN:

My background when I started

367

off in the Medi-Cal program
was in the system design area,
defining the functional
requirements for the state
MMIS, including MEDS.  I did
not work on the MEDS project
when it was developed.  I was
in the same room as the people
who worked on it, and my
responsibility was taking the
MEDS data into the system
design that brought it to the
claims processing system, and
then brought it to eligibility
verification for providers.
So I had to know MEDS well, I
wasn't part of the design of
it but I knew the
functionality of what it did,
because I had to take that
data and move it to the claims
processing system so that, you
know, you got a claim from a
doctor or a hospital and you
want to make sure the person

368

is eligible, are they eligible
full scope, all those things
again.  So we had to know the
functionality of the system.
And the same thing for
providing to the AEVS, I was
the design manager for that
program.  So I got it down to,
I wouldn't say the bits and
bytes level because I'm not a
programmer, but from a
functionality standpoint,
pretty deep into the weeds.

MR. AHERN:

Right.  So you'd be looking at
systems, design schematic
diagrams, you'd be look at
algorithm diagrams, flow of
data.  I mean it's maybe not
at the lowest level of -- I
mean in other words, most --
you're working with a
programmer but he's -- people
are talking to you about the
system and you're saying on a

**JA 203**

369

very technical level what
information flows from...
MR. ROSENSTEIN:
    Yeah.
MR. AHERN:
    ...where to where, and making
    sure it all gets there.
MR. ROSENSTEIN:
    Yeah.  We would define, here
    are the programmatic
    requirements, they would come
    back to us with the flow
    diagrams.  We would approve
    that it meets the programmatic
    requirements from the flow
    diagrams.  They would go off
    and code it, and then we would
    put in test cases to test it.
    So we were involved in the
    testing of it.  I did the
    testing, review meetings, and
    I was literally first-level
    supervisor over the, you know,
    four staff, and we were doing
    all the work on the current

370

MMIS, you know, recommend team
7980, doing all the design
work.  And then subsequently,
I was involved in lots of
these various exchanges.  All
the SSI, SSP stuff was done
back then.  It's been around
forever.  But...
MR. AHERN:
    So it sounds like...
MR. ROSENSTEIN:
    ...I was known to get into the
    weeds...
MR. AHERN:
    Yeah.
MR. ROSENSTEIN:
    ...partially because I started
    at the working level in the
    state and worked my way up.
MR. AHERN:
    So it sounds like you have
    what I would call the
    technical background to talk
    about the transfer of data in
    terms of the one step up from

371

the programmer, the one
abstracted level that's still
very, very technical, very
hands-on, especially when you
get to testing...
MR. ROSENSTEIN:
    Um-hum.
MR. AHERN:
    ...you really have to
    understand the system to test
    it.  And if -- and that's part
    of what I want to get on the
    record here, because there is
    an issue of to what degree you
    are a technical expert, and
    maybe we know more now than we
    did when we made that
    decision.
MR. ROSENSTEIN:
    Yeah.  Yeah, at a certain
    point I was on the technical
    advisory group for CMS...
MR. AHERN:
    Right.
MR. ROSENSTEIN:

372

...and when I was the Medicaid
director, each Medicaid --
each leadership Medicaid
director who's on the council
is a vice chair had an
assignment of overseeing a
technical group.  My technical
group was the recipient group.
So even when I was a Medicaid
director I got -- you know, if
you ever want to see people
get in the weeds, get some
type of Medicaid eligibility,
that is really in the weeds.
So I was known to get in the
weeds.
MR. AHERN:
    Well, if we were to move to
    the MAEVS system, can you give
    us an equivalent overview of
    how you -- if you -- what your
    connection on a technical
    level or an operational level
    was with that system?
MR. ROSENSTEIN:

00431

373

1    With the -- which system?
2  MR. AHERN:
3       The Medicaid, was it
4       Eligibility Verification
5       System?
6  MR. ROSENSTEIN:
7       The Eligibility Verification
8       System?
9  MR. AHERN:
10      Yeah.
11 MR. ROSENSTEIN:
12      I was the project manager.  I
13      had probably 10 staff working
14      for me, and we -- literally,
15      we came up with the concept of
16      what to do, and then we laid
17      out, you know, what were the
18      access points, what were the
19      flow, is it going to be real-
20      time data or is it going to
21      be, you know, batch files.
22      Are we going to let our
23      vendor, who's running the
24      systems, it was run by our
25      fiscal agent, are we going to

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

374

1       have them maintain a file or
2       -- where, you know -- and they
3       translate it, or do we have
4       them direct access MEDS.  It
5       was my decision no way in the
6       world are we going to let them
7       translate data, they didn't
8       have a direct access.  So I
9       was involved in all the major
10      design decisions.  Then at the
11      higher level I didn't do test
12      data, but I had my staff do
13      test data.  I certainly
14      reviewed the test outcome
15      because, you know, this whole
16      program turned, you know,
17      eligibility change
18      dramatically.  We had a,
19      believe it or not, a paper
20      card every month with sticky
21      labels on it.
22 MR. AHERN:
23      I believe it.
24 MR. ROSENSTEIN:
25      And then we went to a plastic

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

375

1       card.  So it was a dramatic
2       change.  And we had to be
3       right.  So, you know, I
4       oversaw the testing of the
5       program and -- but I didn't do
6       actual test cases.
7  MR. AHERN:
8       So in another world, you would
9       be considered an IT person in
10      those roles, in, say, a
11      corporate entity that was
12      developing a financial system,
13      that would certainly be an IT
14      role...
15 MR. ROSENSTEIN:
16      Yes.
17 MR. AHERN:
18      ...project manager of an IT
19      project.
20 MR. ROSENSTEIN:
21      And the people who are doing
22      the job today are IT staff.
23      They may not have any
24      different expertise than me,
25      but yeah, they are IT roles

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

376

1       now.  It wasn't back then.
2  MR. AHERN:
3       So it sounds like you do have
4       a lot of expertise on the --
5       not just the managerial,
6       operational, and goalsetting
7       objectives, but on the IT...
8  MR. ROSENSTEIN:
9       Yes.
10 MR. AHERN:
11      ...hard part -- the hard part,
12      is what I...
13 MR. ROSENSTEIN:
14      Yeah.
15 MR. AHERN:
16      Making it work.
17 MR. ROSENSTEIN:
18      Yeah.  You had to make it
19      work.  And I've stayed, even
20      though, you know, I've moved
21      up, very IT-involved.  As I
22      mentioned, I was involved with
23      the Federal Government on the
24      Part D system, the Part D
25      system implementation.  I was

York Stenographic Services, Inc.
34 North George St, York, PA 17401 - (717) 854-0077

377

```
 1        the state Medicaid lead on
 2        that, because Medicaid had a
 3        big role.  So I've stayed
 4        involved in the system my
 5        entire career, because I can't
 6        help but do it, that's what I
 7        know.
 8   MR. AHERN:
 9        Thank you very much.  I have
10        no more questions.
11   THE CHAIRMAN:
12        Mr. Ziegler, do you have
13        questions?
14   MR. AHERN:
15        Yeah, just one.  Sort of
16        trying to summarize and trying
17        to figure out possibly a way
18        to figure this out, and it
19        goes back to Ms. Benson's
20        question, I would love to see
21        what's on the SSA file sent
22        over.  I'm going to assume the
23        10, 20, and 60, they're Medi-
24        Cal codes...
25   MR. ROSENSTEIN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

378

```
 1        Um-hum.
 2   MR. ZIEGLER:
 3        ...so I'm just questioning, on
 4        that file coming over, is it a
 5        C01, an M01, an M02 coming,
 6        and then you say this means
 7        10, 20, and 60 for us?
 8   MR. ROSENSTEIN:
 9        Some sort of indicator, yeah.
10        There's some -- there's a data
11        field in the SSA file that
12        says what's their type, are
13        they aged, blind, or disabled,
14        there's some code in their
15        file that...
16   MR. ZIEGLER:
17        Yeah.
18   MR. ROSENSTEIN:
19        ...translates one-to-one.
20        So...
21   MR. ZIEGLER:
22        Right, and it could just say
23        aged, blind, or disabled, but
24        then what does -- I don't know
25        what C01 means or M02 or M --
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

379

```
 1        you know, it could mean aged,
 2        blind, or disabled, and that's
 3        how you translate.  But to me,
 4        what's coming over on that
 5        file could be the key to this
 6        whole case really.  It could
 7        tell us exactly -- because SSA
 8        is providing the codes, and it
 9        could tell us what SSA said;
10        whether it was SSI or not.  So
11        that's sort of key.  The other
12        thing is, I now we've had
13        discussion about SSP and we
14        threw out like the 14 percent
15        number, but based upon that
16        file, that's -- SSA is
17        potentially saying to you this
18        is SSI percentage, and then
19        I'm assuming that you're
20        determining who qualifies for
21        SSP...
22   MR. ROSENSTEIN:
23        So...
24   MR. ZIEGLER:
25        ...is that true?
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

380

```
 1   MR. ROSENSTEIN:
 2        So Social Security
 3        Administration makes that
 4        determination.
 5   MR. ZIEGLER:
 6        They do that too?
 7   MR. ROSENSTEIN:
 8        Yeah, and they...
 9   MR. ZIEGLER:
10        And they -- and that's on that
11        file they send over also?
12   MR. ROSENSTEIN:
13        Yes.
14   MR. ZIEGLER:
15        So the question is would they
16        have other indicators on there
17        to identify -- so to me,
18        what's key is, I would love to
19        see that file coming over.
20   MR. ROSENSTEIN:
21        Okay.
22   MR. ZIEGLER:
23        That could be this whole case,
24        potentially...
25   MR. ROSENSTEIN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 206**

381

Yeah.  And had we been able to
access it...

MR. ZIEGLER:

...understanding what's in
that file.

MR. ROSENSTEIN:

...that file, we probably
could have answered this
question.  Unfortunately, you
know, the hospital doesn't
have access to the Social
Security Administration file.
The Department of Healthcare
Services can't legally share
it with us.

MR. ZIEGLER:

Yeah, but it did come over,
right?  There's a translation.
I think you said Social
Security sends over the file,
and then there's the
assignment of the codes by the
Department of Healthcare
Services.  That gets posted to
the MEDS system, which...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

382

MR. ROSENSTEIN:

Okay.

MR. ZIEGLER:

...gets accessed by ADS.  So
that file is there if it was
electronically sent by SSA.

MR. ROSENSTEIN:

Yeah, the Department of
Healthcare Services has that
file.

MR. ZIEGLER:

But it is sent in the
translation occurs within your
system...

MR. ROSENSTEIN:

Well, I don't know...

MR. ZIEGLER:

...correct?

MR. ROSENSTEIN:

...if I would call it a
translation, it's more of a,
you take one data element on
the file, read it, and it says
this person is blind, and post
a -- the proper aid code,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

383

versus -- but, you know,
they're all SSI, SSP eligible.
Whether aged, blind, or
disabled probably is
immaterial for this
discussion, but the Department
does interpret somehow the
data off a data element,
probably a direct transfer.

MR. ZIEGLER:

And the question is what is on
that file that they're
translating?

MR. ROSENSTEIN:

I'm sorry, say...

MR. ZIEGLER:

What is on that file that's
being translated?

MR. ROSENSTEIN:

Yeah, and I don't have the
specific data element...

MR. ZIEGLER:

See, that's where I...

MR. ROSENSTEIN:

...in the data dictionary,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

384

but...

MR. ZIEGLER:

That's...

MR. ROSENSTEIN:

...it -- you know, I'm
assuming they read the file
and it says this a 1, and 1
equals 10, 2 equals...

MR. ZIEGLER:

Well, that -- yeah, I think
that would be important.  I
would like to understand what
that is...

MR. ROSENSTEIN:

Yeah.

MR. ZIEGLER:

...to see -- and it may not be
helpful and it may be
extremely helpful, but I think
that could be, you know, key.

MR. ROSENSTEIN:

Yeah, the translation of the
data and the existence of
whether they're SSI, SSP
eligible, that's been going on

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

385

```
 1      for 40 years probably, and
 2      nobody has questioned what the
 3      accuracy -- I mean this is,
 4      you know, fairly claimed every
 5      quarter and, you know...
 6  MR. ZIEGLER:
 7      Yeah.
 8  MR. ROSENSTEIN:
 9      ...use every federal
10      disallowance and it's never
11      been an issue Federal
12      Government review, they never
13      brought into question that
14      it's a 10, 20, or 60 is
15      inaccurate.  I think that's
16      pretty well proven that...
17  MR. ZIEGLER:
18      Yeah.
19  MR. ROSENSTEIN:
20      ...those are accurate.
21  MR. ZIEGLER:
22      And I'm not really questioning
23      from that standpoint, I'm
24      questioning it from what SSA
25      is sending over that gets
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

386

```
 1      translated, and what exactly
 2      that data is.
 3  MR. ROSENSTEIN:
 4      Yeah.  And I am sorry I don't
 5      have that data...
 6  MR. ZIEGLER:
 7      Well, that's what I'd like to
 8      know.  That's it.
 9  THE CHAIRMAN:
10      Okay.  I guess sort of along
11      the same lines, one of the
12      things that could be helpful
13      is to -- what Ms. Benson was
14      asking about, the -- like the
15      CO2 code and other codes that
16      are in -- described in the
17      Federal Register, those are
18      payment codes by SSI or -- and
19      some of those payment codes
20      are actually suspension of
21      payments, and they're sort of,
22      I guess you'd say, nonpayment
23      codes.  But it's dealing with
24      do we disburse, and when we
25      disburse, what code do we
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

387

```
 1      assign to it, which sort of
 2      gives a picture of what's
 3      going on overall with the
 4      patient once -- or the
 5      recipient once they qualify
 6      for SSI.
 7  MR. ROSENSTEIN:
 8      Um-hum.
 9  THE CHAIRMAN:
10      And we know that with SSP,
11      there is an interaction with
12      SSI every time there's a code
13      over here for a payment or
14      nonpayment that affects what
15      goes on over here with SSP.
16  MR. ROSENSTEIN:
17      Um-hum.
18  THE CHAIRMAN:
19      And so it could very well be
20      helpful, because as I
21      understand that with the 10,
22      60, and 20, that's just
23      dealing with overall large
24      picture of eligibility, it
25      doesn't necessarily say what
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

388

```
 1      type of payment they'll
 2      receive from SSP or how much
 3      that is.  It could be that
 4      maybe they receive no payment.
 5      I'm not necessarily sure...
 6  MR. ROSENSTEIN:
 7      Um-hum.
 8  THE CHAIRMAN:
 9      ...but it could be helpful to
10      know what some of those codes
11      are to get some sense of the
12      interaction between SSP and
13      SSI.  For instance, on the
14      chart that you have listing
15      SSP-only recipients versus, I
16      guess, a mixture of SSI and
17      SSP, it'd be helpful to know
18      what it means by "SSP-only",
19      what's included in that
20      bucket, and maybe how that
21      breaks out, for instance, 10
22      percent in institution.  For
23      example, I know that there's a
24      code for -- I think for an
25      institution or -- on the SSI
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

389

```
 1        side of things, how does that
 2        sort of flow down to the
 3        SSP...
 4   MR. ROSENSTEIN:
 5        Um-hum.
 6   THE CHAIRMAN:
 7        ...if they're in a
 8        correctional institution, how
 9        does that code sort of flow
10        down.  I'm thinking of ways
11        how -- that might necessarily
12        help, and I don't know if you
13        have additional information
14        that...
15   MR. ROSENSTEIN:
16        I don't know if...
17   THE CHAIRMAN:
18        ...in response.
19   MR. ROSENSTEIN:
20        SSP will follow SSI's rules.
21        So if their payment is stopped
22        for SSI, SSP follows.  I mean
23        the Social Security
24        Administration varies -- Medi-
25        Cal treats SSI and SSP the
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

390

```
 1        same.  So using your example
 2        of the correctional
 3        institution, their Medi-Cal
 4        coverage would be cut off.
 5        Medi-Cal doesn't cover people
 6        in a correctional institution,
 7        so their -- that would trigger
 8        eligibility to end.
 9   THE CHAIRMAN:
10        But with someone in a nursing
11        home, for example...
12   MR. ROSENSTEIN:
13        Eligibility...
14   THE CHAIRMAN:
15        ...there may not necessarily
16        be -- there may -- there would
17        be continued eligibility for
18        SSI...
19   MR. ROSENSTEIN:
20        Um-hum.
21   THE CHAIRMAN:
22        ...but there may be no SSI
23        payment.
24   MR. ROSENSTEIN:
25        Or a reduced payment.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

391

```
 1   THE CHAIRMAN:
 2        Or reduced.  But as I
 3        understand, more likely than
 4        not, it's actually no payment,
 5        of if there is a payment it's
 6        a very miniscule...
 7   MR. ROSENSTEIN:
 8        The latter, I think.
 9   THE CHAIRMAN:
10        So in those instances, as I
11        understand, where there is no
12        SSI payment because they're in
13        a skilled nursing facility,
14        there would be an SSP payment
15        though.
16   MR. ROSENSTEIN:
17        No, the SSP payment is reduced
18        also.
19   THE CHAIRMAN:
20        But there would be an SSP
21        payment.
22   MR. ROSENSTEIN:
23        Well, you know, if they're in
24        a nursing home, they no longer
25        need the payment to pay for
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

392

```
 1        rent, so both the SSI and SSP
 2        is reduced when they go in a
 3        nursing home.  And yet they
 4        still -- they're still
 5        Medicaid eligible, Medi-Cal
 6        eligible.  And they still may
 7        go into the hospital...
 8   MS. BENSON:
 9        And...
10   MR. ROSENSTEIN:
11        ...just because they're in a
12        nursing home doesn't mean they
13        don't go to the hospital.
14   MS. BENSON:
15        And your code 10, 20, or 60
16        would remain the same, is that
17        correct?
18   MR. ROSENSTEIN:
19        That's correct.
20   MS. BENSON:
21        And just from, again, the
22        Federal Register, on page
23        5281, the -- I'll say the SSI
24        codes change when the person
25        goes into the nursing home.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

393

If the person goes into the nursing home and gets a -- and doesn't get any payment at all, then it's an E01, and an E02 is used to identify a person who is not entitled to SSI payments in the month in which that code is used, pursuant to Section whatever of the Act, and provides that the application for the SSI -- so when a person goes -- I'm sorry, I was reading the eligibility for E02, but E01 actually represents an individual who is a resident of a medical treatment facility and subject to a $30 payment limit, but has countable income of $30 or more, and that individual is not entitled to receive SSI payments.  So in CMS' calculation of the SSI fraction, they do not count

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

394

anybody that's coded E01, per the Federal Register. However, if they're still counted as a 10, a 20, or a 60, then your system that you're using right now that you presented these numbers is counting that.  And I understand because you're still going to be paying Medicare -- Medicaid claims -- Medi-Cal claims and so you can't change your codes, but CMS has determined, per the Federal Register, that they can't count those payments because they did not get a check.  And so they would be some of the patients that we're talking about here, so anybody who went into a nursing home from being in the hospital, or vice-versa, and didn't get a benefit check that month would be showing up

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

395

still as a 10, 20, or 60, but they would not be counted in the SSI fraction based on the methodology that CMS explained in the Federal Register.  And that's -- which I think that really goes to your point.
MR. ROSENSTEIN:
     And certainly, the 14 percent is not a precise number in terms of all those factors, but I don't know if that also accounts for...
MS. BENSON:
     Well, they...
MR. ROSENSTEIN:
     ...you know, a 20 percent differential.
MS. BENSON:
     Well, those people may not get an SSP payment either.  I'm -- I certainly don't know that. But it's clear here that if they don't get an SSI payment then -- because of this $30

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

396

limit, and they have $30, that they are not being counted for SSI, however, the code that you're getting...
MR. ROSENSTEIN:
     Yeah.
MS. BENSON:
     ...returned from the state, the 10, 20, or 60, is not changing because...
MR. ROSENSTEIN:
     Um-hum.
MS. BENSON:
     ...you still have to make the Medicare -- I mean Medi-Cal claim payment.
MR. ROSENSTEIN:
     Yeah, I mean...
THE CHAIRMAN:
     And that's...
MR. ROSENSTEIN:
     ...there are less than 65,000 Medicare enrollees in nursing homes statewide.  So I don't know if that would account for

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 210**

00437

397

1  this big difference.  I mean
2  it might be some, but...
3  THE CHAIRMAN:
4      And that's where some further
5      information on that 14 percent
6      from a macro level may be
7      helpful to get a better
8      picture of, you know, what's
9      included in that in terms of
10     the payment type of
11     situations.
12  MS. BENSON:
13     And maybe looking at the
14     information that SSA is giving
15     you and seeing if they're
16     giving you codes E1 or E2,
17     because then you could
18     identify these patients and
19     then you could pull them out
20     of the data that you pull
21     together, if you are, in fact,
22     getting those codes.
23  MR. ROSENSTEIN:
24     The Department of Healthcare
25     Services might be able to.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

398

1  They cannot share it with the
2  hospital because it's not for
3  the administration of the
4  Medicaid program.  And their
5  contract and federal law
6  limits them...
7  MS. BENSON:
8      I...
9  MR. ROSENSTEIN:
10     ...from sharing.  There's a
11     beneficiary...
12  MS. BENSON:
13     No, I understand...
14  MR. ROSENSTEIN:
15     ...way, you know...
16  MS. BENSON:
17     ...it's -- yeah.
18  MR. ROSENSTEIN:
19     It has -- I'm sorry, it has to
20     come from...
21  MS. BENSON:
22     I feel for you...
23  MR. ROSENSTEIN:
24     ...CMS.
25  MS. BENSON:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

399

1      ...in trying to get the data.
2  MR. ROSENSTEIN:
3      Yeah.
4  MS. BENSON:
5      I truly do.
6  MR. ROSENSTEIN:
7      That's why we asked CMS.
8  MS. BENSON:
9      Yeah.  No, I understand that.
10  MR. GETZOFF:
11     I mean I can represent on
12     behalf of the hospital, we've
13     tried every way to crack the
14     nut of getting the SSA data,
15     it's...
16  MS. BENSON:
17     Right.  I...
18  MR. GETZOFF:
19     ...seemingly impossible.
20  MS. BENSON:
21     I totally understand that.
22  MR. GETZOFF:
23     Yeah.
24  THE CHAIRMAN:
25     And so from a macro level, it

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

400

1  might be helpful to get a
2  better picture of the story
3  behind the SSP payments, which
4  the payment codes on the SSP
5  side of things very well --
6  and how they break out, can be
7  very well reflective of, and I
8  would expect it to be, of the
9  information that they receive
10  from SSA.  So the -- all the
11  SSP codes and payments are
12  reactive to the information
13  they're getting from SSA.  And
14  so to the extent we have, you
15  know, that 14 percent breaking
16  out, that creates a -- sort of
17  a better picture potentially
18  of what is being received from
19  SSA.  And...
20  MR. ZIEGLER:
21     Yeah.  Yeah, and I agree with
22     that.  So, you know, what I
23     would like to see is what's
24     being send over from SSA, and
25     then how it's being translated

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 211**

401

```
 1        over.  If there is...
 2   MR. GETZOFF:
 3        We can't...
 4   MR. ZIEGLER:
 5        ...a translation.
 6   MR. GETZOFF:
 7        We can't access that
 8        information.
 9   MR. ZIEGLER:
10        But it does come over.
11   THE CHAIRMAN:
12        On a claim-by-claim level.
13   MR. ZIEGLER:
14        It does come over and it's
15        translated as 10, 20, or 60.
16        A file is coming over.
17   MR. GETZOFF:
18        Yes, but we can't access it
19        because Mr. Rosenstein is no
20        longer a -- even if he was, he
21        couldn't share it, but he's no
22        longer an...
23   MR. ZIEGLER:
24        But...
25   MR. GETZOFF:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

402

```
 1        ...employee...
 2   MR. ZIEGLER:
 3        But it is coming over to
 4        Pomona, right?
 5   MS. LETRAN:
 6        No.
 7   MR. ZIEGLER:
 8        No.
 9   MR. GETZOFF:
10        No.
11   MR. ZIEGLER:
12        To Medi-Cal.  Okay.
13   MR. GETZOFF:
14        Believe me, if we had that
15        information...
16   MR. ZIEGLER:
17        I got you.
18   MR. GETZOFF:
19        ...we would have shared it.
20   MR. ZIEGLER:
21        I got you.  I got you.
22   MS. LETRAN:
23        Wave the magical wand.
24   MR. GETZOFF:
25        Yeah.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

403

```
 1   MR. ZIEGLER:
 2        So that's state.
 3   MR. ROSENSTEIN:
 4        Yeah, and that's the
 5        government, CMS.
 6   MR. ZIEGLER:
 7        And the state can't give you
 8        that?  They won't give you
 9        anything?  I know SSA won't,
10        but will the state?
11   MR. GETZOFF:
12        The state can't.
13   MR. ZIEGLER:
14        ...help you understand what's
15        sent and how they're
16        translating?
17   MS. LETRAN:
18        No.  I've asked.
19   MR. GETZOFF:
20        They can't legally.  They
21        are...
22   MR. ZIEGLER:
23        But on a patient level, but
24        can they tell us what's on
25        that SSA file, high-level,
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

404

```
 1        like C01, we translate this to
 2        10, M01, 20.
 3   MR. ROSENSTEIN:
 4        If the question is how do they
 5        get the aid code definition, I
 6        can get that.  That's...
 7   MR. ZIEGLER:
 8        Okay.
 9   MR. ROSENSTEIN:
10        But I can't get information on
11        which of their patients...
12   MR. ZIEGLER:
13        Right.
14   MR. ROSENSTEIN:
15        ...were in a nursing home and,
16        therefore, were not entitled
17        to disproportionate care when
18        they went to the hospital.  I
19        can't get that kind of data
20        because it's not involved in
21        the administration of the
22        Medicaid program, and that's
23        all that they -- you know,
24        they -- it would be such a
25        federal violation if they were
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 212**

405

```
1        to provide, you know, use
2    Social Security
3    Administration...
4  MR. ZIEGLER:
5        Right.
6  MR. ROSENSTEIN:
7        ...for anything but the
8    administration of the program
9    that Social Security, because
10    -- I just -- you know, from
11    experience, we were challenged
12    once when I worked for the
13    state by the Social Security
14    Administration that we
15    violated our agreement.  And
16    we didn't, by the way.  But
17    they were not happy in
18    challenging this.  So I could
19    just guarantee you they're
20    going to do nothing to violate
21    the Social Security...
22  MR. ZIEGLER:
23        Right.
24  MR. ROSENSTEIN:
25        ...Administration agreement.
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

406

```
1  MR. ZIEGLER:
2        Okay.
3  THE CHAIRMAN:
4        Okay.  And on MEDS, MEDS is a
5    system that's used by multiple
6    agencies within the state of
7    California?
8  MR. ROSENSTEIN:
9        It is a system that's operated
10    by the State Department of
11    Health Services, but is the
12    central data used by multiple
13    agencies; counties, State
14    Department of Social Services,
15    Department of Environmental
16    Services.  So yes, but it's
17    operated by the Department of
18    Healthcare Services.
19  THE CHAIRMAN:
20        Okay.  And Medi-Cal primarily
21    was involved with pulling
22    information from it, or what
23    types of information was Medi-
24    Cal, I guess, involved in
25    terms of entering into the
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

407

```
1        MEDS?
2  MR. ROSENSTEIN:
3        The Medi-Cal -- I'm not sure
4        -- you know, it's a source of
5        all eligibility for Medi-Cal,
6        so...
7  THE CHAIRMAN:
8        Okay.
9  MR. ROSENSTEIN:
10        ...various entities who enter
11        Medi-Cal eligibility
12        information, that data gets
13        posted to MEDS.
14  THE CHAIRMAN:
15        Okay.  Medi-Cal though wasn't
16        involved with the aid codes
17        being entered in, that was
18        being done by a sister agency?
19  MR. ROSENSTEIN:
20        Well, Medi-Cal defines what
21        the aid codes are.  So they
22        will say -- they will -- any
23        time there's a new federal
24        program that Medi-Cal covers,
25        they will create one or more
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

408

```
1        aid codes that says this
2        person is covered for breast
3        and cervical cancer treatment,
4        and it'll post it.  And then
5        when somebody, county or
6        state, makes the person
7        eligible for that program,
8        that aid code gets posted.
9  THE CHAIRMAN:
10        Okay.  Well, there's Medi-Cal
11        aid codes and then there were
12        the SSP aid codes.
13  MR. ROSENSTEIN:
14        Well, SSP aid codes are three
15        Medi-Cal aid codes of about
16        200.  So Medi-Cal created 10,
17        20, 60, you know, 40 years ago
18        for the -- for SSI, SSP
19        eligibility.
20  THE CHAIRMAN:
21        It's a -- they essentially
22        opted to incorporate the aid
23        codes of the sister agency,
24        meaning the SSP is
25        administered by a sister
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

**JA 213**

409

```
 1        agency.
 2   MR. ROSENSTEIN:
 3        SSP is administered by Social
 4        Services.  The contract to do
 5        the eligibility determination
 6        -- or -- let me say -- the
 7        contract to make someone SSI,
 8        SSP automatically Medi-Cal-
 9        eligible is held by the
10        Department of Healthcare
11        Services.  Sorry for all the
12        bureaucracy here.  So...
13   THE CHAIRMAN:
14        Right.  So Medi-Cal itself
15        doesn't have the direct
16        interface with SSA, it's the
17        Department of Healthcare
18        Services that has the
19        interface with SSA, and uses
20        that information to then
21        assign the aid codes, that
22        then the Department of
23        Healthcare Services would dump
24        that data as relevant and as
25        truncated as needed into the
```

410

```
 1        MEDS, and then...
 2   MR. ROSENSTEIN:
 3        Yeah, Medi-Cal, Department of
 4        Healthcare Services gets the
 5        data directly from Social
 6        Security Administration.
 7        Their relationship with Social
 8        Security Administration is one
 9        of people who are on SSI, SSP
10        are made eligible and posted
11        to MEDS.  So that's all
12        Healthcare Services.  The SSP
13        program, which is a grant
14        program...
15   THE CHAIRMAN:
16        Um-hum.
17   MR. ROSENSTEIN:
18        ...is a Social Services
19        program.  It gives people
20        additional cash for living
21        expenses.  That grant program
22        is run by the Department of
23        Social Services.
24   THE CHAIRMAN:
25        Okay.
```

411

```
 1   MR. ROSENSTEIN:
 2        Sorry to -- this is confusing,
 3        but -- so they don't get the
 4        SDX file, Medi-Cal does.  But
 5        if you were to -- the grant
 6        amount is determined by Social
 7        Services.
 8   MR. AHERN:
 9        Speaking of confusing, would
10        it be asking too much for you
11        to, post-hearing, just present
12        a diagram to...
13   MR. ROSENSTEIN:
14        Yeah, okay.  Yeah.
15   MR. AHERN:
16        As you're an IT person, so
17        you're...
18   MR. ROSENSTEIN:
19        Yeah.  Yeah.
20   MR. AHERN:
21        ...probably used to a flow
22        diagram.
23   MR. ROSENSTEIN:
24        Um-hum.
25   MR. AHERN:
```

412

```
 1        Maybe that would put it in
 2        visual form.
 3   MR. ROSENSTEIN:
 4        Yeah.  It is very confusing.
 5   MR. AHERN:
 6        Who's connected to who and
 7        what information is going
 8        back-and-forth.
 9   MR. ROSENSTEIN:
10        Yeah.  Yeah, multiple state
11        agencies, multiple federal
12        agencies.
13   MR. AHERN:
14        And you can patent that and
15        maybe make that a consulting
16        product.
17   THE CHAIRMAN:
18        Let me see if there were any
19        other questions I had.  So to
20        your knowledge, SSP payments
21        and Medi-Cal coverage do not
22        begin mid-month, they always
23        begin the first of month?
24   MR. ROSENSTEIN:
25        Yes.  Medi-Cal, the
```

413

    eligibility file only has
    month segments.  So you can
    only be eligible for the full
    month.
THE CHAIRMAN:
    And the same for SSP?
MR. ROSENSTEIN:
    Yeah, same.  And, you know,
    Medi-Cal treats SSI and SSP
    exactly the same.
THE CHAIRMAN:
    Okay.
MS. BENSON:
    Do you know if a beneficiary
    who applies in the middle of
    August and gets qualified so
    they have August 1 through
    August 31 would be -- they
    would have that for their
    Medi-Cal insurance, do they
    get a payment -- an SSP
    payment for August, or do they
    not get it until September?
MR. ROSENSTEIN:
    My understanding of the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

414

    payments for SSP follow the
    same process that the payments
    for SSI follow.
MS. BENSON:
    Okay, so if the SSI payment
    doesn't come until September,
    the SSP payment would not come
    until September.
MR. ROSENSTEIN:
    That's my understanding.
MS. BENSON:
    Okay, thank you very much.
MR. ROSENSTEIN:
    The Social Security
    Administration writes the
    checks for both.
MS. BENSON:
    That makes sense.
THE CHAIRMAN:
    Okay.  And -- actually, that's
    all the questions I had.  And
    are there any other Board
    questions?  With that, then
    we'll turn to redirect...
MR. GETZOFF:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

415

    Just a few.
THE CHAIRMAN:
    ...based on the Board
    questions.
        ***
    REDIRECT EXAMINATION
BY MR. GETZOFF:
    Q.  You mentioned in response
to Ms. Benson's questions that you
thought there were about 65,000
nursing home patients that are on
Medi-Cal in California.
    A.  Yeah, less than that, but
yes.
    Q.  And was that true in the
2006 to 2008 period?
    A.  It's been true for 15
years.
    Q.  Okay.  How many Medi-Cal
participating hospitals are there in
California?  Ballpark estimate is
fine.  I know it's a big state.
    A.  Well, every hospital
participates.  I think there's in
excess of 300 participating

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

416

hospitals.
    Q.  So presumably, would that
65,000 nursing home patients -- my
goodness, would that 65,000 nursing
home patients would be distributed around
the state?
    A.  Yes.  It's a geographical
distribution that wouldn't really
vary by county.
    Q.  Okay.  Can I ask you to
look at, it's Provider Exhibit P27,
page 502?
        ***
THE CHAIRMAN:
    What was the page again?
MR. GETZOFF:
    502.
THE CHAIRMAN:
    Okay.
MR. GETZOFF:
    502.
        ***
BY MR. GETZOFF:
    Q.  Okay?  Are you familiar
with the aid code 14 on this page?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

417

A. Yes, that's the Medi-Cal
Medically Needy program.  And that
basically are people who would
otherwise qualify for SSI, but chose
not to get the cash grant.
                    ***
MR. GETZOFF:
     I think that's all I have.
THE CHAIRMAN:
     Okay.  Mr. Olszewski?
MR. OLSZEWSKI:
     I do not have any questions,
thank you.
THE CHAIRMAN:
     Okay.  With that, your
     testimony is complete.  And do
     you have any other witnesses,
     Mr. Getzoff?
MR. GETZOFF:
     Excuse me?
THE CHAIRMAN:
     Do you have any other
     witnesses?
MR. GETZOFF:
     No.  No, there are no other

418

witnesses.
THE CHAIRMAN:
     Okay.  And, Mr. Olszewski, do
     you have witnesses?
MR. OLSZEWSKI:
     No.  No witnesses.
THE CHAIRMAN:
     Okay.  Then at this point we
     can move to Board questions.
MS. BENSON:
     So I guess my question here
     would concern expedited
     judicial review.  If you take
     a look at the proposed -- I'm
     sorry, the final rule that
     proposes the methodology and
     then finalized it, and talks
     about the dates of the various
     runs that are going to be
     used, what systems they're
     going to come from, what codes
     CMS is going to pick up, what
     cost report years are
     involved, do you believe that
     the Board has the ability to

419

make a determination that we
     should use Pomona's
     information as opposed to
     following the methodology set
     out in the final rule?
MR. GETZOFF:
     I do.  I think that the Board
     certainly has authority to
     order additional payment where
     an issue of -- appears on a
     cost report and is, you know,
     raised to a level of
     uncertainty such as this.  So
     I think the Board has a
     general power to do that.  I
     also would say that we are not
     claiming that any of the plain
     language of the regulation or
     the statute are a problem
     here.  We are not attacking
     CMS' process, per se, we are
     simply arguing that the data
     is correct and we have, I
     believe, shown, you know, to a
     fairly good degree that there

420

are serious problems that are
     not being picked up, for
     whatever reason.  And it may
     be human error, it may be
     system error, it could be
     anything, that are not being
     picked up and that is creating
     this huge discrepancy in the
     data.  So I do believe that
     the Board has the power to
     make a ruling on that basis.
     I also believe that if the
     Board, after deliberation,
     reached findings but could not
     -- felt that it was somehow
     constrained by a CMS
     regulation or ruling, which I
     don't believe applies to this
     here, but it -- if it did, the
     findings could be issued and
     at that point either the Board
     could seek on its own motion
     expedited judicial review
     based on those findings, or
     you can ask the Provider and

P-20

01036

POMONA VALLEY HOSPITAL MEDICAL CENTER'S (PVHMC) PROCESS OF CAPTURING SSI DAYS FOR MEDICARE DSH REIMBURSEMENT
Refer to I-1 Process Summary, I-2 Legend for further explanations, and I-3 for summary of logics/queries



ALL PVHMC
Inpatient Data
DSS Database
HDX Database
+
Paid Claims:
PCL File
PS&R File
PFS DSH
Database
+
CMS
MedPar SSI
Patient File

PVHMC SSI Master Patient Listing
(In Microsoft Access)
* Assign available aid code
* Determine Medi/Medi Status
*Determine SSI patients - PVHMC records
* Linked in CMS MedPar SSI Patients
*Listing of all patients and SSI status

Aid code sources (by svcs month)
1) POS Network:  AEVS, HDX
2) Medi-Cal PCL
3) Manual/retro elig. approval
4) Stay may have partial aid code approval

Export to Microsoft Excel for further review:
°Grouping for SSI and Non-SSI days
°SSI days by aid code
°SSI days determined by PVHMC
°Summary of CMS SSI (Matched) and PVHMC determined SSI (Unmatched) days
°Patient detail of SSI days for PRRB appeal

SSI Aid codes
All CMS SSI accounts
PVHMC SSI: 10/20/60
Sampled Aid code verification
Sent 30 accts to State 12/30/15 for manual verification. State did only 10 accts for 2006, and all had 10/20/60

• Did you review a letter dated January _____, 2016 from Stan Rosenstein

Removed Non-SSI accounts from listing:
°Accounts with non-Medi/Medi  Insurance
°Accounts with Medi/Medi but no SSI assignment

Final PVHMC Medi/Medi patient list with SSI days for submission to CMS /MAC for appeal, review and audit

30 samples sent to CMS and SSA to validate. Efforts started in Jan 2016 with counsels, consultants, Congresswoman, and Senator. No written responses from CMS and SSA @ 5/30/2017

7/10/2017  5:40 PM

C:\Users\getzoff\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\ZJKLON03\PVHMC%20SSI%20Identification%20Process_2006%20to%202008_PRRB[1]  Flow-Chart

0175

P-24

01057



POMONA VALLEY HOSPITAL
M E D I C A L   C E N T E R
*Expert care with a personal touch*

January 21, 2016

Mr. Tzvi Hefter
TMH Health Policy Consultants, LLC
3110 Shelburne Road
Pikesville, MD  21208

RE:   Medi-Cal SSI aid code verification process and supporting documentation
      Provider No. 05-0231
      FYEs: 2006, 2007, and 2008

Dear Tzvi:

Thank you  for assisting our hospital in contacting CMS and we hope, through CMS, the Social Security Administration with respect to our attempt to demonstrate that the hospital's DSH SSI percentage was understated during specified years.  This letter describes the method utilized by Pomona Valley Hospital Medical Center (PVHMC) in capturing the Medi-Cal SSI aid codes, specifically 10, 20, and 60, to determine the SSI/SSP recipients for purposes of the DSH SSI numerator calculation.

As background information, we prepared our internal Medicare/Medi-Cal patients with SSI benefits through the usage of the California Medi-Cal SSI aid codes.  We then compared our internal SSI file with the patient listing obtained from the CMS SSI Medpar file, and determined the Matched accounts (where CMS and PVHMC both agreed on the SSI days), and the Unmatched accounts (where PVHMC showed more SSI days than CMS).  Of the SSI accounts that we matched with the CMS SSI file for the above three years, approximately 97% of the accounts from CMS had the State aid code of 10, 20 or 60.  Please see below for the general description of the SSI aid codes:

| Codes | Program/Description per the State of California DHCS Aid Codes Master Chart |
|-------|----------------------------------------------------------------------------|
| Aid Codes Captured by PVHMC (& CMS) as SSI per Medi-Cal Program Description | |
| | SSI/SSP Aid to the Aged |
| 10 | (FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| | SSI/SSP Aid to the Blind (FFP). |
| 20 | A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| | SSI/SSP Aid to the Disabled |
| 60 | (FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |

The Medi-Cal aid codes were obtained from PVHMC billing records.  The aid codes are obtained through the Point of Service (POS) Network.  The POS Network is used to verify title XIX eligibility and related aid codes for the current month of service and up to 12 previous months.  Within the POS Network, the eligibility verification could be accessed through the Automated Eligibility verification system (AEVS), the Internet or State-approved vendor software, such as Health Data Exchange (HDX).  Please refer to Exhibit A from the Medi-Cal website www. medi-cal.ca.gov regarding the eligibility checking and the POS Network reference.  PVHMC uses the HDX to verify Medi-Cal eligibility, as per our HDX Inquiry policy in Exhibit B.  Please see Exhibit C for the HDX website at www.hdx.com

pvhmc.org                          1798 North Garey Avenue | Pomona, CA 91767 | 909.865.9500

0192

01058

The Medi-Cal aid codes can also be requested in writing through the Medi-Cal Eligibility Division of the Department of Healthcare Services (DHCS). However, due to DHCS' limited resources, we were informed that only 10 accounts could be verified directly by DHCS in this manner (though using the HDX website method also taps into DHCS data).

To demonstrate the validity of the SSI aid codes that we claimed as additional SSI days (labeled as CMS Unmatched in our Medicare/Medi-Cal SSI schedule), we selected sample records and provided the aid code documentation from DHCS and the HDX Eligibility Response printout:

1) We sorted the Unmatched accounts by patient days, from high to low
2) We selected the top 10 Unmatched accounts with the highest patient days, in calendar year 2006, 2007, and 2008. We sent these accounts to DHCS on 12/30/2015 for aid code verification. We have received back 2006, and DHCS informed us that 2007 and 2008 would not be verified, due to the limit of 10 accounts. Please see Exhibit D for the information that we sent to DHCS, the responded DHCS 2006 letter, and subsequent follow-ups for 2007 and 2008. Please note that for 2006, we selected the top 10 accounts with services in 2006, and did not choose any accounts with services in 2005.
3) For 2006, we selected another 20 accounts, randomly choosing every 5th account after the top 10 accounts sent to DHCS. Please see Exhibit E for our sample selections and the related Eligibility Response printout showing the supports for aid codes 10, 20, or 60.
4) For 2007 and 2008, we selected the top 10 accounts that we sent to DHCS and printed out the Eligibility Response as DHCS will not be verifying these. Please Exhibit F and G, respectively.
5) For each of the above year, we included a summary schedule (in Exhibit E, F, and G) of all the SSI days that we identified through the usage of aid codes, separated between CMS Matched and Unmatched. The percentage of the Unmatched is between 34% to 38%.

We strongly believe that the usage of the Medi-Cal aid codes 10, 20 or 60 represent the SSI/SSP status of our Medicare/Medi-Cal patients. We greatly appreciate your advice and assistance in moving this important issue forward. If you have any questions or will need any additional information with which to approach CMS,, please contact me at (909) 865-9844.

Sincerely,

*Candice Le-Tran*

Candice Le-Tran
Director of Reimbursement & Capitated Systems

Encl.

cc: Laurence Getzoff
    Keith Fontenot
    Stan Rosenstein

N:\REIMB\Appeals\SSI Appeals_Medi-Cal Aid Code process ltr.docx

# HEALTH MANAGEMENT ASSOCIATES

VIA U.S. MAIL & E-MAIL

January 21, 2016

Mr. Marc Hartstein
Hospital and Ambulatory Policy Group
Centers for Medicare and Medicaid Services
7500 Security Blvd.
Windsor Mill, MD  21244-1849

Dear Mr. Hartstein:

I have been retained by Pomona Valley Hospital Medical Center (Pomona) to assist it in connection with PRRB appeals filed by Pomona relating to the calculation of Pomona's "SSI Percentage" and DSH calculation for a series of years, including but not limited to Pomona's fiscal years ending December 31, 2006, 2007 and 2008.  In the course of this engagement, I am being asked by Pomona, among other tasks, to review data relating to the verification of Supplemental Security Income (SSI) and/or State Supplemental Payment (SSP) status of patients treated at Pomona during the 2006 to 2008 period, in order to assist in the identification and verification of the SSI status of hundreds of patients.  It is my understanding that Pomona is contesting the calculation of the SSI Percentage in these years based on the fact, among others, that State records may show a higher percentage of SSI eligible individuals than do the records obtained by Pomona from CMS.

Prior to serving as a consultant with  Healthcare Management Associates (HMA), I worked for approximately 31 years in various administrative positions with the State of California Medicaid program known as "Medi-Cal."  Most pertinently, the Eligibility Division of the Medi-Cal program reported to me for 13 years.  In addition, I worked on the development, implementation and operation of the Medi-Cal eligibility and verification system that was in use during the 2006-2008 timeframe (and is still in use today) and am familiar with that system.  Finally, I served as the Medicaid Director or Assistant Medicaid Director for 13 years, including during the 2006 to 2008 period.

As a result of my experience with and knowledge of the Medi-Cal program and its verification and eligibility systems, I am quite familiar with the types of Medi-Cal verification records being submitted for CMS and SSA review, and believe them to accurately reflect information that was received by the Medi-Cal program directly from the Social Security Administration with regard to program eligibility.  (As you may know, the State of California contracts with SSA to administer benefits both for SSI and SSP recipients, so that benefits are

1215 K STREET, SUITE 1050, SACRAMENTO, CALIFORNIA 95814
TELEPHONE: 916.792.3740 | FAX: 916.446.4220
WWW.HEALTHMANAGEMENT.COM

ATLANTA, GEORGIA • AUSTIN, TEXAS • BOSTON, MASSACHUSETTS • CHICAGO, ILLINOIS • COLUMBUS, OHIO
DENVER, COLORADO • HARRISBURG, PENNSYLVANIA • INDIANAPOLIS, INDIANA • LANSING, MICHIGAN • NEW YORK, NEW YORK
OLYMPIA, WASHINGTON • PORTLAND, OREGON • SACRAMENTO, CALIFORNIA • SAN FRANCISCO, CALIFORNIA
SEATTLE, WASHINGTON • SOUTHERN CALIFORNIA • TALLAHASSEE, FLORIDA • WASHINGTON, DC

0195

01061

1/21/2016
Page 2

combined into one check on a monthly basis for SSI/SSP recipients.) SSA sends the State of California a computer tape of beneficiaries on SSI called the SDX file. This file is processed by DHCS and interfaced with the Medi-Cal Eligibility Data System (MEDS) through the assignment of one of the three aid codes, 10, 20 or 60. MEDS data is the basis for providers to verify Medi-Cal eligibility.

Pomona is submitting to CMS (for ultimate submission to the SSA) two types of Medi-Cal records at this time, as a sample group, to determine whether, in fact, CMS's published SSI percentages respectively for Pomona's 2006, 2007 and 2008 cost reporting years omitted a significant number of days that Pomona believes, based on State Medi-Cal records, constitute days associated with patients who were, at the time of their services, receiving SSI benefits:

First, Pomona is submitting one list verified by Amy Rosenkranz and Manuel Urbina of the Medi-Cal program's Medi-Cal Eligibility Division, "Program Integrity Unit" of the State Department of Health Care Services. These lists are in response to Pomona specifically requesting that Medi-Cal verify the SSI status of ten specific patients from each of the 2006, 2007, and 2008 fiscal years. (Pomona would have preferred to have more patients verified by Medi-Cal, but due to time limitations, the 2006 list was the maximum that Medi-Cal agreed to verify SSI status on.) I am familiar with the work of the Program Integrity Unit -- it is within the Division of Eligibility – and I can verify that the SSI/SSP status information that would have been checked by Program Integrity in response to Pomona's inquiry is information that would have been received by the Medi-Cal program directly from the SSA.

Second, Pomona is submitting three sets (totaling 40 records) of the Medi-Cal on-line Eligibility Response printouts from Medi-Cal Point of Service (POS) Network from its 2006, 2007, and 2008 cost reporting years, to demonstrate that a significant additional percentage of patients from these years were SSI eligible at the time of services. Pomona is submitting 20 Eligibility Response printouts for 2006, 10 printouts for 2007, and 10 printouts for 2008. From my service with Medi-Cal, I know that these reports are the product of an online verification system that was established by the Medi-Cal program to assist providers in determining eligibility of patients and/or prospective patients for Medi-Cal program benefits. These reports also include an indicator regarding each patient's SSI/SSP status through the usage of aid code assignment, specifically 10, 20 or 60. The information regarding SSI/SSP status is obtained by the Medi-Cal program directly from the SSA, for purposes of compiling information regarding Medi-Cal beneficiaries' eligibility. Pomona indicates that it routinely obtains these reports for all Medi-Cal eligible patients at the time of service, which is consistent with my understanding of how the online verification system was designed to function (information is available on a beneficiary month of eligibility basis, based on the month of service, but only for one year). Pomona has asked me to review the SSI patient lists for 2006, 2007, and 2008, DHCS letter verifying the 10 SSI patients from 2006, and sample online Eligibility Reponses printouts reports. Based on my review of the records being submitted to CMS and SSA, I believe that each of the individual patient reports was obtained from the Medi-Cal online verification system, and that each report contains verification of patient SSI/SSP status that was obtained by the Medi-Cal program within roughly 30 days of services date from the Social Security Administration.

0196

01062

1/21/2016
Page 3

      If I can be of any further assistance for purposes of verifying the information being submitted by Pomona at this time, I would be pleased to assist. Please contact me at (916) 792-3740, e-mail srosenstein@healthmanagement.com.

                                  Sincerely,

                                  Stan Rosenstein

cc: Tzvi Hefter
    Candice Le-Tran
    Laurence D Getzoff
    Keith Fontenot

0197

01063

P-25

01359

DIANNE FEINSTEIN
CALIFORNIA

SELECT COMMITTEE ON
   INTELLIGENCE—VICE CHAIRMAN
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND
   ADMINISTRATION

# United States Senate

WASHINGTON, DC 20510–0504

http://feinstein.senate.gov

May 20, 2016

Ms. Christina Walters
Senior Public Affairs Specialist
San Francisco Regional Public Affairs Office
Social Security Administration
1221 Nevin Ave
Richmond, California 94801

Dear Ms. Walters:

I am writing to bring to your attention a letter from Pomona Valley Hospital regarding their request to have 30 records of SSI patients from 2006-2008 reviewed.  Please look into the issues raised, as quickly as possible, so I can appropriately respond to them.

Attached you will find the enclosures from my constituent to assist you with your review.  After you have completed your review, please send your written response to Abby Ellis of my San Francisco office.  Ms. Ellis may be contacted by phone at (415) 393-0707, or by fax at (415) 393-0710, if you have any questions.

Sincerely,

Dianne Feinstein
United States Senator

DF:ae

FRESNO OFFICE:
2500 TULARE STREET
SUITE 4290
FRESNO, CA 93721
(559) 485-7430

LOS ANGELES OFFICE:
11111 SANTA MONICA BOULEVARD
SUITE 915
LOS ANGELES, CA 90025
(310) 914-7300

SAN DIEGO OFFICE:
880 FRONT STREET
SUITE 4236
SAN DIEGO, CA 92101
(619) 231-9712

SAN FRANCISCO OFFICE:
ONE POST STREET
SUITE 2450
SAN FRANCISCO, CA 94104
(415) 393-0707

0493

JA 226

01360

**Please Help Pomona Valley Hospital Medical Center With a Medicare Challenge**
**May 2016**

**Background**

The Pomona Valley Hospital Medical Center believes a discrepancy in data used by the Centers for Medicare & Medicaid Services (CMS) led its Medicare disproportionate share hospital payments (Medicare DSH) to be $6 million less than they should have been from 2006 to 2008. Although CMS has agreed to look into this matter, it has not been able to secure the assistance it needs from the Social Security Administration to do so.

**About Pomona Valley Hospital Medical Center**

Founded in 1903, the Pomona Valley Hospital Medical Center is a 437-bed acute-care hospital that serves Pomona, Claremont, Chino, Chino Hills, La Verne, Montclair, Ontario, Rancho Cucamonga, Alta Loma, San Dimas, and beyond. Those communities have a large population of low-income residents: 25 percent of the households in the communities the hospital serves have incomes of less than $25,000 a year. In more than half of those households, languages other than English are spoken at home. In 2013, 57 percent of the hospital's patients were insured by Medicaid, 22 percent by Medicare, and four percent were uninsured while only 16 percent had private health insurance.

The hospital and more than 2500 employees respond to the challenges this community poses with a broad range of services, including a busy emergency room (more than 85,000 visits in 2013); Centers of Excellence in cancer and cardiac care; a Primary Stroke Center; a maternity unit that welcomes 7500 babies into the world every year and includes a Level III Neonatal Intensive Care Unit; and an on-site outpatient care pavilion and four satellite outpatient facilities.

**The Challenge**

Medicare DSH payments are made only to hospitals like the Pomona Valley Hospital Medical Center that care for especially large numbers of low-income and uninsured inpatients. Without the additional DSH payments, these hospitals would suffer significant losses caring for such patients; Medicare DSH is intended to help lessen those losses. Pomona Valley qualifies for Medicare DSH based on the many Medicaid and Supplemental Security Income (SSI) patients it serves: in 2013, more than half of its patients – 57 percent – were insured by California's Medi-Cal program and another four percent were uninsured.

One of the components in the Medicare DSH formula is the number of days SSI patients spend as inpatients in the hospital. The SSI days figures that CMS used for its 2006-2008 Medicare DSH calculations are based on data furnished to CMS by the Social Security Administration. The hospital has reviewed the SSI data CMS used and compared it to SSI data it received from California's state government and observed discrepancies that suggest the federal data may be incomplete. Pomona Valley is in the process of appealing its 2006, 2007, and 2008 Medicare DSH payments to CMS's Provider Reimbursement Review Board, but final resolution of that appeals process, including appealing the decision to District Court, could take years.

DF - 5/20/16

0494

01361

CMS has agreed to look into this discrepancy since it understands that an administrative resolution of this issue instead of a judicial resolution would be in both the hospital's and the federal government's best interest, saving significant time and resources. CMS has asked the Social Security Administration to examine a sample of just 30 records – ten records for each of the three years in question – to help determine the accuracy of the data provided by the Social Security Administration. Although CMS has made a number of attempts to obtain the Social Security Administration's assistance to resolve this issue, that agency has not yet responded to this request.

**Our Request**

Medicare DSH is an important part of the Pomona Valley Hospital Medical Center's financial foundation, helping the hospital offer an extensive range of high-quality services to a community with significant numbers of low-income and government-insured patients. The hospital's leaders believe that a discrepancy in data between the state and the federal government has led to a $6 million shortfall in its Medicare DSH payments between 2006 and 2008. CMS has graciously agreed to look into this issue – other discrepancies affecting many DSH hospitals have been identified and addressed in the past – and CMS has asked the Social Security Administration to verify a sample of just 30 records to determine whether its database, and that of the state of California, record the same SSI status for these 30 individuals. To date, the Social Security Administration has not responded to this request. Now, Pomona Valley asks the members of its congressional delegation to convey to the Social Security Administration their desire that it comply expeditiously with the CMS request. Resolving this matter quickly and administratively will save the hospital and the federal government the significant time and resources that would be necessary to resolve a lengthy legal appeal.

DF – 5/20/16

0495

**JA 228**

01362



## SOCIAL SECURITY

**OCT 2 6 2016**

Social Security Administration
San Francisco Regional Public Affairs
P.O. Box 4201
Richmond CA  94804

The Honorable Dianne Feinstein
United States Senator
One Post Street, Suite 2450
San Francisco, California 94104

Dear Senator Feinstein:

Thank you for your May 20, 2016, letter on behalf of Pomona Valley Hospital Medical Center
concerning their request to have 30 records of Supplemental Security Income (SSI) patients from
2006-2008 reviewed.

The San Francisco Regional Office investigated Pomona Valley Hospital Medical Center's
concerns and discovered the Centers for Medicare & Medicaid Services (CMS) Headquarters
contacted our Central Office regarding how certain data is populated from Social Security's
(SSA) data sharing agreement (State Exchange Agreement) to the State of California's database.
We reached out to the components involved and determined SSA provided the requested
information to CMS in the spring of this year.   We found no evidence that SSA agreed to review
any Supplemental Security Income (SSI) records related to Pomona Valley Hospital Medical
Center.

The matter that you wrote about is under the jurisdiction of CMS, therefore, it is our
recommendation that Pomona Valley Hospital Medical Center direct their questions to CMS so
that the inquiry can be resolved. Below we are providing you with the contact information for
the individual at CMS who would be best equipped to assist Pomona Valley Hospital Medical
Center with this inquiry.

Emily Lipkin Emily.Lipkin@cms.hhs.gov     Lisa Leong Lisa.Leong@cms.hhs.gov
(410) 786-3633                            (415) 744-3658
7500 Security Blvd                        90 Seventh Street, Suite 5-300 (5W)
Woodlawn MD  21244                        San Francisco CA 94103

Please let us know if we can be of further assistance.

Sincerely,

Patricia Raymond
Regional Communications Director

0496

P-26

01364

DIANNE FEINSTEIN
CALIFORNIA



SELECT COMMITTEE ON INTELLIGENCE - VICE CHAIRMAN
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION

## United States Senate
WASHINGTON, DC 20510-0504
http://feinstein.senate.gov

October 26, 2016

Carolyn W. Colvin
Acting Commissioner
Social Security Administration
6401 Security Boulevard
Baltimore, MD 21235

Dear Commissioner Colvin:

I write today to request that your agency respond to a request for assistance from Pomona Valley Health Hospital Medical Center based in Pomona, California. It has come to my attention that the Pomona Valley Health Hospital may have been underpaid approximately $6 million under the Medicare Disproportionate Share Hospital Payment formula. In order to verify its concerns, the hospital requested that the Social Security Administration assist with its case in January of this year. The hospital has not received a response from your agency and I would like to request your assistance in resolving this issue.

Pomona Valley Health Hospital Medical Center is a non-profit health care provider that serves thousands of East Los Angeles and San Bernardino County residents each year. The majority of the hospital's patients are low-income and are medically underserved. More than 57 percent of patients are insured by Medicaid, while an additional four percent have no health insurance at all. The hospital assists a diverse socioeconomic and ethnic population, and it is crucial that it receive the appropriate reimbursement level to provide quality healthcare to the communities it serves.

Under the Medicare Disproportionate Share Hospital payment formula, a hospital is paid for the number of days that Supplemental Security Insurance (SSI) patients are treated in its facilities. Pomona Valley Hospital reviewed the number of SSI days it was paid for from 2006 to 2008 and found that the State of California's Social Security records indicate that the hospital served a much higher proportion of SSI patients than it was paid for. This discrepancy indicates that the State of California's Social Security records and the Centers for Medicare and Medicaid's Social Security records are different. Due this potential discrepancy, the hospital's administrators believe that it was

0497

JA 231

01365

underpaid $6 million under the Medicare Disproportionate Share Hospital Payment formula and are appealing the reimbursement amount at a hearing in January 2017.

Recognizing that the State's data may not be up to date, in January 2016 the hospital reached out to you to verify the accuracy of its findings by reviewing a sample of ten patient cases from each of the years in question. The hospital has since followed up with your department and the Centers for Medicare and Medicaid Services numerous times to no avail.

In addition, staff in my San Francisco and Los Angeles offices have attempted repeatedly to gain information about the request but have not been able to learn anything of use. I encourage your administration to make every effort to thoroughly review the hospital's request and reply as soon as possible in writing.

Ensuring that the underserved in California have access to quality healthcare is one of my top priorities and it is imperative that we support local efforts to serve communities in need.

I look forward to hearing your response because this is an issue of great importance to me. Thank you for giving this request every consideration.

Sincerely,

Dianne Feinstein
United States Senator

DF/as

DF - 10\26\16

0498

**JA 232**

01366

DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON THE JUDICIARY
– RANKING MEMBER
SELECT COMMITTEE ON
INTELLIGENCE
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON RULES AND
ADMINISTRATION

## United States Senate

WASHINGTON, DC 20510–0504
http://feinstein.senate.gov

May 19, 2017

Seema Verma
Administrator
Centers for Medicare and Medicaid Services
Hubert H. Humphrey Building
200 Independence Avenue, SW, Room 445-G
Washington, D.C. 20201

Nancy Berryhill
Acting Commissioner
Social Security Administration
2100 M Street, NW
Washington, DC 20037

Dear Administrator Verma and Acting Commissioner Berryhill:

Since May of 2016, my office has been working with staff in both of your
departments to resolve an issue concerning Pomona Valley Health Hospital
Medical Center in Southern California.  For context, officials from Pomona Valley
Health Hospital believe that the hospital was underpaid approximately $6 million
under the Medicare Disproportionate Share Hospital Payment formula.  In order to
address this issue, the hospital requested that the Social Security Administration
(SSA) and the Centers for Medicare and Medicaid (CMS) verify the hospital's
payment discrepancy in January of 2016. To date, neither the hospital nor my
office has received a satisfactory response to this request.

Staff in my Washington D.C., San Francisco, and Los Angeles offices have had
numerous communications with both Social Security Administration and Centers
for Medicare and Medicaid Services staff. Over the course of e-mails and phone
calls, I understand that your departments have provided, at times, conflicting
reasons as to why the agencies could not assist Pomona hospital. In December of
2016, staff from my office, SSA, and CMS held a conference call to determine
why there was a significant delay in the agencies' response time. While no
resolution was reached, both departments agreed to put in writing their response to

0499

01367

the hospital's request; an official explanation of their response; and a history of the issue for my office's records. To date, my office has not received any of the promised documents despite numerous assurances from SSA and CMS.

Based on conversations my staff has had with SSA and CMS, it is my understanding that neither department is legally restricted from working together to provide the hospital with the information it needs. The departments' reluctance to provide an explanation in writing is highly concerning and irregular.

I ask that you carefully examine this issue and provide a prompt response. I am deeply frustrated by the lack of a clear and effective response from both the Social Security Administration and the Centers for Medicare and Medicaid Services. Please take urgent action to resolve this issue quickly.

I look forward to receiving your responses in writing.

Sincerely,

Dianne Feinstein
United States Senator

DF - 5|19|17

0500

**JA 234**

01368

P-27

01369

**PVHMC**

**Summary of SSI Days by aid code for Position Paper**

**PVHMC FYE: 12/31/2006**

**Federal Fiscal Year:  10/1/2005 - 9/30/2006 SSI data**

For EXHIBIT E  (T. Hefter package)

Values

| Matched | Aid Cd | Patient count | Pt Count Mix | Total PVHMC Days (LOS) | CMS Medicare Days | CMS SSI Days | Total PVHMC SSI Days |
|---|---|---|---|---|---|---|---|
| CMS Matched | 10 | 313 | 27.72% | 1,978 | 1,965 | 1,978 | 1,978 |
| | 14 | 3 | 0.27% | 8 | 8 | 8 | 8 |
| | 1E | 2 | 0.18% | 20 | 20 | 20 | 20 |
| | 20 | 21 | 1.86% | 340 | 293 | 340 | 340 |
| | 60 | 382 | 33.84% | 2,245 | 2,171 | 2,245 | 2,245 |
| | 64 | 5 | 0.44% | 24 | 24 | 24 | 24 |
| | 6E | 3 | 0.27% | 40 | 40 | 40 | 40 |
| | (blank) | 19 | 1.68% | 166 | 135 | 147 | 147 |
| CMS Matched Total | | 748 | 66.25% | 4,821 | 4,656 | 4,802 | 4,802 |
| CMS Partial Matched | 10 | 2 | 0.18% | 23 | 23 | 6 | 23 |
| | 60 | 6 | 0.53% | 103 | 100 | 78 | 103 |
| CMS Partial Matched Total | | 8 | 0.71% | 126 | 123 | 84 | 126 |
| CMS Unmatched | 10 | 133 | 11.78% | 727 | 646 | 0 | 727 |
| | 20 | 15 | 1.33% | 123 | 123 | 0 | 123 |
| | 60 | 225 | 19.93% | 1,204 | 1,146 | 0 | 1,204 |
| CMS Unmatched Total | | 373 | 33.04% | 2,054 | 1,915 | 0 | 2,054 |
| Grand Total | | 1,129 | 100.00% | 7,001 | 6,694 | 4,886 | 6,982 |

**JA 236**

PVHMC \

Legend of California Aid Codes captured as SSI

| Code | Program/Description per the State of California DHCS Aid Codes Master Chart |
|---|---|
| **Aid Codes Captured by PVHMC (& CMS) as SSI per Medi-Cal Program Description** | |
| 10 | SSI/SSP Aid to the Aged (FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| 20 | SSI/SSP Aid to the Blind (FFP). A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| 60 | SSI/SSP Aid to the Disabled (FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |
| **Aid Codes Assigned to CMS SSI Beneficiaries Days in CMS SSI DUA Data File (Claimed by PVHMC):** | |
| 14 | Aid to the Aged - Medically Needy (FFP). Covers persons 65 years of age or older who do not wish or are not eligible for a cash grant, but are eligible for Medi-Cal only. |
| 1E, 6E | Continued eligibility for the Aged (1E) (FFP) or Disabled (6E), Covers former SSI beneficiaries who are Aged (with exception of persons who are deceased or incarcerated in a correctional facility) until the county predetermines their eligibility. |
| 64 | Aid to the Disabled û Medically Needy (FFP). Covers persons who meet the federal definition of disability and do not wish or are not eligible for cash grant, but are eligible for Medi-Cal only. |
| Blank | Accounts identified as SSI by CMS MedPar file where PVHMC internal aid code is not available. |

Source: DHCS Aid Codes Master Chart

01371

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | |
| 2 | FYE: 2006 | | | | | |
| 3 | | | | | | |
| 4 | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | | |
| 5 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published Data |
| 6 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,803 | 4,886 | 4,886 |
| 7 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 179 | | |
| 8 | Less: Estimate of State SSP only days  & Note B below | | | 0% | | |
| 9 | Total Federal Medicare SSI days | | | 6,982 | 4,886 | 4,886 |
| 10 | Total Medicare Days Part A & C per CMS MedPar data (2) | | | 32,371 | 32,371 | 33,149 |
| 11 | SSI Percentage per PVHMC | | | 21.57% | 15.09% | 14.740% |
| 12 | Published SSI % per CMS | | | 14.740% | | |
| 13 | SSI Percent Difference | | | 6.83% | | |
| 14 | DSH Formula's Multiplier | | | 82.50% | | |
| 15 | SSI Incremental Difference | | | 5.63% | | |
| 16 | PVHMC 2006 Federal specific Payment per Audited PS&R dated 11/29/2010 | | | 28,271,966 | | |
| 17 | Increase in SSI Reimbursement | | | $   1,592,863 | | |
| 18 | | | | | | |
| 19 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | |
| 20 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C | | | | | |
| 21 | in SSI factor is already in a separate appeal Issue | | | | | |
| 22 | | | | | | |
| 23 | Note B: Per various research and DHCS' email confirmation from Medi-Cal Eligibility Branch on 10/27/15 , Aid Codes 10,20, and 60 are all Federal SSI.  Therefore, we do not need to estimate for State only SSP. | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |

**JA 238**

PVHMC
Summary of SSI Days by Aid Code for Position Paper
FFY 2007

Filter for Aid Code with SSI Days & tie to summary SSI Days on S-1, from linked main data

| Submission | TRUE |
|---|---|

| Matched | Aid Cd | Values | | | Sum of CMS MCare Days | Sum of CMS SSI Days | Sum of SSI MCare per PVHMC | Sum of SSI MCareHMO per PVHMC | Sum of SSI Total per PVHMC |
|---|---|---|---|---|---|---|---|---|---|
| | | Count of PT_NO_WSCD | Sum of DAYS_STAY | Mix of Days | | | | | |
| CMS Matched | 10 | 336 | 1,903 | 28.51% | 1,890 | 1,903 | 1,821 | 82 | 1,903 |
| | 14 | 1 | 4 | 0.06% | 4 | 4 | 4 | 0 | 4 |
| | 20 | 19 | 123 | 1.84% | 123 | 123 | 122 | 1 | 123 |
| | 60 | 382 | 1,977 | 29.62% | 1,889 | 1,967 | 1,905 | 62 | 1,967 |
| | 64 | 4 | 20 | 0.30% | 20 | 20 | 20 | 0 | 20 |
| | (blank) | 1 | 7 | 0.10% | 7 | 7 | 7 | 0 | 7 |
| | 14 | | 94 | 1.41% | 74 | 94 | 94 | 0 | 94 |
| CMS Matched Total | | 757 | 4,128 | 61.84% | 4,007 | 4,118 | 3,973 | 145 | 4,118 |
| CMS Unmatched | 10 | 171 | 965 | 14.46% | 954 | 0 | 808 | 157 | 965 |
| | 20 | 10 | 32 | 0.48% | 30 | 0 | 30 | 2 | 32 |
| | 60 | 256 | 1,505 | 22.55% | 1,461 | 0 | 1,464 | 41 | 1,505 |
| CMS Unmatched Total | | 437 | 2,502 | 37.48% | 2,445 | 0 | 2,302 | 200 | 2,502 |
| CMS Partial Ma | 10 | 1 | 20 | 0.30% | 19 | 19 | 20 | 0 | 20 |
| | 60 | 2 | 25 | 0.37% | 25 | 16 | 25 | 0 | 25 |
| CMS Partial Match Total | | 3 | 45 | 0.67% | 44 | 35 | 45 | 0 | 45 |
| Grand Total | | 1,197 | 6,675 | 100.00% | 6,496 | 4,153 | 6,320 | 345 | 6,665 |

**JA 239**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | |
| 2 | FYE: 2007 (SSI = FFY 2007) | | | | | |
| 3 | | | | | | |
| 4 | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | | |
| 5 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published (3/19/2012) Data - FFY 2007 |
| 6 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,320 | 4,153 | 4,153 |
| 7 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 345 | | |
| 8 | Less: Estimate of State SSP only days  & Note B below | | | 0% | | |
| 9 | Total Federal Medicare SSI days | | | 6,665 | 4,153 | 4153 |
| 10 | Total Medicare Days Part A & C per CMS MedPar data (2) | | | 27,538 | 27,538 | 28,188 |
| 11 | SSI Percentage per PVHMC | | | 24.20% | 15.08% | 14.733% |
| 12 | Published SSI % per CMS | | | 14.733% | | |
| 13 | SSI Percent Difference | | | 9.47% | | |
| 14 | DSH Formula's Multiplier | | | 82.50% | | |
| 15 | SSI Incremental Difference | | | 7.81% | | |
| 16 | PVHMC Federal specific Payment per Audited PS&R dated 7/28/11 for FYE 2007 | | | 28,828,953 | | |
| 17 | Increase in SSI Reimbursement | | | $    2,252,263 | | |
| 18 | | | | | | |
| 19 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | |
| 20 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C | | | | | |
| 21 | in SSI factor is already in a separate appeal issue | | | | | |
| 22 | | | | | | |
| 23 | Note B: Per various research and DHCS' email confirmation from Medi-Cal Eligibility Branch on 10/27/15 , Aid Codes 10,20, and 60 are all Federal SSI.  Therefore, we do not need to estimate for State only SSP. | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |

**JA 240**

PVHMC                    FYE: 2007 (SSI = FFY 2007)

Legend of Aid Codes captured as SSI

| Code | Benefits | SOC | Program/Description |
|------|----------|-----|---------------------|
| **Aid Codes Captured by PVHMC (& CMS) as SSI per Program Description** | | | |
| | | | SSI/SSP Aid to the Aged |
| 10 | Full | No | (FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| | | | SSI/SSP Aid to the Blind (FFP). |
| 20 | Full | No | A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| | | | SSI/SSP Aid to the Disabled |
| 60 | Full | No | (FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |
| **Aid Codes Assigned to CMS SSI Beneficiaries Days in CMS SSI DUA Data File (Claimed by PVHMC):** | | | |
| | | | Aid to the Aged - Medically Needy (FFP). Covers persons |
| 14 | Full | No | 65 years of age or older who do not wish or are not eligible for a cash grant, but are eligible for Medi-Cal only. |
| | | | Aid to the Disabled û Medically |
| 64 | Full | No | Needy (FFP). Covers persons who meet the federal definition of disability and do not wish or are not eligible for cash grant, but are eligible for Medi-Cal only. |
| Blank | | | Accounts identified as SSI by CMS MedPar file where PVHMC internal aid code is not available. |

Source: DHCS Aid Codes Master Chart

PVHMC
**Summary of SSI Days by Aid Code for Position Paper**
FFY 2008

| Submission | TRUE |
|------------|------|

| Matched | Aid Cd | Values Count of PT_NO_WSCD | Sum of DAYS_STAY | Mix of Days | Sum of CMS MCare Days | Sum of CMS SSI Days | Sum of SSI MCare per PVHMC | Sum of SSI Mcare HMO per PVHMC | Sum of SSI Total per PVHMC |
|---------|--------|-----|-----|-----|-----|-----|-----|-----|-----|
| CMS Matched | 10 | 338 | 1,818 | 27.20% | 1,805 | 1,805 | 1,672 | 133 | 1,805 |
| | 13 | 1 | 8 | 0.12% | 8 | 8 | 8 | 0 | 8 |
| | 1E | 1 | 5 | 0.07% | 5 | 5 | 5 | 0 | 5 |
| | 20 | 17 | 136 | 2.04% | 136 | 136 | 131 | 5 | 136 |
| | 3N | 1 | 4 | 0.06% | 4 | 4 | 4 | 0 | 4 |
| | 60 | 357 | 2,220 | 33.22% | 2,148 | 2,148 | 2,055 | 93 | 2,148 |
| | 63 | 1 | 4 | 0.06% | 4 | 1 | 1 | 0 | 1 |
| | 64 | 1 | 9 | 0.13% | 9 | 9 | 9 | 0 | 9 |
| | 80 | 1 | 3 | 0.04% | 3 | 3 | 3 | 0 | 3 |
| | | 11 | 55 | 0.82% | 55 | 55 | 50 | 5 | 55 |
| CMS Matched Total | | 729 | 4,262 | 63.77% | 4,177 | 4,174 | 3,938 | 236 | 4,174 |
| CMS Unmatche | 10 | 147 | 849 | 12.70% | 821 | 0 | 718 | 131 | 849 |
| | 20 | 15 | 65 | 0.97% | 63 | 0 | 61 | 4 | 65 |
| | 60 | 247 | 1,416 | 21.19% | 1,396 | 0 | 1,359 | 57 | 1,416 |
| CMS Unmatched Total | | 409 | 2,330 | 34.86% | 2,280 | 0 | 2,138 | 192 | 2,330 |
| CMS Partial Ma | 10 | 5 | 36 | 0.54% | 31 | 31 | 36 | 0 | 36 |
| | 60 | 5 | 55 | 0.82% | 52 | 33 | 55 | 0 | 55 |
| CMS Partial Match Total | | 10 | 91 | 1.36% | 83 | 64 | 91 | 0 | 91 |
| Grand Total | | 1,148 | 6,683 | 100.00% | 6,540 | 4,238 | 6,167 | 428 | 6,595 |

N:\SSI Data\2008\FFY 2008 PVHMC SSI[S-4_SSI By AC]
7/10/2017 12:18 PM

0535

JA 242

01404

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | |
| 2 | FYE: 2008 (SSI = FFY 2008) | | | | | |
| 3 | | | | | | |
| 4 | | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | |
| 5 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare | CMS Published (3/19/2012) Data - FFY 2008 |
| 6 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,167 | 4,238 | 4,235 |
| 7 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 428 | | |
| 8 | Less: Estimate of State SSP only days  & Note B below | | | 0% | | |
| 9 | **Total Federal Medicare SSI days** | | | **6,595** | **4,238** | **4,235** |
| 10 | Total Medicare  Days Part A & C per CMS MedPar data (2) | | | 28,768 | 28,768 | 29,404 |
| 11 | SSI Percentage per PVHMC | | | 22.92% | 14.73% | 14.403% |
| 12 | Published SSI % per CMS | | | 14.403% | | |
| 13 | SSI Percent Difference | | | 8.52% | | |
| 14 | DSH Formula's Multiplier | | | 82.50% | | |
| 15 | SSI Incremental Difference | | | 7.03% | | |
| 16 | PVHMC Federal specific Payment per Audited PS&R dated 2/23/12 (FYE 2008) | | | 31,693,675 | | |
| 17 | **Increase in SSI Reimbursement** | | | **$ 2,228,264.87** | | |
| 18 | | | | | | |
| 19 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | |
| 20 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C in | | | | | |
| 21 | SSI factor is already in a separate appeal issue | | | | | |
| 22 | | | | | | |
| 23 | Note B: Per various research and DHCS' email confirmation from Medi-Cal Eligibility Branch on 10/27/15 , Aid Codes 10,20, and 60 are all Federal SSI.  Therefore, we do not need to estimate for State only SSP. | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |

PVHMC                FYE: 2008 (SSI = FFY 2008)

Legend of Aid Codes captured as SSI

| Code | Benefits | SOC | Program/Description |
|------|----------|-----|---------------------|
| **Aid Codes Captured by PVHMC (& CMS) as SSI per Program Description** | | | |
| 10 | Full | No | SSI/SSP Aid to the Aged<br>(FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| 20 | Full | No | SSI/SSP Aid to the Blind (FFP).<br>A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| 60 | Full | No | SSI/SSP Aid to the Disabled<br>(FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |
| **Aid Codes Assigned to CMS SSI Beneficiaries Days in CMS SSI DUA Data File (Claimed by PVHMC):** | | | |
| 13 | Full | Y/N | Aid to the Aged- LTC (FFP)<br>Covers persons 65 years of age or older who are medically needy and in LTC status |
| 1E | Full | No | Continued eligibility for the<br>Aged (FFP). Covers former SSI beneficiaries who are Aged (with exception of persons who are deceased or incarcerated in a correctional facility) until the county predetermines their eligibility. |
| 3N | Full | No | Aid to Families with Dependent<br>Children (AFDC) - 1931(b) Non-CalWORKs |
| 63 | Full | Y/N | Aid to the Disabled - LTC Status (FFP). Covers persons<br>who meet the federal definition<br>of disability who are medically needy and in LTC status. |
| 64 | Full | No | Aid to the Disabled - Medically<br>Needy (FFP). Covers persons who meet the federal definition of disability and do not wish or are not eligible for cash grant, but are eligible for Medi-Cal only. |
| 80 | Restricted to Medicare expenses | No | Qualified Medicare Beneficiary<br>(QMB). Provides payment of Medicare Part A premium and Part A and B coinsurance and deductibles for eligible low income aged, blind, or disabled individuals. |
| Blank | | | Accounts identified as SSI by CMS MedPar file where PVHMC internal aid code is not available. |

Source: DHCS Aid Codes Master Chart

**JA 244**

01406

. P-30

01429

| From: | Candice LeTran |
| To: | Sadra, Amanda (Feinstein) |
| Subject: | 30 SSI records with SSA |
| Date: | Wednesday, November 02, 2016 9:21:00 AM |

Hi Amanda,
I am checking in to ensure that you received the email the Larry Getzoff sent on Friday to Lisa
Leong on the 30 SSI records. It went secured, and I have re-attached the body below in blue.

Please keep me posted with your progress with SSA, and they offered a turn-around time for this
review, as we still need to prepare for our Board hearing in January if this can't be settled with
CMS soon.

Please let me know if I can do anything, and we greatly appreciate the attention that you put in on
this matter.

Candice Le-Tran
Office: 909-865-9844


From: Laurence D. Getzoff
To: 'lisa.leong@cms.hhs.gov'
Cc: 'amanda_sadra@feinstein.senate.gov', 'Candice LeTran'
Sent: Friday, October 28, 2016 3:28:44 PM

  Attachments: PVHMC SSI 30 samples_for SSA Verification_06 to 08.pdf

Ms. Leong:
Our Firm is counsel to Pomona Valley Hospital Medical Center. On behalf of the
hospital, I am forwarding securely to you a list of thirty (30) patients, their
accounts and claims. If she has not already done so, Amanda Sadra, of Senator
Dianne Feinstein's Office, will contact you to explain why we are involving you
in this process, and to discuss some of the background supporting this request.
I am also available to discuss the circumstances of our request with you.

In brief summary, we have been attempting, with the blessing of CMS, to resolve
a reimbursement matter involving the "SSI Percentage" of the Disproportionate
Share Hospital ("DSH") calculation for three of Pomona's fiscal years. Because
California State generated data and CMS generated data do not necessarily agree
on the SSI status of individual patients at the times they received hospital
services, the hospital has been trying to find a way to have the Social Security
Administration verify, one way or the other, the SSI status of a small sample of
patient accounts.

Ten patient accounts from each of the years at issue, 2006, 2007 and 2008, were
selected, and are included on the attached list. With the extremely diligent

0562

**JA 246**

01434

assistance of Senator Feinstein's office, after several months, the Social
Security Administration has agreed to review these 30 accounts, to verify
whether these patients had or did not have SSI benefits covering the time they
received services, and to advise the parties regarding the findings. The SSA,
however, has advised Senator Feinstein's office that it will review and report
on these 30 accounts only if it can receive the listing from CMS, and to return
the results to CMS (for discussion with the hospital). The SSA representative
who has been corresponding with Senator Feinstein's office identified you as a
CMS representative with whom to discuss this matter; therefore, we are
requesting, along with Senator Feinstein's office, that you assist us in
providing the information to the SSA, and then agree to receive the results of
the SSA review.

For your convenience, I will also send you (by separate email outside of the
"secure" environment) two letters from Senator Feinstein to the SSA, which will
provide you additional background, should you want and/or need it.

We very much appreciate your talking to Amanda Sadra of the Senator's office, as
well as your sending the attached listing to the SSA for review.

If you have any questions of me, please do not hesitate to call me at
310-551-8190. Thank you, once again, for your help.

Laurence Getzoff
lgetzoff@health-law.com
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181

0563

**JA 247**

01435

| From: | Laurence D. Getzoff |
| To: | Candice LeTran |
| Subject: | FW: Pomona Valley Hospital Medical Center |
| Date: | Thursday, November 03, 2016 3:02:11 PM |

FYI.

### Laurence Getzoff

lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the
use of the person or entity to whom the e-mail was addressed. It contains information that may
be protected by the attorney-client privilege, work-product doctrine, or other privileges, and
may be restricted from disclosure by applicable state and federal law. If you are not the
intended recipient of this message, be advised that any dissemination, distribution, or use of
the contents of this message is strictly prohibited. If you have received this message in error,
or are not the named recipient(s), please notify the sender immediately by reply e-mail or by
phone at (310) 551-8190 and delete this message from your computer. Thank you.

**From:** Leong, Lisa (CMS/CFMFFSO) [mailto:Lisa.Leong@cms.hhs.gov]
**Sent:** Thursday, November 03, 2016 2:36 PM
**To:** Laurence D. Getzoff
**Cc:** 'amanda_sadra@feinstein.senate.gov'
**Subject:** RE: Pomona Valley Hospital Medical Center

Mr. Getzoff,

I've been sick and have been out of the office. I am confirming receipt of your email.

Thank you,

Lisa

Lisa Leong
Division of Medicare Financial Management & Fee for Service Operations
Centers for Medicare and Medicaid Services
90 7th Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707
Telephone: 415-744-3669
Fax: 415-744-2706
email: lisa.leong@cms.hhs.gov

**From:** Laurence D. Getzoff [mailto:LGETZOFF@HEALTH-LAW.COM]
**Sent:** Thursday, November 3, 2016 12:01 PM
**To:** Leong, Lisa (CMS/CFMFFSO) <Lisa.Leong@cms.hhs.gov>

0564

01436

**Cc:** 'amanda_sadra@feinstein.senate.gov' <amanda_sadra@feinstein.senate.gov>
**Subject:** Pomona Valley Hospital Medical Center

Ms. Leong:

Last Friday afternoon, I sent you a short explanation of an issue involving some data that Senator
Feinstein's office had arranged to be reviewed by the Social Security Administration, but which the
SSA had asked us to have CMS send directly to them. Amanda Sadra of Senator Feinstein's
California Field Office was coordinating this process on behalf of the Senator. Ms. Sadra was going
to coordinate with you further.

As I did not receive a bounce back to any of the three emails I sent to you (or Ms. Sadra), I am
assuming the emails were received and that the data will be forwarded to the SSA. However, I
have received no confirmation from you or acknowledgment of receipt. Given the nature of the
data (involving a limited number of patient names), and even though the data was sent through
our secure system, I would like to at least receive a confirmation that you received the emails and
data, and that you have been in touch with Ms. Sadra. The SSA's review of the 30 patient accounts
also is time sensitive, so we want to make certain at this time that everyone has what they need,
and that the review by SSA is being facilitated. There is no "work" on this that CMS has to do at
this point to my knowledge, other than facilitating the SSA's review of the small number of patient
accounts for determination of SSI status.

Thank you for your assistance in this matter. We appreciate it.

*Laurence Getzoff*
lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the
use of the person or entity to whom the e-mail was addressed. It contains information that may
be protected by the attorney-client privilege, work-product doctrine, or other privileges, and
may be restricted from disclosure by applicable state and federal law. If you are not the
intended recipient of this message, be advised that any dissemination, distribution, or use of
the contents of this message is strictly prohibited. If you have received this message in error,
or are not the named recipient(s), please notify the sender immediately by reply e-mail or by
phone at (310) 551-8190 and delete this message from your computer. Thank you.

Filtered by 3BClean from http://www.microsystems.com

Filtered by 3BClean from http://www.microsystems.com

**JA 249**

| From: | Laurence D. Getzoff |
|---|---|
| To: | Candice LeTran |
| Subject: | FW: Pomona Valley Hospital Medical Center |
| Date: | Thursday, November 03, 2016 3:02:31 PM |

FYI

**Laurence Getzoff**

lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181

The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone at (310) 551-8190 and delete this message from your computer. Thank you.

**From:** Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
**Sent:** Thursday, November 03, 2016 2:49 PM
**To:** Laurence D. Getzoff
**Subject:** Re: Pomona Valley Hospital Medical Center

Laurence,

Talking to CMS tomorrow at 8.

Will update soon.

-Amanda

Sent from my iPhone

On Nov 3, 2016, at 12:01 PM, Laurence D. Getzoff <LGETZOFF@HEALTH-LAW.COM> wrote:

> Ms. Leong:
>
> Last Friday afternoon, I sent you a short explanation of an issue involving some data that Senator Feinstein's office had arranged to be reviewed by the Social Security Administration, but which the SSA had asked us to have CMS send directly to them. Amanda Sadra of Senator Feinstein's California Field Office was coordinating this process on behalf of the Senator.  Ms. Sadra was going to coordinate with you further.

0566

01438

As I did not receive a bounce back to any of the three emails I sent to you (or Ms. Sadra), I am assuming the emails were received and that the data will be forwarded to the SSA. However, I have received no confirmation from you or acknowledgment of receipt. Given the nature of the data (involving a limited number of patient names), and even though the data was sent through our secure system, I would like to at least receive a confirmation that you received the emails and data, and that you have been in touch with Ms. Sadra. The SSA's review of the 30 patient accounts also is time sensitive, so we want to make certain at this time that everyone has what they need, and that the review by SSA is being facilitated. There is no "work" on this that CMS has to do at this point to my knowledge, other than facilitating the SSA's review of the small number of patient accounts for determination of SSI status.

Thank you for your assistance in this matter. We appreciate it.

*Laurence Getzoff*
lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone at (310) 551-8190 and delete this message from your computer. Thank you.

Filtered by 3BClean from http://www.microsystems.com

Filtered by 3BClean from http://www.microsystems.com

0567

| | |
|---|---|
| **From:** | Laurence D. Getzoff |
| **To:** | "lisa.leong@cms.hhs.gov" |
| **Cc:** | "amanda_sadra@feinstein.senate.gov"; Candice LeTran |
| **Subject:** | PVHMC SSI 30 samples_for SSA Verification_06 to 08 |
| **Date:** | Friday, October 28, 2016 3:28:53 PM |
| **Attachments:** | SecureMessageAtt.html |

 

This is a secure, encrypted message.
To read it, open the attachment contained with this email
Or alternatively you can used this provided link to "pick up" your email & attachment(s).
Please be aware this "pickup" will expire.... but the attachement will remain within this email

Click here within 4 days of receiving the message for web "pickup"

More Info

0568

01440

| | |
|---|---|
| From: | Candice LeTran |
| To: | "Sadra, Amanda (Feinstein)" |
| Cc: | lgetzoff@health-law.com; Kate Finkelstein (kate@debrunner.us) |
| Subject: | RE: Pomona Valley Hospital SSI data - Status (30 records)? |
| Date: | Tuesday, December 06, 2016 4:06:00 PM |

Hi Amanda,
I am checking in again.  Please give us an update on what SSA said from your call with them last week
- did they give you an estimate of when they would have the results?  Thank you.

Candice Le-Tran
Office: 909-865-9844

-----Original Message-----
From: Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
Sent: Wednesday, November 30, 2016 12:04 PM
To: Candice LeTran
Cc: lgetzoff@health-law.com; Kate Finkelstein (kate@debrunner.us)
Subject: RE: Pomona Valley Hospital SSI data - Status?

Hi Candice,

I have a call scheduled with SSA tomorrow at 1pm. I'll let you know what they tell me.


Amanda Sadra
Field Representative | U.S. Senator Dianne Feinstein
11111 Santa Monica Boulevard, Suite 915
Los Angeles, CA 90025 | (310) 914-7300


-----Original Message-----
From: Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
Sent: Wednesday, November 30, 2016 11:54 AM
To: Sadra, Amanda (Feinstein) <Amanda_Sadra@feinstein.senate.gov>
Cc: lgetzoff@health-law.com; Kate Finkelstein (kate@debrunner.us) <kate@debrunner.us>
Subject: RE: Pomona Valley Hospital SSI data - Status?

Hi Amanda,
I am checking in for an update, as you are aware time is of the essence to us.  Quick recap, we sent
the 30 sample SSI records to CMS San Francisco office on 10/28/16, and CMS did confirm receipt of
these records.  CMS and SSA were going to coordinate to review these records .  My estimate is each
record should not take more than 1-2 minutes to look up as SSA simply needs to validate if the
reported aid code is Federal or not.

We greatly appreciate your assistance on this issue, and look forward to hearing back with some SSA
updates.  Thank you.

Candice Le-Tran
Director of Regulatory Reimbursement & Analytics Pomona Valley Hospital Medical Center
Office: 909-865-9844

-----Original Message-----
From: Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
Sent: Monday, November 21, 2016 9:26 AM
To: Candice LeTran

0569

01441

Cc: lgetzoff@health-law.com
Subject: Re: Pomona Valley Hospital SSI data - Update

I asked for an update last week but have not heard back. I will follow-up again today.

Sent from my IPhone

> On Nov 21, 2016, at 8:58 AM, Candice LeTran <Candice.LeTran@pvhmc.org> wrote:
>
> Hi Amanda,
> I am checking in to see if SSA had received our 30 records from CMS, and if an estimated turnaround time was given, so that we can plan for our January hearing in Baltimore.  Thank you for your help.
>
> Candice Le-Tran
> Office: 909-865-9844
>
> -----Original Message-----
> From: Sadra, Amanda (Feinstein)
> [mailto:Amanda_Sadra@feinstein.senate.gov]
> Sent: Tuesday, November 08, 2016 2:32 PM
> To: Candice LeTran
> Subject: Update
>
> Candice,
>
> Please share this with the team:
>
> We have elevated this issue to the highest levels of CMS and SSA. We seem to have two willing agencies, who aren't speaking to each other. I have been assured that talks are in progress between the two agencies to figure out the best foot forward. My impression is that there's been one miscommunication after another. That should be over now.
>
> I'm continuing to work and will update you with new information as it comes in.
>
> Thank you,
>
> Amanda Sadra
>
> Sent from my iPhone
> The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
>
>

The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

0570

01442

| From: | Sadra, Amanda (Feinstein) |
|---|---|
| To: | Candice LeTran |
| Subject: | Update (CMS_SSA 30 records) |
| Date: | Tuesday, November 08, 2016 2:32:30 PM |

Candice,

Please share this with the team:

We have elevated this issue to the highest levels of CMS and SSA. We seem to have two willing agencies, who aren't speaking to each other. I have been assured that talks are in progress between the two agencies to figure out the best foot forward. My impression is that there's been one miscommunication after another. That should be over now.

I'm continuing to work and will update you with new information as it comes in.

Thank you,

Amanda Sadra

Sent from my iPhone

P-32

01451



DEPARTMENT OF HEALTH & HUMAN SERVICES     Centers for Medicare & Medicaid Services

7500 Security Boulevard
Baltimore, MD  21244-1850

June 23, 2017

The Honorable Dianne Feinstein
United States Senate
Washington DC 20510

Dear Senator Feinstein:

Thank you for your May 19, 2017 letter regarding payments to Pomona Valley Health Hospital under the Medicare Disproportionate Share Hospital (DSH) payment formula.  Your office first reached out to CMS regarding this issue in late October, 2016, and I regret any confusion that may have occurred during the course of our subsequent conversations.

Medicare DSH payments are authorized and described in the Social Security Act at Section 1886(d)(5)(F). This provision directs CMS to make additional Medicare payments to subsection (d) hospitals that serve a significantly disproportionate number of low-income patients. Most subsection (d) hospitals qualify for Medicare DSH payments based on a methodology that, among other factors, takes into account the number of a hospital's inpatient days that are furnished to patients who were entitled to both Medicare Part A and Supplemental Security Income (SSI) benefits.  Title XVI of the Social Security Act authorizes the Social Security Administration to make SSI eligibility determinations.

Section 1886(d)(5)(F)(vi)(I) of the Act specifies the methodology by which CMS calculates each hospital's DSH payment. CMS has implemented 1886(d)(5)(F)(vi)(I) through its FY 2011 rulemaking, in which CMS addresses the issue of source data for determining the number of inpatients who were entitled to both Medicare Part A and SSI. This CMS rule (75 Fed. Reg. 50275 to 50286) finalizes CMS policy that the SSI eligibility file produced at a certain point in time serves as the system of record for whether or not an individual is entitled to SSI benefits for individuals who applied for SSI benefits for a specified time period.  This means that CMS defers to SSA's determination as to whether an individual is entitled to SSI benefits, as reflected in that specific eligibility file, at the time that file is produced.

CMS does not have access to any additional SSI information beyond what is transmitted in that SSI eligibility file, and in light of the relevant privacy rules and existing CMS regulations, the agency does not have authority to ask for additional information that SSA may have created at other points in time or shared with other outside parties.  CMS relies on the eligibility file created by SSA as the source of information to match, on an annual basis, the many millions of beneficiary records on behalf of thousands of Medicare DSH hospitals nationwide. This is a policy that went through notice and comment rulemaking, and CMS does not make exceptions for individual hospitals.

Furthermore, disputes regarding Medicare payment determinations are handled through the appeals process for all providers.

0578

01452

Pomona is currently awaiting a hearing at the Provider Review Reimbursement Board (PRRB). The PRRB is the administrative forum for appeals from Medicare providers dissatisfied with Medicare payment determinations. The PRRB has five board members who are appointed by the Secretary of HHS and serve three-year terms. The PRRB appeals process is a relatively formal one. For additional information, see **https://www.cms.gov/Regulations-and-Guidance/Review-Boards/PRRBReview/Downloads/PRRBRULES_07_01_2015.pdf**

By statute, the CMS Administrator (pursuant to a delegation from the Secretary) may review final PRRB decisions. See 42 USC 1395oo(f)(1); 42 CFR 405.1875. A decision of the Board may be affirmed, modified, reversed, or vacated and remanded by the CMS Administrator within 60 days of notification to the provider of that decision. If a provider is not happy with the final decision of the CMS Administrator, it may pursue its case in federal court.

I hope this response clarifies CMS policy with respect to the DSH payment formula. Please do not hesitate to contact CMS if you have further questions.

Respectfully,

Carol L. Blackford
Director
Hospital Ambulatory and Payment Group
Center for Medicare, CMS

0579

**JA 258**

01453

P-34

01459

# HEALTH MANAGEMENT ASSOCIATES

July 12, 2017

Re:   Case Number: 13-0430, Pomona Valley Hospital Medical Center, Provider No. 05-0231.

## I.   SCOPE OF ENGAGEMENT

I was engaged by Pomona Valley Hospital Medical Center to provide information and my opinion on how California's Medicaid program (Medi-Cal) provides providers with information pertaining to Medi-Cal enrollees' enrollment in the Supplemental Security Income (SSI) program.  This includes a description of how Medi-Cal obtains SSI eligibility information from the Social Security Administration (SSA), places that information on its eligibility files and provides this information to Medi-Cal providers.  Further, I was engaged to provide information on enrollment numbers between people on Medi-Cal who are enrolled in SSI and the State Supplemental Payment (SSP) program.

## QUALIFICATIONS

Attached is a copy of my Résumé.

I am currently a consultant specializing in health care, primarily relating to state programs such as Medicaid.  I provide consultation to a wide range of clients on many issues and as a result I have continued to stay knowledgeable on Medicaid Program requirements, both current and historical.  I have been a consultant since January 2009.

Prior to becoming a consultant, I worked as a California state employee in the Medi-Cal for 32 years.  I served as an executive appointee with the State of California for 21 years of this time with over 13 years as the Medicaid Director or Deputy Medicaid Director in California.  When I retired from the State of California at the end of 2008, I was the Chief Deputy Director of Health Care Programs for the Department of Health Care Services ("DHCS").

During the last 13 years of my employment (while I was the Medicaid Director or Deputy Medicaid Director), I had responsibility for setting policy for the California Medicaid Program ("Medi-Cal"), operation of the Medi-Cal eligibility system, operation of the Medi-Cal payment systems (provider enrollment and claims processing), operation of the state's prior authorization system, operation of the Medi-Cal drug program, oversight of the Medi-Cal Managed Care program, development and implementation of various federal waivers, and numerous other parts of the Program.

During my tenure working for the state, I had extensive involvement, responsibility and leadership in the state processes that obtained SSI and SSP data from the Social Security Administration and provided that information to Medi-Cal providers. This included:

1

**JA 260**

- Beginning in 1977, work on developing the California Medicaid Management Information Systems ("MMIS"). This work included design of the recipient subsystem which was used to store information on people who were eligible for Medi-Cal for use in claims processing. During this time I worked closely with the state employees who were designing, developing and implementing the Medi-Cal Eligibility Data System (MEDS), which is used to collect eligibility data from various sources including the SSA, into a central data depository for use in maintaining people's Medi-Cal eligibility, providing this information for claims processing, and providing this information to providers. My work with these systems continued until I retired from the state at the end of 2008.
- In the late 1980s I was the manager in charge of designing and implementing Medi-Cal's Automated Eligibility Verification System (AEVS). This system provides real time eligibility information to providers who use this information to verify a person's Medi-Cal eligibility and to obtain necessary demographic information.

All of the systems cited above are still in operation and were in operation and were in operation during the 2006-2008 time period.

During my tenure working for California, I also had considerable involvement in Medicaid on a national level. This included serving as an officer of the National Association of State Medicaid Directors, including serving as its Vice-Chair for several years. In my earlier work, I was a member of the federal Systems Development Technical Advisory Group, which worked with the federal government on developing requirements for the operation of state MMISs. The federal government establishes requirements for state MMISs that consist of six subsystems. One of the six subsystems in the MMIS is the Recipient Subsystem, which includes both the computer systems and processes that obtain and retain enrollee eligibility information for state Medicaid Programs.

I have a Master's Degree in Public Administration from the University of Southern California and a Bachelor's Degree from the University of Iowa.

## II.   FINDINGS

### SSI/SSP Processing

California is one of the thirty-two states that grant automatic Medicaid (Medi-Cal) eligibility to anyone enrolled in either the SSI or SSP programs. Under this arrangement states enter into a "1634 agreement" with SSA. These agreements are named for the implementing provision in the Act. These 1634 agreement specifies the State and SSA's responsibilities and requires the state to provide Medicaid coverage to recipients of federally-administered SSI and State Supplementary Payments (SSP's). California is a signatory to a 1634 agreement with the SSA.

2

Under this agreement, the SSA is responsible for processing applications for SSI /SSP eligibility and determining eligibility for these programs. After this determination, SSA provides Medi-Cal with information on SSI/SSP recipients by the way of the State Data Exchange (SDX) file. Medi-Cal then utilizes this information to establish and maintain Medi-Cal eligibility.

Upon receipt of SSI/SSP data from the SSA via the SDX, the Department of Health Care Services (DHCS) processes this data and posts it to its MEDS file. The MEDS file is the central depository of all Medi-Cal eligibility data including data from the SSA, California counties, and from DHCS and other state departments. MEDS posts demographic information about each person, assigns each person with a unique Client Identification Number, and assigns each person with the appropriate Aid Code that identifies the source of that person's eligibility. For new enrollees, MEDS will also cause the Medi-Cal's fiscal agent to issue a plastic Medi-Cal eligibility card known as the Benefits Identification Card (BIC). All Medi-Cal enrollees, including those on SSI/SSP, receive a BIC.

The MEDS computer system including the process to accept and post SDX data was implemented in the early 1980s and it was in operation through the entire 2006-2008 time period (it remains in operation today). The system is highly reliable as demonstrated by its ability to function well for over 30 years. MEDS has been shown to be accurate in providing the eligibility information provided to it by various sources including the SSA.

**Aid Codes**

Medi-Cal eligibility is extremely complex with multiple categories of eligibility. Each category of eligibility may grant the enrollee a different set of benefits (full scope or limited) and may have one of several federal matching rates (ranging from zero percent federal funds up to 100 percent federally funded). Further, there are various state and federal reporting requirements that require the state to track and report on various eligibility groups including the number of people enrolled and expenditures on their behalf.

In order to meet these requirements, Medi-Cal uses a series of "Aid Codes" that MEDS assigns to each enrollee so that the state, the federal government, and providers know the source of the person's eligibility, the scope of services the person can get, and the federal funding level. There are now well over 100 Aid Codes in use in Medi-Cal.

Medi-Cal uses three long established Aid Codes for Medi-Cal enrollees on SSI/SSP. These are:

    10, SSI/SSP Aid to the Aged (full scope). "A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older."

0586

01462

20, SSI/SSP Aid to the Blind (full scope).  "A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age."

60. SSI/SSP Aid to the Disabled (full scope). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability."[1]

The three Aid Codes used for SSI/SSP have been in use for over 30 years.  Assignment of these codes by Medi-Cal has been well established and has withstood the test of time including federal oversight throughout this period.  There is no question that an enrollee assigned this code has gotten their Medi-Cal eligibility through enrollment in the SSI/SSP program.

**Medi-Cal Provider Eligibility Verification**

When a person is first enrolled in Medi-Cal, including people with Medi-Cal eligibility due to being on SSI/SSP, MEDS causes the Medi-Cal fiscal agent to issue a lifetime plastic BIC card.  As a lifetime card, the BIC contains a limited amount of information.  This information includes the enrollee's:

- Name
- Client Identification Number
- Gender
- Birthdate

And the card issuance date.

Medi-Cal grants eligibility status on a monthly basis and a person's status may change from month to month.  As the BIC is a lifetime card, it does not include eligibility information.  The BIC by itself is not "Proof of Eligibility".

Providers need to know if a person is eligible at the time of service and if so what service limits exist (does the person have full scope benefits or limited scope benefits) and they need "Proof of Eligibility".  To provide providers this information and "Proof of Eligibility", Medi-Cal uses the Automated Eligibility Verification System to allow providers to access necessary eligibility information on their patients.  This system is also known as the "Medi-Cal Point of Service (POS) Network".  This system operates like a retail credit card system where a provider enters in, by a swipe or manually, the information on the BIC and Medi-Cal returns to the provider critical eligibility information on the patient.  This includes the patient's Aid Code.

---

[1] Aid Code Master Chart, November 24, 2015,
http://www.dhcs.ca.gov/services/MH/Documents/MedCCC/Library/SDMCAidCodeChart11-24-15.pdf

4

0587

01463

While Medi-Cal eligibility is granted on a monthly basis, the granting of this status can occur anytime in the month. Once a person is granted Medi-Cal eligibility that person may immediately go to a provider for medical care. To meet this real time requirement no eligibility information is maintained by the Automated Eligibility Verification System. Rather for each transaction that system accesses MEDS to obtain the most current information. In the case of the three long existent Aid Codes for SSI/SSP, the codes that are on MEDS are provided to the provider.

As the Medi-Cal is providing "Proof of Eligibility" a guarantee that the provider can rely on this information and receive payment based on this information, Medi-Cal has ensured that it is accurate. Since the Automated Eligibility Verification System has been in operation for over 20 years it has been well tested and withstood the test of time.

**The Information a Provider Receives from Medi-Cal is Information from the SSA**

As stated above, California receives SSI/SSP information directly from the SSA. Medi-Cal posts this information on its MEDS system and uses three Aid Codes that identify each individual as enrolled in the SSI/SSP program. When a provider accesses enrollee information via the Automated Eligibility Verification System they receive the Aid Code created by MEDS using the data from the SSA. The SSI/SSP Aid Codes have been in place for more than 30 years, the MEDS system has been assigning these codes for over 30 years, and the Automated Eligibility Verification System has been in place for over 20 years. There is no question as to the accuracy of these systems and processes and they have been providing Proof of Eligibility and meeting federal and state reporting requirements for decades.

**SSI and SSP**

The SSI Program is a federally funded program which provides income support to eligible individuals who are aged 65 or older, blind or disabled and qualified blind or disabled children. The SSP Program is the state program which augments SSI. Both SSI and SSP benefits are administered by the Social Security Administration (SSA). If an eligible individual qualifies for SSI, they qualify for SSP.

The standards to qualify for SSI and SSP are complex and vary by a number of factors including what category of eligibility a person has, the person's living arrangements, and the person's income. For each eligibility group there is a maximum income standard for receipt of an SSI grant and a higher maximum income standard for receipt of an SSP grant. A person whose income falls below the SSI level will get both a cash grant from SSI and a supplemental SSP cash grant. However, there are people whose income falls above the income standard for SSI but below the SSP income level. These people would only receive a SSP cash grant.

5

0588

01464

As mentioned above, after making its decision on whether a person is eligible for SSI/SSP the SSA sends Medi-Cal a computer record that says whether the person is eligible for SSI/SSP. This record does not distinguish between people who are eligible for SSI/SSP and those people who are only eligible for SSP. Thus the response a provider receives from Medi-Cal includes both people on SSI as well as those people whose income is too high for SSI but still receive SSP.

In order to enable me to ascertain what percentage of SSI/SSP records were SSP only, on December 23, 2016 Aron Smith a manager in the Cash Assistance, Special Projects and Coordinated Care Initiative Unit of the California Department of Social Services provided me with enrollment totals for California for the period of July 2005 through June 2009 for people enrolled in SSI (which would include SSP) and those enrolled only in SSP with no SSI enrollment. This information is shown in Exhibit A to this report and Exhibit P-37.

This information shows that for this period there are 68,636,595 enrollment months (people enrolled in a specific month) or which 58,936,800 are in SSI and 9,699,795 are only in SSP. This means the average enrollment of people with a SSI/SSP designation by SSA in California and only have SSP averages approximately 14 percent. In reviewing this data on a monthly basis, it consistently averages about 14 percent enrolled only in SSP. Consistently, 86 percent of the people with an SSI/SSP designation had SSI.

Therefore one can assume in reviewing a provider's data one would expect that about 14 percent of the individuals the provider is told by Medi-Cal to have SSI/SSP status would have only SSP enrollment and the remaining 86 percent would be enrolled in SSI.

**Pomona Valley Hospital Medical Center Analysis**

I have reviewed the analysis done by Candice Le-Tran, Director of Reimbursement & Capitated Systems, Pomona Valley Hospital Medical Center, and have found her analysis to be correct. In her analysis she identified patients on Medi-Cal who had SSI/SSP as designated by either having Aid Code 10, 20 or 60 and then their associated claims. She has properly identified the Aid Codes that are SSI/SSP. These Aid Codes have then been matched with Center for Medicare and Medicaid (CMS) data which provides a very large number of people who are unmatched.

I have found the following data for these 3 Aid Codes:

| Year | Matched | Unmatched | Percent Unmatched |
|------|---------|-----------|-------------------|
| FY 2006 | 716 | 381 | 35% |
| FY 2007 | 737 | 440 | 37% |
| FY 2008 | 695 | 436 | 39% |

6

Based on this analysis that between 35 and 39 percent of the patients with Aid Codes showing them as having SSI/SSP were not found to have SSI status when matched with CMS data. This conclusion is inconsistent with the data that the State receives from SSA, which shows during this time period 86 percent of the people with SSI/SSP have SSI and only 14 percent are enrolled in only SSP.

On January 21, 2016 I sent a letter to Marc Hartstein, Hospital and Ambulatory Policy Group, Centers for Medicare and Medicaid Services regarding CMS's published SSI percentages respectively for Pomona's 2006, 2007 and 2008 cost reporting years. This letter is Exhibit Number P-35. The purpose of this letter was in part to "...to determine whether, in fact, CMS's published SSI percentages respectively for Pomona's 2006, 2007 and 2008 cost reporting years omitted a significant number of days that Pomona believes, based on State Medi-Cal records, constitute days associated with patients who were, at the time of their services, receiving SSI benefits".

My letter included ten specific patients from each of the 2006, 2007, and 2008 fiscal years where staff from the Medi-Cal Eligibility Division, "Program Integrity Unit" of the State DHCS verified that these enrollees had an eligibility status of SSI/SSP. This verification by the State further demonstrates that Pomona has correctly determined SSI/SSP status based on the information provided to it through verification of eligibility. The Program Integrity Unit performs state and federally required quality reviews of Medi-Cal eligibility determinations and are experts in ensuring accuracy in the Medi-Cal eligibility process.

Further this letter indicated that Pomona was submitting three sets (totaling 40 records) of the Medi-Cal on-line Eligibility Response printouts from Medi-Cal Point of Service (POS) Network from its 2006, 2007, and 2008 cost reporting years, to demonstrate that a significant additional percentage of patients from these years were SSI/SSP eligible at the time of services (SSI/SSP status with Aid Codes 10, 20 or 60). This information was "...the product of an online verification system that was established by the Medi-Cal program to assist providers in determining eligibility of patients and/or prospective patients for Medi-Cal program benefits." This information was further verification that Pomona had accurately received eligibility information from the State, properly determined these individuals had SSI/SSP status, and that there was an underreporting of information by CMS.

Had my letter been acted on, there would have been further validation of this information by CMS. Regretfully, my letter was not acted on by CMS.

7

0590

**JA 266**

01466

III.    **CONCLUSION**

Based on my analysis and experience the Medi-Cal data is accurate in giving providers SSI/SSP status, Ms. Le-Tran did a proper, complete and accurate analysis of her patient records and how they show SSI/SSP status, and the analysis shows that the percentage of people shown on Medi-Cal as having SSI/SSP status who do not have SSI benefits pursuant to the CMS database (and who therefore were  "SSP" only) is much larger (by between 200% and 300%) than the data the State has on how many people during this time period had SSP only.  Based on the data available to me, there appears to be a problem with the CMS data.  As noted earlier, it has been my desire to have this data discrepancy resolved by having CMS and SSA do a sample of Pomona's cases so that greater clarity could be obtained so as to resolve this issue.  Regretfully the federal government has not been willing to do this analysis, leaving their data in question.

Sincerely,

Stan Rosenstein
Principal Consultant

8

P-37

01490

**Laurence D. Getzoff**

**Subject:** FW: SSI/SSP Data 2005-2009
**Attachments:** SSI-SSP Caseload Info 2005-2009.docx

**From:** Stan Rosenstein [mailto:srosenstein@healthmanagement.com]
**Sent:** Friday, December 23, 2016 3:33 PM
**To:** Laurence D. Getzoff; Danette Polchowski; Candice.LeTran@pvhmc.org
**Subject:** FW: SSI/SSP Data 2005-2009

**From:** Smith, Aron@DSS [mailto:Aron.Smith@dss.ca.gov]
**Sent:** Friday, December 23, 2016 1:39 PM
**To:** Stan Rosenstein <srosenstein@healthmanagement.com>
**Cc:** Carroll, Eileen@DSS <Eileen.Carroll@dss.ca.gov>; Thomson, Debbi@dss.ca.gov <Debbi.Thomson@dss.ca.gov>; Cervinka, Pete@DSS <Pete.Cervinka@DSS.ca.gov>; Rutledge, Kim@DSS <Kim.Rutledge@dss.ca.gov>; Bandaccari, Lisa@DSS <Lisa.Bandaccari@dss.ca.gov>
**Subject:** SSI/SSP Data 2005-2009

Good afternoon,

Thank you for your inquiry.  Attached please find monthly statewide breakouts of SSI/SSP and SSP-only caseloads for fiscal years 2005 through 2009 in response to Questions #1 and 2.  Unfortunately, we are unable to provide this data for specific counties.

We hope you find this information helpful.

Aron Smith
Staff Services Manager I
Cash Assistance, Special Projects and Coordinated Care Initiative Unit
Program Integrity, Cash Assistance and Coordinated Care Initiative Bureau
Policy & Quality Assurance Branch
Adult Programs Division
California Department of Social Services
(916) 651-1174


Save Our Water

CONFIDENTIALITY NOTICE: This Communication, with its contents, may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws, including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Stan Rosenstein <srosenstein@healthmanagement.com>
**Date:** December 21, 2016 at 12:43:41 PM PST
**To:** "Cervinka, Pete@DSS (Pete.Cervinka@DSS.ca.gov)" <Pete.Cervinka@DSS.ca.gov>, "Carroll, Eileen@DSS

1

0612

01491

(Eileen.Carroll@dss.ca.gov)" <Eileen.Carroll@dss.ca.gov>
**Subject: SSP Only Caseload**

Hello, I hope you both are doing well.

I am doing work for a client and they are trying to get information on the caseload counts in CA for people who are enrolled in SSI/SSP and of that group, how many get SSP only. The SSP only group are those people who have income too high to qualify for SSI but low enough to get a SSP only cash grant. SSA sends enrollment information on SSI/SSP to DHCS and DHCS is not able to breakdown how many people in the files they get are SSP only. We know there is a subset of SSI/SSP enrollees who only get SSP, but we have been unable to get a count or percent of how many people there are.

I am hoping that CDSS knows this breakdown. I am not able to find this breakdown on your Web Site.

My client is specially interested in the fiscal years 2005 through 2009 but would take other years if that information is not available.

I was hoping you could direct me to the right place or person to get this information.

They are specifically looking for (but would take what you have if it gives a comparison of caseload in SSP/SSP to SSP only):

1. For each of the fiscal years 2005 through 2009, a statewide count of the number of people receiving SSI benefits.
2. For each of the fiscal years 2005 through 2009, a statewide count of the number of people receiving only SSP benefits (no SSI).
3. For each of the fiscal years 2005 through 2009, the same two data sets for Los Angeles County, Riverside County and San Bernardino County.

I appreciate any assistance you can provide in getting me to the right person or place to get this information.

Take care and thank you.

Stan Rosenstein
Phone: 916.792-3740

srosenstein@healthmanagement.com

---

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

0613

01492

Hello,

Please find the attached SSI/SSP information for FY 2005-2009.

| Month - Year | Total SSI Caseload | Caseload – SSP Only (No SSI) |
|---|---|---|
| | | |
| July 2005 | 1,196,567 | 196,567 |
| August 2005 | 1,201,958 | 197,436 |
| September 2005 | 1,203,998 | 197,896 |
| October 2005 | 1,203,912 | 199,399 |
| November 2005 | 1,209,061 | 200,163 |
| December 2005 | 1,203,954 | 200,535 |
| January 2006 | 1,180,468 | 187,387 |
| February 2006 | 1,182,214 | 187,571 |
| March 2006 | 1,196,088 | 190,377 |
| April 2006 | 1,207,087 | 198,651 |
| May 2006 | 1,209,340 | 199,120 |
| June 2006 | 1,209,410 | 199,936 |
| | | |
| July 2006 | 1,163,141 | 190,204 |
| August 2006 | 1,173,146 | 192,004 |
| September 2006 | 1,175,737 | 193,470 |
| October 2006 | 1,222,746 | 203,814 |
| November 2006 | 1,223,216 | 204,693 |
| December 2006 | 1,221,100 | 205,347 |
| January 2007 | 1,224,647 | 202,549 |
| February 2007 | 1,225,847 | 202,881 |
| March 2007 | 1,226,262 | 203,062 |
| April 2007 | 1,230,427 | 203,978 |
| May 2007 | 1,230,532 | 204,176 |
| June 2007 | 1,232,539 | 204,942 |
| | | |
| July 2007 | 1,214,181 | 204,939 |
| August 2007 | 1,216,117 | 205,349 |
| September 2007 | 1,220,536 | 206,286 |
| October 2007 | 1,244,689 | 207,203 |
| November 2007 | 1,244,211 | 207,894 |
| December 2007 | 1,225,029 | 203,512 |
| January 2008 | 1,226,334 | 202,092 |
| February 2008 | 1,244,310 | 206,091 |
| March 2008 | 1,245,627 | 206,777 |
| April 2008 | 1,248,737 | 206,969 |
| May 2008 | 1,247,780 | 206,956 |
| June 2008 | 1,253,629 | 208,221 |
| | | |
| July 2008 | 1,254,039 | 208,359 |
| August 2008 | 1,257,422 | 209,052 |
| September 2008 | 1,262,530 | 210,177 |
| October 2008 | 1,262,985 | 210,174 |
| November 2008 | 1,267,145 | 212,100 |

0614

JA 271

01493

| December 2008 | 1,266,221 | 211,238 |
| January 2009 | 1,263,666 | 205,594 |
| February 2009 | 1,268,020 | 205,956 |
| March 2009 | 1,268,371 | 205,983 |
| April 2009 | 1,270,831 | 206,306 |
| May 2009 | 1,253,793 | 188,190 |
| June 2009 | 1,257,200 | 188,219 |

**BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD**

| | |
|---|---|
| **Pomona Valley Hospital Medical Center** | ) |
| | ) |
| **Provider No. 05-0231** | ) |
| | ) **PRRB CASE NO. 13-0430** |
| **(PROVIDER)** | ) |
| | ) |
| vs. | ) **FYE  December 31, 2006** |
| | ) |
| Medicare Administrative Contractor: | ) |
| **NORIDIAN HEALTHCARE SOLUTIONS, LLC** | ) |
| **(MAC JE)** | ) |
| | ) |
| and | ) |
| | ) |
| Appeals Support Contractor: | ) |
| **FEDERAL SPECIALIZED SERVICES, LLC** | ) |

RECEIVED

AUG 0 7 2017

PROVIDER REIMBURSEMENT
REVIEW BOARD

**MAC'S FINAL POSITION PAPER**

Submitted By:
Peggy Sharpe
Noridian Healthcare Solutions, LLC
Noridian JE Part A
P.O. Box 6782
Fargo, ND 58108-6782

515-697-4045

        and

Anthony Whelan
Federal Specialized Services, LLC
1701 S. Racine Avenue
Chicago, IL 60608-4058

630-746-0508

01602

The Provider states in its position paper that it is requesting CMS and the SSA furnish

more information to demonstrate that it has identified the correct number of days in its

calculation.  The MAC contends that CMS has provided the detail that supports the

number of SSI days utilized in its calculation of the SSI percentage included on the

Provider's final cost report.


**3.  The Calculation Methodology Utilized by CMS**

As explained above, CMS revised its process for matching Medicare and SSI eligibility

data.  The Secretary published the revised process in the August 16, 2010 Federal Register.

See 75 FR 50,275-50,286 (Aug. 16, 2010) (Exhibit I-9). In the Federal Register, CMS

responded to comments regarding the revised process.


CMS addresses SSI entitlement as follows:

> The authorizing DSH statute at section 1886(d)(5)(F)(vi)(I) of the Act limits the
> numerator to individuals entitled to Medicare benefits who are also "*entitled* to
> supplemental security income benefits (excluding any State supplementation)"
> (emphasis added). Consistent with this requirement, we have requested, and are
> using in the data matching process, those SSA codes that reflect "entitlement to"
> receive SSI benefits. Section 1602 of the Act provides that "[e]very aged, blind, or
> disabled individual who is determined under Part A to be eligible on the basis of his
> income and resources shall, in accordance with and subject to the provisions of this
> title, be *paid* benefits by the Commissioner of the Social Security" (emphasis added).
> However, eligibility for SSI benefits does not automatically mean that an individual
> will receive SSI benefits for a particular month. For example, section 1611(c)(7) of
> the Act provides that an application for SSI benefits becomes effective on the later of
> either the month following the filing of an application for SSI benefits or the month
> following eligibility for SSI benefits.
>
> (75 FR page 50280)

**JA 274**

01613

CMS goes on to explain that "SSI entitlement can change from time to time, and we believe that including SSI codes of C01, M01, and M02 accurately captures all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits." (Id, at 50281)

CMS also comments on the timing of the data match.

> As we stated in the FY 2006 IPPS final rule, we believe that administrative finality with respect to the calculation of a hospital's SSI fraction is important (70 FR 47440). We continue to believe that it is important to find an appropriate balance between administrative finality (that is, the final settlement of a hospital's cost report) and the inclusion of retroactive SSI eligibility determinations and the lifting of SSI payment suspensions by using the best and latest available SSI eligibility data at the time of cost report settlement. Further, we believe it is important to account for the time period in which hospitals are allowed to submit timely Medicare claims in order to ensure that the point in time that we perform the match process includes as many timely submitted inpatient hospital claims as are administratively practicable.
>
> .....
>
> Therefore, we believe that using the version of MedPAR that is updated 15 months after the end of the fiscal year would contain more accurate and complete inpatient claims information, as we would be using claims data from 3 months after the filing deadline for claims with a date of service occurring on the last day of the second preceding fiscal year. Furthermore, a later update of the SSI eligibility file would contain more accurate eligibility information and would account for all retroactive changes in SSI eligibility and the lifting of SSI payment suspensions through that date.
>
> .....
>
> We believe that, by calculating SSI fractions on the basis of SSI eligibility data and MedPAR claims data that are updated 15 months after the end of the Federal fiscal year, we would be using the best data available to us, given the deadlines for the submission and final settlement of Medicare cost reports.
>
> (Id, at 50282)

CMS stated that the timing of the data match described above achieves "an appropriate balance between accounting for additional retroactive SSI eligibility determinations and the lifting of SSI payment suspensions using all timely submitted Part A inpatient claims, and

11

**JA 275**

01614

facilitating administrative finality through the timely final settlement of Medicare cost reports." (Id, at 50283)

The Provider's SSI ratio, as adjusted by the MAC, was properly determined based on the revised process as published in the August 16, 2010 Federal Register.  CMS has properly calculated the Provider's SSI ratio in accordance with 42 C.F.R § 412.106(b).

## C.  Conclusion

It is the MAC's position that the methodology proposed by the Provider in its Final Position Paper is not appropriate for use in calculating the SSI Percentage. The Provider's method uses data from a secondary source, instead of the primary databases maintained by the SSA and CMS.  In addition, the matching process described in the August 16, 2010 Federal Register is much more detailed, accurate and specific than the method proposed by the Provider.

The Provider has failed to demonstrate that the SSI ratio is not accurate. The SSI ratio has been properly determined based on CMS' process for matching Medicare and SSI eligibility data as published in the August 16, 2010 Federal Register. The MAC respectfully requests the Board affirm its adjustment to the SSI Percentage as calculated by CMS.

12

01615

P7

P-7

01908

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0734

## DSH DATA USE AGREEMENT FOR COST REPORTING PERIODS
## THAT INCLUDE DECEMBER 8, 2004 AND THEREAFTER

DUA #  *05-0231*

### AGREEMENT FOR USE OF CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS)
### DATA CONTAINING INDIVIDUAL-SPECIFIC INFORMATION

In order to secure data that resides in a CMS Privacy Act System of Records, and in order to ensure the integrity, security, and confidentiality of information maintained by the CMS, and to permit appropriate disclosure and use of such data as permitted by law, CMS and *Pomona Valley Hospital Medical Center, 05-0231* enter into this agreement to comply with the following specific paragraphs.
*(Provider Name and Number)*

1. This Agreement is by and between the Centers for Medicare & Medicaid Services (CMS), a component of the U.S. Department of Health and Human Services (DHHS), and *Pomona Valley Hospital Medical Center, 05-0231*, hereinafter termed "User."
*(Provider Name and Number)*

2. This Agreement addresses the conditions under which CMS will disclose and User will obtain and use the CMS data file(s) specified in paragraph 5. This Agreement supersedes any and all agreements between the parties with respect to the use of data from the files specified in paragraph 5 and preempts and overrides any instructions, directions, agreements, or other understanding in or pertaining to any grant award or other prior communication from the Department of Health and Human Services or any of its components with respect to the data specified herein. Further, the terms of this Agreement can be changed only by a written modification to this Agreement or by the parties adopting a new agreement. The parties agree further that instructions or interpretations issued to User concerning this Agreement or the data specified herein, shall not be valid unless issued in writing by the CMS point-of-contact specified in paragraph 16 or the CMS signatory to this Agreement shown in paragraph 17.

3. The parties mutually agree that CMS retains all ownership rights to the data file(s) referred to in this Agreement, and that User does not obtain any right, title, or interest in any of the data furnished by CMS.

4. User represents, and in furnishing the data file(s) specified in paragraph 5. CMS relies upon such representation, that such data file(s) will be used solely for the purpose of calculating User's Medicare fraction of the disproportionate patient percentage. User represents further that User shall not disclose, release, reveal, show, sell, rent, lease, loan, or otherwise grant access to the data covered by this Agreement to any person. Exception: User may disclose, release, reveal or show individually identifiable data to the following entities (including individuals employed by or under contract with such entities) and individuals, to the extent necessary to calculate User's Medicare fraction of the disproportionate patient percentage: (1) CMS; (2) a fiscal intermediary under contract with CMS; (3) The PRRB; (4) a consultant or attorney or other representative under contract with User to prosecute, or assist in the prosecution of, an administrative and/or judicial appeal of CMS's calculation of its disproportionate patient percentage; (5) the Department of Justice (6) a Federal court. Any such grant of access by User to individually identifiable data under the foregoing Exception shall be strictly limited to the extent necessary for User to calculate its Medicare fraction of the disproportionate patient percentage – User is expected to redact individually identifiable data and/or use code identifiers wherever possible. User further agrees that, within the User organization, access to the data covered by this Agreement shall be limited to the minimum number of individuals necessary to achieve the purpose stated in this section paragraph and to those individuals on a need-to-know basis only.

Form CMS-R-0235D2 (12/09)

2

01909

5. The following CMS data file(s) is/are covered under this Agreement:
   MEDPAR File Extract

| Provider Number | Provider Cost Reporting Period |
|---|---|
| 05- 0231 | 1/1/2006 ∿ 12/31/2006 |
| 05- 0231 | 1/1/2007 ∿ 12/31/2007 |
| 05- 0231 | 1/1/2008 ∿ 12/31/2008 |
| 05- 0231 | 1/1/2009 ∿ 12/31/2009 |
| | |
| | |
| | |

The above file(s) are being disclosed to User under routine use 3 of the 'Medicare Provider Analysis and Review (MEDPAR), HHS/CMS/OIS, 09-70-0514' Privacy Act system of records, published at 71 Fed. Reg. 17470 (April 06, 2006).

6. The parties mutually agree that the aforesaid file(s) (and/or any derivative file(s) (which includes any file that maintains or continues identification of individuals)) may be retained by User no more than 90 days after the date of termination of User's appeal of CMS's calculation of its disproportionate patient percentage. For purposes of this paragraph, "date of termination of User's appeal" shall be the date upon which any of the following events occur: (1) the User abandons its appeal; (2) an order rendered by the PRRB, the CMS Administrator or court upholding CMS's calculation of User's disproportionate patient percentage has become final and non-appealable; (3) an order rendered by the PRRB, the CMS Administrator or court awarding additional payment to User with respect to the disproportionate patient percentage (including an order approving a settlement) has become final and non-appealable and such payment has been made to User; (4) an administrative resolution satisfactory to User and to the fiscal intermediary is reached on the appeal, and any additional payment provided for by such resolution, with respect to the disproportionate patient percentage, has been made to User. User agrees to destroy the files(and/or any derivative file(s) (which includes any file that maintains or continues identification of individuals)) after the date of termination of User's appeal. User agrees that no data from CMS records, or any parts thereof, shall be retained when the aforementioned file(s) are destroyed unless authorization in writing for the retention of such file(s) has been received from the appropriate Systems Manager or the person designated in paragraph 17 of this Agreement. User acknowledges that strict adherence to the aforementioned retention date is required.

The Agreement may be terminated by either party at any time for any reason upon 30 days written notice. Upon such notice, CMS will cease releasing data to User under this Agreement and will notify User to destroy all previously released data files. Sections 3, 4, 6, 9, 10, 12, 13 and 14 shall survive termination of this Agreement.

01910

7. User agrees to establish appropriate administrative, technical, and physical safeguards to protect the confidentiality of the data and to prevent unauthorized use or access to it. The safeguards shall provide a level and scope of security that is not less than the level and scope of security established by the Office of Management and Budget (OMB) in OMB Circular No. A-130, Appendix III—Security of Federal Automated Information Systems (http://www.whitehouse.gov/omb/circulars/a130/a130.html), which sets forth guidelines for security plans for automated information systems in Federal agencies. User acknowledges that the use of unsecured telecommunications, including the Internet, to transmit individually identifiable or deducible information derived from the file(s) specified in paragraph 5 is prohibited. Further, User agrees that the data must not be physically moved or transmitted in any way from the site(s) indicated in paragraph 16, except as provided in paragraph 4, without written approval from CMS.

8. User agrees that the authorized representatives of CMS or DHHS Office of the Inspector General will be granted access to premises where the aforesaid file(s) are kept for the purpose of inspecting security arrangements confirming whether the User is in compliance with the security requirements specified in paragraph 7.

9. The User agrees not to disclose direct findings, listings, or information derived from the file(s) specified in section 5, with or without direct identifiers, if such findings, listings, or information can, by themselves or in combination with other data, be used to deduce an individual's identity. Examples of such data elements include, but are not limited to geographic location, age if > 89, sex, diagnosis and procedure, admission/discharge date(s), or date of death.

The User agrees that any use of CMS data in the creation of any document (manuscript, table, chart, study, report, etc.) concerning the purpose specified in section 4 (regardless of whether the report or other writing expressly refers to such purpose, to CMS, or to the files specified in section 5 or any data derived from such files) must adhere to CMS' current cell size suppression policy. This policy stipulates that no cell (eg. admittances, discharges, patients) less than 11 may be displayed. Also, no use of percentages or other mathematical formulas may be used if they result in the display of a cell less than 11. By signing this Agreement you hereby agree to abide by these rules and, therefore, will not be required to submit any written documents for CMS review. If you are unsure if you meet the above criteria, you may submit your written products for CMS review. CMS agrees to make a determination about approval and to notify the user within 4 to 6 weeks after receipt of findings. CMS may withhold approval for publication only if it determines that the format in which data are presented may result in identification of individual beneficiaries.

10. User understands and agrees that it may not reuse original or derivative data file(s) without prior written approval from the appropriate System Manager or the person designated in paragraph 17 of this Agreement.

11. The parties mutually agree that the following specified Attachments are part of this Agreement:

☒ NO ATTACHMENTS

_____

_____

_____

12. User agrees that in the event CMS determines or has a reasonable belief that User has made or may have made disclosure of the aforesaid file(s) that is not authorized by this Agreement or other written authorization from the appropriate System Manager or the person designated in paragraph 17 of this Agreement, CMS in its sole discretion may require User to: (a) promptly investigate and report to CMS User's determinations regarding any alleged or actual unauthorized disclosure, (b) promptly resolve any problems identified by the investigation; (c) if requested by CMS, submit a formal response to an allegation of unauthorized disclosure; (d) if requested by CMS, submit a corrective action plan with steps designed to prevent any future unauthorized disclosures; and (e) if requested by CMS, return data files to CMS. User understands that as a result of CMS's determination or reasonable belief that unauthorized disclosures have taken place, CMS may refuse to release further CMS data to User for a period of time to be determined by CMS.

01911

13. User hereby acknowledges that criminal penalties under § 1106(a) of the Social Security Act (42 U.S.C. § 1306(a)), including a fine not exceeding $5,000 or imprisonment not exceeding 5 years, or both, may apply to disclosures of information that are covered by § 1106 and that are not authorized by regulation or by Federal law. User further acknowledges that criminal penalties under the Privacy Act (5 U.S.C. § 552a(i) (3)) may apply if it is determined that the Requestor, User or Custodian, or any individual employed or affiliated therewith, knowingly and willfully obtained the file(s) under false pretenses. Any person found guilty under the Privacy Act shall be guilty of a misdemeanor and fined not more than $5,000. Finally, User acknowledges that criminal penalties may be imposed under 18 U.S.C. § 641 if it is determined that the User, or any individual employed or affiliated therewith, has taken or converted to his own use data file(s), or received the file(s) knowing that they were stolen or converted. Persons convicted under § 641 shall be fined under Title 18 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $1,000, they shall be fined under Title 18 or imprisoned not more than one year, or both.

14. By signing this Agreement, User agrees to abide by all provisions set out in this Agreement for protection of the data file(s) specified in paragraph 5, and acknowledges having received notice of potential criminal or administrative penalties for violation of the terms of the Agreement.

15. On behalf of User the undersigned individual hereby attests that he or she is authorized to enter into this Agreement and agrees to all the terms specified herein.

Name and Title of User *(Representative for Provider)* (typed or printed)

_VALLEN H. Kuo , Senior Financial & Reimbursement Analyst_

Provider Name

_Pomona Valley Hospital Medical Center_

Street Address

_1798 N. Garey Ave_

| City | State | ZIP Code |
|------|-------|----------|
| _Pomona_ | _CA_ | _91767_ |

| Office Telephone *(Include Area Code)* | E-Mail Address *(If applicable)* |
|------|------|
| _(909) 865-9880_ | _VALLEN.Kuo@PVHMC.ORG_ |

| Signature | Date |
|------|------|
| _Vallen H. Kuo_ | _2/17/2013_ |

**JA 281**

01912

16. The parties mutually agree that the following named individual(s) and/or entities is or are designated as Custodian(s) of the file(s) on behalf of User and each person or entity so designated will be responsible for the observance of all conditions of use and for establishment and maintenance of security arrangements as specified in this Agreement to prevent unauthorized use. User is responsible for any non-observance of the conditions of use, and/or failure to establish or maintain security arrangements, on the part of any Custodian. User agrees to notify CMS within fifteen (15) days of any change of custodianship. The parties mutually agree that CMS may disapprove the appointment of a custodian or may require the appointment of a new custodian at any time.

Each Custodian agrees and in his or her capacity as an employee or contractor (including consultant, attorney or other representative) of the User to comply with all of the provisions of this Agreement on behalf of User.

| Name of Custodian *(typed or printed)* |||
|---|---|---|
| *Vallen H. Kuo , Senior Financial & Reimbursement Analyst* |||
| **Company/Organization** |||
| *Pomona Valley Hospital Medical Center* |||
| **Street Address** |||
| *1798 N. Grarey Ave.* |||
| **City** *Pomona* | **State** *CA* | **ZIP Code** *91767* |
| **Office Telephone** *(include Area Code)* *(909) 865-9880* || **E-Mail Address** *(if applicable)* *VALLEN.KUO @ PVHMC.ORG* |
| **Signature** *(signature)* || **Date** *7/17/2013* |

17. The parties mutually agree that the following named individual will be designated as point-of-contact for the Agreement on behalf of CMS.

On behalf of CMS the undersigned individual hereby attests that he or she is authorized to enter into this Agreement and agrees to all the terms specified herein.

| Name of CMS Representative |||
|---|---|---|
| JoAnn Cerne |||
| **Title/Component** |||
| Health Insurance Specialist, CMM, Division of Acute Care |||
| **Street Address** 7500 Security Boulevard || **Mail Stop** C4-08-06 |
| **City** Baltimore | **State** MD | **ZIP Code** 21244-1850 |
| **Office Telephone** *(Include Area Code)* 410-786-4530 || **E-Mail Address** *(if applicable)* Joann.Cerne@cms.hhs.gov |
| **Signature** || **Date** |

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0734. The time required to complete this information collection is estimated to average 30 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, N2-14-26, Baltimore, Maryland 21244-1850 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

Form CMS-R-0235D2 (12/09)                                                                                    6

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| POMONA VALLEY HOSPITAL MEDICAL CENTER, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 18-2763 (ABJ) |
| ALEX M. AZAR II, *Secretary, United States Department of Health and Human Services*, | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Pursuant to Federal Rule of Civil Procedure 56 and 58 and for the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that plaintiff's motion for summary judgment [Dkt. # 11] is GRANTED in part and DENIED in part, and defendant's cross-motion for summary judgement [Dkt. # 13] is DENIED.

This matter is REMANDED to the Secretary for further proceedings consistent with the Memorandum Opinion issued on this date.

This is a final appealable order.

_____

AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2020

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| POMONA VALLEY HOSPITAL MEDICAL CENTER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 18-2763 (ABJ) |
| ALEX M. AZAR II, *Secretary, United States Department of Health and Human Services*, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

In this lawsuit against the Secretary of the U.S. Department of Health and Human Services, plaintiff Pomona Valley Hospital Medical Center challenges certain payments it received for Fiscal Years 2006 through 2008 under the Medicare statute. Specifically, it asserts that the Secretary improperly calculated payments owed to it under the disproportionate share hospital ("DSH") adjustment, which provides an additional payment to hospitals that serve a disproportionately large number of low-income patients. Plaintiff filed an administrative appeal of the calculation to the Provider Reimbursement Review Board, which upheld the calculation. The Secretary adopted the Board's decision, and plaintiff has filed this lawsuit, arguing that since the calculation was not based on the best available data, the decision to uphold the calculation did not comport with the applicable statute and regulations. Because the Board's decision is not supported by substantial evidence, the Court will grant plaintiff's motion for summary judgment in part and remand the matter to the agency for further proceedings consistent with this decision.

## BACKGROUND

I.    **Legal Framework**

    A.    **The Medicare Statue**

    The Medicare Act, 42 U.S.C. § 1395 *et seq.*, provides health insurance to elderly and disabled individuals.  The Secretary of the Department of Health and Human Services administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS"), a component of the department, and CMS contracts with Medicare Administrative Contractors ("MACs"),[1] typically private insurance companies, to determine amounts to be paid to Medicare providers, including hospitals such as plaintiff.  42 U.S.C. § 1395kk; *id.* § 1395h(a); 42 C.F.R. § 413.24(f).

    Medicare is divided into five parts, Parts A through E.  *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011), citing 42 U.S.C. §§ 1395c–1395i–5.  Among other things, Medicare Part A provides payments to hospitals for inpatient services provided to Medicare beneficiaries. 42 U.S.C. § 1395c *et seq.*  Hospitals are reimbursed for these services based on their operating costs using standardized rates subject to certain adjustments, such as the DSH adjustment at issue here. 42 U.S.C. § 1395ww(d); *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 22 (D.D.C. 2008).

    B.    **The DSH Adjustment**

    The DSH adjustment provides additional payments to hospitals that serve a disproportionately large number of low-income patients.  42 U.S.C. § 1395ww(d)(5)(F); *Adena Reg'l Med. Ctr. v. Leavitt,* 527 F.3d 176, 177–78 (D.C. Cir. 2008) (explaining that Congress

---

1    MACs were formerly referred to as "fiscal intermediaries."  42 U.S.C. § 1395h(a), 42 C.F.R. § 413.24(f).

determined any hospital that serves a disproportionately large percentage of low-income patients should be reimbursed at a higher rate "because the more low-income patients a hospital treats, the more it costs on average to care for Medicare patients").   The Medicare statute provides that a hospital's DSH adjustment is established using the "disproportionate patient percentage" ("DPP"), 42 U.S.C. § 1395ww(d)(5)(F)(v) and (vi), which is a "proxy" calculation of how many low-income patients a hospital serves.   *Ne. Hosp. Corp.*, 657 F.3d at 3.   The higher the DPP proxy, the larger the DSH adjustment and the higher the DSH payment a hospital receives.   *See Cath. Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 916 (D.C. Cir. 2013).

### 1.   The Disproportionate Patient Percentage

DPP is the sum of two fractions.   *Cath. Health*, 718 F.3d at 916.   The first fraction seeks to capture those patients served by a hospital who are eligible for Medicare and Supplemental Security Income ("SSI"), which is income provided by the federal Social Security Administration ("SSA") to financially needy individuals who are aged, blind, or disabled.   *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019); *see* 42 U.S.C. § 1381 *et seq.*   This fraction is referred to as the Medicare/SSI fraction or simply the SSI fraction.   *See Cath. Health*, 718 F.3d at 916.   The second fraction seeks to account for patients who are not eligible for Medicare, but who receive Medicaid, which is a state-administered program for low-income individuals and families.   *See id.*   The two fractions provide separate indicators of low income that, when added together, serve as "an indirect, proxy measure for low income."   *Id.*

This lawsuit concerns the SSI fraction, specifically, the numerator of this fraction.

## 2.  The SSI Fraction and Its Numerator

The Medicare statute defines the SSI fraction as follows:

> [T]he numerator . . . is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator . . . is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  This means that the numerator seeks to count the hospital's number of patient days – meaning, overnight stays – of patients who were entitled to benefits under both Medicare Part A and SSI at the time they were receiving inpatient services at the hospital, and the denominator is the total number of the hospital's overnight stays for all patients, who for such days, were entitled to Medicare Part A benefits.  *Id.*  The fraction "effectively asks, out of all patient days *from Medicare beneficiaries*, what percentage of those days came from Medicare beneficiaries who *also* received SSI benefits?"  *Cath. Health*, 718 F.3d at 917 (emphasis in original).

The Secretary, through his delegate the Centers for Medicare and Medicaid Services, is responsible for computing each hospital's SSI fraction.  *See* 51 Fed. Reg. 31,454, 31,459 (Sept. 3, 1986) (making CMS responsible for this task because hospitals would have difficulty identifying their Medicare patients who are also SSI recipients).

Pursuant to a regulation issued in 2010, CMS computes the SSI fraction by matching data from the Social Security Administration with Medicare inpatient data in CMS's own files by looking for one of three codes appearing in SSA's files – C01, M01, and M02 – to identify a patient's entitlement to SSI benefits.  *See* Medicare Program, Final Rule, 75 Fed. Reg. 50,041,

50,281 (Aug. 16, 2010) (stating that using SSI codes "C01, M01, and M02 accurately captures all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits").[2]  CMS matches individuals appearing in the SSA data denoted with these three codes with individuals appearing in its own Medicare Provider Analysis and Review ("MedPAR") file, which contains information for all Medicare beneficiaries using hospital inpatient services.  *See Baystate*, 545 F. Supp. 2d at 23–24; *see also* 75 Fed. Reg. at 50,276; 51 Fed. Reg. 16,772, 16,777.  CMS identifies the individuals appearing in both two data sets to determine the number of patients, and the inpatient days for those patients at each hospital, for the applicable fiscal year to calculate the hospital's SSI numerator.  *See Cath. Health*, 718 F.3d at 916.

The Medicare Administrative Contractor then uses the SSI fraction calculated by CMS to determine what a hospital will receive under the DSH adjustment, which is a component of the total Medicare payment to a given hospital.  *See* 42 C.F.R. § 412.106(b)(2)–(5).

### C.    Providers' Access to SSA Data

The Medicare statue requires the Secretary to "arrange to furnish . . . hospitals . . . the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage . . . for that hospital for the current cost reporting year."

---

2      The 2010 Final Rule was the product of the 2008 ruling in *Baystate Medical Center v. Leavitt*, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008),  in which the court held that CMS's process for matching Medicare and SSA data failed to use "the best available data" to determine the number of patients entitled to SSI benefits.  545 F. Supp. 2d at 58–59 (finding CMS failed to use superior data readily available to it, including updated SSA data available before the end of the settlement period that would have reflected retroactive SSI eligibility determinations, forced pay SSI records, and inactive or "stale" SSI records omitted from the SSI fractions for two fiscal years).  After that ruling, the Secretary issued a new regulation that revised CMS's matching process.  Final Rule, 75 Fed. Reg. at 50,277 (explaining that Final Rule was based on the "revised match process used to implement the Baystate decision [which] addressed all of the concerns found by the court").

Medicare Modernization Act, Pub. L. No. 108-173, § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. § 1395ww Note); *see* 70 Fed. Reg. 47,278, 47,439 (explaining that a hospital will be provided this data "to calculate and verify its Medicare fraction, and to decide whether it prefers to have the fraction determined on the basis of its fiscal year rather than a Federal fiscal year" and that it "will be the same data set CMS uses to calculate the Medicare fractions for the Federal fiscal year").  To accomplish this, CMS gives hospitals data from its MedPAR Limited Data Set[3] "contain[ing] the matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis."  70 Fed. Reg. at 47,440.

But given the confidentiality of information retained by the Social Security Administration, CMS does not give the hospital the complete SSI eligibility file that it receives from SSA.  *See id.* (rejecting proposal that CMS release the data file of SSI eligibility information that the Social Security Administration gives CMS because CMS is prohibited from disclosing SSI eligibility information).

### D.   Administrative Review

A hospital may obtain administrative review of a MAC's payment determination by requesting a hearing before the Provider Reimbursement Review Board ("PRRB" or the "Board").  *See* 42 U.S.C. § 1395oo(a).  A decision of the Board must be

---

3    The MedPAR Limited Data Set or MedPAR LDS "contains a summary of all services furnished to a Medicare beneficiary, from the time of admission through discharge, for a stay in an inpatient hospital or skilled nursing facility, or both; SSI eligibility information; and enrollment data on Medicare beneficiaries."  70 Fed. Reg. at 47,439.

The MedPAR LDS is protected under the Privacy Act, 5 U.S.C. § 552a, and the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996), but these disclosures are permissible under an applicable routine use.  *See id.* at 47,439.

> based upon the record made at such hearing, which shall include the
> evidence considered by the intermediary and such other evidence as may be
> obtained or received by the Board, and shall be supported by substantial
> evidence when the record is viewed as a whole.

42 U.S.C. § 1395oo(d).  A hospital bears the "burden of production of evidence and burden of

proof by establishing, by a preponderance of the evidence, that the provider is entitled to relief on

the merits of the matter at issue."  42 C.F.R. § 405.1871(a)(3).

A Board decision is final "unless the Secretary, on his own motion, and within 60 days

after the provider . . . is notified of the Board's decision, reverses, affirms, or modifies the Board's

decision," after which time a hospital may obtain judicial review of the decision by filing a civil

action with a district court.  *See* 42 U.S.C. § 1395oo(f)(1).

## II.      Factual and Procedural History

### A.      CMS's Calculation of Plaintiff's DSH Adjustment

Plaintiff Pomona Valley Hospital Medical Center is a nonprofit general acute-care hospital

in Pomona, California that furnished hospital services to patients, including Medicare

beneficiaries, during the fiscal years 2006 through 2008, the years at issue in this case.  Compl.

[Dkt. # 1] ¶ 6.

CMS calculated plaintiff's SSI fractions for those fiscal years as follows:

|  |  |
|---|---|
| FY 2006 | 14.74% |
| FY 2007 | 14.73% |
| FY 2008 | 14.40% |

*See* Pl.'s Post-Hearing Brief, Exs. P-40, P-41, and P-42, AR 00119, 00121, 00123; *see also*

AR 00135, 00152, 00170.[4]

---

[4]      Citations to the Administrative Record will use "AR" and the Bates numbers appearing at
the bottom right of each page of the record.

**B.      Plaintiff's Efforts to Verify the Calculation**

Plaintiff sought to verify CMS's calculation of the SSI fraction that was used in determining its total DSH adjustment because it thought that the fraction was lower than it should be.  *See* PRRB Hr'g Tr., AR 00339–476 ("Tr.") at 143–44, AR 00374; *see also id.* at 145–46, AR 00375 (explaining that over the years the hospital sought to validate the fraction because the fraction fluctuated while its patient population remained consistent).  Plaintiff requested and obtained CMS's MedPAR data for federal FYs 2006 and 2007 – the data CMS used to calculate the FY 2006 SSI fraction.  *See* Pl.'s Final Position Paper, AR 01830; *see also* 70 Fed. Reg. at 47,440 (CMS gives hospitals data "contain[ing] the matched patient-specific Medicare Part A inpatient days/SSI eligibility data").

Plaintiff also sought the underlying SSA data from CMS, so it could review both the matched and unmatched data against its own patient files.  *See* PRRB Decision No. 2018-D50 (Oct. 1, 2018), AR 0006–15 ("Board Decision") at 6, AR 00011 (plaintiff "made numerous efforts to obtain the source SSA data"); *see* Compl. ¶ 34.  CMS declined the request.  Answer [Dkt. # 7] ¶ 19 (admitting that "CMS generally does not share the underlying SSA data that it uses in the revised matching process and refused Plaintiff's request related to such data in connection with the Medicare/SSI fractions at issue").

Plaintiff then sought to have either CMS or the Social Security Administration review a sample of thirty to fifty "unmatched" patients and days and compare that sample against SSA's data to ascertain whether they had been correctly excluded.  *See* Letter from Candice Le-Tran to Tzvi Hefter (Jan. 21, 2016), AR 01058–59 (seeking assistance to communicate with CMS and SSA about carrying out the review); *see also* Tr. at 97–113, AR 00363–67 (testifying about plaintiff's efforts to obtain the review of the sample records).  It offered to abide by the results of

the review if it confirmed the accuracy of the CMS calculation. *See* Tr. at 97–113, AR 00363–67 (testifying about plaintiff's willingness to abide by the result of the review); Pl.'s Post-Hr'g Brief at 17, AR 00059 (asserting that "if the review showed an overwhelming result of no matches, Pomona would have dropped the challenge."). Plaintiff also enlisted the help of a Member of Congress to try to persuade the agencies to cooperate with this effort. *See* Letter from U.S. Senator Dianne Feinstein to Christina Walters, SSA (May 20, 2016), Ex. P-25, AR 01360–62; Letter from U.S. Senator Dianne Feinstein to Carolyn W. Colvin, SSA (Oct. 26, 2016), Ex. P-26, AR 01365–66. But this request was declined as well. Tr. at 238–239, AR 00398; Letter from Carol L. Blackford, CMS, to U.S. Senator Dianne Feinstein (June 23, 2017), Ex. P-32, AR 01452–53.

### C.   Plaintiff's Recalculation of the SSI Numerator

Unsuccessful in obtaining either the underlying SSA data or a review of sample data, plaintiff set out to recalculate its SSI fraction numerator using data to which it did have access from the State of California Department of Health Care Services Medi-Cal program.[5] *See* Board Decision at 6, AR 00011. Plaintiff matched individuals appearing in its own patient files and CMS's MedPAR data files with individuals appearing in Medi-Cal's files.

Plaintiff identified individuals in Medi-Cal's files designated with "aide codes" 10, 20, and 60 – codes that indicate that an individual is eligible for federal SSI. *See* Tr. at 309, AR 00416 (explaining that an aide code indicates how an individual became eligible for Medi-Cal, the source of eligibility, the source of the benefits, and how much money the state can claim from the federal

---

[5]   Medi-Cal is California's Medicaid program. *Asante v. Azar*, 436 F. Supp. 3d 215, 220 (D.D.C. 2020), citing Cal. Welf. & Inst. Code § 14000, *et seq.* Medicaid is a cooperative federal-state program authorized by Title XIX of the Social Security Act that finances medical care for people who cannot afford medical services. *Id.*

government).  The record shows that Medi-Cal aide code 10 denotes "aged," aide code 20 denotes "blind," and aide code 60 denotes "disabled," and these codes are used to indicate patients in each category who are eligible for federal SSI or state supplementary payments ("SSP") benefits.[6]  Tr. at 73, AR 00357; *id.* at 311, AR 00416.  Medi-Cal assigns these codes to individuals appearing in its files using information from the Social Security Administration – the source of the data used by CMS.  Tr. at 313–314, AR 00417; *see also* Rosenstein Decl. ¶ 3, AR 00104; Pl.'s Post-Hearing Brief, Exs. P-47 and P-48, AR 00180–84.

Plaintiff's expert witness testified that this method accurately identified SSI and SSP patients from Medi-Cal's files, *see* Tr. at 320–321, AR 00418–19, and a former Director of the CMS Division of Acute Care testified that Medi-Cal received SSI/SSP entitlement data directly from the SSA and that the data was reliable.  Tr. at 216–217, AR 00392–93 (testifying that the data "seems to be a reliable basis for determining whether or not those patients truly were getting SSI or not").[7]

Plaintiff compared the results of its matching using the Medi-Cal data and codes with the results of CMS's match of MedPAR and SSA data and found that the patient days between the two data sets either a) matched, meaning CMS's data and plaintiff's data were in agreement; b) did

---

[6]    "State supplementary payments" refers to the payments that some states, including California, make to supplement the federal payment benefits of the SSI program.  *See* 42 U.S.C. § 1382e; *see also* Soc. Sec. Admin., *Understanding Supplemental Security Income SSI Benefits – 2020 Edition*, https://www.ssa.gov/ssi/text-benefits-ussi.htm (last visited Sept. 30, 2020).

[7]    In comparing its patient records to the Medi-Cal data, plaintiff excluded patient days if it could not locate an aide code to substantiate that a particular patient had been receiving SSI and/or SSP benefits.  *See* Tr. at 68, AR 00355.  And it only counted patient days when an aide code appeared for only a portion of a patient's admission to the hospital.  *See id.* at 65–66, AR 00355; *id.* at 68, AR 00355.

not match, meaning plaintiff found aide code 10, 20, or 60 for all days of a patient's stay, but CMS did not include the patient and days in its data; or c) partially matched, meaning some but not all of a patient's overnight stays were in CMS's data.  *See* Tr. at 76–77, AR 00357–58; *see also* PVHMC Summary of SSI Days by Aid Code, Ex. P-27, AR 01369–406.  The result of plaintiff's analysis using publicly available data was that there were additional Medicare/SSI patients in the hospital, and a greater number of patient days, than CMS had included in its calculation of the SSI fraction.  *See* PVHMC Summary of SSI Days by Aid Code, Ex. P-27, AR 01369–406.

### D.    Plaintiff's Administrative Appeal of the DSH Adjustment Calculation

With that analysis in hand, plaintiff filed a timely appeal of the MAC's calculation of its DSH adjustment for fiscal years 2006, 2007, and 2008 with the Provider Reimbursement Review Board, and the parties each submitted briefs.  MAC's Final Position Paper, AR 01600–16; Pl.'s Final Position Paper, AR 01823–38.

The issue before the Board was "[w]hether the Medicare Administrative Contractor properly calculated Pomona Valley Hospital Medical Center's disproportionate share hospital reimbursement with respect to the Provider's Supplemental Security Income percentage."  Board Decision at 2,  AR 00007.

### 1.  The Board's Hearing

On August 17, 2017, the PRRB held a hearing on the matter.  *See, e.g.*, Tr.  At the hearing, plaintiff presented three witnesses:  Candice Le-Tran, plaintiff's Director of Reimbursement and Analytics; Tzvi Hefter, former Director of CMS's Division of Acute Care; and Stan Rosenstein, former Director of Medi-Cal.  Tr. at 3–4, AR 00339.  The Board accepted Mr. Rosenstein as an expert witness on the Medi-Cal program in general and Medi-Cal eligibility.  Tr. at 294, AR 00412.

The MAC presented no evidence or testimony at the hearing.  *See* Tr. 3–4, AR 00339 (showing that the MAC presented no witnesses and submitted only its final position paper with its exhibits[8] at the hearing).  In its position paper, it argued that plaintiff's recalculation of the SSI numerator was unreliable because it did not document that it excluded patients who received only state supplemental income, MAC's Final Position Paper at 9, AR 01612; and that CMS gave the hospital the SSI data it was required to provide by regulation.  *See* MAC's Final Position Paper at 10, AR 01613.  At the hearing, the MAC argued that plaintiff improperly relied on Medi-Cal data to recalculate the SSI fraction when Medicare regulations require the numerator to be determined using data from the SSA and CMS, Tr. at 40–41, AR 00348–49,[9] and that the interest of administrative finality should bar any effort by plaintiff to recalculate the SSI numerator using later data.  Tr. at 42–43, AR 00349.[10]

---

8       Although the MAC's exhibits do not appear to be included in the Administrative Record, its Final Position Paper states that the exhibits were its calculations of the DSH adjustment and the legal authorities it relied upon in its paper.  *See* MAC Final Position Paper at 14 (listing exhibits I-1 and I-2 as its August 20, 2012 Notice of Program Reimbursement and applicable pages of its Audit Adjustment Report and exhibits I-6–I-10 as 42 C.F.R. § 412.106, 70 Fed. Reg. 47,438-47, 439 (August 12, 2005); *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008), as amended by 587 F. Supp. 2d 37 (D.D.C. 2008); 75 Fed. Reg. 50,275–286 (Aug. 16, 2010), and CMS Ruling 1498-R (April 28, 2010).  Exhibits I–3–I–5 were exhibits showing that issues not pertaining to plaintiff's SSI fraction were transferred to other appeals pending before the Board. *See id.*; *see also id.* 2–3.

9       This is not a serious objection because plaintiff was attempting to replicate or estimate what the numerator should be since it did not *have* the SSA data.  It was not asserting that the MAC should use its calculation was but rather that its calculation revealed potential issues with CMS's matching.

10      Similarly, this objection is of little moment given the purpose of plaintiff's calculation and the fact that plaintiff was not given the data that CMS used, and at bottom, the administrative finality argument is inconsistent with a provider's statutory right to appeal.

After the hearing and in response to questions from the Board, plaintiff submitted a post-hearing brief and fact declarations.  Pl.'s Post-Hearing Brief, AR 00038–00101; Rosenstein Decl., AR 00103–08; Le-Tran Decl., AR 00109–14.  In that brief, following questions from the Board about how plaintiff accounted for patients who received only SSP benefits, plaintiff revised its calculation to correct an error in how the hospital originally estimated SSP-only beneficiaries. Pl.'s Post-Hearing Brief at 32, AR 00074; Le-Tran Decl. ¶ 6, AR 00112–13 (responding to Board members' request for "additional clarity regarding the derivation of the '14%' SSP-only population in California and how that number was derived" and correcting an error that increased the estimate of SSP-only beneficiaries "to just over 16%").[11]

Even as corrected, the calculation revealed a substantial divergence between CMS's calculation and plaintiff's best efforts to derive a number without access to the actual Social Security Administration data.

| Year | CMS Days | Pl.'s Days | % Difference | CMS Patients | Pl. Patients | $ Difference |
|------|----------|-----------|--------------|--------------|--------------|--------------|
| 2006 | 4,886 | 5,841 | 19.55% | 748 | 1,129 | $  770,837 |
| 2007 | 4,153 | 5,553 | 25.00% | 757 | 1,197 | $1,291,520 |
| 2008 | 4,238 | 5,500 | 22.95% | 729 | 1,148 | $1,232,627 |

---

11     Patients in Medi-Cal files assigned aide codes 10, 20 or 60 could be entitled to SSI-only benefits, SSP-only benefits, or both SSI and SSP benefits simultaneously.  Rosenstein Decl. ¶ 5, AR 00105–06; Le-Tran Decl. ¶ 6, AR 00112–113; Tr. at 92–94, AR 00361–62.  The Medicare statute counts only hospital days of patients who are entitled to "supplementary security income benefits (excluding any State supplementation)," *see* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), but Medi-Cal records do not identify a patient as SSP-only, so following questions from the Board about the effect of SSP-only patients in plaintiff's analysis, plaintiff reduced the total of patients and days for each year by approximately16.5%, which it determined was the statewide average of SSI/SSP patients having SSP-only benefits during California's fiscal years 2006 to 2009.  *See* Pl.'s Post-Hearing Brief, Exs. P-51 and P-46, AR 00191–93, 00178–79); *see also* Rosenstein Decl. ¶5, AR 00105–06.

Pl.'s Post-Hearing Brief, Exs. P-40, P-41, and P-42, AR 00118–123; *see also* Pl.'s Ex. P-27 at 501, 518, 535, AR 01370, 01387, 01404; Pl.'s Post-Hearing Brief at 8, AR 00050.

### 2.   The Board's Decision

On October 1, 2018, the Board issued its decision on plaintiff's administrative appeal, affirming the SSI fraction and DSH adjustment.  *See* Board Decision; Letter from Lisa Ogilvie-Barr to Laurence D. Getzoff and Wilson C. Leong (Oct. 1, 2018), AR 00004.   The Board acknowledged "Pomona's difficulty in proving that CMS significantly understated Pomona's SSI fractions for the three fiscal years under appeal" without access to the underlying SSA data or without the ability to test a sample of its data against the SSA data.  Board Decision at 7, AR 00012. But it found a number of flaws in plaintiff's matching and recalculation, specifically, that:

- plaintiff assumed all individuals with a Medi-Cal aide code of 10, 20, or 60 would "map to an SSI code of C01, M01, or M02," when plaintiff itself recognized that the Medi-Cal aide codes included individuals who receive SSP payments but not SSI payments, Board Decision at 7, AR 00012;

- individuals who are eligible for Medi-Cal and go into a nursing home remain Medi-Cal eligible with an aide code of 10, 20, or 60, and so would be counted as SSI-eligible by Pomona, when CMS excludes such individuals when determining SSI-eligible days, *id.*;

- there are differences in timing for when someone becomes eligible for Medi-Cal benefits and when someone becomes eligible for SSI benefits, affecting when an individual would appear with an aide code in the Medi-Cal file and when it would appear as entitled to SSI in the SSA data, Board Decision at 8, AR 00013; and

- plaintiff "did not explain or identify the potential reasons for differences between the data" from its own files, the Medi-Cal system data, the MedPAR SSI patient file, and other data sources plaintiff used, *id.*

The Board concluded that because plaintiff did not provide a "crosswalk" that mapped the Medi-Cal aide codes to the SSI codes; estimate the impact of the two issues identified by the Board; or explain or identify the reasons for differences between the Medi-Cal aide codes and the SSI

codes, plaintiff "did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS . . . were flawed."  Board Decision at 8–9, AR 00013–14.  It found then, that the "[SSI] percentages used by the Medicare Contractor for Pomona Valley Hospital Medical Center's . . .  [DSH] adjustment for its 12/31/2006, 12/31/2007 and 12/31/2008 cost reports were proper."  *Id.* at 2, AR 00007.

On November 21, 2018, the CMS Administrator, as the Secretary's delegate, notified plaintiff that she had declined to review the Board's decision, making the decision final for purposes of judicial review under 42 U.S.C. § 1395oo(f).  Letter from Jacqueline R. Vaughn to Laurence D. Getzoff (Nov. 21, 2018), AR 00001.

###    E.    Plaintiff's Lawsuit

On November 27, 2018, plaintiff filed this lawsuit.  Compl.  On May 29, 2019, plaintiff filed a motion for summary judgment.  Pl.'s Mot. for Summary J. [Dkt. # 11]; Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. [Dkt. # 11-1] ("Pl.'s Mot.").  On August 9, 2019, defendant filed a cross-motion and opposition brief.  Def.'s Cross-Mot. for Summ. J.; Mem. in Supp. of Def.'s Cross-Mot. and Opp. to Pl.'s Mot. for Summ. J. [Dkt. # 13] ("Def.'s Mot. and Opp.").  On September 27, 2019, plaintiff filed its opposition and reply brief, Mem. of P. & A. in Opp. to Def.'s Mot. and Reply [Dkt. # 16] ("Pl.'s Reply"), and on November 26, 2019, defendant filed his reply brief.  Reply Mem. in Supp. of Def.'s Cross-Mot. for Summ. J. [Dkt. # 17].  The Administrative Record was docketed with the Court on December 10, 2019.  Joint Appendix [Dkt. # 18].

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).   However, in cases involving review of agency action under the Administrative Procedure Act ("APA"), Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).   Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." *Id.* § 706(2)(E).   However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   The agency's decision is presumed to be valid, *see Citizens to Preserve Overton Park*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.   A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted) (internal quotation marks omitted).

## ANALYSIS

Plaintiff contends that the Centers for Medicare and Medicaid Services made calculation and/or matching errors in determining its DSH adjustment, and that the Board decision upholding that determination, which was adopted by the Secretary, is not supported by substantial evidence and is arbitrary and capricious.  Compl. ¶¶ 2, 58–68.

**I.     The Court must determine whether the Board's decision is supported by substantial evidence.**

Defendant argues that it should be able to rely on the matching process established by its 2010 Final Rule to calculate plaintiff's SSI numerator, asserting that the process is not arbitrary and capricious.  *See* Def.'s Mot. and Opp. at 20 (arguing that the process was described in the Federal Register, *see* 75 Fed. Reg. at 24,002–06, and subjected to public notice and comment). But this case challenges a decision of the PRRB, not the 2010 Final Rule.  *See* Pl.'s Mot. at 25 (asking the Court to set aside the SSI fraction, not the rule); *see also* Pl.'s Reply at 7, n.8 (contending that plaintiff does not challenge the agency's interpretation of a statute but "whether [its] matching methodology has been applied accurately and whether the Secretary's conclusions were based on the best available data").

Courts review PRRB decisions pursuant to the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706.  *See* 42 U.S.C. § 1395oo(f)(1); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  Under that standard, decisions "reviewed on the record of an agency hearing provided by statute," like the Board's decision at issue in this case, must be set aside if the agency's "action, findings, and conclusions [are] found to be . . . unsupported by substantial evidence."  5 U.S.C. § 706(2)(E); *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 348–49 (D.C. Cir. 1987) ("Our review in this case, like that of the District Court, is limited to

determining whether, on the record as a whole, the PRRB's decision is supported by substantial evidence."). The provider bears the burden of showing that the decision violates the APA standard. *See Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C. Cir. 1979).

A court's "review in substantial-evidence cases calls for careful scrutiny of the entire record" before the agency. *Brown v. Bowen*, 794 F.2d 703, 705 (D.C. Cir. 1986). It may not uphold an agency decision based on *post-hoc* rationalizations offered by the agency or its counsel. *See Dep't. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908–09 (2020); *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 631 n.31 (1980). When a court reviews the final decision of an administrative tribunal like the PRRB that follows an evidentiary hearing, "[t]he reviewing court must take the [tribunal's] findings into account as part of the record," and "the significance to be ascribed to them depends largely on the importance of credibility in the particular case." *Baystate*, 545 F. Supp. 2d at 35–36, quoting *Morall v. DEA*, 412 F.3d 165, 179 (D.C. Cir. 2005) (citations and internal quotation marks omitted). "The final decision must 'consider relevant contradictory evidence, including evidence that led the [tribunal] to contrary findings of fact and credibility,' and failure to do so may result in reversal." *Id.*, quoting *Morall*, 412 F.3d at 180.

## II. Plaintiff presented evidence that CMS's matching process excluded patient days that should have been included in its SSI numerator.

Plaintiff presented evidence to the Board that supplied grounds to question whether CMS's matching of MedPAR and SSA data undercounted the patient days used in the challenged SSI numerator. It presented evidence that aide codes 10, 20, and 60 denote patients in Medi-Cal's files who are eligible for California state supplemental payments and/or federal supplemental security income, Tr. at 73, AR 00357; *id.* at 311, AR 00416, and that its matching of its own patient records

against Medi-Cal's data showed that CMS failed to include hundreds of patients denoted with aide codes 10, 20, and 60, and thousands of patient days, in calculating plaintiff's SSI numerator.  Pl.'s Post-Hearing Brief, Exs. P-40, P-41, and P-42, AR 00118–123; Pl.'s Ex. P-27 at 501, 518, 535, AR 01370, 01387, 01404.  The record also shows that although plaintiff's original estimate of the average number of patients who were only SSP-eligible was incorrect, which resulted in an overcount of SSI beneficiaries in plaintiff's original analysis, plaintiff submitted revised figures after the hearing.  Le-Tran Decl. ¶ 6, AR 00112–13.  Finally, the record shows that the MAC presented no evidence of its own to the PRRB to counter plaintiff's evidence, relying only on its final position paper and exhibits at the hearing.  Tr. at 3–4, AR 00339; *see also* Tr. at 16, AR 00342 (admitting the final position paper and exhibits).

### III.   The Board upheld the SSI calculation even though the MAC presented no evidence to contradict plaintiff's evidence.

Based on this record, the Board agreed with the MAC that the DSH adjustment was properly calculated based on the CMS's determination of plaintiff's SSI numerator.  Although the Board acknowledged that plaintiff would have "difficulty" proving that CMS understated its SSI fractions without the underlying SSA data or a sample tested against that data, Board Decision at 7, AR 00012, it found plaintiff's showing, which was based on Medi-Cal data, to be insufficient.

The Board found that plaintiff wrongly "assume[d] that all individuals with an 'aide code' of 10, 20, or 60, will map to an SSI code of C01, M01, or M02," but that plaintiff did attempt to adjust for SSP-only beneficiaries in its calculation.  Board Decision at 7, AR 00012.  It also noted evidence of other variances between the aide codes and SSA's codes, including that plaintiff's witness acknowledged that someone who goes into a nursing home would still remain Medi-Cal eligible denoted with an aide code of 10, 20, or 60 and counted as SSI eligible by the plaintiff,

when CMS does not count such a person as SSI-eligible in its calculations.  *Id.*  And it cited testimony from plaintiff's witness that "Medi-Cal eligibility is month-specific" and begins on the first day of the month of the application, whereas SSI eligibility begins on either the first day of the month after an application is filed or the first day of the month after the applicant is determined to be eligible, whichever is later.  *Id.* at 8, AR 00013.  The Board recognized that plaintiff considered the effect of both these variances to be minimal, but it found that it could not know the extent of their effect because plaintiff failed to quantify their impact.  *Id.*  Finally, it found that although plaintiff "performed a detail comparison of its internal data, the Medi-Cal system data, the MedPAR SSI patient file, and multiple other data sources, it did not explain or identify the potential reasons for differences" among those sources.  *Id.*; *see also id.* at 8–9, AR 00013–14 (stating that plaintiff could have reviewed the definitions of the SSI codes and aide codes and "built a crosswalk or diagram" to identify if there were other situations in which an individual would be assigned aide code 10, 20, or 60 but would not be assigned SSA code C01, MO1, or M02); *id.* citing Tr. 334–38, AR 00422 (testimony by plaintiff's witness that he did not know if there was a one-to-one correlation between the Medi-Cal and SSA codes).  Given this, the Board concluded that plaintiff failed to "submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS . . . were flawed."  *Id.*

## IV.  **The Board's decision is not supported by substantial evidence.**

But the question before the Court is not whether plaintiff presented sufficient quantifiable data to prove that CMS's calculation was flawed, or whether plaintiff had ascertained the reasons for the discrepancies.  The question is whether upon review of the entire record, there was substantial evidence to support the *Board's* decision that plaintiff's SSI fraction had been properly determined by CMS.  5 U.S.C. § 706(2)(E); *Biloxi Reg'l Med. Ctr.*, 835 F.2d at 348–49.

The Board did not make a serious effort to address this question.  It concluded that because it could poke holes at what plaintiff provided, it did not need to examine the accuracy of what CMS did.  Indeed, CMS, through the MAC, did not even bother to produce evidence at the hearing to justify its SSI fraction.  Further, the Board's decision fails to explain why the various potential flaws with plaintiff's calculation undermined plaintiff's conclusion so thoroughly that there was no reason to peek behind CMS's methodology at all, even though it was CMS's matching that was under review, not plaintiff's.

The record shows that plaintiff used Medi-Cal data and aide codes 10, 20, and 60 to try to recalculate its SSI numerator and identify patient days that CMS may have missed in matching SSA data with Medicare files.  It also shows that aide codes 10, 20, and 60 do not overlap precisely with SSA codes C01, M01, and M02, so the aide codes do not definitively indicate that a patient is SSI-eligible for purposes of determining the SSI fraction.

The Board highlighted these differences in reaching its conclusion, emphasizing that plaintiff either failed to explain the differences in the data sets and codes with sufficient detail or failed to estimate the impact of some of these differences.  But even when plaintiff estimated differences in the codes and data – such as when it sought to quantify the effect of SSP-only patients in its calculations – rather than credit the estimate, the Board found that a minor error in the original estimate simply proved that plaintiff's matching effort was flawed.  *See* Board Decision at 7–8, AR 00012–13.  So the Board made its decision not based on evidence presented by the agency but on its conclusion that plaintiff's evidence was insufficient "to *prove* that the SSI percentages calculated by CMS . . . were flawed."  Board Decision at 8–9, AR 00013–14 (emphasis added).

While that may be a reasonable way to assess the data, there is not enough evidence in this record for the Court to conclude that "substantial evidence" supports the Board's decision that the SSI numerators "were proper."  Board Decision at 2, AR 00007.  "[W]here an agency is in sole possession of the records necessary to prove a party's claim, the agency may not reject the aggrieved party's allegations as insufficiently proven unless the agency comes forward with 'countervailing evidence or a reason, *not based on the insufficiency of the [movant's] showing*, that explains why the . . . allegations have not been accepted.'"  *Baystate*, 545 F. Supp. 2d at 51 (edits, omissions, and emphasis in original), quoting *Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830–31 (D.C. Cir. 1993).  "[T]he burden of bringing forward evidence generally shifts when the defendant has greater access to information on a particular issue."  *Id.*, quoting *Atlanta Coll. of Med.*, 987 F.2d at 831.

The record here shows that the agency had the data that would have answered plaintiff's allegations and that proving the allegations without it would be "difficult[ ]," Board Decision at 7, AR 00012, if not impossible.  Nevertheless, the agency declined to provide plaintiff with any of the underlying SSI data or to conduct or facilitate a test of sample data, even though plaintiff agreed it would abide by the result of such a test.  *See* Board Decision at 6, AR 00011.[12]  And it declined to present any of that data to the Board on appeal.  Without that evidence, the Board improperly rejected plaintiff's allegations, *Atlanta Coll. of Med.*, 987 F.2d at 830–31, and the Court finds that its decision is "unsupported by substantial evidence."  5 U.S.C. § 706(2)(E).

---

12      The data CMS did provide to plaintiff pursuant to the statute, 42 U.S.C. § 1395ww Note, only included the "matched patient-specific Medicare Part A inpatient days/SSI eligibility data," not the data for unmatched patients.  70 Fed. Reg. at 47,440.  So that data would not allow plaintiff to determine whether CMS failed to match any patient or patient days it thought should have been included in its SSI numerator.

**V.      The Court will not impose an adverse inference against the defendant but will order remand of the matter.**

Plaintiff asks the Court to impose an adverse inference against defendant given the agency's failure to present evidence to the Board, Pl.'s Reply at 23, and argues that remand "is not necessary because a full administrative record has been provided to the Court." Pl.'s Mot. at 44. It asks the Court to set aside the Board's decision, issue a writ of mandamus, and order the Secretary to recalculate its SSI fraction using the correct SSI data, provide plaintiff the data and the programs CMS used to accomplish the recalculation, and pay the additional amounts due to it. Compl. ¶¶ 70, 72; *id.* at Request for Relief ¶ 1.

But that would be contrary to the law of this Circuit.  In this circumstance, the burden is on the agency "to *produce* countervailing evidence or a reason, not based on the insufficiency of the [plaintiff's] showing" that explains why the SSI numerator is accurate, but the ultimate burden of persuasion remains with plaintiff.  *See Atlanta Coll. of Med.*, 987 F.2d at 831 (emphasis in original), citing *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 253 (1981).  Mindful that it must not "substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, the Court finds that remand is the appropriate remedy at this stage of the proceedings.  *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 366 (D.C. Cir. 1995) (noting that an agency may reopen proceedings to take new evidence if a reviewing court finds the agency's original findings invalid).

**CONCLUSION**

For the reasons set forth above, the Court will grant plaintiff's motion for summary

judgment in part and deny it in part [Dkt. # 11], deny defendant's cross-motion [Dkt. # 13], and

remand the matter to the agency for further proceedings consistent with this ruling.


AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2022, I electronically filed the foregoing Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. I also certify that I will cause seven paper copies of the Joint Appendix to be filed with the Court within two business days.

I further certify that on this 10th day of May, 2022, I served the foregoing Joint Appendix on counsel of record for appellee/cross-appellant by electronic service via the CM/ECF system.


 /s/ Stephanie R. Marcus
Stephanie R. Marcus