[ORAL ARGUMENT NOT YET SCHEDULED]
**Nos. 20-5350, 20-5351 (consolidated)**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

POMONA VALLEY HOSPITAL MEDICAL CENTER,
Plaintiff-Appellee/Cross-Appellant,

v.

XAVIER BECERRA, Secretary, United States
Department of Health and Human Services,
Defendant-Appellant/Cross-Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**FINAL APPELLANT'S REPLY/CROSS-APPELLEE RESPONSE
BRIEF FOR XAVIER BECERRA**

_____

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARK B. STERN
STEPHANIE R. MARCUS
(202) 514-1633
*Attorneys, Appellate Staff*
*Civil Division, Room 7539*
*Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530-0001*

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE................................................................................2

      A.    Statutory and Regulatory Framework ....................................................2

      B.    The Present Litigation ...........................................................................5

SUMMARY OF ARGUMENT ...............................................................................5

ARGUMENT ...........................................................................................................8

I.      SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S
      DECISION UPHOLDING THE SECRETARY'S CALCULATION
      OF THE CHALLENGED MEDICARE FRACTIONS. ................................8

      A.    The District Court Erred By Failing To Consider Or Afford
             Deference To The 2010 Final Rule. ......................................................8

      B.    The Board's Decision Upholding CMS's Calculation Of The
             Challenged Medicare Fractions Is Reasonable And
             Supported By Substantial Evidence. ....................................................14

             1.    Pomona Failed To Show That The Challenged
                  Medicare Fractions Were Understated. ....................................14

             2.    Pomona's Arguments In Support Of Shifting The
                  Burden Of Production Lack Merit. ...........................................30

II.     THE DISTRICT COURT CORRECTLY HELD THAT IT
      LACKED AUTHORITY TO IMPOSE AN ADVERSE
      INFERENCE AGAINST THE SECRETARY ON REMAND. ...................38

CONCLUSION ......................................................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page(s)**

*Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*,
  987 F.2d 821 (D.C. Cir. 1993)............................................................... 5, 32

*Baystate Med. Ctr. v. Leavitt*,
  545 F. Supp. 2d 20 (D.D.C.), *amended in part*,
  587 F. Supp. 2d 37 (D.D.C. 2008)   ............................................. 13, 32, 35

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ............................................................................ 9, 10

*County of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999)............................................................. 7, 39

*Federal Power Comm'n v. Idaho Power Co.*,
  344 U.S. 17 (1952) .................................................................................... 38

*Methodist Hosp. of Sacramento v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1994)............................................................... 9, 13

*Mt. Diablo Hosp. v. Shalala*,
  3 F.3d 1226 (9th Cir. 1993) ....................................................................... 13

*Palisades Gen'l Hosp. Inc. v. Leavitt*,
  426 F.3d 400 (D.C. Cir. 2005).............................................................. 7, 39

*South Prairie Constr. Co. v. Local No. 627*,
  *Int'l Union of Operating Eng'rs, AFL-CIO*,
  425 U.S. 800 (1976) ................................................................................. 38

*Tenet HealthSystems HealthCorp. v. Thompson*,
  254 F.3d 238 (D.C. Cir. 2001).................................................................. 31

*Texas Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981) ........................................................................... 39, 40

**Statutes:**

Medicare Act:
  42 U.S.C. 1395ww(d)(5)(F)(vi)(I)..............................................2, 8, 15, 17

Medicare Prescription Drug, Improvement, and Modernization
  Act of 2003, Pub. L. No. 108-173, § 951,
  117 Stat. 2066, 2427 (codified at 42 U.S.C. 1395ww Note) ....................4
      42 U.S.C. 1395ww Note.....................................................34

42 U.S.C. 1382(c)(7) ........................................................19

42 U.S.C. 1382e ............................................................17

**Regulation:**

42 C.F.R. 405.1871(a)(3) ................................................11, 30

**Other Authorities:**

51 Fed. Reg. 31,454 (Sept. 3, 1986) ........................................36

70 Fed. Reg. 47,278 (Aug. 12, 2005) ...............................4, 34, 36

75 Fed. Reg. 50,042 (Aug. 16, 2010) ......................2, 3, 8, 9, 13, 15, 20, 21, 24, 35

GLOSSARY

| | |
|---|---|
| "Board" | Provider Reimbursement Review Board |
| "CMS" | Centers for Medicare & Medicaid Services |
| "Disproportionate-share" | Disproportionate share hospital |
| "Medi-Cal" | California Department of Health Care Services' Medicaid program |
| "MedPAR" | Medicare Provider Analysis and Review |
| "Secretary" | Secretary of Health and Human Services |
| "SSI" | Supplemental security income |

# INTRODUCTION

As we showed in our opening brief, substantial evidence supports the Provider Reimbursement Review Board's decision upholding the Secretary of Health and Human Services' calculation of plaintiff Pomona Valley Hospital Medical Center's challenged disproportionate share hospital adjustments. Pomona's arguments in support of the district court's holding lack merit. The Board identified in detail the shortcomings with Pomona's evidence, and the hospital's brief fails to come to grips with the Board's decision, which is firmly anchored in the record.

Pomona also cross-appeals to seek reversal of the district court's refusal to impose an adverse inference against the agency with respect to the accuracy of its calculation of the hospital's Medicare fractions on remand. Because Pomona is not entitled to any relief, the Court need not reach any issue of remedy. Even if the district court's decision were correct on the merits, however, the court properly recognized that it lacked authority to grant any relief beyond a remand to the Secretary.

STATEMENT OF THE CASE

**A.    Statutory and Regulatory Framework**

In our opening brief, we set forth the statutory and regulatory framework governing the Centers for Medicare & Medicaid Services' (CMS) calculation of the Medicare fraction of the disproportionate-share hospital (disproportionate-share) adjustment.  See Gov't Br. 2-11.  Because that framework also applies to the cross-appeal, we briefly summarize the relevant parts of it here.

**1.**    At issue in this case is the calculation of the "Medicare fraction," which seeks to determine the percentage of hospital patient days attributable to individuals entitled to Medicare who were also low-income.  The Medicare disproportionate-share provision directs the agency to use, as a proxy for low-income patients, Medicare beneficiaries who were also "entitled to supplemental security income [SSI]."  42 U.S.C. 1395ww(d)(5)(F)(vi)(I).  Because the SSI program is administered by the Social Security Administration, calculation of the Medicare fraction numerator requires use of Social Security Administration data, as well as Medicare inpatient data compiled by CMS.  See 75 Fed. Reg. 50,042, 50,276 (Aug. 16, 2010) (2010 Final Rule).

2

**2.**   CMS calculated Pomona's Medicare fractions in the relevant fiscal years

pursuant to the revised data matching process described in detail in the 2010 Final

Rule.  See 75 Fed. Reg. at 50,277-50,285.  In the Final Rule, the Secretary of

Health and Human Services (Secretary) explained how the agency had revised the

matching process in order to use the best available data. *Id*. at 50,276-50,278.

For example, the SSI file that CMS receives from the Social Security

Administration would now include all SSI payment records, including those for

"stale" as well as active cases, and for automated and manual payments. *Id*. at

50,277.  The Secretary noted that the revised process would also use the Medicare

Enrollment Database, which contains social security numbers of Medicare

enrollees that could be used in the matching process to help ensure that all

Medicare/SSI patient days are included in the calculation. *Id*.  The Secretary

further explained that "we have requested, and are using in the data matching

process, those [Social Security Administration] codes that reflect 'entitlement to'

receive SSI benefits," and identified those codes as C01, M01, and M02. *Id*. at

50,280-50,281.  As the agency determined, "including SSI codes of C01, M01, and

M02 accurately captures all SSI-entitled individuals during the month(s) that they

are entitled to receive SSI benefits." *Id.* at 50,281.

3

**3.**  In the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Medicare Modernization Act), Congress provided for hospitals' access to data that CMS uses to compute the Medicare fraction.  Section 951 of the Act requires the Secretary to "arrange to furnish * * * hospitals * * * the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage * * * for that hospital for the current cost reporting year."  Pub. L. No. 108-173, § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. 1395ww Note).

In 2005, the Secretary established a process to implement Section 951 that would ensure that hospitals have access to data pertaining to the calculation of the disproportionate-share adjustment, and to the Medicare fraction in particular. See 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005).  Pursuant to those procedures, the Secretary provides hospitals with information from the Medicare Provider Analysis and Review (MedPAR) Limited Data Set, which contains the "matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis" for the relevant period and is the same data set CMS uses to calculate Medicare fractions for the fiscal year.  See *id.*

4

**B.  The Present Litigation**

Our opening brief describes Pomona's request for administrative and judicial review of CMS's calculation of its disproportionate-share adjustments for fiscal years 2006-2008.  See Gov't Br. 11-17.  As relevant to Pomona's cross-appeal, the district court rejected Pomona's contention that it should impose an adverse inference against CMS with respect to the accuracy of the Medicare fraction calculations on remand.  Op. 23, JA 306.  The court also denied Pomona's request that it "issue a writ of mandamus, and order the Secretary to recalculate its SSI fraction using the correct SSI data, provide plaintiff the data and the programs CMS used to accomplish the recalculation, and pay the additional amounts due to it."  *Id*.  The court noted that Pomona's requests with respect to remedy were "contrary to the law of this Circuit," since the "ultimate burden of persuasion remains with plaintiff."  *Id.* (citing *Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 831 (D.C. Cir. 1993)).  The court thus held that remand "is the appropriate remedy at this stage of the proceedings."  *Id*.

## SUMMARY OF ARGUMENT

**I.**  As we demonstrated in our opening brief (Gov't Br. 21-39), the district court erred by concluding that substantial evidence did not support the Provider

Reimbursement Review Board's (Board) decision upholding CMS's calculation of Pomona's Medicare fractions for the relevant cost years.  The district court based its holding on two mistakes of law.  First, the court erred by concluding that the 2010 Final Rule was not relevant to its inquiry.  Second, the court misapplied the substantial evidence standard by erroneously shifting the burden of production to the Secretary and failing to afford appropriate weight to the Board's decision.

Pomona misapprehends the Board's decision and the record on which it was based.  CMS calculated Pomona's Medicare fractions in the relevant fiscal years pursuant to the revised data-matching process described in detail in the 2010 Final Rule.  The Secretary has never suggested that calculations based on the Final Rule are, as Pomona puts it, "infallible."  On the contrary, the Board carefully reviewed evidence submitted by Pomona, and identified numerous flaws in Pomona's data and methodology, including discrepancies between Pomona's California State Medicaid program (Medi-Cal) codes and the Social Security Administration codes that CMS uses to calculate hospitals' Medicare fractions that undermine Pomona's claims.  The Board also suggested several ways Pomona could have bolstered its evidentiary showing without obtaining further data from CMS or the Social Security Administration, but Pomona failed to do so.

6

**II.**  Pomona cross-appeals from the district court's refusal to impose an adverse inference on remand with respect to the accuracy of CMS's calculation of the challenged Medicare fractions.  This Court need not reach the cross-appeal issue because Pomona is not entitled to any relief on the merits.

Even assuming *arguendo* that the district court's decision were correct on the merits, the court properly denied Pomona's request for any remedial relief beyond a remand to the Secretary.  As this Court has emphasized, "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *Palisades Gen'l Hosp. Inc.* v. *Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999)).  Moreover, although the district court erred by shifting the burden of production to the Secretary, it correctly acknowledged that the "ultimate burden of persuasion remains with plaintiff." Op. 23, JA 306.

7

## ARGUMENT

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S DECISION UPHOLDING THE SECRETARY'S CALCULATION OF THE CHALLENGED MEDICARE FRACTIONS.

### A.  The District Court Erred By Failing To Consider Or Afford Deference To The 2010 Final Rule.

**1.**  CMS calculated the challenged Medicare fractions in this case pursuant to the revised data-matching process adopted through notice-and-comment rulemaking and set forth in detail in the 2010 Final Rule.  See R18 at 11, JA 43; 75 Fed. Reg. at 50,276-50,285.  The numerator of the Medicare fraction consists of patient days attributable to individuals who are "entitled to benefits under [Medicare] part A" and also "entitled to [SSI]," while the denominator is all patient days attributable to Medicare beneficiaries.  42 U.S.C. 1395ww(d)(5)(F)(vi)(I).  As set forth above and in our opening brief (Gov't Br. 9-11), in promulgating the 2010 Final Rule, the Secretary comprehensively addressed the agency's methodology for determining whether an individual Medicare beneficiary is "entitled to [SSI]" for purposes of the Medicare fraction numerator.  75 Fed. Reg. at 50,276-50,285.

Under the 2010 Final Rule, the numerator of the Medicare fraction is limited to Medicare beneficiaries who are entitled to receive SSI benefits, as

8

reflected by Social Security Administration codes C01, M01, and M02. 75 Fed.

Reg. at 50,280-50,281. The revised matching process adopted in the Final Rule

involves a detailed comparison of Medicare billing records and SSI-entitlement

data in the SSI file provided by the Social Security Administration. *Id*. at 50,276-

50,285. The SSI file contains the codes denoting each individual's month-by-

month entitlement to SSI benefits, and, as the Secretary explained, serves as the

agency's "system of record" regarding SSI entitlement for purposes of calculating

the Medicare fraction. See *id*. at 50,277.

Where, as here, Congress has not prescribed any particular methodology for

determining whether an individual Medicare beneficiary is "entitled to [SSI]" for

purposes of the Medicare fraction numerator, but has instead delegated that

authority to the Secretary in administering the statute, the Secretary's

determination is entitled to substantial deference. See *Chevron, U.S.A., Inc. v.

Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). This Court has

recognized that such deference is heightened in the Medicare context, due to "the

tremendous complexity of the Medicare statute." *Methodist Hosp. of Sacramento

v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994).

9

**2.** The 2010 Final Rule, the analysis therein, and the deference owed to the agency thus should have been at least the starting point for the district court in reviewing an agency decision involving that regulation. *Chevron*, 467 U.S. at 842-43. This principle applies with particular force here, because Pomona does not challenge the substantive or procedural validity of the 2010 Final Rule or the methodology adopted therein. See Pl. Br. 3, 45 (confirming that hospital is not challenging validity of Final Rule or Secretary's revised methodology). Under these circumstances, the Secretary is entitled to rely on this revised matching process, absent a sufficient showing by the hospital that the agency did not use the best available data or erroneously applied the process in this case.

The district court erred by holding otherwise. Contrary to the court's holding, that Pomona "challenges a decision of the [Board], not the 2010 Final Rule," (Op. 17, JA 300), does not alter the role of that Rule, which, as the Board recognized, governed its analysis and provides the basis for CMS's calculation of the Medicare fraction. See R18 at 11-14, JA 43-46. Indeed, the 2010 Final Rule contains the Secretary's determinations (unchallenged here) regarding the revised matching process, including which databases to use, what search procedures to employ, and which safeguards to use to guard against errors or omissions, and thus

10

itself demonstrates why the Secretary need not make any affirmative proffer of evidence supporting its calculations unless and until the hospital satisfies its evidentiary burden before the Board.  See 42 C.F.R. 405.1871(a)(3).

**3.**  Pomona offers no justification for the district court's refusal even to consider the Final Rule much less afford it deference and, instead, attributes to the Secretary positions that the government has never asserted.  Pomona mistakenly characterizes the Secretary as arguing that the process set forth in the 2010 Final Rule is "infallible" or creates a "presumption of infallibility," (Pl. Br. 3, 6, 7, 39, 40, 43, 58), and contends that the Secretary is making this argument "to insulate CMS's SSI fractions from all challenges."  Pl. Br. 44, 58.

Pomona does not advance its argument by attacking a straw man.  As we explained in our opening brief, a "hospital that challenges CMS's calculation can attempt to demonstrate that the agency erred in applying this matching process and thereby understated its disproportionate-share Medicare fraction."  Gov't Br. 18.  The Secretary therefore is not contesting that "the 2010 Rule did not purport to insulate CMS's [Medicare] fractions from all challenges, nor could it," and that "CMS's SSI-day calculations for Pomona were subject to challenge in the ordinary appeal process provided by the Medicare statute and regulations."  Pl. Br. 44.

11

That hospitals may challenge CMS's calculation of their Medicare fractions does not render the 2010 Final Rule irrelevant in determining whether substantial evidence supports the Board's decision, however.  In the present case, the district court demonstrated its misunderstanding of the fundamental role of the Final Rule when it stated that CMS "did not even bother to produce evidence at the hearing to justify its SSI fraction."  See Op. 21, JA 304.  The 2010 Final Rule provided the justifications for CMS's choice of data and methodology, and Pomona bore the burden of producing sufficient evidence to challenge CMS's application of that methodology in this case.  It was error for the district court to conclude that the agency must "justify" the challenged Medicare fractions in the abstract, without regard to the established process for making the determination.

The district court further erred when it faulted the Board for "fail[ing] to explain why the various potential flaws with plaintiff's calculation undermined plaintiff's conclusion so thoroughly that there was no reason to peek behind CMS's methodology at all."  Op. 21, JA 304.  The Board had no need to "peek behind CMS's methodology" here, as the agency has outlined that methodology in great detail in a notice-and-comment rulemaking, and Pomona is not challenging that methodology, nor has it shown any error in that methodology as applied to its

12

case. See 75 Fed. Reg. at 50,276-50,285. Instead, Pomona argued simply that the result of that process was "understated," based on different data and a different process. Even if Pomona had shown such an understatement, and it did not, it would not justify setting aside the Medicare fractions challenged here.

Indeed, under applicable precedent, the burden of demonstrating error falls on the hospital, and it would need to establish that CMS did not use "the best available data" to calculate the challenged fractions. As we explained in our opening brief (Gov't Br. 30-31), in the Medicare context, courts have recognized that where, as here, the statute does not prescribe a particular methodology or source of data, CMS's determinations should be upheld so long as the agency uses "the most reliable data available" or the "best available data." See *Methodist Hosp.*, 38 F.3d at 1230; see also *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1233 (9th Cir. 1993) (per curiam); *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 40-41 (D.D.C.), *amended in part*, 587 F. Supp. 2d 37 (D.D.C. 2008). In the present case, Pomona's evidentiary showing must be evaluated in the context of the 2010 Final Rule, in which the agency provided a detailed explanation of why it determined that the data sources used in its revised matching process meet the best available data standard. See 75 Fed. Reg. at 50,275-50,281.

13

**B. The Board's Decision Upholding CMS's Calculation Of
The Challenged Medicare Fractions Is Reasonable And
Supported By Substantial Evidence.**

In holding that the Board's decision was not supported by substantial

evidence, the district court also mistakenly shifted the burden of production to the

Secretary and failed to give sufficient weight to the Board's finding that Pomona

had not "submit[ted] sufficient quantifiable data" to show any error in CMS's

calculations.  See R18 at 14, JA 46.  Pomona seeks to defend the district court's

decision by asserting that it presented "unrebutted" evidence demonstrating that

CMS's calculations were incorrect, which, in turn, showed that it was likely that

the agency did not use the best available data.  See Pl. Br. 4, 5, 39, 47, 50, 51, 57.

Pomona's evidence was in no sense unrebutted, and the Board rejected Pomona's

contentions in a thorough analysis fully supported by the record.

**1.  Pomona Failed To Show That The Challenged Medicare
Fractions Were Understated.**

**a.**  Before the Board, Pomona alleged that CMS undercounted the number of

patient days attributable to SSI-entitled Medicare beneficiaries in the numerator of

the hospital's disproportionate-share Medicare fractions in the cost years at issue.

R18 at 11, JA 43.  Pomona never developed a specific theory as to why the

calculation led to an alleged undercount, however, and instead posited "an inaccurate translation of data between agencies, human error, coding errors or other potential problems that may have led to CMS not using the best available data to calculate Pomona's SSI fraction" for each of the cost years at issue. *Id*. at 10, JA 42. The hospital based its allegations on information it had obtained from the California State Medicaid program (known as "Medi-Cal"), which it contended cast doubt on CMS's calculations. *Id*. at 11, JA 43.

As noted, the Medicare fraction numerator is limited to patient days attributable to individuals who are "entitled to benefits under [Medicare] part A" and also "entitled to [SSI]." 42 U.S.C. 1395ww(d)(5)(F)(vi)(I). Under the revised matching process set forth in the 2010 Final Rule, CMS relies on Social Security Administration codes C01, M01, and M02, which "accurately capture[] all SSI-entitled individuals, during the month(s) that they are entitled to receive SSI benefits." See 75 Fed. Reg. at 50,281. By contrast, Pomona's own methodology—based on Medi-Cal aide codes assigned by the State of California—does not limit the Medicare fraction to such patients. Pomona nonetheless contended that Medi-Cal codes 10, 20, and 60 directly correlated with the Social

15

Security Administration codes that CMS determined indicate entitlement to SSI benefits within the meaning of the Medicare disproportionate-share provision.

Pomona's insistence that it provided "unrebutted" evidence that the fractions calculated by CMS were understated is belied by the administrative record before the Board. While Pomona showed that use of its own data and methodology would lead to a higher Medicare fraction than that calculated by CMS pursuant to the 2010 Final Rule, it did not establish that CMS's calculations were inaccurate or that the agency did not use the best available data. See R18 at 11-12, JA 43-44. Nor was Pomona's evidentiary showing uncontested. To the contrary, before the Board, the Medicare contractor argued that CMS properly calculated Pomona's Medicare fractions pursuant to the 2010 Final Rule and "dispute[d] that Pomona's data is more accurate than CMS' because [Pomona] did not explain how the SSI status codes of C01, M01, and M02 used by CMS to calculate the [Medicare] fraction interplay with the California[] 'aide codes' of 10, 20 and 60." *Id*. And, following a hearing that revealed that Pomona's methodology and data were demonstrably unreliable in a number of respects, the Board itself rebutted Pomona's showing in the final agency decision in this case. See *id*. at 11-14, JA 43-46.

16

At the outset, the Board noted that Pomona's methodology "assumes that all individuals with" a Medi-Cal aide code of 10 (aged), 20 (blind), or 60 (disabled) will directly "map to" to Social Security Administration codes that denote entitlement as set forth in the 2010 Final Rule. R18 at 12, JA 44.  The Board determined, however, that Pomona had not established such a correlation, and proceeded to identify numerous flaws in Pomona's data and methodology. *Id*. at 12-14, JA 44-46.

First, the Board explained that Pomona's methodology would improperly include days attributable to individuals who receive only California state supplementary payments (SSP), but were not entitled to federal SSI benefit payments.  R18 at 12, JA 44. The Medicare disproportionate-share provision expressly excludes such "SSP-only" days from the numerator of the Medicare fraction. 42 U.S.C. 1395ww(d)(5)(F)(vi)(I) (Medicare fraction numerator includes days of patients entitled to SSI benefits, "excluding any State supplementation").[1] As the Board pointed out, patients entitled only to State supplementation would not receive one of the three Social Security Administration codes indicating

---

[1] "State supplementary payments" or "State supplementation" refers to the payments that some states make to supplement the federal payment benefits of the SSI program.  See 42 U.S.C. 1382e.

entitlement to payment of SSI benefits, and thus, their patient days should not be included in the Medicare fraction numerator. R18 at 12, JA 44. Pomona acknowledged this flaw at the hearing (see *id*. at 362, JA 135), and one of its witnesses explained that she had been given inaccurate information about the three Medi-Cal aide codes and erroneously believed that they included only "federal SSI." *Id*.; see Pl. Br. 26 ("Medi-Cal's records do not distinguish beneficiaries who received only State benefits").

Pomona attempted to correct for this flaw, submitting adjusted calculations to try to exclude an estimated number of SSP-only days. See R18 at 12, JA 44; Pl. Br. 24 n.6, 26-27. Pomona's "corrected" Medicare fractions showed that even by its own estimates, this error alone would result in a vastly overstated number of days in the Medicare fraction numerator. See R18 at 12, JA 44 (noting the significantly reduced number of additional SSI-entitled days claimed in Pomona's post-hearing submission after removal of SSP-only days). For one cost year, for example, Pomona's "correction" reduced its original number of additional claimed SSI-entitled days in the Medicare fraction numerator by more than half. *Id*.

Second, the Board explained that Pomona's methodology would improperly include days associated with certain nursing home residents who were not entitled

18

to receive SSI benefit payments for the days in question, and thus would not be assigned an SSI code of C01, M01, or M02 by the Social Security Administration. See R18 at 12-13, JA 44-45. But as Pomona's own witness acknowledged at the Board hearing, these patients would remain Medi-Cal eligible and would be assigned an aide code of 10, 20, or 60. See *id*. at 423, JA 196.

Third, the Board noted a further discrepancy between the effective dates of eligibility for Medi-Cal benefits (first day of month of application) and entitlement to SSI (first day of month *following application*). R18 at 13, JA 45; see 42 U.S.C. 1382(c)(7). Thus, Pomona's methodology would also erroneously include patients who would not be entitled to be paid SSI benefits but, as Pomona's witness acknowledged, would still be assigned Medi-Cal aide codes of 10, 20, or 60 because the Medi-Cal program does not have the same sort of delayed effective date as the SSI program. See R18 at 13, 424, JA 45, 197.

**b.**  Pomona argues that these discrepancies between its Medi-Cal data and the Social Security Administration data used by CMS pursuant to the process adopted in the 2010 Final Rule either were corrected before the Board or were minimal in effect. See Pl. Br. 26-32, 47-50. Pomona misses the point. The discrepancies identified by the Board exemplify the more fundamental problem

19

with Pomona's methodology—namely, that it does not accurately identify patient days that should be included under the Medicare Act statutory formula.

Pomona's contentions that it has corrected for the improper inclusion of SSP-only days and that the other identified flaws have only limited impact fail to address this problem. Pomona provided no basis to conclude that its methodology would otherwise limit the Medicare fraction to patients who were entitled to payment of SSI benefits when they were in the hospital. The Board emphasized, both at the hearing and in its final decision, that there are other situations (many specifically discussed by the Secretary in the 2010 Final Rule, see 75 Fed. Reg. at 50,281) in which otherwise-eligible patients might not be entitled to SSI payments in a particular month. See, *e.g.*, R18 at 8, 13-14, 435-39, JA 40, 45-46, 208-12.

Indeed, after identifying three instances in which Pomona's methodology would improperly include patients who were not entitled to SSI payments at the relevant time, the Board had no basis to suppose that the methodology was sound in other respects.[2] As one Board member explained, such identified flaws reflect a

---

[2] For example, Pomona also did not show that the timing of its Medi-Cal data is consistent with timing of the data that CMS uses to calculate hospitals' Medicare fractions in the revised matching process, which could create an additional discrepancy. As set forth in the Final Rule, CMS determined that it would use SSI eligibility files and MedPAR claims information "that are updated

20

difference "in definition" between the Medi-Cal aide codes upon which Pomona

relied and the three Social Security Administration codes identified in the 2010

Final Rule as denoting entitlement to SSI benefits. R.18 at 425, JA 198.

Pomona not only failed to establish the accuracy of its own methodology

and data, but likewise failed to show any reason to question the accuracy of the

challenged CMS fractions.  In light of the evidence before the Board that

Pomona's methodology produced Medicare fractions that were overstated under

the statute and that there was no way to quantify the magnitude of this

overstatement, it is only natural to expect that the CMS fractions would be lower

than Pomona's own fractions.  Contrary to Pomona's suggestion, the problem is

not merely that the hospital "could not pinpoint the cause, or the precise quantity"

---

15 months after the close of each Federal fiscal year."  75 Fed. Reg. at 50,282.
The Secretary adopted the 15-month time period after determining that it struck the
best balance with respect to accuracy and administrative finality concerns, and "to
ensure that we have captured all of the inpatient claims and to capture as many
retroactive SSI entitlement determinations as possible," and that Medicare
fractions "are calculated with the best available data to us at that time."  See *id*. at
50,282-50,284.  Pomona's filings before the Board show that the timing of its
Medi-Cal data was in no way limited to that 15-month time period.  See R18 at 56,
64, 1832 (Medi-Cal codes based on weekly or monthly updates).  Absent any
showing that the Secretary's determinations in the Final Rule were unreasonable,
which Pomona does not attempt here, it is improper to look to Pomona's different
set of data from a different time period.

21

of alleged errors in the CMS fraction.  Pl. Br. 47.  Rather, the problem is that Pomona failed to make even a preliminary showing that would cast doubt on the validity of the CMS fractions.

The Board's conclusion in this respect applies with particular force given that Pomona is not challenging the revised matching process adopted in the 2010 Final Rule, as the hospital's entire case rested on the proposition that its own methodology and data were "more reliable" than those used by CMS.[3]  See Pl. Br. 3, 20.  In short, as the Board proceedings showed, Pomona's methodology and data were not reliable, and its evidentiary showing was not "unrebutted."

In its appellate brief, Pomona continues to advance arguments that fail to address this fundamental problem. Pomona attempts to demonstrate the reliability of its data by citing its witnesses' testimony about the Medi-Cal aide codes, including assertions that they are "based entirely on information that Medi-Cal

---

[3] Tellingly, although Pomona claims that CMS's calculation was inaccurate, it appears that the hospital nonetheless relied on that same calculation when it was favorable to its own interests, as Pomona's posthearing brief suggests that it claimed additional SSI days identified in CMS's calculation even when that SSI day was *not* assigned a Medi-Cal code of 10, 20, or 60. See R18 at 54, JA 49 ("Pomona also chose not to include in its SSI fraction numerator any days that did not have aid codes 10, 20 and 60, *unless such days were specifically identified as SSI days by CMS in CMS's own calculation*." (emphasis added)).

receives from" the Social Security Administration, that they are assigned only after being verified based on two separate Social Security Administration data fields, that the codes identify someone who is aged, blind or disabled, and that "only those patient days during the period actually covered" by one of the Medi-Cal aide codes were included in Pomona's calculation of the numerator of its Medicare fractions. Pl. Br. 22-23. But none of the testimony or evidence suggests that the Medi-Cal codes provide a reliable means of identifying Medicare beneficiaries who were actually entitled to receive payment of federal SSI benefits for the month(s) or days they received inpatient services.[4]

As the Board observed, SSI entitlement can change from month-to-month based on various factors, and a person who is, or has been, deemed entitled in one

---

[4] Pomona also repeatedly relies on "expert testimony" to support its position. Pl. Br. 35, 49. But the Board declined to recognize Pomona's witness, Mr. Stan Rosenstein, as an expert on the most relevant topics. The Board accepted him as an expert only on the Medi-Cal program and Medi-Cal eligibility, *declining* to recognize him as an expert on: (1) the interface with and use of SSI and SSP data by Medi-Cal for determining eligibility, (2) how California obtains SSI and SSP information from the Social Security Administration, and (3) the Medi-Cal aide code system. See R18 at 409, 411-12. In any event, as noted (see *supra* p. 19), Mr. Rosenstein acknowledged discrepancies between Medi-Cal codes 10, 20, and 60, and Social Security Administration codes indicating entitlement to SSI. R18 at 423-24, JA 196-97.

month may not be entitled to SSI payments in subsequent months.  R18 at 8-9, JA
40-41. Unlike the three SSI codes used by CMS, which reflect entitlement to SSI
payments on a month-by-month basis, *see* 75 Fed. Reg. at 50,280-50,281,
Pomona's Medi-Cal codes do not reflect entitlement to federal SSI payments and
thus do not necessarily denote individuals who were entitled to receive such
payments while they were in the hospital.

     **c.**  In addition, the Board identified several ways in which Pomona could
have strengthened its evidentiary showing with the information available to it, but
found that the hospital had failed to do so.  R18 at 12-14, JA 44-46.  First, with
respect to the discrepancy relating to patients who came to the hospital from
nursing homes, the Board acknowledged Pomona's submission of statewide
statistics and arguments that the discrepancy would have minimal effect (cf. Pl. Br.
29-30), but emphasized that Pomona "could have quantified from its own records
the number of additional days being requested that were for patients that came to
Pomona from a nursing home."  R.18 at 12, JA 44.  As the Board explained,
"[w]ithout Pomona providing an estimate of the impact of this difference on the
additional SSI days being requested, the Board does not and cannot know the
significance of this coding difference." *Id*. at 12-13, JA 44-45.

Second, with respect to the discrepancy between the effective dates of entitlement to Medi-Cal and SSI benefits, the Board acknowledged Pomona's contentions regarding why in its view this difference would have a minimal effect (cf. Pl. Br. 31-32), but nonetheless found that "Pomona could have estimated the potential impact that the different effective dates had on the additional days it is requesting by reviewing its records and the State's records, to determine if any of the additional days are associated with individuals whose application for Medi-Cal/SSP was submitted in [the] same month the patient days of service occurred." R18 at 13, JA 45. Without this information, the Board noted that it would not know the potential impact the different effective dates has on Pomona's data. *Id*.

The Board further emphasized that despite its specific request, Pomona had failed to submit a diagram, crosswalk, or other comparison to show how the Medi-Cal codes on which it relied would correlate to the three Social Security Administration codes that denote entitlement to SSI within the meaning of the Medicare disproportionate-share provision. R.18 at 13-14, JA 45-46. Indeed, the Board expressly found that Pomona "could have developed this crosswalk without the use of Health Insurance Portability and Accountability Act ('HIPAA') protected information, by obtaining the definitions of the various codes, and if

25

necessary confirming the information with the appropriate authorities." *Id*. at 14, JA 46.

　　As the Board explained, Pomona "could have reviewed the definitions of both the SSI codes and 'aide codes' and built a crosswalk or diagram to identify if there were other situations"—in addition to the identified SSP, nursing home, and effective date discrepancies—"in which an individual would be assigned or remain on an 'aide code' of 10, 20, or 60, but the SSI code would not be C01, M01, or M02." R18 at 13-14, JA 45-46. Instead, Pomona submitted with its post-hearing brief information pertaining to "indicator value codes," without any clear explanation of what those codes mean or how (if at all) they relate to the SSI codes indicative of entitlement to benefits. *Id.*, JA 46. As a result, the Board had no way of knowing the extent to which Pomona's Medi-Cal codes correlate with SSI codes *other* than C01, M01, and M02, thereby resulting in improper inclusion of patients who, under the statutory formula, should have been excluded. *Id*., JA 45-46.

　　Pomona objects to the Board's request for a crosswalk on two grounds, neither of which has merit. See Pl. Br. 50-51. First, Pomona disputes the Board's conclusion that it could have created a crosswalk without obtaining additional data from the government. But as the Board clearly explained, it was not asking

Pomona to compare its Medi-Cal data to underlying SSI entitlement data in the possession of the Social Security Administration. Rather, the Board noted that Pomona could create the crosswalk without additional data "by obtaining the definitions of the various codes, and if necessary confirming the information with the appropriate authorities." R18 at 14, JA 46. Pomona provides no reason to doubt that conclusion. To the contrary, as the Board noted, Pomona evidently began developing a comparison, but either did not follow through on the effort or did not report the ultimate results, and instead submitted exhibits with its post-hearing brief containing "indicator value codes" used by the State in assigning the Medi- Cal aide codes. *Id.*

Further, as the record makes clear, Pomona was perfectly capable of ascertaining what the Medi-Cal aide codes mean and how they compare to SSI codes. Pomona had already performed such a comparison in the course of the Board proceedings, though the results of that comparison undermined rather than supported its own methodology. See R18 at 12, JA 44 (noting that plaintiff "recognized that" the three aide codes "include individuals who receive a SSP payment but no SSI payment and therefore these individuals would not have an SSI code of C01, M01, or M02"); see also, *e.g.*, Provider's Post-Hearing Br., *id.* at

27

77, JA 50 (stating that as Pomona's witness "confirmed at the hearing, and as has since been re-confirmed after the hearing as well, that patients who lose their SSI payments completely due to receipt of nursing home benefits [*i.e.*, patients receiving an SSI code of E01, rather than C01, M01, or M02], may still be 'coded' by DHCS for some period as 10, 20 or 60"). These examples show that it was indeed possible for Pomona to obtain information necessary to complete a crosswalk or diagram showing how Medi-Cal aide codes relate to the three SSI codes indicating SSI-entitlement without seeking underlying HIPAA protected SSI entitlement data from the Social Security Administration.

Pomona also makes the conclusory, unsupported assertion that "unrebutted evidence demonstrated that all of the Medi-Cal aid codes Pomona relied on denoted active SSI-entitlement, other than the three potential exceptions identified and addressed above (State-benefit-only days, nursing home unpaid days, and first-month Medi-Cal days)," and thus, a crosswalk would be "irrelevant" and "makeweight." Pl. Br. 51. As the Board made clear, however, Pomona failed to establish that there were no further discrepancies between the Medi-Cal codes and Social Security Administration codes denoting SSI entitlement. Moreover, the existence of the three discrepancies identified at the hearing led the Board to

28

reasonably conclude that there could be more, and at the very least, gave the Board a valid basis for requesting the crosswalk to ensure that there were no additional discrepancies between the Medi-Cal and Social Security Administration codes. Where, as here, the burden is on the hospital filing the appeal to produce evidence of an error in CMS's application of the revised matching process, it is at minimum reasonable for the Board to request further information when it finds that the hospital has not met that burden.

**d.** Pomona also objects (Pl. Br. 58) to the Board's conclusion that it did not present "sufficient quantifiable data in the record to prove" that the Medicare fractions calculated by CMS were inaccurate. See R.18 at 11-14, JA 43-46. Just as Pomona misconstrues the government's argument by contending that "[t]he Secretary relies on the outlandish presumption that the data and process called for in the 2010 Rule are infallible," Pomona erroneously equates the Board's "sufficient quantifiable data in the record" standard with "'perfect quantifiability' required by the Board." Pl. Br. 58.

As we explained, the Secretary does not take—and has never taken—the position that the methodology and data set forth in the 2010 Final Rule have a presumption of infallibility. Rather, the Secretary contends that the district court

29

erred by failing to give the Final Rule and the methodology therein the deference

they are due under precedent of this Court and the Supreme Court.  Similarly,

nothing in the Board's decision supports Pomona's allegation that the Board

requires "perfect quantifiability."  To the contrary, the Board sought only sufficient

evidence from Pomona to establish that the State aide codes that it used for its

calculations corresponded to the parameters of the Social Security Administration

codes that denote entitlement to SSI within the meaning of the Medicare

disproportionate-share provision.  As detailed above, substantial evidence supports

the Board's decision that Pomona's evidentiary showing was insufficient, and

perfection was not required.  See R18 at 11-14, JA 43-46.

### 2.  Pomona's Arguments In Support Of Shifting The Burden Of Production Lack Merit.

As we showed in our opening brief (Gov't Br. 33-39), the district court erred

by shifting the burden of production to the Secretary.  Agency regulations

governing Board hearings make clear that the hospital that files the appeal bears

the burden of production as well as the burden of proof before the Board.  42

C.F.R. 405.1871(a)(3) (Board "decision must include findings of fact and

conclusions of law regarding," *inter alia*, "whether the provider carried its burden

of production of evidence and burden of proof by establishing, by a preponderance

of the evidence, that the provider is entitled to relief on the merits of the matter at

issue."). In the context of upholding a Board decision under the substantial

evidence standard, this Court has recognized that when a hospital challenges a

Medicare payment determination in an appeal to the Board, it bears the burden of

producing sufficient and accurate data to establish its claims. See *Tenet*

*HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 242-46 (D.C. Cir. 2001).[5]

In the present case, however, the district court erroneously relied on the

principle that "[w]here an agency is in sole possession of the records necessary to

prove a party's claim, the agency may not reject the aggrieved party's allegations

as insufficiently proven unless the agency comes forward with 'countervailing

evidence or a reason, *not based on the insufficiency of the [movant's] showing*, that

---

[5] Pomona attempts to distinguish *Tenet* (Pl. Br. 54 n.12) on the grounds that there was no evidence in that case that was exclusively under the agency's control. Pomona misses the point. *Tenet* shows that under the substantial evidence standard applied in the Medicare context, the plaintiff hospital bears the burden of production and there is no need for the agency to make any affirmative showing if the plaintiff does not meet that burden. See *Tenet*, 254 F.3d at 242-46. In any event, as we demonstrate in the text, the district court erred in this case by holding that the evidence necessary to prove Pomona's claim was in the sole possession of the agency.

explains why the . . . allegations have not been accepted.'"  Op. 22, JA 305

(quoting *Baystate*, 545 F. Supp. 2d at 51 (quoting *Atlanta Coll. of Med. & Dental

Careers, Inc. v. Riley*, 987 F.2d 821, 831 (D.C. Cir. 1993))).  As we showed in our

opening brief (Gov't Br. 33-39), that principle does not apply here.

     First, the 2010 Final Rule itself is a "'countervailing * * * reason" unrelated

to the insufficiency of Pomona's showing for sustaining the challenged Medicare

fraction calculations.  The rulemaking provides the agency's rationale for its data-

matching process, and thus is a basis for upholding CMS's calculation of the

fractions absent a showing by Pomona that CMS's application of the process was

flawed in this case.  The 2010 Final Rule reasonably prescribes a methodology that

takes into account the challenges of calculating Medicare fractions for thousands of

hospitals, a calculation that is based in part on highly sensitive information that is

in the possession of a different agency, and that is not easily accessible.

Accordingly, especially given that (as discussed *infra* pp. 34-35) Congress has

already provided for hospitals' access to relevant information, hospitals do not

have the right to demand additional information or obtain additional testing outside

the matching process on a case-by-case basis to challenge its application.

The district court therefore erred by citing CMS's refusal "to conduct or facilitate a test of sample data at Pomona's request" as a basis for burden-shifting. See Op. 22, JA 305.  The agency's unwillingness to make *ad hoc* exceptions to the revised matching process adopted in the Final Rule cannot justify burden-shifting, and to hold otherwise would defeat the purpose of adopting that process, which is the established means of generating Medicare fractions for thousands of hospitals nationwide. See Gov't Br. 29 & n.4.  Thus, as the Board correctly recognized, the critical issue in this case was the reliability of Pomona's own methodology and data—or lack thereof—and whether it cast doubt on CMS's application of the revised matching process here.  R18 at 12-14, JA 44-46.

Pomona acknowledges that this argument "might have some logic if Pomona had declined to present any evidence and just demanded that CMS prove that its calculations were correct," but argues that "[h]ere, however, Pomona presented substantial evidence demonstrating the probability that CMS's calculations were materially incorrect."  Pl. Br. 54.  In effect, Pomona is arguing that it *did* meet its burden of production, not that the 2010 Final Rule is irrelevant or does not itself provide a basis for upholding the challenged Medicare fractions.  As we have

demonstrated (Gov't Br. 37-39; *supra* pp. 14-30), however, substantial evidence

supports the Board's holding that Pomona failed to satisfy that burden here.

Second, CMS did not have sole possession of the relevant data because it

provided Pomona with the MedPAR data file (which contains data used by CMS to

calculate Pomona's Medicare fractions) through the agency's established process

under Section 951 of the Medicare Modernization Act of 2003.  See 42 U.S.C.

1395ww Note; 70 Fed. Reg. at 47,438.  The Secretary thereby satisfied all relevant

statutory and regulatory requirements with respect to production of data, and

Pomona used that data in its calculations.  Pomona has provided no reason to

conclude that Congress has not already adequately addressed the issue of hospitals'

access to data in the Medicare Modernization Act, nor has Pomona challenged the

adequacy of the process created by the Secretary to implement that statute.

Accordingly, because the Secretary has already furnished the relevant data

pursuant to the applicable statutory and regulatory standards (see R18 11, JA 43),

the district court should have rejected Pomona's arguments for burden-shifting.

Pomona nonetheless asserts that the Secretary violated the "spirit" of Section

951.  Pl. Br. 60.  If that were the case, presumably Congress would have taken

further action or required production of additional data in the years since the

34

Secretary implemented Section 951 in the 2005 rulemaking.  Congress has not

done so, and its existing requirement of data disclosure in the Medicare

Modernization Act reflects an implicit judgment that disclosing more is not

required.  Pomona has not challenged the Secretary's notice-and-comment

regulation implementing the Medicare Modernization Act here or argued that the

agency failed to comply with that regulation, and Pomona therefore cannot refute

the agency's assertion that it has already produced all data required by statute and

regulation.[6]

Instead, Pomona contends (Br. 60) that the "spirit" of Section 951 requires

the Secretary to go beyond statutory and regulatory requirements by producing the

underlying Social Security Administration eligibility file, which is not limited to a

_____

[6] Nor does CMS even have the specific underlying Social Security
Administration data for Pomona's patients.  Although the Social Security
Administration provides CMS with "monthly indicators" of entitlement or non-
entitlement, those indicators are not the SSI codes, but are merely *based on*
assigned SSI codes.  See *Baystate*, 545 F. Supp. 2d at 29 n.17; 75 Fed. Reg. at
50,276 ("The SSI eligibility data that CMS receives from SSA contain monthly
indicators to denote which month(s) each person was eligible for SSI benefits
during a specific time period").  A person that the Social Security Administration
codes as C01, M01, or M02 code is thus merely communicated to CMS as entitled
to SSI benefits (for example, C01 is communicated as a "1"), while any other code
denoting non-entitlement to SSI is communicated to CMS as a "0," without any
other additional information about why the Social Security Administration
determined that the individual is not entitled to SSI benefits for the month.

particular hospital or its patients, but rather contains individual records pertaining to millions of SSI recipients nationwide. See 51 Fed. Reg. 31,454, 31,459 (Sep. 3, 1986) (SSI file as of 1986 contains over 5 million records). Pomona has not shown that it needs or is entitled to such a sweeping disclosure of sensitive, privacy-protected information. As the Secretary explained in the regulation implementing Section 951 (not challenged here), information from the SSI eligibility file is protected under data use agreements between the Social Security Administration and CMS, under which CMS is "strictly prohibited" from disclosing it, and the Social Security Administration "is prohibited from disclosing the information by Federal law and regulations." See 70 Fed. Reg. at 47,440 (noting that while such disclosure is not permitted, CMS is permitted to disclose the MedPAR matched data subject to proper limitations and protections).

Moreover, although the Board acknowledged potential practical difficulties for hospitals in challenging the accuracy of CMS's calculation of Medicare fractions, it thoroughly explained why Pomona had failed to satisfy its burden of production even in light of such difficulties. R18 at 12-14, JA 44-46. The Board also outlined a number of ways that Pomona could have strengthened its evidentiary showing in order to meet its burden without obtaining any additional

36

data from CMS, but Pomona failed to do so. *Id.* Where, as here, the agency has undertaken a notice-and-comment rulemaking that itself provides a reason to sustain the challenged Medicare fractions unrelated to the insufficiency of Pomona's evidentiary showing and has already produced any statutorily-required data, and Pomona has not taken actions suggested by the Board to strengthen its evidence without additional data, the district court lacked any basis for shifting the burden of production.

In sum, neither of the elements of the Catch 22 that Pomona alleges—*i.e.*, that "[h]ospitals can overcome a *post-hoc* presumption that the Secretary's calculations are infallible by using only SSI data and matching details that the Secretary refuses to disclose" (Pl. Br. 3)—is present in this case. As we have shown, the Secretary has never argued for a presumption of infallibility, and the Board clearly set forth how Pomona could have bolstered its case without using SSI data. The district court misapplied the substantial evidence standard by failing to defer to (or even consider) the 2010 Final Rule, and by erroneously flipping the burden of proof. The court also failed to afford appropriate weight to the Board's findings. After considering Pomona's submissions and holding a hearing, the Board appropriately weighed the evidence and the testimony, and determined that

37

Pomona's showing was insufficient to cast doubt on the validity of CMS's calculations.  The Board's determination was reasonable and supported by substantial evidence, and this Court therefore should reverse the district court's grant of partial summary judgment to Pomona.

## II. THE DISTRICT COURT CORRECTLY HELD THAT IT LACKED AUTHORITY TO IMPOSE AN ADVERSE INFERENCE AGAINST THE SECRETARY ON REMAND.

This Court need not reach Pomona's cross-appeal with respect to remedy, because, as we have demonstrated, Pomona is not entitled to any relief on the merits in this case.  Even assuming *arguendo* that Pomona were so entitled, however, the district court correctly recognized that it lacked authority to order any relief beyond a remand to the agency.  *E.g.*, *South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs, AFL-CIO*, 425 U.S. 800, 805-06 (1976) (per curiam); *Federal Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20-21 (1952).  As the Supreme Court has emphasized, in administrative law cases, "the guiding principle * * * is that the function of the reviewing court ends when an error of law is laid bare."  *Idaho Power Co.*, 344 U.S. at 20.  The district court therefore properly denied Pomona's request that it impose an adverse inference with respect

to the accuracy of CMS's calculation of the challenged Medicare fractions on remand.  See Op. 23, JA 306.

Indeed, this Court has held that "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *Palisades Gen'l Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999)).  Notably, Pomona acknowledges that an adverse inference with respect to the accuracy of CMS's fractions "might conceivably present some tension in the context of a remand to an agency here." Pl. Br. 61.  That is an understatement; an adverse inference would not only conflict with controlling precedent of the Supreme Court and this Court, but also, as the district court recognized, with the fact that on remand, "the ultimate burden of persuasion remains with plaintiff." Op. 23, JA 306.

Pomona's reliance on *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), for the proposition that "[i]f the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the

39

case," is unavailing.  See Pl. Br. 62 (quoting *Burdine*, 450 U.S. at 254).  That proposition is inapposite here, because *Burdine* did *not* involve a remand to a federal administrative agency, and in the present case, the Board did *not* believe Pomona's evidence and expressly found it insufficient.  The district court cannot retry the facts on substantial evidence review, nor does it have the authority to impose an adverse inference on remand.

If this Court reaches the issue, it therefore should affirm the district court's denial of Pomona's request for any remedial relief beyond a remand to the agency.

## CONCLUSION

For the foregoing reasons, the district court's grant of partial summary judgment in favor of plaintiff should be reversed.  If the Court reaches the issue, it should affirm the district court's refusal to impose an adverse inference with respect to the accuracy of CMS's calculations of the challenged Medicare fractions on remand.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MARK B. STERN
STEPHANIE R. MARCUS
    (202) 514-1633
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7539*
    *Department of Justice*
    *950 Pennsylvania Ave., N.W.*
    *Washington, D.C.  20530*

MAY 2022

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. 32(a)(6).  The word processing program (Microsoft Word 2016) used to prepare the brief reports that the brief is 8,689 words long.  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 with Times New Roman, 14 point font.


   /s/ Stephanie R. Marcus
    Stephanie R. Marcus

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of May, 2022, I electronically filed the foregoing Final Appellant's Reply/Cross-Appellee Response Brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.

I further certify that on this 17th day of May, 2022, I served the foregoing Final Appellant's Reply/Cross-Appellee Response Brief by electronic service via the CM/ECF system on counsel of record for appellee/cross- appellant.


 /s/ Stephanie R. Marcus
Stephanie R. Marcus