**NOT YET SCHEDULED FOR ORAL ARGUMENT**
**Nos. 20-5350, 20-5351 (consolidated)**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**POMONA VALLEY HOSPITAL MEDICAL CENTER,**
*Plaintiff-Appellee/Cross-Appellant,*

v.

**XAVIER BECERRA, Secretary,**
**Department of Health and Human Services,**
*Defendant-Appellant/Cross-Appellee.*

*On Appeal from the United States District Court*
*for the District of Columbia*
*Civil Action No. 1:18-CV-02763-ABJ*

**FINAL BRIEF FOR APPELLEE/CROSS-APPELLANT**

ROBERT L. ROTH
KELLY A. CARROLL
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, N.W., Suite 550
Washington, D.C. 20004-2141
Tel.: (202) 580-7701
Fax: (202) 580-7719
Email: rroth@health-law.com

SVEN C. COLLINS
HOOPER, LUNDY & BOOKMAN, P.C.
Sven C. Collins
999 19th Street, Suite 3000
Denver, Colorado 80202
Tel.: (720) 687-2850
E-mail: scollins@health-law.com

*Attorneys for Appellee/Cross-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiff-Appellee/Cross-Appellant Pomona Valley Hospital Medical Center, by and through its undersigned counsel, hereby certifies the following as to Parties, Rulings, and Related Cases:

### A.    PARTIES

#### Appellants

Appellant/Cross-Appellee, defendant below, is the Secretary of the United States Department of Health and Human Services.

#### Appellee

Appellee/Cross-Appellant Pomona Valley Hospital Medical Center ("Pomona"), plaintiff below, is a hospital that at all times relevant to this action participated in the Medicare program.  Pursuant to Circuit Rule 26.1, the undersigned certifies that there are no parent companies or any publicly held company that has a 10 percent or greater ownership interest in Appellee/Cross-Appellant.

#### Intervenors and *Amici Curiae*

There are no intervenors or *amici curiae* in this action and there also were none in the District Court.

### B.    RULINGS UNDER REVIEW

The ruling under review is the September 30, 2020 Memorandum Opinion (Dkt. No. 20), with Final Order (Dkt. No. 19), issued by the district court (Jackson, J.) in

*Pomona Valley Hosp. Med. Ctr. v. Azar*, No. 18-cv-02763, 2020 WL 5816486 (D.D.C. Sept. 30, 2020).

## C.     **RELATED CASES**

The case on review was before the district court under Civil Action No. 18-2763-ABJ.  The case was not previously before this Court or any other court.  Counsel are not aware of any other related cases "involving substantially the same parties and the same or similar issues," as defined in Circuit Rule 28(a)(1)(C).

Respectfully submitted,

HOOPER, LUNDY & BOOKMAN, P.C.

By:  _____/s/Robert L. Roth_____
Robert L. Roth (DC Bar No. 441803)
Kelly A. Carroll (DC Bar No. 1018485)
401 9th Street, NW, Suite 550
Washington, DC  20004
Tel.:  (202) 580-7700
Fax:  (202) 580-7719
E-mail:  rroth@health-law.com

Sven C. Collins
999 19th Street, Suite 3000
Denver, Colorado  80202
Tel.:  (720) 687-2850
E-mail:  scollins@health-law.com

*Attorneys for Appellee/Cross-Appellant*

2

**TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF CONTENTS......................................................................................i

TABLE OF AUTHORITIES ........................................................................... iii

I.      STATEMENT OF JURISDICTION ..............................................1

II.     ISSUE PRESENTED FOR REVIEW BY APPELLEE/CROSS-APPELLANT ...................................................................................1

III.    STATUTES AND REGULATIONS INVOLVED...........................2

IV.     STATEMENT OF THE CASE .......................................................2

        A.      Introduction and Overview..................................................2

        B.      The Medicare Program........................................................7

        C.      Notice-and-Comment Rulemaking Required.......................8

        D.      Medicare Disproportionate-Share Payments.......................9

        E.      Calculation of the SSI Fraction .........................................11

        F.      Previous Scrutiny of CMS's Calculation of the SSI Fraction............14

        G.      Medicare Cost Report Submission and Appeals Process...................16

        H.      Administrative and Judicial Review of Board Decisions ..................17

        I.      Administrative Procedure Act.............................................18

        J.      Factual Background............................................................18

                1.      Pomona's Recalculation of its FYs 2006-2008 SSI Fractions.................20

                2.      CMS Rebuffed Pomona's Attempt to Provide a Verified Sample of Records to CMS/SSA .............31

i

K.  Board Decision .....................................................................33

L.  District Court Decision........................................................35

V.  SUMMARY OF THE ARGUMENT ...........................................38

VI.  STANDARD OF REVIEW........................................................40

VII.  ARGUMENT...........................................................................42

A.  THE BOARD'S DECISION VIOLATES THE APA AND
OTHER AUTHORITIES. ................................................42

1.  Using Reliable Data Available to It, Pomona Showed
That the SSI Fractions Likely Were Not Properly
Determined..................................................................44

2.  The Potential Differences that Board Found in Pomona's
Data Were Incorrect, Insubstantial, or Both. ...........................47

3.  The District Court Properly Ruled that Pomona's
Evidence Shifted the Burden of Production to the
Secretary......................................................................53

4.  The Board's "Sufficient Quantifiable Data" Standard
Improperly Nullifies Pomona's Statutory Right to
Challenge Its SSI Fractions.......................................57

B.  POMONA IS ENTITLED TO APPLICATION OF AN
ADVERSE INFERENCE AGAINST THE SECRETARY. ..............60

VIII.  CONCLUSION.................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

CASES[1]

*Atlanta College of Med. and Dental Careers, Inc. v. Riley*,
   987 F.2d 821 (D.C. Cir. 1993) ................................................2, 5, 36, 37, 44, 51, 53, 58, 61, 62

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) ...........................................................................................................9

*Baystate Medical Center v. Leavitt*,
   545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008) ..............2, 3, 5, 14, 36, 51

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988).............................................................................................................41

*Brown v. Bowen*,
   794 F.2d 703 (D.C. Cir. 1986) ...........................................................................................41

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)............................................................................................................41

*Geddes v. Benefits Review Bd.*,
   735 F.2d 1412 (D.C. Cir. 1984) .........................................................................................53

*Heartland Reg'l Med. Ctr. v. Leavitt*,
   511 F. Supp. 2d 46 (D.D.C. 2007) .....................................................................................41

*Int'l Union v. NLRB*,
   459 F.2d 1329 (D.C. Cir. 1972) ....................................................................................58, 60

*Lakeland Bus Lines, Inc. v. NLRB*,
   347 F.3d 955 (D.C. Cir. 2003) ......................................................................................41, 52

*Monmouth Med. Ctr. v. Thompson*,
   257 F.3d 807 (D.C. Cir. 2001) ...........................................................................................17

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm
   Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983)..................................................................................................37, 41, 61

---

[1] Authorities upon which we chiefly rely are marked with an asterisk (*).

*PPG Indus., Inc. v. United States*,
  52 F.3d 363 (D.C. Cir. 1995) ................................................................... 61

*Pub. Citizen, Inc. v. HHS*,
  332 F.3d 654 (D.C. Cir. 2003) ................................................................. 40

*Sithe/Indep. Power Partners v. FERC*,
  285 F.3d 1 (D.C. Cir. 2002) ..................................................................... 41

*Tenet HealthSystems HealthCorp. v. Thompson*,
  254 F.3d 238 (D.C. Cir. 2001) ................................................................. 54

*Texas Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981) .................................................................................. 61

*U.S. Telecom Ass'n v. FCC*,
  227 F.3d 450 (D.C. Cir. 2000) ................................................................. 42

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ............................................................................ 41, 52

## STATUTES

5 U.S.C. §553 ................................................................................................ 9

5 U.S.C. §706 ........................................................................... 5, 6, 18, 35, 40

28 U.S.C. §1291 ............................................................................................ 1

28 U.S.C. §1331 ............................................................................................ 1

28 U.S.C. §1361 ............................................................................................ 1

42 U.S.C. §§1395c, *et seq.* .......................................................................... 8

42 U.S.C. §1395h ......................................................................................... 8

42 U.S.C. §1395hh(a)(1) ............................................................................. 8

42 U.S.C. §1395hh(a)(2) ............................................................................. 8

42 U.S.C. §1395kk ....................................................................................... 7

42 U.S.C. §1395oo .................................................................................. 16, 35

42 U.S.C. §1395oo(a)–(f) ........................................................................... 45

42 U.S.C. §1395oo(f) ........................................................... 1, 17, 35, 40, 57

42 U.S.C. §1395oo(f)(1) ...................................................................17, 18

42 U.S.C. §1395oo(f)(2) ...................................................................17, 63

42 U.S.C. §1395ww ...............................................................................55

42 U.S.C. §1395ww(d) .............................................................................9

42 U.S.C. §1395ww(d)(1) - (5)................................................................9

42 U.S.C. §1395ww(d)(5)(F) ...................................................................9

42 U.S.C. §1395ww(d)(5)(F)(i) ..............................................................10

42 U.S.C. §1395ww(d)(5)(F)(v) and (vi)...........................................10, 11

42 U.S.C. §1395ww(d)(5)(F)(vi)(I) .....................................................11, 24

Medicare Modernization Act, Pub. L. No. 108-173, § 951, 117 Stat. 2066, 2427
(2003) (codified at 42 U.S.C. §1395ww)....................................12, 46, 54, 55, 59, 60

REGULATIONS

42 C.F.R. §405.1871(b)(1)......................................................................17

42 C.F.R. §405.1877(a)(3) ......................................................................17

42 C.F.R. §421.5(b) ...............................................................................17

FEDERAL REGISTER

MEDICARE PROGRAM; CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE
PAYMENT SYSTEMS AND FISCAL YEAR 2006 RATES, 70 Fed. Reg. 47,278,
47,439 (Aug. 12, 2005) ...........................................................12, 13, 55, 59

MEDICARE PROGRAM; HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS FOR
ACUTE CARE HOSPITALS AND THE LONG TERM CARE HOSPITAL PROSPECTIVE
PAYMENT SYSTEM CHANGES AND FY2011 RATES, 75 Fed. Reg. 50,041,
50,275, et seq. ..................................................................14, 15, 30, 45

OTHER AUTHORITIES

2 J. Wigmore, Evidence §285 (3d ed. 1940)............................................60

H.R. Rep. No. 99-241, pt. 1, at 16 (1985), as reprinted in 1986
U.S.C.C.A.N. 579, 594. .......................................................................10

# GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| APA | -- | Administrative Procedure Act |
| AR | -- | Administrative Record filed in the District Court |
| Board | -- | Provider Reimbursement Review Board |
| CMS | -- | Centers for Medicare & Medicaid Services |
| FY | -- | Pomona Valley Hospital Medical Center's Fiscal Year |
| JA | -- | Joint Appendix to be filed by April 22, 2022 |
| Medi-Cal | -- | California Department of Health Care Services' Medicaid program |
| MedPAR | -- | Medicare Provider Analysis and Review |
| Secretary | -- | Secretary of Health and Human Services |
| SSA | -- | Social Security Administration |
| SSI | -- | Supplemental security income |

# I.     <u>STATEMENT OF JURISDICTION</u>

Plaintiff-Appellee/Cross-Appellant Pomona Valley Hospital Medical Center ("Pomona"), a non-profit hospital located in Pomona Valley, California, invoked the jurisdiction of the district court under 42 U.S.C. §1395oo(f), 28 U.S.C. §1331, and 28 U.S.C. §1361, seeking judicial review of the final decision of Defendant-Appellee/Cross-Appellant, Secretary of Health and Human Services ("the Secretary"), denying Pomona's appeals of its Medicare reimbursement for fiscal years ("FYs") 2006-2008. R1 ¶4, JA5.[1] On September 30, 2020, the district court issued a final order granting plaintiff's motion for summary judgment in part and denying it in part, and denying defendant's cross-motion for summary judgment. R19, JA283.

After Defendant filed a timely notice of appeal, Plaintiff filed a timely notice of cross-appeal on November 28, 2020. JA3; Fed. R. App. P. 4(a)(3). This Court has jurisdiction over the appeal and cross-appeal under 28 U.S.C. §1291.

# II.     <u>ISSUE PRESENTED FOR REVIEW BY APPELLEE/CROSS-APPELLANT</u>

The issue presented by Pomona is:

Whether the district court erred by not (a) setting aside the Secretary's final decision, (b) imposing on the Secretary the adverse inference that any evidence withheld by the Secretary would show that Pomona's

---

[1] "R" refers to the Record on Appeal. "JA" refers to the Joint Appendix filed on May 10, 2022.

1

recalculations of the additional Medicare amounts due were correct, and the Secretary's initial calculations were incorrect, and (c) ordering the Secretary to recalculate and pay Pomona the additional Medicare amounts due, with the interest required by statute.

### III.     STATUTES AND REGULATIONS INVOLVED

Pertinent statutes and regulations are in the Addendum filed herewith.

### IV.     STATEMENT OF THE CASE

A.     **Introduction and Overview**

*Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008) ("*Baystate*"), found that the Secretary had failed to use the best available data in the matching methodology for calculating "SSI fractions," which are used to determine Medicare Disproportionate Share Hospital ("Disproportionate-Share") payments due to qualifying Medicare-participating hospitals. Relying on this Court's decision in *Atlanta College of Med. and Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830-31 (D.C. Cir. 1993) ("*Atlanta College*"), *Baystate* also rejected the Secretary's refusal to consider the hospital's evidence of error because the Secretary's refusal was on the grounds that the hospital's evidence allegedly was insufficient, where it was the Secretary that had "sole possession of the records necessary to make a fuller demonstration." *Baystate*, 545 F. Supp. 2d at 52 (emphasis added).

2

After the sweeping (and unappealed) rebuke in *Baystate*, the Secretary adopted a revised matching methodology in 2010, which Pomona is not challenging. But that methodology, even if reasonable, will result in accurate SSI fraction calculations <u>only if</u> (1) the inputted Supplemental Security Income ("SSI") and Medicare data is correct and (2) the agency correctly matched the SSI and Medicare data in accordance with the description of the new 2010 methodology.

Where, as here, hospitals have the undisputed statutory right to challenge the accuracy of their SSI fractions, the exercise of that right hinges on (1) access to the relevant SSI and Medicare data and (2) the ability to review the details of the matching process. But the Secretary discloses neither the data nor the matching details, despite a statute that requires the Secretary to "furnish" the "data necessary" for hospitals to calculate their SSI fractions and verify they are correct.

The Secretary's brief seeks to use a Catch-22 to block hospitals from challenging their SSI fractions: Hospitals can overcome a *post-hoc* presumption that the Secretary's calculations are infallible by using <u>only</u> SSI data and matching details that the Secretary refuses to disclose. Here, however, Pomona figured out a way to overcome that block, which the Secretary improperly refuses to acknowledge. Using extensive Medicare information gathered from its patients, SSI information made available by Medi-Cal (the California Medicaid program), and its SSI fractions from Medicare audits from previous fiscal years, Pomona amassed considerable evidence

3

showing that the SSI fractions the Secretary calculated for fiscal years 2006-2008 under the new methodology were significantly understated, resulting in Medicare underpayments of millions of dollars.

Prior to the administrative hearing, Pomona offered to present a sample of its findings to the Secretary to review using the SSI data and matching details available only to the government. Pomona said it would walk away if the government could show that Pomona's recalculated SSI fractions were wrong. Given that the Secretary had access to the data to show that Pomona's SSI fractions were correct, one would have expected government to have performed that review, which could have obviated the need for this action. But the Secretary refused.

Left with no alternative, Pomona sought relief through the administrative and judicial review process by appealing to the Provider Reimbursement Review Board ("Board"). Pomona introduced extensive unrebutted evidence at the Board hearing showing that there were material discrepancies between Pomona's data and the Secretary's data which, at the least, proved that the Secretary likely did not use the best available data to calculate Pomona's SSI fractions. In contrast, the Secretary (acting through his contractor-agent) presented no witnesses or evidence to rebut Pomona's proof.

The Board's decision, which is the Secretary's final decision for purposes of judicial review, upheld the correctness of the SSI fractions finding that Pomona had

not presented "sufficient quantifiable data" to prove that the SSI fractions at issue were wrong. The district court, however, found that the Board had improperly focused on "quantification," which relates to the <u>amount</u> of the underpayment, rather than whether the administrative record provided substantial evidence that the SSI fractions actually were correct, stating:

> But the question before the Court is not whether plaintiff presented sufficient quantifiable data to prove that CMS's calculation was flawed, or whether plaintiff had ascertained the reasons for the discrepancies. <u>The question is whether upon review of the entire record, there was substantial evidence to support the *Board's* decision that plaintiff's SSI fraction had been properly determined by CMS</u>. 5 U.S.C. § 706(2)(E); *Biloxi Reg'l Med. Ctr.* 835 F.2d 345, at 348-49 (D.C. Cir. 1987).

Dist. Ct. slip opinion ("Op."), R20 at 20, JA303 (underlining added). The district court answered that question "no." *Id.* at 22, JA305.

In doing so, the district court, relying on *Baystate* and *Atlanta College*, rejected the Board's refusal to consider Pomona's evidence of error on the grounds that the evidence that Pomona proffered allegedly was insufficient to quantify the precise extent of CMS's error in its SSI fractions. This is because (1) before the Board, Pomona introduced unrebutted evidence demonstrating the likelihood that the SSI fractions the Secretary had calculated were significantly understated, and (2) the Secretary, despite having "sole possession of the records necessary to make a fuller demonstration" (*Baystate*, 545 F. Supp. 2d at 52) and potentially substantiate the SSI fractions, proffered nothing.

5

Thus, the district court found (at 22, JA305) that the Board had "improperly rejected" Pomona's allegations that its SSI fractions were incorrect and that the Board's "decision is 'unsupported by substantial evidence.' 5 U.S.C. § 706(2)(E)." The district court, however, declined to apply an adverse inference against the Secretary on remand. This appeal ensued.

Conjuring the protective presumption of infallibility to justify the Secretary's refusal to disclose the SSI data and matching information to try to rebut Pomona's substantial proof of error, the Secretary's brief argues that disclosure is not necessary because the 2010 matching process necessarily produced correct SSI fractions. Such a position is facially as inappropriate and implausible as taxpayers arguing that the IRS must accept their claimed deductions for in-kind donations calculated using "thrift shop value" as correct without being able to ask for proof of what items were donated and how their value was determined.

Moreover, if the Board were correct that perfect "quantifiability" is the standard that a hospital must meet to shift the burden to the Secretary to provide evidence to show that the SSI fractions were correct, no hospital could meet that standard because of the Secretary's refusal to disclose the relevant SSI data and matching details used to calculate those fractions. This Catch-22 would effectively nullify the undisputed statutory right of hospitals to challenge their SSI fractions.

Furthermore, the Secretary <u>never asserted</u> in the 2010 Final Rule adopting the new matching process, or otherwise, (1) that the SSI data and matching process are impervious to error and (2) why the presumption of infallibility is reasonable. Thus, this argument is an improper *post-hoc* effort of the Secretary's counsel to uphold the SSI factions on grounds never presented by the Secretary. Regardless, the record that Pomona established before the Board rebutted any applicable presumption by showing that there were errors in the SSI data, the matching process, or both.

For these reasons, this Court should affirm the district court's decision reversing the Board, set aside the Secretary's SSI fractions, and remand them to the Secretary, with an adverse inference that the fractions were incorrect, while allowing the Secretary to use the underlying SSI data to determine the correct SSI fractions and any additional amounts owing to Pomona, with statutory interest.

## B.    The Medicare Program

The Medicare Act, 42 U.S.C. §§1395 *et seq*., establishes a program of health insurance for the aged, disabled, and individuals with end-stage renal disease. The Secretary, the federal official responsible for administering the Medicare program, has delegated that responsibility to the Centers for Medicare and Medicaid Services ("CMS"), an agency within the Department of Health and Human Services, and CMS's contractors. 42 U.S.C. §1395kk.

The Medicare program is divided into five parts: A, B, C, D, and E. Part A of the Medicare program, which is at issue in this action, provides for coverage and payment for, among others, inpatient hospital services on a fee-for-service basis. 42 U.S.C. §§1395c, *et seq*. CMS pays providers participating in Part A of the Medicare program, such as Pomona, for covered services rendered to Medicare beneficiaries through Medicare contractors, which are agents of the Secretary. Each Medicare-participating hospital is assigned to a Medicare contractor. 42 U.S.C. §1395h. The amount of the Medicare Part A payment to a hospital for services furnished to Medicare beneficiaries is determined by its Medicare contractor based on instructions from CMS.

**C.    Notice-and-Comment Rulemaking Required**

Under 42 U.S.C. §1395hh(a)(1), the Secretary must "prescribe such regulations as may be necessary to carry out the administration" of the Medicare program. That statute also states:

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

42 U.S.C. §1395hh(a)(2). Under 42 U.S.C. §1395hh(a)(2), manual provisions and subregulatory documents, which are not promulgated in accordance with applicable notice-and-comment procedures, are not effective to the extent that any of them

8

"establishes or changes a substantive legal standard governing the . . . payment for services" under Medicare. Thus, these subregulatory documents generally do not have the force and effect of law.

Separately, the Administrative Procedure Act ("APA") dictates rulemaking procedural requirements, specifically that Federal agencies (1) provide notice of proposed rulemaking, (2) afford interested parties an opportunity to comment on the proposed rulemaking, and (3) consider the relevant comments/matters presented. 5 U.S.C. §553; *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1809-10 (2019).

## D.    Medicare Disproportionate-Share Payments

Since 1983, acute care hospitals, such as Pomona, have been reimbursed under Medicare's Inpatient Prospective Payment System. *See* 42 U.S.C. §1395ww(d). Prospective payments are not based directly on the costs actually incurred by the hospitals but on predetermined, nationally applicable rates, subject to certain payment adjustments. 42 U.S.C. §1395ww(d)(1) - (5). One adjustment is the "disproportionate share hospital" or "Disproportionate-Share" payment. *See* 42 U.S.C. §1395ww(d)(5)(F).

Since 1986, hospitals that treat a disproportionately large number of low-income patients have been entitled to Disproportionate-Share payments in addition to their standard Prospective Payment System payments:

> [F]or discharges occurring on or after May 1, 1986, the Secretary shall
> provide, in accordance with this subparagraph, for an additional payment

9

amount for each subsection (d) hospital which- (I) serves a significantly disproportionate number of low-income patients (as defined in clause (v)). . . .

42 U.S.C. §1395ww(d)(5)(F)(i).   Congress enacted the Disproportionate-Share adjustment to compensate hospitals for the relatively higher operating costs associated with providing services to low-income patients. *See* H.R. Rep. No. 99-241, pt. 1, at 16 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579, 594.

Low-income patients are typically sicker and more costly to treat in a hospital setting than other patients with similar diagnoses.  In addition, hospitals that treat large numbers of low-income patients need more resources and staffing, such as social workers.  These increased operating costs are concentrated in certain hospitals that would be disadvantaged by a payment system that paid fixed rates based on the <u>average</u> operating costs for inpatient services across all hospitals.   Without Disproportionate-Share payments, hospitals serving a high percentage of low-income patients would be underpaid and more challenged to continue providing full ranges of care.

Pomona's Disproportionate-Share payments were based on its "disproportionate patient percentage." 42 U.S.C. §1395ww(d)(5)(F)(v) and (vi).  The disproportionate patient percentage is the sum of two fractions, which are designed to capture the percentage of low-income patients a hospital serves on an inpatient basis by counting

10

the number of days that certain low-income patients receive inpatient services in a given fiscal year. *Id.*

This action concerns the first disproportionate patient percentage fraction, referred to as the "SSI fraction," which accounts for inpatients who are entitled benefits under both Medicare Part A "and Supplemental Security Income ('SSI'), which is income provided by the federal Social Security Administration ('SSA') to financially needy individuals who are aged, blind, or disabled." Op. 3, JA286.   The SSI fraction is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter.

42 U.S.C. §1395ww(d)(5)(F)(vi)(I).   The SSI fraction, therefore, measures the percentage of a hospital's total Medicare Part A-entitled inpatients who were also entitled to SSI benefits when they received inpatient services.

**E.    Calculation of the SSI Fraction**

The second of the two Disproportionate-Share fractions, known as the "Medicaid fraction," is based entirely on a detailed listing of patient data that is available to hospitals, compiled by and prepared by them, and subsequently audited by

11

the Medicare contractor. In contrast, CMS unilaterally determines SSI fractions without any input from hospitals. *See* Op. 4-5, JA287-288. Medicare contractors are required to make Disproportionate-Share payment determinations based solely on the SSI fractions that CMS supplies, without any input by hospitals. *Id.*

CMS determines the numerator of the SSI fraction (*i.e.*, the number of inpatient days during the fiscal period for Medicare Part A-entitled inpatients who were also entitled to SSI benefits at the time that they received the inpatient services) by matching data from CMS's Medicare Provider Analysis and Review ("MedPAR") file, which is a database containing admission and discharge information for all Medicare hospital inpatients, against SSI-entitlement data from SSA (the agency that administers the SSI program). *Id.*

Historically, CMS did not disclose to hospitals any information about the data or matching process the agency used to calculate SSI fractions. In 2003, however, Congress required the Secretary to arrange, by December 8, 2004, "to furnish . . . hospitals . . . the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage . . . for that hospital for the current cost reporting year." Medicare Modernization Act, Pub. L. No. 108-173, § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. §1395ww Note); *see* MEDICARE PROGRAM; CHANGES TO THE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEMS AND FISCAL YEAR 2006 RATES, 70 Fed. Reg. 47,278, 47,439 (Aug.

12, 2005) (explaining that a hospital will be provided this data "to calculate and verify its Medicare fraction, and to decide whether it prefers to have the fraction determined on the basis of its fiscal year rather than a Federal fiscal year" and that it "will be the same data set CMS uses to calculate the Medicare fractions for the Federal fiscal year").

"To accomplish this, CMS gives hospitals data from its MedPAR Limited Data Set[2] 'contain[ing] the matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis.' 70 Fed. Reg. at 47,440." Op. 6, JA289. Crucially, as the district court explained:

> But given the confidentiality of information retained by the Social Security Administration, CMS does not give the hospital the complete SSI eligibility file that it receives from SSA. *See id.* (rejecting proposal that CMS release the data file of SSI eligibility information that the Social Security Administration gives CMS because CMS is prohibited from disclosing SSI eligibility information).

*Id.* (emphasis added). Here, CMS specifically refused Pomona's request for SSI entitlement data for purposes of determining the accuracy of the SSI fractions at issue, *Id.* at 8, JA291, even though the data concerned Pomona's patients, each of which had authorized Pomona to access the data necessary for payment of their medical care.

---

[2] "The MedPAR Limited Data Set or MedPAR LDS 'contains a summary of all services furnished to a Medicare beneficiary, from the time of admission through discharge, for a stay in an inpatient hospital or skilled nursing facility, or both; SSI eligibility information; and enrollment data on Medicare beneficiaries.' 70 Fed. Reg. at 47,439." Op. 6 n.3, JA289.

**F.**     **Previous Scrutiny of CMS's Calculation of the SSI Fraction**

There has previously been extensive litigation regarding problems with CMS's calculation of the SSI fraction.  Most important of these for present purposes is *Baystate*, where the court determined that it was arbitrary and capricious for the CMS Administrator to "find[] that CMS relied on the best available data in determining the patients entitled to SSI benefits …  because CMS failed to use superior data readily available to it …."  545 F. Supp. 2d at 57-58.  To correct the agency's errors, the court remanded the matter to the Secretary for the purposes of having CMS recalculate the SSI fractions at issue based on the "best available data," as determined by the court. *See id*. at 48.  The Secretary did not appeal *Baystate*.

Responding, in part, to *Baystate*, on April 28, 2010, CMS issued Ruling 1498-R, which required CMS to recalculate the SSI fractions of the *Baystate* plaintiffs and other hospitals whose SSI fractions were not yet issued (this included Pomona's SSI fractions for FYs 2006-2008, which are at issue here), using the methodology for calculating SSI fractions that CMS planned to implement in light of *Baystate*.[3]  CMS published this "improved" data-matching methodology in the Federal Register on August 16, 2010 ("2010 Rule"), the Preamble of which included a description of the changes to the methodology.   *See* MEDICARE PROGRAM; HOSPITAL INPATIENT

---

[3] A copy of Ruling 1498-R is available at: https://www.cms.gov/regulations-and-guidance/guidance/rulings/downloads/cms1498r.pdf.

PROSPECTIVE PAYMENT SYSTEMS FOR ACUTE CARE HOSPITALS AND THE LONG TERM CARE HOSPITAL PROSPECTIVE PAYMENT SYSTEM CHANGES AND FY2011 RATES, 75 Fed. Reg. 50,041, 50,275, *et seq*. (Aug. 16, 2010).  That Final Rule adopted the methodology prospectively, "for FY 2011 and beyond."  *Id.* at 50,281.

The 2010 Rule explains how the CMS and SSA data would be matched and which SSA codes would be counted for purposes of confirming a patient's entitlement to SSI benefits: C01, M01, and M02.  *See* 75 Fed. Reg. at 50,277-78, 50,281.  The Preamble also limits the data that could be used to calculate SSI fractions to data available as of fifteen months after the end of each FFY (FFYs start October 1 and end the following September 30) and requires that the data be measured only once, and never revisited.  *Id.* at 50,284.

Importantly, CMS's new process provides for no external validation of or way for hospitals to review the underlying data or matching process.  *See, e.g., id*. at 50,278–79 (describing CMS's "internal data validation process …[, the data from which] we do not intend to provide … to the public.").  And the Preamble contained no validation process for CMS's SSI fractions determined for historical hospital cost report periods, such as Pomona's.  *See id*. at 50,278 (describing internal validation process only for "calculating … SSI fractions for FY 2011 and beyond…).

Pursuant to Ruling 1498-R, CMS calculated the SSI fractions for Pomona for FYs 2006-2008 using the new 2010 methodology.  Despite asserted use of this

"improved" methodology, it appears that CMS's calculations significantly understated Pomona's SSI fractions. This action is Pomona's effort (1) to determine whether its FYs 2006-2008 SSI factions actually were understated and, if so, (2) to recalculate Pomona's FYs 2006-2008 Disproportionate-Share payments using accurate SSI fractions. Before the district court, the Secretary conceded that hospitals (including Pomona) are not given an opportunity to review for accuracy the underlying SSA data that is used to calculate SSI fractions. *See* Op. 8, JA291 (citing Answer [ECF No. 7], at ¶19).

## G.    **Medicare Cost Report Submission and Appeals Process**

At the close of its FY, a hospital must submit a Medicare "cost report" showing the costs incurred during the FY and other data used to determine the Medicare reimbursement due to the hospital for the FY. The hospital's Medicare contractor analyzes and audits the cost report and issues a Medicare Notice of Program Reimbursement, which informs the hospital of the final determination of its total Medicare reimbursement for the FY. If a hospital is dissatisfied with its Medicare contractor's final determination, it has a right to obtain a hearing before the Board by filing an appeal with the Board within 180 days of receiving its Notice of Program Reimbursement. 42 U.S.C. §1395oo.

**H.**     **Administrative and Judicial Review of Board Decisions**

The decision of the Board constitutes final administrative action in a provider appeal unless the Secretary reverses, affirms, or modifies the decision.  42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§405.1871(b)(1) and 405.1877(a)(3).  The Secretary has delegated his authority to review Board decisions to the CMS Administrator.  Thus, the Secretary's final administrative decision for purposes of judicial review is either the decision of the Board or the decision of the CMS Administrator after review of the Board's decision.  *Id.*  Here, the Board's decision is the Secretary's final administrative decision for purposes of judicial review.

A provider may obtain judicial review of the Secretary's final administrative decision by filing suit within 60 days of receipt in the district court for the judicial district in which the provider is located or in the United States District Court for the District of Columbia.  42 U.S.C. §1395oo(f).  In such actions, the Secretary is the proper defendant.  *See* 42 C.F.R. §421.5(b).  Under 42 U.S.C. §1395oo(f)(2), interest is to be awarded in favor of a prevailing provider.  Judicial relief is also available under the equitable remedy of mandamus where a hospital has a clear right to the relief sought and the Secretary has a non-discretionary duty to honor that right.  *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001).

I.    **Administrative Procedure Act**

Under 42 U.S.C. §1395oo(f)(1), an action brought for review of the Secretary's final decision "shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the APA.  Under the APA, a "reviewing court shall… hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).  Furthermore, a reviewing court shall: "hold unlawful and set aside agency action, findings, and conclusions found to be … unsupported by substantial evidence … on the record of an agency hearing provided by statute."  5 U.S.C. §706(2)(E).  Additionally, a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law."  5 U.S.C. §706(2)(D).

J.    **Factual Background**

This action arises from three consolidated Board appeals by which Pomona challenged its Medicare Disproportionate-Share payments for FYs 2006-2008 as understated on the grounds that they were calculated using SSI fractions based on erroneous data, while better and more reliable data was readily available, but not used. Although CMS and SSA have the exact data that would allow Pomona to show that its SSI fractions are incorrect (or the Secretary to show that these fractions are correct), the agencies have refused to introduce this data or make it available to Pomona.

18

At the Board hearing on August 17, 2017, Pomona presented three witnesses: (1) Ms. Candice Le-Tran, Pomona's Director of Reimbursement and Analytics, (2) Mr. Tzvi Hefter, the former Director of the CMS Division of Acute Care, which is responsible for Disproportionate-Share payment policy, and (3) Mr. Stan Rosenstein, who held many positions at Medi-Cal, including Director of the overall program and, before that, Director of the Medi-Cal beneficiary Eligibility Branch.  *See* Op. at 11, JA294; *see also* Board Transcript of Aug. 17, 2017 Hearing ("Tr.") 44:2-47:2 (JA122-123), 205:17-206:22 (JA163), 269:20-274:11 (JA179-180).[4]  The Board accepted Mr. Rosenstein as an expert witness on the topics of the Medi-Cal program generally and Medi-Cal eligibility.  Tr. 294 (JA185).

At the hearing, in addition to being subject to questioning by counsel for the parties (*i.e.*, Hospital and the Medicare contractor), witnesses may be questioned by the Board members.  In response to Board member questions at the hearing, Ms. Le-Tran and Mr. Rosenstein submitted post-hearing factual declarations.  *See* Provider's Post-Hearing Brief, Appendices A and B (JA51-63).  This evidence is summarized below.  In contrast, the Medicare contractor (acting as the agent for the Secretary/CMS) presented <u>no witnesses</u> (lay or expert) at the hearing and offered <u>no factual evidence</u> in the form of documents or factual declarations, either to <u>support</u> its

---

[4] Parallel citations to the Certified Administrative Record filed in the district court were included in Pomona's initial brief but have been deleted from this final brief.

case or to rebut Pomona's evidence and witnesses. Op. 12, JA295. The only evidence the Medicare contractor provided was its original calculations of the Disproportionate-Share adjustments based on the SSI fractions CMS had determined. Op. at 12 n.8, JA295.

### 1.    Pomona's Recalculation of its FYs 2006-2008 SSI Fractions

From the outset, Pomona sought to produce a more accurate count of "SSI days" using more reliable data. Shortly after the close of each FY at issue in this action, Pomona filed a Medicare cost report which, among other items, estimated what Pomona thought its SSI fractions should be, based on prior experience. Tr. 51-52 (JA124). After audit, the Medicare contractor adjusted Pomona's estimated SSI fractions to the percentage determined and published by CMS using the revised 2010 methodology, which showed a significant reduction. *See* Provider's Post-Hearing Brief, Exs. P-43, P-44, and P-45 (JA71-73, JA75-78, and JA80-81); *see also* Tr. 52-53 (JA124-125).

CMS calculated Pomona's SSI fractions for FYs 2006, 2007, and 2008, as 14.74%, 14.73% and 14.40%, respectively. *See* Op. 7, JA290. In accordance with its internal policy, CMS did not grant Pomona's request to obtain the underlying SSA data that CMS used to calculate these fractions. *See id.* at 8.

Unable to obtain either CMS's or the SSA's data relating to the SSI status of their individual patients, Pomona used the following verified data sources to determine the accuracy of its SSI fractions for FYs 2006-2008:

1. To identify which of its Medicare patient inpatient days CMS used to calculate the denominators (Medicare days) of the SSI fractions, Pomona used CMS "MedPAR" data for FFYs 2005-2009, pursuant to the "DSH Data Use Agreement for Cost Reporting Periods that Include December 8, 2004 and Thereafter." *See* Tr. 53-56, 68-69 (JA125, 128-129); JA278-282.

2. To identify the Medicare patient inpatient days from the denominators of the SSI fractions for which the Medicare patients were also entitled to SSI benefits during the inpatient stay, and thus to calculate the SSI fraction numerators (Medicare with SSI days), Pomona used Medi-Cal "aid codes," which identified Medi-Cal beneficiaries who also were entitled to SSI.[5]  *See* Board Decision at 6, JA43.

Pomona focused only on Medicare inpatients to whom Medi-Cal had assigned aid codes of "10", "20" and "60" because these codes specifically and uniquely identify individuals whom SSA had confirmed were actively receiving at a particular time (1) Federal SSI payment and/or (2) California State supplemental payments.  *Id.*

At the hearing, Mr. Rosenstein testified:

---

[5] "Aid Codes" are assigned by Medi-Cal to "tell various entities; the State, Federal Government, providers, what is the source of [Medi-Cal] eligibility . . . you can look at an aid code you know where this person – how this person became eligible, source of eligibility, what source of benefits they get, and how much money the state can claim from the Federal Government." *See* Tr. 308-11, 309:5-11(Testimony of S. Rosenstein) (JA188-189).  Mr. Rosenstein testified that "aid codes" are "100% accurate" and "well tested."  *Id.* at 309:22-23 (JA189).

> Q.    And which aid codes identify a Medi-Cal enrollee on SSI and/or
> [State supplemental payments]?
> A.    They are identified by three aid codes, 10, 20 and 60.

*See* Tr. at 311:2-6 (JA189).  Mr. Rosenstein further testified that the assignment of aid

codes 10 (corresponding to aged status), 20 (blind) and 60 (disabled) is based entirely

on information that Medi-Cal receives from SSA.  *See id.* at 313:4-314:12 (JA190);

*see also* Declaration of S. Rosenstein, ¶3 (JA53); Provider's Post-Hearing Brief, Exs.

P-47 and P-48 (JA84-88).  Mr. Rosenstein stated as follows, in further (unrefuted)

testimony, how the SSA data supporting assignment of a 10, 20 or 60 aid code is used:

> Q.    Does the information used to create the aid codes ultimately derive
> from the Social Security Administration?
> A.    100 percent.  It comes off of what Social Security Administration
> gives the state, and all the – 10, 20 and 60, all is define whether aged,
> blind, or disabled.
> Q.    And how is then [*sic*] assigned to individuals?
> A.    Well, it's assigned – the aid code is assigned based upon the
> Social Security record, and there's a data element in the Social Security
> record that says, you know, for this eligible person, they're aged, blind or
> disabled.  So it's in their data set and the State takes that data, changes
> the number to one of the – you know, changes the data to its data set and
> posts it.
> Q.    In your opinion, do these records verify that Pomona's method of
> identifying SSI and [State supplemental payments] patients was
> accurate?
> A.    Yes.

*See* Tr. 320:15-321:17 (JA191-192).  Further, Medi-Cal assigns aid codes 10, 20 and

60 only after verification from two separate SSA data fields, <u>both</u> of which <u>must</u>

confirm the individual's aged, blind, or disabled status.  *See* JA84-88.

The testimony from Mr. Hefter confirmed that Medi-Cal received SSA's SSI/State supplemental payments entitlement data directly from the SSA:

> . . . [T]he State had a very invested interest in making sure that the information it was getting from SSA was consistent with its information, because it was paying money to the Social Security Administration to supplement those SSI payments. So the data that the state was getting, it was getting from SSA. . . and it seems to be a reliable basis for determining whether or not those patients truly were getting SSI or not.

*See* Tr. 216:24-217:12 (JA165-166). Pomona also used several other data sources to confirm the accuracy of the Medi-Cal aid codes for each and every patient for the relevant inpatient admissions. *See* PVHMC SSI Data Process Flow Chart, Ex. P-20 (JA217-218).

Ms. Le-Tran confirmed at the hearing that Pomona did not include patient days in its recalculated SSI fraction numerator if Pomona could not locate an aid code to substantiate that a particular patient had been receiving SSI and/or State supplemental payment benefits. *See* Tr. 68:12-16 (JA128). Ms. Le-Tran similarly testified that, where patients only had a "10" "20" or "60" aid code for a portion of their admission (a "partial" aid code approval), only those patient days during the period actually covered by one of those three aid codes were included in Pomona's calculation of the numerator of the SSI fraction. *See id.* 65:20-66:4 (JA128); 68:12-16 (JA128).

Pomona also compared, on a patient-by-patient/day-by-day basis, the days that CMS included in the numerator of the SSI fractions at issue with Pomona's own recalculation of its SSI fractions based the data sources identified above. Pomona

grouped the days as either "matched" (CMS's data and Pomona's data are in agreement), "unmatched" (Pomona has verified a 10, 20 or 60 aid code for all days, but CMS does not include the patient and days on its list of Part A plus SSI beneficiaries), or "partial match" (a portion of the admission was "matched" but not for all days of the admission). *See* Tr. 76:17-77:3 (JA130-131); *see also* PVHMC Summary of SSI Days by Aid Code, Ex. P-27 (JA235-242).

The results of these calculations of SSI matching days are set forth below and include an adjustment to Pomona's days and patients to eliminate the effect of the Statewide average of patients with only State supplemental payments:[6]

| Year | CMS Day Count | Pomona Day Count | CMS Patient Count | Pomona Patient Count |
|------|---------------|------------------|-------------------|----------------------|
| 2006 | 4,886 | 5,841 | 748 | 1,129 |
| 2007 | 4,153 | 5,553 | 757 | 1,197 |
| 2008 | 4,238 | 5,500 | 729 | 1,148 |

---

[6] The "raw" totals of patients found by Pomona to have been assigned aid codes 10, 20 or 60 included patients who were entitled to SSI-only benefits, State supplemental payment benefits, and both benefits simultaneously. Declaration of S. Rosenstein, ¶5 (JA54-55); Declaration of C. Le-Tran, ¶6 (JA61-62); Tr. 92:11-94:6 (JA134-135). Pomona excluded from the "raw" totals a conservatively large estimate of patients who received <u>State-only benefits</u>, because CMS counts only days of patients actually were receiving SSI benefits in the SSI fraction. *See* 42 U.S.C. §1395ww(d)(5)(F)(vi)(I). Because Medi-Cal records do not identify a patient as State-only, and in light of Pomona's inability, despite considerable efforts, to access the SSA data, Pomona <u>reduced</u> the "raw" total of patients (and days) for each year by approximately 16.5% of the patients, which is the statewide average of patients having exclusively State benefits during State fiscal years 2006 to 2009. *See* Provider's Post-Hearing Brief, Exs. P-51 and P-46 (JA93-95, 82-83); *see also* Declaration of S. Rosenstein, ¶5 (JA54-55).

24

Based on these results, CMS's count of SSI days for Pomona are lower than Pomona's calculated SSI days by 19.55% in 2006, by 25% in 2007, and by 22.95% in 2008. CMS's count of patients receiving SSI benefits during the months of admission is lower than Pomona's count of SSI receiving patients in these years (even after subtracting the 16.5% of patients with only State supplemental payments) by between 20% and 25% each year.

If the SSI fractions at issue were calculated using the data Pomona marshalled, they would have increased to 18.04% for FY 2006, 20.16% for FY 2007, and 19.12% for FY 2008, which would translate into additional estimated reimbursement of $770,837 for FY 2006, $1,291,520 for FY 2007, and $1,232,627 for FY 2008. Provider's Post-Hearing Brief, Exs. P-40, P-41, and P-42 (JA64-69).[7]

a.    Calculation of Statewide Average State-Only Supplemental Payment Population

Only the SSA maintains records that conclusively identify the patients who are receiving SSI plus State supplemental payment benefits, as opposed to those receiving exclusively State benefits. *See* Expert Report by S. Rosenstein, Ex. P-34 at 2, 3 (JA261-262). Medi-Cal's records do not distinguish beneficiaries who received only State benefits. *See id* at 6 (JA265); Tr. 298:17-299:9 (JA186). Absent access to SSA

---

[7] In addition, Pomona determined that the denominators of its SSI fractions for FYs 2006-2008 were overstated, which also reduced the SSI percentage. *See* Tr. 89:3-91:6 (JA134), Ex P-27 (JA235-244).

records, the most reliable and accurate measure of the State-benefit-only population at Pomona would be to approximate based on statewide average numbers of State-benefit-only recipients during Pomona's FYs at issue (2006-2008).

Mr. Rosenstein obtained these statistics from the California Department of Social Services, along with the underlying documentation from which these statistics were derived. *See* Ex. P-37 and Provider's Post-Hearing Brief, Ex. P-51 (JA269-272, JA93-95). Based on his review of the statistics and source documentation obtained from the California Department of Social Services, Mr. Rosenstein determined that approximately 16.5% of SSI/State-supplemental-payment recipients were entitled exclusively to State-supplemental benefits. *See* Declaration of S. Rosenstein, ¶5 (JA54-55).

Pomona converted that figure to a month-by-month average, matching the intervals for grants and review of SSI and State supplemental payment benefits, to derive precise averages of percentages patients statewide who received only State supplemental payments: 16.34% in 2006, 16.69% in 2007, and 16.61% in 2008. *See* Declaration of C. Le-Tran, ¶6 (JA61-62), and Exs. P-40, P-41, P-42 (JA64-69), and P-46, (JA82-83). Importantly, whereas the statewide-average of patients receiving only State supplemental payments during the FYs at issue was approximately 16.5%, the gross percentage of "unmatched" patients (Pomona claims the patient had SSI benefits and CMS claims they do not) in each of Pomona's FYs at issue was approximately

35% in 2006, 37% in 2007 and 39% in 2008—*i.e.*, between 200% and 300% larger than the Statewide average percentage. (*See* JA265-267.)

In Mr. Rosenstein's experience as a Medi-Cal official, he had never before heard of the State-benefit-only population in California being such a large number. Thus, Mr. Rosenstein stated that "there appears to be a problem with the CMS data." *See* Expert Report by S. Rosenstein, Ex. P-34 (JA267); Tr. 324:16-327:4 (JA192-193). There is too large a gap between the calculations to be caused by the size of the State-benefit-only population: "There has to be something wrong with the data. It just does not – it's not in sync with the experience of – that the State of California has with the overall SSI, SSP [State supplemental payment] program. It's just so much more off than average. And the SSI, SSP Population is a very consistent population." *See* Tr. 326-327 (JA193).

Mr. Hefter's testimony agreed that the unexplained difference between Pomona's and CMS's respective Medicare/SSI fraction calculations was too large to be explained away by attributing the difference to a large number of State-benefit-only patients. *See* Tr. 253:4-254:11 (JA175). "It made me think that there is some kind of systemic problem. . ." *See id.* 224:12-25 (JA167). There was no contrary testimony or evidence presented by the Medicare contractor.

   b. Retention of Aid Codes 10, 20 or 60 After Admission to Nursing Home

At hearing, and in its decision, the Board questioned whether the variance in SSI data could be due to a difference in coding nursing home residents. For example, the Board stated in its decision that "[w]ithout Pomona providing an estimate of the impact of this difference [in coding nursing home residents] on the additional SSI days being requested, the Board does not and cannot know the significant of this coding difference." (JA44-45.) Pomona presented extensive testimony on this issue and, notably, the Medicare contractor introduced no contrary evidence or witness testimony.

An SSI patient who goes into long term care (including a nursing facility) retains an aid code of 10, 20 and 60 for the first three months after admission. *See* Provider's Post-Hearing Brief, Ex. P-53 (JA107-1112). Medi-Cal representatives confirmed that patients with SSI benefits retain their full SSI payment benefits for the first three months of residence in a nursing facility. *See* Declaration of S. Rosenstein, ¶6 (JA55). Mr. Rosenstein stated that, based on his many years of experience working for and ultimately running the Medi-Cal program, roughly 50% of the people in nursing facilities remain there for fewer than three months. *See* Declaration of Rosenstein, ¶6 (JA55); *see also* Provider's Post-Hearing Brief, Ex. P-49 at 2 (JA91); *Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life*, J. of

Amer. Geriatric Society, September 2010 (9): 1701-1706, Provider's Ex. P-52 (JA96-106).

Mr. Rosenstein estimated that the Medi-Cal beneficiary nursing home census for all of California during 2006-2008 ranged from 60,000 to 65,000 per year. This was confirmed in Post-Hearing Exhibit P-49, page 2 (JA91) as well as in paragraph 6 of Mr. Rosenstein's Declaration (JA55). During the same period, according to the former Medi-Cal Director, there were approximately 360 acute care hospitals operating in California (many of which have far more beds than does Pomona). *See* Declaration of S. Rosenstein, ¶7 (JA55-56); Provider's Post-Hearing Brief, Ex. P-54 (JA113-118). Thus, no single hospital (and especially Pomona) would have received a particularly large number of patients admitted from nursing homes.

According to Mr. Rosenstein, of the few potential patients admitted to any one hospital from nursing facilities, only fraction of them would have lost their SSI benefits while in that hospital, because (1) only half of nursing home patients might be admitted to a hospital in a given year, (2) half of those admitted would retain <u>all</u> their SSI benefits during their less than three-month admission, and (3) others may retain a <u>portion</u> of their SSI benefits during their less than three month admission. *See* Declaration of S. Rosenstein, ¶¶6, 7, 8a and 8c (JA55-56). The possible loss of SSI benefits by patients admitted to an acute care hospital (such as Pomona) from nursing facilities is therefore not a plausible explanation for the very large difference in the

respective SSI fractions calculated by CMS and Pomona. There simply were not enough nursing home patients admitted to any one hospital who could have lost their SSI benefits right at the time of the acute care admission.

Thus, there is no factual basis for the Board's concern that the variance in CMS and Pomona data could be due to a difference in coding nursing home residents. The Medicare contractor introduced no contrary evidence.

      c.    Potential Impact of Differences in Timing of Patients' Receipt of New Medi-Cal Coverage Compared to Becoming Eligible to Receive SSI Benefits for the First Time

The Board also questioned whether differences in timing of patients' qualification for Medi-Cal benefits as compared to when such patient started to receive SSI payments may have skewed the number of "unmatched" patients and/or days.[8] For example, the Board noted that "different effective dates represents another difference between CMS' data and Pomona's data." JA45.

But Pomona presented evidence demonstrating that this is a rare situation that occurs <u>only if</u> the patient were admitted at a hospital and, in that same month, for the very first time applied for both Medi-Cal and SSI benefits. *See* Declaration of S. Rosenstein, ¶4 (JA53-54). However, receipt of SSI benefits is only one of many ways

---

[8] The 2010 Rule states that CMS begins to count a patient as "SSI entitled" only after the first actual payment of benefits to that individual, which is made during the <u>second</u> month of eligibility. *See* 75 Fed. Reg. at 50,280.

a patient can demonstrate eligibility for Medi-Cal benefits. (*See* JA53-54.) Ms. Le-Tran stated at in her post-hearing declaration:

> Pomona does not (and did not in 2006, 2007 and 2008) assist our patients in applying for SSI benefits, nor does the hospital have a process or procedure in place to help patients use newly applied for SSI benefits to qualify for Medi-Cal benefits.

*See* Declaration of C. Le-Tran, ¶7 (JA62). Mr. Rosenstein stated:

> It is my opinion based on my many years of experience working in the Medi-Cal eligibility area that any effect of such a difference would be minimal. From my vantage point as a former Director of Medi-Cal, we know that most of the enrollment on SSI is fairly stable in California, and that if a hospital is not using SSI as a means for obtaining Medi-Cal enrollment for coverage of an hospitalization, then it is quite uncommon for a patient to be seeking Medi-Cal enrollment for the first time at the same time as seeking SSI benefits for the first time. . . My understanding in this case (to be confirmed by Ms. Le-Tran) is that Pomona does not assist individual patients in seeking SSI (or SSP) payments, but rather uses other methods to help such patients qualify for Medi-Cal benefits if needed.

*See* Declaration of S. Rosenstein, ¶4 (JA53-54).

Thus, there is no factual basis for the Board's concern that differences in timing of patients' qualification for Medi-Cal benefits as compared to when such patient started to receive SSI payments may have skewed the number of "unmatched" patients and/or days. The Medicare contractor introduced no contrary evidence.

## 2. CMS Rebuffed Pomona's Attempt to Provide a Verified Sample of Records to CMS/SSA

Pomona sought to obtain information to confirm the accuracy of Pomona's SSI-entitlement data directly from SSA in various ways, but to no avail. In addition, in an

31

attempt to avoid the need for a hearing entirely, Pomona prepared, and submitted to CMS, a 50-record sample for review by SSA to determine the accuracy of Pomona's SSI-entitlement data using the following methodology.

First, Pomona created the 50-record sample, including 20 "randomly selected" records from 2006, and then the ten longest "unmatched" (Pomona believes patient is confirmed SSI recipient, CMS claims patient not entitled to SSI benefits) Medicare patient admissions from FYs 2006-2008. *See* Letter from C. Le-Tran to T. Hefter (January 21, 2016), Ex. P-24 (JA220-221); *see also* Tr. 98:9-99:19 (Testimony of C. Le-Tran) (JA136). Pomona asked Mr. Hefter to approach CMS and seek assistance in submitting the sample to the SSA for specific review of the limited sample of "unmatched" patients. *See* Tr. 101:7-15, 217:20-219:7 (Testimony of C. Le-Tran and T. Hefter) (JA137, 166).

Pomona agreed to accept the results of an SSA and CMS review of the 50-record sample. *See* Tr. 102:10-13 (JA137). Prior to submitting the sample, Pomona asked Mr. Rosenstein to authenticate Pomona's use of Medi-Cal aid code information and to assess the sampling methodology overall. Mr. Rosenstein noted that the first 10 of the records had specifically been verified by Medi-Cal employees, and that the sample was accurate and compelling. *See id.* 317:9-14 (JA191); Letter from S. Rosenstein to M. Hartstein at CMS (January 21, 2016), Ex. P-24 (JA223).

Initially, CMS indicated some interest but, ultimately, CMS decided not to pursue the sample testing due to alleged "workload" concerns. *See* Tr. 238:16-239:13 (Testimony of T. Hefter) (JA171). Pomona asked for assistance from then-U.S. Senator Feinstein, who wrote letters to both CMS and SSA urging the agencies to cooperate and engage in testing the limited sample. *See* Letter from U.S. Senator Dianne Feinstein to C. Walters, SSA (May 20, 2016) and Letter from P. Raymond, SSA to U.S. Senator Dianne Feinstein (Oct. 26, 2016), Exs. P-25, P-26 (JA226-228 and JA229).

After repeated requests from the Senator's office, and an apparent willingness by the SSA to review such a limited sample, it appeared that a deal had been brokered that would result in CMS transmitting a 30-record sample to the SSA, and the results transmitted back to CMS (since neither agency wished to provide documents directly to Pomona). *See* Email Correspondence with A. Sadre, Aide to Sen. Dianne Feinstein, Ex. P-30 (JA246-255). CMS ultimately refused to cooperate and declined to transmit the sample to the SSA. *See* Letter from C. Blackford, CMS, to U.S. Senator Dianne Feinstein (June 23, 2017), Ex. P-32 (JA256-258).

## K.    Board Decision

On October 1, 2018, the Board issued its decision affirming the SSI fractions used by the Medicare contractor, finding that Pomona "did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS …

were flawed." *See* Board Decision at 9 (JA46). The Board's holding was based on a number of findings that are unsupported by any evidence in the record, let alone substantial evidence, including:

> 1.    Pomona improperly assumed all individuals with Medi-Cal aid codes 10, 20, or 60 mapped to SSI codes of C01, M01, or M02,[9]
>
> 2.    Pomona's failure to provide a "crosswalk" that mapped Medi-Cal aid codes 10, 20 and 60, to SSI codes C01, M01, or M02, precluded determining if there was error,
>
> 3.    Pomona did not explain or identify the potential reasons for differences between the Medi-Cal aid codes and SSI codes, and
>
> 4.    Pomona could have, but did not, provide an estimate of the impact of two potential explanations for the variances between the Medi-Cal aid codes and SSI codes.

*Id.* 7-9 (JA43-46). Critically, however, the Board's decision failed to address Pomona's extensive, uncontroverted evidence and testimony on these matters, including expert testimony.

---

[9] Pomona's <u>initial</u> totals of days for the numerator of the SSI fractions for FYs 2006-2008 were calculated prior to the Board hearing using data from individuals with Medi-Cal aid codes 10, 20, or 60, thus <u>potentially</u> including individuals receiving only State supplemental payment benefits (and not also receiving <u>Federal</u> SSI benefits). *See* discussion *supra* at 24-27. However, the Board acknowledged that Pomona corrected its <u>final</u> totals by including an adjustment to eliminate the effect of possible State-only supplemental payment days. Board Decision 7 (JA44). Importantly, the Board's decision does <u>not</u> challenge Pomona's <u>final</u> totals on the basis that Pomona improperly failed to account for the possible inclusion of inpatient days where the Medicare beneficiary patient was entitled only to State supplemental payment benefits. *See id.*

On November 21, 2018, the CMS Administrator declined to review the Board's decision, making it the Secretary's Final Decision for purposes of judicial review under 42 U.S.C. §1395oo.  Pomona timely filed this action in the district court within 60 days of receipt of the Board's decision.  *See* 42 U.S.C. §1395oo(f).

## L.    <u>District Court Decision</u>

The district court held that the Board's "decision is 'unsupported by substantial evidence.'"  Op. 22, JA305 (quoting 5 U.S.C. § 706(2)(E)).  It reached this conclusion based on the following analysis:

> [T]he question before the Court is not whether plaintiff presented sufficient quantifiable data to prove that CMS's calculation was flawed, or whether plaintiff had ascertained the reasons for the discrepancies. The question is whether upon review of the entire record, there was substantial evidence to support the Board's decision that plaintiff's SSI fraction had been properly determined by CMS.

*Id.* at 20, JA303.

The district court found the Board had not made "a serious effort to address this question," concluding "that because it could poke holes at what plaintiff provided, it did not need to examine the accuracy of what CMS did."  *Id*. at 21.  Where "CMS … did not … produce evidence to justify its SSI fraction …, the Board's decision fails to explain why the various potential flaws with plaintiff's calculation undermined plaintiff's conclusion so thoroughly that there was no reason to peek behind CMS's methodology at all, even though it was CMS's matching that was under review, not plaintiff's."  *Id*.

The district court acknowledged that the "Board highlighted differences" between the Medi-Cal aid codes and the SSA codes, "emphasizing that plaintiff either failed to explain the differences … with sufficient detail or failed to estimate the impact of some of those differences.  But even when plaintiff estimated differences in the codes and data — such as when it sought to quantify the effect of SSP-only [only State supplemental payment] patients in its calculations — rather than credit the estimate, the Board found that a minor error in the original estimate simply proved that plaintiff's matching effort was flawed….  So the Board made its decision not based on evidence presented by the agency but on its conclusion that plaintiff's evidence was insufficient 'to *prove* that the SSI percentages calculated by CMS … were flawed.' Board Decision at 8-9, AR 00013-14 (emphasis added)."  *Id.*, JA303

The district court also found "there is not enough evidence in this record for the Court to conclude that 'substantial evidence' supports the Board's decision that the SSI numerators 'were proper.'" *Id.* at 22, JA305 (quoting Board Decision at 2, JA39). The district court applied the burden-shifting rule, set forth in *Atlanta College*, 987 F.2d at 830-31, and *Baystate*, 545 F. Supp. 2d at 51, stating:

> "'[W]here an agency is in sole possession of the records necessary to prove a party's claim, the agency may not reject the aggrieved party's allegations as insufficiently proven unless the agency comes forward with countervailing evidence or a reason, not based on the insufficiency of the [movant's] showing, that explains why the . . . allegations have not been accepted."

36

Op. 22, JA305 (internal quotations omitted).  "The record here shows that the agency had the data that would have answered plaintiff's allegations and that proving the allegations without it would be 'difficult[ ],' Board Decision at 7, AR 00012, if not impossible."  *Id.*

The court then noted that "the agency declined to provide plaintiff with any of the underlying SSI data or to conduct or facilitate a test of sample data, even though plaintiff agreed it would abide by the result of such a test…; [and] it declined to present any of that data to the Board on appeal. Without that evidence, the Board improperly rejected plaintiff's allegations, *Atlanta [College]*, 987 F.2d at 830-31, and the Court finds that its decision is 'unsupported by substantial evidence.'"  *Id.*, JA305.

The district court declined to "impose an adverse inference against [the Secretary], given the agency's failure to present evidence to the Board" or to "set aside the Board's decision, issue a writ of mandamus, and order the Secretary to recalculate its SSI fraction using the correct SSI data, provide plaintiff the data and the programs CMS used to accomplish the recalculation, and pay the additional amounts due to it."  *Id.* at 23, JA306.  The district court held such relief "would be contrary to the law of this Circuit," because "the ultimate burden of persuasion remains with plaintiff" and the court must not "'substitute its judgment for that of the agency ….'"  *Id*.  (quoting *State Farm*, 463 U.S. at 43).  Therefore "the Court finds that remand is the appropriate remedy at this stage of the proceedings."  *Id.*

## V.    SUMMARY OF THE ARGUMENT

Although this action involves the complexities of Medicare Disproportionate-Share reimbursement, the central concepts of substantial evidence and proof of error should be quite familiar territory.  The district court ruled that the "Board's decision that the SSI numerators 'were proper'" lacked "substantial evidence …." Op. 22, JA305.  This ruling should be affirmed for the reasons explained by the district court and because the Board's decision was arbitrary and capricious and otherwise unlawful under the APA and other authorities.

As the district court correctly found, the Board applied the wrong standard, rejecting Pomona's appeal because it allegedly had not submitted "sufficient *quantifiable* data … to prove that the SSI percentages calculated by CMS … were flawed." *Id.* at 20, JA303.  The Board improperly (1) conflated proving liability with quantifying damages and (2) ignored Pomona's unrebutted evidence demonstrating the likelihood that the SSI fractions were, in fact, incorrect.

Significantly, Pomona presented unrefuted evidence that accounted for all potential discrepancies in Pomona's data that were identified by the Board.  As a practical matter, any further precision as to the extent of or reasons for CMS's error would require access to the underlying SSI data and details of CMS's matching.  Thus, the district court correctly held that the burden shifted to the agency to produce

any evidence it had rebutting Pomona's proof and, having failed to do so, the Board's decision could not stand.

Relying on what amounts to a *post-hoc* presumption infallibility to avoid disclosing the SSI data and matching information to respond to Pomona's substantial proof of error, the Secretary's brief argues that the agency's 2010 matching process necessarily produced correct SSI fractions in every instance. Such a position is facially inappropriate and implausible given the many thousands of backlogged SSI fractions CMS calculated for hospitals during the timeframe after *Baystate* under Ruling 1498-R.

Furthermore, the Secretary <u>never asserted</u> in the 2010 Final Rule adopting the new matching process, or otherwise, that the SSI data and CMS matching process are infallible, much less explained why it would be reasonable to presume them so. Thus, this argument is an improper *post-hoc* effort of the Secretary's counsel to uphold the SSI factions on grounds never asserted by the Secretary.

Moreover, if the Board and the Secretary are correct that perfect "quantifiability" is the standard that a hospital must meet to shift the burden to the Secretary to provide evidence to show that the SSI fractions were correct, no hospital could meet that standard because the government refuses to disclose the underlying SSI data and matching details. Acceptance of this Catch-22 standard would

effectively nullify the undisputed statutory right of hospitals to challenge their SSI fractions.

Because the unrefuted record before the Board demonstrated the fact of error in CMS's SSI fractions, and CMS had access to, but failed to produce, the data necessary to rebut those facts, the district court correctly reversed the Board. Moreover, CMS's failure to proffer such potentially exculpatory data triggered an adverse inference that production of this data would have confirmed that CMS's SSI calculations were, in fact, erroneous.

For these reasons, this Court should affirm the district court's decision reversing the Board, set aside the Secretary's SSI fractions, and remand them to the Secretary, with an adverse inference that the fractions were incorrect, while allowing the Secretary to use the underlying SSI data to determine the correct SSI fractions and any additional amounts owing to Pomona, with statutory interest.

## VI.    **STANDARD OF REVIEW**

This Court exercises *de novo* review of the legal issues in this appeal, including the district court's grant of summary judgment. *Pub. Citizen, Inc. v. HHS*, 332 F.3d 654, 658 (D.C. Cir. 2003). Jurisdiction over this action arises under 42 U.S.C. §1395oo(f), which provides that it "shall be tried pursuant to the applicable provisions under" the APA. Accordingly, this Court's review is governed by 5 U.S.C. §706, which requires the Court to set aside the Secretary's decision if it is arbitrary and

capricious, an abuse of discretion, not based on substantial evidence, or otherwise not in accordance with law. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414-17 (1971).

In *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.("Motor Vehicle")*, 463 U.S. 29 (1983), the Supreme Court described the "arbitrary and capricious" standard as follows:

> Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. at 43. The "substantial evidence" standard is a "subset of the arbitrary-and-capricious standard." *See Heartland Reg'l Med. Ctr. v. Leavitt*, 511 F. Supp. 2d 46, 51 n.6 (D.D.C. 2007) (citing *Sithe/Indep. Power Partners v. FERC*, 285 F.3d 1, 5 n.2 (D.C. Cir. 2002)). Substantial evidence review "calls for careful scrutiny of the entire record." *Brown v. Bowen*, 794 F.2d 703, 705 (D.C. Cir. 1986). Moreover, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *See Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 961-62 (D.C. Cir. 2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In addition, a reviewing court may uphold agency action only on the basis articulated by the agency in its decision, not on *post-hoc* rationalization offered by the agency or its counsel. *Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204, 212 (1988).

41

Further, it is well established "that an agency must cogently explain why it has exercised its discretion in a given manner and that explanation must be sufficient to enable us to conclude that the [agency's action] was the product of reasoned decisionmaking."  *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 460 (D.C. Cir. 2000).

## VII.   ARGUMENT

### A.     THE BOARD'S DECISION VIOLATES THE APA AND OTHER AUTHORITIES.

The Board concluded that Pomona did not proffer "sufficient quantifiable data" to prove that the SSI fractions at issue were flawed and, thus, upheld them as "proper" even though the Medicare contractor did not present <u>any</u> evidence during the Board proceedings, including evidence that (1) countervailed Pomona's overwhelming (and unrefuted) evidence that the fractions were inaccurate or (2) showed why the fractions were accurate.  Rather, the Board "concluded that because it could poke holes at what [Pomona] provided, it did not need to examine the accuracy of what CMS did."  Op. 21, JA304.

This was improper because "the question before the Court is not whether [Pomona] presented sufficient quantifiable data to prove that CMS's calculation was flawed, or whether plaintiff had ascertained the reasons for the discrepancies" but, rather, "whether upon review of the entire record, there was substantial evidence to support the Board's decision that plaintiff's SSI fraction had been properly determined by CMS."  *Id*. at 20, JA303.  The district court found that the Board "did not make a

42

serious effort to address this question [*i.e.*, whether the fractions were correct]" (*id*. at 21, JA304), and that the Board's finding that the fractions were "proper" violates the APA because it is "unsupported by substantial evidence" (*id*. at 22, JA305).

The district court was correct because the record evidence supporting CMS's SSI fractions was not only <u>un</u>substantial, it was nonexistent. The Secretary now pivots to arguing that the process established in the 2010 Rule insulates its SSI fractions under what amounts to a presumption of infallibility, which Pomona could not overcome using SSI evidence from a source other than SSA and CMS's matching details (which SSA and CMS refused to disclose, hence the Catch-22). The Secretary also argues that Pomona did not present enough evidence that the SSI fraction calculations were erroneous to shift the burden of production to CMS. Brief for Appellant/Cross-Appellee ("Sec'y Br.") 21-22. These arguments fail for several reasons.

First, the 2010 Rule did not purport to insulate CMS's SSI fractions from all challenges, nor could it. CMS's SSI-day calculations for Pomona were subject to challenge in the ordinary appeal process provided by the Medicare statute and regulations. In its appeal, Pomona exhausted all <u>available</u> sources of data and demonstrated that it is probable that CMS's SSI fractions were substantially inaccurate and not based on the best available data and/or the result of flaws in the matching process.

43

Second, the Secretary is incorrect that the Board could flatly reject this evidence on the basis of potential differences between Pomona's data and the data SSA and CMS refused to provide. Pomona's unrebutted proof demonstrated that the potential differences were incorrect, insubstantial, or both.

Third, under *Atlanta College*, which the Secretary's brief does not try to distinguish and which involves substantially similar circumstances, the burden shifted to the agency, which had the data that would have definitively addressed Pomona's proof of error, but produced nothing. Faced with this record, the Board lacked any basis, much less substantial evidence, to affirm the Secretary's calculations.

Fourth, and most important for due process purposes, this Court should reject the "sufficient quantifiable data" standard used by the Board because acceptance of it would effectively allow CMS to nullify Pomona's statutory right to judicial review. This is because SSA and CMS refused to give Pomona access to, or even use themselves, the data that would "quantify" precisely the incorrectness of the fractions.

### 1.    Using Reliable Data Available to It, Pomona Showed That the SSI Fractions Likely Were Not Properly Determined

The Secretary is right that Pomona did not challenge "the substantive or procedural validity of the 2010 Final Rule." Sec'y Br. 25. But Pomona was not required to do so, because the SSI fractions at issue were not part of a determination made in the 2010 Final Rule. Instead, CMS determined the SSI fractions at issue

under Ruling 1498-R, which were then included in the Medicare contractor-issued notices of program reimbursement for Pomona for FYs 2006-2008.

Ruling 1498-R explicitly states that each such notice of program reimbursement "will be subject to administrative and judicial review in accordance with the applicable jurisdictional and procedural requirements of section 1878 of the Act, the Medicare regulations, and other agency rules and guidelines." *See* Ruling 1498-R at 31. Although Congress has precluded review of some areas of Medicare reimbursement, it has not precluded review of CMS's Medicare Disproportionate-Share calculations. *Compare* 42 U.S.C. §1395oo(a)–(f) (permitting hospitals to seek administrative and judicial review of reimbursement determinations in their notice of program reimbursement) *with id.* §1395oo(g) (delineating certain determinations, but not Medicare Disproportionate-Share determinations, for which administrative and judicial review are precluded). Thus, as the Secretary appears to recognize (Sec'y Br. 25), Pomona was entitled to appeal its SSI fractions to the Board and beyond.

Pomona's Board appeal challenged the results of the process CMS used to determine Pomona's SSI fractions. Although the 2010 Rule describes the process CMS said it was going to use, virtually nothing is known about the reliability of CMS's underlying methodology. *See, e.g.*, 75 Fed. Reg. at 50,278-79 (noting the internal validation process for SSI calculations applies only for FYs 2011 forward, the results of which CMS did not intend to disclose). Further, despite the requirements of

45

Section 951, CMS provides hospitals only with summary data showing the end result of its match process—it did not give Pomona any opportunity to review for accuracy the underlying SSI entitlement data that CMS used to determine Pomona's SSI counts. *See* Op. 7, JA290.

Because of the government's refusal to provide the underlying SSI data and matching details, Pomona marshalled SSI-entitlement data from Medi-Cal and used its own matching process to show that CMS's SSI fractions at issue significantly undercounted the SSI days and were not correct. The extensive evidence introduced by Pomona and its three witnesses is explained in detail in Section IV.J.1, above, and showed conclusively that there either was an error in the SSI data CMS used, how CMS executed the match process or both: After conservatively accounting for potential discrepancies in the Medi-Cal data on which it was forced to rely, Pomona's evidence showed that CMS's counts of SSI days ranged from almost 20% to 25% lower than those calculated by Pomona for the three years.

In contrast, the Secretary (acting through the Medicare contractor) could have but presented <u>no witnesses</u> (lay or expert) at the hearing and offered <u>no factual evidence</u> in the form of pre- or post-hearing factual Declarations, either <u>to support</u> its case <u>or</u> to <u>rebut</u> Pomona's evidence and witnesses. On this record, the Court should find that the SSI fractions were, in fact, incorrect.

### 2. The Potential Differences that Board Found in Pomona's Data Were Incorrect, Insubstantial, or Both.

The Secretary argues that Pomona failed to meet its burden of demonstrating there was <u>any</u> error in CMS's SSI calculations because Pomona could not pinpoint the cause, or the precise quantity, of CMS's vastly lower counts of SSI patient days compared to the counts Pomona determined using available data.  Sec'y Br. 26-27. The Secretary cites portions of the Board's decision discussing several potential deficiencies in Pomona's data, matching, and recalculation of the SSI fractions. However, this argument ignores the unrebutted evidence that Pomona marshalled at the hearing, (1) establishing that CMS's calculations were in error, (2) identifying the exact patients with error, and (3) showing that CMS refused to provide access to the data needed to determine precisely the extent of, and the reasons, for the error.  A review of the evidence demonstrates that the alleged potential deficiencies in Pomona's SSI calculations were incorrect, insubstantial, or both.

a.     The Board noted that not all individuals with one of the Medi-Cal aid codes 10, 20, or 60 that Pomona's experts identified as denoting SSI entitlement would "map to an SSI code of C01, M01, or M02" because the Medi-Cal aid codes included some individuals who received only State supplemental payments, which are not counted in the numerator of the SSI fraction.  Board Decision 7 (JA44).  However, as the Board <u>itself</u> acknowledged, Pomona "eliminated the [estimated] SSP only [State-supplemental-payment-only] days" from its calculations.  *Id.*

47

Further, the Board found no fault with Pomona's final totals excluding State-benefit-only days, *id.,* which the undisputed record showed were conservative (Pomona reduced the "raw" total of patients (and days) for each year by approximately 16.5%), *see supra* at 24 n.6, 25-27. Importantly, after subtracting all the estimated State-benefit-only days, there remained an enormous gulf between CMS's calculations and Pomona's recalculations. But, alas, Pomona could go no further than basing its calculations of State-benefit-only days on statewide averages because only the SSA records, which SSA and CMS have but to which Pomona was denied access, would conclusively identify patients with State-only benefits. *See supra* at 25.

b.    The Board raised the possibility that patients admitted from a nursing home, some of whom would not receive SSI payments, could potentially account differences between Pomona's recalculated SSI fractions and CMS's initial SSI fractions. Board Decision at 7 (JA44). In response, Pomona presented extensive testimony, including unrefuted expert testimony, that the potential impact of days related to such nursing home residents would be quite small—and could never account for CMS's significantly lower SSI-day counts. *See supra* at 28-30. The Board made no findings that this evidence was not credible, and the Medicare contractor made no attempt to rebut it.

48

c.      The Board also raised the possibility that differences in the timing of patients' qualification for Medi-Cal benefits, as compared to when such patients started to receive SSI payments, may have skewed the number of "unmatched" patients and/or days.  Board Decision at 8 (JA45).  Again, however, Pomona presented extensive unrefuted testimony, including expert testimony, that such differences could have an effect only in relatively farfetched situations—where a patient is admitted at Pomona, and, in that same month, for the first time, applied for both Medi-Cal and SSI benefits and was somehow granted Medi-Cal eligibility on the basis of a very quick decision by SSA to make the individual eligible for SSI benefits. *See supra* at 30-31.

This scenario is all the more unlikely because Pomona does not, and did not, assist its patients in seeking SSI benefits.  *See* JA62.  One reason a hospital might assist patients seeking SSI benefits is because entitlement to SSI benefits is one way to qualify for coverage Medi-Cal, which could then pay for the hospital stay.  But the former Medi-Cal Director explained that "if a hospital [such as Pomona] is not using SSI as a means for obtaining Medi-Cal enrollment for coverage of a hospitalization, then it is quite uncommon for a patient to be seeking Medi-Cal enrollment for the first time at the same time as seeking SSI benefits for the first time."  JA53-54 (emphasis added).  The Board made no findings that this evidence was not credible, and the Medicare contractor made no attempt to rebut it.

d.    Despite acknowledging that it "would have been a difficult task," the Board faulted Pomona for not providing a "crosswalk" mapping "how information from SSA is translated into [Medi-Cal] aid codes 10, 20, and 60, in order to gain insight into how these aid codes relate to [SSA codes] C01, M01, and M02," which CMS allegedly used for its match.  Board Decision 9 (JA46).

The Board theorized that Pomona could have done this without the SSA data, *id.*, but there is nothing in the record supporting that theory.  Moreover, Pomona's unrebutted evidence showed that, beyond just being "difficult," creating a crosswalk is not possible without the underlying SSI data that supports the assignment of "SSI benefits entitlement" codes, which the SSA and CMS refused to disclose.[10]  Further, Pomona's unrebutted evidence demonstrated that all of the Medi-Cal aid codes Pomona relied on denoted active SSI-entitlement, other than the three potential exceptions identified and addressed above (State-benefit-only days, nursing home unpaid days, and first-month Medi-Cal days), so a crosswalk was not only irrelevant, it was also makeweight.

_____

[10] Without either the SSI data itself or the opportunity to test Pomona's findings of additional SSI days against the SSI data, it was impossible for Pomona to identify what had caused CMS's errors or to calculate their precise extent.  *See* Op. 22 (JA305).  In particular, and contrary to the Secretary's assertions (at 26-27) and the Board's findings (JA45), the unrebutted evidence established that Pomona could not provide a "crosswalk" or other additional information mapping the Medi-Cal codes indicating SSI status precisely to the SSI codes, without access to the underlying SSI data that CMS and SSA had (*see* Tr. 358:20-361:24 (JA201-202), 377:14-381:15 (JA206-207), 385:22-386:5 (JA208), 397:12-399:9 (JA211).

e.       Notwithstanding the substantial uncontroverted evidence presented by Pomona, the Board's decision also required Pomona to provide exact estimates of the impact of the above scenarios on the additional SSI days being requested and to determine if "there were any other potential reasons for the discrepancies" between the Medi-Cal data and the underlying SSI data.  *See* JA44-45.  However, more of Pomona is not required.

Where, as here, Pomona has presented "specific allegations supported by all the information available to [it]," the burden of production shifts to the Medicare contractor to explain why such allegations are not supported.  *Atlanta College*, at 831. In both possible differences between the Medi-Cal data and the underlying SSI data— the impact of nursing home residents or differing effective dates of benefits—the Medicare contractor did not present <u>any contrary evidence</u>, and thus, could not have met its burden to produce countervailing evidence or proof to explain why Pomona's overall allegations should not be accepted.  *See id.*, at 830-31; *see also Baystate*, 545 F. Supp. 2d at 51.   Importantly even after accounting for each and every potential difference, the net resulting data still showed that CMS's counts of SSI days were likely significantly understated and, thus, that the agency's calculations were in error.[11]

---

[11] The Secretary argues that the "best available data" standard tolerates some error. Sec'y Br. 31.  However, the record before the Board demonstrated significant error— (footnote continued)

Because nothing was proffered in rebuttal, the Board lacked substantial evidence simply to sweep Pomona's evidence of error aside and conclude that the SSI numerators were "proper." *See Lakeland Bus Lines, Inc.*, 347 F.3d at 962 (a court "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'") (quoting *Universal Camera Corp.*, 340 U.S. at 487). Indeed, as the district court noted, "the Board's decision fails to explain why the various potential flaws with plaintiff's calculation undermined plaintiff's conclusion so thoroughly that there was no reason to peek behind CMS's methodology at all." Op. 21, JA304.

The data necessary to conclusively prove Pomona's claim and to demonstrate the exact adverse impact of the discrepancies lies exclusively within the control of SSA and CMS, both of which rejected Pomona's request for disclosure. Thus, it was error for the Board to "deny [Pomona's] … claim on the ground that [Pomona] … had not excluded possible scenarios that could affect the accuracy of [Pomona's] … submissions when those scenarios could only be eliminated with information

---

CMS's counts of SSI days ranged from almost 20% to 25% lower than those calculated by Pomona for the three years. *See supra* at 25. Further, without the underlying SSI data that CMS failed to produce, it is not possible to determine whether the error was because CMS failed in some way to implement its matching process, or simply made mistakes in data used for the match, much less whether the error was tolerably based on the best available data.

unavailable to the [Pomona]." *See Atlanta College*, at 830.  Indeed, the "statutorily granted right to appeal would be meaningless if the Secretary could reject for 'hypothetical' reasons [from Pomona] … showing of a mistaken calculation backed up by all the information to which the [Pomona] … had access." *Id.*

### 3.    The District Court Properly Ruled that Pomona's Evidence Shifted the Burden of Production to the Secretary.

The bedrock rule is that "the burden of bringing forward evidence generally shifts when the defendant has greater access to information on a particular issue." *Atlanta College*, at 831 (citing *Geddes v. Benefits Review Bd.*, 735 F.2d 1412, 1418 (D.C. Cir. 1984)).  Like the plaintiffs in *Atlanta College*, Pomona here went "'about as far as [it] could go'" when it "presented specific allegations supported by all the information available to [it]," which information was "sufficient, if undisputed, to require the Secretary to reverse" the SSI fraction determinations; this shifted the burden to the Secretary to "produce countervailing evidence or a reason, not based on the insufficiency" the evidence presented "that explains why … the allegations have not been accepted." *See id.*  Because "the agency declined to provide [Pomona] … with any of the underlying SSI data[,] … to conduct or facilitate a test of sample data, … [or] to present any of that data to the Board …," the district court correctly found that "the Board improperly rejected [Pomona's] allegations."  Op. 22, JA305.

The Secretary presents several arguments why it was inappropriate to shift the burden, but each argument is contrary to the record, or otherwise meritless, and should

be rejected.  First, the Secretary asserts (at 35) that the 2010 Rule itself was reason enough to affirm CMS's SSI calculations because it described the method CMS stated it would use.  That argument might have some logic if Pomona had declined to present any evidence and just demanded that CMS prove that its calculations were correct.

Here, however, Pomona presented substantial evidence demonstrating the probability that CMS's calculations were materially incorrect.  *See supra* at 20-25.[12] At that point, the 2010 Rule no longer justified CMS's calculations—it did not purport to create a presumption of infallibility, and all evidence pointed straight to the conclusion that either something was wrong with the data CMS had used or CMS had erred in implementing the matching methodology set forth in the 2010 Rule.  The underlying SSI data, to which only SSA and CMS had access, held the key to determining whether the agency had, in fact, both used the best available data and matched that data properly.

Second, the Secretary argues (at 35) that CMS had already provided Pomona with the "relevant data" by producing "the MedPAR data file through the agency's established process under Section 951 of the Medicare Modernization Act of 2003

---

[12] The Secretary's reliance on *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238 (D.C. Cir. 2001), is puzzling.  The plaintiff there, unlike Pomona, had full access to whatever evidence it might have needed to prove its case (the amount of capital loss reimbursable by Medicare); and, unlike here, there was no relevant evidence that resided exclusively with the agency.  *Id.* at 241-44.  The plaintiff simply failed to produce adequate documentation to support its valuation, *id.* at 244-45, and had "itself created the evidentiary difficulty," *id.* at 246.

…," so the burden-shifting rule did not apply.  This is *post-hoc* and a non-sequitur.  The Secretary knows that the MedPAR file reveals only the end result of CMS's SSI match process, but does not contain the underlying SSI-entitlement data or the specific SSA codes assigned to each patient, to which Pomona had no access.  *See* Op. 8, JA291.  Thus, the MedPAR data can be used only to check CMS's math but not to determine whether CMS botched the matching process or the data was faulty.

Further, neither the Section 951 statute nor the implementing CMS rulemaking purports to restrict, in adjudications, the agency from providing additional data or the application of ordinary evidentiary rules.  *See* 42 U.S.C. §1395ww Note; 70 Fed. Reg. 47,440.  In fact, to the extent it covers disputes at all, the preamble to the final rule states that a hospital that believes CMS's count of SSI-entitled days is erroneous has a right to a Board appeal.  *Id.* at 47,441.  Thus, the fact that CMS provided MedPAR data could not nullify the burden-shifting rule.

Third, the Secretary asserts (at 36-37) that burden-shifting should not apply because SSI data is private.  This argument also lacks a basis in the law and the record.  By Section 951, Congress made clear that it expected hospitals would be given the data needed to confirm that the SSI fractions calculated by CMS were correct.  And, of course, CMS could have produced the data subject to an appropriate protective order, which may not have been necessary because the data concerned Pomona's patients, each of which had authorized Pomona to access the data necessary

for payment of their medical care.  Further, such privacy concerns might not even have arisen if CMS had reviewed the SSA matching results for the patient sample, as Pomona had requested and as SSA was willing to do, until CMS scuttled the process.

Fourth, the Secretary argues (at 38) that the Board was correct not to shift the burden to the agency, because the Board found fault with Pomona's evidence and "suggested ways in which Pomona could have strengthened its case without obtaining additional information from CMS or the Social Security Administration."  This argument lacks support because the Secretary rehashes two of the nits already refuted above regarding alleged deficiencies in Pomona's evidence:  Pomona did not precisely account "for the discrepancy between the effective dates of eligibility for Medi-Cal benefits (first day of month of application) and entitlement to SSI (first of month following application)" and did not produce a "crosswalk" of the Medi-Cal codes to the SSA codes.

The record evidence, however, demonstrated that neither of those tasks was feasible without the information that the government refused to disclose.  *See supra* at 50 & n10.  Moreover, while those tasks conceivably could have allowed a more precise calculation of CMS's error, the unrebutted record of error existed either way.  Finally, given its direct access to the SSA data, CMS cannot seriously deny that it had "greater access" than Pomona did to the information that would have definitively resolved the dispute.

56

Accordingly, the district court properly found that the Board (1) should have shifted the burden of production to CMS and (2) lacked substantial evidence for its decision that CMS's SSI calculations "were proper." Op. 22, JA305 (citing Board Decision 2, JA39).

### 4. The Board's "Sufficient Quantifiable Data" Standard Improperly Nullifies Pomona's Statutory Right to Challenge Its SSI Fractions.

As shown, Pomona has the undisputed statutory right to challenge its SSI fractions under 42 U.S.C. §1395oo(f) and Ruling 1498-R. But the exercise of that right obviously hinges on Pomona—once it has presented credible, unrefuted evidence demonstrating error in CMS's SSI match—having (1) access to the SSI data and (2) the ability to review the details of the matching process. The Secretary, however, disclosed neither. The Secretary relies on the outlandish presumption that the data and process called for in the 2010 Rule are infallible, combined with the lack of access to the SSI data and the details of the matching, to block the ability of hospitals to challenge their SSI fractions.[13]

---

[13] The Secretary (at 29-30) notes that the 2010 Rule creates "a uniform methodology for the complex and burdensome task of calculating hospitals' Medicare fractions nationwide," and that hospitals had a chance to comment on the process CMS adopted. But this case challenges the application of that process to Pomona, and Pomona's unrebutted evidence demonstrated the significant likelihood that the process had produced materially inaccurate SSI fractions.

Under these circumstances, the Board's "sufficient quantifiable data" standard effectively nullifies Pomona's statutory right to judicial review.  This is because the data "sufficient" for Pomona to show the incorrectness of the SSI fractions with the "perfect quantifiability" required by the Board is solely within possession of CMS and SSA, both of which refused to make the data available to Pomona.[14]  If this Court were to accept "perfect quantifiability" as the standard Pomona must meet to shift the burden to the Secretary to provide evidence to show that the fractions were correct, no hospital would ever be able to sustain a challenge because of the lack of availability of SSI data and matching details, effectively negating entirely the statutory appeal right.

This Catch-22 standard also would be arbitrary and capricious.  *Atlanta College*, at 830-31 (quoting district court: "'By requiring the schools to produce data that is not available to them before it will even consider errors alleged by them, the Department has transformed its initial reliance on the guarantee agencies' data into an irrebuttable presumption, and has therefore rendered the appeals process … arbitrary and capricious.'").

Perhaps acknowledging that it would be improper to simultaneously require exact proof and cut off all access to the data necessary for such proof, the Secretary argues (at 35-36) that "this is not a case where the agency has sole possession of the

---

[14] "[W]hen a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him."  *Int'l Union*, 459 F.2d at 1336.  *See* Section VII.B below.

relevant data" because "the Secretary provided Pomona with the MedPAR data file through the agency's established process under Section 951 of the Medicare Modernization Act of 2003." However, this argument is patently incorrect—as the district court found (Op. 5-6, JA288-289), the Secretary does not provide, under the Section 951 process or otherwise, underlying SSI data or the details about the matching process, which is the relevant information for purposes of this litigation, and did not do so here.

With regard to the implementation of Section 951, the district court stated "CMS gives hospitals data from its MedPAR Limited Data Set," which identifies the end results of its SSI-match process, specifically, records of "'matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis.'" Op. 6, JA289 (quoting 70 Fed. Reg. at 47,440). Crucially, as the district court explained,

> given the confidentiality of information retained by the Social Security Administration, CMS does not give the hospital the complete SSI eligibility file that it receives from SSA.

*Id*. Moreover, the government refused Pomona's request for such data for purposes of determining the accuracy of the SSI fractions at issue even though Section 951 of the Medicare Modernization Act required the Secretary "to furnish . . . hospitals . . . the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage . . . for that hospital for the current cost reporting year."

Thus, the Secretary's further argument that the "Secretary thereby satisfied all relevant statutory and regulatory requirements with respect to production of data" does not address, let alone refute, Pomona's argument. Rather, it shows that, in addition to the APA violations in the Board's Decision, the Secretary's actions violated, at the very least, the spirit of Section 951.

**B.      POMONA IS ENTITLED TO APPLICATION OF AN ADVERSE INFERENCE AGAINST THE SECRETARY.**

As shown, the Secretary (but not Pomona) has access to the underlying SSI data and matching details necessary to prove, conclusively, whether CMS's SSI fraction calculations are correct. Because the Secretary's failed to produce, or even to allow verification using, the data, the district court should have applied an inference that the data would validate Pomona's calculations and further invalidate the Secretary's calculations. *See Int'l Union v. NLRB*, 459 F.2d 1329, 1336-37 (D.C. Cir. 1972) (listing cases applying "common sense" adverse inference rule); *see also* 2 J. Wigmore, Evidence §285 (3d ed. 1940) ("The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, *that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party*." (emphasis added)).

The district court declined to apply an adverse inference because: "the ultimate burden of persuasion remains with plaintiff," Opinion at 23 (citing *Atlanta College* at 831 and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); and the district court stated it was inappropriate to "'substitute its judgment for that of the agency,'" *id.* (citing *State Farm*, 463 U.S. at 43), and, thus, that remand was the appropriate remedy …" *id.* (citing *PPG Indus., Inc. v. United States*, 52 F.3d 363, 366 (D.C. Cir. 1995).

Pomona acknowledges that the adverse-inference rule might conceivably present some tension in the context of a remand to an agency here. However, the Board's Decision was made at the conclusion of an adversarial adjudication where the Secretary, acting through Pomona's Medicare contractor, presented no evidence. In *Texas Dep't of Cmty. Affairs*, which the district court cited, the Supreme Court explained that a party's failure to proffer evidence in response to a shift of burden results in judgment in favor of the other party: "If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 254.

As shown above in Section VII.A.3, the burden of production shifted to the Secretary's agent, the Medicare contractor, to produce "countervailing evidence or a reason, not based on the insufficiency of [Pomona] showing," why CMS's SSI

61

fractions were correct. *Atlanta College*, at 831. Because the Medicare contractor had access to, but did not produce, the underlying SSI data or any other evidence that could have responded to Pomona's evidence, it should be presumed that the SSI data would have supported Pomona's calculations and not CMS's calculations.

Thus, the Court should, for purposes of remand, impose an adverse inference that CMS's SSI fractions were incorrect. In so doing, the Court would not be substituting its judgment for CMS's to determine the precise amount of Pomona's underpayments. Instead, CMS would make that determination using the underlying SSI data, if necessary. But the agency should not get another bite at the apple to try to rebut Pomona's proof that CMS's SSI fractions were in error, the fact of which should be found to have been conclusively established.

## VIII.  **CONCLUSION**

For the foregoing reasons, this Court should affirm in part and reverse in part the district court's judgment, set aside the Board's decision, and order the Secretary to recalculate Pomona's SSI fractions for the cost-reporting years at issue to include all improperly omitted SSI days, recalculate the resulting increased inpatient hospital payments, and pay Pomona the additional amounts due, with interest calculated under 42 U.S.C. §1395oo(f)(2).

Dated:  May 20, 2022                    Respectfully submitted,

                                          HOOPER, LUNDY & BOOKMAN, P.C.

                             By:  _____/s/Robert L. Roth_____
                                    Robert L. Roth (DC Bar No. 441803)
                                    Kelly A. Carroll (DC Bar No. 1018485)
                                    401 9th Street, NW, Suite 550
                                    Washington, DC  20004
                                    Tel.:  (202) 580-7700
                                    Fax:  (202) 580-7719
                                    E-mail:  rroth@health-law.com

                                    Sven C. Collins
                                    999 19th Street, Suite 3000
                                    Denver, Colorado  80202
                                    Tel.:  (720) 687-2850
                                    E-mail:  scollins@health-law.com

                                    *Attorneys for Appellee/Cross-Appellant*

# <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) because this brief contains 15,084 words, as determined by the word-count function of Microsoft Office 365 ProPlus, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 ProPlus in 14-point Times New Roman font.

Dated:  May 20, 2022          /s/ Robert L. Roth
                              Robert L. Roth
                              Attorney for Appellee/Cross-Appellant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 20th day of May, 2022, I electronically filed the Final Brief for Appellee/Cross-Appellant with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/CF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Robert L. Roth<br>
Robert L. Roth

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

**Statute:**

42 U.S.C §1395ww(d)(5)(F)(v).............................................................. Add. 1

42 U.S.C §1395ww(d)(5)(F)(vi).............................................................. Add. 2

42 U.S.C §1395ww Note........................................................................ Add. 2

42 U.S.C §1395oo................................................................................. Add. 3


**Regulatory Materials:**

42 C.F.R. §412.106(b)........................................................................... Add. 7

42 C.F.R. §405.1871.............................................................................. Add. 8

70 Fed. Reg. 47,278, 47,438-47,443 (Aug. 12, 2005)................................. Add. 10

75 Fed. Reg. 50,042, 50,275-50,286 (Aug. 16, 2010)................................. Add. 17

**Statute:**

**42 U.S.C §1395ww. Payments to hospitals for inpatient hospital services (excerpts)**

\*\*\*

**[42 U.S.C §1395ww(d)(5)(F)(v), (vi)]**

(F) (i)Subject to subsection (r), for discharges occurring on or after May 1, 1986, the Secretary shall provide, in accordance with this subparagraph, for an additional payment amount for each subsection (d) hospital which—

> (I) serves a significantly disproportionate number of low-income patients (as defined in clause (v)),

\*\*\*

> **(v)** In this subparagraph, a hospital "serves a significantly disproportionate number of low income patients" for a cost reporting period if the hospital has a disproportionate patient percentage (as defined in clause (vi)) for that period which equals, or exceeds—
>
> > **(I)** 15 percent, if the hospital is located in an urban area and has 100 or more beds,
> >
> > **(II)** 30 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in a rural area and has more than 100 beds, or is located in a rural area and is classified as a sole community hospital under subparagraph (D),
> >
> > **(III)** 40 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in an urban area and has less than 100 beds, or
> >
> > **(IV)** 45 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in a rural area and is not described in subclause (II).

A hospital located in a rural area and with 500 or more beds also "serves a significantly disproportionate number of low income patients" for a cost reporting period if the hospital has a disproportionate patient percentage (as defined in clause (vi)) for that period which equals or exceeds a percentage specified by the Secretary.

(**vi**) In this subparagraph, the term "disproportionate patient percentage" means, with respect to a cost reporting period of a hospital, the sum of—

(**I**) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter, and

(**II**) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI.

**\*\*\***

**[NOTE]**

**Furnishing Hospitals With Information To Compute DSH Formula**

Pub. L. 108–173, title IX, § 951, Dec. 8, 2003, 117 Stat. 2427, provided that: "Beginning not later than 1 year after the date of the enactment of this Act [Dec. 8, 2003], the Secretary [of Health and Human Services] shall arrange to furnish to subsection (d) hospitals (as defined in section 1886(d)(1)(B) of the Social Security Act, 42 U.S.C. 1395ww(d)(1)(B)) the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage under such section for that hospital for the current cost reporting year. Such data shall also be furnished to other hospitals which would qualify for additional payments under part A of title XVIII of the Social Security Act [42 U.S.C. 1395c et seq.] on the basis of such data."

**Statute:**

**42 U.S.C §1395oo.  Provider Reimbursement Review Board**

**(a) Establishment**

Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board (hereinafter referred to as the "Board") which shall be established by the Secretary in accordance with subsection (h) and (except as provided in subsection (g)(2)) any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title and which has submitted such reports within such time as the Secretary may require in order to make payment under such section may obtain a hearing with respect to such payment by the Board, if—

(**1**) such provider—

(**A**)

(**i**) is dissatisfied with a final determination of the organization serving as its fiscal intermediary pursuant to section 1395h of this title as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for the period covered by such report, or

(**ii**) is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title,

(**B**) has not received such final determination from such intermediary on a timely basis after filing such report, where such report complied with the rules and regulations of the Secretary relating to such report, or

(**C**) has not received such final determination on a timely basis after filing a supplementary cost report, where such cost report did not so comply and such supplementary cost report did so comply,

(**2**) the amount in controversy is $10,000 or more, and

(**3**) such provider files a request for a hearing within 180 days after notice of the intermediary's final determination under paragraph (1)(A)(i), or with respect to appeals under paragraph (1)(A)(ii), 180 days after notice of the Secretary's final determination, or with respect to appeals pursuant to paragraph (1) (B) or (C), within 180 days after notice of such determination would have been received if such determination had been made on a timely basis.

**(b) Appeals by groups**

The provisions of subsection (a) shall apply to any group of providers of services if each provider of services in such group would, upon the filing of an appeal (but without regard to the $10,000 limitation), be entitled to such a hearing, but only if the matters in controversy involve a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more.

**(c) Right to counsel; rules of evidence**

At such hearing, the provider of services shall have the right to be represented by counsel, to introduce evidence, and to examine and cross-examine witnesses. Evidence may be received at any such hearing even though inadmissible under rules of evidence applicable to court procedure.

**(d) Decisions of Board**

A decision by the Board shall be based upon the record made at such hearing, which shall include the evidence considered by the intermediary and such other evidence as may be obtained or received by the Board, and shall be supported by substantial evidence when the record is viewed as a whole. The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

**(e) Rules and regulations**

The Board shall have full power and authority to make rules and establish procedures, not inconsistent with the provisions of this subchapter or regulations of the Secretary, which are necessary or appropriate to carry out the provisions of this section. In the course of any hearing the Board may administer oaths and affirmations. The provisions of subsections (d) and (e) of section 405 of this title with respect to subpoenas shall apply to the Board to the same extent as they apply to the Secretary with respect to subchapter II.

**(f) Finality of decision; judicial review; determinations of Board authority; jurisdiction; venue; interest on amount in controversy**

(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board,

or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5 notwithstanding any other provisions in section 405 of this title. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

**(2)** Where a provider seeks judicial review pursuant to paragraph (1), the amount in controversy shall be subject to annual interest beginning on the first day of the first month beginning after the 180-day period as determined pursuant to subsection (a)(3) and equal to the rate of interest on obligations issued for purchase by the Federal Hospital Insurance Trust Fund for the month in which the civil action authorized under paragraph (1) is commenced, to be awarded by the reviewing court in favor of the prevailing party.

**(3)** No interest awarded pursuant to paragraph (2) shall be deemed income or cost for the purposes of determining reimbursement due providers under this chapter.

**(g) Certain findings not reviewable**

**(1)** The finding of a fiscal intermediary that no payment may be made under this subchapter for any expenses incurred for items or services furnished to an individual because such items or services are listed in section 1395y of this title shall not be reviewed by the Board, or by any court pursuant to an action brought under subsection (f).

**(2)** The determinations and other decisions described in section 1395ww(d)(7) of this title shall not be reviewed by the Board or by any court pursuant to an action brought under subsection (f) or otherwise.

**(h) Composition and compensation**

The Board shall be composed of five members appointed by the Secretary without regard to the provisions of title 5 governing appointments in the competitive services. Two of such members shall be representative of providers of services. All of the members of the Board shall be persons knowledgeable in the field of payment of providers of services, and at least one of them shall be a certified public accountant. Members of the Board shall be entitled to receive compensation at rates fixed by the Secretary, but not exceeding the rate specified (at the time the service involved is rendered by such members) for grade GS–18 in section 5332 of title 5. The term of office shall be three years, except that the Secretary shall appoint the initial members of the Board for shorter terms to the extent necessary to permit staggered terms of office.

**(i) Technical and clerical assistance**

The Board is authorized to engage such technical assistance as may be required to carry out its functions, and the Secretary shall, in addition, make available to the Board such secretarial, clerical, and other assistance as the Board may require to carry out its functions.

**(j) "Provider of services" defined**

In this section, the term "provider of services" includes a rural health clinic and a Federally qualified health center.

**Regulation:**

**42 C.F.R. §412.106 - Special treatment: Hospitals that serve a disproportionate share of low-income patients.**

**(excerpts)**

\*\*\*

**(b) Determination of a hospital's disproportionate patient percentage -**

**(1) General rule.** A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.

**(2) First computation**: Federal fiscal year. For each month of the Federal fiscal year in which the hospital's cost reporting period begins, CMS -

**(i)** Determines the number of patient days that -

**(A)** Are associated with discharges occurring during each month; and

**(B)** Are furnished to patients who during that month were entitled to both Medicare Part A (including Medicare Advantage (Part C)) and SSI, excluding those patients who received only State supplementation;

**(ii)** Adds the results for the whole period; and

**(iii)** Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of days that -

**(A)** Are associated with discharges that occur during that period; and

**(B)** Are furnished to patients entitled to Medicare Part A (including Medicare Advantage (Part C)).

**(3) First computation: Cost reporting period**. If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name, provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.

**Regulation:**

**42 C.F.R. §405.1871 - Board hearing decision.**

**(a)**

**(1)** If the Board finds jurisdiction over a specific matter at issue and conducts a hearing on the matter (as described in §§ 405.1840(a) and 405.1845(e) of this subpart), the Board must issue a hearing decision deciding the merits of the specific matter at issue.

**(2)** A Board hearing decision must be in writing and based on the admissible evidence from the Board hearing and other admissible evidence and written argument or comments as may be included in the record and accepted by the Board (as described in §§ 405.1845(g) and 405.1865 of this subpart).

**(3)** The decision must include findings of fact and conclusions of law regarding the Board's jurisdiction over each specific matter at issue (see § 405.1840(c)(1)), and whether the provider carried its burden of production of evidence and burden of proof by establishing, by a preponderance of the evidence, that the provider is entitled to relief on the merits of the matter at issue.

**(4)** The decision must include appropriate citations to the record evidence and to the applicable law, regulations, CMS Rulings, and other interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS. Where the Board's decision reverses or modifies a contractor determination on an issue for which the policy expressed in an interpretive rule (other than a regulation or a CMS Ruling), general statement of policy or rule of agency organization, procedure or practice established by CMS would be dispositive of that issue (if followed by the Board), the Board decision must explain how it gave great weight to such interpretive rule or other such instruction but did not uphold the contractor's determination on the issue.

**(5)** A copy of the decision must be sent promptly to each party to the appeal.

**(b)**

**(1)** A Board hearing decision issued in accordance with paragraph (a) of this section is final and binding on the parties to the Board appeal unless the hearing decision is reversed, affirmed, modified, or remanded by the Administrator under §§ 405.1875(a)(2)(i), 405.1875(e), and 405.1875(f) of this subpart, no later than 60 days after the date of receipt by the provider of the Board's decision.

Add. 8

(**2**) A Board hearing decision is inoperative during the 60-day period for review of the decision by the Administrator, or in the event the Administrator reverses, affirms, modifies, or remands that decision within the period.

(**3**) A Board hearing decision that is final under paragraph (b)(1) of this section is subject to the provisions of § 405.1803(d) of this subpart, unless the decision is the subject of judicial review (as described in § 405.1877 of this subpart).

(**4**) A final Board decision under paragraph (a) and (b) of this section may be reopened and revised by the Board in accordance with §§ 405.1885 through 405.1889 of this subpart.

(**5**) When the contractor's denial of the relief that the provider seeks before the Board is based on procedural grounds (for example, the alleged failure of the provider to satisfy a time limit) or is based on the alleged failure to supply adequate documentation to support the provider's claim, and the Board rules that the basis of the contractor's denial is invalid, the Board remands to the contractor for the contractor to make a determination on the merits of the provider's claim.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 405, 412, 413, 415, 419, 422, and 485**

[CMS–1500–F]

RIN 0938–AN57

**Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates**

**AGENCY:** Centers for Medicare and Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

**SUMMARY:** We are revising the Medicare hospital inpatient prospective payment systems (IPPS) for operating and capital-related costs to implement changes arising from our continuing experience with these systems. In addition, in the Addendum to this final rule, we describe the changes to the amounts and factors used to determine the rates for Medicare hospital inpatient services for operating costs and capital-related costs. We also are setting forth rate-of-increase limits as well as policy changes for hospitals and hospital units excluded from the IPPS that are paid in full or in part on a reasonable cost basis subject to these limits. These changes are applicable to discharges occurring on or after October 1, 2005, with one exception: The changes relating to submittal of hospital wage data by a campus or campuses of a multicampus hospital system (that is, the changes to § 412.230(d)(2) of the regulations) are effective on August 12, 2005.

Among the policy changes that we are making are changes relating to: The classification of cases to the diagnosis-related groups (DRGs); the long-term care (LTC)–DRGs and relative weights; the wage data, including the occupational mix data, used to compute the wage index; rebasing and revision of the hospital market basket; applications for new technologies and medical services add-on payments; policies governing postacute care transfers; payments to hospitals for the direct and indirect costs of graduate medical education, submission of hospital quality data, payment adjustment for low-volume hospitals, changes in the requirements for provider-based facilities; and changes in the requirements for critical access hospitals (CAHs).

**DATES:** *Effective Dates:* The provisions of this final rule, except the provisions

of § 412.230(d)(2), are effective on October 1, 2005. The provisions of § 412.230(d)(2) are effective on August 12, 2005. This rule is a major rule as defined in 5 U.S.C. 804(2). Pursuant to 5 U.S.C. 801(a)(1)(A), we are submitting a report to Congress on this rule on August 1, 2005.

**FOR FURTHER INFORMATION CONTACT:**

Marc Hartstein, (410) 786–4548, Operating Prospective Payment, Diagnosis-Related Groups (DRGs), Wage Index, New Medical Services and Technology Add-On Payments, Hospital Geographic Reclassifications, Postacute Care Transfers, and Disproportionate Share Hospital Issues.

Tzvi Hefter, (410) 786–4487, Capital Prospective Payment, Excluded Hospitals, Graduate Medical Education, Critical Access Hospitals, and Long-Term Care (LTC)–DRGs, and Provider-Based Facilities Issues.

Steve Heffler, (410) 786–1211, Hospital Market Basket Revision and Rebasing.

Siddhartha Mazumdar, (410) 786–6673, Rural Hospital Community Demonstration Project Issues.

Mary Collins, (410) 786–3189, Critical Access Hospitals (CAHs) Issues.

Debbra Hattery, (410) 786–1855, Quality Data for Annual Payment Update Issues.

Martha Kuespert, (410) 786–4605, Specialty Hospitals Definition Issues.

**SUPPLEMENTARY INFORMATION:**

**Electronic Access**

This **Federal Register** document is also available from the **Federal Register** online database through *GPO Access*, a service of the U.S. Government Printing Office. Free public access is available on a Wide Area Information Server (WAIS) through the Internet and via asynchronous dial-in. Internet users can access the database by using the World Wide Web; the Superintendent of Documents home page address is *http://www.access.gpo.gov/nara_docs/*, by using local WAIS client software, or by telnet to *swais.access.gpo.gov*, then login as guest (no password required). Dial-in users should use communications software and modem to call (202) 512–1661; type swais, then login as guest (no password required).

**Acronyms**

AAOS    American Association of Orthopedic Surgeons
ACGME    Accreditation Council on Graduate Medical Education
AHIMA    American Health Information Management Association
AHA    American Hospital Association
AICD    Automatic implantable cardioverter defibrillator

AMI    Acute myocardial infarction
AOA    American Osteopathic Association
ASC    Ambulatory Surgical Center
ASP    Average sales price
AWP    Average wholesale price
BBA    Balanced Budget Act of 1997, Pub. L. 105–33
BES    Business Expenses Survey
BIPA    Medicare, Medicaid, and SCHIP [State Children's Health Insurance Program] Benefits Improvement and Protection Act of 2000, Pub. L. 106–554
BLS    Bureau of Labor Statistics
CAH    Critical access hospital
CBSAs    Core-Based Statistical Areas
CC    Complication or comorbidity
CIPI    Capital Input Price Index
CMS    Centers for Medicare & Medicaid Services
CMSA    Consolidated Metropolitan Statistical Area
COBRA    Consolidated Omnibus Reconciliation Act of 1985, Pub. L. 99–272
CoP    Condition of Participation
CPI    Consumer Price Index
CRNA    Certified registered nurse anesthetist
CRT    Cardiac Resynchronization Therapy
DRG    Diagnosis-related group
DSH    Disproportionate share hospital
ECI    Employment Cost Index
FDA    Food and Drug Administration
FIPS    Federal Information Processing Standards
FQHC    Federally qualified health center
FTE    Full-time equivalent
FY    Federal fiscal year
GAAP    Generally accepted accounting principles
GAF    Geographic adjustment factor
HIC    Health Insurance Card
HIS    Health Information System
GME    Graduate medical education
HCRIS    Hospital Cost Report Information System
HIPC    Health Information Policy Council
HIPAA    Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191
HHA    Home health agency
HHS    Department of Health and Human Services
HPSA    Health Professions Shortage Area
HQA    Hospital Quality Alliance
ICD–9–CM    International Classification of Diseases, Ninth Revision, Clinical Modification
ICD–10–PCS    International Classification of Diseases, Tenth Edition, Procedure Coding System
ICU    Intensive Care Unit
IHS    Indian Health Service
IME    Indirect medical education
IPPS    Acute care hospital inpatient prospective payment system
IPF    Inpatient psychiatric facility
IRF    Inpatient rehabilitation facility
IRP    Initial residency period
JCAHO    Joint Commission on Accreditation of Healthcare Organizations
LAMCs    Large area metropolitan counties
LTC–DRG    Long-term care diagnosis-related group
LTCH    Long-term care hospital
MCE    Medicare Code Editor
MCO    Managed care organization
MDC    Major diagnostic category

Add. 10

*Comment:* One commenter requested clarification regarding whether the urban hospital that rescinded its section 1886(d)(8)(E) rural reclassification under our proposal would also forfeit new program IME FTE cap adjustments that it received while reclassified as rural.

*Response:* In the proposed rule, we stated that an urban hospital that reclassifies under section 1886(d)(8)(E) of the Act is treated as rural for payment purposes under section 1886(d) of the Act and, as such, can receive a 130-percent IME FTE cap adjustment and can also receive IME FTE resident cap adjustments based on new programs. We proposed that an urban hospital that rescinds its section 1886(d)(8)(E) reclassification would forfeit any increases to its IME cap that it received as a result of being reclassified as rural.

As mentioned above in this final rule, we are modifying our proposal to state that only an urban hospital that had reclassified as rural for fewer than 10 years will forfeit the cap adjustments that it received as a result of being reclassified as rural. Therefore, in response to the commenter, where the hospital had been reclassified as rural under section 1886(d)(8)(E) of the Act for fewer than 10 years and then rescinds its rural reclassification, the hospital's IME FTE resident cap would be adjusted to eliminate any adjustment for training residents in a new program. Only rural hospitals may receive a cap adjustment at any time for starting new programs. Unless the urban hospital qualifies for a cap adjustment for new programs under § 413.79(e)(1), an urban hospital that begins training residents in

a new program cannot receive an adjustment to their IME FTE resident caps.

For the reasons stated above, in this final rule we are amending the regulations at § 412.105 by adding a new paragraph (f)(1)(xv) (changed from proposed paragraph (f)(1)(xiv) in the proposed rule) to provide that a hospital that rescinds its section 1886(d)(8)(E) reclassification and that has been reclassified under such section for fewer than 10 years will forfeit any adjustments to its IME FTE resident cap it received due to its rural status. Thus, as stated in the example given above, a hospital that reclassified as rural under section 1886(d)(8)(E) of the Act with an IME FTE cap of 10 would have received a 130 percent adjustment to its IME FTE cap (that is, 10 FTEs × 1.3). Furthermore, if this hospital, while reclassified as rural, started a new 3-year residency program with 2 residents in each program year, its IME FTE resident cap would have been increased by an additional 6 FTEs to 19 FTEs (that is, 13 FTEs + 6 FTEs). However, if the hospital maintains its rural status for a period of fewer than 10 continuous years, once the hospital rescinds its reclassification under section 1886(d)(8)(E) of the Act to become urban again, its IME FTE resident cap would return to 10 FTEs (its original pre-reclassification IME FTE cap).

### G. Payment to Disproportionate Share Hospitals (DSHs) (§ 412.106)

#### 1. Background

Section 1886(d)(5)(F) of the Act provides for additional payments to

subsection (d) hospitals that serve a disproportionate share of low-income patients. The Act specifies two methods for a hospital to qualify for the Medicare disproportionate share hospital (DSH) adjustment. Under the first method, hospitals that are located in an urban area and have 100 or more beds may receive a DSH payment adjustment if the hospital can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are derived from State and local government payments for care furnished to indigent patients. These hospitals are commonly known as ''Pickle hospitals.'' The second method, which is also the most commonly used method for a hospital to qualify, is based on a complex statutory formula under which payment adjustments are based on the level of the hospital's DSH patient percentage, which is the sum of two fractions: the ''Medicare fraction'' and the ''Medicaid fraction.'' The Medicare fraction is computed by dividing the number of patient days that are furnished to patients who were entitled to both Medicare Part A and Supplemental Security Income (SSI) benefits by the total number of patient days furnished to patients entitled to benefits under Medicare Part A. The Medicaid fraction is computed by dividing the number of patient days furnished to patients who, for those days, were eligible for Medicaid but were not entitled to benefits under Medicare Part A by the number of total hospital patient days in the same period.

$$ \text{DHS Patient Percentage} = \frac{\text{Medicare, SSI Days}}{\text{Total Medicare Days}} + \frac{\text{Medicaid, Non-Medicare Days}}{\text{Total Patient Days}} $$

#### 2. Implementation of Section 951 of Pub. L. 108–173 (MMA)

In the FY 2006 IPPS proposed rule (69 FR 23434), we proposed to implement a mechanism for implementing section 951 of Pub. L. 108–173, which requires the Secretary to arrange to furnish the data necessary for hospitals to compute the number of patient days used in calculating the disproportionate patient percentages. The provision is not specific as to whether it applies to the patient day data used to determine the Medicare fraction or the Medicaid fraction. We interpret section 951 to require the Secretary to arrange to furnish to hospitals the data necessary to calculate both the Medicare and Medicaid fractions. With respect to both

the Medicare and Medicaid fractions, we interpret section 951 to require CMS to arrange to furnish the personally identifiable information that would enable a hospital to compare and verify its records, in the case of the Medicare fraction, against the CMS' records, and in the case of the Medicaid fraction, against the State Medicaid agency's records. Currently, as explained in more detail below, CMS provides the Medicare SSI days to certain hospitals that request these data. Hospitals are currently required under the regulation at § 412.106(b)(4)(iii) to provide the data adequate to prove eligibility for the Medicaid, non-Medicare days.

#### 3. Calculation of the Medicare Fraction

The first component of the Medicare DSH patient percentage calculation is the Medicare fraction. As indicated above, the numerator of the Medicare fraction includes the number of patient days furnished by the hospital to patients who were entitled to both Medicare Part A and SSI benefits. This number is divided by the hospital's total number of patient days furnished to patients entitled to benefits under Medicare Part A. In order to determine the numerator of this fraction for each hospital, CMS obtains a data file from the Social Security Administration (SSA). CMS matches personally identifiable information from the SSI file against its Medicare Part A

entitlement information for the fiscal year to determine the number of Medicare/SSI days for each hospital during each fiscal year. These data are maintained in the MedPAR Limited Data Set (LDS) as described in more detail below and discussed in a notice published on August 18, 2000 in the **Federal Register** (65 FR 50548). The number of patient days furnished by the hospital to Medicare beneficiaries entitled to SSI is divided by the hospital's total number of Medicare days (the denominator of the Medicare fraction). CMS determines this number from Medicare claims data; hospitals also have this information in their records. The Medicare fraction for each hospital is posted on the CMS Web site (*http://www.cms.hhs.gov*) under the SSI/Medicare Part A Disproportionate Share Percentage File. Under current regulations at § 412.106(b)(3), a hospital may request to have its Medicare fraction recomputed based on the hospital's cost reporting period if that year differs from the Federal fiscal year. This request may be made only once per cost reporting period, and the hospital must accept the resulting DSH percentage for that year, whether or not it is a more favorable number than the DSH percentage based on the Federal fiscal year.

In accordance with section 951 of Pub. L. 108–173, as we proposed in the FY 2006 IPPS proposed rule, we are changing the process that we use to make Medicare data used in the DSH calculation available to hospitals. Currently, as stated above, CMS calculates the Medicare fraction for each section 1886(d) hospital using data from the MedPAR LDS (as established in a notice published in the August 18, 2000 **Federal Register** (65 FR 50548)). The MedPAR LDS contains a summary of all services furnished to a Medicare beneficiary, from the time of admission through discharge, for a stay in an inpatient hospital or skilled nursing facility, or both; SSI eligibility information; and enrollment data on Medicare beneficiaries. The MedPAR LDS is protected by the Privacy Act of 1974 (5 U.S.C. 552a) and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104–191). The Privacy Act allows us to disclose information without an individual's consent if the information is to be used for a purpose that is compatible with the purpose(s) for which the information was collected. Any such compatible use of data is known as a "routine use." In order to obtain this privacy-protected data, the hospital must qualify under the routine

use that was described in the August 18, 2000 **Federal Register**. Currently, a hospital qualifies under the routine use if it has an appeal properly pending before the Provider Reimbursement Review Board (PRRB) or before an intermediary on the issue of whether it is entitled to DSH payments, or the amount of such payments. Once determined eligible to receive the data under the routine use, the hospital is then required to sign a data use agreement with CMS to ensure that the data are appropriately used and protected, and pay the requisite fee.

Beginning with cost reporting periods that include December 8, 2004 (within one year of the date of enactment of Pub. L. 108–173), we will arrange to furnish, consistent with the Privacy Act, MedPAR LDS data for a hospital's patients eligible for both SSI and Medicare at the hospital's request, regardless of whether there is a properly pending appeal relating to DSH payments. We will make the information available for either the Federal fiscal year or, if the hospital's fiscal year differs from the Federal fiscal year, for the months included in the 2 Federal fiscal years that encompass the hospital's cost reporting period. Under this provision, the hospital will be able to use these data to calculate and verify its Medicare fraction, and to decide whether it prefers to have the fraction determined on the basis of its fiscal year rather than a Federal fiscal year. The data set made available to hospitals will be the same data set CMS uses to calculate the Medicare fractions for the Federal fiscal year.

Because we interpret section 951 to require the Secretary to arrange to furnish these data, we do not believe that it will continue to be appropriate to charge hospitals to access the data. These changes will require CMS to modify the current routine use for the MedPAR LDS to reflect changes in the data provided and the circumstances under which they are made available to hospitals. In a future **Federal Register** document, we will publish the details of any necessary modifications to the current routine use to implement section 951 of Pub. L. 108–173.

*Comment:* Several commenters supported our proposal to release information from the MedPAR LDS to hospitals so that they can verify their Medicare DSH calculation. The commenters also supported our proposal to allow hospitals to choose whether they prefer to have their calculations performed using data from the Federal fiscal year or the hospital's cost reporting period. In addition, most commenters agreed with our proposal to

eliminate the need for a pending appeal in order to receive the data and to eliminate the corresponding fee.

Several commenters requested that CMS expedite the publication of the updated routine use for the MedPAR system of records, which will reflect the changes necessary to implement section 951 of Pub. L. 108–173. One commenter urged CMS to eliminate the fee associated with data requests for all years and not just years that span December 8, 2004. In addition, the commenter recommended the elimination of the appeals requirement for all years, including those that occur before the cost reporting period that includes December 8, 2004.

One commenter recommended that CMS clarify how hospitals will receive the SSI/Medicare data for both the Federal fiscal year and the hospital's cost reporting period. The commenter also asked whether CMS expected or would require hospitals to elect the same time period from year to year. Another commenter requested that CMS provide specific guidance to hospitals and fiscal intermediaries on how to use this information to support the Medicare DSH calculation. One commenter requested that CMS clarify whether the data provided to the hospitals will be patient-specific and whether the data will include the date of discharge.

*Response:* We appreciate the commenters' support for our proposed policies and kept their views in mind in developing the final regulations set forth below. We understand hospitals' need for more information on the updated routine use and data use agreement and are working to release these documents as soon as possible. As we stated in the FY 2006 IPPS proposed rule, the new routine use and data use agreement will require neither a fee nor a properly pending appeal before the fiscal intermediary or the PRRB for us to furnish information from the MedPAR LDS to hospitals. Hospitals must submit a written request to CMS through the fiscal intermediary to receive this information. With respect to applying this policy retroactively, section 903 of Pub. L. 108–173 prohibits us from issuing retroactive rulemaking unless it is necessary to comply with statutory requirements, or failure to apply the change retroactively would be contrary to public interest. We do not believe this policy meets either of the conditions for making the policy retroactive to cost reporting periods prior to those that span December 8, 2004.

We expect that hospitals will use these data to calculate and verify their DSH Medicare fraction, and to decide

whether they prefer to have the fraction determined on the basis of their cost reporting period rather than a Federal fiscal year. The information from the MedPAR LDS released to hospitals will contain the matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis for the 2 Federal fiscal years that comprise a hospital's cost reporting period. At this time, we are not requiring hospitals to select either the Federal fiscal year or their cost reporting period and use that selection for each subsequent year. A hospital may opt to use the data from either time period each year. Regardless, a hospital will continue to be required under the regulations at § 412.106(b)(3) to submit a written request to CMS, through its fiscal intermediary, if it prefers to use its cost reporting period data instead of the Federal fiscal year data in determining the DSH Medicare fraction. The resulting fraction will become the hospital's official DSH Medicare fraction for that period and will be binding for that cost reporting period.

*Comment:* One commenter cautioned that, while access to the data could reduce the number of appeals to the PRRB on the DSH calculation, CMS must respond in a timely manner to hospital requests for the SSI/Medicare data for this policy to be effective.

*Response:* We understand that it is imperative that we release information from the MedPAR LDS to hospitals in a timely manner to ensure that they can calculate their Medicare DSH fraction. When we publish the updated routine use, we will indicate the timeframes within which we expect to make these data available to hospitals. Currently, we publish the prior Federal fiscal year's DSH Medicare fractions (also called "SSI ratios") for all providers in August of each year.

*Comment:* Several commenters suggested that we release the data file of SSI eligibility information provided to CMS by SSA. The commenters indicated that hospitals need access to the SSI eligibility file in order to compute their own Medicare DSH adjustment. One commenter suggested that CMS modify the routine use to allow SSI eligibility information to be provided directly to hospitals.

*Response:* In accordance with the published routine use for the SSI system of records maintained by the SSA, CMS signs a data use agreement with SSA to receive the SSI data file for the sole purpose of administering the Medicare and Medicaid programs. While we understand the commenters' concern, CMS is strictly prohibited from disclosing SSI eligibility information. In

addition, SSA is prohibited from disclosing this information by Federal law and regulations. While we cannot release the SSI eligibility information provided by SSA, we are permitted to disclose the results of the data match of SSI eligibility information with the Medicare inpatient hospital billing data as a routine use for the MedPAR LDS system of records. The routine use allows us to release the information to hospitals that sign a data use agreement that limits the uses and protects the privacy of the SSI/MedPAR LDS match information.

*Comment:* One commenter stated that SSA has expressed a willingness to provide CMS with updated SSI eligibility information that may include retroactive grants or denials of eligibility, which would then be used by CMS to revise calculations of hospitals' DSH Medicare fractions.

*Response:* We understand that many hospitals are concerned that later data matches may produce a different Medicare fraction. However, we believe that there needs to be administrative finality to the calculation of a hospital's Medicare fraction. CMS has previously stated that its goal is to obtain reasonably accurate but not perfect calculations (51 FR 16777). Additionally, our data have shown that 98 to 99 percent of SSI eligibility determinations are made and remain unchanged 6 months after the end of the Federal fiscal year. There will be a minimum of 6 months between the end of the hospital's cost reporting period and the April 1 date that we receive SSI eligibility information. The time lag between the close of a hospital's cost reporting period and the April 1 date that we obtain the eligibility information could actually be much longer for many hospitals. For a hospital with an October 1 to September 30 cost reporting period, we will use SSI eligibility information from 6 months after its year ends. However, we will be using SSI eligibility 17 months after a hospital's year ends with a November 1 to October 31 cost reporting period. Given the time between the end of hospital cost reporting periods and when we are furnished with SSI eligibility information for that period, we believe it is highly unlikely that a subsequent data run will produce data that is significantly different than one completed 6 months after the end of the Federal fiscal year.

Therefore, we will use the SSI eligibility information provided to CMS by SSA 6 months after the end of the Federal fiscal year (or April 1) to calculate the DSH Medicare fraction. We will match these data to the MedPAR

system once and conduct no further matches after that time. For cost reporting periods that span 2 Federal fiscal years, a hospital will receive the data for the 2 Federal fiscal years once the data from the second year have been matched against the SSI data available to CMS 6 months after the end of that year. Although it is possible that these data will be available up to 17 months after the cost reporting period has ended, hospitals will continue to be permitted to use the data to determine whether they prefer to base their calculation on data from the Federal fiscal year or their cost reporting period. The calculation from the requested time period will be used in the final settlement for the cost reporting period. This policy will be reflected in the updated routine use and in the data use agreement, which hospitals will sign with CMS to obtain the privacy protected MedPAR LDS data match. As previously mentioned, we will publish the updated notice of routine use for the MedPAR system of records in a future **Federal Register** document.

*Comment:* One commenter requested that CMS allow hospitals to choose the data field CMS would use to conduct the SSI eligibility/MedPAR LDS data match. The commenter suggested that hospitals be allowed to request that the data match be made by social security number, health insurance claim account number (HICAN), name, gender, date of birth, or Title II identifier, or a combination of these factors.

*Response:* We do not use social security numbers to conduct the SSI/MedPAR data match because social security numbers are used on a "wage earner" basis that is not necessarily specific to an individual Medicare beneficiary (or hospital patient). The HICANs are unique to each beneficiary. Because of this, we do not have social security numbers for every Medicare beneficiary in the MedPAR data.

In addition, we do not agree that individual hospitals should be given the choice to run the SSI/MedPAR data match by alternative criteria. Such variation between providers would result in an inconsistent matching methodology, and inconsistent DSH Medicare fraction calculations, among providers.

*Comment:* One commenter suggested that, in place of using the MedPAR system, CMS use the Provider Statistical and Reimbursement (PS&R) data file to determine the denominator of the Medicare fraction.

*Response:* We believe it is appropriate to continue to use the MedPAR for Medicare DSH calculations. Principally, as documented in the **Federal Register**,

the MedPAR system has been the Medicare Part A data source for the Medicare DSH calculation since the implementation of the DSH adjustment. More importantly, the MedPAR system and the PS&R do not necessarily contain the same data. The MedPAR system contains utilized days and the PS&R contains days paid to the provider by Medicare. The PS&R does not contain certain types of days that should be included in the denominator of the Medicare fraction, such as covered days that were paid by a Medicare managed care organization ("MCO"). For these reasons, we are not proceeding with the commenter's recommendation at this time.

*Comment:* Several commenters suggested that CMS allow a hospital to submit additional days that it believes were omitted in error from the SSI/MedPAR system data match. One commenter acknowledged that the hospital would bear the burden of proving SSI/Medicare entitlement for each patient day claimed.

*Response:* If a hospital disagrees with the fiscal intermediary's determination regarding the final amount of Medicare DSH payment to which it is entitled, the hospital has the right to appeal the fiscal intermediary's decision in accordance with the procedures set forth in the regulations at 42 CFR Part 405, Subpart R, which concern provider payment determinations and appeals. Generally, during the first stage of the appeals process, a fiscal intermediary will consider any documentation a hospital has submitted for review. The fiscal intermediary will assess whether the information provided is sufficient to warrant a reconsideration of the DSH Medicare fraction at that point in the appeals process.

*Comment:* One commenter requested that CMS clarify "Medicare days" included in the Medicare fraction and explain how the MedPAR system captures all of the days that should be included, especially if Medicare did not pay the claim. The commenter specifically requested that CMS address the treatment of MCO or "Medicare Advantage" days, dual-eligible with exhausted Medicare Part A benefits, dual-eligible without SSI, and third party payer patient days.

*Response:* Although we believe that this comment is generally out of the scope of the FY 2006 IPPS proposed rule regarding the implementation of section 951 of the MMA, we understand the commenter's concern regarding the possible exclusion of certain days from the Medicare DSH calculation. Due to this concern, we are currently examining our system to ensure that all appropriate days are included in the DSH Medicare fraction.

In addition, on several occasions we have stated our policies concerning the treatment of MCO, dual-eligible with exhausted Medicare Part A benefits, dual-eligible without entitlement to SSI, and third party payer patient days in the Medicare DSH calculation. We suggest that the commenter refer to the FY 2005 IPPS final rule for our policy on dual-eligible patient days, including those with exhausted Medicare Part A hospital coverage and MCO days (69 FR 49098 and 49099). Commenters may also review the IPPS final rule for FY 1991 regarding when the MedPAR was updated to include MCO days (55 FR 35994, September 4, 1990). Regarding third party payer days, we refer commenters to the IPPS final rule for FY 1987, which states our policy prior to our FY 2005 policy change (51 FR 31460, September 3, 1986). For FY 2005 and subsequent fiscal years, we have updated the regulations at § 412.106(b) to reflect the inclusion of days for which Medicare was not the primary payer.

### 4. Calculation of the Medicaid Fraction

The second component of the Medicare DSH patient percentage calculation is the Medicaid fraction. The numerator of the Medicaid fraction includes hospital inpatient days that are furnished to patients who, for those days, were eligible for Medicaid but were not entitled to benefits under Medicare Part A. Under the regulation at § 412.106(b)(4)(iii), hospitals are responsible for proving Medicaid eligibility for each Medicaid patient day and verifying with the State that patients were eligible for Medicaid on the claimed days. The number of Medicaid, non-Medicare days is divided by the hospital's total number of inpatient days in the same period. Total inpatient days are reported on the Medicare cost report. (This number is also available in the hospital's own records.)

Much of the data used to calculate the Medicaid fraction of the DSH patient percentage are available to hospitals from their own records or from the States. We recognize that Medicaid State plans are only permitted to use and disclose information concerning applicants and recipients for "purposes directly connected with the administration of the [State] plan" under section 1902(a)(7) of the Act. Regulations at 42 CFR 431.302 define these purposes to include establishing eligibility (§ 431.302(a)) and determining the amount of medical assistance (§ 431.302(b)). Thus, State plans are permitted under the currently applicable statutory and regulatory provisions governing the disclosure of individually identifiable data on Medicaid applicants and recipients to provide hospitals the data needed to meet their obligation under § 412.106(b)(4)(iii) in the context of either an "eligibility inquiry" with the State plan or in order to assist the hospital, and thus the State plan, in determining the amount of medical assistance.

In the process of developing a plan for implementing section 951 with respect to the data necessary to calculate the Medicaid fraction, we asked our regional offices to report on the availability of this information to hospitals and on any problems that hospitals face in obtaining the information that they need. The information we received suggested that, in the vast majority of cases, there are established procedures for hospitals or their authorized representatives to obtain the information needed for hospitals to meet their obligation under § 412.106(b)(4)(iii) and to calculate their Medicaid fraction. There is no uniform national method for hospitals to verify Medicaid eligibility for a specific patient on a specific day. For instance, some States, such as Arizona, have secure online systems that providers may use to check eligibility information. However, in most States, providers send a list of patients to the State Medicaid office for verification. Other States, such as Hawaii, employ a third party private company to maintain the Medicaid database and run eligibility matches for providers. The information that providers submit to State plans (or third party contractors) differs among States as well. Most States require the patient's name, date of birth, gender, social security number, Medicaid identification, and admission and discharge dates. States or the third parties may respond with either "Yes/No" or with more detailed Medicaid enrollment and eligibility information such as whether or not the patient is a dual-eligible, whether the patient is enrolled in a fee-for-service or HMO plan, and under which State assistance category the individual qualified for Medicaid.[11]

We note that we have been made aware of at least one instance in which a State is concerned about providing hospitals with the requisite eligibility data. We understand that the basis for the State's objections is section

[11] Bear in mind that States and hospitals should, in keeping with the HIPAA Privacy Rule, limit the data exchanged in the context of these inquiries and responses to the minimum necessary to accomplish the task.

Add. 14

47442     **Federal Register** / Vol. 70, No. 155 / Friday, August 12, 2005 / Rules and Regulations

1902(a)(7) of the Act. The State is concerned that section 1902(a)(7) of the Act prohibits the State from providing eligibility data for any purpose other than a purpose related to State plan administration. However, as described above, we believe that States are permitted to verify Medicaid eligibility for hospitals as a purpose directly related to State plan administration under § 431.302.

In addition, we believe it is reasonable to continue to place the burden of furnishing the data adequate to prove eligibility for each Medicaid patient day claimed for DSH percentage calculation purposes on hospitals because, since they have provided inpatient care to these patients for which they billed the relevant payers, including the State Medicaid plan, they will necessarily already be in possession of much of this information. We continue to believe hospitals are best situated to provide and verify Medicaid eligibility information. Although we believe the mechanisms are currently in place to enable hospitals to obtain the data necessary to calculate their Medicaid fraction of the DSH patient percentage, there is currently no mandatory requirement imposed upon State Medicaid agencies to verify eligibility for hospitals. At this point, we continue to believe there is no need to modify the Medicaid State plan regulations to require that State plans verify Medicaid eligibility for hospitals. However, should we find that States are not voluntarily providing or verifying Medicaid eligibility information for hospitals, we will consider amending the State plan regulations to add a requirement that State plans provide certain eligibility information to hospitals.

*Comment:* Several commenters encouraged CMS to amend the Medicaid State plan requirements to require States to furnish Medicare eligibility data to requesting hospitals. Several commenters believed that variability in how State Medicaid agencies collect and manage Medicaid data make the process to convert and match hospital records to State Medicaid records extremely time-consuming and complex. The commenter believed that requiring every State to report Medicaid eligibility data in the same manner would decrease hospitals' administrative work. Several other commenters suggested that CMS not make any change to the States' requirements at this time, but continue to consider this idea as an option for the future. Another commenter suggested that CMS amend the State plan requirements to include a requirement that the States must make Medicaid eligibility information available in a timely manner, such as 90 days after receipt of a hospital's request. This commenter believed that States should be prohibited from charging hospitals a fee for accessing the data. Several commenters suggested that CMS modify the Medicaid State plan requirements to require that any contract between the State Medicaid agency and an MCO specify that the MCO would be required to submit reliable utilization data to the State to verify managed care days/patients.

*Response:* We are dedicated to working with the State Medicaid agencies to ensure that hospitals have access to data to verify Medicaid eligibility. While the commenters expressed concern that some hospitals find it burdensome to adapt the Medicaid eligibility data available from the States to their records, we do not believe these types of data processing concerns are significant enough to warrant changes to the State plan requirements. We are also aware that not all State agencies have the resources available to modify their systems in a standardized way. We note that the Center for Medicaid and State Operations in CMS has communicated CMS' expectation of compliance with hospitals' requests for Medicaid eligibility information to the State Medicaid agencies. If the State Medicaid agencies refuse to provide data to enable hospitals to calculate their DSH Medicaid fraction and meet their obligations under our regulations at § 412.106(b)(4)(iii), we will consider amending the Medicaid State plan requirements to require the State agency to release the information to the requesting hospitals.

We also do not believe that we have the authority to require State Medicaid agencies to provide the Medicaid eligibility information free-of-charge. However, we do note that the State Medicaid Manual already requires that States not impose unreasonable fees on hospitals seeking eligibility information.

With respect to Medicaid MCO utilization, State Medicaid agencies must maintain Medicaid eligibility information on beneficiaries enrolled in MCOs in order to make payments to those MCOs. Because hospitals are seeking Medicaid eligibility information and not inpatient hospital utilization information, we do not believe that it is appropriate for CMS to oblige the State Medicaid agencies to record and make available to hospitals MCO utilization data.

*Comment:* Several commenters argued that Congress intended that CMS provide the Medicaid eligibility data to aid hospitals in calculating their own Medicare DSH patient percentage.

*Response:* While we are aware that section 951 requires that CMS provide the data necessary for hospitals to calculate their Medicare DSH patient percentage, we stand by our belief that hospitals are in a better position to verify Medicaid eligibility with the State Medicaid agencies through their established mechanisms. Therefore, we believe hospitals have available to them the data necessary to calculate the Medicaid fraction for their Medicare DSH patient percentage. CMS will continue to work with State Medicaid agencies to ensure that Medicaid eligibility information is made available to hospitals.

*Comment:* Several commenters indicated that some State Medicaid agencies are refusing to provide hospitals with Medicaid eligibility information.

*Response:* We are not aware of any State Medicaid agency that is refusing to provide hospitals with current Medicaid eligibility information, and the commenters did not cite any such circumstances. However, we are aware that several State Medicaid agencies have previously expressed concern regarding hospital requests for historic Medicaid eligibility information. We note that section 2080.18 of the State Medicaid Manual limits the timeframe within which the State Medicaid agencies may provide eligibility information to requesting hospitals. Section 2018.18 clearly specifies that State Medicaid agencies may only provide eligibility information for dates within 12 months of the date of the request. Therefore, many States have expressed concern that responding to requests for eligibility data outside of that 12-month window would be in violation of CMS' policy. In light of past and pending appeals and litigation, we are working with the States to make sure historic information is available to requesting hospitals. The Center for Medicaid and State Operations released a memo to the CMS Regional Offices to be shared with the Medicaid State agencies. This memo, dated September 9, 2003, requested the full cooperation of the State Medicaid agencies in responding to hospital requests for historic Medicaid eligibility information. The States were specifically encouraged to retain Medicaid eligibility records in order to be able to comply with hospital requests for historic data, even if their normal record retention schedule would have allowed the destruction of such records. CMS' request to Medicaid State Agencies to provide hospitals with

historical Medicaid eligibility data represents an exception to the general rule as stated in section 2080.18 of the State Medicaid Manual intended to assist hospitals to respond to the past and pending appeals and litigation.

*Comment:* Several commenters stated that the data provided to hospitals from the Medicaid State agencies are often inaccurate. They noted that several fiscal intermediaries have refused to accept data from hospitals, which was obtained from the State Medicaid agencies.

*Response:* The Medicaid State agencies maintain eligibility information on Medicaid recipients. To date, we have been made aware of accuracy problems insofar as the data requested are historic and the complete records may no longer be available. As previously noted, we have requested that the State Medicaid agencies comply with hospital requests for historic data and modify their record retention schedules appropriately. We suggest that hospitals experiencing problems with the quality of current Medicaid eligibility data work with their fiscal intermediaries and State Medicaid agency to address the specific problems the hospital is encountering.

*Comment:* One commenter suggested that CMS establish a formal process for hospitals to report States that are not complying with hospital requests for Medicaid eligibility information. The commenter proposed that CMS dedicate an area on the CMS Web site for hospitals to report problems encountered with State Medicaid agencies.

*Response:* We are interested in the commenter's proposals and will consider this for future modification of the CMS Web site. Although we are not adopting the proposal at this time, we ask that hospitals that experience difficulty obtaining Medicaid eligibility information from a State Medicaid agency contact the appropriate CMS Regional Office. We will continue to work with the individual State agencies to ensure that hospitals have access to such information.

*Comment:* One commenter suggested that the fiscal intermediaries process hospital requests for Medicaid eligibility data and work with the State Medicaid agencies to obtain such data.

*Response:* Under the regulations at § 412.106(b)(4)(iii), hospitals bear the burden of furnishing data adequate to provide eligibility for each Medicaid patient day claimed in the Medicare DSH calculation. This includes verifying with the State that a patient was eligible for Medicaid on each of the claimed days. As stated above, the information provided to CMS by the Regional Offices indicated that there are established procedures for hospitals or their authorized representatives to obtain the information needed for hospitals to meet their obligation under § 412.106(b)(4)(iii) and to calculate their Medicaid fraction. In light of this, we do not believe that fiscal intermediaries should be made responsible for verifying Medicaid eligibility with the State Medicaid agencies.

*Comment:* One commenter suggested that CMS issue explicit instructions to fiscal intermediaries indicating that hospitals may submit their own data to support the days included in the Medicaid fraction.

*Response:* While hospitals do bear the burden of verifying Medicaid eligibility for the patient days they submit to be included in calculation of their DSH Medicaid fraction, the State Medicaid agency must verify that, for those days, the particular patient was eligible for inpatient hospital benefits under an approved Medicaid State plan or section 1115 waiver program. If a hospital believes that the State Medicaid agency did not correctly determine the Medicaid eligibility of a patient on a specific day for which the hospital has additional and distinct evidence to indicate that the patient was in fact eligible for Medicaid on that day, the hospital may submit this information for review by the fiscal intermediary. The fiscal intermediary retains the right to determine whether the documentation is sufficient to warrant the inclusion of the days in the Medicaid fraction. While we currently have no plans to issue instructions to fiscal intermediaries on the verification of Medicaid eligibility, we will consider addressing this concern in future communication with fiscal intermediaries.

*Comment:* One commenter stated that certain Medicaid eligibility information must be made available to hospitals through the State Medicaid agencies. The commenter indicated that solely providing whether a patient is eligible for Medicaid is not sufficient to determine whether the hospital days associated with that patient should be included in the DSH Medicaid fraction calculation. Specifically, this commenter indicated that the State must also provide: the dates of eligibility for Medicaid or whether the patient was eligible for Medicaid during an inpatient stay, whether the recipient has met spend down requirements (if applicable), and the type of Medicaid benefits the recipient received. The commenter indicated that this information is critical in determining the days that should be included in the DSH Medicaid fraction calculation.

*Response:* We encourage hospitals to continue working with individual State Medicaid agencies to ensure that they have access to the information needed to determine Medicaid eligibility for purposes of the DSH Medicaid fraction. If hospitals are unable to obtain data from the Medicaid State agencies data needed to calculate their DSH Medicaid fraction, we encourage them to notify their CMS Regional Office for assistance.

*Comment:* One commenter suggested that CMS establish a more efficient method for hospitals to verify dual eligibility using the Common Working File (CWF).

*Response:* We encourage hospitals to continue working with individual State Medicaid agencies and fiscal intermediaries to ensure that they have access to the information needed to determine Medicaid eligibility for purposes of the DSH Medicaid fraction. If hospitals are unable to obtain data from the Medicaid State agencies needed to calculate their DSH Medicaid fraction, we encourage them to notify their CMS Regional Office for assistance.

## H. Geographic Reclassifications (§§ 412.103, 412.230, and 412.234)

### 1. Background

With the creation of the MGCRB, beginning in FY 1991, under section 1886(d)(10) of the Act, hospitals could request reclassification from one geographic location to another for the purpose of using the other area's standardized amount for inpatient operating costs or the wage index value, or both (September 6, 1990 interim final rule with comment period (55 FR 36754), June 4, 1991 final rule with comment period (56 FR 25458), and June 4, 1992 proposed rule (57 FR 23631)). As a result of legislative changes under section 402(b) of Pub. L. 108–7, Pub. L. 108–89, and section 401 of Pub. L. 108–173, the standardized amount reclassification criterion for large urban and other areas is no longer necessary or appropriate and has been removed from our reclassification policy (69 FR 49103). We implemented this provision in the FY 2005 IPPS final rule (69 FR 49103). As a result, hospitals can request reclassification for the purposes of the wage index only and not the standardized amount. Implementing regulations in Subpart L of Part 412 (§§ 412.230 et seq.) set forth criteria and conditions for reclassifications for purposes of the wage index from rural to urban, rural to rural, or from an urban

**50042** **Federal Register** / Vol. 75, No. 157 / Monday, August 16, 2010 / Rules and Regulations

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**42 CFR Parts 412, 413, 415, 424, 440, 441, 482, 485, and 489**

**[CMS–1498–Fand CMS–1498–IFC; CMS–1406–F]**

**RIN 0938–AP80; RIN 0938–AP33**

**Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System Changes and FY2011 Rates; Provider Agreements and Supplier Approvals; and Hospital Conditions of Participation for Rehabilitation and Respiratory Care Services; Medicaid Program: Accreditation for Providers of Inpatient Psychiatric Services**

**AGENCY:** Centers for Medicare and Medicaid Services (CMS), HHS.

**ACTION:** Final rules and interim final rule with comment period.

**SUMMARY:** We are revising the Medicare hospital inpatient prospective payment systems (IPPS) for operating and capital-related costs of acute care hospitals to implement changes arising from our continuing experience with these systems and to implement certain provisions of the Affordable Care Act and other legislation. In addition, we describe the changes to the amounts and factors used to determine the rates for Medicare acute care hospital inpatient services for operating costs and capital-related costs. We also are setting forth the update to the rate-of-increase limits for certain hospitals excluded from the IPPS that are paid on a reasonable cost basis subject to these limits.

We are updating the payment policy and the annual payment rates for the Medicare prospective payment system (PPS) for inpatient hospital services provided by long-term care hospitals (LTCHs) and setting forth the changes to the payment rates, factors, and other payment rate policies under the LTCH PPS. In addition, we are finalizing the provisions of the August 27, 2009 interim final rule that implemented statutory provisions relating to payments to LTCHs and LTCH satellite facilities and increases in beds in existing LTCHs and LTCH satellite facilities under the LTCH PPS.

We are making changes affecting the: Medicare conditions of participation for hospitals relating to the types of practitioners who may provide rehabilitation services and respiratory care services; and determination of the effective date of provider agreements and supplier approvals under Medicare.

We are also setting forth provisions that offer psychiatric hospitals and hospitals with inpatient psychiatric programs increased flexibility in obtaining accreditation to participate in the Medicaid program. Psychiatric hospitals and hospitals with inpatient psychiatric programs will have the choice of undergoing a State survey or of obtaining accreditation from a national accrediting organization whose hospital accreditation program has been approved by CMS.

We are also issuing an interim final rule with comment period to implement a provision of the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010 relating to Medicare payments for outpatient services provided prior to a Medicare beneficiary's inpatient admission.

**DATES:** *Effective Date:* These rules are effective on October 1, 2010, except for amendments to § 412.2(c)(5) introductory text, (c)(5)(iii), and (c)(5)(iv); § 412.405; § 412.521(b)(1); § 412.540; § 412.604(f); § 413.40(c)(2) introductory text, (c)(2)(iii), and (c)(2)(iv), that are effective on June 25, 2010 and apply to services furnished on or after June 25, 2010. In accordance with sections 1871(e)(1)(A)(i) and (ii) of the Social Security Act, the Secretary has determined that retroactive application of these regulatory amendments is necessary to comply with the statute and that failure to apply the changes retroactively would be contrary to public interest:

*Comment Period:* To be assured consideration, comments on the interim final rule with comment period (CMS–1498–IFC) that appears as section IV.M., of the preamble of this document and includes amendments to § 412.2(c)(5) introductory text, (c)(5)(iii), and (c)(5)(iv); § 412.405; § 412.521(b)(1); § 412.540; § 412.604(f); § 413.40(c)(2) introductory text, (c)(2)(iii), and (c)(2)(iv) must be received at one of the addresses provided below, no later than 5 p.m. EST on September 28, 2010. Comments on other sections of this document will not be considered.

**ADDRESSES:** When commenting on issues presented in the interim final rule with comment period, please refer to file code CMS–1498–IFC. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation at *http://www.regulations.gov.* Follow the instructions for "Comment or Submission" and enter the file code CMS–1498–IFC to submit comments on this interim final rule.

2. *By regular mail.* You may mail written comments (one original and two copies) to the following address ONLY:

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1498–IFC, P.O. Box 8011, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments (one original and two copies) to the following address ONLY:

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1406–IFC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments (one original and two copies) before the close of the comment period to either of the following addresses:

a. Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201

(Because access to the interior of the HHH Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, please call telephone number (410) 786–7195 in advance to schedule your arrival with one of our staff members.

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Tzvi Hefter, (410) 786–4487, and Ing-Jye Cheng, (410) 786–4548, Operating Prospective Payment, MS–DRGs, Hospital Acquired Conditions (HAC),

Add. 17

meet the Medicare discharge criterion based on the latest available MedPAR data. However, the hospital must verify in writing to its fiscal intermediary or MAC that it continues to be more than 15 miles from any other IPPS hospital. (As noted above, we expect Medicare claims data from FY 2010 to be available to determine the low-volume payment adjustment for FY 2012.) A hospital that was not a low-volume hospital in FY 2011, and believes it meets the discharge and mileage criterion for FY 2012, should make its request in writing, with documentation that it meets the mileage criterion, to its fiscal intermediary or MAC by September 1, 2011, in order for the applicable low-volume percentage add-on to be applied beginning with discharges on or after October 1, 2011.

*Comment:* A few commenters requested clarification regarding the application of the low-volume payment adjustment at section 1886(d)(12) of the Act to SCHs and MDHs, given that these types of hospitals are also subsection (d) hospitals. These commenters also requested that CMS explicitly state that the applicable low-volume percentage add-on is applied to an SCH's or a MDH's payments at the Federal rate or the hospital-specific rate.

*Response:* Section 1886(d)(12)(C)(i) defines a low-volume hospital, in part, as a "subsection (d) hospital." SCHs and MDHs are "subsection (d) hospitals" although they can be paid under a hospital-specific rate instead of under the IPPS. As subsection (d) hospitals, SCHs and MDHs are eligible to receive the low-volume adjustment if the hospital meets the discharge and mileage criteria. Section 1886(d)(12)(A) states that the applicable low-volume percentage add-on payment will be "[i]n addition to any payments calculated [under section 1886]". For SCHs and MDHs, payment under section 1886 is determined using either the Federal rate or the hospital-specific rate, whichever results in a greater payment.

After consideration of the public comments we received, we are adopting the continuous linear sliding scale equation set forth by commenters to determine the low-volume payment adjustment for FYs 2011 and 2012 for eligible low-volume hospitals with Medicare discharges of *more than 200* and *less than 1,600* (that is, from 201 to 1,599 Medicare discharges), and we have modified § 412.101(c)(2) of the regulations in this final rule accordingly. We are revising § 412.101 to reflect the final changes as discussed above. In addition, we note that we are making structural changes to the final

regulation text at § 412.101 as compared to the proposed regulation text at § 412.101(for example, we are combining proposed paragraph (b)(2)(iii) into paragraph (b)(2)(i) to more concisely reflect the final policy that we are establishing in this final rule).

## E. Indirect Medical Education (IME) Adjustment (§ 412.105)

### 1. Background

Section 1886(d)(5)(B) of the Act provides for an additional payment amount under the IPPS for hospitals that have residents in an approved graduate medical education (GME) program in order to reflect the higher indirect patient care costs of teaching hospitals relative to nonteaching hospitals. The regulations regarding the calculation of this additional payment, known as the indirect medical education (IME) adjustment, are located at § 412.105.

Public Law 105–33 (BBA 1987) established a limit on the number of allopathic and osteopathic residents that a hospital may include in its full-time equivalent (FTE) resident count for direct GME and IME payment purposes. Under section 1886(h)(4)(F) of the Act, for cost reporting periods beginning on or after October 1, 1997, a hospital's unweighted FTE count of residents for purposes of direct GME may not exceed the hospital's unweighted FTE count for its most recent cost reporting period ending on or before December 31, 1996. Under section 1886(d)(5)(B)(v) of the Act, a similar limit on the FTE resident count for IME purposes is effective for discharges occurring on or after October 1, 1997.

### 2. IME Adjustment Factor for FY 2011

The IME adjustment to the MS–DRG payment is based in part on the applicable IME adjustment factor. The IME adjustment factor is calculated by using a hospital's ratio of residents to beds, which is represented as *r*, and a formula multiplier, which is represented as *c*, in the following equation: $c \times [\{1 + r\}^{.405} - 1]$. The formula is traditionally described in terms of a certain percentage increase in payment for every 10-percent increase in the resident-to-bed ratio.

Section 502(a) of Public Law 108–173 modified the formula multiplier *(c)* to be used in the calculation of the IME adjustment. Prior to the enactment of Public Law 108–173, the formula multiplier was fixed at 1.35 for discharges occurring on or after FY 2003 and thereafter. In the FY 2005 IPPS final rule, we announced the schedule of formula multipliers to be used in the

calculation of the IME adjustment and incorporated the schedule in our regulations at § 412.105(d)(3)(viii) through (d)(3)(xii). Section 502(a) modified the formula multiplier beginning midway through FY 2004 and provided for a new schedule of formula multipliers for FYs 2005 and thereafter as follows:

• For discharges occurring on or after April 1, 2004, and before October 1, 2004, the formula multiplier is 1.47.
• For discharges occurring during FY 2005, the formula multiplier is 1.42.
• For discharges occurring during FY 2006, the formula multiplier is 1.37.
• For discharges occurring during FY 2007, the formula multiplier is 1.32.
• For discharges occurring during FY 2008 and fiscal years thereafter, the formula multiplier is 1.35.

Accordingly, for discharges occurring during FY 2011, the formula multiplier is 1.35. We estimate that application of this formula multiplier for the FY 2011 IME adjustment will result in an increase in IPPS payment of 5.5 percent for every approximately 10-percent increase in the hospital's resident-to-bed ratio.

### 3. IME-Related Changes in Other Sections of this Final Rule

We refer readers to section IV.H.2. and IV.H.3. of the preamble of this final rule for a discussion of changes to the policies for identifying "approved medical residency programs" and the electronic submission of Medicare GME affiliation agreements.

## F. Payment Adjustment for Medicare Disproportionate Share Hospitals (DSHs): Supplemental Security Income (SSI) Fraction (§ 412.106)

### 1. Background

Section 1886(d)(5)(F) of the Act provides for additional Medicare payments to subsection (d) hospitals that serve a significantly disproportionate number of low-income patients. The Act specifies two methods by which a hospital may qualify for the Medicare disproportionate share hospital (DSH) adjustment. Under the first method, hospitals that are located in an urban area and have 100 or more beds may receive a Medicare DSH payment adjustment if the hospital can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are derived from State and local government payments for care furnished to needy patients with low incomes. This method is commonly referred to as the "Pickle method."

The second method for qualifying for the DSH payment adjustment, which is

the most common, is based on a complex statutory formula under which the DSH payment adjustment is based on the hospital's geographic designation, the number of beds in the hospital, and the level of the hospital's disproportionate patient percentage (DPP). A hospital's DPP is the sum of two fractions: the "Supplemental Security Income (SSI) fraction" and the "Medicaid fraction." The SSI fraction (also known as the "SSI ratio" or the "Medicare fraction") is computed by dividing the number of the hospital's inpatient days that are furnished to patients who were entitled to both Medicare Part A (including patients who are enrolled in a Medicare Advantage (Part C) plan) and SSI benefits by the hospital's total number of patient days furnished to patients entitled to benefits under Medicare Part A (including patients who are enrolled in a Medicare Advantage (Part C) plan). The Medicaid fraction is computed by dividing the hospital's number of inpatient days furnished to patients who, for such days, were eligible for Medicaid, but were not entitled to benefits under Medicare Part A, by the hospital's total number of inpatient days in the same period.

Because the DSH payment adjustment is part of the IPPS, the DSH statutory references (under section 1886(d)(5)(F) of the Act) to "days" apply only to hospital acute care inpatient days. Regulations located at 42 CFR 412.106 govern the Medicare DSH payment adjustment and specify how the DPP is calculated as well as how beds and patient days are counted in determining the DSH payment adjustment. Under § 412.106(a)(1)(i), the number of beds for the Medicare DSH payment adjustment is determined in accordance with bed counting rules for the IME adjustment under § 412.105(b).

2. CMS' Current Data Matching Process for the SSI Fraction

As we discussed in the FY 2011 IPPS/LTCH PPS proposed rule (75 FR 24002), from the inception of the Medicare DSH adjustment in 1986, CMS (formerly HCFA) has calculated the SSI fraction for each acute care hospital paid under the IPPS. This fraction, in combination with the Medicaid fraction, is used to determine whether the provider qualifies for a DSH payment adjustment and the amount of any such payment (51 FR 16772, 16777, May 6, 1986 interim final rule). In determining the number of inpatient days for individuals entitled to both Medicare Part A and SSI, as required for calculation of the numerator of the SSI fraction, CMS matches the Medicare records and SSI

eligibility records for each hospital's patients during the Medicare fiscal year, unless the provider requests calculation of the SSI fraction on a cost reporting period basis (in which case the provider would receive its SSI fraction based on its own cost reporting period). The data underlying the match process are drawn from: (a) The Medicare Provider Analysis and Review (MedPAR) data file; and (b) SSI eligibility data provided by the Social Security Administration (SSA). CMS has matched Medicare and SSI eligibility records using Title II numbers (included in the SSI records) and Health Insurance Claims Account Numbers (HICANs) (contained in the MedPAR file). Below we provide a more detailed description of both a Title II number and a HICAN.

*Title II Number:* If a person qualifies for retirement or disability benefits under Title II of the Act (42 U.S.C. 401 *et seq.*), SSA assigns a "Title II number" to the individual. If the Title II beneficiary's own earnings history (or the individual's disability) were the basis for such benefits, the person's Social Security number (SSN) would constitute the "root" of the individual's Title II number. However, if the person's Title II benefits were based on the earnings history of another individual (for example, a spouse), that other person's SSN would provide the root for the beneficiary's Title II number. In addition to a root SSN, each Title II number ends with a Beneficiary Identification Code (BIC) that identifies the basis for an individual's entitlement to benefits. For example, a person who becomes eligible for benefits under his or her own account would be described by his or her SSN followed by the BIC "A" whereas a wife who becomes eligible for benefits under her husband's account would be described by his SSN followed by the BIC "B." Children who become eligible under a parent's account would be described by the parent's SSN followed by the BIC "C1," "C2," etc.

*HICAN:* When a person becomes entitled to Medicare benefits, he or she is assigned a HICAN for purposes of processing claims submitted on his or her behalf for Medicare services. A beneficiary's HICAN (which may not necessarily contain his or her SSN) is included on the Medicare inpatient hospital claim.

Each HICAN for a beneficiary should be identical, at the same point in time, to that individual's Title II number. This is because HICANs and Title II numbers are both assigned on the basis of the same data source, the SSA-maintained Master Beneficiary Record, and by using the same rules (that is, the rules for

determining which person's SSN will serve as the root for an individual's HICAN and Title II number and for determining the BIC for both types of numbers).

We note that a person's Title II number and HICAN can change over time. For example, if the individual's entitlement to Title II and Medicare benefits was originally based on the earnings history of a first spouse, but the beneficiary later qualified for such benefits on the basis of a second spouse's earnings history, the beneficiary's HICAN and Title II number would change accordingly. Specifically, the first spouse's SSN would be the root of the beneficiary's original HICAN and Title II number; later, the second spouse's SSN would become the root of the beneficiary's second HICAN and Title II number.

The SSI eligibility data that CMS receives from SSA contain monthly indicators to denote which month(s) each person was eligible for SSI benefits during a specific time period. The current matching process uses only one Title II number (which is included in the SSI file) and one HICAN (found in the MedPAR file) for each beneficiary. In the current matching process, CMS has used the HICAN because it is the patient identifier that is provided by hospitals on the Medicare claim. Because SSNs are not included on Medicare inpatient claims, CMS has not historically used SSNs in the match process.

For a given fiscal year, CMS determines the numerator of the hospital's SSI fraction (that is, the number of the hospital's inpatient days for all of its patients who were simultaneously entitled to Medicare Part A benefits and SSI benefits) by calculating the sum of the number of the hospital's inpatient days that are associated with all of the identical Title II numbers and HICANs for the hospital's claims that are found through the data matching process. In turn, CMS determines the denominator of the hospital's SSI fraction by calculating the sum of the number of the hospital's inpatient days for patients entitled to benefits under Medicare Part A (regardless of SSI eligibility) that are included in the hospital's inpatient claims for the period.

3. *Baystate Medical Center* v. *Leavitt* Court Decision

In *Baystate Medical Center* v. *Leavitt,* 545 F. Supp. 2d 20, *as amended,* 587 F. Supp. 2d 37, 44 (D.D.C. 2008), the district court concluded that, in certain respects, CMS' current matching process (as described above) did not use the

"best available data" to match Medicare patient day information with SSI eligibility data when calculating the plaintiff's SSI fractions for FYs 1993 through 1996. Specifically, the court found that:

• Stale SSI Records and Forced Pay SSI Records. For the earliest years in question in *Baystate,* the SSI eligibility data did not include "stale" records—that is, records for individuals whose SSI records were no longer active from SSA's perspective. (We note that it is our understanding that, as of the year 2000, SSA no longer differentiates between inactive and active records and therefore, no longer uses the "stale record" indicator in its databases.) The court also found that the SSI data file only included SSI eligibility information for SSI payments that were automated (as opposed to manual), thereby excluding those people who, for whatever reason, received manual or "forced pay" payments. *Baystate,* 545 F. Supp. 2d at 44–46.

• Match Based on Only One Title II Number and One HICAN. The court found fault with CMS' use of only a single Title II number and one HICAN in the match process. As a beneficiary may receive SSI and Medicare Part A benefits under more than one Title II number and HICAN over a period of time, CMS would not have matched a beneficiary's records if there had been a change in the person's Title II number and HICAN between the time of an inpatient stay and when the match process was completed. *Baystate,* 545 F. Supp. 2d at 46–49.

• Retroactive SSI Eligibility Determinations and Lifting of Payment Suspensions. The court found that the match process did not appropriately account for retroactive eligibility determinations of SSI eligibility and the lifting of payment suspensions because the match process used SSI eligibility data that did not include more recent retroactive determinations of SSI eligibility and the lifting of SSI payment suspensions. By not using more recent SSI eligibility information that was available to CMS at the time of the hospital's cost report settlement, the court concluded that CMS did not use the "best available data" to calculate the provider's SSI fraction. *Baystate,* 545 F. Supp. 2d at 42–44.

CMS continues to believe that its current data matching process and the resultant SSI fraction and DSH payments were lawful. Nonetheless, the agency did not appeal the *Baystate* decision. Accordingly, CMS implemented the court's decision by recalculating the plaintiff's SSI fractions for 1993 through 1996. In recalculating

the SSI fractions at issue in the *Baystate* case, we worked closely with SSA to ensure that stale and forced pay SSI records were included in the SSI eligibility data. Also, we used a revised data matching process (described in more detail below) that comports with the court's decision. As the revised data matching process was completed using SSI eligibility data compiled between 13 and 16 years beyond the fiscal years at issue in the *Baystate* case, we believe any issues associated with retroactive determinations of SSI eligibility and the lifting of payment suspensions had been long since resolved. Furthermore, because we believe that the revised match process used to implement the Baystate decision addressed all of the concerns found by the court, in the FY 2011 IPPS/LTCH PPS proposed rule we proposed to use the same revised data matching process for calculating hospitals' SSI fractions for FY 2011 and subsequent fiscal years.

### 4. CMS' Process for Matching Medicare and SSI Eligibility Data

#### a. Inclusion of Stale Records and Forced Pay Records in the SSI Eligibility Data Files

In recalculating the SSI fractions at issue in the *Baystate* case, stale records and forced pay records were included in the SSI eligibility data files that CMS used in the revised data match for the four fiscal years at issue. All SSI payment records, whether the payments were automated or manual or were for an individual whose record was active or stale, are now included in the data files provided by SSA and will continue to be included in the future.

#### b. Use of SSNs in the Revised Match Process

As indicated above, the current matching process only uses one Title II number and one HICAN in the data match process. As we discussed in the FY 2011 IPPS/LTCH PPS proposed rule, by contrast, our revised match process would make use of the Medicare Enrollment Database (EDB), which is CMS' system of records for all individuals who have ever been enrolled in Medicare. The EDB includes SSNs as well as all of an individual's HICANs. In our proposed revised match process, the individual's SSN, contained in the SSI eligibility data file, would be compared to the SSNs in the Medicare EDB, and each matched SSN would then be "cross-walked" within the EDB to find any and all HICANs associated with the individual's SSN. The resulting HICANs would then be matched against

those HICANs contained in the MedPAR claims data files.

As stated in the proposed rule, before explaining our proposed revised match process in more detail, we believe it is appropriate to provide some background regarding SSNs and the three databases that would be used in our proposed match process. An individual should have only one SSN, which should be unique to that individual. The SSN may be assigned by SSA when the individual begins gainful employment (if not earlier). However, if an applicant for SSI benefits does not already have a SSN, SSA then assigns a SSN to the person. Thus, in the SSI eligibility data that SSA provides to CMS, each individual identified in those data should have a unique SSN.

The first database that we proposed to use in our revised match process was the SSI eligibility data file, which contains a unique SSN for every SSI record and could include as many as 10 different historical Title II numbers for the records related to one individual. We proposed to use 10 as the maximum number of Title II numbers for a beneficiary because that is likewise the maximum number of HICANs that can be attributed to any one individual in our EDB. However, we noted that, as a practical matter, the greatest number of historical HICANs associated with any beneficiary appears to be 7. The SSI eligibility file serves as the system of record for whether or not SSA made a payment of SSI benefits to an individual who applied for SSI benefits.

The second relevant database, the Medicare EDB, contains a SSN for virtually every record in the EDB. Furthermore, the EDB has the capacity to hold up to 10 historical HICANs for a specific Medicare enrollee. (It is important to note that, of the more than 100 million records in the EDB, less than 0.07 percent (that is, fewer than 7 of every 10,000 records) relate to individuals for whom the EDB does not include a SSN for the person. The EDB might not include a SSN for an individual if, for example, the person lives in another country but is entitled to Medicare benefits through his or her spouse.)

The third relevant database that we proposed to use in our revised match process was the MedPAR file. Hospitals submit claims to Medicare for inpatient services provided to Medicare beneficiaries. These claims are eventually accumulated in the MedPAR database. We noted that the MedPAR database does not contain SSNs. The MedPAR database contains one HICAN number for each and every record of services provided to a Medicare

**Add. 20**

beneficiary who was admitted to a Medicare-certified hospital or skilled nursing facility. This database allows us to calculate the number of Medicare inpatient hospital days, which we use in determining each hospital's DSH SSI fraction.

Utilizing the steps set forth below, in the proposed rule, we proposed to use these three databases in a revised match process for FY 2011 and subsequent fiscal years:

Step 1—Use SSNs to find any and all relevant HICANs. We proposed to use the SSI eligibility file provided by SSA to compare the individual SSNs in that file to the SSNs contained in the Medicare EDB. Each matched SSN would then be "cross-walked" (within the EDB) to find any and all HICANs associated with the individual's SSN. The resulting HICANs would then be matched against those HICANs contained in the MedPAR claims data files. This process should identify all relevant SSI records in which a SSN is associated with an individual who is simultaneously enrolled in Medicare Part A and in the SSI program.

Step 2—Utilize any and all Title II numbers. In order to provide further assurance that all of the Title II numbers and HICANs for SSI-eligible individuals have been identified, next we proposed to compare the complete list of Title II numbers from the SSI data file (up to 10 Title II numbers for any one individual) to the list of HICANs generated through Step 1 above. If the SSI data file includes any Title II numbers that were not already identified in Step 1, the Title II number would be included in our revised match process and compared to any and all HICANs in MedPAR. We noted that by including this second step (that is, adding all Title II numbers not previously identified by Step 1), we were addressing the very small universe of individuals for whom the EDB does not include a SSN. If an individual is entitled to SSI benefits and Medicare benefits, the new format of the SSI eligibility file will contain up to 10 Title II numbers and, if they have not already been captured, each of those numbers will be included in our revised match process. Even if an individual does not have a SSN in the EDB, this second step should ensure that our revised match process will include that individual.

Step 3—Ensure consistency between the HICANs in the EDB, Title II numbers, and the HICANs in the MedPAR file. The EDB stores the beneficiary's record at the most specific level of detail. For example, if the beneficiary's Medicare eligibility was originally based on the earnings history of a spouse who subsequently dies, the beneficiary would have two HICANs. Both HICANs, which would have the same root, but different BICs, would be stored in the EDB. However, the inpatient claim in the MedPAR file will only have the individual's HICAN at a more general level of detail; in the preceding example, the BIC would identify the beneficiary only as a spouse without specifying whether the spouse (that is, the "primary" beneficiary) was alive or deceased. This third step should ensure consistency between the HICANs from Step 1 and the Title II numbers from Step 2 by "equating" (or converting) the BIC identifiers to the identifiers that are on the inpatient claim that is included in the MedPAR file. In addition, we proposed that, for any SSI-eligible beneficiary who is receiving Medicare benefits based on his or her own account but whose records have not been matched already, we would attempt to match the beneficiary's HICAN in the MedPAR file. Specifically, we proposed to simply add an "A" to all the SSNs in the SSI eligibility data file so that, if that individual was not captured by Steps 1 and 2 above (for whatever unlikely reason) but MedPAR indicated that the person had received Medicare services, the individual would be included in the data match process by this third step.

Step 4—Calculate the SSI fraction. We did not propose any changes with respect to the final step in determining the SSI fraction. To calculate the numerator of the SSI fraction, CMS would continue to sum a hospital's Medicare inpatient days in the acute care part of the hospital (excluding IPPS-exempt units such as rehabilitation and psychiatric units) where the Medicare beneficiary was simultaneously entitled to SSI benefits. To calculate the denominator, CMS would continue to sum a hospital's total Medicare inpatient days in the acute care part of the hospital.

*Comment:* Many commenters supported the proposed data matching process and applauded CMS for working to refine the data matching process and for sharing details of the process in the proposed rule. Some commenters stated that it was difficult to determine the accuracy of the proposed data matching process without more details about the matching process, including more information on steps, testing, and validation processes or, alternatively, providing the underlying data files to the hospitals. Some commenters asked that CMS ensure that all HICANs included in the MedPAR file match to a HICAN in the EDB. The commenters requested that

CMS exclude any HICANs from the MedPAR file that did not match to the EDB so that the SSI fractions would not be understated. Commenters also asked that CMS ensure that the proposed data matching process is consistent with Federal Information Processing Standards (FIPS). One commenter asked that CMS include SSI indicators in the EDB and give access to authorized parties so that hospitals can calculate their own SSI fractions and litigation over the SSI fractions would be reduced.

*Response:* We appreciate the commenters' support of our proposed data matching process. We believe that the proposed data matching process will produce more accurate SSI fractions. We also believe that we have shared all relevant details about the proposed revised data matching process in order to allow the public a meaningful opportunity to submit comments. Specifically, we have described the specific data files we intend to use, provided information and background about those data files along with a detailed, step-by-step description of how we intend to use those files for purposes of the data matching process, and provided specific information, including examples, of the specific timeframes in which we intend to conduct the various aspects of the data matching processes. However, per the commenters' request, we are sharing additional details in this final rule about the testing and validation procedures we intend to use. Specifically, as part of our internal data validation processes, we will track certain summary statistics in an effort to minimize any errors or omissions of data that might lead to inaccurate SSI fractions. The summary statistics we produce when calculating each fiscal year's SSI fractions for FY 2011 and beyond will include the number of SSI records received from SSA and will include at least all of the following information about SSI records that "matched" to Medicare inpatient hospital claims using the revised data matching process: (1) The number of SSI records matched using the new data matching process; (2) the number of records indicating that the individual is deceased; and (3) the number of records where at least one SSI monthly indicator reflects that the individual was in forced pay or forced due status. Additionally, we will produce summary statistics relating to SSI records that did not match to a Medicare inpatient claim, and will include at least all of the following information: (1) The number of unmatched SSI records with no Title II numbers; (2) the number of unmatched SSI records with one or

more Title II numbers; and (3) the number of records in the EDB with a HICAN, but no SSN. As these data will be used as part of our internal data validation process, we do not intend to provide them to the public.

In response to the comment requesting that we ensure that every HICAN on the MedPAR file match a HICAN in the EDB, we agree that every HICAN in the MedPAR file should match a HICAN in the EDB. We believe that this is necessarily the case because a Medicare claim must be submitted with a valid HICAN in order to populate the MedPAR database. As we stated in the proposed rule, the EDB is CMS' system of records for all individuals who have ever been enrolled in Medicare and includes SSNs as well as all of an individual's (current and historical) HICANs. The MedPAR file includes the HICAN under which the Medicare beneficiary received Medicare benefits for a particular inpatient stay. Therefore, there should not be a HICAN in the MedPAR file that does not match to a HICAN in the EDB. Because there is no apparent reason for there to be a case where a HICAN in the MedPAR file did not match to a HICAN in the EDB, we did not propose to match HICANs in the MedPAR file to those in the EDB. We also note that "Step 3" of our proposed process should ensure consistency between the HICANs in the EDB and those in the MedPAR file by "equating" (or converting) the BIC identifiers in the EDB to the identifiers that are on the inpatient claim that is included in the MedPAR file. We also proposed that, for any SSI-eligible beneficiary who is receiving Medicare benefits based on his or her own account but whose records have not been matched in steps 1 or 2 of the proposed data matching process, we would attempt to match directly to the beneficiary's HICAN in the MedPAR file. Specifically, we proposed to add an "A" to all the SSNs in the SSI eligibility data file so that, if that individual was not captured by Steps 1 and 2 above, but the MedPAR file indicated that the person had received Medicare services, the individual would be included in the data match process by this third step. We believe that this step further helps us to capture any SSI-entitled individual who is receiving Medicare benefits based on his or her own account. However, after consideration of this public comment, in an attempt to provide even more assurances that our data matching process will yield accurate SSI fractions and capture all Medicare beneficiaries who were entitled to SSI at the time of their

inpatient hospital stay, we will add this step to our validation procedures when conducting the data matching process. That is, we will test the MedPAR data to determine whether each HICAN in the MedPAR file matches to a HICAN in the EDB. In the unlikely event that we find a HICAN in the MedPAR file that we are not able to locate in the EDB, we will investigate the record to determine whether the HICAN is valid (in which case we would include it in our data matching process). However, if we find that the HICAN is not valid, we are adopting a policy to exclude that record from the data matching process, and we also will exclude that invalid record from the calculation of both the numerator and the denominator of the SSI fraction.

With respect to the comment about FIPS, we note that the data matching process is consistent with the FIPS, to the extent the data used in the data matching process are covered under FIPS.

In response to the comment that we populate the EDB with the monthly SSI indicators and grant access to certain members of the public so that hospitals could calculate their own SSI fractions, we note that the EDB contains several elements of protected personally identifiable information and is the sole system of records for Medicare eligibility. As such, we may only provide access to the EDB to persons authorized under the Privacy Act or the HIPAA Privacy Rule. However, we agree that there are advantages to allowing hospitals to compute their own SSI fraction and provide supporting documentation for the amount of DSH claimed, consistent with the process under the regulations for computing the Medicaid fraction. We are open to suggestions from the public regarding how CMS and SSA could provide the data necessary for hospitals to compute their own SSI fractions without compromising protected personally identifiable information and other protected information. We also welcome suggestions describing how CMS or its contractors should verify the accuracy of the hospitals' computations without significantly increasing administrative burden.

*Comment:* A few commenters requested that CMS release each hospital's detailed SSI fraction data or give hospitals access to patient-level detail data, including SSI eligibility information, so each hospital could determine the accuracy of its SSI fractions. One commenter asked that CMS publish both the Federal fiscal year SSI fractions and each hospital's cost reporting period SSI fractions.

Some commenters asked that CMS provide assurances that there are no other data errors or omissions in the SSI file or the data matching process and asked that CMS work collaboratively with SSA to ensure the accuracy of the SSI file and to obtain SSNs for records in the EDB that are missing an SSN.

*Response:* Under the proposed data matching process for FY 2011 and beyond, CMS will continue to share certain detailed SSI fraction data used to calculate the hospital's SSI fraction as long as the hospital has a valid data use agreement with CMS and submits a request for such data. More detail on obtaining these data may be found on our Web site at: *http://www.cms.gov/PrivProtectedData/ 07_DSHRateData.asp* and the data use agreement application may be found on our Web site at: *http://cmsnet.cms.hhs. gov/hpages/oisnew/sysndata/access_to_ data/cms-DUA.pdf.* As stated in the proposed rule, we publish these data for every hospital based on the Federal fiscal year but, under the regulations at § 412.106(b)(3), a hospital with a cost reporting period that differs from the Federal fiscal year may request a revised SSI fraction that is based on its own cost reporting period rather than the Federal fiscal year. In such a case, we would revise the hospital's SSI fraction using SSI and Medicare data derived from the data match process for the two Federal fiscal years that spanned the hospital's cost reporting period. We believe that the statute governing the SSI fraction (section 1886(d)(5)(F)(vi)(I) of the Act) requires that one SSI fraction be calculated and used for purposes of determining a hospital's disproportionate patient percentage. We believe that allowing individual hospitals to request their own cost reporting period SSI fractions is sufficient and goes above and beyond what the statute requires. The current policy of calculating all hospitals' SSI fractions based on the Federal fiscal year does not require that we maintain a list of each individual hospital's cost reporting period, nor does it require that we perform multiple iterations of the data matching process. It would be administratively unwieldy to not only track every hospital's cost reporting period, but to calculate SSI fractions based on the many different cost reporting periods that hospitals across the country may have.

With respect to the comment requesting that CMS work with SSA to ensure accuracy of the SSI file, we note that CMS has worked collaboratively with SSA throughout the development of the data matching process that was described in the FY 2011 proposed rule.

We are committed to continue working with SSA to ensure that the file we receive from SSA for the purposes of the SSI fraction data matching process is complete and comprehensive and includes all individuals who are entitled to SSI. To our knowledge, there are no omissions or data errors on the SSI file that we receive from SSA. If we become aware of any such omissions or errors, we will work with SSA to correct them as quickly as possible. With respect to obtaining an SSN for each record in the EBD that does not have an SSN, we remind the commenters that "of the more than 100 million records in the EDB, less than 0.07 percent (that is, fewer than 7 of every 10,000 records) relate to individuals for whom the EDB does not include a SSN for the person." There are valid reasons that a person in the EDB may not have an SSN. For example, as we noted in the proposed rule, a person could live in a country other than the United States, but be entitled to Medicare benefits through his or her spouse. Another example of a record in the EDB that may validly lack an SSN is if the person filed for a spouse's or widow/er's benefit prior to the 1980's because SSA did not require that the person filing for benefits have an SSN at that time. There may be other valid reasons that a record in the EDB does not have an SSN, and as we previously stated, less than 0.07 percent of records in the EDB lack an SSN. We do not believe that it is possible to add an SSN for every record if the person became entitled to Title II or Medicare benefits without ever applying or receiving an SSN. However, we note that the EDB is populated by SSA on a frequent basis; to the extent that a record is added to the EDB, the SSN that SSA has on file for that person should be included in the EDB as well. Moreover, even if there were instances in which a record in the EDB was missing an SSN, the lack of an SSN for certain records in the EDB should have no effect on the data matching process because, in order to be entitled to SSI benefits, an individual must have an SSN. That is, a person who does not have an SSN, by definition, cannot be entitled to SSI. (We refer readers to the proposed rule language at 75 FR 24003 that states: "However, if an applicant for SSI benefits does not already have a SSN, SSA then assigns a SSN to the person.") Thus, in the SSI eligibility data that SSA provides to CMS, each individual identified in those data should have a unique SSN. Additionally, as we stated under Step 2 of the proposed data matching process, if an individual is entitled to SSI

benefits and Medicare benefits, the new format of the SSI eligibility file will contain up to 10 Title II numbers and, if they have not already been captured, each of those numbers will be included in our revised match process. Even if an individual does not have a SSN in the EDB, this second step should ensure that our revised match process will include that individual.

In response to the comment that CMS share the SSI file data with hospitals, the SSI program is under the authority of SSA and CMS is not authorized to share SSA data. Additionally, CMS is only permitted to use the SSI data for the sole purpose of conducting the data match process and calculating the SSI fractions. To the extent that a third party wishes to obtain direct access to the SSI file, it must contact SSA directly and meet SSA's requirements to become an authorized user.

*Comment:* One commenter stated that CMS uses total (that is, "paid and unpaid") Medicare days in the denominator of the SSI fraction, but uses paid SSI days in the numerator of the SSI fraction. The commenter requested that CMS interpret the word "entitled" to mean "paid" for both SSI-entitled days used for the numerator and Medicare-entitled days used in the denominator, or alternatively, that CMS include both paid and unpaid days for both SSI entitlement and Medicare entitlement such that there is consistency between the numerator and the denominator of the SSI fraction. The commenter stated that there were several SSI codes that represent individuals who were eligible for SSI, but not eligible for SSI payments, that should be included as SSI-entitled for purposes of the data matching process. Specifically, the commenter stated that at least the following codes should be considered to be SSI-entitlement:

• E01 and E02
• N06, N10, N11, N18, N35, N39, N42, N43, N46, N50, and N54
• P01
• S04, S05, S06, S07, S08, S09, S10, S20, S21, S90, and S91
• T01, T20, T22, and T31

*Response:* In response to the comment that we are incorrectly applying a different standard in interpreting the word "entitled" with respect to SSI entitlement versus Medicare entitlement, we disagree. The authorizing DSH statute at section 1886(d)(5)(F)(vi)(I) of the Act limits the numerator to individuals entitled to Medicare benefits who are also "*entitled* to supplemental security income benefits (excluding any State

supplementation)" (emphasis added).[19] Consistent with this requirement, we have requested, and are using in the data matching process, those SSA codes that reflect "entitlement to" receive SSI benefits. Section 1602 of the Act provides that "[e]very aged, blind, or disabled individual who is determined under Part A to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this title, be *paid* benefits by the Commissioner of the Social Security" (emphasis added). However, eligibility for SSI benefits does not automatically mean that an individual will receive SSI benefits for a particular month. For example, section 1611(c)(7) of the Act provides that an application for SSI benefits becomes effective on the later of either the month following the filing of an application for SSI benefits or the month following eligibility for SSI benefits.

On the other hand, section 226 of the Act provides that an individual is automatically "entitled" to Medicare Part A when the person reaches age 65 and is entitled to Social Security benefits under section 202 of the Act (42 U.S.C. 402) or becomes disabled and has been entitled to disability benefits under section 223 of the Act (42 U.S.C. 423) for 24 calendar months. Section 226A of the Act provides that qualifying individuals with end-stage renal disease shall be entitled to Medicare Part A. In addition, section 1818(a)(4) of the Act provides that, "unless otherwise provided, any reference to an individual entitled to benefits under [Part A] includes an individual entitled to benefits under [Part A] pursuant to enrollment under [section 1818] or section 1818A." We believe that Congress used the phrase "entitled to benefits under part A" in section 1886(d)(5)(F)(vi) of the Act to refer to individuals who meet the criteria for entitlement under these sections.

Moreover, unlike the SSI program (in which entitlement to receive SSI benefits is based on income and resources and, therefore, can vary from time to time), once a person becomes entitled to Medicare Part A, the individual does not lose such entitlement simply because there was no Medicare Part A coverage of a

---

[19] As a side note, we have used the phrase "SSI-eligible" interchangeably with the term "SSI-entitled" in the FY 2011 proposed rule as well as prior proposed and final rules, but the statute requires that we include individuals who were entitled to SSI benefits in the SSI fractions. Although we have used these terms interchangeably, we intended no different meaning, and our policy has always been to include only Medicare beneficiaries who are entitled to receive SSI benefits in the numerator of the SSI fraction.

specific inpatient stay. Entitlement to Medicare Part A reflects an *individual's* entitlement to Medicare Part A benefits, not the hospital's entitlement or right to receive payment for services provided to such individual. Such Medicare entitlement does not cease to exist simply because Medicare payment for an individual inpatient hospital claim is not made. Again, we are bound by section 1886(d)(5)(F)(vi)(I) of the Act, which defines the SSI fraction numerator as the number of SSI-entitled inpatient days for persons who were "entitled to benefits under [P]art A," and the denominator as the total number of inpatient days for individuals who were "entitled" to Medicare Part A benefits.

In response to the comment about specific SSI status codes, SSA has provided information regarding all of the SSI status codes mentioned by the commenter to assist in the determination of whether any of these codes represent individuals who were entitled to SSI benefits for the purposes of calculating the SSI fraction for Medicare DSH. With respect to the codes that begin with the letter "T," SSA informed us that all of the codes represent individuals whose SSI entitlement was terminated. Code "T01" represents records that were terminated because of the death of the individual, but we confirmed that this code would not be used until the first full month after the death of the individual. That is, for example, if a Medicare individual was entitled to SSI during the month of October, was admitted to the hospital on October 1 and died in the hospital on October 15, the individual would show up as entitled to SSI for the entire month of October on the SSI file (code T01 would not be used on the SSI file until November) and 15 Medicare/SSI inpatient hospital days for that individual would be counted in the numerator and the denominator of the SSI fraction for that hospital.

Codes beginning with the letter "S" reflect records that are in a "suspended" status and, according to SSA, do not represent individuals who are entitled to SSI benefits.

SSA maintains that code "P01" is obsolete and has not been used since the mid-1980s. Therefore, it would not be used on any SSI files reflecting SSI entitlement for FY 2011 and beyond.

Codes that begin with the letter "N" represent records on "nonpayment" and are not used for individuals who are entitled to SSI benefits.

Code "E01" represents an individual who is a resident of a medical treatment facility and is subject to a $30 payment limit, but has countable income of $30 or more. Such an individual is not

entitled to receive SSI payment. Alternatively, an individual who is a resident of a medical treatment facility and is subject to a $30 payment limit, but does not have countable income of at least $30, would be reflected on the SSI file as a "C01" (which denotes SSI entitlement) for any month in which the requirements described in this sentence are met. Code "E02" is used to identify a person who is not entitled to SSI payments in the month in which that code is used pursuant to section 1611(c)(7) of the Act, which provides that an application for SSI benefits shall be effective on the later of (1) the first day of the month following the date the application is filed, or (2) the first day of the month following the date the individual becomes eligible for SSI based on that application. Such an individual is not entitled to SSI benefits during the month that his or her application is filed or is determined to be eligible for SSI, but, for the following month, would be coded as a "C01" because he or she would then be entitled to SSI benefits.

Therefore, both codes E01 and E02 represent individuals who are not entitled to SSI benefits and are reflected accordingly on the SSI file. If the individual's entitlement to SSI benefits is initiated the ensuing month, that individual would then be coded as a "C01" on the SSI file and would be included as SSI-entitled for purposes of the data matching process.

As we have discussed above, none of the SSI status codes that the commenter mentioned would be used to describe an individual who was entitled to receive SSI benefits during the month that one of those status codes was used. SSI entitlement can change from time to time, and we believe that including SSI codes of C01, M01, and M02 accurately captures all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits.

After consideration of the public comments we received, we are adopting the proposed data matching process for FY 2011 and beyond as final. The only modification we are making to the proposed data matching process is adopting a policy to exclude a record from the data matching process if we find a HICAN in the MedPAR file that we are not able to locate in the EDB, which is an extremely unlikely situation as noted in the prior discussion in this final rule. We are adopting this additional step in our validation process in response to public comments to provide even more assurances that our data matching process will yield accurate SSI fractions and capture all Medicare beneficiaries who were

entitled to SSI at the time of their inpatient hospital stay.

### c. Timing of the Match

One of the district court's findings in the *Baystate* decision was that CMS did not use a more recent SSI entitlement file to calculate the provider's SSI fractions. As a result, it might be possible that if a beneficiary treated at the hospital was later determined retroactively to be SSI entitled, or if a suspension of the individual's SSI payments was later lifted, that inpatient stay might not be included in the numerator of the SSI fraction. We believe that, in our recalculation of the *Baystate* hospital's SSI fractions and DSH payments, retroactive SSI entitlement determinations and the lifting of SSI payment suspensions were not an issue due to the long period of time that elapsed between the provider's 1993 through 1996 fiscal years and our use of updated SSI entitlement data during our completion of the revised match process in 2009. However, we stated our belief that further consideration of the timing of both the SSI entitlement information that SSA provides to CMS and our proposed revised match process for FY 2011 and subsequent fiscal years was warranted.

At present, SSA provides an annual file to CMS with SSI entitlement information that is current through March 31, or 6 months after the end of the prior Federal fiscal year on September 30 (70 FR 47278, 47440, August 12, 2005). Based on this date, for a hospital with an October 1 to September 30 cost reporting period, the SSI entitlement information we currently use contains 6 to 18 months worth of retroactive SSI entitlement determinations and payment suspension closures—6 months from September (that is, the end of the cost reporting period), and 18 months from October (that is, the beginning of the cost reporting period). The time lag between the close of a hospital's cost reporting period and the date that CMS receives SSI entitlement information could actually be longer or shorter for some hospitals, depending on the hospital's specific cost reporting period. The SSI fractions are generally based on the Federal fiscal year; however, under the regulations at § 412.106(b)(3), a hospital with a cost reporting period that differs from the Federal fiscal year may request a revised SSI fraction that is based on its own cost reporting period rather than the Federal fiscal year. In such a case, we would revise the hospital's SSI fraction using SSI and Medicare data derived from the data match process for the two Federal fiscal years that

spanned the hospital's cost reporting period.

As we stated in the FY 2006 IPPS final rule, we believe that administrative finality with respect to the calculation of a hospital's SSI fraction is important (70 FR 47440). We continue to believe that it is important to find an appropriate balance between administrative finality (that is, the final settlement of a hospital's cost report) and the inclusion of retroactive SSI eligibility determinations and the lifting of SSI payment suspensions by using the best and latest available SSI eligibility data at the time of cost report settlement. Further, we believe it is important to account for the time period in which hospitals are allowed to submit timely Medicare claims in order to ensure that the point in time that we perform the match process includes as many timely submitted inpatient hospital claims as are administratively practicable.

In accordance with the regulations at 42 CFR 424.44 and the Medicare Claims Processing Manual (Pub. 100–04), Chapter 1, Section 70, a hospital must generally file a claim by December 31 of the following year (for services furnished during the first 9 months of a calendar year) and by December 31 of the second following year (for services provided during the last 3 months of the calendar year). Section 6404 of the Affordable Care Act recently changed these deadlines to no more than "1 calendar year from the date of service" effective for services provided on or after January 1, 2010. Therefore, Medicare claims for hospital services furnished in FY 2011 would have to be submitted no later than September 30, 2012.

Generally speaking, providers have a financial incentive to submit fee-for-service claims as close as possible to the date of the patient's discharge, and providers have no incentive to wait until the claims submission deadline. Thus, while conducting a data match with MedPAR files that were updated 6 months after the end of the Federal fiscal year may not capture all of a provider's Medicare inpatient claims, we believe that, in large part, the provider's fee-for-service claims are very likely to be included in that MedPAR file. The same may not be true for the "information only" or "no pay" claims that hospitals are required to submit to their fee-for-service contractor for Medicare Advantage (MA) beneficiaries. Because claims for MA beneficiaries are paid by MA plans and not the fee-for-service contractor, hospitals may not have the same incentive to file these claims as close as possible to the date

of the patient's discharge.[20] However, in accordance with Transmittal 1396 (issued December 14, 2007) and Transmittal 1695 (issued March 6, 2009), which changed the instructions in the Medicare Claims Processing Manual (Pub. 100–04), all IPPS hospitals that do not qualify for IME payments, direct GME payments, or nursing and allied health (N&AH) payments are specifically directed to submit informational-only claims for all MA inpatients to ensure that all data for MA beneficiaries are included in the SSI fraction. Accordingly, we indicated that we also were considering changes to the timing of the data match process to ensure that all of a hospital's MA claims are included in the revised matching process, given the current timing requirements for when hospitals must submit these claims after the time of the patient's discharge.

In addition, in matching eligibility records for Medicare beneficiaries and SSI recipients to calculate the SSI fractions for FY 2011 and future fiscal years, we proposed to use more recent SSI eligibility information from SSA and a more updated version of the MedPAR file that is likely to contain more claims data. We currently use SSI eligibility data and MedPAR claims data that are updated 6 months after the close of the Federal fiscal year. We proposed to use, for FY 2011 and subsequent years, SSI eligibility data files compiled by SSA and MedPAR claims information that are updated 15 months after the close of each Federal fiscal year. This proposal would more closely align the timing of the match process with the timing of our requirements (described above) for the timely submission of claims. For example, under our proposal, to calculate the FY 2011 SSI fractions, we would use the December 2012 update of the FY 2011 MedPAR file (containing claims information for patient discharges between October 1, 2010 and September 30, 2011), and a December 2012 SSI eligibility file (containing FY 2011 SSI eligibility data updated

through December 2012, with a lag time relative to the Federal fiscal year of between 15 and 27 months). We expect that the FY 2011 SSI fractions would be published around March 2013 and would be used to settle cost reports for cost reporting periods that began in FY 2011. In addition, we would continue our practice of using each hospital's latest available SSI fraction in determining IPPS interim payments from the time that the SSI fractions are published until the SSI fractions for the next fiscal year are published.

Under current law as amended by section 6404 of the Affordable Care Act, Medicare inpatient claims for FY 2011 can be submitted no later than 1 calendar year from the date of service or by September 30, 2012, for claims with a September 30, 2011 date of service. Therefore, we believe that using the version of MedPAR that is updated 15 months after the end of the fiscal year would contain more accurate and complete inpatient claims information, as we would be using claims data from 3 months after the filing deadline for claims with a date of service occurring on the last day of the second preceding fiscal year. Furthermore, a later update of the SSI eligibility file would contain more accurate eligibility information and would account for all retroactive changes in SSI eligibility and the lifting of SSI payment suspensions through that date.

We proposed that the FY 2011 SSI fractions would be used to determine the hospitals' Medicare DSH payments for cost reporting periods beginning in FY 2011 (that is, October 1, 2010 through September 30, 2011). The proposed timing of the data match for the SSI fractions, effective for FY 2011, would result in FY 2011 SSI fractions being published around March 2013 and would generally coincide with the final settlement of cost reports for cost reporting periods beginning in FY 2011.

We believe that, by calculating SSI fractions on the basis of SSI eligibility data and MedPAR claims data that are updated 15 months after the end of the Federal fiscal year, we would be using the best data available to us, given the deadlines for the submission and final settlement of Medicare cost reports. Cost reports must be submitted to the Medicare fiscal intermediary or MAC no later than 5 months after the end of the provider's cost reporting period; the fiscal intermediary or MAC must make a determination of cost report acceptability within 30 days of receipt of the provider's cost report (42 CFR 413.24(f)(2)(i) and 413.24(f)(5)(iii)). In accordance with the Medicare Financial Manual (Pub. 100–06), Chapter 8,

---

[20] Teaching hospitals have an incentive to submit these claims as close as possible to the date of the patient's discharge because these claims are used, in part, to compute those hospitals' indirect graduate medical education payments. The claims are also used for a teaching hospital's direct medical education payments. Non-teaching DSH hospitals do not have the same direct incentives to submit these claims as close as possible to the date of the patient's discharge, but to the extent that the MA beneficiary is also SSI eligible, it would be to the hospital's advantage to ensure these claims are included in the match process. However, nonteaching DSH hospitals are required to submit MA claims for all MA beneficiaries, regardless of whether the beneficiaries were eligible for SSI benefits.

**Federal Register** / Vol. 75, No. 157 / Monday, August 16, 2010 / Rules and Regulations    **50283**

Section 90, the fiscal intermediary or MAC is expected to settle each cost report that is not scheduled for audit within 12 months of the contractor's acceptance of the cost report. We believe that our proposed timing of the data match would achieve an appropriate balance between accounting for additional retroactive SSI eligibility determinations and the lifting of SSI payment suspensions using all timely submitted Part A inpatient claims, and facilitating administrative finality through the timely final settlement of Medicare cost reports.

BILLING CODE 4120–01–P

### Example of Timeline to Calculate FY 2011 SSI Fractions under Current Policy

| Cost Reports That Use the FY 2011 SSI Ratios | Deadline for Timely Filing of Claims | MedPAR File Used | SSI Entitlement File | Cost Reports Normally Accepted | Cost Report Final Settlement | SSI Fraction Available |
|---|---|---|---|---|---|---|
| Cost reports beginning October 1, 2010 through September 30, 2011 | September 2012 | March 2012 update of FY 2011 MedPAR | March 2012 update of FY 2011 SSI eligibility | Generally between March 2012 and February 2013 | Generally between March 2013 and February 2014 | Summer 2012 |

### Example of Timeline to Calculate FY 2011 SSI Fractions under Final Rule

| Cost Reports That Use the FY 2011 SSI Ratios | Deadline for Timely Filing of Claims | MedPAR File Used | SSI Entitlement File | Cost Reports Normally Accepted | Cost Report Final Settlement | SSI Fraction Available |
|---|---|---|---|---|---|---|
| Cost reports beginning October 1, 2010 through September 30, 2011 | September 2012 | December 2012 update of FY 2011 MedPAR | December 2012 update of FY 2011 SSI eligibility | Generally between March 2012 and February 2013 | Generally between March 2013 and February 2014 | Spring 2013 |

**Add. 26**

**50284** **Federal Register** / Vol. 75, No. 157 / Monday, August 16, 2010 / Rules and Regulations

BILLING CODE 4120–01–C

*Comment:* Many commenters supported the proposed timing of the data matching process. Some commenters asked that CMS explain how cost report settlement would coincide with the proposed timing. Specifically, commenters asked whether contractors would issue Notices of Program Reimbursement prior to the availability of the SSI fractions. One commenter asked that CMS calculate an additional SSI fraction at the time of cost report audit for cost reports that are audited after the initial SSI fractions are published. One commenter noted that under the proposed timeline for calculating the SSI fractions, some hospitals would have already submitted their cost reports and had desk reviews and audits before the release of the SSI fractions. In particular, some commenters were concerned that hospitals with fiscal years beginning between October 1 and December 1 would have their cost reports settled before the release of the SSI fractions. One commenter cited Medicare Financial Management Manual Publication 100–06, Chapter 8, Section 90 that requires final settlement of cost reports within 12 months of acceptance. Commenters are concerned that the 12-month cost report settlement deadline may occur before the publication of the SSI fractions for certain cost reporting periods. Commenters questioned whether CMS will instruct Medicare contractors to hold the Notice of Program Reimbursement until the SSI fractions are released or will the contractors settle cost reports using the prior year's SSI fraction. In addition, commenters questioned whether contractors would automatically re-open cost reports to use the current year's SSI fractions if they were settled using the prior year's SSI fraction before the publication of the current year's SSI fractions.

*Response:* We appreciate the support for our proposal to change the timing of our match and calculation of the SSI fractions from 6 months after the end of the Federal fiscal year to 15 months after the end of the Federal fiscal year. We believe that our proposal to conduct the SSI eligibility match and calculate the SSI fractions 15 months after the end of the Federal fiscal year will ensure that the SSI fractions are calculated with the best data available to us at that time. We note that the 15-month timeframe proposed is an approximation and subject to the data validation protocols as described previously in this final rule. We believe that the match will be conducted no sooner than 15 months after the end of

the Federal fiscal year and the match process, including all appropriate validation steps as finalized, will be performed as efficiently as possible and in accordance with the production cycles of the required data files.

Hospitals submit their cost reports based on their cost reporting period, which varies by hospital. Thus, it would be administratively unwieldy to conduct the SSI match in "real-time" and calculate an individual hospital's SSI fraction whenever that hospital's cost report needed to be settled. By calculating the SSI fractions 15 months after the end of the Federal fiscal year, we believe that we are striking an appropriate balance between the best data available to us at the time and the agency's operational needs, using the best available data that does not unduly hinder the cost report settlement process. As we discussed in the proposed rule, hospital cost reports are submitted to the Medicare contractor no later than 5 months after the end of the provider's cost reporting period. The Medicare contractor must accept the cost report within 30 days of receipt (in accordance with 42 CFR 413.24(f)(2)(i) and 413.24(f)(5)(iii)), and is expected to settle the cost reports that are not audited within 12 months of acceptance of the cost report (in accordance with Medicare Financial Management Manual 100–06, Chapter 8, Section 90). Generally, hospital cost reports are not final settled without the SSI fraction that corresponds to the fiscal year in which the cost report began. Commenters raised concerns that hospitals with fiscal years beginning October 1, 2010 or December 1, 2010 (thus, ending September 30, 2011 or November 30, 2011) would be settled before the release of the SSI fractions. Those cost reports would be submitted by the end of February 2012 or April 2012; they would be accepted by March 2012 or May 2012 and would need to be final settled no later than March 2013 or May 2013. We believe that under our proposal to calculate the SSI match 15 months after the end of the Federal fiscal year, cost reports will be settled with the appropriate SSI fraction within the timeframe of cost report settlement and that cost reports will be final settled with the SSI fraction of the given year. In the case where a cost report is required to be settled before the SSI fractions are published, CMS may instruct that the contractors settle the cost report with the latest SSI fraction available and may reopen the cost report to issue a revised notice of program reimbursement once the appropriate SSI fraction is available, or we may instruct

the contractors to wait to settle the cost report until the appropriate SSI fractions are published. We will continue to evaluate what would be the best approach in such a scenario.

*Comment:* One commenter stated that the chart in the proposed rule that displayed the timeline for the revised match process indicated that, for FY 2011, the timely filing of claims ends in December 2012 when it should be September 2012. The commenter asked that CMS correct the deadline for the timely filing of claims for FY 2011 to read September 2012.

*Response:* We agree with the commenter. Under section 6404 of the Affordable Care Act, the deadline for timely filing of claims has been revised to be one year after the end of the Federal fiscal year, effective January 1, 2010. Therefore, hospitals will have until September 2012 to file their FY 2011 claims. The chart has been revised in this final rule to reflect this change. Although the deadline for the timely filing of claims is 12 months after the end of the Federal fiscal year, we are finalizing our proposal to conduct the data matching process and calculate SSI fractions approximately 15 months after the end of the Federal fiscal year to ensure we have captured all of the inpatient claims and to capture as many retroactive SSI entitlement determinations as possible.

After consideration of the public comments that we received, we are adopting a policy to conduct the data matching process approximately 15 months after the end of the Federal fiscal year.

### 5. CMS Ruling 1498–R

On April 28, 2010, the CMS Administrator issued a CMS Ruling, CMS–1498–R (Ruling), that addresses three Medicare DSH issues, including CMS' process for matching Medicare and SSI eligibility data and calculating hospitals' SSI fractions. With respect to the data matching process issue, the Ruling requires the Medicare administrative appeals tribunal (that is, the Administrator of CMS, the PRRB, the fiscal intermediary hearing officer, or the CMS reviewing official) to remand each qualifying appeal to the appropriate Medicare contractor. The Ruling also explains how, on remand, CMS and the contractor will recalculate the provider's DSH payment adjustment and make any payment deemed owing. The Ruling further provides that CMS and the Medicare contractors will apply the provisions of the Ruling on the data matching process issue (and two other DSH issues, as applicable), in calculating the DSH payment

**Add. 27**

adjustment for each hospital cost reporting period where the contractor has not yet final settled the provider's Medicare cost report through the issuance of an initial notice of program reimbursement (NPR) (42 CFR 405.1801(a) and 405.1803).

More specifically, the Ruling provides that, for qualifying appeals of the data matching issue and for cost reports not yet final settled by an initial NPR, CMS will apply any new data matching process that is adopted in the forthcoming FY 2011 IPPS final rule for each appeal that is subject to the Ruling. The data matching process provisions of the Ruling would apply to properly pending appeals and open cost reports for cost reporting periods beginning prior to October 1, 2010 (that is, those preceding the effective date of the FY 2011 IPPS final rule).

The Ruling further states that, if a new data matching process is not adopted in the forthcoming FY 2011 IPPS final rule, CMS would apply to claims subject to the Ruling the same data matching process as the agency used to implement the *Baystate* decision by recalculating that provider's SSI fractions. As indicated above, we have adopted the proposed data matching process for FY 2011 and beyond as final. The only modification we are making to the proposed matching process is adopting a policy to exclude a record from the data matching process if we find a HICAN in the MedPAR file that we are not able to locate in the EDB, which is an extremely unlikely situation as noted in the prior discussion in this final rule. We are adopting this additional step in our validation process to respond to public comment and provide even more assurances that our data matching process will yield accurate SSI fractions and capture all Medicare beneficiaries who were entitled to SSI at the time of their inpatient hospital stay. The same data matching process will be used to calculate SSI fractions for cost reporting periods covered under the Ruling.

*Comment:* Several commenters addressed a variety of issues related to the Ruling.

*Response:* We note that Administrator Rulings are not subject to public comment and that we did not seek public comment on CMS Ruling 1498–R. Accordingly, we are not summarizing or providing responses to comments related to the Ruling in this final rule.

6. Clarification of Language on Inclusion of Medicare Advantage Days in the SSI Fraction of the Medicare DSH Calculation

In the FY 2005 IPPS final rule (69 FR 49099), we discussed in the preamble the codification of our policy of including the days associated with Medicare + Choice (now Medicare Advantage (MA)) beneficiaries under Medicare Part C in the SSI fraction of the DSH calculation. In that rule, we indicated that we were revising the regulation text at § 412.106(b)(2)(i) to incorporate this policy. However, we inadvertently did not make a change in the regulation text to conform to the preamble language. We also inadvertently did not propose to change § 412.106(b)(2)(iii) in the FY 2005 final rule, although we intended to do so. Accordingly, in the FY 2007 IPPS final rule (72 FR 47384), we made a technical correction to amend the regulations at § 412.106(b)(2)(i) and § 412.106(b)(2)(iii) to make them consistent with the preamble language of the FY 2005 IPPS final rule and to conform to the policy implemented in that rule. Section 412.106(b)(2)(i) of the regulations discusses the numerator of the SSI fraction of the Medicare disproportionate patient percentage (DPP) calculation, while § 412.106(b)(2)(iii) of the regulations discusses the denominator of the SSI fraction of the Medicare DPP.

In the proposed rule, we indicated that we were aware that there might be some confusion about our policy to include MA days in the SSI fraction, specifically regarding whether we have implied that MA beneficiaries are not actually "entitled to receive benefits under Part A" by using the word "or" in § 412.106(b)(2)(i)(B) and § 412.106 (b)(2)(iii)(B) with respect to MA days. We note that, in the FY 2005 final rule, we stated that we believed that Medicare + Choice (now MA) beneficiaries are patients who are entitled to benefits under Medicare Part A. With respect to the change to the regulatory text that we intended to make in the FY 2005 IPPS final rule, we stated "* * * we are adopting a policy to *include* patient days for M+C beneficiaries in the Medicare fraction" (69 FR 49099) (emphasis added). In order to further clarify our policy that patients days associated with MA beneficiaries are to be included in the SSI fraction because they are still entitled to benefits under Medicare Part A, in the FY 2011 IPPS/LTCH PPS proposed rule (75 FR 24006 and 24007), we proposed to replace the word "or" with the word "including" in

§ 412.106(b)(2)(i)(B) and § 412.106(b)(2)(iii)(B).

*Comment:* We did not receive any public comments on this specific proposal. However, several commenters urged CMS to reconsider its policy to include Medicare Advantage days and days for which a beneficiary exhausted his or her Medicare inpatient hospital benefits in the SSI fraction. The commenters stated that such days did not represent days that individuals were "entitled to benefits under Medicare [P]art A" (because the patient days were not paid for under Medicare Part A) and as such, should not be included in either the numerator or denominator of the SSI fraction. The commenters stated that, to the extent that dually eligible (that is, simultaneously enrolled in Medicare and Medicaid) Medicare Advantage patients or exhausted benefits patients had an inpatient hospital stay, those days should be included in the Medicaid fraction. Additionally, a commenter stated that CMS did not have sufficient processes in place to assure that the agency is properly counting all of the days in the SSI fraction and "is not double counting any of them in both the numerator of the Medicaid fraction and the denominator of the SSI fraction." The commenter asked that CMS address why it ** * * thinks it need not properly capture all of these days in the denominator of the SSI fraction or the precise steps that CMS has or will take to assure that the agency is capturing all of these days in that denominator."

*Response:* We did not propose any changes to the categories of Medicare days that we include in the SSI fractions. Specifically, the proposed rule states that "We did not propose any changes with respect to the final step in determining the SSI fraction. As we stated in the proposed rule, to calculate the numerator of the SSI fraction, CMS will continue to sum a hospital's Medicare inpatient days in the acute care part of the hospital (excluding IPPS-exempt units such as rehabilitation and psychiatric units) where the Medicare beneficiary was simultaneously entitled to SSI benefits. To calculate the denominator, CMS will continue to sum a hospital's total Medicare inpatient days in the acute care part of the hospital."

Accordingly, we are not responding to these comments in detail. However, we disagree that Medicare Advantage days and exhausted benefit days should be excluded from the SSI fraction. We believe that the days of all patients who are entitled to SSI and Medicare Part A should be included in the Medicare fraction. We adopted a policy to include

exhausted benefit and other noncovered days in the SSI fraction, after notice and comment rulemaking, in FY 2005 (69 FR 49099). We adopted a policy to include Medicare health maintenance organization (HMO) days in the September 4, 1990 final IPPS rule (55 FR 35994), and this longstanding policy has continued as Medicare HMOs have evolved, and these patient days have been included with every iteration of Medicare HMOs, including patient days for beneficiaries entitled to Medicare Part A but who elect to obtain their benefits through Medicare Advantage. As discussed above, we codified this policy in our regulations in the FY 2005 IPPS final rule (69 FR 49099).

As we have previously explained, we believe that, in the statutory section which sets forth the Medicare DSH fraction, the phrase "entitled to benefits under [P]art A" refers to individuals who are entitled to Part A benefits under Part A pursuant to section 226, section 226A, section 1818, or section 1818A (42 U.S.C. 426, 42 U.S.C. 426–1, 42 U.S.C. 1395i–2, or 42 U.S.C. 1395i–2(a), respectively). We note that the statute uses mandatory language, unambiguously stating that qualifying individuals "shall be entitled to benefits under [P]art A." Patients who have exhausted their Part A hospital benefits or enrolled in Medicare Advantage still meet the statutory criteria for entitlement to Medicare Part A benefits, even though Medicare Part A does not directly pay for a particular inpatient day.

With respect to exhausted benefit days, we note that a beneficiary's right to have Medicare make a payment is subject to the limitations in Part A. The rule that Medicare will not pay for days after Part A hospital benefits are exhausted is an example of one of those restrictions. Thus, a patient remains entitled to benefits under Part A on days where Medicare does not make a payment because of those limitations, and consistent with section 1886(d)(5)(F)(vi)(I) of the Act, these days should be included in the SSI fraction.

With respect to the days of patients enrolled in Medicare Advantage plans, we believe that the sections of the Social Security Act which create Part C clearly demonstrate that Part C enrollees remain entitled to Medicare Part A benefits, and we do not believe that Congress intended to alter the calculation of the DSH payment adjustment when it enacted Medicare Part C. Moreover, we also believe that the commenters' objections to including the days of patients enrolled in Medicare Advantage would be equally applicable to patients enrolled in

section 1876 risk plans, but section 1876 of the Act repeatedly makes clear that patients enrolled in section 1876 risk plans remain entitled to benefits under Medicare Part A.

Finally, while the commenters suggest that patients who have exhausted their Part A hospital benefits or enrolled in Medicare Advantage should be counted in the Medicaid fraction, we note that not all patients who are entitled to SSI are also eligible for Medicaid. Thus, adopting the commenters' proposal would result in some patients entitled to SSI and Medicare Part A not being counted in the numerator of either of the DSH fractions. We believe that this result would be contrary to Congressional intent. Consequently, we see no reason to revise our policy at this time.

In response to the comment requesting that CMS assure that it is including all exhausted days and Medicare Advantage days in the SSI fraction and asserting that CMS does not have sufficient processes in place to assure accurate counting, we believe that we are properly counting these types of days, to the extent that hospitals comply with Medicare requirements and submit claims for those days. We do not believe it is necessary to go into further detail about our processes for capturing these types of days in this final rule because we did not make any proposal related to that issue.

We are adopting our proposed revision of § 412.106(b)(2)(i)(B) and § 412.106(b)(2)(iii)(B) as final, without modification.

## G. Medicare-Dependent, Small Rural Hospitals (MDHs) (§ 412.108)

### 1. Background

Under the IPPS, separate special payment protections are provided to a Medicare-dependent, small rural hospital (MDH). MDHs are paid based on the higher of the Federal rate for their hospital inpatient services or a blended rate based in part on the Federal rate and in part on the MDH's hospital-specific rate. Section 1886(d)(5)(G)(iv) of the Act defines an MDH as a hospital that is located in a rural area, has not more than 100 beds, is not an SCH, and has a high percentage of Medicare discharges (that is, not less than 60 percent of its inpatient days or discharges either in its 1987 cost reporting year or in two of its most recent three settled Medicare cost reporting years). The regulations at 42 CFR 412.108 set forth the criteria that a hospital must meet to be classified as an MDH.

Although MDHs are paid under an adjusted payment methodology, they are still IPPS hospitals paid under section 1886(d) of the Act. Like all IPPS hospitals paid under section 1886(d) of the Act, MDHs are paid for their discharges based on the DRG weights calculated under section 1886(d)(4) of the Act.

Through and including FY 2006, under section 1886(d)(5)(G) of the Act, MDHs are paid based on the Federal rate or, if higher, the Federal rate plus 50 percent of the amount by which the Federal rate is exceeded by the updated hospital-specific rate based on the hospital's FY 1982 or FY 1987 costs per discharge, whichever of these hospital-specific rates is higher. Section 5003(b) of Public Law 109–171 (DRA 2005) amended section 1886(d)(5)(G) of the Act to provide that, for discharges occurring on or after October 1, 2006, MDHs are paid based on the Federal rate or, if higher, the Federal rate plus 75 percent of the amount by which the Federal rate is exceeded by the updated hospital-specific rate based on FY 1982, FY 1987, or FY 2002 costs per discharge, whichever of these hospital-specific rates is highest.

For each cost reporting period, the fiscal intermediary or MAC determines which of the payment options will yield the highest aggregate payment. Interim payments are automatically made at the highest rate using the best data available at the time the fiscal intermediary or MAC makes the determination. However, it may not be possible for the fiscal intermediary or MAC to determine in advance precisely which of the rates will yield the highest aggregate payment by year's end. In many instances, it is not possible to accurately forecast the outlier payments, the amount of the DSH adjustment or the IME adjustment, all of which are applicable only to payments based on the Federal rate and not to payments based on the hospital-specific rate. The fiscal intermediary or MAC makes a final adjustment at the settlement of the cost report after it determines precisely which of the payment rates would yield the highest aggregate payment to the hospital.

If a hospital disagrees with the fiscal intermediary's or the MAC's determination regarding the final amount of program payment to which it is entitled, it has the right to appeal the determination in accordance with the procedures set forth in 42 CFR part 405, subpart R, which govern provider payment determinations and appeals.