NOT YET SCHEDULED FOR ORAL ARGUMENT
Nos. 20-5350, 20-5351 (consolidated)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**POMONA VALLEY HOSPITAL MEDICAL CENTER,**
*Plaintiff-Appellee/Cross-Appellant,*

v.

**XAVIER BECERRA, Secretary,**
**Department of Health and Human Services,**
*Defendant-Appellant/Cross-Appellee.*

*On Appeal from the United States District Court*
*for the District of Columbia*
*Civil Action No. 1:18-CV-02763-ABJ*

## FINAL REPLY BRIEF FOR APPELLEE/CROSS-APPELLANT

ROBERT L. ROTH
KELLY A. CARROLL
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, N.W., Suite 550
Washington, D.C.  20004-2141
Tel.: (202) 580-7701
Fax: (202) 580-7719
Email:  rroth@health-law.com

SVEN C. COLLINS
HOOPER, LUNDY & BOOKMAN, P.C.
999 19th Street, Suite 3000
Denver, Colorado  80202
Tel.:  (720) 687-2850
E-mail:  scollins@health-law.com

*Attorneys for Appellee/Cross-Appellant*

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF CONTENTS ......................................................................................i

TABLE OF AUTHORITIES ............................................................................ ii

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................1

II.     ARGUMENT ...........................................................................................3

A.     POMONA'S ENTITLEMENT TO RELIEF ON THE MERITS
PROVIDES GROUNDS FOR AN ADVERSE INFERENCE. ......................4

         1.     Pomona's Unrebutted Record Evidence Shows CMS's
SSI Fractions Were Likely Substantially Understated. ..............5

         2.     The Secretary's Arguments that the Burden of Production
Never Shifted to CMS Lack Merit ...........................................10

         3.     The Secretary's Argument that CMS's SSI Fractions
Were Entitled to Deference Fails As a Matter of Law and
Is Also Beside the Point. .........................................................17

B.     ORDERING AN ADVERSE INFERENCE INSTRUCTION ON
REMAND IS CONSISTENT WITH THE LAW OF THIS CIRCUIT. .......18

III.     CONCLUSION .........................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES[1]

*Atlanta College of Med. and Dental Careers, Inc. v. Riley*,
  987 F.2d 821 (D.C. Cir. 1993) ...................................................................................15, 20, 21

*Baystate Medical Center v. Leavitt*,
  545 F. Supp. 2d 20, amended by 587 F. Supp. 2d 37 (D.D.C. 2008) ......................................15

*Harbor Ins. Co. v. Schnabel Found. Co.*,
  946 F.2d 930 (D.C. Cir.1991) ...................................................................................................1

*Int'l Union v. NLRB*,
  459 F.2d 1329 (D.C. Cir. 1972) ..........................................................................................3, 19

*Palisades Gen'l Hosp. Inc. v. Leavitt*,
  426 F.3d 400 (D.C. Cir. 2005) ...........................................................................................20, 21

*Tenet HealthSystems HealthCorp. v. Thompson*,
  254 F.3d 238 (D.C. Cir. 2001) ................................................................................................15

*Texas Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981) .................................................................................................................21

STATUTES

42 U.S.C. §1395oo(f)(2) ...............................................................................................................22

Medicare Modernization Act, Pub. L. § 951 (2003)...............................................................16, 17

REGULATIONS

42 C.F.R. §405.1843(b)(1)..............................................................................................................14

42 C.F.R. §405.1875 .......................................................................................................................14

OTHER AUTHORITIES

CMS Ruling 1498-R (April 28, 2010) ......................................................................................11, 16

---

[1] Authorities upon which we chiefly rely are marked with an asterisk (*).

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | | |
|---|---|---|
| APA | -- | Administrative Procedure Act |
| AR | -- | Administrative Record filed in the District Court |
| Board | -- | Provider Reimbursement Review Board |
| CMS | -- | Centers for Medicare & Medicaid Services |
| FY | -- | Pomona Valley Hospital Medical Center's Fiscal Year |
| JA | -- | Joint Appendix to be filed by May 10, 2022 |
| Medi-Cal | -- | California Department of Health Care Services' Medicaid program |
| MedPAR | -- | Medicare Provider Analysis and Review |
| Secretary | -- | Secretary of Health and Human Services |
| SSA | -- | Social Security Administration |
| SSI | -- | Supplemental security income |

Plaintiff-Appellee/Cross-Appellant Pomona Valley Hospital Medical Center ("Pomona"), for its reply to the response of Defendant-Appellant/Cross-Appellee, Secretary of Health and Human Services ("the Secretary"), states as follows.

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT

For more than 30 years, this Circuit has used the "chutzpah" doctrine to chastise a very specific type of litigant indiscretion – arguing that the harmful consequences of a party's own actions should protect that party from punishment for the harm caused by the actions.[1]  It is hard to imagine a more fitting regulatory example than the Secretary's argument here:  The Secretary first refuses to provide or proffer SSI entitlement data for Pomona's patients (which is available to the Secretary but not Pomona) and then argues that Pomona failed to show with sufficient precision that the Secretary's determination of SSI entitlement of Pomona's patients was incorrect, which the Secretary knows Pomona could not do without the Secretary's SSI entitlement data.

With the Secretary's SSI entitlement data, Pomona would know precisely based on a few simple computer matches with its own patient data the extent to which the Secretary's SSI calculations were understated.  Deprived of this data,

---

[1] *See, e.g.*, *Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 n. 5 (D.C. Cir.1991) ("It reminds us of the legal definition of chutzpah: chutzpah is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan.").

Pomona's only recourse was to (1) obtain from Medi-Cal as much of the SSI entitlement data as the Federal government makes available to States and (2) painstakingly match that data against Pomona's own patient data.

During the administrative appeals process, Pomona presented the results of its match along with testimony from former program directors at Medi-Cal and CMS, with a combined more than 50 years of government experience, to show that the Secretary's SSI entitlement calculations were significantly lower than the calculations that Pomona made using the data available from Medi-Cal and its own patients. Before the Board, the Secretary's contractor presented no evidence or testimony to rebut Pomona's evidence or the calculations that flow directly from the data available to Pomona.

After extensive briefing in the lower court, and here, we now know that the Secretary does not take issue with the premise that Pomona's matching methodology was based on State data that itself was derived from SSI entitlement data furnished directly from the SSA. Nor does the Secretary challenge the truth or accuracy of Pomona's witness testimony. Rather, the Secretary criticizes Pomona's results as not precise enough – despite the unrefuted record evidence that Pomona could not be more precise unless it had the Secretary's SSI entitlement data. The Secretary argues that Pomona's lack of precision shows that (1) the Secretary's decision upholding the SSI entitlement data was supported by substantial evidence and (2)

the lower court improperly held that Pomona's evidence shifted to the Secretary the burden to proffer evidence showing that the agency's SSI entitlement data was correct.

The Secretary's strategy of quibbling about Pomona's precision is particularly inappropriate because the Secretary has (or has access to) the data to show precisely that Pomona is wrong, and that the agency's SSI entitlement data is correct, if that is in fact the case. The Secretary's failure to include in the record any proof that the agency is right (or that Pomona is wrong) requires this Court, under the Circuit's long-standing "common sense" adverse inference rule, to conclude that Pomona is right. *See Int'l Union v. NLRB*, 459 F.2d 1329, 1336-37 (D.C. Cir. 1972) (listing cases applying "common sense" adverse inference rule). Consistent with such a holding, Pomona is entitled to an adverse inference on remand.

## II.    ARGUMENT

The Secretary opposes the application of an adverse inference on remand, arguing (at 38)[2] that Pomona allegedly is not entitled to any relief on the merits and, (at 39-40) even if Pomona were entitled to relief on the merits, Circuit precedent requires remand without an adverse inference. The Secretary's arguments lack merit legally and factually and should be rejected.

---

[2]  All references herein to the Secretary's brief are to the response/reply brief.

3

## A. POMONA'S ENTITLEMENT TO RELIEF ON THE MERITS PROVIDES GROUNDS FOR AN ADVERSE INFERENCE.

As an initial matter, the Secretary argues (at 38) that an adverse inference on remand is not warranted because Pomona allegedly is not entitled to any relief on the merits. This argument fails because the Secretary ignores certain parts of the unrebutted record evidence and distorts others. Specifically, the Secretary fails to rebut Pomona's showing that (1) CMS's SSI fractions likely significantly understated Pomona's SSI entitled days by 20% to 25% for the three years at issue and (2) Pomona could not define fully the precise extent and cause of the errors in CMS's fractions without access to the SSI data that the Secretary has (or has access to), but refuses to provide, and with which data the Secretary could show definitively that either CMS's SSI fractions were correct or Pomona's calculations were incorrect.

Therefore, contrary to the Secretary's protestations, the burden is properly shifted to the Secretary to show that CMS's SSI fractions were correct and/or Pomona's data is incorrect. CMS's fractions should be found to be presumptively incorrect (and Pomona's data presumptively correct) because the Secretary did not meet that burden despite having the evidence to show definitively that CMS's SSI fractions actually are correct (and Pomona's data is incorrect).

1.     **Pomona's Unrebutted Record Evidence Shows CMS's SSI Fractions Were Likely Substantially Understated.**

The Secretary (at 22 and 23) asserts that Pomona's evidence "failed to … cast doubt on the validity of the CMS fractions," because "none of the evidence … suggests that the Medi-Cal codes provide a reliable means of identifying Medicare beneficiaries who were actually entitled to ... receive payment of federal SSI benefits for the month(s) or days they received inpatient services."  This argument fails because the Secretary ignores Pomona's unrebutted evidence showing that the three Medi-Cal aid codes at issue denote entitlement to SSI and/or State supplemental payments and that, even after accounting for potential over-inclusiveness identified by the Board, CMS's SSI fractions likely significantly understated Pomona's count of SSI entitled days by between 20% and 25% for the three years at issue.

First, Pomona's unrebutted evidence showed that Pomona relied on the three specific Medi-Cal aid codes that closely correlate with SSI entitlement.  The Board admitted, without objection, the testimony of the former Medi-Cal Program Director (Mr. Stan Rosenstein), which was corroborated by the former CMS director responsible for the Disproportionate-Share payment policy (Mr. Tzvi Hefter), that the three Medi-Cal aid codes (10, 20, and 60) reliably designate patients who are entitled to SSI benefits and/or State supplemental payments at a particular time.  *See* Pomona Br. 21-23.  The Secretary's agent failed to rebut this evidence at the Board hearing, and the Secretary's conclusory *post hoc* suggestion (at 23 n.4) that this

5

testimony was somehow beyond the experience or knowledge of the former program directors should be rejected as improper and lacking a basis in fact or law.[3]

The Board also admitted into evidence Pomona's detailed, exacting calculations identifying inpatient days for its Medicare patients whose records also showed one of the three specific Medi-Cal aid codes denoting entitlement to SSI benefits and/or State supplemental payments during their inpatient stay. These calculations, which were introduced and explained through the testimony of Pomona's Director of Reimbursement and Analytics (Ms. Candice Le-Tran), demonstrated that approximately 96% of the patients for which CMS determined a Medicare inpatient was entitled to SSI benefits matched one of the three specific Medi-Cal aid codes (10, 20, or 60).

Specifically, as cited in Pomona's initial brief, Pomona introduced a table for its FY 2006 calculations that matched the available CMS data with Pomona's own

---

[3] Mr. Rosenstein had first-hand knowledge of Medi-Cal eligibility and the aid codes relevant to this case. *See* Tr. at 270-281 (JA179-182). Further, the areas in which the Board recognized Mr. Rosenstein as an expert witness—the Medi-Cal program generally and Medi-Cal eligibility, *see id.* at 294:20-25 (JA185)—easily encompassed his testimony that the three identified Medi-Cal aid codes denoted SSI entitlement. *See* Tr. at 308-309 (JA188-189) (noting that aid codes are used to "tell various entities; the state, Federal Government, providers, what is the source of [Medi-Cal] eligibility…you can look at an aid code you know … how this person became eligible, source of eligibility, what source of benefits they get, and how much money the state can claim from the Federal Government."); *see also* Expert Report by S. Rosenstein, Ex. P-34 (JA262-265) (describing the use of aid codes to meet State and Federal requirements for State tracking and reporting on various eligibility groups).

patient data and shows that (1) CMS had identified SSI-entitled days for a total of 748 patients whose records also include a Medi-Cal aid code and (2) for 716 of these 748 patients (95.7%) the Medi-Cal aid code is 10, 20, or 60. *See* Tr. 76:17-82:19 (JA130-132); and Ex. P-27 (JA235-238).[4] This nearly 96% matching rate, which was above 97% for FYs 2007 and 2008, *see* Tr. 83:20-84:20 (JA132); JA239 (table for FY 2007) and 01404, JA242 (table for FY 2008), demonstrates that Medi-Cal aid codes 10, 20, and 60 are reliable indicators of SSI entitlement.[5] The Secretary's agent did not contest before the Board this overwhelming correlation between these three Medi-Cal codes and CMS's SSI entitlement determinations, and the Board did not make any findings to the contrary.

---

[4] Ms. Le-Tran also explained that Pomona excluded consideration of several other Medi-Cal aid codes that only occasionally corresponded with CMS's identified SSI-entitled days, even though excluding them may have eliminated a number of Pomona's legitimately qualifying SSI-entitled patient days. *See* Tr. at 68:12-16, (JA128); 81-82 (JA132). The Secretary (at 22 n.3) tries to spin this effort to be precise into Pomona's endorsement of CMS's calculations. However, this misstates the record because Pomona disregarded those other aid codes when identifying *additional* SSI-entitled days, and merely used CMS's existing calculations of SSI-entitled days for its baseline for total SSI days.

[5] Although Pomona was able to match 96-97% of the patients found by CMS as having SSI days to the three Medi-Cal aid codes, Pomona identified with the same aid codes additional SSI days for many of them and additional patients for whom CMS found no SSI days. *See* Pomona Br. 25 (table showing that Pomona identified 381 more patients and 966 more inpatient days with SSI entitlement than CMS had found for FY 2006). It is these additional inpatient days that Pomona identified with aid codes 10, 20, or 60 that show CMS understated Pomona's SSI counts by 20% to 25% for the three years at issue. *Id.*

Second, Pomona refined its SSI entitlement calculations to address potential differences between CMS's SSI-determinations and what is included within Medi-Cal aid codes 10, 20, and 60. The Secretary correctly notes (at 17-20) that the Medi-Cal aid codes potentially could include some "false positives" *i.e.*, where the Medi-Cal aid codes are used for patients who do not qualify as SSI-entitled for Medicare Disproportionate-Share payment purposes. These were fully addressed before the Board by Pomona.

As discussed in Pomona's initial brief (at 47-49), the Board identified three specific situations where false positives potentially could occur: (1) where a patient was entitled only to State supplemental payments; (2) where a patient was admitted as a hospital inpatient more than three months after going into a nursing home; and (3) where a patient first applied for SSI benefits in the same month as being admitted to Pomona. Critically, even after Pomona accounted for each of these three potential situations, its counts of SSI-entitled patient days still exceeded CMS's counts by large amounts. *See* Pomona Br. 49-50, 52 & n.11.

The Secretary (at 19-20) does not dispute that Pomona's proof before the Board satisfactorily accounted for the three types of potential "false positives." Indeed, the Board acknowledged that Pomona had corrected its calculations for the first issue by "eliminat[ing] these [State supplemental payment] only days." Board

Decision 7 (JA44). Thus, the Secretary's assertion (at 18) that Pomona's calculations were unreliable for this reason fails for lack of a factual predicate.

Further, the unrebutted evidence showed that the nursing home and first-month issues were immaterial. Specifically, Mr. Rosenstein testified that these latter two scenarios (involving patients who potentially either (1) were admitted from nursing homes, after their SSI benefits had already stopped, or (2) first applied for SSI benefits in the same month as they were admitted to Pomona) were quite rare and could not account for the substantial gap between CMS's SSI fractions and Pomona's calculations (as discussed, the gap ranged from 20% to 25% for the three years under appeal). *See* Pomona Br. 24-25, 28-32, 50; *see also* Decl. of C. Le-Tran, ¶3 (JA60); Exhibits P-40 – 42 (JA64-69).[6] The Board did not criticize Pomona's methods for addressing these potential false positives (although, as discussed below, the Board unreasonably demanded more precision from Pomona even though only CMS had access to the data necessary for such precision).

Thus, Pomona meticulously established a *prima facie* case, solidly grounded on the evidence to which it had access, demonstrating that CMS's SSI fractions were likely materially understated. This *prima facie* case, coupled with the fact that only

---

[6] Mr. Rosenstein's testimony, to which there was no objection or rebuttal, was based both on his many decades of experience and expertise with Medi-Cal, including as the Director of the entire program, and on studies, data, and other documents concerning the potential nursing home or first-month-eligibility issues. *See* Pomona Br. 26-32.

the Secretary possessed (or had access to) the data to further refine or refute Pomona's SSI calculations or to show CMS's fractions were correct, appropriately triggered shifting the burden to the Secretary to show that CMS's SSI fractions were correct (or Pomona's data is incorrect).[7]

### 2. The Secretary's Arguments that the Burden of Production Never Shifted to CMS Lack Merit.

Despite the foregoing, the Secretary argues that the burden of production never shifted to CMS because (1) the Board found that Pomona allegedly could have precisely quantified potential false positives resulting from the use of the Medi-Cal aid codes 10, 20, and 60, and (2) the Secretary was not statutorily required to produce anything more than the limited MedPAR data file, which both parties agree lacked any of the underlying SSI data. These arguments should be rejected not only because they contradict the record and Circuit precedent, but because they beggar common sense.

a.    The Secretary argues (at 20) that, even though Pomona had addressed the three potential false positives before the Board, the Board could completely reject Pomona's proof of error because Pomona "provided no basis to conclude that its methodology would otherwise limit the Medicare fraction to" proper SSI-entitled

---

[7] The Secretary correctly notes (at 14) that Pomona was unable to identify the cause of CMS's errors. Again, however, only CMS had access to the data that could illuminate what caused the errors.

10

patients.  The Secretary asserts (at 20) that the "Board emphasized … that there are other situations" where a patient might not be SSI-entitled in a given month, as "specifically discussed by the Secretary in the 2010 Final Rule."

However, the pages of the Board's decision and the hearing transcript that Secretary cites in support of this argument ("R18 at 8, 13-14, JA208-212") focus on the nursing home and first-month issues that have been addressed extensively in this litigation.  Outside of these (and the State supplemental payment issue discussed above), neither the MAC nor the Board identified any material potential over-inclusiveness issues with Medi-Cal Codes 10, 20, and 60 that Pomona both had the data to address and did not address.[8]

More specifically, as explained in Pomona's initial brief (at 50-51), the Board identified only the following three specific pieces of information as allegedly lacking from the record:  (1) an estimate of how many of Pomona's patients came from nursing homes (and thus potentially lost their SSI benefits at some point during their inpatient stay at Pomona), (2) an estimate of how many of the Medi-Cal code entitlement days were associated with patients who applied for Medi-Cal benefits in

---

[8] The Secretary argues (at 20 n.2) that Pomona did not establish that the timing of Medi-Cal entitlement data is identical to the timing of the SSI entitlement data that CMS uses.  This alleged potential difference does not appear in the Board's decision; it is thus *post hoc* and may not be considered.  Further, the Secretary's timing argument also is factually irrelevant because, according to CMS Ruling 1498-R (April 28, 2010), CMS purportedly calculated Pomona's 2006-2008 SSI fractions in 2012, well after the ordinary 15-month timing window outlined in the 2010 Rule.

the same month they were admitted, and (3) a diagram or "crosswalk" mapping the three Medi-Cal aid codes to the SSI entitlement codes. The Secretary (at 24-26) asserts that there was no way the Board could know the "significance" of any potential false positives in Pomona's SSI calculations without this information.

However, as shown in Pomona's initial brief (at 47-51), the undisputed record evidence that Pomona meticulously assembled already established that CMS's SSI calculations were likely significantly understated. Thus, the information the Board requested was immaterial to its determination of the fact of error. Indeed, the record evidence shows that Pomona lacked access to the information the Board requested and thus could not provide the precise quantification that the Board demanded. *See* Pomona Br. 50-51 & n.10; *see also* n.9 below.

Moreover, the Secretary is incorrect to suggest that Pomona ignored the Board's request for a diagram comparing the Medi-Cal aid codes to the Federal SSI codes. Instead, the unrebutted record evidence is that Pomona went to great lengths to create a "flow diagram," which the Board explicitly requested, showing how data was transmitted to Medi-Cal from SSA, using information from the State. *See* Tr. 411-412 (JA214) (requesting that Mr. Rosenstein, post-hearing, "present a … flow diagram" of "[w]ho's connected to who and what information is going back-and-forth.").

12

Pomona filed with the Board this detailed diagram and all the information it was able to obtain on how SSA codes might translate to Medi-Cal codes.  *See* Decl. of S. Rosenstein ¶3 (JA53); Decl. of C. Le-Tran ¶9 (JA63); Exhibits P-47, P-48, and P-55 (JA84-88 and JA119-120).  However, Pomona could get no further and produce a true "crosswalk" between the three Medi-Cal codes and the SSI codes without the SSI entitlement information from CMS and/or SSA.  *See* Pomona Br. 50-51 & n.10; *see also* Tr. 397:13 – 406:2 (JA211-213).

The Secretary (at 26-27) parrots the Board in speculating that Pomona could have created a "'crosswalk without additional data by obtaining the definitions of the various codes, and if necessary confirming the information with the appropriate authorities.'" (quoting R18 at 14, JA46).  However, this vague suggestion is unsupported by, and actually contrary to, the unrebutted record evidence.[9]

---

[9]  Specifically, Mr. Rosenstein testified that the California Department of Healthcare Services "couldn't legally [help analyze data received from the SSA].... Only the CMS and [SSA] can do this analysis, I'm afraid."  Tr. 358:20-361:24 (JA201-202).  Mr. Rosenstein also confirmed that "the hospital doesn't have access to the [SSA] file.  The Department of Healthcare Services can't legally share it with us."  Tr. 377:14-381:15 (JA206-207; *see also* 385:22-386:5 (JA208) ("I am sorry I don't have that data.").  When the Board asked Mr. Rosenstein if Pomona could "look[] at the information SSA is giving you and see[] if they give you codes E1 or E2 [which denote nursing-home or first-month patients], because then you could … pull them out of the data …," he confirmed that the State agency "cannot share it with the hospital," due to legal restrictions, 397:12-398:6 (JA211), and that "it has to come from … CMS," *id.* 398:12-399:7 (JA211); *see also id.* 399:24-406:2 (JA211-213) (stating, "we can't access" what is being sent over from SSA and how it is being translated).

13

Moreover, Pomona had already provided all information that it could obtain regarding the data mapping that was available from the State "authorities" and lacked access to any similar data from CMS or SSA.[10]

More importantly, however, it was unreasonable for the Board to ask Pomona to produce information that was not available to Pomona, when the Board knew that the requested information was readily available to the Secretary's agent but did not ask the agent or CMS to produce the information, even though such a request is explicitly permitted under the Board's regulations.[11]    Notably, neither the Secretary's agent, nor CMS itself, proffered a crosswalk showing that the CMS SSI fractions were right and/or Pomona's were wrong.  Instead, the Secretary steadfastly refuses to provide Pomona any of the necessary SSI entitlement data and then has the "chutzpah" to complain that Pomona's proof is not precise enough.

---

[10] *See* Decl. of C. Le-Tran ¶9 (JA63) (explaining that "a formal table or 'crosswalk' is not available" and that the State provided "a translation instruction" that "was used as a basis for [the] process flow charts in Exhibits P-47 and P-48.").

[11] Because the Secretary's agent and CMS had access to the relevant data, the Secretary's argument (at 28) rings hollow that "the Board had no way of knowing the extent to which Pomona's Medi-Cal codes correlate with" the SSI entitlement codes.  The Board could have called as witnesses representatives of the Secretary or CMS, subject to the approval of CMS or the Secretary.  42 C.F.R. §405.1843(b)(1).  Further, the Secretary's agent could have sought documents from CMS or the Secretary, subject to approval of CMS or the Secretary; and CMS and/or the Secretary could have weighed in by filing an *amicus curie* brief at the Board.  *Id.* §405.1843(b)(2) & (d).  Finally, the CMS Administrator could have reviewed the Board's decision and added any helpful data.  42 C.F.R. §405.1875.

b.    Because CMS had superior, indeed exclusive, access to the data necessary to show the cause and precise extent of the SSI errors that Pomona had demonstrated, the burden properly shifted to CMS to "show its cards" or risk a finding that Pomona's data was correct and that CMS's SSI fractions were unsupported by substantial evidence. *Atlanta College of Med. and Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830-31 (D.C. Cir. 1993) ("*Atlanta College*").   The Board's refusal to shift the burden to CMS was incorrect under Circuit precedent.[12] In resisting this conclusion, the Secretary rehashes two points from his opening brief, both of which Pomona refuted in its initial brief but will briefly address again here.

First, the Secretary asserts (at 32) that "the 2010 Final Rule itself" rebutted Pomona's evidence.   The Secretary states that the 2010 Rule set up a reasonable process to generate thousands of fractions nationwide, and declares that "hospitals do not have a right to" any additional information or testing outside "the matching process" to challenge its application.

---

[12] The Secretary (at 31 n.5) clings to the assertion that this case is governed by *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 242-46 (D.C. Cir. 2001), because that case involved the substantial evidence standard.  However, nothing in *Atlanta College* suggests that the burden-shifting rule it announced is inapplicable in substantial evidence cases.   Instead, *Atlanta College* holds that the burden of production shifts to the agency where it has greater access to the information and the regulated party has produced sufficient evidence demonstrating error.  987 F.2d 831. And, of course, *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008), applied this same burden-shifting concept in a substantial evidence appeal involving SSI fractions and similar issues of the Secretary's exclusive access to the relevant SSI entitlement data.

This assertion is refuted, however, by the agency's own ruling:  CMS Ruling 1498-R expressly acknowledges that CMS's SSI fraction determinations "will be subject to administrative and judicial review in accordance with the applicable jurisdictional and procedural requirements of section 1878 of the Act, the Medicare regulations, and other agency rules and guidelines."  *See* Ruling 1498-R at 31.  The Secretary concedes (at 11) that his SSI calculations are not infallible, and the underlying SSI data, to which only SSA and CMS had access, hold the key to determining the extent of the errors that Pomona's evidence demonstrated.

Second, the Secretary clings to his argument (at 34) that burden shifting does not apply because CMS had already provided Pomona with the "relevant data" by producing "the MedPAR data file … under Section 951 of the Medicare Modernization Act of 2003," and baselessly asserts (at 35) that Congress intended that the limited MedPAR data file suffice in all instances.  Again, these arguments should be rejected as *post-hoc*, but more fundamentally because the limited MedPAR data file provided to hospitals does not contain the underlying SSI entitlement data or the specific SSA codes assigned to each patient, to which Pomona had no access.  *See* Pomona Br. at 55.  Thus, the limited MedPAR data file cannot be used to validate the accuracy of CMS's SSI fractions without the actual SSI data.

Further, the Secretary does not explain how his position can be reconciled with CMS's statement in the rulemaking implementing Section 951 that a hospital

16

that believes CMS's count of SSI-entitled days is erroneous "has the right to appeal the … decision in accordance with … the regulations … [for] … provider payment determinations and appeals." *Id.* at 47,441. Pomona's initial brief (at 55) pointed this out and the Secretary has no response. Thus, the fact that CMS provided limited MedPAR data does not save the Secretary from the burden-shifting rule.[13]

### 3.    The Secretary's Argument that CMS's SSI Fractions Were Entitled to Deference Fails As a Matter of Law and Is Also Beside the Point.

The Secretary (at 9) makes the reasonable point that courts should defer to the methodology in the 2010 Rule because Congress gave the Secretary discretion to adopt this methodology. The Secretary also correctly notes Pomona did not appeal the 2010 Rule itself. But the Secretary overreaches by arguing that deference to the

---

[13] The Secretary's final objections to producing SSI data are makeweight. First, the Secretary asserts (at 35) that shifting the burden would require the Secretary to provide "individual records pertaining to millions of SSI recipients nationwide." In fact, however, the Secretary would have to review only the specific SSI records for the several hundred patients Pomona had identified for each of the three years at issue as also having SSI benefits based on the three Medi-Cal aid codes. Simpler still, the agency could have undertaken Pomona's suggestion to review only a sample 30-50 of Pomona's own patient records. Further, based on the consent of its patients, Pomona already has access to whatever "sensitive" HIPAA related patient identifying information is contained in those files. Second, the Secretary contends (at 35 n.6) that CMS "does not have the underlying [SSI] data for Pomona's patients;" it has "monthly indicators" of SSI entitlement rather than the actual entitlement codes themselves. This statement proves that CMS both has precisely the data that could explain the discrepancies between Pomona's SSI calculations and CMS's SSI calculations and, as necessary, could obtain from SSA further data underlying these "monthly indicators." CMS does not describe any reason why this information could not be provided.

methodology set forth in the 2010 Rule encompasses all outcomes resulting from the use of that methodology.  This position lacks merit because the Secretary concedes (at 11 and 29) that the process in the 2010 Rule is not infallible and that hospitals are entitled to challenge their SSI fractions.

Here, despite being deprived of the underlying SSI entitlement data, Pomona made a Herculean effort using the State-compiled, SSA-derived data available to it to show that CMS's SSI calculations were likely substantially understated.  At that point, deference to the process in the 2010 Rule became beside the point.  Instead, at that point, CMS was obligated to proffer evidence rebutting Pomona's substantial proof.  The district court correctly ruled that CMS's failure to proffer any rebuttal evidence meant that the Board has no factual basis on which it could reasonably conclude that CMS's SSI fractions actually were supported by substantial evidence.  Op. 22, JA305.

## B.  ORDERING AN ADVERSE INFERENCE INSTRUCTION ON REMAND IS CONSISTENT WITH THE LAW OF THIS CIRCUIT.

Pomona demonstrated (at 60-62 in its initial brief and above) that it is entitled to an adverse inference on remand because (1) after Pomona made its *prima facie* case before the Board, the burden shifted to the Secretary's agent to produce evidence and/or testimony to counter Pomona's evidence that CMS's SSI fraction calculations were likely substantially understated, and (2) the Secretary's agent did not provide any evidence or testimony.  It is undisputed that CMS had (or had access

18

to) the evidence necessary to prove that the CMS SSI fractions were correct (and/or Pomona's data was incorrect), but that the Secretary's agent made no effort to produce the evidence or explain why it could not do so, in whole or in part, even though it should have been a relatively simple task given that Pomona had meticulously identified in minute detail the specific additional patients and/or SSI-entitled days at issue. *See* Tr. 114:13 – 115:11 (JA140) (Testimony of C. Le-Tran estimating that a review of the proposed 30-50 sample claims might take several hours).

Because the agency presented no evidence before the Board to support the accuracy of CMS's SSI fractions, or to show why such a presentation was not made, the "only rational inference" from the agency's "unexplained nonproduction" is that the unproduced determinative data would have supported Pomona's claims. *Int'l Union v. NLRB*, 459 F.2d 1329, 1347 (D.C. Cir. 1972).

The Secretary (at 38-39) argues that there can be no adverse inference because courts are allegedly powerless to instruct the Secretary with respect to the actions the agency takes on remand. This notion that courts must give agencies a blank-slate mandate on remand after setting aside erroneous agency action is contrary to precedent. Instead, it is well established that courts are empowered to instruct the agency on the correct legal standards to apply on remand, and they routinely do so.

This common-sense point is established by the case on which the Secretary primarily relies, *Palisades Gen'l Hosp. Inc. v. Leavitt*, 426 F.3d 400 (D.C. Cir. 2005). *Palisades* holds that a court may remand a "case … to the agency for further action <u>consistent with the correct legal standards</u>." 426 F.2d at 403 (emphasis added). Directing an adverse evidentiary inference, in accordance with the *Atlanta College* and *International Union* cases, is nothing more than an instruction as to the correct legal standards governing the Secretary's actions on remand.

Importantly, imposing an adverse-inference instruction would not require the Court to step outside its traditional role as an appellate tribunal reviewing an agency final determination. *See Palisades* at 403 (stating that the district court reviewing a final agency action sits as an appellate tribunal). Pomona appealed the Board's refusal to apply an adverse inference and asks this Court to determine that the Board's failure to apply an adverse inference was contrary to law.

Moreover, Pomona is not asking the Court to "order specific relief" or to "grant it full relief," as *Palisades* held would be improper. *Id.* Instead, for purposes of remand, the adverse inference instruction would bar CMS from further litigating the point that its SSI fractions were in error, under the legal principles established

by *Atlanta College* and *International Union*.[14]  However, CMS could still determine, based on the SSI entitlement evidence, the extent of the errors and the additional Disproportionate Share payments that Pomona is due.

In the end, an adverse inference is appropriate to prevent the right to judicial review here from becoming a nullity.  Circuit precedent obligated the agency to introduce evidence in defense of CMS's SSI fractions, but it did not introduce any such evidence.  The hearing is over, and CMS should not be permitted to start from scratch on remand.

## III.   CONCLUSION

For the foregoing reasons, and those set forth in Pomona's initial brief, this Court should affirm in part and reverse in part the district court's judgment, set aside the Board's decision, apply an adverse inference, and order the Secretary to recalculate Pomona's SSI fractions for the cost-reporting years at issue to include all improperly omitted SSI days, recalculate the resulting increased inpatient hospital

---

[14] Pomona (at 62) also cited *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), for the unremarkable principle that a litigant with the burden of production on an issue that does not proffer evidence loses on that issue. The Secretary (at 40) tries to distinguish *Burdine* because "it did not involve a remand to a federal agency …."  But, under the facts presented here, the Board's hearing is analogous to a court case and the review by the Federal courts under the APA is more in the nature of an "appellate" proceeding.  *See Palisades*, at 403.  Moreover, the Secretary does not explain why CMS should be permitted to relitigate an issue where it could have presented evidence but failed to do so.

payments, and pay Pomona the additional amounts due, with interest calculated under 42 U.S.C. §1395oo(f)(2).

Dated:  May 20, 2022

Respectfully submitted,

HOOPER, LUNDY & BOOKMAN, P.C.

By:  _____ /s/Robert L. Roth _____
Robert L. Roth (DC Bar No. 441803)
Kelly A. Carroll (DC Bar No. 1018485)
401 9th Street, NW, Suite 550
Washington, DC  20004
Tel.:  (202) 580-7700
Fax:  (202) 580-7719
E-mail:  rroth@health-law.com

Sven C. Collins
999 19th Street, Suite 3000
Denver, Colorado  80202
Tel.:  (720) 687-2850
E-mail:  scollins@health-law.com

*Attorneys for Appellee/Cross-Appellant*

22

<u>**CERTIFICATE OF COMPLIANCE**</u>

The undersigned certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(C) because this brief contains 5521 words, as determined by the word-count function of Microsoft Office 365 ProPlus, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 ProPlus in 14-point Times New Roman font.

Dated:  May 20, 2022          /s/ Robert L. Roth
                              Robert L. Roth
                              Attorney for Appellee/Cross-Appellant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 20th day of May, 2022, I electronically filed the Final Reply Brief for Appellee/Cross-Appellant with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/CF users and that service will be accomplished by the appellate CM/ECF system.

_____/s/ Robert L. Roth_____
Robert L. Roth
